1  LATHAM & WATKINS LLP
       Jessica Stebbins Bina (Bar No. 248485)
2      *jessica.stebbinsbina@lw.com*
   10250 Constellation Blvd. Suite 1100
3  Los Angeles, CA 90067
   Telephone: +1 424.653.5500
4  Facsimile: +1 424.653.5501

5  Attorneys for Petitioners Sable Offshore
   Corp., Pacific Pipeline Company, and Pacific
6  Offshore Pipeline Company

7  O'MELVENY & MYERS LLP
       Dawn Sestito (Bar No. 214011)
8      *dsestito@omm.com*
       Lauren Kaplan (Bar No. 294703)
9      *lkaplan@omm.com*
   400 South Hope Street, 19th Floor
10 Los Angeles, California 90071
   Telephone: +1 213.430.6000
11 Facsimile: +1 213.430.6407

12 Attorneys for Petitioners and Plaintiffs Exxon
   Mobil Corporation, Mobil Pacific Pipeline
13 Company, and ExxonMobil Pipeline
   Company

14

15              **UNITED STATES DISTRICT COURT**

16              **CENTRAL DISTRICT OF CALIFORNIA**

17

18 SABLE OFFSHORE CORP.;                | CASE NO.
   PACIFIC PIPELINE COMPANY;
19 PACIFIC OFFSHORE PIPELINE            | **VERIFIED PETITION FOR WRIT OF**
   COMPANY; EXXON MOBIL                 | **MANDATE AND COMPLAINT FOR**
20 CORPORATION, MOBIL PACIFIC           | **DECLARATORY RELIEF AND**
   PIPELINE COMPANY, AND                | **DAMAGES**
21 EXXONMOBIL
   PIPELINE COMPANY,                    | DEMAND FOR JURY TRIAL

22          Petitioners/Plaintiffs,

23      v.

24 COUNTY OF SANTA BARBARA;
   SANTA BARBARA COUNTY
25 BOARD OF SUPERVISORS and
   DOES 1-20,
26
27          Respondents/Defendants.

28

Petitioners and Plaintiffs Sable Offshore Corp. ("Sable Offshore"), Pacific Pipeline Company ("PPC"), and Pacific Offshore Pipeline Company ("POPCO") (collectively, "Sable") and Petitioners and Plaintiffs Exxon Mobil Corporation ("ExxonMobil"), Mobil Pacific Pipeline Company ("MPPC"), and ExxonMobil Pipeline Company ("EMPCo") (collectively, "ExxonMobil affiliates") (together with Sable, "Petitioners") submit this petition for a writ of mandate and complaint for declaratory relief and damages against Respondents and Defendants the County of Santa Barbara and Santa Barbara County Board of Supervisors ("County"), and allege as follows:

## INTRODUCTION

1.     This case arises from the County of Santa Barbara's arbitrary and unlawful refusal to transfer valid Final Development Permits ("FDPs" or "permits") recognizing the owner, operator, and guarantor of three oil and gas facilities (the "Facilities") from the ExxonMobil affiliates, the Facilities' prior owners, operators, and guarantors, to Sable, their current and lawful owners, operators, and guarantors.

2.     The permits at issue were issued by the County.  These FDPs initially authorized the construction and continue to authorize the ongoing operation and maintenance of the Facilities.  Compliance with the permits is required in order to operate the Facilities.  While the FDPs have no expiration and are still valid, the Facilities are not currently processing oil and gas.  Sable Offshore acquired the Facilities and POPCO from ExxonMobil and PPC from MPPC in February 2024. Sable plans to restart the Facilities and has invested substantial resources, totaling tens of millions of dollars, in repair and maintenance of the Facilities since acquiring them.

3.     Santa Barbara County Code ("County Code") Chapter 25B (hereinafter, "Chapter 25B") provides a limited and formal process, through the County Planning Commission ("Planning Commission") to transfer the FDPs to a

2

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

new owner, operator, or guarantor.  Under the County Code, permit transfer is mandatory so long as the narrow requirements of Chapter 25B—which largely focus on demonstrating that the new owner, operator, and guarantor of the permitted facilities have updated the permit information and agreed to comply with the FDPs' requirements—are met.

4.     After acquiring the Facilities in early 2024, Sable provided all required information to the County in order to satisfy the FDP transfer process. County staff confirmed that Sable met all the requirements under Chapter 25B and recommended approval.  (Staff Report for a Change of Owner, Operator, and Guarantor for the Santa Ynez Unit, POPCO Gas Plant, and Las Flores Pipeline System, dated Oct. 22, 2024, attached hereto as Exhibit 1 [2024 Staff Report].)  In October 2024, the Planning Commission confirmed that all requirements for transfer had been met and approved the change in owner, operator, and guarantor for the Facilities as required by Chapter 25B.

5.     The County Code provides that permit transfer approvals under Chapter 25B may be appealed to the County Board of Supervisors ("Board").  The Board's role is solely to review and "affirm, deny, or modify" the Planning Commission's decision.  Unlike the Planning Commission, the Board is not authorized to take independent action on Chapter 25B permit transfers; it acts only as a reviewing body.

6.     After the Planning Commission approval, two sets of organizations appealed the decision to the Board.  These appeals urged the Board to adopt a sweeping construction of Chapter 25B that would—contrary to its plain text— permit the County to bar the permit transfers based on alleged "facts" wholly outside the statutory scheme and, in so doing, deny Sable its vested rights in the FDPs, and deny the ExxonMobil affiliates the ability to exit from the permits despite their sale of the Facilities.  County staff, in a written report and in a staff presentation to the Board, urged the Board to follow the law and deny the appeals.

3

(Board Agenda Letter for a Change of Owner, Operator, and Guarantor for the Santa Ynez Unit, Pacific Offshore Pipeline Company Gas Plant, and Las Flores Pipeline System Final Development Plan Permits, dated Feb. 25, 2025, attached hereto as Exhibit 2.)

7.    At the February 2025 hearing, the Board did not reach a decision on the appeals.  It split the vote of the Board's five members 2-to-2, with the fifth supervisor recusing herself from the vote based on a conflict of interest.  The two supervisors who voted against the denial motion made clear that their votes were not based on the limited criteria in Chapter 25B.  One explained that he thought that allowing oil operations to restart in the County—something wholly outside the scope of Chapter 25B—was an "insane idea."  The other stated that she found the method of financing Sable used to purchase the Facilities through a seller-financed transaction "fishy."  The two remaining supervisors voted to deny the appeals and urged their fellow supervisors to follow the law.

8.    Because the Board did not grant the appeals, the Planning Commission's decision stands.  The Planning Commission is vested by the County Code with authority to grant the change in owner, operator, and guarantor for the Facilities and transfer the FDPs, and its decision has not been overturned or modified.

9.    Nonetheless, in contravention of applicable law, the County has refused to transfer the FDPs (*i.e.*, it has refused to replace references to the ExxonMobil affiliates as the prior owners, operators, and guarantors in the permits with Sable), leaving Petitioners in an administrative and legal limbo.

10.    The County's failure to proceed as required by Chapter 25B places unnecessary legal and financial burdens on the Petitioners.  The County's refusal to transfer the permits denies ExxonMobil and MPPC the right to remove themselves from FDPs for Facilities they no longer own, as they are still listed on the FDPs even though the Facilities themselves have been acquired by Sable.  This raises

4

significant legal and financial questions that require the ExxonMobil affiliates to invest substantial time, money and resources, notwithstanding that the Facilities are now owned by Sable and all requirements under Chapter 25B have been met.

11.     Because the FDPs have not yet been transferred to Sable as required under applicable law, Sable cannot take full advantage of the benefits of the Facilities it purchased.  Sable has made significant investments of money, resources, and time in the Facilities based on vested entitlements derived from the FDPs, including a vested right to lawfully operate the Facilities in the County.  The County's refusal to act as required by law unfairly deprives Sable of those vested entitlement rights and unlawfully deprives the Petitioners of the benefit of their bargain.

## JURISDICTION AND VENUE

12.     This action arises under the laws of the United States and the State of California.  This Court has jurisdiction over the federal claims pursuant to 28 USC § 1331.  This Court has supplemental jurisdiction over the California state law claims pursuant to 28 USC § 1367.

13.     This Court has jurisdiction to grant mandamus relief pursuant to sections 1085 and 1094.5 of the California Code of Civil Procedure.

14.     This Court has authority to grant declaratory relief under 28 USC §§ 2201 and 2202 and California Code of Civil Procedure § 1060.

15.     Venue in this Court is proper pursuant to 28 USC § 1391(b).[1]

## THE PARTIES

16.     Petitioner/Plaintiff Sable Offshore is a Delaware corporation, registered to do business in California, with its principal place of business in Texas.

---

[1] The filing of this complaint and Petitioners' participation in this lawsuit shall not be construed as a waiver of personal jurisdiction defenses in any other matter. Petitioners do not consent to personal jurisdiction in California in connection with any other matter.

17.     Petitioner/Plaintiff PPC is a Delaware corporation, registered to do business in California.

18.     Petitioner/Plaintiff POPCO is a California corporation.

19.     Petitioner/Plaintiff ExxonMobil is a New Jersey corporation with its principal place of business in Texas.

20.     Petitioner/Plaintiff EMPCo is a Delaware Limited Liability Company with its principal place of business in Texas.

21.     Petitioner/Plaintiff MPPC is a Delaware corporation with its principal place of business in Texas.

22.     Respondent/Defendant County of Santa Barbara is a political subdivision of the State of California.  The Facilities are located within the jurisdictional limits of the County of Santa Barbara.

23.     Respondent/Defendant Board of Supervisors of the County of Santa Barbara is Santa Barbara County's legally constituted legislative body and is composed of five elected Board members.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES
## AND STANDING

24.     Petitioners have exhausted all administrative remedies available, and have no plain, speedy, or adequate remedy in the ordinary course of law, to compel the County's issuance of permits listing Sable as the owner, operator, and guarantor of the Facilities.

25.     Petitioners have a direct and substantial beneficial interest in the County's full and complete compliance with all applicable laws.  Absent obtaining judicial relief, the ExxonMobil affiliates will still be listed on the FDPs and Sable will not be able to lawfully hold the permits for its Facilities in Santa Barbara, leaving Petitioners in legal limbo and forcing them to incur substantial unnecessary

and unlawful financial and legal burdens.[2]

## GENERAL ALLEGATIONS

### The Facilities

26.     Sable owns the Facilities, which are oil and gas production and transportation facilities spanning from Santa Barbara County to Kern County. Of these facilities, the Las Flores Pipeline ("Pipeline"), the POPCO facilities ("POPCO Facilities"), and Santa Ynez Unit ("SYU") are County-permitted facilities located within unincorporated Santa Barbara County that treat crude oil and natural gas from offshore platforms.

27.     The Pipeline is a crude oil pipeline that generally runs from the Gaviota Coast to the Kern County boundary. The Pipeline is authorized by the County under County FDPs 88-DPF-033 (RV01)z, 88-CP-60 (RV01), 88-DPF-25cz, 85-DP-66cz, and 83-DP-25cz.

28.     The POPCO Facilities are onshore oil and gas production facilities located in the Las Flores Canyon. The POPCO Facilities are authorized by the County under County FDPs 93-FDP-015 and 74-CP-ll (RVl).

29.     The SYU is comprised of the onshore components connecting off-shore platforms Hondo, Harmony, and Heritage to the associated onshore processing facilities. The SYU is authorized by the County under County FDPs 87-DP-32cz (modified on July 25, 2001, with 87-DP-032cz (RV05) Synergy Project) (modified on Feb. 19, 2003, with 87-DP-032cz (RV06) Offshore Power Cable Repair & Enhancement Project).

### State and Federal Agency Jurisdiction

---

[2] There is no avenue for further review at the County level. As detailed *infra*, the Board of Supervisors is composed of five members, one of whom is permanently recused on the subject, and the other four of whom are irreconcilably split. County staff has refused to take further action absent direction from the Board, even in the face of threatened litigation, and the Board has refused to reconsider the matter or even to inform Petitioners of its position with respect to the effect of a tie vote. The statute itself contains no "failure to act" provision.

7

30.     The Office of State Fire Marshal ("OSFM"), under delegation from the federal Pipeline Hazardous Materials Safety Administration ("PHMSA"), holds exclusive jurisdiction over safe Pipeline repair and restart.[3]  The County has previously entered a binding settlement with Petitioners' predecessors confirming the County's lack of jurisdiction over Pipeline operations.[4]

31.     The California Department of Fish and Wildlife Office of Spill Prevention and Response ("OSPR") is charged with ensuring that operators of production facilities that could impact waters of the state demonstrate financial responsibility sufficient to address any potential spill that could occur.  (Gov. Code §§ 8670.37.51, 8670.37.53, 8670.37.54.)

32.     The State Lands Commission regulates oil and gas production operations on oil and gas leases on state tide and submerged lands, which are applicable to mobile rigs, fixed offshore structures, and upland locations serving these leases.  (2 CCR § 2129(a).)

33.     The California Department of Industrial Relations – Division of Occupational Safety and Health ("Cal/OSHA") establishes minimum safety standards for drilling, production, refining, and transportation of petroleum products.  (8 CCR §§ 6502, 6750.)

34.     Finally, oil and gas operations in federal waters are regulated by the Bureau of Ocean Energy Management ("BOEM") and Bureau of Safety and Environmental Enforcement ("BSEE").  (43 USC § 1331; 30 CFR § 550.101.)

35.     These state and federal regulations completely "occupy the field" and

---

[3] OSFM is certified by the PHMSA, an agency within the United States Department of Transportation, to regulate intrastate pipelines. (49 U.S.C. § 108(b); Gov. Code §§ 51010, 51013.1(c) [directing OSFM to promulgate regulations pursuant to this section]).  Such regulations include defining automatic shutoff systems, creating a process to assess the adequacy of the operator's risk analysis, creating a process by which an operator may request confidential treatment of information submitted in the plan, and determining how near to an environmentally and ecologically sensitive area a pipeline must be to be subject to the requirements of Section 51013.1.

[4] See Settlement Agreement between Celeron Pipeline Company of California and the County of Santa Barbara (Feb. 8, 1988).

VERIFIED PETITION FOR WRIT OF MANDATE AND
COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

1    preempt local regulation of oil and gas production, pipeline operations, and safety

2    work.  As such, the County's review under Chapter 25B focuses on specific and

3    limited requirements, all of which Sable has met.

4

5                    **The Facilities' Vested Final Development Permits**

6        36.    In the County, an FDP can authorize the operation of certain oil and

7    gas production facilities.  Upon its issuance, the FDP authorizes the construction

8    and operation of such facilities consistent with the terms and requirements of the

9    FDP.  Once issued and relied upon, the FDP is a vested entitlement that runs with

10   the facilities it authorizes, subject to its terms and conditions.

11       37.    The FDPs for the Facilities were issued in 1987 (SYU), 1988

12   (Pipeline), and 1993 (POPCO Facilities).  Each permit was issued pursuant to then-

13   existing County requirements.  The FDPs include various conditions regulating the

14   construction, operation, and eventual abandonment of the Facilities.  The

15   conditions outline specific compliance obligations, penalties for non-compliance,

16   and review procedures for requested changes to the authorized uses.

17       38.    Subsequently, the Facilities' initial owners constructed and began

18   operating them, after obtaining all other necessary state and federal authorizations,

19   vesting the right to continue to operate the Facilities consistent with the FDPs.

20   Over the years, the Facilities' prior owners, including ExxonMobil, invested many

21   millions of dollars in the Facilities.

22       39.    The FDPs do not include an expiration date or any conditions that

23   could result in a *de facto* expiration of the FDPs.  Further, the FDPs do not include

24   any requirement that subsequent owners, operators, or guarantors of the Facilities

25   obtain additional approval from the County to take advantage of the vested rights

26   to own and operate the Facilities provided by the FDPs.  Sable, as successor in

27   interest to the original owners of the Facilities, has vested rights vis-à-vis the

28   County to own, restart, and operate the Facilities.

1

## County Code Chapter 25B

2    40.    In 2001, approximately a decade to a decade-and-a-half after the first

3    of the FDPs for the Facilities was issued and years after they were built, the

4    County adopted Chapter 25B, which created a formal process for transferring

5    already-issued FDPs for existing facilities to new owners, operators, and

6    guarantors.  The stated purpose of Chapter 25B is to "ensur[e] that safe operation,

7    adequate financial responsibility, and compliance with all applicable county laws

8    and permits are maintained during and after all changes of owner, operator or

9    guarantor of certain oil and gas facilities."  (County Code § Chapter 25B-1).

10    41.    Petitioners are informed and believed that the County is the only

11    jurisdiction in California to have adopted such a process.  In other California local

12    jurisdictions, permits for oil and gas facilities transfer to new owners automatically

13    or with minimal formalities, such as updating contact information, when existing

14    facilities are sold.

15    42.    Chapter 25B prescribes certain narrow requirements for permit

16    transfers for new owners, operators, and guarantors and compels the County to

17    approve requests upon determining that those requirements have been met.  As

18    such, Chapter 25B creates a ministerial review process.  Chapter 25B authorizes

19    the Director of Planning ("Director") to process certain transfer approvals and

20    authorizes the Planning Commission to process others.  (County Code § 25B-8(a)-

21    (b).)  Applications that include a component under the Director's jurisdiction and

22    another component under the Planning Commission's jurisdiction may be

23    processed with a combined application before the Planning Commission.  (County

24    Code § 25B-8(c).)

25    43.    Permit transfers are prohibited except in accordance with Chapter

26    25B.  (County Code § 25B-4(d).)  Further, any owner, operator, guarantor, or

27    permittee who fails to comply with the statute is subject to civil penalties of up to

28    $25,000 per day as well as criminal penalties.  (County Code § 25B-13.)

44.    When approving combined applications that include a change of owner, operator, and guarantor of a permitted facility under Chapter 25B, the Planning Commission must confirm compliance with readily verifiable requirements based on objective facts, as follows:

a.    Fees and Exactions – the Planning Commission must confirm that "all outstanding County-required fees and exactions due for the facility have been paid." (County Code § 25B-10(a)(1) [change of operator]; see also §§ 25B-9(a)(1) [change of owner].)

b.    Financial Guarantees – the Planning Commission must confirm that "all necessary insurance, bonds or other instruments or methods of financial responsibility approved by the county and necessary to comply with the permit and any county ordinance have been updated, if necessary, to reflect the new operator and will remain in full effect following the operator change." (County Code §25B-10(a)(2) [change of operator]; see also §§ 25B-9(a)(2) [change of owner], 25B-9(e)(1) [change of guarantor].)

c.    Acceptance of Permit – the Planning Commission must confirm that "the proposed operator has provided a letter from a responsible official representing the proposed operator formally accepting all conditions and requirements of the permit." (County Code § 25B-10(a)(3) [change of operator]; see also §§ 25B-9(a)(3) [change of owner].)

d.    Safety Audit – the Planning Commission must confirm that the "current owner or operator has provided a copy of the most recent county-conducted comprehensive safety audit of the physical facility, along with a description of the status of implementing its recommendations, to the proposed new operator." (County Code § 25B-10(a)(4) [change of operator]; see also § 25B-9(a)(4) [change of owner].)

e.    Compliance with Existing Permit Requirements – the Planning Commission must confirm that "[a]s of the date that the application is deemed

11

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

complete, the current operator is in compliance with all requirements of the permit, including any requirements of a county-required safety audit, any notice of violation, and any county ordinance, or the owner and proposed operator have entered into a written agreement with the director that specifies an enforceable schedule to come into compliance with such requirements." (County Code § 25B-9(a)(5) [change of operator]; see also § 25B-10(a)(5) [change of owner].)

f.    Compliance Plans Contact Information – the Planning Commission must confirm that the "current owner and proposed operator have updated, where applicable, any existing, approved safety inspection maintenance and quality assurance program, emergency response plan, fire protection plan, and oil spill contingency plan, or equivalent approved plans, with current emergency contact information pertaining to the new operator.  The current owner and proposed operator have agreed in writing to revise all other plans required by the permit or any county ordinance, as necessary to reflect the change of operator, and to do so with sufficient diligence to obtain approval of the revised plans by the appropriate county official within six months after assuming operations."  (County Code § 25B-10(a)(6) [change of operator].)

g.    Transitional Plans – the Planning Commission must confirm that the "current owner or operator and proposed operator have submitted a transitional plan that will demonstrate that the proposed operator shall receive adequate training, including by means of cross training by the current operator, where feasible, and shall have a good working knowledge of the crucial compliance plans listed [in the immediately preceding factor] before assuming control of operations.  The plan has been approved by the director. The planning commission may exempt the current owner and proposed operator from this requirement, or portions thereof, for good cause." (County Code § 25B-10(a)(7) [change of operator].)

12

1       h.     Emergency Response Plan Drills – the Planning Commission must

2  confirm that "the proposed operator has adequately performed one or more

3  county approved emergency response plan drills necessary to respond to

4  emergency episodes that may occur at the facility." (County Code § 25B-

5  10(a)(8) [change of operator].)

6       i.      Operator Capability – the Planning Commission must confirm that the

7  proposed operator "has the skills, training, and resources necessary to operate

8  the permitted facility in compliance with the permit and all applicable county

9  codes and has demonstrated the ability to comply with compliance plans listed

10  [above].  The director shall require relevant records of compliance, and

11  corrective actions taken subsequent to any major incidents for facilities, if any,

12  that are similar in nature to those that are the subject of the permit, as may be

13  necessary to make findings.  These records shall be used to provide sufficient

14  assurance that the proposed operator does not reflect a record of non-compliant

15  or unsafe operations systemic in nature for similar facilities to those being

16  considered for operatorship." (County Code § 25B-10(a)(9) [change of

17  operator].)

18      45.    Chapter 25B requires that "upon making the findings listed in" the

19  ordinance, "the planning commission ***shall*** approve the change" of operator,

20  owner, or guarantor.[5]  (County Code § 25B-10(b) [emphasis added]; § 25B-9(g).)

21  The Planning Commission is not given discretion to accept or reject a permit

22  transfer; it merely confirms compliance with the specific, enumerated provisions in

23  Chapter 25B.  The only additional conditions it may impose are those necessary

24  "to ensure that any insurance or other financial guarantees that were *submitted to*

25

26  

27  [5] For combined applications, when the Planning Commission is reviewing an
application that would otherwise fall under the Director's jurisdiction (such as
change of owner or change of guarantor), the Planning Commission is charged

28  with making the findings required for approval (Sec. 25B-9.1-9.5).  (County Code
§ 25B-5(c).)

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

VERIFIED PETITION FOR WRIT OF MANDATE AND
COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

1   *and relied on by the planning commission* [or director] *as a basis to make any*
2   *finding required by this chapter are maintained*." (*Id.* [emphasis added].)

3       46.     Chapter 25B vests the Planning Commission with original jurisdiction
4   to determine whether the requested transfers comply with the provisions of Chapter
5   25B. The Planning Commission's determination "may be appealed to the board of
6   supervisors by the applicant or any interested person adversely affected by such
7   decision." (County Code § 25B-12(b)(1).) On appeal, the Board must hold a *de*
8   *novo* hearing and "shall affirm, reverse, or modify the planning commission's
9   decision at a public hearing." (County Code § 25B-12(b)(2).) The Board is thus
10  neither required nor permitted to undertake a different inquiry from the Planning
11  Commission; rather, its review is limited to affirming, reversing, or modifying *the*
12  *Planning Commission*'s decision.

13      47.     Chapter 25B does not stay a Planning Commission determination that
14  is on appeal to the Board.

15                                     **2023 ExxonMobil Transfer**

16      48.     In recent years, there have been efforts by individuals and
17  organizations opposed to oil and gas development to transform this ministerial,
18  limited ordinance into a means of frustrating operation of the Facilities pursuant to
19  vested entitlements. However, given the narrow scope of Chapter 25B, and the
20  constraints of federal and state law, which fully preempt regulation over Pipeline
21  operations and most other aspects of the Facilities' operations, these efforts have
22  largely failed.

23      49.     In 2023—before the events giving rise to this petition—the County
24  resisted such an effort and confirmed Chapter 25B's narrow scope. Specifically,
25  on June 14, 2023, the Planning Commission approved a change of owner,
26  guarantor, and operator for the Pipeline that transferred status from then-owner,
27  guarantor, and operator Plains Pipeline L.P. to PPC (then owned by MPPC),
28  ExxonMobil, and EMPCo, respectively.

50.    In making that determination, the Planning Commission foreclosed objections made by a number of interested entities who made arguments similar to those made by the appellants in the instant proceeding.  For example, the Planning Commission:

- Determined that the permit transfers were not "projects" under the California Environmental Quality Act ("CEQA") section 15378(b)(5), because they were "organizational or administrative activities of governments that will not result in direct or indirect physical changes to the environment";

- Determined that a 2015 spill on the Pipeline did not render it out of compliance with the FDP, within the meaning of Chapter 25b 9(a)(5) and 10(a)(5); and

- Determined that alleged failures in cathodic protection on the Pipeline did not render it out of compliance with the FDP, within the meaning of Chapter 25b 9(a)(5) and 10(a)(5).  (See 2023 Planning Commission Action Letter, dated Jun. 16, 2023, Attachment A - Findings of Approval, attached hereto as Exhibit 3, pp. 115-20.)

51.    As in this case, interested parties appealed the Planning Commission's 2023 determination to the Board—once again making all these same arguments.  In their appeal letter, the 2023 appellants argued that the permit transfers were a project under CEQA and that "[a] full EIR must therefore be ordered."  The Board rejected this argument and determined that "the proposed action is not subject to CEQA, as it does not constitute a 'project', as defined by CEQA Guidelines Section 15378(a)."  (Board Agenda Letter for a Change of Owner, Operator, and Guarantor for the Las Flores Pipeline System, dated Sept. 19, 2023, attached hereto as Exhibit 4 [2023 Board Letter], p. 124.)

52.    The 2023 appellants also argued that the prior owner was "not in compliance with existing permit conditions," citing to the alleged failure "to install

15

and operate a functional cathodic protection system," and alleged maintenance failures related to the 2015 oil spill.  The Board rejected this argument and found that the prior owner was "in compliance with all requirements of the FDP Permit." (Board Agenda Letter for a Change of Owner, Operator, and Guarantor for the Las Flores Pipeline System, dated Sept. 19, 2023, Attachment A – Findings of Approval attached hereto as Exhibit 5 [2023 Findings of Approval], p. 134.)  On September 19, 2023, the Board denied the appeal and affirmed the Planning Commission's determination approving the requested change of owner, guarantor, and operator for the Pipeline.  (Board Minute Order, dated Sept. 19, 2023, attached hereto as Exhibit 6.)

53.    In deliberations, the Board acknowledged the limited nature of their inquiry and ultimately agreed with County staff's analysis recommending denial of the appeal.  Supervisor (now Chair) Laura Capps noted that the requested "change of ownership is an administrative action" and that in approving the transfer would ensure that the "County permit actually matches the company that owns the pipeline."  (Hearing Transcript excerpt of the Santa Barbara County Board of Supervisors Hearing, September 19, 2023 Meeting, attached as Exhibit 7, p. 143.)

54.    Further, in the 2023 Findings of Approval, the Board affirmed that each of the required findings set forth in Chapter 25B had been satisfied, including those related to fees and exactions (Exhibit 5, [2023 Findings of Approval], pp. 132, 134,) financial guarantees (*id.*, pp. 132, 134-35,) acceptance of the permit (*id.*, pp. 133, 135,) facility safety audit (*ibid.*,) compliance with existing permit requirements (*id.*, pp. 134-35,) compliance plans contact information (*id.*, pp. 135-36,) transitional plan (*id.*, p. 136,) emergency response drills (*ibid.*,) and operator capability  (*Id.*, p. 137.)

55.    Following the denial of the appeals, the County transferred the Pipeline permits to the ExxonMobil affiliates.

**Commission Approval of Sable's Chapter 25B Applications and**

16

**Appeals to Board**

56.     After the 2023 ExxonMobil proceedings concluded, on February 14, 2024, Sable acquired full ownership of PPC and POPCO, the owners of the Pipeline and POPCO facility, from MPPC and ExxonMobil, respectively.  Sable also acquired the SYU, which was owned by ExxonMobil.

57.     In compliance with Chapter 25B, Sable thereafter submitted applications to the County to authorize the change of owner, operator, and guarantor for the Facilities (the "Transfers").

58.     After a monthslong, diligent review of the submitted materials, County staff determined the applications to be complete and fully compliant with Chapter 25B, and recommended that the Planning Commission approve the Transfers.  (Exhibit 1, pp. 42-43.)  As part of this process, County staff prepared a detailed analysis of consistency with the Chapter 25B requirements and presented draft findings, ultimately adopted by the Planning Commission, going through each and every requirement of Chapter 25B and demonstrating each requirement was fully satisfied.  These findings included—consistent with the 2023 transfer determinations—that the prior owners were in compliance with the FDPs, as well as confirming that the permit transfer process is administrative and does not constitute a project under CEQA.

59.     The Planning Commission took up the matter at a lengthy and thorough hearing—lasting approximately six hours—on October 30, 2024.  At the close of that hearing, the Planning Commission made the required findings and approved the Transfers by a vote of 3 to 1.  (Planning Commission Approval of Change of Owner, Operator, and Guarantor for the Santa Ynez Unit, POPCO[] Gas Plant, and Las Flores Pipeline System Final Development Plan Permits, dated Oct. 30, 2024, attached hereto as Exhibit 8, pp. 149-50.)

60.     Specifically, consistent with County staff's detailed review and recommendations, the Planning Commission made required findings related to:

17

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

- <u>Fees and Exactions</u> (County Code § 25B-9(a)(1), 25B-10(a)(1)) – determining that "the requirements of this finding are satisfied" and that there are "no outstanding payments" due for the Facilities. (Exhibit 8, pp. 151, 153, 157, 160.)

- <u>Financial Guarantees</u> (County Code § 25B-9(a)(2), 25B-9(e)(1), 25B-10(a)(2)) – determining that all previously required bonds and endowments under the FDPs have been satisfied, and that the only other County-imposed financial obligations would be triggered solely at the time of permanent closure of the respective Facilities. (*Id*., pp. 151-52, 156-57, 159-60.)

- <u>Acceptance of Permit</u> (County Code § 25B-9(a)(3), 25B-10(a)(3)) – determining that the requirements of this finding were satisfied. (*Id*., pp. 152, 154, 157, 160.)

- <u>Safety Audit</u> (County Code § 25B-9(a)(4), 25B-10(a)(4)) – determining that this finding had been satisfied and that copies of the necessary audit information had been provided to Sable as the new owner/operator. (*Id*., pp. 152, 154, 157-58, 161-62.) Related to the SYU and POPCO, the Planning Commission determined that the County's Systems Safety & Reliability Review Committee had deferred annual audits until the Pipeline restarted operations. (*Id*., pp. 152.) Related to the Pipeline, the Planning Commission noted that the 1988 Settlement Agreement between the County and Celeron/All American "determined that the County does not have the jurisdiction to regulate any aspect of the design, construction, or operation of the pipeline." (*Id*., pp. 161.) While no County-conducted safety audits are required for the Pipeline, safety audit information from PHMSA and OSFM from 2018 to 2023 were provided to the County and Sable. (*Ibid*.)

18

- <u>Compliance with Existing Permit Requirements</u> (County Code § 25B-9(a)(5), 25B-10(a)(5)) – determining that this requirement had been satisfied, as the owner/operator "is in compliance with all requirements of the FDP" and "[n]o notices of violation had been issued" by the County. (*Id*., pp. 153-54, 158, 161.)

- <u>Compliance Plans</u> (County Code § 25B-10(a)(6)) – determining that this requirement had been satisfied and that "all relevant compliance plans have been updated with the current emergency contact information" for Sable as required by the County Code. (*Id*., pp. 154-55, 158, 161.)

- <u>Transitional Plans</u> (County Code § 25B-10(a)(7)) – determining that Sable had submitted comprehensive transition plans on October 22, 2024, and that this requirement was satisfied. (*Id*., pp. 155, 158, 162.)

- <u>Emergency Response Plan Drills</u> (County Code § 25B-10(a)(8)) – determining that this requirement was satisfied, and that Sable had conducted emergency response drills for the Facilities. (*Id*., pp. 155, 159, 162.)

- <u>Operator Capability</u> (County Code § 25B-10(a)(9)) – determining that this requirement had been satisfied, citing the extensive subject matter expertise of Sable's management team, experience of the on-site operations team, and that the team has had "zero major incidents involving crude oil and gas facilities within the U.S." while managing facilities between 2009 and 2021. (*Id*., pp. 156, 159, 162-63.)

61.　Because the Planning Commission determined that all of the requirements of Chapter 25B had been met, the County Code compelled the Transfers, unless the Planning Commission's determinations were affirmatively set aside on appeal.

19

62.     On November 5, 2024, the Center for Biological Diversity and Wishtoyo Foundation ("CBD Appellants") filed an appeal (the "CBD Appeal").

63.     On November 7, 2024, the Environmental Defense Center, Get Oil Out!, and Santa Barbara County Action Network ("EDC Appellants") (together with the CBD Appellants, "Appellants") filed a separate appeal (the "EDC Appeal", and together with the CBD Appeal, the "Appeals").

64.     The Appeals urged the Board to adopt an expansive interpretation of Chapter 25B, by which the Board would undertake a comprehensive audit of Sable's finances, require massive new bonds totaling hundreds of millions of dollars, require new environmental review for the fully-permitted Facilities despite such review not being authorized by the FDPs, and otherwise essentially gut the FDPs and deny Sable the fully-vested rights attendant therein.  The goal of the Appeals was not to ensure compliance with Chapter 25B, but to persuade the Board to ignore the limits of their authority, deny Sable's vested rights, and prevent the ExxonMobil affiliates from removing themselves from the FDPs.

65.     On February 20, 2025, County staff issued a Board letter (staff report) and presentation, recommending the Board deny the Appeals in their entirety.  Once again, County staff prepared a detailed analysis.  The staff report addressed and rejected each of the arguments made by Appellants.  County staff found that none of the points raised in the Appeals changed their recommendations or otherwise impacted Sable's now-established compliance with the requirements of Chapter 25B.  To the contrary, County staff confirmed that the scope of Chapter 25B was narrow, and did not authorize the County to undertake the expansive demands urged by Appellants.  The staff Board letter confirmed that the Planning Commission had correctly approved the Transfers and recommended that the Board deny the Appeals.  (*See* Exhibit 2.)

66.     Prior to the Board's hearing related to the Transfers, both Petitioners and Appellants filed letters in support of their respective positions.  Sable also

submitted evidence from the administrative record before the Planning Commission demonstrating its full compliance with Chapter 25B.  Appellants, on the other hand, submitted hundreds of pages of materials focused on issues entirely outside the scope of Chapter 25B, such as their claim that a restart of oil operations at the Facilities creates environmental and safety risks, Sable's financial structure and regulatory filings, and Sable's applications for authorizations from other regulatory agencies such as the Office of the State Fire Marshal, which are beyond the scope of the County's jurisdiction.

67.    These arguments were intended to draw the Board's attention away from the County's limited review authority under Chapter 25B.  Appellants argued that the County should use Chapter 25B as a means to deny the Transfers and attempt to halt oil and gas production from the Facilities altogether.  As noted above, many of these same arguments were made to and rejected by the Board in 2023, when it affirmed the Planning Commission's decision to approve the Pipeline transfer to the ExxonMobil affiliates.

## **Board No-Action Determination and Failure to Transfer FDPs**

68.    On February 25, 2025, the Board held a public hearing on both Appeals.  Appellants urged the Board to exceed its power by granting the Appeals and denying the lawful affirmation of the Planning Commission's approval of the Transfers.

69.    As part of their arguments, Appellants also misleadingly urged the Board to rely upon an early draft of Chapter 25B that was never adopted.  That draft ordinance would have given the Planning Commission much broader powers, including the power to modify the FDPs, require new financial conditions, and otherwise impose conditions on transfers.  That draft ordinance, however, was never adopted.  Indeed, it could not have been lawfully adopted, as the contemplated powers would have been wholly outside the County's jurisdiction.  Moreover, had the County in fact adopted an ordinance permitting it to simply

21

1    shred adopted FDPs and effectively revoke vested entitlements any time properties

2    were transferred, it would have violated the Takings Clause of both the United

3    States Constitution and the California Constitution as well.  As Supervisor Steve

4    Lavagnino remarked at the hearing:

> "as much as some would like to expand the scope of this hearing, my job today is to determine really whether or not this applicant meets the requirements [of] 25B, not what we wish it said, ***not what the draft copy stated, not what some retired employee thought, but what it actually says***, and a speaker asked us to consider what was the intent of the staff when they wrote it, and after seeing the draft and after seeing the real part, it's… being here for a while, I'm sure staff and maybe even the board wanted it to be stronger, and I would assume then county counsel reviewed it and ***realized maybe there were parts of it that possibly were illegal***."

70.    At the hearing on the Appeals, Supervisor Joan Hartmann recused

herself from the proceedings, which left only four of the five supervisors present to

consider and act on them.  After an approximately seven-hour hearing and

deliberation, the remaining four supervisors split the vote on a motion to deny the

appeals, 2 votes to 2 votes.  Supervisors Steve Lavagnino and Bob Nelson voted in

favor of denying the appeals, and Chair Laura Capps and Supervisor Roy Lee

voted against the denial motion.

71.    The justifications advanced by the two supervisors who voted in favor

of the Appeals demonstrate a disregard for the limited scope of review mandated

by Chapter 25B.  Instead of adhering to the criteria set forth in Chapter 25B, Chair

Capps relied on her own subjective "smell test," claiming that her job was "to look

at the big picture and to extrapolate of [*sic*] what we're actually doing here."

Instead of basing her decision on the requirements of Chapter 25B, Chair Capps

cited numerous arbitrary and irrelevant factors, faulting Sable for (1) not going

"above and beyond the checklist" in Chapter 25B because Sable did not provide

copies of insurance policies (which are not required by Chapter 25B and were

never requested by County staff or the Planning Commission); (2) alleged non-

cooperation with the Coastal Commission, which post-dated the applications and is

outside the scope of Chapter 25B, and which was rebutted by County staff; and (3)

VERIFIED PETITION FOR WRIT OF MANDATE AND
COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

the manner in which Sable financed its acquisition of the Facilities—something that again, is wholly outside the scope of Chapter 25B.  Further, Chair Capps disparaged the entire Chapter 25B process indicating that it is "designed to be completely confusing" and "completely in favor of big interests."

72.    Supervisor Lee likewise made no attempt to apply the criteria set forth in Section 25B.  Instead, he indicated that he would support "upholding the appeals," because, in his opinion, restarting the Facilities—something that is entirely outside the scope of Chapter 25B—is an "insane idea" and a "very bad idea."

73.    As the Board cannot act without three votes,[6] the split vote resulted in Appellants failing to carry their burden to overturn the Planning Commission's approval and accordingly no action being taken by the Board on the appeals.

74.    As a matter of established law, the Board's failure to take action means that the Planning Commission's October 30, 2024 approval of the Transfers stands.  (*See, e.g.*, *Grist Creek Aggregates, LLC v. Superior Court*, 12 Cal. App. 5th 979, 991 (2017) (Hearing Board's "tie vote meant that [previously issued Authority to Construct] was allowed to stand, which was effectively a decision not to revoke it."); *see also Today's Fresh Start, Inc. v. Los Angeles County Office of Education*, 197 Cal. App. 4th 436 (2011), *rev'd on other grounds by* 57 Cal. 4th 197 (2013) (where county board of education split 4-4 on appeal of school charter revocation, this "amounted to a final decision by the board failing to adopt the motion, denying the appeal, and upholding the revocation").)  Thus, following the Board hearing, the County should have transferred the permits to Sable.

75.    However, the County did not act in accordance with the law.  Instead,

---

[6] Procedural Rules Governing Planning, Zoning and Subdivision Hearings Before the Board of Supervisors and Planning Commission (Santa Barbara County Res. No. 91-333), Sec, IV,1 ["Any action taken by the Board of Supervisors must be by a majority of the Board of Supervisors.  An abstention shall not be counted as an affirmative vote on the motion."].

1   it pleaded confusion, with its Director of Planning and Development publicly

2   stating that the County was "in the process of … determining" the impact of the tie

3   vote.

4        76.    On February 26, 2025, Sable sent the Director a letter requesting that

5   the County promptly transfer the FDPs by issuing corrected FDPs that replace the

6   names of the prior owners, operators, and guarantors.  (Letter to L. Plowman re:

7   Change of Owner, Operator, and Guarantor for the Santa Ynez Unit, POPCO Gas

8   Plant, and Las Flores Pipeline System Final Development Plan Permits, dated Feb.

9   26, 2025, attached hereto as Exhibit 9.)  Noting that there had been some confusion

10   as to the practical impact of the Board's 2-2 split vote, that letter outlined the legal

11   basis for how the Board's no-action resulted in affirming the Planning

12   Commission's determination.  EDC Appellants sent a separate letter on March 1,

13   2025, urging the County to hold that the "no action" vote left Transfers in

14   perpetual administrative limbo.

15        77.    On April 11, 2025, Sable sent the Director another letter again

16   requesting that the County transfer the FDPs forthwith, and noting that it might

17   need to seek writ relief if the County failed to act.  (Letter to L. Plowman re:

18   Change of Owner, Operator, and Guarantor for the Santa Ynez Unit, POPCO Gas

19   Plant, and Las Flores Pipeline System Final Development Plan Permits, dated Apr.

20   11, 2025, attached hereto as Exhibit 10.)

21        78.    At its April 16, 2025 meeting, the Board went into closed session to

22   discuss Sable's threat of litigation regarding the Transfers.  At the conclusion of

23   the closed session, the Board noted that no reportable action was taken.

24        79.    The County has taken no further action to transfer the permits and has

25   not responded to Sable's letters other than acknowledging their receipt.

26        80.    The County's failure to effectuate the Transfers is unlawful.  The

27   Board's "no action" leaves in place the Planning Commission's decision below

28   approving the Transfers, and the permits are required to be transferred as a matter

1  of established law.

2      81.    Further, the Board's "no action" was itself arbitrary and outside of the

3  limited scope of its review under Chapter 25B.  Because the Board failed to act, it

4  also made no findings either in support of approval or denial of the Appeals.  As

5  such, the County has indicated that the Transfers are in an unending administrative

6  limbo, where Petitioners have no further administrative recourse.

7      82.    Without following the requirements of Chapter 25B, the County has

8  made a *de facto* and improper denial of the Transfers by failing to issue new FDPs.

9  **FIRST CAUSE OF ACTION**

10  **Writ of Mandate – Failure to Comply with County Code Chapter 25B**

11  **(Cal. Code Civ. Proc. § 1085) By Failing To Effectuate the Transfers**

12      83.    Petitioners allege and incorporate by reference each and every of the

13  above allegations.

14      84.    The County violated County Code Chapter 25B by failing to issue

15  corrected FDPs reflecting the Planning Commission's October 30, 2025 approval

16  of the Transfers upon the Board's decision not to take action on the Appeals.

17      85.    Under the County Code, jurisdiction over approval of the Transfers is

18  vested in the Planning Commission.  Pursuant to Chapter 25B, the Planning

19  Commission approved the Transfers, which were then appealed to the Board.  The

20  Board neither reversed nor modified the Planning Commission's determination.

21  The Board has given Petitioners no indication that it intends to consider or act

22  further on the Transfers; to the contrary, with one member permanently recused

23  and the remaining members strongly split, the Board has given the opposite

24  indication.

25      86.    Under the County Code, jurisdiction over approval of the Transfers is

26  vested in the Planning Commission in the first instance.  If an appeal to the

27  Planning Commission's determination is filed, Chapter 25B requires the Board to

28  "affirm, reverse, or modify the planning commission's decision." (County Code §

25

25B-12(b)(2).)  The Board of Supervisors acts solely in a reviewing capacity; it may "affirm, deny, or modify the planning commission's decision," but has no independent jurisdiction.

87.    Because original jurisdiction vests with the Planning Commission, and the Board acts only as a reviewing authority, the Board's failure to act constitutes a failure of the Appeals, and leaves the Planning Commission's determination in place.

88.    No provision in Chapter 25B stays a Planning Commission determination that is appealed to the Board.  The Planning Commission's determination and the Transfers are valid and effective.

89.    Upon request from Sable to formally transfer the FDPs consistent with the Commission's approval, the County refused.  Consistent with the Planning Commission's action and the Board's failure to act, the FDPs must be transferred to Sable.  The County's refusal to complete the administrative task of updating the FDPs consistent with the Planning Commission's approval of the Transfers unlawfully denies the ExxonMobil affiliates the right to relieve themselves of the burden of County permits for Facilities they no longer own or operate, deprives Sable of rights legally acquired under the FDPs, and subjects Petitioners to substantial financial harm.

90.    Petitioners are entitled to issuance of a writ of mandate directing the County to transfer the FDPs from the ExxonMobil affiliates to Sable by issuing updated FDPs consistent with the Planning Commission's October 30, 2025 approval of the Transfers.

## SECOND CAUSE OF ACTION

### Writ of Mandate – Failure to Comply with County Code Chapter 25B
### (Cal. Code Civ. Proc. § 1085) By Failing To Act on Appeals

91.    Petitioners allege and incorporate by reference each and every of the above allegations.

92.    Approval under Chapter 25B is compulsory if the requirements have been met: "upon making the findings listed in" the ordinance, "the planning commission ***shall*** approve the change" of operator, owner, or guarantor.  As such, approval of the Transfers and disposition of any appeals are ministerial actions.

93.    If an appeal to the Planning Commission's determination is filed, Chapter 25B requires the Board to "affirm, reverse, or modify the planning commission's decision."  (County Code § 25B-12(b)(2).)  Here, the Board failed to make a determination.

94.    The Board's failure to act means that the Board has not affirmed, reversed, or modified the Planning Commission's determination, in violation of the County Code.  The Board is obligated under the County Code to act on the Appeals, but failed to do so.

95.    Further, as the Board's determination is ministerial in nature, and County staff furnished the Board with detailed information demonstrating that the Transfers comply with all relevant ministerial requirements under Chapter 25B, the Board was required by law to deny the Appeals and affirm the Planning Commission's determination.

96.    The Board refused to undertake its ministerial duty to deny the Appeals and uphold the Planning Commission's approval of the Transfers.  The Board's refusal to undertake its ministerial duty to deny the Appeals and uphold the Planning Commission's approval of the Transfers unlawfully denies the ExxonMobil affiliates the right to relieve themselves of the burden of County permits for Facilities they no longer own or operate, deprives Sable of rights legally acquired under the FDPs, and subjects Petitioners to substantial financial harm.

97.    Petitioners are entitled to issuance of a writ of mandate directing the Board to deny the Appeals and affirm the Planning Commission's approval of the Transfers.

**THIRD CAUSE OF ACTION**

**Writ of Mandate – Violation of County Code Chapter 25B**

**(Cal. Code Civ. Proc. § 1094.5)**

**(Pleaded in the Alternative to First and Second Causes of Action)**

98.    Petitioners allege and incorporate by reference each and every of the above allegations.

99.    The Board violated County Code Chapter 25B by failing to act on the Appeals.  The failure to act resulted in a *de facto* denial of the Transfers, but the Board made no findings of denial and never formally disposed of the Appeals.  Further, because the scope of review under Chapter 25B is incredibly narrow, the Board abused its discretion by refusing to deny the Appeals and uphold the Planning Commission's determination, which is consistent with the requirements of Chapter 25B.  The members of the Board that voted against denying the Appeals further acted arbitrarily and in a capricious manner, without evidentiary support, and contrary to law.

100.    Under the County Code, jurisdiction over approval of the Transfers is vested in the Planning Commission in the first instance.  The Planning Commission approved the Transfers on October 30, 2025.  The Board acts solely in a reviewing capacity; it may "affirm, deny, or modify the planning commission's decision" but has no independent jurisdiction.  There is no provision in Chapter 25B staying the Planning Commission's determination during the pendency of an appeal.  Upon hearing the Appeals, the Board took no action and made no findings.

101.    The Board's failure to act places Petitioners into an administrative limbo.  The County refuses to transfer the FDPs and has made no findings to support that position.  The County's refusal to transfer the FDPs, and its failure to make findings to support its position, unlawfully denies the ExxonMobil affiliates the right to relieve themselves of the burden of County permits for Facilities they

28

1    no longer own or operate, deprives Sable of rights legally acquired under the FDPs,

2    and subjects Petitioners to substantial financial harm.

3        102.    Further, the County's *de facto* denial of the Transfers, through the

4    Board's refusal to deny the Appeals and affirm the Planning Commission decision,

5    is an abuse of discretion.  Sable has complied with all County Code requirements

6    and obtained the required approval from the Planning Commission.  County staff

7    provided the Board with a detailed analysis of each of the points raised by the

8    Appellants and confirmed that the Transfers fully comply with Chapter 25B.  Still,

9    the Board refused to deny the Appeals and affirm the Planning Commission's

10   determination.

11       103.    Instead, at least two members of the Board publicly indicated their

12   intent to ignore the requirements of Chapter 25B and to instead deny the Transfers

13   for policy-based reasons having nothing to do with the Chapter's requirements.

14   Supervisor Lee indicated that he was opposed to the restart of operations even with

15   full compliance with the FDP.  And Chair Capps stated that she found Sable's

16   purchase of the Facilities "fishy" and faulted Sable for failing to provide

17   documents that were neither required by Chapter 25B nor requested by the County.

18       104.    As County staff confirmed in its letter to the Board, the requirements

19   of Chapter 25B are so narrow in scope that the Board lacked legitimate discretion

20   to grant the Appeals and deny the Transfers.  Nevertheless, the County is now

21   treating the Board's no-action as a denial of the Transfers, but as the record

22   evidence demonstrates, the Transfers meet all Chapter 25B requirements and

23   Petitioners have proceeded as required by law.  Thus, the Board abused its

24   discretion in failing to deny the Appeals and uphold the Planning Commission's

25   approval of the Transfers.

26       105.    For the foregoing reasons, the County has failed to proceed in

27   accordance with the law, and Petitioners are entitled to issuance of a writ of

28   mandate directing the Board to deny the Appeals and affirm the Planning

1    Commission's approval.  In the alternative, Petitioners are entitled to issuance of a

2    writ of mandate directing the Board to make a determination on the Appeals, as

3    required by Chapter 25B, and adopt findings in support of such determination.

4    <u>**FOURTH CAUSE OF ACTION**</u>

5    **Writ of Mandate – Violation of the Takings Clause of the Fifth and**

6    **Fourteenth Amendments to the United States Constitution and Article I,**

7    **Section 19 of the California Constitution**

8    **(42 U.S.C. § 1983; Cal. Const. art. I, § 19)**

9       106.   Petitioners allege and incorporate by reference each and every of the

10   above allegations.

11      107.   The federal and state Constitutions prohibit the government from

12   taking private property "without just compensation."  (U.S. Const. amends. V,

13   XIV; Cal. Const. art. I, § 19.)  Under the Fifth and Fourteenth Amendments of the

14   United States Constitution to the United States Constitution and Article I, Section

15   19 of the California Constitution, Petitioners have a federal and state right to be

16   free from the taking of their private property and from laws that take or seize

17   property for a public purpose, but on an unreasonable ground and without any

18   mechanism for compensation.

19      108.   Sable invested more than $600 million in the acquisition of the

20   Facilities.  Since purchase, Sable has invested more than $100 million more in

21   repairing the Facilities and preparing them for renewed operations.  Sable has a

22   vested right to continue operations and perform repair and maintenance activities

23   on the Facilities as contemplated and previously authorized under the FDPs, and

24   ExxonMobil and MPPC have a vested right to sell their assets and exit the FDPs

25   without improper County interference.  Efforts to utilize the County's process for

26   approving the Transfers to thwart restart or sale of the Facilities, or revoke the

27   FDPs, infringes upon Petitioners' vested rights under the FDPs.

28      109.   The County's refusal to transfer the lawfully acquired rights conferred

1    under the FDPs illegally infringes upon Petitioners' property rights.

2        110.   The County's failure to issue corrected FDPs substantially impairs

3    Petitioners' property rights, for the benefit of the public and without prior

4    compensation.

5        111.   In refusing to issue the corrected FDPs, the County violated the Fifth

6    and Fourteenth Amendments of the United States Constitution and Article I,

7    Section 19 of the California Constitution.

8        112.   For the foregoing reasons, the County has failed to proceed in

9    accordance with the law, and Petitioners are entitled to issuance of a writ of

10    mandate directing the County to issue corrected FDPs.

11                    **FIFTH CAUSE OF ACTION**

12    **Declaratory Relief and Damages – Violation of the Takings Clause of the Fifth**

13    **and Fourteenth Amendments to the United States Constitution and Article I,**

14                **Section 19 of the California Constitution**

15    **(42 U.S.C. § 1983; Cal. Const. art. I, § 19; Cal. Code Civ. Proc. § 1060)**

16        113.   Petitioners allege and incorporate by reference each and every of the

17    above allegations.

18        114.   The County enacted and is charged with enforcing Chapter 25B,

19    which places straightforward requirements on the transfer of existing, active

20    entitlements from one property owner to the next.  At the urging of Appellants, at

21    the February 25, 2025 hearing, the Board stepped well beyond the limited scope

22    outlined in Chapter 25B to consider factors and considerations that are irrelevant to

23    the narrow authority prescribed by the County Code.  As applied, the Board's

24    failure to uphold the Transfers violates the Petitioners' constitutional property

25    rights under the FDPs.

26        115.   By refusing to focus on the narrow scope of review prescribed by the

27    County Code, the Board overstepped its authority and applied Chapter 25B in a

28    manner that violates federal and state law.  To the extent Chapter 25B serves a

31

public purpose, the Board's no-action and the County's subsequent refusal to issue
updated FDPs deprives Petitioners of their property without providing a
mechanism for compensation.

116. ExxonMobil and MPPC have a vested right to transfer their assets,
including the FDPs, and Sable obtained a vested right to operate the Facilities
consistent with the FDPs. The County's failure to effectuate the Transfers
consistent with Chapter 25B seriously imperils Sable's significant investment in
the Facilities. Further, the County's failure to proceed as required by law in
issuing updated FDPs subjects Petitioners to potential legal and financial exposure.

117. There is a justiciable controversy in this case as to whether Chapter
25B violates the Fifth and Fourteenth Amendments of the United States
Constitution and Article I, Section 19 of the California Constitution.

118. Petitioners seek a declaratory judgment that Chapter 25B, as applied
by the County here, unconstitutionally takes property, seizes property, or deprives
Petitioners of their property rights in violation of the United States and California
Constitutions.

119. As a direct and proximate cause of the County's actions, Petitioners
have suffered and continue to suffer substantial damages in an amount to be proven
at trial. Accordingly, Petitioners also seek damages and attorneys' fees for the
violations of the United States Constitution.

## SIXTH CAUSE OF ACTION

**Declaratory Relief and Damages – Violation of the Supremacy Clause of the
United States Constitution and Article XI, Section 7 of the California
Constitution**

**(42 U.S.C. § 1983; U.S. Const., Art. VI; Cal. Code Civ. Proc. § 1060)**

120. Petitioners allege and incorporate by reference each and every of the
above allegations.

121. Regulation of pipeline safety, restart, and operation are under the

32

exclusive federal jurisdiction of PHMSA, which delegates authority to OSFM.  As such, regulation of pipeline safety, restart, or operation is reserved for OSFM and PHMSA, not the County.

122.   The Supremacy Clause of the Constitution states that "the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State Contrary notwithstanding."  (U.S. Constitution, Art. VI, cl. 2.)  The Supremacy Clause preempts state or local governments from interfering in a field fully occupied by federal agencies and law.

123.   Under federal law, PHMSA has authority to regulate oil pipelines and has delegated authority over pipeline safety to OSFM.  The County is preempted from regulating pipeline operations, including authorizing the restart of the pipeline or denying Sable's request to transfer the FDPs on the basis of safety concerns.

124.   At the Board's February 25, 2025 hearing, the two Supervisors who voted against denying the Appeals expressly cited concerns about pipeline safety as the reason for their no vote.  Supervisor Lee's summation of the request of the Board on the Appeals was that "we have a pipeline that leaked in 2015…and we want to restart it," adding that he felt that was "an insane idea."  Chair Capps opined that it was "not fair to the public" that the "one shot" that the public had to comment on the restart of the Facilities consisted of a hearing regarding "a technicality on a permit change."

125.   Article XI, Section 7, of the California Constitution provides that "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws."

126.   Under state law, OSPR has the exclusive authority to require that owners and operators have the financial wherewithal to cover costs associated with

33

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

a worst-case-scenario incident, and sets specific requirements.  The County lacks authority to require different or additional requirements not authorized by OSPR or the FDPs.  Thus, under Chapter 25B, the County's inquiry is limited to assessing compliance with County-imposed financial requirements.  The County is preempted from requiring additional financial assurances, as that is fully within the purview of OSPR and the County's requirement would place it in conflict with state law.

127.    Again, the Supervisors who voted against denying the Appeals expressly stated that Sable's finances was a reason for doing so.  In addition to expressing her belief that Sable's financing was "fishy," Chair Capps opined that the Board's decision was "about fiscal oversight," and stated, "it's too risky to have an applicant that was formed when a major company decided that having this pipeline was potentially too risky."

128.    Concerns related to pipeline safety or financial assurances, beyond those required by the County, are not a lawful basis for denying the Transfers.  Not only are they outside County Code Chapter 25B, they are preempted by federal and state law.  Consideration of these factors by Chair Capps and Supervisor Lee as part of the basis for voting against the denial of the Appeals violated the Supremacy Clause of the United States Constitution and state law.

129.    Petitioners seek a declaratory judgment that Chapter 25B, as applied by the County here, is preempted by federal and state law and damages in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioners/Plaintiffs pray for relief as follows:

1. For the First, Second, Third, and Fourth Causes of Action for Writ of Mandate:

   a. For a peremptory writ of mandamus directing the County to issue updated FDPs reflecting the Planning Commission's approval or, in the alternative, direct the County to make a determination on the Appeals;

34

b.  For attorneys' fees and other litigation expenses permitted by law in an amount to be proven; and

c.  For such other and further relief as the Court may deem just and proper.

2.  For the Fifth and Sixth Causes of Action for Declaratory Relief and Damages:

a.  For a declaration finding that, as applied, the County's Chapter 25B ordinance violates the Fifth and Fourteenth Amendments and Supremacy Clause of the Constitution and Article I, Section 19 and Article XI, Section 7 of the California Constitution;

b.  For damages in an amount to be proven;

c.  For attorneys' fees and other litigation expenses permitted by law in an amount to be proven; and

d.  For such other and further relief as the Court may deem just and proper.

## **<u>DEMAND FOR JURY TRIAL</u>**

Petitioners/Plaintiffs demand a jury trial for all issues so triable.

Dated:  May 8, 2025                    Respectfully submitted,

                                        LATHAM & WATKINS LLP
                                        Jessica Stebbins Bina


                                        By /s/ *Jessica Stebbins Bina*
                                        Jessica Stebbins Bina
                                        Attorneys for Plaintiffs and
                                        Petitioners Sable Offshore Corp.,
                                        Pacific Pipeline Company, and Pacific
                                        Offshore Pipeline Company


                                        O'MELVENY & MYERS LLP
                                        Lauren Kaplan


                                        By /s/ *Lauren Kaplan*
                                        Lauren Kaplan
                                        Attorneys for Plaintiffs and
                                        Petitioners Exxon Mobil Corporation,
                                        Mobil Pacific Pipeline Company, and
                                        ExxonMobil Pipeline Company

35

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VERIFICATION

I, J. Caldwell Flores, am President of Sable Offshore Corp. ("Sable Offshore"), Pacific Pipeline Company ("PPC"), and Pacific Offshore Pipeline Company ("POPCO"), and I am authorized to execute this verification on behalf of Sable Offshore, PPC, and POPCO.  I have read the forgoing **VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** and know the contents thereof. The matters stated therein are true and correct to my own personal knowledge, except those matters that are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct, and that I have executed this Verification on this 6th day of May, 2025, in Goleta, California.

_____
J. Caldwell Flores, President

VERIFIED PETITION FOR WRIT OF MANDATE AND
COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

**VERIFICATION**

I, Saul Flota, am the Vice President and US Operations Manager at ExxonMobil Pipeline Company ("EMPCo"), and I am authorized to execute this verification on behalf of EMPCo.  I have read the foregoing **VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** and know the contents thereof. The matters stated therein are true and correct to my own personal knowledge, except those matters that are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that I have executed this Verification on this 8 day of May, 2025, in Spring, Texas.

Saul Flota

VERIFIED PETITION FOR WRIT OF MANDATE AND
COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES
CASE NO. _____

# VERIFICATION

I, Nathan Franka, was SYU Asset Manager of Exxon Mobil Corporation ("ExxonMobil"), and I am authorized to execute this verification on behalf of ExxonMobil.  I have read the foregoing **VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** and know the contents thereof. The matters stated therein are true and correct to my own personal knowledge, except those matters that are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that I have executed this Verification on this 6th day of May, 2025, in Spring, Texas.

Nathan Franka

VERIFIED PETITION FOR WRIT OF MANDATE AND
COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES
CASE NO.

LATHAM&WATKINS
ATTORNEYS AT LAW
LOS ANGELES

1   **VERIFICATION**

2       I, David Welsh, am the President at Mobil Pacific Pipeline Company

3   ("MPPC"), and I am authorized to execute this verification on behalf of MPPC.  I

4   have read the foregoing **VERIFIED PETITION FOR WRIT OF MANDATE**

5   **AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** and

6   know the contents thereof. The matters stated therein are true and correct to my

7   own personal knowledge, except those matters that are stated on information and

8   belief, and as to those matters I believe them to be true.

9       I declare under penalty of perjury under the laws of the United States that

10  the foregoing is true and correct, and that I have executed this Verification on this

11  8 day of May, 2025, in Spring, Texas.

12

13

14

15

16                        David Welsh

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

VERIFIED PETITION FOR WRIT OF MANDATE AND
COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES
CASE NO. _____

39