*Sable Offshore Corp, et al. v. County of Santa Barbara, et al.*

Case No. 2:25-cv-04165

# ADMINISTRATIVE RECORD

# VOLUME 21 OF 21

# COSB AR 006750– COSB AR 007221

*Sable v. County of Santa Barbara*

Case No. 2:25-cv-04165

<u>INDEX TO ADMINISTRATIVE RECORD</u>

| 1. | Planning Commission Materials From October 30, 2024 Hearing | |
|---|---|---|
| **Date** | **Document** | **Bates No.** |
| 2024-10-30 | Agenda | COSB AR000001-AR000004 |
| Various | Noticing Documents | COSB AR000005-AR000014 |
| 2024-10-22 | Staff Report | COSB AR000015-AR000067 |
| 2024-10-30 | Attachment A – Findings | COSB AR000068-AR000180 |
| 2024-10-30 | Attachment B1 – Conditions of Approval (SYI FDP Permit 87-DP-32cz RV06) | COSB AR000081-AR000160 |
| 2024-10-30 | Attachment B2 – Conditions of Approval (POPCO Gas Plant FDP Permit) | COSB AR000161-AR000187 |
| 2024-10-30 | Attachment B3 – Conditions of Approval (Las Flores Pipeline System FDP) | COSB AR000188-AR000236 |
| 2024-10-22 | Attachment C – CEQA Notice of Exemption | COSB AR000237-AR000239 |
| 2024-03-14 | Attachment D  - 25B Permit Amendment Applications | COSB AR000240-AR000312 |
| 2024-07-01 | Attachment E1 – Transition Plans (SYU-POPCO) | COSB AR000313-AR000328 |
| 2024-07-01 | Attachment E2 – Transition Plans (Las Flores Pipeline) System) | COSB AR000329-AR000343 |
| 2024-02-01 | Attachment F – Compliance Plans | COSB AR000344-AR000344 |
| | -    Las Flores Pipeline Integrated Contingency Plan _redacted (1) | COSB AR000345-AR000633 |
| | -    Las Flores Pipeline Noise Monitoring and Control Plan Redacted (2) | COSB AR000634-AR000640 |
| | -    Las Flores Pipeline Pump Station Fire Protection Plan_Redacted (3) | COSB AR000641-AR000670 |
| | -    Las Flores Pipeline SIMQAP REDACTED (4) | COSB AR000671-AR000745 |
| | -    Las Flores Pipeline Site Security Plan_Redacted (5) | COSB AR000746-AR000749 |
| | -    SYU City of Santa Barbara Harbor Use Plan (6) | COSB AR000750-AR000775 |
| | -    SYU Groundwater Monitoring Plan (7) | COSB AR000776-AR000799 |
| | -    Integrated Noise Monitoring Plan Redacted (8) | COSB AR000800-AR000901 |
| | -    SYU POPCO ERP Redacted (9) | COSB AR000902-AR001282 |
| | -    SYU POPCO Fire Protection Plan_Redacted (10) | COSB AR001283-AR001518 |
| | -    SYO POPCO NGL Inventory Management Plan Redacted (11) | COSB AR001519-AR001520 |
| | -    SYU POPCO Preservation Task List Redacted (12) | COSB AR001521-AR001528 |
| | -    SYU POPCO SIMQAP redacted (13) | COSB AR001529-AR001572 |
| | -    SYI Security Control Plan Redacted (14) | COSB AR001573-AR001683 |
| | -    SYU TRMPP (15) | COSB AR001684-AR001696 |
| 2024-09-11 | Attachment G - Certificates of Insurance | COSB AR001697-AR001700 |
| 2024-10-03 | Attachment H – Certificates of Financial Responsibility | COSB AR001701-AR001703 |
| 2024-10-22 | Applicant Submittal | COSB AR001704-AR001722 |
| 2024-10-24 | Public Comment Letters | |

### 1. Planning Commission Materials From October 30, 2024 Hearing

| Date | Document | Bates No. |
|---|---|---|
| | - Public Comment Letter 1 | COSB AR001723-AR001758 |
| | - Public Comment Letter 2 | COSB AR001759-AR001772 |
| | - Public Comment Letter 3 | COSB AR001773-AR001844 |
| | - Public Comment Letter 4 | COSB AR001845-AR001850 |
| | - Public Comment Letter 5 | COSB AR001851-AR001861 |
| | - Public Comment Letter 6 | COSB AR001862-AR001866 |
| | - Public Comment Letter 7 | COSB AR001867-AR001972 |
| 2024-10-30 | Presentations | |
| | - Staff Presentation | COSB AR001973-AR001985 |
| | - Applicant Presentation | COSB AR001986-AR002004 |
| | - EIR | COSB AR002005-AR002005 |
| | - Slide | COSB AR002006-AR002006 |
| 2024-10-30 | Minutes | COSB AR002007-AR002009 |
| 2024-11-13 | Minutes | COSB AR002010-AR002013 |

### 2. Board of Supervisors Materials from February 4, 2025 Hearing

| Date | Document | Bates No. |
|---|---|---|
| 2025-02-04 | Agenda | COSB AR002014-AR002032 |
| 2024-02-04 | Noticing | COSB AR002033-AR002046 |
| 2024-02-04 | Board Letter | COSB AR002047-AR002049 |
| 2024-11-05 | Attachment A1 – CBD Appeal Letter | COSB AR002050-AR002057 |
| 2024-11-07 | Attachment A2 – EDC Appeal Letter | COSB AR002058-AR002169 |
| 2024-10-30 | Attachment B – Planning Commission Action Letter | COSB AR002170-AR002340 |
| 2024-10-22 | Attachment C – Planning Commission Staff Report | COSB AR002341-AR002673 |
| 2024-10-24 | Attachment  D - Public Comment Record | COSB AR002674-AR002923 |
| 2024-12-17 | Attachment E – Facilitation Report | COSB AR002924-AR002924 |
| 2024-02-04 | Minute Order | COSB AR002925-AR002926 |

### 3. Board of Supervisor Materials From February 24, 2025 Hearing

| Date | Document | Bates No. |
|---|---|---|
| 2024-02-25 | Agenda | COSB AR002927-AR002952 |
| 2025-02-25 | Board Letter | COSB AR002953-AR002969 |
| 2025-02-25 | Attachment A – Findings | COSB AR002970-AR002986 |
| 2025-02-25 | Attachment B – Conditions of Approval (B-1) | COSB AR002987-AR003067 |
| 2025-02-25 | Attachment B - Conditions of Approval (B-2) - POPCO Gas Plant FDP Permit No. 93-FDP-015 AM03 | COSB AR003068-AR003093 |
| 2025-02-25 | Attachment B - Conditions of Approval (B-3) - Las Flores Pipeline FDP Permit No. 88-DPF-033 | COSB AR003094-AR003142 |
| 2025-02-25 | Attachment C - CEQA Notice of Exemption | COSB AR003143-AR003145 |
| 2025-02-21 | Appellant Comment Letter - Center for Biological Diversity | COSB AR003146-AR003181 |
| 2025-02-18 | Appellant Exhibit - Center for Biological Diversity (1) | COSB AR003182-AR003195 |

| 2025 | Appellant Exhibit - Center for Biological Diversity (2) | COSB AR003196-AR003198 |
|---|---|---|
| 2025-02-25 | Appellant Comment Letter - Environmental Defense Center | COSB AR003199-AR003472 |
| 2025-02-21 | Appellant Accufacts, Inc. Report - Environmental Defense Center | COSB AR003473-AR003484 |
| 2025-02-21 | Appellant Economic Analysis - Environmental Defense Center | COSB AR003485-AR003493 |
| 2025-02-18 | Appellant References - Center for Biological Diversity & Wishtoyo Foundation - Volume 1 | COSB AR003494-AR003790 |
| 2025-02-19 | Appellant References - Center for Biological Diversity & Wishtoyo Foundation - Volume 2 | COSB AR003791-AR004014 |
| 2025-02-19 | Appellant References - Center for Biological Diversity & Wishtoyo Foundation - Volume 3 | COSB AR004015-AR004384 |
| 2025-02-19 | Appellant References - Center for Biological Diversity & Wishtoyo Foundation - Volume 4 | COSB AR004385-AR004544 |
| 2025-02-19 | Appellant References - Center for Biological Diversity & Wishtoyo Foundation - Volume 5 | COSB AR004545-AR004691 |
| 2025-02-19 | Appellant References - Center for Biological Diversity & Wishtoyo Foundation- Volume 6 | COSB AR004692-AR005025 |
| 2025-02-19 | Appellant References - Center for Biological Diversity & Wishtoyo Foundation - Volume 7 | COSB AR005026-AR005178 |
| 2025-02-19 | Appellant References - Center for Biological Diversity & Wishtoyo Foundation - Volume 8 | COSB AR005179-AR005232 |
| 2025-02-21 | Applicant Appeal Response | COSB AR005233-AR005257 |
| 2023-09-21 | Applicant Exhibits | COSB AR005258-AR006102 |
| 2025-01-20 | Public Comment - Group 1 | COSB AR006103-AR006124 |
| 2025-02-19 | Public Comment - Group 2 | COSB AR006125-AR006176 |
| 2025-02-20 | Public Comment - Group 3 | COSB AR006177-AR006252 |
| 2025-02-21 | Public Comment - Group 4 | COSB AR006253-AR006425 |
| 2025-02-24 | Public Comment - Group 5 | COSB AR006426-AR006498 |
| 2025-02-24 | Public Comment - Group 6 | COSB AR006499-AR006500 |
| 2025-02-25 | Public Comment - Group 7 | COSB AR006501-AR006509 |
| 2025-02-19 | Public Comment - City of Buellton | COSB AR006510-AR006512 |
| 2025-02-11 | Public Comment - City of Goleta | COSB AR006513-AR006516 |
| 2025-02-19 | Public Comment - City of Santa Barbara | COSB AR006517-AR006519 |
| 2025-02-21 | Public Comment - WE Watch | COSB AR006520-AR006521 |
| 2025-02-21 | Public Comment - Gray Panthers Santa Barbara Network | COSB AR006522-AR006523 |
| 2025-02-21 | Public Comment - Live Oak Unitarian Universalist Congregation of Goleta Social Justice Ministry | COSB AR006524-AR006525 |
| 2025-02-24 | Public Comment - Santa Barbara South Coast Chamber of Commerce | COSB AR006526-AR006527 |
| 2025-02-24 | Public Comment - Exxon Mobil | COSB AR006528-AR006529 |
| 2025-02-24 | Public Comment - Law Office of Janean Acevedo Daniels | COSB AR006530-AR006531 |
| 2025-02-25 | Staff Memorandum - Public Comment Not Considered or Accepted into the Official Record | COSB AR006532-AR006594 |
| 2025-02-25 | Staff Presentation | COSB AR006595-AR006615 |
| 2025-02-25 | Appellant Presentation - Center for Biological Diversity | COSB AR006616-AR006628 |
| 2025-02-25 | Appellant Presentation - Environmental Defense Center | COSB AR006629-AR006647 |
| 2025-02-25 | Applicant Presentation | COSB AR006648-AR006667 |
| 2025-02-25 | Speaker Slips | COSB AR006668-AR006752 |

| 2025-02-25 | Minute Order | COSB AR006753-AR006755 |
| 2025-02-25 | Memo: Planning Project/Appeal Hearing Time Estimate | COSB AR006756-AR006758 |
| 2025-02-25 | Memo: Departmental Presenter List | COSB AR006759-AR006759 |

| 4. | Board of Supervisors Materials from Closed Session on April 16, 2025 | |
|---|---|---|
| **Date** | **Document** | **Bates No.** |
| 2025-04-16 | Closed Session Agenda, 04-16-2025 | COSB AR006760-AR006767 |
| 2025-04-16 | Closed Session Agenda, 04-16-2025 – Attachment | COSB AR006768-AR006770 |
| 2025-02-26 | Applicant Letter to Santa Barbara County Planning Director | COSB AR006771-AR006773 |
| 2025-03-01 | Appellant EDC Letter to Board of Supervisors | COSB AR006774-AR006778 |
| 2025-04-17 | Closed Session Minutes, 04-17-2025 | COSB AR006779-AR006786 |

| 5. | Transcripts | |
|---|---|---|
| **Date** | **Document** | **Bates No.** |
| 2024-10-30 | Transcript of Planning Commission Hearing on October 30, 2024. | COSB AR006787-AR006939 |
| 2025-02-25 | Transcript of Board of Supervisors Hearing on February 25, 2025. | COSB AR006940-AR007207 |
| 2025-02-26 | Transcript of Planning Commission Hearing on February 26, 2025. | COSB AR007208-AR007221 |

**REQUEST TO SPEAK**



one **COUNTY**
one **FUTURE**

☐ **General Public Comment**

Agenda Item # *SABLE*

Date: *2/25/25*

Name: *Karen Kennedy*

(Print Name Clearly)

Phonetic Spelling: _____

(In an effort to pronounce names correctly please provide phonetic spelling)

Contact Information *(optional):* *805 773 9181*

(Phone Number Including Area Code)

_____

(Email Address)

Representing *(optional):* *SABLE*

(Organization, etc.)

All individual speakers and organized presentations to the Board of Supervisors are subject to time limits imposed at the discretion of the Chair.

Persons desiring to address the Board of Supervisors must complete and deliver to the Clerk a speaker slip **PRIOR** to the commencement of the item.

When speaking, be brief, stay on subject, present only new information. When testifying before the Board of Supervisors, personal attacks and other disruptive behavior is not appropriate.

(The Clerk will call you to the microphone at the appropriate time)

**PLEASE SEE REVERSE FOR BOARD MEETING PROTOCOLS**

COSB AR006750

**REQUEST TO SPEAK**

☐  **General Public Comment**

Agenda Item # ___01___

Date: ___2/24/25___

Name: ___Callan  Sheehy___

(Print Name Clearly)

Phonetic Spelling: _____

(In an effort to pronounce names correctly please provide phonetic spelling)

Contact Information *(optional)*: _____

(Phone Number Including Area Code)

_____

(Email Address)

Representing *(optional)*: ___Environetal  Law club___

(Organization, etc.)

All individual speakers and organized presentations to the Board of Supervisors are subject to time limits imposed at the discretion of the Chair.

Persons desiring to address the Board of Supervisors must complete and deliver to the Clerk a speaker slip **PRIOR** to the commencement of the item.

When speaking, be brief, stay on subject, present only new information. When testifying before the Board of Supervisors, personal attacks and other disruptive behavior is not appropriate.

(The Clerk will call you to the microphone at the appropriate time)

**PLEASE SEE REVERSE FOR BOARD MEETING PROTOCOLS**

COSB AR006751

**REQUEST TO SPEAK**

COUNTY OF SANTA BARBARA
CALIFORNIA
*one* COUNTY
*one* FUTURE

☐ **General Public Comment**

Agenda Item # V1

Date: 7/24/25

Name: Matthew Canfer

(Print Name Clearly)

Phonetic Spelling: _____

(In an effort to pronounce names correctly please provide phonetic spelling)

Contact Information *(optional)*: _____

(Phone Number Including Area Code)

_____

(Email Address)

Representing *(optional)*: UCSB Environmental Law Club

(Organization, etc.)

All individual speakers and organized presentations to the Board of Supervisors are subject to time limits imposed at the discretion of the Chair.

Persons desiring to address the Board of Supervisors must complete and deliver to the Clerk a speaker slip **PRIOR** to the commencement of the item.

When speaking, be brief, stay on subject, present only new information. When testifying before the Board of Supervisors, personal attacks and other disruptive behavior is not appropriate.

(The Clerk will call you to the microphone at the appropriate time)

**PLEASE SEE REVERSE FOR BOARD MEETING PROTOCOLS**

COSB AR006752



# County of Santa Barbara

## BOARD OF SUPERVISORS

## Minute Order

### February 25, 2025

**Present:**   5 - Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

<u>PLANNING AND DEVELOPMENT DEPARTMENT</u>                    <u>File Reference No.  25-00144</u>

**RE:**   HEARING - Consider recommendations regarding the appeals of the Planning Commission Approval of the Sable Offshore Corporation's Change of Owner, Operator, and Guarantor for the Santa Ynez Unit, Pacific Offshore Pipeline Company Gas Plant, and Las Flores Pipeline System Final Development Plan Permits, Third, Fourth, and First Districts, as follows: (EST. TIME: 2 HR.)

a) Deny the appeals, Case Nos. 24APL-00025 and 24APL-00026;

b) Make the required finding for approval of the Sable Offshore Corporation's Change of Owner, Operator, and Guarantor for the respective Santa Ynez Unit, Pacific Offshore Pipeline Company Gas Plant, and Las Flores Pipeline System Final Development Plan Permits, including California Environmental Quality Act (CEQA) findings;

c) Determine the requests are not a "project" that is subject to environmental review under CEQA Guidelines Section 15378(b)(5), finding that the actions consist of administrative activities of government that will not result in direct or indirect changes to the environment; and

d) Grant de novo approval of the Change of Owner, Operator, and Guarantor for the respective Santa Ynez Unit, Pacific Offshore Pipeline Company Gas Plant, and Las Flores Pipeline System Final Development Plan Permits as detailed in the Board Letter and subject to the Conditions of Approval.

COUNTY EXECUTIVE OFFICER'S RECOMMENDATION: POLICY

*HEARING TIME: 9:43 AM - 12:52 PM AND 1:41 PM - 4:10 PM (5 HR. 38 MIN.)*

COSB AR006753



# County of Santa Barbara

## BOARD OF SUPERVISORS

## Minute Order

### February 25, 2025

Received and filed staff presentation and conducted a public hearing.

Mike Stoker, Paasha Mahdavi, Emily Engel, Jeff Maassen, Anna Marie Gott, Marell Brooks, Chris Lange, Robert Almy, Ken Hough, Kathryn Henry, Michael Lyons, Dr. Linda Phillips, Kelsey Perry, Kaytee Dobbs, Benjamin Bhutani Goedert, Lily Poehler, Nate Irwin, James Kyriaco, Thomas Becker, Terry Fernandez, Ethan Maday, Karin Hauenstein, Lauren Keane, Vivienne Chankai, Deane Plaister, Kaili Mikami, Rebecca Williams, Izzi Sistek, Mia DiCostanzo, Milena Seymour, Nikki Talebi, Jonathan Ullman, Reese Raygoza, Mike Caldwell Nathaniel Williams, Steve Balkcom, Ella Boehme, Ted Roche, Olivia Schroeder, Steve Coldiron, Seth Dolak, Abigail Youngblood, Pascual Morales, Josh Medrano, Juan Montelongo, Brian Trautwein, Benjamin Bray, Evelyn Lynn, Jared Umphress, Charlotte Breier, Dove Joans, Johnny McConville, Ted Morton, Danny Zaragoza, Christopher Alexander, Holly Sherwin, Sean Kennedy, Karen Kennedy, Callian Sheey, Matthew Camper, Laurie Bailey, Lorraine Woodman, Craig Woodman, Solange Aguilar, Tevin Schmitt, Angie Gulizia, Sneha, Jason Wall, Elizabeth Martinez, Nancy Avoce, Katie Davis, Alhan Diaz, Elena Danielson, Jessi Rumkin, Andrew Robbins, Kian Ghodassi, Gillian Heald, John Hoohleutner, David Quezada, Zarick MacDonald, Melia Martinez, Efigenia Barnales, Mariza Sullivan, Emilie Difede, Janet Garcia, Jenna McGovern, Everett Mathiason, Stephanie Katers, Hailey Rowen, Jenna McGovern, Mya Aldrich, Alex Borgas, Ruth Hellier, Hillary Hauser, Juan Salas, Bill Hickman, Candice Meneghin and Seth Steiner addressed the Board.

A motion was made by Supervisor Lavagnino, seconded by Supervisor Nelson, that this matter be acted on as follows:

To accept the following documents into the record: Public Comment letter from Evie Lynn, Public Comment letter from Janice Rudestam, Public Comment letter from Karen Dorfman, Public Comment letter from Rachel Rhodes, Presentation Replacement No. 1 Applicant/Sable, Public Comment Letter from Lauren French, Public Comment Support Letters from FionaHutton&Associates on behalf of Sable/Applicant, Public Comment letter from Heal the Ocean, Public Comment letter from Linda Stewart-Oaten, Public Comment letter from Laura Haston, Public Comment letter from Kaytee Dobbs and a Public Comment letter from David Hourin.

The motion failed by the following vote:

      **Ayes:**  2 -   Supervisor Nelson, and Supervisor Lavagnino

      **Noes:**  2 -   Supervisor Lee, and Supervisor Capps

  **Recused:**  1 -   Supervisor Hartmann

COSB AR006754



# County of Santa Barbara

## BOARD OF SUPERVISORS

## Minute Order

### February 25, 2025

A motion was made by Supervisor Lavagnino, seconded by Supervisor Nelson, that this matter be acted on as follows:

a) Denied the appeals, Case Nos. 24APL-00025 and 24APL-00026;

b) Made the required findings for approval of the Sable Offshore Corporation's Change of Owner, Operator, and Guarantor, including California Environmental Quality Act (CEQA) findings;

c) Approved; and

d) Granted de novo approval of the Change of Owner, Operator, and Guarantor.

The motion failed by the following vote:

    **Ayes:**  2 -   Supervisor Nelson, and Supervisor Lavagnino

    **Noes:**  2 -   Supervisor Lee, and Supervisor Capps

    **Recused:**  1 -   Supervisor Hartmann

A conceptual motion was made by Supervisor Capps, seconded by Supervisor Lee, to approve the appeals, Case Nos. 24APL-00025 and 24APL-00026.

The motion failed by the following vote:

    **Ayes:**  2 -   Supervisor Lee, and Supervisor Capps

    **Noes:**  2 -   Supervisor Nelson, and Supervisor Lavagnino

    **Recused:**  1 -   Supervisor Hartmann

COSB AR006755

# Clerk of the Board of Supervisors

County of Santa Barbara
105 E. Anapamu St., Rm. 407
Santa Barbara, CA 93101

## Memo: Planning Project/Appeal Hearing Time Estimate
_____

**Agenda Date***:* February 25, 2024

**Subject:**  Appeal of the Sable Offshore Corporation's Change of Owner, Operator, and Guarantor of the Santa Ynez Unit, POPCO Gas Plant, and Las Flores Pipeline System Final Development Plan Permits

Note: Presentation time should be limited to 10 minutes with a 5 minute (maximum) rebuttal/response time. The planner should inform the applicant (and appellant, if applicable) of the amount of time they have allotted.

|  | **Time Allocation** |
|---|---|
| **Staff Presentation** | 10 min |
| Contact: Errin Briggs, 805-568-2047, ebriggs@countyofsb.org | |
| Staff Planner: Jacquelynn Ybarra, 805-568-2047, jybarra@countyofsb.org | |
|  | |
| **Appellant(s)** | 20 min |
| Note: If applicable/for appeals | (10 min each) |
| 1.  Miyoko Sakashita, 510-844-7108, miyoko@biologicaldiversity.org | |
| 2.  Linda Krop, 805-963-1622, lkrop@environmentaldefensecenter.org | |
| **Applicant(s)** | 20 min |
| Steve Rusch, 323-697,2060, srusch@sableoffshore.com | |
|  | |
| **Public Comment/Level of Interest** | 40 min |
| Note: Generally, speakers are given 3 minutes each. | |
| • Low (15 minutes or less) | |
| • Medium (15 minutes – 30 minutes) | |
| • High (30 minutes or more) | |
|  | |
| **Rebuttal/Response** | |
| Notes: Update based on hearing type. Rebuttals are for appeals. | |
| Appellant (If applicable/for appeals) | 10 min |
|  | (5 min each) |
| Applicant | 10 min |
|  | |
| **Staff Comments** | 5 min |
|  | |
| **Board of Supervisors Deliberation** | 20 min |
|  | |
| **Total Hearing Time Estimate** | 120 min |
| Note: This should match the time estimate provided in the Board Letter. | |

COSB AR006756

**CONTACT INFORMATION:**

Note: This section should include: First Name, Last Name, and email address of all participants. In addition, please indicate the attendance type of each participant by using the provided drop-down menu.

**Applicant(s):**

| Attendance Type | Full Name | Email |
|---|---|---|
| IN PERSON | Steve Rusch, Sable | srusch@sableoffshore.com |
| IN PERSON | Jessica Stebbins Bina, Latham Watkins Outside Counsel | Jessica.StebbinsBina@lw.com |
| IN PERSON AVAILABLE FOR QUESTIONS | Anthony Duenner, Sable | aduenner@sableoffshore.com |
| IN PERSON AVAILABLE FOR QUESTIONS | Caldwell Flores, Sable | cflores@sableoffshore.com |
| IN PERSON AVAILABLE FOR QUESTIONS | DJ Moore, Latham Watkins Outside Counsel | DJ.Moore@lw.com |
| IN PERSON AVAILABLE FOR QUESTIONS | Lauren Paull, Latham Watkins Outside Counsel | Lauren.Paull@lw.com |
| ZOOM AVAILABLE FOR QUESTIONS | Lance Yearwood, Sable | lyearwood@sableresources.com |

**Appellant(s):**

| Attendance Type | Full Name | Email |
|---|---|---|
| IN PERSON | Mark Patronella, Center for Biological Diversity | mpatronella@biologicaldiversity.org |
| IN PERSON | Rachel Mathews, Center for Biological Diversity | rmathews@biologicaldiversity.org |
| IN PERSON | Linda Krop, Environmental Defense Center | lkrop@environmentaldefensecenter.org |
| IN PERSON | Jeremy Frankel, Environmental Defense Center | jfrankel@environmentaldefensecenter.org |

**Staff:**

| Attendance Type | Full Name | Email |
|---|---|---|
| IN PERSON | Jacquelynn Ybarra, Planner | jybarra@countyofsb.org |
| IN PERSON | Errin Briggs, Deputy Director | ebriggs@countyofsb.org |
| IN PERSON AVAILABLE FOR QUESTIONS | Jeff Wilson, Assistant Director | jewilson@countyofsb.org |
| IN PERSON AVAILABLE FOR QUESTIONS | Lisa Plowman, Director | lplowman@countyofsb.org |

COSB AR006757

**Mandatory Docketing Requirements:**

☐  Hearing Time Estimates are due at the time of docketing.

☐  Email the Hearing Time Estimate along with the Board Letter and all associated materials to
   BoardLetters@countyofsb.org with a clearly titled email.

☐  Provide one (1) Original hard copy to the Clerk of the Board.

**Additional Information**

☐  Email BoardLetters@countyofsb.org immediately with <u>any</u> changes to the above information.

COSB AR006758

# Clerk of the Board of Supervisors

County of Santa Barbara
105 E. Anapamu St., Rm. 407
Santa Barbara, CA 93101



one
COUNTY
one
FUTURE

**Memo: Departmental Presenter List**    25-00144

**Agenda Date:**  February 25, 2025

**Staff Contact:** Jacquelynn Ybarra, jybarra@countyofsb.org

**Subject:** Appeals of the Sable Change of Owner, Operator and Guarantor of the Santa Ynez Unit, POPCO Gas Plant, and Las Flores Pipeline System

**Sponsoring Department:** Planning and Development, Energy Minerals and Compliance Division

**Presenters:** Please provide the information listed in the table below.

| Attendance Type | Full Name | Email |
|---|---|---|
| **IN PERSON** | Jacquelynn Ybarra, Planner | jybarra@countyofsb.org |
| | | |
| | | |

## Mandatory Docketing Requirements:

☐ PowerPoint Presentations are due no later than 4:00 PM the Wednesday prior to the hearing date.

☐ All PowerPoint presentations must be e-mailed (PowerPoint and PDF) to both BoardLetters@countyofsb.org and GuestCA@countyofsb.org.

☐ Presentations must include slide numbers.

☐ Provide one (1) Original of the PowerPoint Presentation printed in color, as follows:

   o  Single-sided
   o  One (1) slide per page – Printed as "Full Page Slides"
   o  Paper clipped
   o  NOT hole-punched

## Additional Information

☐ Email SBCOB@countyofsb.org immediately with any changes made to the PowerPoint Presentation or the Presenters after submittal.

# County of Santa Barbara

# BOARD OF SUPERVISORS



*First District - Roy Lee*
*Second District - Laura Capps, Chair*
*Third District - Joan Hartmann*
*Fourth District - Bob Nelson, Vice Chair*
*Fifth District - Steve Lavagnino*

*Mona Miyasato, County Executive Officer*

## Agenda

**Wednesday, April 16, 2025**

**9:00 AM**

**BUDGET WORKSHOP**

**COUNTY ADMINISTRATION BUILDING**
**BOARD HEARING ROOM, FOURTH FLOOR**
**105 EAST ANAPAMU STREET, SANTA BARBARA**

The Board of Supervisors meets concurrently as the Board of Directors of: the Flood Control & Water Conservation District, the Water Agency, the Laguna County Sanitation District, and other Special Districts.

Web Streaming of the Board of Supervisors Meetings, Agendas, Supplemental Materials and Minutes of the Board of Supervisors are available on the internet at: www.countyofsb.org

Please see page two of this agenda for public participation options for the Board of Supervisors Meetings. Persons may address the Board on any matter listed on the agenda. Matters not listed on the agenda may be addressed  during the public comment period at the conclusion of the administrative agenda.

COSB AR006760

**25-00268**

**The Santa Barbara County Board of Supervisors currently provides in-person participation as well as remote participation until further notice.**

**Board members and the public may participate from the County Administration Building, Board Hearing Room, Fourth Floor located at 105 East Anapamu Street in Santa Barbara or the Joseph Centeno Betteravia Government Administration Building Board Hearing Room located at 511 Lakeside Parkway in Santa Maria.**

**The following methods of participation are available to the public:**

**1. You may observe the live stream of the Board meetings in the following ways:**

- Televised in English and Spanish (SAP channel via Comcast and Cox) on local cable channel 20;
- Online at: <https://www.countyofsb.org/1333/CSBTV-Livestream>; and
- YouTube (English) at: <https://www.youtube.com/user/CSBTV20> (Closed Captioning Available)
- YouTube (Spanish) at: <<https://www.youtube.com/@csbtv20espanol74>>

**2. If you wish to provide public comment, the following methods are available:**

- **Distribution to the Board of Supervisors** - Submit your comment via email prior to 5:00 PM on the day prior to the Board meeting. Please submit your comment to the Clerk of the Board at: sbcob@countyofsb.org. Your comment will be distributed to the Board and posted online. Whether the comment is formally part of the record depends on the agenda item it is submitted for and its length and time of submittal as set out in Board Resolution 91-333 (Land Use).

- **Attend the Meeting In-Person -** Individuals are allowed to attend and provide comments at the Board meeting in-person at the locations noted above.

- **Attend the Meeting by Zoom** - Individuals wishing to provide public comment remotely during the Board meeting can do so via Zoom by clicking the below link to register in advance.

**Important Note:** Zoom is not intended for County staff to view the meeting. Please refer to the viewing methods outlined above.

Register for Public Comment in advance for this meeting:
<https://santabarbaracounty.zoomgov.com/webinar/register/WN_8wAqFH-gQRi5u-2_WsJDVA>

After registering, you will receive a confirmation email containing important information about joining the webinar. Please review the Zoom protocols below, as follows:

1. Once the Chair has announced the item you want to comment on, please join the meeting.

2. You will be placed on mute until it is your turn to speak. You will be able to hear the Board meeting live after calling in and will need to turn off or mute your TV or the web stream to avoid sound interference.

3. The Clerk will call you by name. When removed from mute, you will hear a notification that your line has been unmuted. **If you are using a touchtone phone, you may need to press *6.**

4. Each person may address the Board for up to three minutes at the discretion of the Chair.

5. When your time is up or you have concluded your comments, please hang up or log out.

If you have any questions or if you are participating in the hearing telephonically or electronically and need a disability-related modification or accommodation or have any issues attempting to access the hearing, please contact the Clerk of the Board's Office at (805) 568-2240.

COSB AR006761

## Board Meeting Procedures

*The Board of Supervisors is the legislative body for the County of Santa Barbara. Persons are encouraged to attend and testify before the Board on any matter appearing on the agenda. Correspondence to the Board regarding items appearing on the agenda should be directed to the Clerk of the Board, 105 East Anapamu Street, Room 407, Santa Barbara CA 93101. For information regarding the meetings of the Board of Supervisors including specific meeting times, or any special accommodations, please contact the Clerk of the Board at (805) 568-2240 or sbcob@countyofsb.org. Procedures for the conduct of the meetings of the Board of Supervisors can be found in Board Resolutions 09-368 (General) and 91-333 (Land Use).*

*The schedule of the Board of Supervisors, meeting agendas, supplemental hearing materials and minutes of the Board meetings are available on the Internet at: www.countyofsb.org.*

*Board Meetings are televised live on County of Santa Barbara Cable Channel 20 and on YouTube at: CSBTV20. For information regarding rebroadcasts of a public hearing, please contact the Clerk of the Board at (805) 568-2240 or sbcob@countyofsb.org.*

## Late Distribution and Ex-Parte Communication

*Any disclosable public records related to an open session item on a regular meeting agenda and distributed by the Clerk of the Board to all or a majority of the members of the Board of Supervisors less than 72 hours prior to that meeting are available for inspection in the Clerk of the Board Office, 105 East Anapamu Street, Room 407, Santa Barbara, CA, at the Office of the Board of Supervisors, Betteravia Government Center, 511 East Lakeside Parkway, Santa Maria, CA and on the Internet at: http://santabarbara.legistar.com/Calendar.aspx#current. Any written ex-parte communication subject to disclosure by members of the Board of Supervisors may be published online as an attachment to the corresponding item.*

## Disclosure of Campaign Contributions

*Pursuant to Government Code section 84308, members of the Board of Supervisors are disqualified and not able to participate in any agenda item involving contracts (other than competitively bid, labor, or personal employment contracts), franchises, discretionary land use permits and other entitlements if the Board member received more than $250 in campaign contributions from the applicant or contractor, an agent of the applicant or contractor, or any financially interested participant who actively supports or opposes the County's decision on the agenda item within the preceding 12 months. Applicants, appellants, contractors, agents or any financially interested participant who actively supports or opposes the County's decision on the agenda item who have made campaign contributions totaling more than $250 to a Board member within the preceding 12 months, are required to disclose that fact for the official record of the subject proceeding. Disclosures must include the amount and date of the campaign contribution and identify the recipient Board member and may be made either in writing to the Clerk of the Board of Supervisors prior to the subject hearing or by verbal disclosure at the time of the hearing.*

## Closed Session

*The Board of Supervisors conducts a Closed Session between 12:00 P.M. and 1:00 P.M. and at 8:00 A.M. as necessary. Closed Sessions are not open to the public. Matters discussed during Closed Session include existing and pending litigation, personnel matters and real property negotiations. Actions taken by the Board during Closed Session will be announced during open session (Gov. Code Sections 54957.1(a) & (b), Ralph M. Brown Act). Members of the public may address the Board on Closed Session Agenda items during the General Public Comment period. For information related to Closed Session announcements please contact County Counsel at (805) 568-2950.*

COSB AR006762

**Agenda**

### Disability Access and Accommodation Requests

*The Board of Supervisors Hearing Room in Santa Barbara is located on the Fourth Floor of the County Administration Building, 105 East Anapamu Street, Santa Barbara. The Hearing Room is wheelchair accessible. Accessible public parking is available behind the County Administration Building and in City Parking Lot #6 located at the corner of Anacapa Street and Anapamu Street. Public access to the County Administration Building is available through the Anacapa Street entrance.*

*The Board of Supervisors Hearing Room in Santa Maria is located at the Betteravia Government Center, 511 East Lakeside Parkway, Santa Maria. The Hearing Room is wheelchair accessible. Accessible public parking is available at the Betteravia Government Center.*

*Spanish interpreters, American Sign Language interpreters, Americans with Disabilities Act (ADA) requests, sound enhancement equipment, or other accommodations may be arranged by contacting the Clerk of the Board of Supervisors by 4:00 p.m. on the Friday before the Board meeting. For information about these services please contact the Clerk of the Board at (805) 568-2240 or at sbcob@countyofsb.org.*

COSB AR006763

**9:00 A.M. ..... Convene to Regular Session**

**Roll Call**

**Pledge of Allegiance**

**County Executive Officer's Report**

**25-00001**

County Executive Officer's Report: Receive a report from the County Executive Officer (CEO) on County programs, County staff updates and achievements, staff recognitions, updates on major projects, updates on state and federal legislation, and upcoming events of interest to the Board and the public. There will be no Board discussion except to ask questions or refer matters to staff; and no action will be taken unless listed on a subsequent agenda.

COSB AR006764

## Budget Workshop
## Santa Barbara County Fiscal Year 2025-2026

*The schedule shown is an estimate for planning purposes. Items may be heard earlier or later than listed on the Agenda. Departmental presentations not completed by Wednesday, April 16, 2025 may be considered on Thursday, April 17, 2025. If Budget Workshops are continued to Thursday, April 17, 2025, the Board of Supervisors may discuss budget items for any County Department, County Function or Special Issue previously discussed.*

*Persons may address the Board at the conclusion of each Functional Group or Special Issue presentation. Please refer to the Important Notice Regarding Public Participation on page two (2) of this Agenda for details regarding current methods of participation. Matters not listed on the Agenda or of a general nature may be addressed during the Public Comment Period at the end of each day's hearing.*

*Staff will be available from each Department to respond to questions and to provide information as requested by the Board.*

**9:00 A.M.    Departmental Budgets | Health and Human Services**

County Health
First 5 Santa Barbara County
Social Services
Behavioral Wellness
Child Support Services

**Public Comment**

**Departmental Budgets | Community Resources & Public Facilities**

Public Works
Agriculture, Weights & Measures
Planning & Development
Community Services

**Public Comment**

**Departmental Budgets | Policy and Executive**

County Counsel
Board of Supervisors
County Executive Office
General County Programs & Fund Balances

**Public Comment**

**Budget Workshop Summary**

COSB AR006765

**ADDENDUM**

**Addendum Closed Session Agenda added**

### Closed Session

25-00321

CONFERENCE WITH LEGAL COUNSEL-ANTICIPATED LITIGATION
(Paragraph (2) of subdivision (d) of Government Code section 54956.9)

Significant exposure to civil litigation: 1 case. On April 11, 2025 the County received a threat of
litigation (letter attached to this Agenda item) from Latham & Watkins LLP regarding "Change of
Owner, Operator, and Guarantor for the Santa Ynez Unit, POPCO Gas Plant, and Las Flores
Pipeline System Final Development Plan Permits."

**Report from Closed Session**

### Departmental Agenda
### Planning Items and Public Hearings

1)       COUNTY EXECUTIVE OFFICE                                          25-00270

HEARING - Consider recommendations regarding the Fiscal Year (FY) 2025-2026 Preliminary
Budget and Budget Development Workshops, as follows:

a) Receive and file information about the FY 2025-2026 preliminary budget;

b) Confirm recommended uses of one-time funds to be included in the County Executive Office's
Recommended Budget;

c) Provide direction, if any, regarding other items to be addressed or included in the County
Executive Office's Recommended Budget, scheduled for release in May and Board adoption
scheduled for June 17, 2025 and June 18, 2025;

d) Provide direction, if any, regarding Special Issues or other items; and

e) Determine pursuant to California Environmental Quality Act (CEQA) Guidelines 15378(b)(4)
that the above actions are not a project subject to CEQA review, because it is a government fiscal
activity that does not involve any commitment to any specific project which may result in a
potentially significant physical impact on the environment.

COUNTY EXECUTIVE OFFICER'S RECOMMENDATION: POLICY

25-00002

COSB AR006766

BOARD OF SUPERVISORS                    Agenda                    April 16, 2025

---

### Public Comment Period

*THE PUBLIC COMMENT PERIOD IS RESERVED FOR COMMENT ON MATTERS WITHIN THE SUBJECT MATTER JURISDICTION OF THE BOARD OF SUPERVISORS. EACH PERSON MAY ADDRESS THE BOARD FOR UP TO THREE MINUTES AT THE DISCRETION OF THE CHAIR, FOR A TOTAL PUBLIC COMMENT PERIOD OF NO MORE THAN 15 MINUTES.  (Resolution No. 09-368) (25-00002)*

*WHEN TESTIFYING BEFORE THE BOARD OF SUPERVISORS, PERSONAL ATTACKS AND OTHER DISRUPTIVE BEHAVIOR ARE NOT APPROPRIATE.*

### Adjourn to

### Budget Workshop
### Thursday, April 17, 2025

### County Administration Building
### Board Hearing Room
### 105 East Anapamu Street , Fourth Floor
### Santa Barbara

### Challenges

*IF YOU CHALLENGE A DETERMINATION MADE ON A MATTER ON THIS AGENDA IN COURT, YOU MAY BE LIMITED TO RAISING ONLY THOSE ISSUES YOU OR SOMEONE ELSE RAISED AT THE PUBLIC HEARING DESCRIBED IN THIS NOTICE, OR IN WRITTEN CORRESPONDENCE TO THE BOARD OF SUPERVISORS AT, OR PRIOR TO, THE PUBLIC HEARING.*

### Announcements

*The meeting of Wednesday, April 16, 2025 will be telecast live on County of Santa Barbara TV Channel 20 at 9:00 AM, and will be rebroadcast on Friday, April 18, 2025, at 9:00 AM and on Saturday, April 19, 2025, at 7:00 AM on CSBTV Channel 20.*

### http://www.countyofsb.org

COSB AR006767

Jessica Stebbins Bina
Direct Dial: 424.653.5525
jessica.stebbinsbina@lw.com

10250 Constellation Blvd., Suite 1100
Los Angeles, California 90067
Tel: +1.424.653.5500  Fax: +1.424.653.5501
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Silicon Valley |
| Hong Kong | Singapore |
| Houston | Tel Aviv |
| London | Tokyo |
| Los Angeles | Washington, D.C. |
| Madrid | |

April 11, 2025

**VIA EMAIL**

Lisa Plowman
Director of Planning and Development
Santa Barbara County
105 E Anapamu Street
Santa Barbara, CA 93101

Re:  Change of Owner, Operator, and Guarantor for the Santa Ynez Unit, POPCO Gas Plant, and Las Flores Pipeline System Final Development Plan Permits

Dear Ms. Plowman:

On behalf of our client, Sable Offshore Corp. ("Sable"), we write regarding the transfer of the permits related to the above-referenced matter. This letter follows up on our February 26, 2025, letter to you, in which we outlined the legal basis for the County's issuance of updated permits to reflect Sable as the new owner, operator, and guarantor of the Santa Ynez Unit, POPCO Gas Plant, and Las Flores Pipeline System (the "Facilities").[1] We write again to reiterate our request, in light of the information provided in our prior correspondence and below, that the County transfer the permits forthwith and without further delay.

As you are aware, the Santa Barbara County Planning Commission ("Planning Commission"), acting pursuant to its authority under Santa Barbara County Code Chapter 25B, approved Sable's applications for the change of owner, operator, and guarantor for the Facilities. On appeal, the Santa Barbara County Board of Supervisors ("Board") failed to act, as the four County Supervisors present split the vote on a motion to deny the appeals, 2 votes to 2 votes.

---

[1] The relevant permit transfers involve the Santa Ynez Unit Final Development Plan (FDP) Permit No. 87-DP-32cz (RV06) transfer from ExxonMobil Corporation to Sable (Owner, Operator, and Guarantor); the Pacific Offshore Pipeline Company (POPCO) Gas Plant FDP Permit No. 93-FDP-015 (AM03) transfer from ExxonMobil Corporation to Sable (Operator and Guarantor); and the Las Flores Pipeline System FDP Permit No. 88-DPF-033 (RV0l)z, 88-CP-60 (RV01)(88-DPF-25cz;85-DP-66cz; 83-DP-25cz) transfer from ExxonMobil Pipeline Company (EMPCo) to Sable (Operator), and ExxonMobil Corporation to Sable (Guarantor).

COSB AR006768

LATHAM&WATKINS LLP

As explained in Sable's February 26 letter, because the Board's role was to review the permit transfers that had already been granted by the Planning Commission (and that were within the Planning Commission's statutory jurisdiction), the no-action determination means the Planning Commission's approval of the transfer of the permits to Sable stands.  (*See, e.g.*, *Grist Creek Aggregates, LLC v. Superior Court*, 12 Cal. App. 5th 979 (2017) (Hearing Board's "tie vote meant that [previously issued Authority to Construct] was allowed to stand, which was effectively a decision not to revoke it."); *see also Today's Fresh Start, Inc. v. Los Angeles County Office of Education*, 197 Cal. App. 4th 436 (2011), *rev'd on other grounds by* 57 Cal. 4th 197 (2013) (where county Board of Education split 4-4 on appeal of school charter revocation, this "amounted to a final decision by the board failing to adopt the motion, denying the appeal, and upholding the revocation.").)  Accordingly, as explained in our prior letter, the County is legally obligated to transfer the permits to Sable.

Sable understands that the County also received a letter from one of the appellants, the Environmental Defense Center ("EDC"), arguing for a contrary interpretation of the tie vote-namely, that the Board's failure to take action constituted a denial of Sable's request for the permit transfers.  Neither the County Code nor the case law cited by EDC supports this position.  To the contrary, EDC ignores the key differences in the code provisions underpinning each court's decision.  In *Clark v. City of Hermosa Beach*, the court held that a tie vote was insufficient to grant the conditional use permit sought because the city's code did not simply direct the city council to review the lower commission's decision for error, but also specifically required that the council decide "whether *it* [the council] should grant or deny the permit." (48 Cal. App. 4th 1152, 1176.)  Here, the County Code clearly limits the Board's authority to reviewing the Planning Commission's determination and does not charge the Board with directly granting or denying the permit transfer request.  (Sec. 25B-12(b)(4).)  Similarly, in *Anderson v. Pittenger*, the court found that the council's tie vote did not affirm the lower commission's determination because the city's code required the council itself to grant, deny, or modify the requested variance.  (197 Cal. App. 2d. 188.)  That is not the case here, as the County's Code grants the Board the authority only to "affirm, reverse or modify *the planning commission's decision*," not the underlying permit transfer.  (Sec. 25B-12(b)(4).)  The court in *Clark* specifically distinguished its holding from the facts here by noting that the council's determination "was not merely to review proceedings before the commission and affirm, reverse, or modify the order of the commission." (48 Cal. App. 4th 194-95.)  This is, of course, precisely the limited scope of review that the County Code affords the Board.  Finally, in *REA Enterprises v. Cal. Coastal Zone Conservation Com.*, the court leaned on Coastal Act language that required the State Board to determine "whether the permit should be granted" and not simply to review the regional commission's decision on the permit.  (52 Cal. App. 3d 596, 609.)  Again, no such language exists in the County Code.

The law is clear: when, as here, jurisdiction is vested originally in a decisionmaker and another decisionmaker acts merely as a reviewing court, a tie vote operates to affirm the original decision.  Only in instances in which the reviewing agency is *itself* tasked with the underlying approval—which the Board was *not* here—does a tie vote result in administrative limbo.

The Board's no-action vote thus affirms the Planning Commission's approval of the permit transfers.  Under the County Code, there is no stay of the Planning Commission's decision pending

LATHAM&WATKINS LLP

appeal. As such, and with no indication that the Board plans to revisit its February 25 vote, the County must transfer the permits to Sable.

Sable is grateful to the Santa Barbara County Planning & Development staff for their hard work and professionalism leading up to the October 30, 2024 County Planning Commission hearing and the February 25, 2025 Board of Supervisors hearing related to the permits. Sable's team has enjoyed working collaboratively with County staff and appreciates their thorough work in preparing recommendations for the Planning Commission's and Board's consideration. We trust that staff will understand that in the absence of transfer of the permits, Sable must proceed with seeking further redress in the form of a writ of mandate. Such action would not reflect any antagonistic attitude from Sable toward Santa Barbara County but would simply serve as the necessary device for addressing any administrative stalemate we will have reached if the permits are not transferred as respectfully requested. Sable again requests the County's prompt transfer of the permits and of course we would be happy to discuss or respond to any questions you may have.

Respectfully submitted,

Jessica Stebbins Bina
of LATHAM & WATKINS LLP

COSB AR006770

**Jessica Stebbins Bina**
Direct Dial: 424.653.5525
jessica.stebbinsbina@lw.com

10250 Constellation Blvd., Suite 1100
Los Angeles, California  90067
Tel: +1.424.653.5500  Fax: +1.424.653.5501
www.lw.com

# LATHAM & WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Austin | Milan |
| Beijing | Munich |
| Boston | New York |
| Brussels | Orange County |
| Century City | Paris |
| Chicago | Riyadh |
| Dubai | San Diego |
| Düsseldorf | San Francisco |
| Frankfurt | Seoul |
| Hamburg | Silicon Valley |
| Hong Kong | Singapore |
| Houston | Tel Aviv |
| London | Tokyo |
| Los Angeles | Washington, D.C. |
| Madrid | |

February 26, 2025

**VIA EMAIL**

Lisa Plowman
Director of Planning and Development
Santa Barbara County
105 E Anapamu Street
Santa Barbara, CA 93101

> Re:  Change of Owner, Operator, and Guarantor for the Santa Ynez Unit, POPCO Gas Plant, and Las Flores Pipeline System Final Development Plan Permits

Dear Ms. Plowman:

On behalf of our client, Sable Offshore Corp. ("Sable"), we first want to thank Santa Barbara County Planning & Development staff for the detailed staff report and presentation provided at yesterday's County Board of Supervisors' ("Board") hearing concerning the above-referenced matter.  We write today to address the outcome of that hearing and request that the County immediately transfer to Sable each of the permits described with more specificity below.

As you are aware, on October 30, 2024, the County Planning Commission ("Planning Commission"), acting pursuant to its authority under Santa Barbara County Code Chapter 25B, approved Sable's applications for the change of Owner, Operator, and Guarantor for the following oil and gas facilities:

1.  Santa Ynez Unit (SYU) Final Development Plan (FDP} Permit No. 87-DP-32cz (RV06) from ExxonMobil Corporation to Sable (Owner, Operator, and Guarantor);

2.  Pacific Offshore Pipeline Company (POPCO) Gas Plant FDP Permit No. 93-FDP-015 (AM03) from ExxonMobil Corporation to Sable (Operator and Guarantor); and

3.  Las Flores Pipeline System FDP Permit No. 88-DPF-033 (RV0l)z, 88-CP-60 {RV01}(88-DPF-25cz;85-DP-66cz;  83-DP-25cz)  from  ExxonMobil Pipeline Company (EMPCo) to Sable (Operator), and ExxonMobil Corporation to Sable (Guarantor).

The Planning Commission documented its approval in findings issued November 4, 2024, attached hereto as Exhibit A.  Two groups of appellants, (1) the Environmental Defense Center, Get Oil Out!, and Santa Barbara County Action Network, and (2) the Center for Biological

LATHAM&WATKINS LLP

Diversity and Wishtoyo Foundation (collectively, "Appellants"), timely appealed the Planning Commission's decision to the Board pursuant to County Code Chapter 25B-12(b) (the "Appeals"). On February 25, 2025, the Board held a public hearing on both Appeals. After an approximately seven-hour hearing and deliberation, the four County Supervisors present split the vote on a motion to deny the appeals, 2 votes to 2 votes. Specifically, Supervisors Steve Lavagnino and Bob Nelson voted in favor of denying the appeals and Supervisors Laura Capps and Roy Lee voted against the motion.[1]

Because the Board cannot act without three votes,[2] the split vote resulted in Appellants failing to carry their burden to overturn the Planning Commission's approval and accordingly no action being taken by the Board on the appeals. This means that the Planning Commission's decision approving the transfer of the permits to Sable stands. (*See, e.g.*, *Grist Creek Aggregates, LLC v. Superior Court*, 12 Cal. App. 5th 979 (2017) (Hearing Board's "tie vote meant that [previously issued Authority to Construct] was allowed to stand, which was effectively a decision not to revoke it."); *see also Today's Fresh Start, Inc. v. Los Angeles County Office of Education*, 197 Cal. App. 4th 436 (2011), *rev'd on other grounds by* 57 Cal. 4th 197 (2013) (where county Board of Education split 4-4 on appeal of school charter revocation, this "amounted to a final decision by the board failing to adopt the motion, denying the appeal, and upholding the revocation.")) The same is true here: the tie vote means the appeals did not succeed and the Planning Commission's underlying decision stands. Sable accordingly requests that the County complete the permit transfers from ExxonMobil to Sable.

We recognize there has been some confusion in the public sphere about the legal outcome of a 2-2 split vote at the Board. And, indeed, the law is clear that "Tie votes mean different things in different contexts." (*Vedanta Soc. Of Southern California v. California Quartet, Ltd.*, 84 Cal. App. 4th 517, 521 (2000).) Essentially, the rule is this: when a supervising agency is required by law to issue its own findings or take its own evidence or issue its own permit, a tie vote can leave the matter in an administrative limbo subject to mandamus review. On the other hand, where an administrative agency sits effectively as a court of *review*, the "classic common law rule that a tie…leaves the decision being appealed from intact" applies. (*Id.*) That is the circumstance here, where the Board was sitting as the court of review of the Planning Commission's approval of Sable's requested permit transfers.

We acknowledge the situation may be different when the law requires an administrative reviewing Board to take new *evidence* or issue specific written findings. (*Id.*) Similarly, where the law *requires* decisions to be made by an *elected* body, a tie vote of that elected body does not affirm the decisions of an unelected body. (*Id.* at 525-526; *see also Clark v. City of Hermosa Beach*, 48 Cal App. 4th 1152 (1996) (where statute required Board of Supervisors itself to issue

---

[1] Supervisor Hartmann recused herself from consideration of the Appeals, which left only four of the five County Supervisors present to consider and act on the Appeals.

[2] Procedural Rules Governing Planning, Zoning and Subdivision Hearings Before the Board of Supervisors and Planning Commission (Santa Barbara County Res. No. 91-333), Sec, IV,1 ("Any action taken by the Board of Supervisors must be by a majority of the Board of Supervisors. An abstention shall not be counted as an affirmative vote on the motion.").

**LATHAM&WATKINS**LLP

permit, lack of action did not mean permit was issued); *Anderson v. Pittenger*, 197 Cal. App. 2d 188 (1961) (distinguishing situation where statute expressly stayed action during pendency of appeal).) Chapter 25B, however, requires none of these things. To the contrary, approval of permit transfers is vested squarely with the Planning Commission. (Sec. 25B-8 (b), (c) (granting Planning Commission "jurisdiction" over operator applications and combined applications); 25B-10 ("The planning commission shall approve an application for change of operator…."").) The County's appeals process does not require the Board to hear evidence or approve the transfers itself; rather, the Board is given authority only to "affirm, reverse or modify *the planning commission's decision*." (Sec. 25B-12(b)(4).) Unlike in other County Code provisions, *see, e.g.*, Sec. 35-182, Sec. 21-71.4, Sec. 37A-15, Sec. 48-4, there is *no* stay of the Planning Commission's decision pending appeal. In these circumstances, the common law rule applies, and the Board's 2-2 vote results in the Planning Commission's decision remaining intact.

Indeed, this is Santa Barbara County's past practice. When the Board deadlocked in 2023 on ExxonMobil's application to install valves on the Las Flores Pipeline, Supervisor Das Williams told the *Santa Maria Sun* that deadlock was "similar to a denial" because the Planning Commission in its initial decision had denied the application.[3] At the same time, the Santa Barbara Independent cited County Counsel Rachel Van Mullem for the proposition that "The 2:2 tie is essentially no action," and thus "The Planning Commission's denial of the project remains in place."[4] Here, the same is true with the opposite outcome: the 2:2 tie vote is "no action" by the Board, and leaves the Planning Commission's ***approval*** of the permit transfers in place.

Sable looks forward to the County's prompt transfer of the permits and of course we would be happy to discuss or respond to any questions you may have.

Respectfully submitted,

Jessica Stebbins Bina
of LATHAM & WATKINS LLP

---

[3] https://www.santamariasun.com/news/supervisors-unable-to-take-action-on-exxonmobil-valve-project-15109756

[4] https://www.independent.com/2023/08/23/exxonmobils-refugio-pipeline-request-ends-in-tie-vote/



**environmental**
DEFENSE CENTER

March 1, 2025

Chair Laura Capps
Santa Barbara County Board of Supervisors
105 East Anapamu Street
Santa Barbara, CA 93101
Via email to: sbcob@countyofsb.org

Re:    **Board of Supervisors' February 25, 2025 "No Action" Vote is a Denial and
Did Not Affirm the Planning Commission's Approval of Sable's Change of
Owner, Operator, and Guarantor (File No. 25-00144)**

Dear Chair Capps and Honorable Supervisors:

The Environmental Defense Center ("EDC"), on behalf of its clients Get Oil Out!
("GOO!"), Santa Barbara County Action Network ("SBCAN"), and EDC (collectively,
"Appellants"), writes to confirm the effect of the Santa Barbara County ("County") Board of
Supervisors' ("Board") non-majority, 2-2 vote on the following staff recommendations:

a)  Deny the appeals, Case Nos. 24APL-00025 and 24APL-00026;
b)  Make the required finding for approval of the Sable Offshore Corporation's Change of
Owner, Operator, and Guarantor for the respective Santa Ynez Unit, Pacific Offshore
Pipeline Company Gas Plant, and Las Flores Pipeline System Final Development Plan
Permits, including California Environmental Quality Act ("CEQA") findings;
c)  Determine the requests are not a "project" that is subject to environmental review under
CEQA Guidelines Section 15378(b)(5), finding that the actions consist of administrative
activities of government that will not result in direct or indirect changes to the
environment; and
d)  Grant *de novo* approval of the Change of Owner, Operator, and Guarantor for the
respective Santa Ynez Unit, Pacific Offshore Pipeline Company Gas Plant, and Las
Flores Pipeline System Final Development Plan Permits as detailed in this Board Letter
and subject to the Conditions of Approval. (Board of Supervisors Agenda Letter at 1
(February 25, 2025) (hereinafter "Board Letter").

March 1, 2025
Board of Supervisors' February 25, 2025 "No Action" Vote is a Denial and Did Not Affirm the Planning
Commission's Approval of Sable's Change of Owner, Operator, and Guarantor (File No. 25-00144)
Page 2 of 5

For the reasons detailed herein, an affirmative vote by a majority of the Board was required to affirm, reverse, or modify the Planning Commission's decision, and where the Board heard the matter *de novo*, the tie vote constituted no action, which effectively resulted in **denial** of Sable Offshore Corp.'s ("Sable") applications for Change in Owner, Operator, and Guarantor of the Final Development Plan Permits for the Santa Ynez Unit, Pacific Offshore Pipeline Company Gas Plant, and the Las Flores Pipeline System.

I.      **The Tie Vote Was No Action Pursuant to County Resolution 91-333 and Well-Settled Case Law.**

Section VI in the Procedural Rules Governing Planning, Zoning and Subdivision Hearings Before the Santa Barbara County Board of Supervisors and Planning Commission governs voting and confirms that (1) "[a]ny action taken by the Board of Supervisors must be by a majority of the Board of Supervisors," and (2) the Board takes no action if a motion on an item fails to carry by the affirmative vote of a majority of the Board. (Resolution 91-333 at 6) County Counsel affirmed these procedures at the February 25 Board hearing after the tie vote, stating that "…in order for the Board to take any action the Board needs a majority vote so every action we take it's at least three votes and sometimes it's four votes so **on a tie vote that's no action of the Board**."[1]

The Board's procedures and County Counsel's declaration regarding the effect of a tie vote is consistent with Government Code section 25005 ("No act of the board shall be valid or binding unless a majority of all the members concur therein.") and several California cases (*e.g., Clark v. City of Hermosa Beach* (1996) 48 Cal. App. 4th 1152, 1176*, as modified on denial of reh'g* (Sept. 11, 1996) ("[A]s a general rule an even division among members of an administrative agency results in no action." [internal citations omitted]) (hereinafter, *Clark*); *Anderson v. Pittenger* (1961) 197 Cal. App. 2d 188, 194-95 ("The tie vote was no action...") (hereinafter *Anderson*).

Therefore, no action was taken by the Board at the February 25 hearing as a result of the tie vote.

II.      **The Tie Vote Did Not Affirm the Planning Commission's Approvals.**

Several California cases support the conclusion that "no action" after a tie vote at a *de novo* hearing constitutes a denial of an application and does not affirm the lower body's decision.

In *Clark*, a city planning commission approved the plaintiff property owners' application for permits related to a building project, but the city council denied the permits by a three-to-two vote. 48 Cal.App.4th at 1159. However, the court determined that one councilmember had a conflict of interest, which deprived the Clarks of a fair hearing, among other things. *Id.* at 1173. The Clarks argued that without that councilmember's participation at the hearing, the vote would

---

[1] Board of Supervisors February 25, 2025, Hearing at 5:47:16-5:47:44.

March 1, 2025
Board of Supervisors' February 25, 2025 "No Action" Vote is a Denial and Did Not Affirm the Planning
Commission's Approval of Sable's Change of Owner, Operator, and Guarantor (File No. 25-00144)
Page 3 of 5

have been 2-2 and affirmed the planning commission's decision to approve the project. *Id.* at
1175. The court disagreed, holding that pursuant to the city's municipal code, the city council did
not review the commission's decision for error but instead "hears the matter de novo, takes
additional evidence at a public hearing, and decides whether *it* should grant or deny the permit."
*Id.,* emphasis in original. The court concluded that a tie vote by the city council would not affirm
the underlying decision of a planning commission, citing *Anderson*, 197 Cal.App.2d at 194-95
and *REA Enterprises v. California Coastal Zone Com.* (1975) 52 Cal.App.3d 596, 605-09
(hereinafter *REA Enterprises*).[2]

    In *Anderson*, the court held that the city council's tie vote constituted "no action" and
"was not an affirmance of the order of the commission" on appeal from the planning
commission's decision to grant a zoning variance. 197 Cal.App.2d at 194-95. There, the planning
commission granted the requested zoning variance. *Id.* at 190. The city council, on its own
motion, appealed the decision of the planning commission and ultimately denied the application
for a variance. *Id.* The plaintiff petitioned the superior court for a review of the proceedings
before the council and the lower court found that the council had exceeded its jurisdiction. *Id.*
The city council appealed the trial court's judgment, contending "(1) That the council was not
bound by the findings of fact made by the commission, but was entitled to hear the matter de
novo. (2) That the 'tie vote' of the council on July 27, 1959, was not a decision upon the appeal
and was not an affirmance of the decision of the commission," among others. *Id.* at 190. The
court agreed with the city, reasoning that "[u]nder the provisions of the ordinance the council
may hear the matter de novo and make its own determination as to whether the facts are such as
to require, under the provisions of the zoning ordinance, the granting of the variance." *Id.* at 195.
The court concluded that the council's tie vote constituted no action, and did not affirm the
planning commission's prior decision.

    Similarly, in *REA Enterprises*, the court found that the state commission's *de novo* tie
vote on appeal from a regional commission's decision to issue a development permit did not
meet the requirement of an affirmative majority vote to approve the permit. The court pointed
out that "[b]y failure to obtain a majority vote, the action taken by the State Commission
effectuated a denial of the issuance of the development permit." 52 Cal.App.3d at 607, followed
in *Clark*, 48 Cal.App.4th at 1176.

    Here, the Board's tie vote at the February 25 hearing constituted "no action" and did not
affirm the Planning Commission's previous decision. Because the Board hearing was held *de
novo*, the failure to approve Sable's application by affirmative majority vote effectively
constitutes a denial. These conclusions are supported by the County's own Code and Board
Letter.

    Chapter 25B-12 in the County's Code expressly states that an appeal of a decision by the
Planning Commission to approve an application is *de novo*. Chapter 25B-12(b)(4). The Board

---

[2] The court noted in a footnote that the lack of an affirmative vote can be construed as a denial. 48 Cal.App.4th at
1176, fn. 24.

March 1, 2025
Board of Supervisors' February 25, 2025 "No Action" Vote is a Denial and Did Not Affirm the Planning
Commission's Approval of Sable's Change of Owner, Operator, and Guarantor (File No. 25-00144)
Page 4 of 5

was therefore required to hear the matter without deference to the Planning Commission's
findings, to review additional evidence, and to affirm, reverse, or modify the Planning
Commission's decision at a public hearing. *Id.* The Board Letter, which contained Staff's
recommended actions to the Board, asked the Board to make the required findings for approval
and grant *de novo* approval of the Change of Owner, Operator, and Guarantor for the Santa Ynez
Unit, Pacific Offshore Pipeline Company Gas Plant, and Las Flores Pipeline System Final
Development Plan Permits. (Board Letter at 1) The Board Letter expressly states that these
approvals must be made by majority vote. *Id.*

The scope of the Board's review was not whether to let the Planning Commission
decision stand. The Board was required to reconsider all aspects of the application as if
reviewing it for the first time and an approval required an affirmative majority vote, regardless of
the action below. *See* Government Code section 25005; *Clark*, 48 Cal. App. 4th at 1176;
*Anderson*, 197 Cal. App. 2d at 194-95; *REA Enterprises*, 52 Cal. App. 3d at 606-07.

## III.  The Board's Tie Vote Was Not an Affirmative Majority Vote to Approve the Change of Owner, Operator, and Guarantor and Therefore Constituted a Denial.

Accordingly, without a majority vote, the Board did not have the ability to approve the
requested Change of Owner, Operator, and Guarantor and make the requisite findings on a *de
novo* basis. A tie vote on a de novo appeal does not reinstate or affirm the lower body's decision.

In failing to obtain a majority vote, the Board's vote effectuated a denial of Sable's
application for Change of Owner, Operator, and Guarantor.

Sincerely,

Linda Krop
Chief Counsel

Cc:    Rachel Van Mullem, County Counsel
       Lisa Plowman, Director of Planning & Development
       Errin Briggs, Energy, Minerals & Compliance Division Manager

March 1, 2025
Board of Supervisors' February 25, 2025 "No Action" Vote is a Denial and Did Not Affirm the Planning
Commission's Approval of Sable's Change of Owner, Operator, and Guarantor (File No. 25-00144)
Page 5 of 5

COSB AR006778

# County of Santa Barbara

# BOARD OF SUPERVISORS



*First District - Roy Lee*
*Second District - Laura Capps, Chair*
*Third District - Joan Hartmann*
*Fourth District - Bob Nelson, Vice Chair*
*Fifth District - Steve Lavagnino*

*Mona Miyasato, County Executive Officer*

## Action Summary

**Wednesday, April 16, 2025**

**9:00 AM**

**BUDGET WORKSHOP**

### COUNTY ADMINISTRATION BUILDING
### BOARD HEARING ROOM, FOURTH FLOOR
### 105 EAST ANAPAMU STREET, SANTA BARBARA

The Board of Supervisors meets concurrently as the Board of Directors of the Flood Control & Water Conservation District, Water Agency, the Santa Barbara Fund for Public and Educational Access and other Special Districts.

Live Web Streaming of the Board of Supervisors Meetings, Agendas, Supplemental Materials and Minutes of the Board of Supervisors are available on the internet at: www.countyofsb.org.

**BOARD OF SUPERVISORS**                    Action Summary                              **April 16, 2025**

## 9:00 A.M. ..... Convened to Regular Session

## Roll Call

**Present:**     5 -   Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor
                       Nelson, and Supervisor Lavagnino

## Pledge of Allegiance

## County Executive Officer's Report

**25-00001**

County Executive Officer's Report: Receive a report from the County Executive Officer (CEO) on
County programs, County staff updates and achievements, staff recognitions, updates on major
projects, updates on state and federal legislation, and upcoming events of interest to the Board and
the public. There will be no Board discussion except to ask questions or refer matters to staff; and
no action will be taken unless listed on a subsequent agenda.

**No report from County Executive Officer, Mona Miyasato.**

COSB AR006780

## Budget Workshop
## Santa Barbara County Fiscal Year 2025-2026

*The schedule shown is an estimate for planning purposes. Items may be heard earlier or later than listed on the Agenda. Departmental presentations not completed by Wednesday, April 16, 2025 may be considered on Thursday, April 17, 2025. If Budget Workshops are continued to Thursday, April 17, 2025, the Board of Supervisors may discuss budget items for any County Department, County Function or Special Issue previously discussed.*

*Persons may address the Board at the conclusion of each Functional Group or Special Issue presentation. Please refer to the Important Notice Regarding Public Participation on page two (2) of this Agenda for details regarding current methods of participation. Matters not listed on the Agenda or of a general nature may be addressed during the Public Comment Period at the end of each day's hearing.*

*Staff will be available from each Department to respond to questions and to provide information as requested by the Board.*

**9:00 A.M.    Departmental Budgets | Health and Human Services**

*HEARING TIME: 9:09 AM - 12:15 PM (3 HR. 6 MIN.)*

**Received and filed staff presentations regarding Departmental Budgets, as follows: County Health, First 5 Santa Barbara County, Social Services, Behavioral Wellness and Child Support Services.**

County Health
First 5 Santa Barbara County
Social Services
Behavioral Wellness
Child Support Services

**Public Comment**

**Re: Departmental Functional Group - Health and Human Services: Michael Bird, Jean Silva, Margaret Bernal, Molly Troup, Philip Seymour, Lynne Gibbs, Dr. Lee Heller, Victoria Feld, Maria Valencia and Liz Bush addressed the Board.**

COSB AR006781

## Departmental Budgets | Community Resources & Public Facilities

*HEARING TIME: 1:46 PM - 3:32 PM (1 HR. 46 MIN.)*

**Received and filed staff presentations regarding Departmental Budgets, as follows: Public Works, Agriculture, Weights & Measures, Planning & Development and Community Services.**

Public Works
Agriculture, Weights & Measures
Planning & Development
Community Services

## Public Comment

**Re: Departmental Functional Group - Community Resources and Facilities: No requests to speak.**

## Departmental Budgets | Policy and Executive

*HEARING TIME: 3:46 PM - 4:24 PM (38 MIN.)*

**Received and filed staff presentations regarding Departmental Budgets, as follows: County Counsel, Board of Supervisors, County Executive Office, General County Programs and Fund Balances.**

County Counsel
Board of Supervisors
County Executive Office
General County Programs & Fund Balances

## Public Comment

**Re: Departmental Functional Group - Policy and Executive: No requests to speak.**

COSB AR006782

### Budget Workshop Summary

*HEARING TIME: 4:24 PM - 5:15 PM (51 MIN.)*

**Received and filed staff presentation regarding the Budget Workshop Summary.**

## Closed Session

**25-00321**

CONFERENCE WITH LEGAL COUNSEL-ANTICIPATED LITIGATION
(Paragraph (2) of subdivision (d) of Government Code section 54956.9)

Significant exposure to civil litigation: 1 case. On April 11, 2025 the County received a threat of litigation (letter attached to this Agenda item) from Latham & Watkins LLP regarding "Change of Owner, Operator, and Guarantor for the Santa Ynez Unit, POPCO Gas Plant, and Las Flores Pipeline System Final Development Plan Permits."

### Report from Closed Session

**No reportable action taken.**

COSB AR006783

**BOARD OF SUPERVISORS**                    Action Summary                              April 16, 2025

<u>**Departmental Agenda**</u>
<u>**Planning Items and Public Hearings**</u>

1)      <u>COUNTY EXECUTIVE OFFICE</u>                                                    <u>**25-00270**</u>

HEARING - Consider recommendations regarding the Fiscal Year (FY) 2025-2026 Preliminary Budget and Budget Development Workshops, as follows:

a) Receive and file information about the FY 2025-2026 preliminary budget;

b) Confirm recommended uses of one-time funds to be included in the County Executive Office's Recommended Budget;

c) Provide direction, if any, regarding other items to be addressed or included in the County Executive Office's Recommended Budget, scheduled for release in May and Board adoption scheduled for June 17, 2025 and June 18, 2025;

d) Provide direction, if any, regarding Special Issues or other items; and

e) Determine pursuant to California Environmental Quality Act (CEQA) Guidelines 15378(b)(4) that the above actions are not a project subject to CEQA review, because it is a government fiscal activity that does not involve any commitment to any specific project which may result in a potentially significant physical impact on the environment.

COUNTY EXECUTIVE OFFICER'S RECOMMENDATION: POLICY

**A motion was made by Supervisor Nelson, seconded by Supervisor Hartmann, that this matter be acted on as follows:**

**a) Received and filed;**

**b) Confirmed recommended uses of one-time funds to be included in the County Executive Office's Recommended Budget, with the exception of the "Replacement of Sheriff Patrol In-Car Video Equipment" totaling $925,000.00. This item will be deferred and scheduled for further discussion in June 2025;**

**c) and d) Provided direction; and**

**e) Approved.**

**The motion carried by the following vote:**

Ayes:        5 -   Supervisor Lee, Supervisor Capps, Supervisor Hartmann, Supervisor Nelson, and Supervisor Lavagnino

COSB AR006784

**BOARD OF SUPERVISORS**                    Action Summary                                    **April 16, 2025**

25-00002

### Public Comment Period

*THE PUBLIC COMMENT PERIOD IS RESERVED FOR COMMENT ON MATTERS
WITHIN THE SUBJECT MATTER JURISDICTION OF THE BOARD OF SUPERVISORS.
EACH PERSON MAY ADDRESS THE BOARD FOR UP TO THREE MINUTES AT THE
DISCRETION OF THE CHAIR, FOR A TOTAL PUBLIC COMMENT PERIOD OF NO
MORE THAN 15 MINUTES.  (Resolution No. 09-368) (25-00002)*

*WHEN TESTIFYING BEFORE THE BOARD OF SUPERVISORS, PERSONAL ATTACKS
AND OTHER DISRUPTIVE BEHAVIOR ARE NOT APPROPRIATE.*

**No requests to speak.**

COSB AR006785

## Adjourned at 5:18 PM

## Adjourned to

## Tuesday, May 6, 2025

## County Administration Building
## Board Hearing Room
## 105 East Anapamu Street , Fourth Floor
## Santa Barbara

## Challenges

*IF YOU CHALLENGE A DETERMINATION MADE ON A MATTER ON THIS AGENDA IN COURT, YOU MAY BE LIMITED TO RAISING ONLY THOSE ISSUES YOU OR SOMEONE ELSE RAISED AT THE PUBLIC HEARING DESCRIBED IN THIS NOTICE, OR IN WRITTEN CORRESPONDENCE TO THE BOARD OF SUPERVISORS AT, OR PRIOR TO, THE PUBLIC HEARING.*

## Announcements

*The meeting of Wednesday, April 16, 2025 will be telecast live on County of Santa Barbara TV Channel 20 at 9:00 AM, and will be rebroadcast on Friday, April 18, 2025, at 9:00 AM and on Saturday, April 19, 2025, at 7:00 AM on CSBTV Channel 20.*

## http://www.countyofsb.org

COSB AR006786

1          [01:43:07]

2          COMMISSIONER MARTINEZ: Good morning, and thank you for your

3      patience and allowing me the opportunity to get here from court, and

4      I'll say thank you to the judge who gave me priority to get me here, so

5      here we go. So we're on to item number two on the agenda, which is our

6      last item on today's agenda. If we could announce it, please.

7          JEFF WILSON: Mr. Chair, while you were driving, just to bring you

8      up to speed, and the public, just for the record. It's already been

9      read in the record, there was a discussion on letters that were

10     submitted. All the letters have been accepted, we'll have a discussion

11     on the next break as far as the availability for you to review those

12     letters, so that if any testimony or any information contained in those

13     letters are used today, that you'll be able to act on that. We're

14     talking specifically, there's an 18-page letter, I think that was

15     provided by EDC, that we wanted to make you aware of, that was

16     distributed today, and made available to the commissioners, and

17     available online and to the public. So at this point, in the hearing,

18     we are ready to go to public comment…not public comment, sorry. A lot

19     happened in that hour. To the staff presentation. Just, again, to

20     reiterate, we do have a number of people online, we have a number of

21     people in the fourth floor hearing room. We have been made aware that

22     there is a little bit of a lag between what is said here and by the

23     time it gets to the fourth floor, so when we get to public comment, we

24     will be calling out at least five names at a time to give people the

25     opportunity to come down here to speak. So just be aware that when we

1

COSB AR006787

1    call your name, start moving towards the hearing room so you can give

2    your testimony.

3          COMMISSIONER MARTINEZ: And this is the EDC letter that you're

4    talking about?

5          JEFF WILSON: That is correct, Chair.

6          COMMISSIONER MARTINEZ:  Okay. And this is the letter that was

7    admitted?

8          JEFF WILSON: Yes.

9          COMMISSIONER MARTINEZ:  Okay. And I'll just say for the record, I

10   can read these things pretty darn quick, that's what we're taught to do

11   in these things. It's true. Also, since it's been read into the record,

12   and let me give at least from my perspective of how we're going to do

13   things today. We have several speaker slips here today. Usually I

14   announce at the beginning of any meeting that if you're going to want

15   to speak, you have to turn in your speaker slips before it's announced.

16   I wasn't here, obviously, so why don't I make sure that if you're going

17   to speak and you haven't turned in a speaker slip, I'm going to go to

18   staff, but let's say within the next five minutes, drop off your

19   speaker slip because then I'm going to cut it off after staff. After

20   staff presents, I'm going to cut it off. Anyone who's online who wants

21   to speak and who hasn't raised their hand, hasn't been recognized as

22   being one who wants to speak via remote, once staff finishes, no more.

23   You can't raise your hand afterwards, okay? So let's just make sure we

24   got that. Those who are speaking, we're going to limit you to a time

25   limit of two minutes, okay? I'll say this with the most respect and

COSB AR006788

1    caution is that we all want to hear you. The issue today is ownership,

2    a change of ownership. That's the issue. I'd appreciate if people can

3    focus in on that thing. It's not these other issues, which I'm well

4    aware of, but appreciate your time and patience in regards to these

5    things. For those people who are upstairs, so what I'm going to do, I'm

6    going to go and read about five or six of them, and then you're going

7    to form a line over here, and then when you step up to the podium, you

8    announce your name, and then I'll make sure I check that off. But for

9    those who are upstairs, the reason I'm going to read five or six of

10   them is then that gives you time to come down. Now, it's already

11   mentioned by Mr. Wilson that there's about a 30-second lag time, so

12   again, I'm going to make sure that there's time there for you to get

13   down and get in line, and then we'll form it. Unfortunately, for those

14   who are here, and because sometimes I go, okay, well, those who have

15   one minute to say something, you can go first and make sure you're

16   heard, this logistic stops that from happening, because we want to make

17   sure that those who are upstairs have a chance to come downstairs.

18   Again, we want to hear from everyone, and we appreciate everyone's

19   participation. I know that our director also has an announcement to

20   make right now, and I'd appreciate if she could make it right now.

21       [01:47:47]

22       LISA PLOWMAN: Thank you, everybody. Coming to the Planning

23   Commission Hearings or the Board Hearings is a really important part of

24   our public process, and our decision makers and the staff want to hear

25   from everybody and from all sides. But unfortunately today, one of my

                                    3

1    staff persons was shoved up against a door because somebody was unhappy

2    that they couldn't get into this room, and that kind of behavior just

3    cannot be tolerated. So I'm going to ask everybody to make sure that we

4    treat each other with respect and with kindness. We have differing

5    views, all of us, but we have to honor that. That's part of what this

6    country is about, and our process is about, so you can express your

7    views, but do it respectfully. If somebody does conduct themselves in

8    that manner, they will be asked to leave the building. And I appreciate

9    you listening to my comments today, and I appreciate your decorum that

10   you're going to display in advance. And then I just wanted to mention

11   one more thing, and that is, the Chair and the rest of the Commission

12   may want to talk about that, but the way we express public support of

13   somebody else's comments is not cheering or clapping, but it's raising

14   your hands like this, and that way we can keep our hearing process

15   moving and make sure that everybody is heard, so thank you very much.

16          COMMISSIONER MARTINEZ:  Thank you. So with that, have you guys

17   done any ex parte communications?

18          COMMISSIONER BRIDLEY: Not yet.

19          COMMISSIONER MARTINEZ:  No, so let's do those first before we

20   move on to the staff. Any ex parte communications that anyone wishes to

21   make, disclose, I should say? Yes, Commissioner?

22          COMMISSIONER REED: Yeah, I had a telephone conversation with Lee

23   Danielson of Sable on the 25th.

24          COMMISSIONER MARTINEZ:  Commissioner Parke?

25

4

1    COMMISSIONER PARKE: I've had a couple of phone conversations with

2    Lee Danielson, most of which we didn't even talk about this case, but

3    what the heck, but they were fun.

4    [01:50:00]

5    And also, we had somebody else on the Sable team with us on the

6    phone the second time, but I forgot his name, and I apologize. I also

7    should disclose, I think, on the Sable side, I had a meeting or a

8    breakfast or Zoom, I can't even remember what it was, with Jim Flores a

9    year or two ago, and I mean, we touched on these transfer issues, so

10   it's just fair that I disclose that, even though that was so long ago.

11   I also had a meeting with EDC attorneys and their clients on Monday

12   morning, and I don't believe I've had any other meetings.

13   COMMISSIONER MARTINEZ:  As for myself, I've had no communications

14   with any parties except for one email communication in which it was

15   from somebody from Sable, I'm forgetting his name, but it was about the

16   presentation of an employee outside of their 20 minutes that we were

17   going to provide to them, and I responded to that. Thank you.

18   Commissioner Bridley?

19   COMMISSIONER BRIDLEY: I had a series of meetings as well. I

20   talked to Steve Gregg, who is partially retired, but works for Exxon.

21   That conversation was on October 29th, regarding the general process of

22   these kinds of transfer of ownership, transfer of operator actions, and

23   then I also talked to the Sable team, Lee Danielson, on Friday, and

24   then again, Steve Rusch yesterday. And then I also had a meeting with

25   the UCSB Environmental Affairs students, Vivian Chankai and Izzy Sistek

5

COSB AR006791

1    on Monday, October 29th. And then also on Tuesday, I had a meeting with

2    Environmental Defense Center, Audubon Society, Get Oil Out, and SBCAN

3    regarding a lot of the issues that they brought up in their letter.

4    That's it.

5         COMMISSIONER MARTINEZ:  Thank you. And with that, then we'll move

6    over to staff.

7         JACQUELYNN YBARRA: Okay. We're ready. Good morning, Chair,

8    Commissioners and members of the public behind me and upstairs and

9    online. It's nice to be here in person with you and happy day before

10   Halloween, or Sauin, as we witches like to call it. Okay. Today, the

11   Commission is considering the change of owner, guarantor, and operator

12   of the Santa Ynez Unit, the POPCO gas plant, and the Las Flores

13   Pipeline System County Permits. I'm the case planner, Jacquelynn

14   Ybarra, and WD Director Errin Briggs is also with me today. Next slide.

15        So there are three separate requests before you, all on behalf of

16   Sable Offshore Corporation dealing with three separate county permits

17   for the following: One, a change of owner, operator, and guarantor of

18   the Santa Ynez Unit, or SYU, final development plan permit from

19   ExxonMobil Corporation to Sable. Two, a change of operator and

20   guarantor of the Pacific Offshore Pipeline Company, or POPCO Gas

21   Plant's final development plan permit from Exxon to Sable. And three,

22   for a change of operator and guarantor of the Las Flores Pipeline

23   System's final development plan permit from ExxonMobil Pipeline Company

24   and ExxonMobil to Sable. To note, POPCO remains the legal owner of the

25   gas plant, and Pacific Pipeline Company, or PPC, remains the legal

6

COSB AR006792

1    owner of the Las Flores Pipeline System. Very important to note today,

2    which I will reiterate a couple times, is that these requests are to

3    transfer the county permits for the individual assets, and not the

4    underlying transfer of the assets themselves. The permit transfers do

5    not include any authorization for work that may occur at the

6    facilities. It doesn't include the restart of the facilities, nor any

7    future operation of the facilities. Next slide.

8         So this slide shows you the facility locations. On the left, you

9    can see POPCO and the SYU. The POPCO gas plant is a very small portion

10   of the larger onshore SYU unit, which contains an oil and water

11   treatment plant and other related facilities. As you can see in the

12   figure, both the gas plant and onshore SYU are co-located in the Las

13   Flores Canyon, which is along the Gaviota Coast. And for everyone's

14   reference, the facilities are about one and a quarter miles north of El

15   Capitan. Although the gas plant and the onshore SYU have their own

16   county final development permits, the operation of the facilities is

17   very much integrated. On the right, you can see the Las Flores Pipeline

18   System. It stretches about 122 linear miles, starting at the Las Flores

19   Canyon, traverses up San Luis Obispo County, sort of parallels Highway

20   166, and ends at the Pentland Station over in Kern County.

21        [01:55:10]

22        Most everyone may know, just a little bit of background on the

23   pipelines, that they were formerly titled Lines 901 and 903 and were

24   operated by Plains All-American Pipeline. When PPC acquired the lines

25   from Plains, the name was changed. So as you can see here, the lines

7

1    are now identified as CA-324, shown in red, CA-325A, shown in green,

2    and CA-325B, shown in purple. Next slide.

3        So why we're before the Commission today, Chapter 25B

4    specifically of our county code governs the process to transfer county

5    permits for certain oil and gas facilities. All three facilities today

6    are subject to this process as they either process or transport oil and

7    gas extracted from offshore reserves. So a change of owner and

8    guarantor are normally under the jurisdiction of the planning and

9    development director, while a change of operator is under the

10    jurisdiction of your Commission. But when we have combined applications

11    like we do today, those could be grouped together and decided on by the

12    Commission. And per our code, the county shall list any new owner,

13    operator, or guarantor and remove any previous parties from the permit

14    upon your Commission finding that the applications are consistent with

15    all the information required by Chapter 25B. Next slide.

16        Okay, this slide gives you a little bit more of a background on

17    the facilities themselves. So the SYU and POPCO gas plant, which are

18    commonly referred to as the Las Flores Canyon facilities, those treat

19    oil and gas produced from offshore platforms, Hondo, Harmony, and

20    Heritage. And up until the recent stable acquisition, they were

21    operated by ExxonMobil. Oil from the SYU is normally transported via

22    the common carrier Las Flores Pipeline System, which I stated before

23    was previously known as Lines 901 and 903, operated by Plains. The

24    pipeline spill in 2015 caused both the pipelines and the Las Flores

25    Canyon facilities to shut-in, as it was the only way to get oil out of

8

COSB AR006794

1    the SYU. However, to date, various preservation and maintenance

2    programs still occur at the facilities to maintain facility integrity

3    under federal, state, and county programs. So PPC acquired the pipeline

4    system from Plains in 2022, and your Commission did approve that permit

5    transfer last year in 2023, which now brings us to the current history

6    of Sable acquiring the SYU, as well as ownership of POPCO and PPC in

7    February of this year. Next slide.

8         Okay, a little bit of background on who Sable is, and we also

9    wanted to highlight below what staff specifically looked at when we

10    reviewed the applications. So Sable is a Houston-based independent oil

11    and gas company. They were formed in 2020, formerly known as Flame, and

12    were initially formed as a special acquisition company. Their executive

13    management team formerly operated facilities in the county, including

14    the Point Pedernales assets near Lompoc, and the Point Arguello assets

15    along the Gaviota Coast, and that was under the operation and ownership

16    of Freeport-McMoRan Oil and Gas, or FMOG, or Plains Exploration and

17    Production Company, or PXP, not to be confused with Plains All-

18    American. Their local teams largely comprised of former Exxon

19    employees, as well as other local employees from other reputable oil

20    and gas companies, such as Phillips 66 and Freeport-McMoRan. Sable

21    entered into a purchase and sale agreement with Exxon to acquire the

22    SYU and ownership of POPCO and PPC in November. The agreement closed in

23    February of this year. So for the county's process, Sable submitted

24    applications to transfer their county permits to us in March, and as

25    part of our completeness review, we did a comprehensive study of

9

COSB AR006795

1    Sable's financial filings with the SEC. We reviewed their insurance

2    certificates, their financial certifications from the state, known as

3    their OSPR COFRs. We reviewed each permit's list of conditions, all

4    relevant compliance plans. We drilled down into their staff experience

5    and org charts.

6        [02:00:00]

7        We confirmed there's been no incidents reports under Sable's

8    former companies, and we looked at safety audit information, operation

9    and maintenance reports, among other things. Next slide.

10        For environmental review of these requests, the permit transfers

11    do not constitute a project as defined by CEQA Section 15378, which

12    specifically exempts administrative actions of government that do not

13    result in direct or indirect physical changes to the environment. So

14    these requests do meet that exemption, as they are administrative

15    action to update the names of the owner, operator and guarantor on the

16    facility's permits. Again, no physical changes are proposed under this

17    process, and the permit transfers do not authorize restart of the

18    facilities. That's an entirely separate process under the regulatory

19    authority of several other state and federal agencies. Next slide.

20        Okay, getting into the meat, the Consistency Analysis. So we

21    analyzed each application in relation to the required findings of

22    Chapter 25B. That consistency analysis is detailed in your staff

23    report. But for this presentation, I'll have summary slides for each of

24    the facilities, starting with the SYU here. So in this table, you can

25    see that Sable has demonstrated consistency with the listed findings. I

10

COSB AR006796

1     did want to highlight a few that I know or think the Commission is

2     interested in. So first, under financial guarantees for change of

3     owner, so Chapter 25B only requires that county insurance bonds and

4     financial guarantees are updated to reflect the new owner of the

5     facility. In this case, the SYU, there's no county-required bonds for

6     the facility, so nothing for Sable to update. The final development

7     plan permit does require that Sable pay property taxes through final

8     abandonment of the facility, and also requires that they be responsible

9     for any cleanup and restoration of an oil or gas leak, and that they

10    also provide copies of other agencies' financial responsibility

11    documents. So to satisfy the permit conditions, Sable provided copies

12    of both their property insurance and their liability insurance, which

13    demonstrates they have over $2.5 billion to cover damage at the SYU and

14    POPCO, as well as over $400 million dollars to cover cleanup and

15    restoration costs in the event of an oil spill. They also provided a

16    copy of their California Office of Spill Prevention and Response

17    Certificate of Financial Responsibility, that's that OSPR COFR acronym

18    you see up there. And that is state-authorized and calculated to

19    demonstrate that they can cover a worst-case oil spill from their

20    offshore operations. Moving down under safety audits, we wanted to note

21    that the last county-conducted safety audit of the SYU and POPCO

22    occurred in 2014, and that audit had no significant findings. We did,

23    the County did authorize those audits to be postponed during

24    preservation of the facility, but they will resume if and when

25    production restarts. Lastly, Exxon, and now Sable, they also submit

11

COSB AR006797

1    monthly O&M reports to the County, which also show no significant

2    findings. Next slide.

3         Okay, still on SYU, this table highlights the findings for change

4    of guarantor and operator. I just wanted to note that some of the

5    findings for each of the changes do overlap, and that full text of the

6    findings is available in Attachment A to your staff report, but I

7    mostly just wanted to show the non-repetitive ones here. So things to

8    highlight under Change of Operator. For Sable's compliance plans, so

9    Chapter 25B just requires that active compliance plans be updated with

10   the new operator's contact information. We did confirm they submitted

11   11 plans for the SYU, and those were all updated appropriately. And

12   then above and beyond the requirements of Chapter 25B, those plans were

13   also reviewed for technical accuracy by various county departments, by

14   our System Safety and Reliability Review Committee or the SSRRC, the

15   Fire Department, and Energy Division's Petroleum Engineer where

16   applicable.

17        [02:05:00]

18        Moving down to transition plan, we also confirmed Sable submitted

19   a comprehensive transition plan. As I mentioned earlier, the facility

20   management team for the SYU has largely all carried over from former

21   staff at ExxonMobil, so it demonstrates a very cohesive team that's

22   able to continue operations with limited disruptions. And there was

23   also asset-specific and general training conducted. Moving down to the

24   Approved Emergency Response Drill, a drill was conducted for the SYU

25   and POPCO in September of this year. Our County Fire Department was in

12

COSB AR006798

1    attendance, and Sable's incident management team who runs and operates

2    those drills, they also carried over from Exxon, again, demonstrating a

3    lot of cohesiveness from the original SYU and POPCO teams.

4        Finally, under Operator Skills and Resources, we wanted to

5    highlight that we confirmed Sable has had no major incidents under

6    their former companies for various years that they were operating those

7    companies. As I said earlier, Sable as an entity may be new, however,

8    all levels of their management teams have long histories of operating

9    oil and gas facilities in the county specifically. All employees have

10   been trained on all the updated compliance plans, and finally,

11   according to Sable's SEC filings, they have enough capital to restart

12   and maintain operations. Next slide.

13       Okay, moving on to POPCO, the orange table shows consistency for

14   the POPCO Gas Plant. This one will be quick because POPCO and SYU are

15   very much intertwined, so the majority of the analysis that was made

16   for the SYU also applies to the gas plant. The only thing that's a

17   little different is how POPCO's permit handles financial guarantees. So

18   for this facility, similar to the SYU, there's no county-required bonds

19   that needed to be updated. However, a future bond will be posted

20   following the shutdown of the facility for final abandonment. And as

21   you can see in the table below, POPCO also meets the findings for

22   change of operator.

23       Last, but definitely not least, the purple table shows

24   consistency for the Las Flores Pipeline system. So under a change of

25   guarantor, for financial guarantees, similar to those other facilities,

13

1     there's no county-required bonds that needed to be updated. The

2     pipeline's final development permit requires Sable to pay property

3     taxes through final abandonment. And then we also wanted to highlight,

4     because the pipeline's permit differs from the SYU in that their permit

5     for the pipeline specifically does not require any insurance or bonds

6     to cover oil spills. However, outside of Chapter 25B, above and beyond

7     what's required in our code and in the permit to support demonstrating

8     that Sable does have the financial capabilities to own and operate the

9     pipeline, they also submitted copies of their liability insurance. That

10    was for the $401 million for all their assets. And they also provided

11    copies of their OSPR COFRs for the pipeline specifically to demonstrate

12    that they can cover a worst-case oil spill specific to those pipelines.

13          Moving down to change of operator, so, under Safety Audits, we

14    wanted to note that there is no county-conducted audit available, and

15    that's due to the 1988 settlement agreement that precludes the county

16    from regulating the design, construction, and operation of the

17    pipeline. So just to clarify, the pipeline system does have a county

18    audit document that's called the SIMQAP, however, they're not subject

19    to county-conducted audits. However, though the county doesn't conduct

20    audits for the pipeline, PHMSA and now the Office of the State Fire

21    Marshal do, and so, Sable did provide a list of those audits that

22    occurred from 2018 to 2023, and the records show that those audits are

23    pretty limited in scope, at least as of right now, to a desktop review

24    and visual inspections of the pipeline. And preliminary findings from

25    those show no findings or concerns.

14

COSB AR006800

1          [02:10:00]

2          For pipeline compliance plans, similar to those for SYU and

3     POPCO, staff confirmed all plans had the required updates, there was

4     five for the pipeline, and this batch was also reviewed for technical

5     accuracy by all the various county departments. Under the transition

6     plan, we confirmed that the pipeline management team has also extensive

7     experience in the industry, with employees coming from other reputable

8     oil and gas companies that have successfully operated in the county,

9     histories not involving Plains All-American Pipeline, and also with

10    asset-specific and general training conducted. For the emergency

11    response drill, a separate drill was conducted for the pipeline system

12    in July of this year. The Fire Department was also in attendance, and

13    everything was conducted to their satisfaction. And finally, for

14    operator capability, the same for the SYU and POPCO analysis, as you

15    can see here, Sable has the necessary skills, training, and resources

16    to operate the pipeline based on the bullets here. Next slide.

17         In conclusion, all findings can be made, as discussed in

18    Attachment A to your staff report. So staff recommends that the

19    Planning Commission, (1) make the required findings for approval, (2),

20    determine the requests are not a project pursuant to CEQA, and (3)

21    approve all requests and adopt the conditions of approval for the

22    following: A change of owner, operator, and guarantor for the SYU, a

23    change of operator and guarantor for the POPCO Gas Plant, and a change

24    of operator and guarantor for the Las Flores Pipeline System. Next

25

15

1    slide. Last slide. That concludes staff's presentation, and we're happy

2    to take questions. Thank you.

3          COMMISSIONER MARTINEZ:  Commissioners? Commissioner Reed?

4          COMMISSIONER REED: Okay. Easy one. So in your opinion, after

5    conducting all this research and compiling your report, has Sable met

6    all of the requirements under Chapter 25 to satisfy the requirements to

7    transfer all of these documents, these permits?

8          JACQUELYNN YBARRA: Commissioner Reed through the Chair, yes.

9          COMMISSIONER REED: Okay. Thank you.

10         COMMISSIONER MARTINEZ:  Commissioner Bridley?

11         COMMISSIONER BRIDLEY: Okay, I might have a few more, but this is

12   an unusual case. It's an unusual part of our county regulation, so

13   excuse me if I'm still catching up to it. So the underlying land

14   ownership, you were very clear that the facilities are going to be not

15   owned, this is just the operational transfer, right? But the

16   facilities, the hardware, the pipes and everything, that's not going to

17   be owned by Sable, or do I have that wrong? Or is it the underlying

18   land is not going to be owned by Sable?

19         ERRIN BRIGGS: So Mr. Chair and Commissioner Bridley, the

20   transactional relationship between Exxon and Sable is a separate action

21   than what we're considering here today. They've already made that

22   transaction. Sable's already acquired the assets physically and

23   financially from ExxonMobil. Today, we are simply transferring the name

24   on the permits to Sable.

25

16

COSB AR006802

1      COMMISSIONER BRIDLEY: Okay. I probably read that, but, again

2   forgive me. And I want to dig a little bit deeper. Maybe you just need

3   to repeat it for me. In terms of the analysis of the financial

4   resources of Sable, we've had a lot of testimony in the letters, we're

5   going to hear it today, about the health of Sable and that they're not

6   Exxon. You know, they're not someone that we hear about every day in

7   the news. So how exactly did you look at what they provided in terms of

8   the insurance and the cash value and judge that against what? Judge

9   that against the cost of a potential spill or judge that against the

10   cost of the operations as Exxon disclosed it, or how does that analysis

11   actually happen by staff?

12      JACQUELYNN YBARRA: Commissioner Bradley, through the Chair, so we

13   looked at specifically what was required for Chapter 25B, and so

14   Chapter 25B only requires that they update any county bonds that they

15   have on file with us, which none of the facilities do. The final

16   development plan permit for SYU and POPCO requires that they submit

17   copies of their OSPR COFRs, those are the state-designated financial

18   certifications, and that they provide copies of their liability

19   insurance to demonstrate they do have financial capabilities. We looked

20   at those insurance certificates, saw that it was over $400 million

21   worth of liability insurance, over $2.5 billion coverage in property

22   damage, and determined that that was sufficient to cover an oil spill

23   from the facilities.

24      [02:15:06]

25

17

COSB AR006803

1          And for the OSPR COFRs, again, the permit condition just requires

2     that they submit copies to the county. So once they submitted those

3     copies of their COFRs that they got from OSPR, it gave them the green

4     light of meeting that condition.

5          ERRIN BRIGGS: And Commissioner Bridley, if I can build on that

6     just a little bit. So there are the basic requirements that are

7     required by 25B, and in addition to that, we encourage the applicant to

8     demonstrate additional insurance, and in their presentation they're

9     going to be able to go over exactly the amounts and what types of

10    insurance they have. It's a pretty robust package of various insurance

11    sources, so we believe that not only have they met the minimum

12    requirements in 25B, they've gone beyond that, and they can get into

13    better detail about what they have.

14         COMMISSIONER BRIDLEY: Okay. I know we're going to hear it in

15    public comment. I appreciate the statement that the $400 million and

16    the $2+ billion is sufficient, but sufficient based on what? What was

17    your threshold that you're looking at in terms of that meeting 25B?

18         ERRIN BRIGGS: So 25B does not require us to examine what the cost

19    of the former spill was or what the cost of a spill could be. It simply

20    requires that they provide copies of their OSPR COFR certificates.

21         COMMISSIONER BRIDLEY: Okay. And remind me again. The OSPR COFR

22    certificates are not a county regulated document.

23         ERRIN BRIGGS: Correct.

24         COMMISSIONER BRIDLEY: So say that again?

25         ERRIN BRIGGS: That's correct.

                                    18

1      COMMISSIONER BRIDLEY: What are they? Who is in charge of those,

2   or who regulates it?

3      ERRIN BRIGGS: CDFW through the Office of Spill Prevention and

4   Response. It's essentially their offshore unit that examines spills and

5   responds to spills and provides for these insurance requirements.

6      COMMISSIONER BRIDLEY: Okay. So regardless of how the county's

7   analysis happens, then the state looks at these two models and

8   determines their own agreement that there's sufficient funding, right?

9      ERRIN BRIGGS: Correct.

10     COMMISSIONER BRIDLEY: So in a way, it's out of the county's

11  control, if I have that right?

12     ERRIN BRIGGS: Mostly, yes.

13     COMMISSIONER BRIDLEY: All right. And then one other question I

14  had was, it caught my attention in the staff report that the last

15  safety audit was in 2014. I'm glad you clarified that was because

16  partially in 2015 everything sort of ceased to exist. Is there any way

17  the county could require that another safety audit happen before they

18  continue or move ahead with using the pipeline in the facility?

19     ERRIN BRIGGS: So Mr. Chair and Commissioner Bridley, through our

20  SSRRC committee, our engineer who's been working with us here on these

21  facilities since they were constructed, he essentially ensures that

22  each operator, including Sable, if and when they go through this

23  process, that they go through an extremely rigorous testing and

24  integrity management process prior to restart. So he's going to be out

25  there conducting a safety audit at the facility. He's going to be

19

COSB AR006805

1    making sure that all the vessels and pipes and all of the hardware at

2    the facility is tested prior to it being put into service -- tanks,

3    vessels, pipelines, everything.

4         COMMISSIONER BRIDLEY: Okay. But that's not called an audit?

5    That's just part of his compliance work and is it effectively an audit?

6         ERRIN BRIGGS: Yeah. I mean, we refer to it as a facility audit.

7         COMMISSIONER BRIDLEY: Okay.

8         ERRIN BRIGGS: And it involves him walking the entire plant with

9    Sable staff and going over everything. And then in addition to the

10   field audit, he'll also require all of the testing reports, again, for

11   all the vessels and pipes and tanks and everything.

12        COMMISSIONER BRIDLEY: Okay, that was all the questions I had now.

13        COMMISSIONER MARTINEZ:  Okay. I'm going to ask a couple

14   questions. So in line with what was just talked about, today we're not

15   discussing the ability to push the green button and start operations,

16   correct?

17        ERRIN BRIGGS: Correct.

18        COMMISSIONER MARTINEZ:  Okay. So what you're talking about just a

19   second ago would obviously occur before there was a green button pushed

20   in starting operations.

21        ERRIN BRIGGS: That's correct.

22        COMMISSIONER MARTINEZ:  Okay. Now, my other question had to do

23   with the property taxes. So Sable right now owns the real property or

24   does it just own personal assets which are taxed under the real

25   property taxes?

COSB AR006806

1          ERRIN BRIGGS: I'm hearing that they own the real property.

2          [02:20:00]

3          COMMISSIONER MARTINEZ:  Okay. And how much are we talking about

4      in property taxes being paid right now?

5          ERRIN BRIGGS: So Chair Martinez, there's a difference between the

6      property taxes required during an idle status now and when they resume

7      production. And there is a very complicated factor that gets calculated

8      for production. So right now, the property taxes are much lower than

9      they would be as if they were producing. But under production, it's in

10     the order of millions.

11         COMMISSIONER MARTINEZ:  Correct. Correct. But I'm just talking

12     about now. Since there's no bond out there, the property taxes continue

13     to be paid.

14         ERRIN BRIGGS: Yes.

15         COMMISSIONER MARTINEZ:  If somebody doesn't abandon it yet, and

16     they're taking time or taking whatever time they need to abandon it,

17     there's a payment of property taxes in place of the bond.

18         ERRIN BRIGGS: Absolutely.

19         COMMISSIONER MARTINEZ:  So I'm just trying to understand what

20     amount are we talking about?

21         ERRIN BRIGGS: I don't have the amount.

22         COMMISSIONER MARTINEZ:  That's something that I'm going to be

23     interested in understanding when Sable comes up so they know. Okay?

24         JACQUELYNN YBARRA: Chair Martinez, the amount for SYU and POPCO,

25     they paid in 2023, was about $77,000 from my records of the tax

21

COSB AR006807

1    assessor. I can't remember what it was for the pipeline, but maybe

2    Sable has that information for you.

3        COMMISSIONER MARTINEZ:  Okay. That's what I'm looking for. Thank

4    you. Those were my questions. Commissioner Parke?

5        COMMISSIONER PARKE: Yes. I've given a lot of thought over the

6    past couple days about the questions I would ask today. And I was all

7    prepared to ask them at about 9:45. But here we are at getting close to

8    quarter after 11. And my questions, which will relate to insurance,

9    finances, cathodic protection, etcetera, etcetera, etcetera, I'd like

10   to reserve them until after public comment. They rest in part on a

11   document -- are you able to pull up this slide really quickly? I'm not

12   going to go over this in depth right now, just to show what I'm

13   referring to. [Refers to slide] There you go. This is from the original

14   EIR for the pipeline. And it's important because some of these things

15   in the EIR, they get incorporated by reference in various documents and

16   requirements. I don't want to go right now. I just want to point out

17   that a lot of my questions will relate to this. Often I'll ask

18   questions at this time so that those people in public comment can be

19   aware of where our thinking is and modify their comments. I kind of

20   think the comment we're going to get today from the letters I've seen

21   are going to be more pro and con kind of things and not so interested

22   in my document here. And I want to let everybody know I gave a copy of

23   this to Mr. Danielson to make sure that Sable was aware of it. I spoke

24   about it with my Brown Act buddy on this case, Mr. Reed. I gave a copy

25   to staff, and staff gave it to me in the first place. You might not

COSB AR006808

1    remember that a couple years ago. And I gave a copy to Environmental

2    Defense Center. So I think I've disseminated it as widely as I could to

3    those who might want to comment on it when we get there. So with all

4    that noise from me, I'm going to rest until I can ask questions after

5    the public comment. And I think that a lot of these things will require

6    some back and forth. That's easy to do with staff, and I think it'll be

7    a fair thing to do with Sable when you have your rebuttal time. Okay?

8    So there you go. Let's get on to other folks.

9         COMMISSIONER MARTINEZ:  Staff have anything to add? No? Okay.

10   Then this will be the time and opportunity.

11        DAVID VILLALOBOS: Just before we get to the applicant

12   presentation, I wanted to just reconfirm the amount of time that was

13   agreed upon.

14        COMMISSIONER MARTINEZ:  For Sable? It was 20 minutes is what it

15   is. And then also, this is the time that I'm going to announce that

16   these are the speaker slips for today, and those who have raised their

17   hands online, that's it. Those are the ones that are in. Okay?

18        COMMISSIONER BRIDLEY: Did you say how many minutes?

19        COMMISSIONER MARTINEZ:  Two minutes. It's going to be two

20   minutes.

21        COMMISSIONER PARKE: And Chair, does that 20 minutes include the

22   rebuttal time, too?

23        COMMISSIONER MARTINEZ:  Well, let me ask you, how much time do

24   you think you're going to be right now?

25        [02:25:00]

23

1       STEVE RUSCH: I'm about 12 minutes and my colleague's about 3, so

2   15 total, plus or minus.

3       COMMISSIONER MARTINEZ:  Let's just stick with 20 minutes, and if

4   I feel that there's a little bit more questions that weren't

5   anticipated, then we can address it then, but the floor is yours. And

6   please announce your name whenever you're speaking at the podium.

7       STEVE RUSCH: Can you hear me okay? Okay. Chairman and fellow

8   Commissioners, my name's Steve Rusch and I'm Vice President of

9   Environmental and Regulatory Affairs for Sable Offshore Corporation.

10  The staff has already reviewed and recommended. We're here today to

11  seek your approval of the change in owner, operator, and guarantor for

12  SYU project, POPCO facilities, and the Las Flores Pipeline System. It

13  appears from the attendance today that it's going to be a full and

14  lively discussion, and as by the comments from Commissioner Parke. As a

15  means of introduction, it's a little bit of a deja-vu all over for me.

16  For as a supervising engineer, my team helped navigate the successful

17  startup of SYU back in 1993. So here we are again today. I know the

18  project well. Accordingly, I've worked with local, state, federal

19  regulators on oil and gas projects and permitting. I've also had the

20  unique experience of working with EDC and Get Oil Out to forge the one

21  and only cooperative deal between Santa Barbara County and the NGOs.

22  One and only. We look forward to working with you and the community to

23  forge new relationships and exciting new community benefits. So

24  starting with the opening slide. You can see the facilities there on a

25

COSB AR006810

1    beautiful spring day, I guess you'd say, with the storage tanks in the

2    foreground and the treating facilities in the background.

3        So who is Sable? Sable is an independent oil and gas company

4    founded in 2020. We're a group of seasoned operators with the skills

5    and necessary training necessary to operate the facilities. A lot of

6    those folks are here today in the audience, and we thank them. Our

7    management and executive team, as staff has mentioned, has over 20

8    years of experience operating facilities in the Santa Barbara Channel.

9    We're community-oriented and a solution-based company with a history of

10   collaboration with the environmental community, as I've mentioned. And

11   we proudly support a number of organizations, including the police

12   officers and the vets. As I mentioned, the purpose of this hearing, and

13   it has been mentioned by staff and others, is approval of transfer of

14   the county's permits to Sable. And as you know, Sable acquired the

15   facilities in February of 2024, and has been working with the county,

16   state, and federal regulators since. Those applications recognize this

17   reality, and as noted, this approval has no bearing on the restart of

18   the pipeline. It's simply the transfer of the permits. The staff report

19   confirms we've met all the requirements for owner, operator, and

20   guarantor. I won't belabor that. Sable's management team has

21   demonstrated its ability to operate its facilities in exemplary

22   fashion. We received the Santa Barbara County's first and only

23   "Resolution for Good Operator," recognizing outstanding performance.

24   We're ranked as MMS's best operator, which is now, of course, BSEE, and

25   the Pacific OCS for Safety of platform and pipeline operations. We

25

1    received Santa Barbara County Commendation for Outstanding Maintenance

2    Practices at the Lompoc Oil and Gas Plant, as well as a number of other

3    accommodations.

4        Now, let's talk about operator capability. As you may know,

5    there's a multitude of compliance and contingency plans that staff

6    reviewed with you, and the ones that I want to point out is the

7    contingency plans there. The Las Flores Pipeline Integrated Contingency

8    Plan is valid and effective and in place. There's been comments to the

9    contrary submitted. Sable successfully conducted emergency response

10   drills, which were required prior to the change in operator and

11   ownership, and there you see some pictures, and we received very

12   favorable feedback from the agencies that were present, commenting on

13   our professionalism and our training and experience.

14       [02:30:09]

15       Sable meets county operator capability requirements, and in my

16   opinion, it exceeds those requirements, as evidenced by the experience

17   levels, most notably on similar Santa Barbara Channel facilities, and

18   as has been mentioned, Sable senior leadership's managed the oil and

19   gas business for over 30 years. The on-site management team transferred

20   over from the same or similar leadership roles at LFC, the Las Flores

21   Canyon facilities, and look at the years of experience there, quite

22   substantial.

23       Financial guarantees. As has been brought up. I'm going to turn

24   to our compliance with the financial requirements. This is expanding a

25   little bit on the questions that were made earlier. We've satisfied the

26

COSB AR006812

1    bond requirements, right, for the 25B, but in addition, we've noted

2    some other items on here, it's a little bit busy, but we've got $112

3    million in cash as of June 30. Since then, we've raised an additional

4    $200 million in cash, and we continue to raise cash. We've raised over

5    $700 million dollars of cash as a corporation. We carry extensive

6    insurance, and this is what was talked about earlier. By statute, we

7    talked about the COFRs that are issued by OSPR. The statute of

8    limitations are $100 million, or $101 million, and we've provided an

9    additional $300 million, above and beyond what OSPR even requires, so

10   that was the $400 million dollar number that staff talked about. In

11   addition, we have the $35 million oil spill financial responsibility

12   policy regarding the offshore facilities. That number will grow as we

13   get into full production, and as Jax mentioned, we've got $2.5 billion

14   in property insurance covering the facilities. So in total, kind of, if

15   you look at the whole picture, it's about $700 plus million dollars in

16   capability to respond to an incident. And the property insurance, for

17   instance, the $2.5 billion property insurance, which would be available

18   if facilities were impacted, and we wouldn't be required then to take

19   the other cash positions I mentioned there to cover those losses. So we

20   would continue to have that $700 plus million available for an incident

21   response. And as we've mentioned, and as I mentioned, we've received

22   the COFRs from OSPR. And these are the ones that are listed online.

23   This is where you can see the $100 million, which is the max that you

24   can get. So again, we supplemented that with the $300 million.

25

27

COSB AR006813

1       That concludes my comments on the 25B application, which is

2    really just for the transfer of those permits. But we've been reading

3    the comments, as I'm sure all of you have, too, and we wanted to

4    briefly explain some of those that were submitted in connection with

5    this hearing and provide some context. We've already mentioned this

6    one, Pipeline Restart. This process, or the permitting process, does

7    not restart the pipeline. We've been through that quite a bit. Pipeline

8    restart is a separate process subject to state and federal regulatory

9    requirements. In the comments, there was made mention of the California

10   Coastal Commission NOV for the Las Flores Pipeline work. Sable's

11   understanding is that it was conducting permitted repair and

12   maintenance pursuant to existing approvals and as required by the

13   Office of the State Fire Marshal, OSFM. And all those activities were

14   being conducted under the supervision of qualified biologists and

15   cultural archaeologists who had extensively reviewed the whole 125-mile

16   pipeline during previous environmental reviews. Those are the same

17   individuals that we have now employed. Sable informed the Commission

18   staff that the interim measures were necessary to secure the safety of

19   those sites and only those interim measures were performed after the

20   NOV was issued on the 27th. And we're now working with the Coastal

21   Commission almost daily now to address concerns and there's no current

22   work going on along the coast except for just this past week with the

23   winds we had, we had to put some fences back up, but there's no work

24   being done along the coast.

25       [02:35:03]

COSB AR006814

1          Third, Sable's experience and safety commitment. We've had

2     decades of safe oil and gas operations as has been mentioned and we're

3     committed to running the pipeline with state-of-the-art improvements.

4          Financial capability. As I mentioned, there's extensive insurance

5     and cash reserves that exceed the requirements. And I also want to

6     mention that there's a number of comments circulating regarding debts,

7     the bankruptcy of an unrelated entity back in 2020. About that

8     bankruptcy, it was a completely different situation than the situation

9     here today. That was a private company not affiliated with Sable

10    Offshore Corporation where this management team was specifically

11    brought in only after a very extensive debt had been acquired by the

12    predecessor company and the predecessor management team following a

13    roll-up of a number of unrelated oil and gas assets in West Texas. The

14    Sable management team was specifically brought in to fix a very

15    distressed, highly leveraged $2.1 billion in debt in high operating

16    cost Permian Basin. This was a financial restructuring or so-called

17    workout situation. Prior to COVID and the Saudi/Russia oil price war,

18    when oil prices briefly went below zero, the team successfully reduced

19    its total debt by approximately $1.4 billion and eliminated $94 million

20    of the annual interest expense. Very different from the situation here.

21    Here upon restart, Sable Offshore will have efficient, low-cost assets,

22    a healthy balance sheet, attractive leverage, which is debt to equity

23    ratios, and access to additional public equity capital as demonstrated

24    by, as I previously mentioned, over $700 million of equity capital

25    raised to date. The truth is, as we've seen above, Sable has extensive

COSB AR006815

1     cash reserves and insurance that exceeds all requirements. And our

2     market cap's about $1.79 billion as of today.

3          Cathodic Protection, mentioned earlier. The Commission already

4     looked at this last year and found that the FTP, the final development

5     plan, does not include any cathodic protection requirements. Staff

6     report confirms, again, that Sable is in full compliance, and there's

7     no changes from last year with respect to cathodic protection. So

8     nothing is different from last year that would warrant a different

9     answer. There's confusion about the waiver or special permit we're

10    seeking from the Office of State Fire Marshal. Again, nothing to do

11    with 25B. But to the extent there is concern, we're not removing

12    anything. We're actually enhancing pipeline integrity. Corrosion

13    protection is a part of pipeline integrity management, and I'll talk

14    more about that in a second.

15         The following demonstrates Sable's commitment to world-class

16    quality and safety. We understand people are concerned about safety, as

17    are we. Regarding the SYU and POPCO Gas Plant, there's a lot of things

18    going on right now as we're refurbishing and getting these back to

19    their world-class "as-new" conditions, the testing we're doing, a lot

20    of work going on. And we'll also end up upgrading the leak protection

21    system also. And as I mentioned, I'll talk a little bit more about the

22    pipeline integrity, on the pipeline, the Las Flores Pipeline, being

23    Line 324, 325. We're implementing a world-class integrity management

24    program using state-of-the-art management practices, multiple

25    inspections, and then, as I mentioned, planned cathodic protection

30

COSB AR006816

1    upgrades, which are just a piece of this. And if you look at what the

2    additional requirements are, and this is what's required by the Consent

3    Decree in most parts, is the anomaly repair criteria, in other words,

4    where we've had wall loss thickness, it's 20% more restrictive than the

5    current regs. Integrity tool frequency runs, and the integrity tools

6    are what we call the mechanical pigs, or they've got different names,

7    but the tools that run through the pipe that measure the external and

8    the internal corrosion, and we call those anomalies where it's been

9    reduced, we're running those ten times greater than the regulations.

10        [02:40:00]

11        For those areas…let me back up. We do have cathodic protection on

12    those 125 miles of pipeline. The majority of that pipeline is covered

13    by that cathodic protection system. That cathodic protection system is

14    in place, and we have cathodic protection test stations about every

15    mile. So all the things are in place for cathodic protection. There are

16    some areas where you have the insulation that's wet, where the cathodic

17    protection is at 100%, and that's where the integrity management

18    program comes in. That's where the State Fire Marshal and the waivers

19    come in, is they have now applied additional requirements to bring that

20    pipe up to as-new condition.

21        One other item. Prior to restart, putting oil in the pipeline,

22    we'll do a hydrotest. And a hydrotest is simply you fill the pipe with

23    water, then you pressure it up, usually around 1.39 to 1.5 times its

24    maximum operating pressure that it's going to be operating at. And then

25    they do an additional spike test even higher than that for a short

31

1    period of time, so that's kind of the final step to ensure that that

2    pipeline is back to as-new condition, because it would not be able to

3    withhold that pressure or withstand that pressure if you haven't done

4    the appropriate repairs on that pipeline, which we are now in the

5    process of doing. We have 31-plus crews out working today repairing

6    that pipeline to the standards that are required by the Consent Decree.

7    So that's when you talk about cathodic protection, it is just a small

8    piece of the overall corrosion, or overall integrity program, and that

9    corrosion protection is in place. It's been taken out of context,

10   "well, we don't have corrosion protection." No, we do. We've got it on

11   the majority of that 125-mile pipeline, and it is a piece of this

12   overall program.

13        So what are we requesting of the Planning Commission? We

14   respectfully request that you adopt the staff's findings and

15   recommendations to determine that the requested change in owner,

16   operator, and guarantor applications are not a "project" under CEQA;

17   make the required findings under the code sections 25B-9 and 10, and

18   approve the change in owner, operator, and guarantor applications. And

19   now I have one of our employees, Ryan McLeod, who's going to speak. And

20   then following that, we'll be available for questions after public

21   comment or before, whatever your desires are. Thank you.

22        RYAN MCLEOD: Good morning, Commissioners. Before I begin, could I

23   get all the Sable supporters to raise their hands? I just want to thank

24   you for coming out today. Thanks for your time and efforts. I do

25   appreciate it. Good morning. My name is Ryan McLeod. I don't usually do

COSB AR006818

1    this, so if you don't mind, I'm going to read from some notes I've

2    written. I am a Sable employee and a proud resident of the Central

3    Coast where I have been fortunate enough to attend school, build a

4    family, and pursue a meaningful career. I'm here today to ask you to

5    please approve Sable's application to become the operator of the Santa

6    Ynez Unit and related facilities. I felt lucky when I gained employment

7    from ExxonMobil back in 2009 and have, over the last decade, worked my

8    way up to become offshore field foreman, leading efforts for all three

9    platforms, Hondo, Harmony, and Heritage. I've always prided myself in

10   ensuring that safety, compliance, and the environment are always my top

11   priorities. When Exxon sold our assets to Sable, like so many former

12   ExxonMobil employees, I chose to work for Sable primarily because I

13   just love this area. Obviously there was a lot of unknowns about moving

14   to a new employer. Would they hold the same standards? Would they

15   support my efforts in ensuring safety and environment were the top

16   priorities? Would they support hiring locally and be a productive

17   member of this community? All of these questions and many more ran

18   through my head. I'm here today because the answer to each one of those

19   questions is yes. Now that I have worked for Sable for nearly a year, I

20   can happily tell you that they have exceeded my expectations. Not only

21   did they ensure that I was employed, but they also ensured that all of

22   my coworkers kept their jobs as well. More importantly, Sable has

23   clearly demonstrated to me and everybody I work with that they hold the

24   same priorities I have worked so hard for all these years to enshrine

25

33

COSB AR006819

1    in our operations -- safety, compliance and the environment. Sable is

2    working hard to bring local jobs back to the Central Coast.

3         [02:45:00]

4         We lost a lot of good people when ExxonMobil left. Families that

5    were forced to find lower paying jobs or simply leave this beautiful

6    area and now we have an opportunity to bring them back, and Sable is

7    providing us that opportunity. I personally take a lot of pride in the

8    role I play in bringing some of the cleanest and most environmentally

9    friendly oil and gas in the world to the market. I love the environment

10   and nobody more than I would love to live in a world where only clean

11   energy exists. But until we get to a point where that is actually

12   feasible, and while the world still runs on oil and gas, I would rather

13   see that oil and gas come from Sable where I know it will come from the

14   most highly regulated and most responsible operators in the world.

15   Integrity means a lot to me and the people I work with at Sable have

16   just that. I've gone from a number on a corporate list to a member of a

17   tightknit team. Sable allows us to succeed as employees and that is

18   what we are asking of you. Please approve Sable's application so we can

19   give them the chance to succeed as well. They deserve it, and frankly,

20   so do we as members of this community who will benefit from Sable's

21   responsible operations at the Santa Ynez Unit for years to come. Thank

22   you for your time.

23        COMMISSIONER MARTINEZ:  Thank you.

24        COMMISSIONER BRIDLEY: Hang on. Come back. You've get another

25   couple of seconds. You said you were with the Exxon crew, right, and I

COSB AR006820

1    think we saw maybe a letter from you in the record signed by a number

2    of employees as well. So of the people that are currently working for

3    Sable, what is the percentage that were already there under the Exxon

4    operation?

5        RYAN MCLEOD: I don't know that exact number. Obviously when Exxon

6    went through years of running idle, we were forced to lose a lot of

7    those employees, so right now we're bringing a lot of people in. So the

8    numbers may be fairly low, I would guess 20% maybe are still Exxon,

9    maybe more than that. 50? I'm hearing about 50%.

10       COMMISSIONER BRIDLEY: 50, okay. All right. That's all.

11       RYAN MCLEOD: And that's only because we lost a lot of people but

12   we're trying to get them back.

13       COMMISSIONER BRIDLEY: Yeah, during the [PH 02:47:10] stalled out

14   period, right.

15       RYAN MCLEOD: The idle [PH 02:47:11] year, yes.

16       COMMISSIONER BRIDLEY: Right. Thank you.

17       RYAN MCLEOD: Thank you.

18       COMMISSIONER MARTINEZ:  I have a quick question for you since you

19   led this one and I'm going to actually ask this of the general public.

20   When everybody was asked to support Sable, a lot of people in the

21   audience raised their hand. And I'm just going to ask this one

22   question. How many of those who raised their hand are residents of our

23   County of Santa Barbara? Thank you. Okay. The reason I ask that

24   question is we're talking about local jobs. That was mentioned in that.

25   Thank you. Commissioner Reed?

35

COSB AR006821

1          COMMISSIONER REED: I have a question perhaps Ryan can answer it.

2     How many employees does Sable have right now? And how many employees do

3     they estimate they will have if at some point the whole unit pipeline,

4     everything would be up and running?

5          STEVE RUSCH: Chair and Commissioner Reed, we're about 120

6     employees now which will ramp up to close to 200. And regarding the

7     question, Chair Martinez, Commissioner Bridley, it was I think 48 of

8     the 50 Exxon people transferred over. So essentially whatever that is,

9     99% of the people, 98% of the people transferred over. So we have been

10    building since that time, since February of 2014, up to 120 plus, 400

11    or plus contract folks that are working for us right now. So we're at a

12    very high level of employment. We've had to lay off six of those crews

13    on the pipeline because of the situation on the coast. We hope to get

14    them back to work right away.

15         COMMISSIONER MARTINEZ: I have a quick question while you're up

16    there. I noticed that establishing a local control center at Santa

17    Maria, what would that consist of and how many people would that

18    consist of?

19         STEVE RUSCH: I think it's probably half a dozen people, plus or

20    minus. And what a control center is, it's going to be in a building,

21    right? It's got computers and screens, and that's where the calls will

22    come in and they'll be monitoring all the data, every mile of that

23    cathodic protection and things like that. The safety valves, there's

24    been 27 what we call FRDs, Flow Restriction Devices, which is a fancy

25    name for valves, we have those all installed now, 27 valves. Those will

COSB AR006822

1    all be controlled by…so if they get the signal that there's a pressure

2    drop, then boom, the valves get shut in. That's all funneled through

3    that. And also if there is an issue, then the calls go out from that

4    local facility to our spill response teams, which we've added to at

5    Gaviota, at Las Flores Canyon, above and beyond what the prior operator

6    had so that they can respond to that location. They'll know where that

7    location is where that pressure drop's been. So that control center,

8    again, in Santa Maria, I think at one of the existing facilities, is

9    something we're working on right now.

10       [02:50:16]

11       COMMISSIONER MARTINEZ:  And here's my last question, really, and

12    I've heard a lot about the insurance policies, which is good to hear,

13    but I don't know exactly what are the ratings, if you have them even

14    available. I know that ratings have changed from my days when it was

15    plus, plus, then it went to AA and so forth. If that information can be

16    provided at some time, if you don't have it now, but within today's

17    time, that'd be great.

18       STEVE RUSCH: We don't have that right now, but we'll get it while

19    we're going through the comment period.

20       COMMISSIONER MARTINEZ:  Okay. Commissioner Bridley?

21       COMMISSIONER BRIDLEY: Just to follow up for you, the Coastal

22    Commission's Notice of Violation, we've had a lot of letters about

23    that, and I see that you reminded us that you thought it was

24    maintenance and repair, and I'm familiar with maintenance and repair

25    not requiring a permit. So can you just explain again, did you think

37

1   that this was all permitted under the Coastal Development Permit that

2   had been issued for some portion of the work, and you didn't realize

3   that this was going to require a separate CDP from the Coastal

4   Commission, or I'm not sure that I'm getting the clear…how did that

5   happen?

6     STEVE RUSCH: Yes. We have an existing CDP, which would allow us

7   to perform that work with appropriate mitigations, and separate from

8   that, there is also an exemption in CEQA, in the Local Coastal Act, for

9   repair of pipelines. And as you know, this pipeline has already been

10   installed, disturbed, so all these areas where we're digging up to

11   repair the anomalies, is in pre-disturbed areas. But we still have the

12   biological and cultural resource folks doing pre-surveys, and surveying

13   while we're doing the digs, so yes.

14     COMMISSIONER BRIDLEY: So you thought you were doing maintenance

15   and repair --

16     STEVE RUSCH: Absolutely.

17     COMMISSIONER BRIDLEY: -- and the Coastal Commission had a

18   different take on it.

19     STEVE RUSCH: Absolutely. Absolutely.

20     COMMISSIONER BRIDLEY: All right. Thank you.

21     COMMISSIONER MARTINEZ:  Commissioner Reed?

22     COMMISSIONER REED: I still have a couple more. I hear from time

23   to time you mention "400 contractors," is that 400 employees of local

24   contractors?

25

COSB AR006824

1        STEVE RUSCH: It's a mixture of both. Most of it is local. Some

2    though for offshore we have to bring. Because the offshore California

3    oil and gas industries, as Ryan mentioned, has declined, so we've had

4    to bring contractors in from the Gulf while we go through a hiring

5    process. But for the contractors that are working on refurbishing the

6    facilities, it's a mixture of both local and sourced outside of

7    California.

8        COMMISSIONER REED: So how many different contractors based in

9    Santa Barbara County -- I've seen a letter signed by a lot of names of

10   people I know -- but how many Santa Barbara County-based firms?

11       STEVE RUSCH: Let me get back to you on that while we're going

12   through comments. I'll have that number.

13       COMMISSIONER REED: I have a lot more detailed questions with

14   respect to the operation of the pipeline, but I think I'll reserve

15   those until later. Thank you.

16       COMMISSIONER MARTINEZ:  I'm afraid to say, but Commissioner

17   Parke?

18       COMMISSIONER PARKE: I have a lot of questions, but I'm going to

19   reserve those, and I'm sure you know that when we're asking you

20   questions and you're answering them, that's not taken from your

21   rebuttal time or your time.

22       STEVE RUSCH: Thank you.

23       COMMISSIONER MARTINEZ:  Thank you, and so this is where we move

24   into public comment. I have a quick question. So what I'm going to do -

25   - I know lunch is approaching, but we're going to go past the lunch

39

COSB AR006825

1    hour for a little bit. I know we took a break, is that fine with staff

2    right now? I'm not talking about the whole way through, but let's take

3    a chunk out and see where we are about 12:30, okay?

4        I'm going to read off about seven names right here from the

5    speaker slips, but during that interim, Mr. Villalobos is going to go

6    to five of the people that are online. So if you can pay attention.

7    You're supposed to come down and start lining up over just behind the

8    podium. No specific order, but first come first served of these people

9    I'm naming: Evie Lynn, Jonathan Ullman, I'm going to say Callian

10   Sheehy, Matthew [PH] Cerufca from UCSB Environmental Law Club. Then we

11   have Bart Leininger from ALG, and the next one is going to be Dustin

12   Hoiseth from Santa Barbara South Coast Chamber. Okay, so you guys get

13   in line, we're going to go to the five people that are online right

14   now. Thank you.

15       [02:55:51]

16       DAVID VILLALOBOS: All right, so starting with the people who have

17   their hand up…so if you want to speak on this item, make sure you have

18   your hand raised online. Our first speaker will be Ted Roche to be

19   followed by Michael Lynch. Mr. Roche?

20       TED ROCHE: Yes, good morning, Commissioners, my name is Ted Roche

21   and I'm here today to speak in support of Sable and ask you to vote in

22   favor of their owner/operator change application before you. As the

23   founder and former CEO of Aqueos, we're a full-service marine

24   construction and commercial diving company that I established nearly 25

25   years ago here in Santa Barbara. I feel I can offer a unique

40

COSB AR006826

1    perspective on Sable's significant contributions to our community and

2    commitment to protecting our environment. I'm also speaking as a Santa

3    Barbara native, as a former commercial abalone diver, and as the father

4    of a commercial fisherman whose livelihood depends on the health of

5    these waters, and also as an avid surfer and proud environmentalist.

6    For me, the ocean is not just a workplace. It's a vital part of my

7    life, both professionally and personally. So my company, Aqueos, we

8    provide essential subsea services to major oil and gas operators,

9    including Sable. Our work spans various regions all over the world, but

10   also right here in Santa Barbara, where we have conducted subsea

11   inspections on every offshore platform and subsea pipeline in the Santa

12   Barbara Channel. That includes the Santa Ynez Unit, where we are

13   currently conducting comprehensive underwater inspections of the

14   interfield and field-to-shore subsea pipelines to ensure the integrity

15   and safety of this critical infrastructure. I've had the privilege of

16   working closely with Sable and the senior management team for nearly

17   two decades, and I'm here to tell you that Sable stands out amongst its

18   peers. They do not merely talk about safety and environmental

19   protection. They embody these values in every aspect of their

20   operations. Their approach is characterized by meticulous attention to

21   detail, rigorous inspections, and a strong commitment to properly

22   maintaining all structures. Please understand that as an owner of a

23   commercial diving company, safe operations and the safety of my

24   personnel has been and will always remain a core value of mine. Our

25   core values are well aligned with Sable. Sable's operations at the

41

COSB AR006827

1     Santa Ynez Unit exemplify how we can balance economic development with

2     environmental responsibility, and I can personally attest that there is

3     no compromising when it comes to safety at Sable, for the workers…

4         COMMISSIONER MARTINEZ:  Thank you. Thank you, and I'm not trying

5     to be rude, but I'm keeping it down to the two minutes, so if I

6     interrupt you, it's only because of that. But thank you. Our next

7     speaker.

8         DAVID VILLALOBOS: Our next speaker will be Michael Lynch, to be

9     followed by Ken Huff, then Michael Lyons, and then the fifth speaker

10    will be Lee Heller. Mr. Lynch, whenever you're ready. We can come back

11    to Mr. Lynch. Our next speaker will be Ken Huff, to be followed by

12    Michael Lyons.

13        KEN HUFF: Good day, Chair Martinez and commissioners. I'm Ken

14    Huff speaking for Santa Barbara County Action Network. SBCAN is

15    represented by Environmental Defense Center on this case, and we urge

16    your commission to deny the requested permit transfers for the reasons

17    stated in EDC's letter. Page 14-4 of Sable's draft integrated

18    contingency plan includes a graph illustrating the volume of oil that

19    would spill in the Cuyama Valley near the Cuyama River, resulting from

20    a worst-case spill. The unsafe pipeline rises some 1,300 feet between a

21    safety valve in Cuyama Valley and the next valve at the top of the

22    mountains before the line drops into Kern County. Even if the valves

23    were immediately closed upon a breach in Cuyama Valley, almost all of

24    the oil from the mountaintop on down to the valley would flow by

25    gravity into Cuyama Valley. That would be nearly 42,000 barrels or more

42

COSB AR006828

1 than 1.7 million gallons, 14 times the size of the Refugio spill, and

2 400 times the size of a tanker truck spill into the Cuyama River a few

3 years ago. Please protect our water and our communities by denying

4 these permit transfers. Thank you.

5   [3:00:25]

6   DAVID VILLALOBOS: Our next speaker will be Mike Lyons to be

7 followed by Lee Heller.

8   MICHAEL LYONS: Can you hear me okay? Hello?

9   DAVID VILLALOBOS: Yes, go ahead.

10   MICHAEL LYONS: My name is Michael Lyons. I'm the president of Get

11 Oil Out, which was formed in the aftermath of the disastrous 1969 oil

12 spill. We've been working to protect Santa Barbara County from the

13 adverse impacts of oil development ever since. As you've heard today,

14 Sable is uniquely vulnerable to financial insolvency. It would be a

15 grave mistake to transfer responsibility for recommissioning these

16 facilities to Sable. The POPCO permit requires that Sable post a

17 performance bond pursuant to condition Q-2. The other two permits at

18 issue allow the Commission to require a performance bond, and it would

19 be irresponsible for the Commission not to do so here. It is essential

20 that applicants like Sable provide a bond when they gain control of a

21 facility, because there's no guarantee that they will be solvent at the

22 time the facility is abandoned. This has been a pervasive issue in

23 California time and time again. We have seen how taxpayers must foot

24 the bill for decommissioning oil and gas facilities after operators

25

43

COSB AR006829

1    have gone bankrupt. Because Sable has not posted a performance bond for

2    decommissioning, the Commission cannot approve the transfer. Thank you.

3         DAVID VILLALOBOS: Our next speaker will be Lee Heller, and then

4    we'll go back to Michael Lynch.

5         LEE HELLER: Thank you, Chair and Commissioners. I will be brief.

6    I lived in Summerland for 18 years. Summerland was the birthplace of

7    the modern offshore oil and gas industry, and there is an enormous

8    amount of improperly capped and managed oil infrastructure from

9    companies that were not properly capitalized or not interested in their

10   commitments to properly abandon wells. So I speak from firsthand

11   experience as someone whose property values were damaged and who moved

12   away because of offshore and near-shore oil and gas development that

13   was not managed by companies that really lacked the resources to do

14   what they were supposed to do under their permits. And we're looking at

15   a modern version of this where the permit process is tighter, the laws

16   are clearer than they were 100 years ago, and you are therefore

17   obligated to make the finding that if this company cannot fulfill its

18   financial obligations, this community should not be put at risk by

19   their inability to do so. So I'd like to echo the comments of the

20   previous speakers and the written comment of Katie Davis and Linda

21   Croft in saying that you should deny these permits because this company

22   is not in a position to follow through on its promises. Thank you.

23        DAVID VILLALOBOS: All right, going back to Michael Lynch.

24        MICHAEL LYNCH: Thank you, can you hear me?

25

44

COSB AR006830

1    DAVID VILLALOBOS: Yes, go ahead. Oh, I think you muted yourself

2    again. Okay, can you --

3    MICHAEL LYNCH: Hello?

4    DAVID VILLALOBOS: Yeah, go ahead, we can hear you now.

5    MICHAEL LYNCH: Okay, I'm sorry. There were a couple of things I

6    wanted to point out, which I think have already been pointed out, but I

7    think they're important. One is that if the company goes bankrupt, the

8    insurance will not necessarily be kept active and will not necessarily

9    cover what's done. So just them having insurance while they're in

10   business is not necessarily sufficient. Yes, a bond would be absolutely

11   critical. And the other thing is, one of the things that was addressed

12   in the staff review was that there has been a review of basically their

13   management ability. Well, we've seen that their management ability,

14   they've demonstrated the management ability doesn't look too good

15   because they were required to cease action, cease performance.

16        [03:05:00]

17        They were required to stop working on the pipeline, and they

18   didn't. Now, either it's poor management or blatant disregard. Either

19   way, it's not acceptable. So I just wanted to point those out. I

20   certainly hope you do not allow this to go through. Thank you.

21        DAVID VILLALOBOS: And Ms. Lynch was our fifth speaker online.

22        COMMISSIONER MARTINEZ:  Okay, so now we'll go to those who are

23   online. And so when you go to the podium, just announce your name

24   before you start speaking. Pay attention to the lights right there. The

25   yellow light gives you an indication that you're coming towards the

45

COSB AR006831

1    end. Red light means exactly what we all know to be stop, okay? Thank

2    you. You're up.

3         EVIE LYNN: Good morning, ladies and gentlemen. My name is Evie

4    Lynn. I'm a helicopter pilot from Aspen Helicopters based in Oxnard,

5    California. We service the entire California coast and the supporting

6    areas. Previously to that, I spent 24 years in the United States Coast

7    Guard flying helicopters and enforcing other statutory limitations of

8    the Coast Guard. Throughout this time, I spent eight years flying

9    amongst the oil and gas industry all over the Gulf of Mexico. I have

10   conducted hundreds of landing and other flight operations with various

11   offshore oil facilities prior to my job at Aspen. I've continued on at

12   Aspen flying offshore, and specifically I have been working here with

13   Sable for the last 22 months. I'm here to share my firsthand experience

14   as it is important for those who have never worked with Sable before to

15   understand their commitment to safety and attention to detail and

16   dedication to providing the best operation possible for Platforms

17   Hondo, Harmony, Heritage, and the surrounding structure. It is because

18   of their values I believe they are the right choice for operating the

19   Santa Ynez Unit as they are present in Santa Barbara. They take a

20   hands-on approach for all decisions that are made, and they are not

21   2,000 miles away. I've conducted multiple flight operations with them.

22   Their proactive safety approach has been demonstrated through value and

23   feedback from their team from the pilots. When we had flight operations

24   and there were large tanks that were noted of concern, they immediately

25   took the tanks down by the request of the pilots and moved those tanks,

COSB AR006832

1    making it safer. I have encountered all manner of helipads throughout

2    my time. Sable's have been some of the best, if not the best, I have

3    encountered. The most important aspect of Aspen's interaction with

4    Sable is that they don't pressure a pilot who delays or declines a

5    flight for safety reasons. The fact that Sable doesn't pressure a pilot

6    to fly indicates Sable's willingness to prioritize safety over

7    production in their operations.

8         COMMISSIONER MARTINEZ:  Thank you.

9         JOHN ULLMAN: Hi, my name is John Ullman, Director of the Santa

10   Barbara/Ventura chapter of the Sierra Club. I'm not from here

11   originally, but I've come to love this place. I'm originally from

12   Florida, which even under Republican leadership opposed offshore oil

13   drilling leases because offshore oil is inherently risky and unpopular.

14   California has not approved a new oil lease since the 1969 Santa

15   Barbara oil spill, and offshore oil is opposed by 72% of Californians.

16   Ninety jurisdictions on the Pacific Coast have passed resolutions

17   opposing offshore oil. The Business Alliance for Protecting the Pacific

18   Coast, representing over 8,100 businesses, points out that spills put

19   our economy at risk. The offshore platforms, pipelines, and gas plants

20   are beyond their projected end of life. The platforms were slated for

21   decommissioning in 2020. According to the original development and

22   production plans, they were designed to last 25 to 30 years. It has now

23   been 40 years since oil production began. Fracking is now banned in

24   California, but this operation in federal waters used fracking and

25   other well stimulation, horizontal drilling extending many miles out,

47

COSB AR006833

1  and they dumped the wastewater in the ocean. Restarting what I believe

2  is the largest offshore oil operation in California by a speculative

3  startup that has just one asset and using a substandard 124-mile-long

4  pipeline that goes along the Gaviota Coast over three rivers and the

5  San Andreas Fault is a disaster waiting to happen. There are times in

6  this world when we need to take a stand. It's time to say, "No, we're

7  not going back."

8        [03:10:00]

9        BART LEININGER: Chair Martinez, Commissioners, thank you for the

10  opportunity to speak to you today. My name is Bart Leininger. I am a

11  principal engineer with Ashworth Leininger Group, an environmental

12  consulting and engineering company located in Camarillo, California.

13  I'm appearing today to provide the Commission a unique perspective

14  about the Santa Ynez Unit facilities and the proposed ownership change.

15  I've been associated with the Santa Ynez Unit for the past 35 years. As

16  a newly minted engineer out of college, I was hired by Exxon, and

17  immediately my job responsibilities were related to the permitting, the

18  construction, and startup of the SYU facilities in the early '90s. As a

19  consultant now, I've continued to support ExxonMobil, and now Sable, in

20  the operations related to environmental compliance at the facilities.

21  Most of my activities have been related to air quality permitting, and

22  compliance, and also I've been involved with water waste and other

23  related environmental issues at the facilities. So I come to you

24  speaking with direct experience related to these facilities, since I've

25  made a career of working with ExxonMobil and now with Sable. I come

48

1    today on my own volition to support the permit transfer, and have

2    worked with Sable's environmental team, who have been part of SYU's

3    legacy over these many years. I know of their integrity and commitment

4    when it comes to environmental stewardship. I've spent my career with

5    these folks. They've conducted themselves with a high degree of

6    professionalism, not only with the county staff, but also with other

7    agency staff throughout Santa Barbara County, and they take very

8    seriously their compliance obligations. These are seasoned

9    professionals that know exactly what is expected of them in Santa

10   Barbara County, and they have my absolute respect. I would encourage

11   the Planning Commission to approve Sable's application, as I have no

12   reservations based on my extensive experience working at the SYU

13   facilities. Thank you.

14       COMMISSIONER MARTINEZ:  Thank you. I'm going to have to stop you

15   right there. Thank you.

16       CAILLIAN SHEEHY: Good afternoon, Mr. Chair and members of the

17   Commission. I'm Caillian Sheehy here on behalf of UCSB's Environmental

18   Law Club. This agenda item is about more than a simple change in

19   ownership. If you vote to approve the validity of Exxon's permit

20   transfer to Sable, you'll be opening the door to restarting a pipeline

21   that was responsible for contaminating one of the most biologically

22   diverse areas on the west coast of the United States. I offer two

23   reasons that you should vote to deny this permit transfer. First,

24   substantial evidence does not support a determination that any benefits

25   from Sable's pipeline restart will outweigh significant and unavoidable

49

1    environmental impact. In denying ExxonMobil's 2022 trucking proposal,

2    you found that the oil supplied and the jobs created would only have a

3    de minimis impact. Today's proposal offers no more benefit than

4    Exxon's, and the risks of moving forward are known and apparent. A July

5    environmental impact draft report from the county found that restarting

6    the pipeline could result in a spill every year and a major rupture

7    every four years. This could result in an even larger disaster than

8    2015's. Moving to my second point, though Sable promises to be a

9    responsible operator, promises made are not always promises kept.

10   Already, Sable has rushed ahead with work on the pipeline, ignoring a

11   notice of violation from the Coastal Commission and prompting a cease

12   and desist. Sable does not even have an approved oil spill remediation

13   plan, nor can it afford to cover the cost of remediation if the

14   pipeline ruptures during restart or shortly thereafter. I'm grateful to

15   have called this community home as a UCSB student and alum, and I'm

16   hopeful that you'll vote to keep our coastlines clean. For the

17   foregoing reasons, I urge you to deny the validity of this permit

18   transfer. Thank you.

19          COMMISSIONER MARTINEZ:  Thank you. Thank you. Next.

20          MATTHEW CAMPA: Good afternoon, Commissioners. My name is Matthew

21   Campa. I'm the attorney advisor to the UCSB Environmental Law Club, and

22   I'd like to thank you for your leadership on this very important issue.

23   If the Santa Ynez Unit is permitted to restart, it is not a question of

24   if but when an oil spill will occur. The environmental report just

25   referenced estimated that a spill would occur every year and that a

COSB AR006836

1    catastrophic rupture would occur every four years. Principally, to

2    approve the change of ownership today is to condone and accept that a

3    catastrophic oil spill will, in fact, occur.

4         [03:15:00]

5         Sable is simply not the kind of corporation that can be trusted

6    with the immense responsibility of restarting and operating the Santa

7    Ynez Unit. This community knows from direct experience the immense cost

8    of oil spill response and remediation. Sable has not demonstrated that

9    it possesses the financial resources nor organizational capacity and

10   expertise to handle such a response. It does not have an approved oil

11   spill contingency plan in violation of its operating permit, and it has

12   undertaken unpermitted installations that has prompted the Coastal

13   Commission to issue a Notice of Violation. Ignorance of the law is not

14   a defense. Sable exists for no other reason other than to operate the

15   Santa Ynez Unit. It owns no other assets or real property. If and when

16   this enterprise goes south because of a catastrophic oil spill, it will

17   be our community, our citizens, our local government, and our

18   environment that will bear the burden. We ask the Commission to deny

19   the change of ownership. Thank you.

20        COMMISSIONER MARTINEZ:  And our next speaker will be Dustin.

21        DUSTIN HOISETH: Hello, Chair Martinez and Commissioners. My name

22   is Dustin Hoiseth. I'm the Public Policy Manager with the Santa Barbara

23   South Coast Chamber of Commerce, which represents businesses from

24   Goleta to Carpinteria. As usual at these hearings, I'm not here today

25   to talk to you about oil. I'm here to advocate for a fair and equitable

51

COSB AR006837

1    process. Today I would like to express the Chamber's support for the

2    approval of Sable's owner/operator change application. As a business-

3    representing organization that prides itself on often being the bridge

4    between business and government, it is critical to the Chamber that we

5    all set appropriate precedents for business in the county. To us, it is

6    imperative that the county, in this case the Planning Commission, take

7    positions that are based upon the validity of the request or item

8    before them, as well as basing their decisions on what is within their

9    jurisdiction for the respective hearing. In this case, our

10   understanding is that the staff report recommends approval of this

11   application as the applicant meets the condition of approval outlined

12   by the county. Businesses large and small struggle every day to meet

13   conflicting federal, state, and local regulations. The best they can

14   hope for when interacting with a government jurisdiction is a fair

15   process, and I believe that our local jurisdictions want to provide

16   that. As presented, this application is consistent with findings for

17   approval. Denying this owner-operator change application today would

18   set a dangerous precedent. Whether we like it or not, the decisions

19   made by local governments regarding one industry send a message to all

20   businesses. Denying this application would send a message to the

21   business community that your projects and applications can still be

22   denied even if you meet all the legal requirements associated with that

23   project. This would understandably discourage future investments from

24   businesses into Santa Barbara County and even lead to our county losing

25   business opportunities to other regions, as we are already seeing. This

COSB AR006838

1    is not a scenario we should risk during a critical phase of our

2    county's economic development. Please approve Sable's application for

3    an owner-operator change. Thank you for your time.

4    　　　　COMMISSIONER MARTINEZ:  Thank you. So now I'm going to read the

5    next seven names and then Mr. Villalobos will go to those who are

6    online. We have Jason Wall, Elizabeth Martinez, John Esparza, David

7    Quesada, Megan Lazaloute, from UCSB/ELC, and Mia DiCostanzo. Well,

8    we're going to go to the speakers right here to allow people to come up

9    here. I mean, speakers, you just hold on right there, but you can call

10   five more. Okay, thank you. So just a reminder for those online, if

11   you'd like to speak, I need you to raise your hand. Right now we

12   currently only have two hands up. We have some more now, okay. Well,

13   no, I they weren't up, then they're done. That's it. If they were up

14   before we started that's what I announced.

15   　　　　DAVID VILLALOBOS: Okay.

16   　　　　COMMISSIONER MARTINEZ:  So we only have two left.

17   　　　　DAVID VILLALOBOS: So our first speaker is Mary Ellen Brooks, to

18   be followed by Linda Phillips.

19   　　　　MARY ELLEN BROOKS: Okay, good afternoon. I'm speaking today on

20   behalf of Citizens Planning Association, and Citizens Planning

21   Association asks that you deny Sable's application to transfer the

22   permits from the Santa Ynez Unit, POPCO Gas Plant, and Las Flores

23   pipelines. Our county has already suffered from the devastating oil

24   spill from those corroded pipelines, and surely there'll be another

25   catastrophic event if you allow these same pipelines to be used.

COSB AR006839

1          [03:20:02]

2          Now I'm going to skip to my own personal experience. I'm going

3     back to 2015. I was traveling on the 101 on the day of the big Refugio

4     spill. Ironically, I was driving home to Lompoc from a Planning

5     Commission meeting that got out early. As I approached Refugio, I was

6     enveloped by a stifling chemical stench. I looked down as I passed

7     Refugio Beach, and I saw nothing unusual. The sun was out, the water

8     was a sparkling blue, but boy could I smell that stench. I continued a

9     short distance north, I saw one van. It was a television van. There was

10    no one from any oil company. I knew something was wrong. I had never

11    experienced that, but where was everyone? No one was there to help.

12    Nothing was being done. As soon as I got home to Lompoc, I called the

13    EDC. They knew something had happened, and they were on their way.

14    History has proven that the oil company did not know what to do, and no

15    one did anything for more than an hour and a half as that toxic gunk

16    spilled into our precious waters and fouled up my favorite beach. Okay,

17    what are we doing today? Are we going to set ourselves up for another

18    catastrophe? We would argue that Sable does not have the financial

19    resources to cover the cost of a cleanup from the next spill. If deep-

20    pocketed Exxon just sat on their hands and let the oil ooze down into

21    the ocean, what will this shell company do? Will they be able to

22    prevent or stop a spill? Do they even have a clue?

23         COMMISSIONER MARTINEZ:  Thank you. I'm going to have to stop you

24    there. There's two minutes. Thank you for your participation.

25         MARY ELLEN BROOKS: Thank you.

54

COSB AR006840

1          COMMISSIONER MARTINEZ:  And our next speaker?

2          DAVID VILLALOBOS: Our next speaker will be Linda Phillips.

3          LINDA PHILLIPS: Hello. Can you hear me?

4          DAVID VILLALOBOS: Yes. Go ahead.

5          LINDA PHILLIPS: I'm Linda Phillips, and I lived here both during

6     the 2015 spill and also earlier during the 1969 oil spill, which

7     basically started the environmental movement. I am a chemist; I've

8     studied hazardous materials protection and how to keep people in the

9     environment from getting hurt by oil spills, among other things, and

10    pipeline spills. And I'm very concerned that there has been no

11    Environmental Impact Report, and apparently that isn't required. And I

12    know that the 2015 oil spill was not properly responded to, and we

13    really need reassurance that if these pipelines are restarted, they

14    both will have the protection from oil spills that some of you have

15    mentioned or some of the speakers here have mentioned, and I'm very

16    concerned that these old, rusted pipelines will spill and create havoc

17    like the ones in 2015 and beyond. And I think I may have run out of

18    time.

19         COMMISSIONER MARTINEZ:  You read my mind. Yes. But thank you for

20    the participation. So what we're going to do now is we're done with

21    those online, so those who come up to the podium, just come up to the

22    podium. And what I'm going to do once we get about three or four

23    speakers in, then I'll read some additional names to give time for

24    those people to just add to the back of the line. Okay? So please

25    announce yourself when you get up to the podium. Thank you.

COSB AR006841

1        JASON WALL: Good afternoon. My name is Jason Wall. Thank you for

2    the opportunity for speaking today. I'm here on behalf of Doty Brothers

3    and many other local union contractors and employees who work with

4    Sable Offshore. We strongly urge for your support in the change

5    application for the Santa Ynez Unit and the Pacific Offshore Pipeline

6    Company facilities. We here at Doty Brothers, we hold ourselves to

7    three main standards, it's kind of like a tripod.

8        [03:25:03]

9        In our aspect, we focus on safety, we focus on quality, but most

10    importantly, this is the last one we really pride ourselves on is

11    integrity. If you don't have one of those, you're like a tripod, it's

12    inevitably going to fall over. Those three qualities that we hold

13    ourselves on, Sable does the same thing. We've only experienced, you

14    know, many other contractors and other customers that have had it, they

15    say it, but these guys actually not just talk it, they walk the walk as

16    well. So like many others in the room, like us contractors, we rely

17    heavily on stable, long-term partnerships with reputable companies

18    similar to Sable. When Sable acquired these assets earlier this year,

19    they did more than just take over the operations. They committed to

20    retaining and working alongside the skilled local workforce and

21    contractors. And I know there was a kind of a question about who

22    supports here today for Sable. A lot of hands were raised and other

23    ones who live locally, everybody isn't here in the room that's working

24    locally, they're out in the field right now. Us, personally, we have

25    probably 30 to 40 guys out in the field right now that are working that

56

COSB AR006842

1   are locally from the local union here. So a lot of the guys here are

2   not fully representative of the local workforce that's out there. We

3   just want to strongly ask for the approval of the Sable's application

4   as it's the first step in the regulatory journey that will enable them

5   to continue the vital work that they are doing. Sable has demonstrated

6   time and again that they are precisely the kind of responsible,

7   community-minded employer that Santa Barbara County needs. We

8   respectfully ask for your support in the application that will allow

9   Sable to continue fostering local jobs and economic growth well [PH

10  03:26:42] worth holding. Thank you.

11          COMMISSIONER MARTINEZ:   Thank you.

12          ELIZABETH MARTINEZ: Good afternoon, Chair Martinez. My name is

13  Elizabeth Martinez. I'm Vice President of Government Relations and

14  Business Development of Meruelo Enterprises, parent company of Doty

15  Brothers. The Meruelo Enterprises, they're native California state

16  contractors companies that do a lot of work in the oil. And as my

17  predecessor Jason mentioned, many of the workers are local. You know,

18  we not only live here, but they shop here and they purchase from your

19  local restaurants, I think it's very important. But again, thank you

20  for this opportunity and we are here strongly on behalf of Sable and

21  owner/operator change application for the Santa Ynez Unit and Pacific

22  Offshore Pipeline Company. Doty Brothers along with Meruelo Enterprises

23  and others in this room rely on partnerships with companies like Sable.

24  Since acquiring these assets, Sable has committed in retaining this

25  skilled local workforce, ensuring the safe, efficient and reliable and

57

COSB AR006843

1    responsible operation of the Santa Ynez facilities. Sable's commitment

2    to safety and environmental responsibility is something that we

3    strongly believe in and this is why we partner with them. So we

4    respectfully request your support for this application to allow Sable

5    to continue fostering local jobs and the economic growth with a

6    commitment to safety and environmental care. Thank you for your time.

7        JUAN ESPARZA: Good morning, my name's Juan Esparza. I am the

8    Chief Quality Assurance Officer for Tidwell Excavating. Thank you for

9    this opportunity, Chair Martinez and Commissioners. Over the last 28

10    years, Tidwell has had the opportunity to be here in Santa Barbara

11    County and Ventura area, installation of various underground utilities.

12    We've worked with some good contractors and we've worked with some bad

13    ones. The bad ones we don't work with again, but when you see a good

14    one come along, you partner up with them. Those good ones are the ones

15    that are committed to safety, to community, to compliance. They're not

16    some out of town fly by night company that's just here to make a dollar

17    and then move on. As we've heard, their workforce here is local

18    residents and local residents take great pride in what they do and the

19    company in which they work for because this is where they raise their

20    families and this is where their future is at. We strongly support

21    Sable Offshore Corporation's change in ownership and their application

22    and we ask that you do approve that as well. When we look at this type

23    of company, we look at these employees, these men that are here. What

24    they want to do, it's not just to pump oil, but rather their

25

COSB AR006844

1    livelihood, but they want to do it in a safe fashion so as to continue

2    to supply it. So we do thank you for your time.

3        COMMISSIONER MARTINEZ:  Thank you. Okay, I'm going to call out

4    some names really quick here. You can go to the podium, but I'm going

5    to call some names really quick. We have Tori Cuthbert, Nancy Avoce,

6    Katie Davis and Maureen Ellenberger.

7        [03:29:54]

8        MEGAN: Hi, my name is Megan, I'm a fourth year political science

9    student at UCSB. I oppose the transfer of permits from Exxon

10   Corporation to Sable Offshore Corp. I recognize that this hearing is

11   not about restarting of the pipeline, but the transfer of permits is a

12   first step towards that. Another spill from these facilities is likely

13   and would be devastating to Santa Barbara County and the Gaviota Coast.

14   Although it was mentioned in the presentation that Sable has oil spill

15   cleanup plans, the damage would already be done to our community and

16   marine and wildlife. Santa Barbara County is home to an incredibly

17   diverse range of marine and wildlife, which was directly harmed by the

18   2015 Refugio Oil Spill. When I heard about this spill, in full honesty,

19   it angered me. It could have been avoided. With Sable Offshore trying

20   to restart this very same pipeline, we face the reality of this

21   happening again. And I don't want to be saying the phrase, it could

22   have been avoided again. To me, this raises troubling questions about a

23   world where corporations like Sable Offshore continue to prioritize

24   profit over the health of our planet, ecosystem, and communities. If

25   this pipeline spills again, it is the local residents of Santa Barbara

COSB AR006845

1    County and our invaluable biodiversity that will bear the burden, not

2    Sable. For these reasons, I urge the planning commission to deny

3    Sable's request for transfer of ownership. Thank you.

4        MIA DICOSTANZO: Hello, my name is Mia DiCostanzo and I am the

5    President of the Environmental Law Club at UCSB. I'm here today to ask

6    you to deny Sable's request to take over as owner and operator of the

7    ExxonMobil facilities. Sable has shown that it cannot responsibly

8    operate these facilities. In just eight months, Sable has had another

9    spill. In addition, Sable undertook major work on the pipeline without

10   the necessary permits. Conditions deteriorated to the point that the

11   California Coastal Commission had to issue a Notice of Violation and

12   direct Sable to cease its operations until it received permits to

13   install valves and conduct repairs. To make matters worse, Sable

14   ignored the notice and continued its work in further violation of the

15   Coastal Act and the county's local program. It was only when the

16   commission threatened to issue a cease and desist order and impose

17   penalties that Sable stopped the work. Sable still hasn't submitted an

18   application for a permit. Instead, Sable has left open sores along the

19   county's coast. Clearly, Sable cannot be trusted to operate the

20   pipelines and other facilities in a safe or responsible manner. I love

21   these oceans and I want them to be protected. Please deny Sable's

22   application. Thank you.

23       DAVID CASADA: Good afternoon, Commissioners. My name is David

24   Casada and I've been a utility worker here in Southern California for

25   30 years. My family has lived and worked right here in Southern

COSB AR006846

1    California for four generations. Every single one of us is a utility

2    worker, climbing a pole, digging a trench, laying pipe for generations

3    and generations. I believe that every single person in this room wants

4    gas prices to be affordable, their lights to turn on, their stove to

5    warm up, their EV cars to charge and water to come out of their faucets

6    every single time they use them. All of those things happen by

7    infrastructure improvement projects. And there's no doubt that all of

8    the rules need to be followed and we need to hold everyone to the

9    standards at all times for the safety of the public. I'm here today as

10   an employee of Meruelo Enterprises, the parent company of the Doty

11   Brothers. The Doty Brothers are a local pipeline contractor safely

12   doing business in Southern California since 1935. As experienced oil

13   and gas pipeline subcontractors, we choose all of our prime contractors

14   very carefully. And Sable has more than proven to be a trusted and

15   strategic partner to us. We are safely working in conjunction with

16   Sable Offshore Corporation, and I strongly urge your support for

17   Sable's change of owner/operator/guarantee application. Please support

18   their permit requests and change of owner applications so that the next

19   steps in the due diligence process can take place. Thank you.

20       COMMISSIONER MARTINEZ:  Thank you, and I'm going to read off some

21   names right now. We have Rick Stich, Julie Henze, Abrah Steward, Deane

22   Plaister, Amy Parry, and Danny Salinger-Brown. You can come up now,

23   thank you. Thank you for your patience.

24

25

COSB AR006847

1    KATIE DAVIS: Thanks, Katie Davis with the Sierra Club, And I live

2    in Goleta. That day of the spill will be seared in my memory. And just

3    seeing a young dolphin dead on the beach with tar in its blowhole.

4    [03:35:00]

5    Plains, in their 2023 annual report, reported they spent $750

6    million on that spill, and that was hundreds of millions over what

7    their insurance covered. They had $500 million in liability insurance,

8    which is $100 million more than Sable had. So Plains had more

9    insurance, and the liability was still hundreds of millions more than

10   their insurance would cover, and they're still contesting insurance

11   covering even what they thought they're responsible for. So they're

12   still fighting about whether they'll get the money from insurance. So

13   insurance does not cover an actual on the ground spill, as we have

14   seen. Sable's assets are net negative. They're $800 million in debt, so

15   they have $100 million on hand, but they're almost $800 million in debt

16   to Exxon. They have net negative liabilities. If they have a spill and

17   they're shut down, they have one asset. They have no income, and their

18   valuation will quickly go to zero. Company valuation is based on what

19   they're able to produce in the future. They will shut down, they will

20   go bankrupt if there is a disaster. Exxon knows this pipeline is unsafe

21   to operate. That's why they financed this other company, so they can

22   avoid liability. They know, they told the county, "We don't want

23   another spill. That's why we want to truck the oil and build a new

24   pipeline." The county knows this pipeline's unsafe. The county

25   prosecutor tried to take it offline when they were prosecuting Plains.

62

COSB AR006848

1    The county report said it would cause a spill every year and a rupture

2    every four years. That's why the county supervisors denied work on the

3    valves, because they don't want this pipeline to restart because they

4    know it's unsafe. The findings are not supported by fact.

5        COMMISSIONER MARTINEZ:  Thank you, I'm going to have to stop you

6    there.

7        KATIE DAVIS: And they will not stand up in court. It's a risk to

8    the county if you approve this. Thank you.

9        COMMISSIONER MARTINEZ:  Thank you.

10    MAUREN ELLENBERGER: Maureen Ellenberger. Honorable Commissioners,

11    I last stood here before a Planning Commission hearing when Plains

12    transferred their leases to Exxon. At that time, one of the

13    commissioners dismissed our concerns, stating it was strictly a

14    business transfer outside the purview of the Planning Commission. That

15    decision has aged poorly, and here we are again. But this time, the

16    stakes are even higher, and the shell game a little bit more dangerous.

17    Unlike the previous transfer to Exxon, we're not dealing with a company

18    with deep pockets and a long track record. Instead, we're facing a

19    deliberate corporate sleight of hand when Exxon, one of the world's

20    largest oil companies, deemed these operations too risky, and their new

21    pipeline idea permit faced hurdles. They didn't walk away. Instead,

22    they created Sable Offshore, a thinly capitalized new company to assume

23    risks they themselves didn't want to take. This isn't just a business

24    transfer, it's a scam designed to evade responsibility. When, not if a

25    spill occurs, who will truly be accountable? The staff report glosses

63

COSB AR006849

1    over this critical question. Sable Oil, funded by Exxon but legally

2    separate, may meet minimum bond requirements, but these are woefully

3    inadequate. Remember, the Refugio oil spill has already cost Plains

4    over 750 million in damages, and Plains Pipeline's bankruptcy left our

5    community bearing much of the burden. This new corporate structure

6    appears deliberately designed to shield Exxon from future liability

7    while leaving our community exposed. Let's be clear what's at stake.

8    The proposal involves restarting platforms dormant for a decade and

9    using 30 to 40-year-old pipeline systems with 80 documented anomalies,

10   so severe that federal safety officials demanded repairs. This is from

11   Nick Welch's reporting in The Independent.

12        COMMISSIONER MARTINEZ:  Thank you. I'm going to have to stop you

13   there. Thank you though. Those in line, can you come down further,

14   because I'm trying to keep an eye on how many people are in the line,

15   and then I'll call more people. I appreciate that. You can start,

16   please.

17        NANCY AVOCE: Good afternoon, Planning Commissioners. My name is

18   Nancy Avoce, and I'm here on behalf of Santa Barbara County Action

19   Network, SBCAN, that continues to oppose oil development around our

20   county and beyond. Our goal today is to urge each of you to consider

21   the implications of permitting this lease transfer. We urge you to take

22   on preventive measures whenever our coast could be impacted by your

23   decisions. We hope that our county's residents' voices are heard. We

24   ask you to consider that our city's economy is dependent on our

25

COSB AR006850

1    beaches, our seafood, our tourism, and more. In the very possible case

2    of yet another spill, we will witness irreversible impacts.

3        [03:40:00]

4        Sable won't be the only entity burdened with the cost and

5    consequences. Our biodiversity, our tourists, our economy, and our

6    county residents will suffer. Regardless of whether or not it's a

7    separate process to restart oil projects, we can set the precedent now.

8    No oil spill contingency plan or response beats preventing a spill in

9    the first place. In the environmental world, Santa Barbara is known for

10   its oil spills. Human actions disrupt our climate and set us back.

11   Let's leave this project in the past and do away with this project.

12   Please vote no to protect our county's greatest asset. Thank you for

13   the opportunity to speak.

14       COMMISSIONER MARTINEZ:  Thank you.

15       JULIE HENZE: Hi, I'm Julie Henze. I drove up here from Ventura

16   this morning because the decisions that you make in this room impact

17   not just the residents of Santa Barbara and Santa Barbara County, but

18   folks in my county, people up and down the coast, and in fact, people

19   around the world. At the end, I'm going to ask that you make a

20   courageous decision today. But first, yesterday I received in the mail

21   my blue flag to hang. That is the international flag for the Planet

22   Earth. I chose to buy this flag because we are all part of the same

23   large community and our survival is a common thread. We depend on each

24   other to have a planet where we can all live and thrive. So I believe

25   we are on this planet to help each other, not hurt each other. And if

65

COSB AR006851

1    we are engaging in practices or industries that might be contributing

2    to global warming through greenhouse gas emissions, I'm not sure that

3    that's in the best interest of you, your families, and all of us that

4    are trying to make it on this planet. I was born in Port Arthur, Texas,

5    because my father's first job out of college was working at the Gulf

6    Oil Refinery, but he moved on to a different job. We're all resilient

7    and if we work together, we can find a solution for global warming.

8    When I see the face of a stranger, I see a neighbor. So I ask, who

9    doesn't have a neighbor that hasn't been affected by drought or fire or

10    flooding? We all have neighbors and we have to look out for each other

11    and I ask that you do not approve a permit that adds to global warming.

12    Thank you.

13            COMMISSIONER MARTINEZ:  Thank you.

14            DANNY SALINGER-BROWN: Good afternoon, Members of the Commission.

15    My name is Danny Salinger-Brown and I'm a student at UCSB and Vice

16    President of the UCSB Environmental Law Club. I oppose the transfer of

17    permits from ExxonMobil to Sable Offshore for the Santa Ynez Unit and

18    the associated processing plant and facilities. When people think of

19    Santa Barbara County, what do they think of? The answer is our

20    coastline. The natural beauty of our coastline is what brings people to

21    Santa Barbara. It is a primary driver behind why students choose to

22    attend UCSB and why tourists choose to visit the area. Restarting

23    operations of the Santa Ynez Unit is irresponsible as it places our

24    coastline in imminent danger. It is reckless to continue use of a

25    corroded pipeline, which is bound to cause another oil spill in the

COSB AR006852

1    future. Sable Offshore is a relatively small company that does not have

2    the resources to cover the cost of a spill. The company purchased the

3    Santa Ynez Unit in part through a loan from ExxonMobil. All in all,

4    short-term financial gains for an oil and gas company and for the

5    county in the form of increased tax revenues should not outweigh the

6    benefits that we gain from preserving our pristine coastline. Thank

7    you.

8            COMMISSIONER MARTINEZ:   Thank you.

9        AMY DANG: My name is Amy Dang, and I'm with the UCSB

10   Environmental Law Club. Many excellent points have already been raised

11   about the economic, environmental, and safety impacts of restarting

12   this pipeline, from Sable's failure to meet the necessary conditions to

13   obtain proper permits, to the enormous public financial burden and the

14   extreme likelihood of another oil spill. However, I want to highlight

15   Santa Barbara's historic and current role as an environmental steward.

16       [03:45:00]

17       We all know about the devastating impacts of the 1969 and 2015

18   oil spills, but also of the incredible efforts that arose from those to

19   protect our lands and waters. How often have you watched the sunset on

20   the beach or stepped into the sun outside and thought about how

21   grateful you are to live here? It is that reason that I and countless

22   others from across the country and the planet have for decades chosen

23   to come here, rather than be anywhere else in the world. These

24   privileges cannot be taken for granted, though, nor can the decades of

25   efforts undertaken to protect them. It would not be befitting of our

67

COSB AR006853

1    legacy and our history, nor of our responsibility and commitment to

2    protecting the environment to allow another utterly preventable oil

3    spill to take place. That is why it is critical to deny the transfer of

4    these permits. Thank you.

5        COMMISSIONER MARTINEZ:  Thank you. And before you start speaking,

6    I'm going to announce some other names as you start getting in line.

7    Okay. So we can start getting them on. Okay. Emiliano Campobello,

8    Spenser Jaime or James Kyriaco, starts with a K. Mark McGinnis, Alan T.

9    Bosure-Harvey, Brady Bradshaw, Jake Toomey, and Irene Cook. Okay,

10   please.

11       ABRAH STEWARD: Good morning, Honorable Chair and Commissioners.

12   My name is Abrah Steward, and I'm the program manager at a nonprofit

13   called Climate First: Replacing Oil & Gas, or CFROG. CFROG is a local

14   nonprofit working to shape the just transition away from fossil fuels

15   to protect our health, our economy, and our climate here on the Central

16   Coast. And I'm here today to urge you to deny the transfer of the

17   permits from ExxonMobil to the Sable Offshore Corporation. Today, I am

18   an environmental advocacy professional, but on May 19, 2015, when the

19   oil spill happened at Refugio Beach, I was a high school student on the

20   surf team. And I remember practices and competitions and beach days

21   being canceled because it wasn't safe to go in the water while our

22   beaches suffocated under a blanket of crude oil. I remember the thick

23   oil slick floating atop the water and lapping up on the shores,

24   covering sand and rocks and seaweed and birds and dead fish. Do you

25   remember that destruction? I remember, I think most of the people in

COSB AR006854

1  this room remember, and that's why it's really astonishing to me that

2  it's even under consideration to approve the transfer of the permits

3  that will ultimately pave the way for this pipeline to flow through our

4  community once again when we have already suffered the consequences,

5  when the operator in question reported a net loss of $165 million and

6  debts of $790 million in the second quarter of 2024 alone. This is not

7  a company who is truly prepared for and capable of supplying the

8  necessary financial resources to handle another catastrophic oil spill.

9  This is not a company who will truly offer long-term high paying jobs

10  to hardworking blue collar laborers, many of whom are here today under

11  the unfortunate impression that there is no other way to make a living

12  and feed their families without sacrificing their own health and the

13  health of their community. There are far more jobs to be found in the

14  decommissioning of this toxic infrastructure and more in the clean

15  energy industry that utilize transferable skills. Approval of these

16  permits establishes the foundation for an inevitable economic and

17  ecological disaster in the near future, and I strongly urge you to deny

18  the transfer of these permits for our planet, our economic prosperity,

19  and the people. Thank you very much.

20      COMMISSIONER MARTINEZ:  Thank you. Next.

21      RICK STICH: Good afternoon, Mr. Chairman and Commissioners.

22      COMMISSIONER MARTINEZ:  Go ahead, please.

23      RICK STICH: Good afternoon, Commissioners, and I'm a local artist

24  and professor…

25      COMMISSIONER MARTINEZ:  I'm sorry, I didn't hear your name.

69

COSB AR006855

1    RICK STICH: And my wife and I live at the bay just in front of --

2    COMMISSIONER MARTINEZ:  No, your name.

3    RICK STICH: Rick Stich.

4    COMMISSIONER MARTINEZ:  Okay, thank you.

5    RICK STICH: We live at the bay just in front of Coal Oil Point.

6    And in May of 2015, we woke up to the beach covered with tar, oil, and

7    dead animals and fish. All the tide pools that the children, the

8    students, everyone enjoys, they were filled with oil and dead

9    creatures. I walked around the point to witness the entire Gaviota

10   Coast covered with the same material and the same dead animals.

11   [03:50:00]

12   It was a heartbreaker, to say the least. I took a walk with one

13   of the scientists that worked on it, and he explained to me that the

14   pipeline was like an old hose that you left out in the yard, and it

15   decayed. But you tried to use it, and you turned it on full blast with

16   the nozzle shut, and it blows out. And then you try to fix it with a

17   piece of duct tape, and the same thing happens again. This is a

18   decaying pipeline. I don't know whether the Sable folks think they can

19   fix it. I'm not sure about that. But one thing I do know is that it's

20   probably not going to have that much integrity, and it's probably going

21   to blow out again. And I just wanted to share that with you. I want you

22   to kind of envision what my experience was walking out there and seeing

23   that. And I hope that when you consider these, you'll consider what

24   they used a lot, the term they used is their integrity, and look at the

25

70

COSB AR006856

1    past and how much integrity there was in a failed pipeline, and lots of

2    failed businesses subsequently. Thank you so much for your time.

3        COMMISSIONER MARTINEZ:  Thank you, Mr. Stich.

4        DEANE PLAISTER: Chair Martinez and members of the commission, my

5    name is Deane Plaister, and I'm a member of the Executive Committee of

6    Surfrider Foundation, Santa Barbara Chapter, speaking for myself. But

7    I'm sure most of our members would agree that we do not need another

8    spill from this pipeline. It is old, it is decrepit, it has failed once

9    badly, and it is predicted to do so again. Sable Oil, which would be

10   responsible for the cleanup following a spill, may or may not have the

11   financial wherewithal to get the job done. Not only is it possibly

12   short of funds, but the company has shown itself to be untrustworthy

13   with regards to repair regulations, and apparently has no approved

14   comprehensive plan for another leak. Sable doesn't sound up to the job,

15   so I would ask you not to transfer Exxon's permits to them. The public

16   shouldn't be saddled with covering the cost of the next spill. The last

17   one was a horrible mess. I know, because I spent all day May 20, 2015,

18   scooping oil into five-gallon buckets, and seeing others wade chest-

19   deep into an oil-covered ocean as they tried to save struggling oil-

20   soaked pelicans and other seabirds. That pipeline is a bomb waiting to

21   go off again. Please don't advance the process of refilling it with oil

22   by transferring the permits without extensive environmental review to a

23   questionable company. Thank you.

24       COMMISSIONER MARTINEZ:  Thank you.

25

71

1         IRENE COOK: Good afternoon. Irene Cook. I'm here with the Society

2    of Fearless Grandmothers, and I must say, I was shocked and angered to

3    read the County Staff report, which basically rubber-stamps Sable's

4    application in a tidy little PowerPoint presentation. The excellent

5    comment letter from Environmental Defense Center, however, paints a

6    very different picture of the situation, describing multiple serious

7    issues that County Staff failed to address. This isn't the first time,

8    and I'm sure it won't be the last, that taxpayers like myself are

9    forced to rely on research and advocacy from independent sources to get

10   to the truth. I stood in this very room and raised this very issue the

11   last time that Sable was in here. When the county repeatedly

12   whitewashes and rubber-stamps fossil fuel applications, it leads to an

13   erosion of trust in the community, this community that's supposed to be

14   an environmental steward and an environmental leader. I'm appalled that

15   the situation is allowed to continue to the detriment of our citizens

16   and our environment. As EDC has clearly demonstrated, Sable is a fly-

17   by-night organization with neither the track record nor the resources

18   to safely operate even a brand-new pipeline, let alone the Swiss cheese

19   piece of garbage that ruptured almost 10 years ago. There's no way you

20   can make the required findings to allow a transfer. Those findings are

21   your legal obligation to make. There is no way that, given this

22   information, you can make those findings, and I implore you to deny

23   this application. Thank you.

24         [03:55:00]

25

                                    72

1          JAKE TOOMEY: Hey there, I'm Jake Toomey. It's good to be in front

2     of all of you today, Commissioners. I'm 19 years old. I'm a third-year

3     student at UCSB, and I'm a member with CALPIRG, which represents 25,000

4     students across the state. I'm making comment today in opposition of

5     the transfer of permits to Sable. At UCSB, the ocean is such an

6     important part of the local culture and identity. And I know that that

7     extends beyond the borders of the campus. I'm sure a love of our oceans

8     is something that everybody in this room can say that they have. And

9     that's why it's essential that we do everything that we can to promote

10    the well-being of our oceans. I mean all the ecosystems that live

11    within our delicate coastlines. And it's essential that we deny Sable's

12    application to transfer permits for the Santa Ynez Unit, POPCO Gas

13    Plant, and Las Flores pipelines. Sable doesn't have a plan to prevent a

14    spill. They say the majority of the pipeline has measures to prevent

15    corrosion. That's like me saying the majority of my bathtub doesn't

16    have holes. In Santa Barbara, we know exactly how devastating it would

17    be if this pipeline spilled again. Sable lacks the plan and funds to

18    address a new worst-case spill. The county did an environmental impact

19    report, and that said that we would have a spill once a year if this

20    pipeline gets back on track. Can we say that Sable could foot the

21    entire bill of a worst-case oil spill and full decommissioning? I don't

22    think so. Residents of Santa Barbara should not be forced to bear the

23    financial and environmental cost of another spill from this faulty

24    pipeline. If we want to protect our ocean, if we want to protect future

25    generations, we need to ensure that this pipeline does not become

73

COSB AR006859

1 operational again and this permit doesn't get transferred. Thank you

2 very much.

3   SPENSER JAIMES: Haku, haku. [Speaking in native language] I said

4 hello. I'm a Chumash and my family comes from Syuxtun, which is now

5 known as Santa Barbara. We also come from the Island of Limuw, which is

6 now known as Scorpion Anchorage on the Island of Santa Cruz. And today

7 I definitely want to advocate for the denial of all these permits being

8 proposed. In our original instruction, when we recreated offshore --

9 sorry, Sable offshore was not included in that instruction, and

10 drilling for oil and fracking for oil offshore, onshore, and your

11 facilities were not in our instruction, and you are not supposed to be

12 here. You guys have never asked for permission to be here, and we have

13 gotten no reparations from you or ExxonMobil for the destruction that

14 you have done in our homelands. And if this ever does get approved, I

15 think it would be great for the county to add in something for Exxon

16 and Sable to give us reparations for them operating in our territory

17 and having this abusive relationship extracting resources from our

18 homelands without our permission. We have the right to say what is to

19 be done in our territory. We should have a seat on this council with a

20 respected member from our community. And, yeah, this isn't right. I

21 think, like, we need to stop putting a price tag. All these people here

22 speaking in favor of this development will be getting a paycheck, and

23 probably big paychecks. And at the end of the day, your paycheck, how

24 much money you will make will not be worth the destruction of our

25 ocean. And, yeah, I'll end there. Thank you.

74

1        COMMISSIONER MARTINEZ:  Thank you. It looks like we have three

2    more people here in regards to the line. I just wanted to ask staff,

3    because I promised you staff, in regards to asking about taking a break

4    for lunch, how you guys are doing.

5        JEFF WILSON: Chair and Commissioners, I believe staff is about

6    ready to fade. They would like to have a break for lunch. So we would

7    ask for that. I think we would like to start at an hour for lunch to

8    accommodate not only staff, but the public, to be able to have time to

9    go somewhere and eat and come back.

10       COMMISSIONER MARTINEZ:  Does that work with you? I see nodding

11   heads. Okay. So you will be the last speakers for the morning session

12   is what we're going to do. Okay?

13      EMILIANO CAMPOBELLO: Okay. Thank you, Commissioners, for the

14   opportunity to address you. My name is Emiliano Campobello, and I come

15   today to speak in opposition to permitting Sable, who intends to

16   restart the former Exxon, former All Plains All-American Pipeline, and

17   also on behalf of the environmental work group of CLUE Santa Barbara --

18   Clergy and Laity United for Economic Justice.

19      [04:00:09]

20      Now, as we all know, this is the same pipeline that ruptured and

21   caused extreme damage to our precious marine habitat, spilled oil into

22   our ocean, much of which washed up on local beaches, strewn with the

23   bodies of the dead. Oil-covered sea life that suffered immeasurably as

24   this oil of death invaded their waters of life. Now, I also believe

25   that planning is about the future and to come up with the best path

COSB AR006861

1    forward. So starting this pipeline would be a horrible step backwards,

2    and those of us who survived the Refugio spill have already seen and

3    experienced the impact. You know, those other sentient beings, our

4    ocean relatives who did not survive the pipeline rupture, we don't hear

5    their cries. Did some of you go there to witness what was happening

6    there when oil covered the beach, dead bodies? Only the cleanup crews

7    really saw and walked among the dead in hazmat suits disposing of their

8    bodies in bins. Here, I bring us the voices of those that we do not

9    see, cannot hear. Does anybody ask the whales, dolphins, seabirds, and

10   fish what we should do about this pipeline? They bear the most extreme

11   consequences, which is why we are here to speak out of compassion for

12   them. Following that oil spill, our community hosted Chief Arvol

13   Looking Horse, the spiritual leader of the Lakota people, along with

14   Lakota runners. This was after the Standing Rock episode that some of

15   you may know of. They came here to pray with our local Chumashan

16   supporters, and we gathered in Refugio in a large circle of prayer that

17   this will never happen again.

18        COMMISSIONER MARTINEZ:  Thank you. I'm going to have to stop you

19   right there. That's two minutes.

20        EMILIANO CAMPOBELLO: No amount of money can raise the dead. Thank

21   you very much.

22        BRADY BRADSHAW: Hi. I'm Brady Bradshaw with the Center for

23   Biological Diversity. The County should pause any consideration of

24   permit transfers until the owners and operators obtain new or revised

25   county permits and development plans, given post-rupture circumstances,

76

COSB AR006862

1    and until the County verifies Sable's compliance with all laws. After

2    the county transferred the pipeline permits to Exxon, Exxon gave up its

3    plan to build a new pipeline. What you're now considering is a

4    completely different equation when it comes to financial responsibility

5    and compliance in light of Sable's intent to restart the failed

6    pipeline as fast as it can. The existing owners and operators are not

7    in compliance with all permit requirements, including the required

8    existence of cathodic protections along the pipelines. There is no way

9    to make this failed pipeline "as good as new" as we have heard claimed

10   by Sable, and we think it is misleading for them to keep publicly

11   saying that. We remain concerned that Sable was issued multiple Notices

12   of Violation from the Coastal Commission for conducting unauthorized

13   work in the coastal zone. The County can't just rely on property taxes

14   for financial assurances. A good question might be, will those property

15   taxes amount to what is needed for spill cleanup and decommissioning

16   when it is expected by a county draft EIR that the pipeline could spill

17   once a year? What we do know raises serious questions. Sable's SEC

18   reported liabilities for decommissioning are inexplicably low. The

19   federal government estimated decommissioning of the SYU at over $470

20   million, yet Sable's figure is only $94 million. The staff report even

21   acknowledged that Sable is currently operating at an accumulated

22   deficit of $426.6 million. Of course, a risky project like this should

23   undergo environmental review under CEQA. I urge you to pause until and

24   unless these important information gaps are filled. If you decide to

25

77

COSB AR006863

1    move forward today with your decision, we strongly urge you to deny the

2    permit transfers.

3         ELLEN THERESA [PH] BOOR-HARBY: Hello, Commissioners. My name is

4    Ellen Theresa Boor-Harby, and I graduated from UCSB in 1979 with my

5    teacher's credential, and I taught for 35 years, and I'm retired now. I

6    feel I must come up here and speak for the children, the future, the

7    generations now to protect our environment. I'm very concerned about

8    all the issues that were brought above and the heartbreak and the

9    devastation of the oil spill, seeing all the dolphins and birds. And

10   I'm just not comfortable with this going through right now with the

11   concerns that have been brought about financial responsibility and

12   conditions for the permits. And I really hope you deny the permits and

13   think about all the future generations and the beautification that

14   stays in Santa Barbara County. Thank you.

15        [04:05:14]

16        COMMISSIONER MARTINEZ:  Thank you. Okay, so we're going to be

17   taking a lunch break, but I'm going to read off the next five, six

18   names so you know that when we come back from lunch, you can be lined

19   up for the podium. We have Johnny Rodriguez-[PH] Mellonville, Vivian

20   Chankay, C-H-A-N-K-A-Y, Jared, no last name, Kevin Laufren, Karen

21   Hallenstein, Molly Troop, and Bill Woodbridge. Okay, so those will be

22   the speakers that will be in line when we come back in an hour, which

23   will be at 1:55. Thank you.

24        [Lunch Break]

25        [05:14:42]

78

COSB AR006864

1          COMMISSIONER MARTINEZ:  Welcome back to our afternoon session. I

2     appreciate everybody's cooperation. We're live, okay, there we go. So

3     we're going to start, and we only have about 14 speakers left. So very

4     shortly, we're going to be getting back into some other issues and

5     giving Sable, as well as staff, the ability to speak. And you're going

6     to hear from the Commissioners. So I'm going to read the names again to

7     make sure that those individuals know that they're supposed to be

8     online here. We got Johnny Rodriguez-Melonville, Vivian Chankai, Jared

9     no last name, Kevin Loughran, Karen Hallenstein, Molly Troop, and Bill

10    Woodbridge. Okay, so if you're any of those names I called, you can

11    step up here and first to the podium gets to speak, don't have to be in

12    alphabetical order.

13         VIVIAN CHANKAI: Good afternoon, Mr. Chair and Commissioners, and

14    thank you for taking my comment. My name is Vivian Chankai, and I'm an

15    advocacy co-chair here on behalf of UCSB's Environmental Affairs Board.

16    Sable Offshore is not a secure company. The Santa Ynez Unit is its only

17    asset. The company's value is primarily in inconsistent and fluctuating

18    stocks, and it is over $400 million in debt. Given these conditions,

19    there should be a considerable doubt whether Sable can continue to

20    operate effectively. It is very likely that another spill from this

21    pipeline under Sable's ownership will bankrupt the company and leave

22    the people of Santa Barbara and the State of California to cover the

23    devastating costs of the spill. Sable has also already shown a lack of

24    transparency by suing to block the release of an unredacted version of

25    its oil spill contingency plan in an attempt to prevent the public from

COSB AR006865

1    knowing the risk we are taking on. I urge you to vote no on this

2    transfer in order to keep the community of Santa Barbara protected.

3    Thank you.

4         COMMISSIONER MARTINEZ:  Thank you. Next.

5         JOHNNY: Okay. Hi, my name is Johnny. I'm also a student at UCSB.

6    I'm a current member with CALPIRG. And yes, we do represent about

7    25,000 student members across all UC campuses. I'm here to oppose the

8    transfer application for Sable's. As someone who lives in Santa

9    Barbara, it is with great pride that I get to tell people who visit

10   that the oil rigs off our coasts have been shut down because of the

11   efforts of Santa Barbarans across decades to have worked to protect our

12   environment. And there's no reason we should be stopping that now. Our

13   well-being and the well-being of our beaches should not be beholden to

14   big corporate oil interests such as Sable, much less a company such as

15   Sable that has shown us they lack the proper resources to properly

16   protect our coasts. Accepting Sable's application to transfer these

17   permits is one step closer to renewing oil drilling off our coasts,

18   whether this is not that step yet. This would be a big step backwards

19   in the work that Santa Barbarans have been pursuing for decades on our

20   coasts to protect our coasts from disastrous oil spills, whether it be

21   in the 60s or more recently. And to the Planning Commission, as well as

22   the audience, I'd like to ask if you're willing to forsake my future,

23   as well as the future of your kids for the sake of money and profits.

24   Thank you.

25        COMMISSIONER MARTINEZ:  Thank you.

80

COSB AR006866

1      JARED UMPHRESS: Hello, everyone. I'm Jared [PH] Umphress is my

2    last name, forgot to write that down. And I come here as a concerned

3    student. And what brings me here is the fact that I come here to speak

4    for the protection of the future of our planet, and thus everyone's

5    future here. And I've heard a lot today that this is just about the

6    permitting process. But let's not miss the fact that this would be a

7    huge step in restarting oil production. As someone who spends a lot of

8    time in the ocean, you can't put a value to nature, to the beauty of

9    it, to seeing a dolphin breach the water, to looking a seal in the eyes

10    and feeling that mutual kinship.

11      [05:20:00]

12      And, yeah, for those reasons, and with climate change,

13    overfishing, all these pressures, which this project would contribute

14    to climate change, let's not risk losing these beautiful creatures and

15    risking the future of all of our lives. I'm young, but I'd like to be

16    able to bring my kids, them bring out their grandchildren, and we could

17    look at the dolphins, the seals, the pelicans, and we say that we did

18    our best to protect that. And I hope and I wish that because we all

19    live on the same planet, that we could work towards something, a better

20    solution that works for all of us. Thank you.

21      COMMISSIONER MARTINEZ:  Thank you. And then before you start, I'm

22    going to call some other names so they can start coming down here. We

23    have Izzy Sistek, Gail Osherenko, Ryan Smith, Ted Morton, okay, please.

24      MOLLY TROOP: Good afternoon, Chair Martinez and members of the

25    Commission. My name is Molly Troop and I'm a science and program

81

COSB AR006867

1     manager at Santa Barbara Channel Keeper. We work to protect and restore

2     the Santa Barbara Channel and its watersheds. I'm here today to urge

3     you to deny Sable Offshore's application for the change in owner, grant

4     operator, and guarantor of the Santa Ynez Unit and related

5     infrastructure. Like many speakers you've heard today, Channel Keeper

6     is concerned about the risk of future oil spills from this

7     infrastructure, including the same corroded pipelines and end of life

8     oil rigs that may be restarted. We are also concerned about Sable's

9     lack of financial assets and the company that will not responsibly

10    operate these facilities. We vividly remember the destruction of the

11    2015 oil spill when over 120,000 gallons of crude oil spewed from a

12    hole in a severely corroded pipeline just north of Refugio State Beach.

13    Hundreds of animals were killed or injured. Commercial fisheries

14    suffered enormous financial losses and over 140,000 recreational days

15    were lost. We're troubled by the county's own analysis that the

16    existing pipeline estimates the risk of an oil spill from the existing

17    pipeline to be five times greater than that of an average pipeline due

18    to its current condition. And the analysis also estimates the line will

19    fail once a year and rupture every four years if this pipeline is

20    brought back online. Regarding finances, we're concerned about the

21    company's ability to respond to these types of environmental disasters,

22    and Sable's financial reports show the amount of debt that the company

23    has, almost $800 million dollars. Finally, we're concerned about the

24    disregard for the environmental laws that protect our sensitive

25    habitats like the Gaviota Coast. Sable recently disregarded a Notice of

82

COSB AR006868

1       Violation order to stop work in the coastal zone. Thank you for

2       considering these comments as you determine whether or not to grant the

3       permit transfer today.

4              COMMISSIONER MARTINEZ:  Thank you.

5              KAREN HALLENSTEIN: Hello, commissioners, Karen Hallenstein. I'm a

6       fourth generation native-born Santa Barbara County resident, mother of

7       three. I have two children attending Lompoc Unified Schools. I'm not

8       paid to be here today. I'm not a member of the club. I support our safe

9       domestic oil production right here in California. This is what is

10      needed in order to reduce dependence on foreign oil, create jobs, and

11      fill the vacuum experienced today with our economic dependence on other

12      countries. Right now, we have these -- okay, I'm going to say it --

13      environmental Nazis. They show up here year after year to paper our

14      commission and our board of supervisors with their unproven anti-oil

15      rhetoric. And when it comes down to it, their largest group of

16      supporters are a bunch of visiting kids fresh out of high school. I

17      used to body surf off Tajiguas and Jalama a lot when I was a kid. This

18      was in the 1980s and '90s. We used to come off the ocean covered in oil

19      from the natural seeps all the time. How is the natural seeping any

20      different from any rare unintentional spillage? Sable's reputation and

21      stability ensures any future problems caused by the collection of oil

22      are being prevented and monitored through technology better than ever

23      before. I know this firsthand. Poor and devastating environmental

24      policy caused the Rodeo Chediski fire in Arizona, and it burned close

25      to 300 homes.

COSB AR006869

1      [05:25:06]

2      That was caused by environmental policies. And the

3   environmentalists never take responsibility for their mistakes. The

4   reason why I don't support these kids and this cult of partisan

5   environmentalists is because of Joyce Dudley. She sued me effectively

6   in civil court for money during the pandemic, bankrupting me.

7      COMMISSIONER MARTINEZ:  Thank you. I'm going to have to stop you

8   right there.

9      KAREN HALLENSTEIN: You're being investigated.

10     MALE: Yeah.

11     KAREN HALLENSTEIN: Everybody is being investigated.

12     COMMISSIONER MARTINEZ:  Okay. Next.

13     IZZY SISTEK: Good afternoon, Commissioners. Thank you for taking

14  my comment. My name is Izzy Sistek and I'm here representing UCSB's

15  Environmental Affairs Board as well as the 25,000 students at UCSB.

16  Sable has not proven that they will be able to safely restart these

17  facilities, manage them responsibly, or fund the cleanup of another

18  spill. During the period when Sable's CEO and chairman, James Flores,

19  served as co-chairman of Freeport-McMoRan's Copper and Gold Oil and Gas

20  division, the company endured billions of losses. Flores was removed

21  and transitioned to Sable Permian Resources, which was formed to

22  acquire distressed oil and gas assets. This company went bankrupt

23  within three years. At Sable, Flores has staffed the company with many

24  of the same people that were involved in Sable Permian's bankruptcy.

25  Does it consider this facility its next distressed asset? Recently,

84

COSB AR006870

1    Sable conducted work without a coastal development permit, causing the

2    Coastal Commission to issue a Notice of Violation. It continued this

3    unpermitted work for several more days until the Coastal Commission

4    threatened it with a cease and desist. I urge you to vote no on this

5    lease transfer because Sable's irresponsible management, unreliable

6    history, and lack of financial backup pose a safety threat to the

7    public. Thank you.

8         COMMISSIONER MARTINEZ:  Thank you. Next.

9         GAIL OSHERENKO: My name is Gail Osherenko. I'm a local and a

10    filmmaker. I was the filmmaker that made "Broke," the story of the 2015

11    Santa Barbara oil spill. And I would like to leave with your clerk some

12    cards with the URL so that you all can see my film again if you

13    haven't, or see it for the first time if you have. Who do I give them

14    to? It's free and available on the website, BrokeTheOilSpillFilm.com. I

15    was there on the beach the day of the spill. I was there for many days

16    after as it was being cleaned up. I remember the numerous mention of

17    "anomalies," which is sort of some kind of nice speak for places in

18    which the pipeline was badly corroded and the failure of the protective

19    system, so-called protective system. I think you all are responsible to

20    be sure that the pipeline has been thoroughly fixed. Even then, I

21    really wonder because I remember being at a hearing after when Exxon

22    proposed to build a smaller, narrower diameter pipeline, which would be

23    more efficient and a better way to transport the oil. So I cannot

24    understand why Sable is now trying to fix this oversized behemoth

25    that's very problematic. I also think you're really responsible under

85

COSB AR006871

1    the law to be sure that we have a bond that covers the decommissioning.

2    There may be 10 years of oil there. That's what people I've talked to

3    who work for Exxon have told me. Maybe it's less. Maybe it's more. But

4    eventually, all these facilities will have to come out. We don't want

5    these toxic waste sites remaining.

6        COMMISSIONER MARTINEZ:  Thank you. I'm going to have to stop you

7    right there, that's the two minutes.

8        GAIL OSHERENKO: Thank you.

9        COMMISSIONER MARTINEZ:  I'm going to read the last names. I mean,

10   the last remaining people behind these who are already in line to come

11   and speak. We have John Hochleutner, Linda Krop, Jeremy Frankel, and

12   Roland Holliday. Please.

13       RYAN SMITH: Good afternoon. My name is Ryan Smith, and I'm a

14   legal extern with the Environmental Defense Center. Chapter 25B

15   explicitly prohibits the county from approving any change of operator

16   unless Exxon is in compliance with all the permit requirements.

17   Currently, Exxon is not in compliance with the permit for the Las

18   Flores Pipeline System because the pipeline lacks effective cathodic

19   protection.

20       [05:30:00]

21       Condition A7 of the permit incorporates as permit conditions all

22   design features described in the 1985 EIR for these pipelines. One

23   feature is cathodic protection, which is intended to prevent external

24   corrosion and which the EIR identified as being of critical importance

25   to the environment and the project. Although these pipelines were

86

1  constructed with cathodic protection system, PHMSA found that system

2  was ineffective and concluded it was the leading cause of the 2015

3  Refugio spill. The county has likewise found that the current cathodic

4  protection system is inadequate. A draft EIR prepared by the county in

5  2022 states that the cathodic protection system on these pipelines is

6  compromised, making them as vulnerable to external corrosion as

7  pipelines without protection. Further, Sable's representative

8  acknowledged this morning that cathodic protection would not be

9  effective on some portions of this pipeline. However, as Commissioner

10  Parke pointed out earlier, the 1985 EIR specifically envisioned that

11  the entire pipeline would be protected from corrosion with cathodic

12  protection systems. Thus, the EIR for the project requires effective

13  cathodic protection, which is incorporated as a condition in the Las

14  Flores Pipeline permit. Without an effective cathodic protection

15  system, Sable and Exxon are not in compliance with the permit. The lack

16  of an effective system of cathodic protection exposes these pipelines

17  to the very environmental impacts that Condition A7 aims to prevent,

18  effectively recreating the conditions that led to the Refugio spill.

19  Because the Planning Commission cannot find that Exxon is in compliance

20  with Condition A7, it must deny the request for change of operator of

21  the Las Flores Pipeline permit. Thank you.

22       COMMISSIONER MARTINEZ:  Thank you:

23       TED MORTON: Hello, my name is Ted Morton. I'm the Executive

24  Director of Santa Barbara Channel Keeper, and today, I urge the

25  Commission to deny Sable's change in ownership application. Today's

87

COSB AR006873

1    decision is a necessary step in restarting production with plans to use

2    an extremely corroded pipeline. There are serious risks associated with

3    moving ahead with production, especially at the rush Sable is promising

4    its investors. The County EIR states that restarting will result in a

5    spill every year and a rupture every four years. We don't want to

6    experience another devastating heavy crude oil spill like we did in

7    2015. Think about the dead and injured wildlife, the closed beaches,

8    the shut down fisheries, and the impacted local businesses. We are

9    concerned about Sable's ability to assume financial responsibilities in

10   future spills, which will take place. As was mentioned before, the cost

11   of cleaning up the 2015 spill is more than $750 million. Part of that

12   was a settlement that was reached in 2022, so seven years after the

13   spill, with fishermen and local property owners, that settlement was

14   for $230 million. Sable's liability insurance is $400. So it doesn't

15   really cover the anticipated cost of a similar type of spill. I also

16   wanted to bring up that we're concerned about GHG emissions, or

17   greenhouse gas emissions. When it was in production, the Santa Ynez

18   Unit was the county's largest source of stationary greenhouse gas

19   emissions. How does restarting align with the county's goals and plans

20   to reduce greenhouse gas emissions? In conclusion, I urge you to

21   protect wildlife, waters, coastline, and fisheries, deny the permit

22   transfer. Thank you.

23         COMMISSIONER MARTINEZ:  Thank you.

24         ROLAND HOLLIDAY: Hello, my name is Roland Holliday. I'm

25   operations manager at OST Trucking and Crane Service. I grew up in the

COSB AR006874

1    Santa Ynez Valley. I graduated from Santa Ynez High, and there was no

2    jobs. I went to work in the oil fields and ended up at OST in 1977.

3    Took on Exxon as an account 40 years ago when they started building

4    POPCO. So they've been my account that long. They built into the oil

5    platforms, and I've worked with Exxon day in, day out for that many

6    years. I do the quoting, the bidding, and I also run the job projects

7    as a foreman. I haven't seen any change in any of the safety practices.

8    I mean, it's all the same people I've been working with day after day,

9    month after month, year after year. They run with the same high

10   expectations of safety. I work with many industries in our trucking and

11   crane industry. I work at Procter & Gamble, Vandenberg Air Force Base.

12   They're premier in safety. Let me put it that way. Them and Procter &

13   Gamble run neck, and neck, and Sable's holding up to that.

14        [05:35:00]

15        And they're going to take on the risk and responsibility. And I

16   look around here, and there's a lot of the vendors I know and companies

17   I know. A lot of us may be living in Ventura County, but we're all

18   Californians. We're all trying to make a living. I've got grandkids now

19   I take care of, and I'd like to see it keep operating, not from a money

20   aspect or the employment aspect. We need oil and gas. And I think the

21   one lady hit it on we need oil and gas from here. You know, we're going

22   to use it for another 40, 50 years. I don't care what invention we come

23   up with. AI might get it quicker, but we're still going to need it for

24   40 years. And I know it's clean, and like I said, just from working up

25   there, I've got a lot of experience with it. Thank you.

89

COSB AR006875

1          COMMISSIONER MARTINEZ:  Thank you, Mr. Holliday.

2          JOHN HOCHLEUTNER: Thank you, Chairman Martinez and board for

3     letting me speak. I'm John Hochleutner with Pacific Petroleum

4     California Incorporated. I've been a Santa Barbara County resident my

5     whole life. And I've got close to 300 employees and 250 of them are

6     based out of Santa Maria. We're a company that's pretty diversified.

7     And one of the safest places has always been to work with ExxonMobil

8     and then Sable. Sable has a management team that is directly involved

9     in safety. When they had other assets in California, they used to

10    provide us with safety conferences at all their assets, and here, and

11    in the valley. We'd go to all the contractors. They'd let almost

12    everybody go. They could leave the lease and go to them. They believe

13    in safety. And we need California-based oil and clean oil in the world.

14    Everybody talks about the environment. You guys don't go and see how

15    they produce in other countries. We are under the strictest regulations

16    of environmental tasks. So I want to thank you for your time.

17         COMMISSIONER MARTINEZ:  Thank you.

18         LINDA KROP: Good afternoon, Chair, members of the Commission. My

19    name is Linda Krop. I'm the Chief Counsel of the Environmental Defense

20    Center. On behalf of our clients, Get Oil Out, SBCAN, and EDC, we urge

21    you to deny Sable's request for change of owner, operator, and

22    guarantor of the Santa Ynez Unit, including the onshore pipelines and

23    processing facilities. As noted in our comment letter, the Commission

24    cannot make the findings required by Chapter 25B. Of particular concern

25    is Sable's clear inability to respond to an oil spill. You've heard

90

COSB AR006876

1    about the likelihood of another spill, which has been confirmed by the

2    County's own analysis. We can't face a spill twice the size of what

3    happened in 2015. We also know how important it is for a company to

4    respond to an oil spill. Plains wasn't able to respond, and they were

5    found criminally liable. We believe that Sable will not be any better.

6    Despite the fact that County regulations require Sable to have an oil

7    spill contingency plan, it still doesn't have one, even though they're

8    telling their investors that they plan to start pumping by the end of

9    the year. We submitted a Public Records Act request to the state to get

10   a copy of their plan. After prevailing in litigation, because Sable

11   didn't want us to get the plan, we found out that it only affects the

12   idle state of the pipeline. They still don't have an oil spill

13   contingency plan for operations. Neither does Exxon Mobil, which

14   withdrew its plans. These deficiencies prevent the county from

15   approving the requested transfers. Chapter 25B was passed for a reason.

16   The County was concerned about larger oil companies offloading their

17   assets to weaker companies without the necessary track record or

18   ability to ensure safe operations. And this is exactly what Exxon Mobil

19   and Sable are attempting to do here. And I want to point out that we

20   did submit our comment letter Monday morning at 10:15. We have the

21   emails to prove it. I don't know why it wasn't distributed. But I will

22   hand out an appendix that we put together in our letter that shows the

23   findings that have to be made and that there's no evidence to support

24   those findings. Thank you.

25          COMMISSIONER MARTINEZ:   Thank you.


                                  91

1          COMMISSIONER PARKE: I have a question.

2          COMMISSIONER MARTINEZ:  Commissioner Parke has a question for

3     you.

4          COMMISSIONER PARKE: I have a question for you, Ms. Krop. And to

5     be fair, I'm going to ask the exact same question to the Sable

6     representatives because you're saying there's no contingency plans on

7     file. And they had a slide, I think it was slide 15, something like

8     that, that said "Here's all of our contingency plans that are on file."

9     Can you explain how I got two polar opposites here and why you believe

10    in what you believe?

11         [05:40:00]

12         LINDA KROP: Yes, thank you. So as a result of our Public Records

13    Act request, we received the oil spill contingency plan that Sable had

14    submitted to the Oil Spill Prevention and Response Agency, or OSPR.

15    That plan was for the idle state of the facilities and said that there

16    was a worst-case scenario oil spill of zero barrels. OSPR found that

17    plan to be deficient and rejected it and directed Sable to resubmit a

18    plan for restart. Sable did eventually submit a plan for restart and

19    actually today is the end of OSPR's 30-day review period to see if that

20    plan is acceptable and adequate. OSPR may accept it as being complete

21    and then review it and make a decision on it. They may say it's still

22    not complete and send it back. So OSPR has told us, and we have the

23    emails to prove it, that they do not have an approved oil spill

24    contingency plan. And they also told us, and we have the emails to

25    prove it, that ExxonMobil withdrew its oil spill contingency plans, so

                                    92

COSB AR006878

1    there are none for operation. We'd be happy to provide you with all

2    these emails from OSPR.

3         COMMISSIONER PARKE: Okay. And Sable, you mark that, because I'll

4    ask you the same question, okay?

5         STEVE RUSCH: We're ready.

6         COMMISSIONER PARKE: You got it.

7         JEREMY FRANKEL: Looks like I'm batting cleanup today. Good

8    afternoon. My name is Jeremy Frankel. I'm an attorney with the

9    Environmental Defense Center. Sable cannot assure the Commission that

10   it will have the financial resources to even operate these facilities,

11   let alone remediate another spill as required by Chapter 25B. Sable is

12   a speculative company with no operational assets, no current revenue

13   stream, and a debt of nearly $800 million. According to Sable's most

14   recent quarterly report, it has about $100 million left in cash on

15   hand. Now it says it might have a bit more. Maybe. I don't have a way

16   to verify that. But its remaining startup expenses will be hundreds of

17   millions in dollars. Importantly, it is unknown when or even if Sable

18   will restart these facilities, which remain its only asset and its only

19   path to profitability. Per Sable itself, substantial doubt exists about

20   its ability to continue, quote, and quote, it may have insufficient

21   funds available to operate its business prior to first production.

22   That's from its SEC filings. Ask yourselves, what would happen if Sable

23   exhausts its remaining cash, a real possibility, and a spill occurs

24   during or shortly after restart? Sable would not have the financial

25   resources to clean up the spill or compensate affected business owners.

93

1    Even the cash that Sable has on hand today would cover only a fraction

2    of its financial obligations, which for the Refugio spill was upwards

3    of $750 million. Inevitably, Sable would become solvent. You can look

4    to our letter about why their insurance is insufficient, but I wanted

5    to quickly touch on the COFRs. The COFRs that Sable submitted are not

6    final, and they won't be until OSPR completes its contingency plan.

7    I've explained that also in the letter. To date, Sable has not provided

8    the commission with a verified estimate of what a worst-case spill

9    would look like from these facilities, making it impossible for the

10   County to find that Sable can remediate a spill. Accordingly, the

11   Commission cannot make the requisite findings of approval for Chapter

12   25B and should deny the transfers. Thank you.

13         COMMISSIONER PARKE: Thank you.

14         COMMISSIONER MARTINEZ:  Thank you. So there's a question. Excuse

15   me. There's one question for you, Frankel.

16         COMMISSIONER PARKE: Okay. And also, I'll be asking the same

17   question to be fair to Sable. So in your letter, you speak to, after

18   restart, Sable is going to owe $790 million in 90 days to Exxon to

19   complete the purchase. Would you explain what you meant in the letter?

20         JEREMY FRANKEL: Sure. So Sable took out a $790 million loan from

21   Exxon to finance their acquisition of these facilities. That loan, the

22   entire principal becomes due 90 days after they restart. So if there

23   was a spill, they'd have the $750 million minimum obligation to

24   remediate, but this would also come due, putting their total

25   liabilities closer to $1.5 billion.

COSB AR006880

1        COMMISSIONER PARKE: And what happens to ownership after that, if

2    it's not paid?

3        JEREMY FRANKEL: Well, if the commission approves the transfers

4    today, they already own the assets. They'd have the permits, and

5    ownership would still be in Sable's name. They'd become insolvent,

6    leaving us, the tax payers, to clean up the mess and to ultimately

7    decommission the facilities.

8        COMMISSIONER PARKE: Again, I'll ask Sable. Thank you.

9        COMMISSIONER MARTINEZ: Wait a minute, I'm going to follow up on

10    that. Wouldn't the remedy be if you own a loan and there's a secured

11    loan on it, wouldn't it revert back to the person who gave you the

12    loan?

13        JEREMY FRANKEL: You'd have to review the loan agreement with

14    Sable and Exxon.

15        COMMISSIONER MARTINEZ: But I thought that's what you reviewed.

16        JEREMY FRANKEL: That is what I reviewed.

17        COMMISSIONER MARTINEZ: That's why I'm asking you the question.

18        JEREMY FRANKEL: I don't recall that in the loan agreement that it

19    would revert back. I know that they have an option to reclaim the

20    facilities.

21        COMMISSIONER MARTINEZ: But you were saying that the taxpayers

22    would be left with this. So that's something I'm going to ask Sable

23    too, so I want to make sure we get a clarification on that. Thank you.

24        [05:45:40]

25

COSB AR006881

1        So now what we're going to do is we're going to go to staff, and

2    then Sable gets some time up here and we'll see what time they have

3    left in regards to it, but let's just start with staff right now. Let's

4    just take it one step at a time.

5        ERRIN BRIGGS: So Mr. Chair, we heard a lot of various issues that

6    were brought up during public comment. We're happy to answer questions

7    of the Commission about any of those issues. It sounds to me like we

8    have an upcoming discussion regarding cathodic protection, and rather

9    than preemptively get into that right now, we'll get into it when

10   Commissioner Parke brings it up.

11       COMMISSIONER MARTINEZ: I'll ask my question right now. Hearing

12   what's been said, if an entity does not abandon - well, until they

13   abandon the facilities, they have to continue to pay the property

14   taxes, that's at the very beginning of today's hearing. Now, my

15   understanding, and correct me if I'm wrong, that if an entity says,

16   "Well, I don't have anything, I don't have money to pay the property

17   taxes," it reverts back to the previous owner, which would be Exxon.

18       ERRIN BRIGGS: That's correct.

19       COMMISSIONER MARTINEZ: So then Exxon would be the one that would

20   have to carry out the abandonment.

21       ERRIN BRIGGS: That's correct.

22       COMMISSIONER MARTINEZ: Okay. That's a very important point I

23   wanted to have in my mind. That's the question I can remember right now

24   I had in my mind, but I don't know if any other commissioners have

25   questions.

96

COSB AR006882

1     ERRIN BRIGGS: And, Mr. Chair, just to clarify. We have three

2     assets, plus offshore facilities in this case. And let's say that Sable

3     were to go bankrupt and was out of the picture and not financially able

4     to respond to an abandonment requirement, Exxon's on the hook for all

5     the assets.

6     COMMISSIONER MARTINEZ: So this is analogous in my mind too. Any

7     property…anybody who buys a contaminated soil, let's just go down this

8     scenario. You buy a piece of property that's contaminated; you then

9     sell it to somebody else. You're in the line of what we call a

10    responsible party.

11    ERRIN BRIGGS: Absolutely.

12    COMMISSIONER MARTINEZ: Okay.

13    LAURA M. BRIDLEY: Questions.

14    COMMISSIONER MARTINEZ: Yes, Commissioner Bridley.

15    COMMISSIONER BRIDLEY: There were a couple of comments during

16    public comment that said…Miss Irene Cook talked about the last time

17    Sable was here. And I guess I'm confused about that, because Sable was

18    not part of the transfer from Plains to Exxon. So can you confirm that?

19    ERRIN BRIGGS: Confirmed.

20    COMMISSIONER BRIDLEY: Okay, and then there's been multiple

21    references by the EIR done by the county. And I understand from EDC

22    that they did a public records request and they got that document and

23    there was information in it. But can you give me a little context about

24    what that EIR was for and it was withdrawn because of why, and does it

25    stand in the record or not?

COSB AR006883

1          ERRIN BRIGGS: So Exxon, I think it was in 2018 or '19 had

2     submitted a permit application for a replacement line. I'm sorry,

3     Plains submitted that application that was overtaken by Exxon. And of

4     course during the processing of that permit request staff started

5     preparing an EIR, and we were working with a group of consultants in

6     order to do that. And we had hired consultants to look at biology and

7     cultural resources. And of course, we had a consultant who developed

8     the risk analysis, and then we had a second consultant who was

9     responsible for peer reviewing and then writing that section. So during

10    the internal admin draft stage, meaning that the document was not

11    finaled, this particular section had not been reviewed by staff at that

12    time, it was very draft, Exxon decided to withdraw their application.

13    So the EIR was never completed. This section was never reviewed

14    completely and published by staff. None of this document ever was

15    intended to become public in its state and all work was stopped on the

16    project.

17          [05:50:00]

18          Now, of course those documents remain in our files uncompleted.

19    So when a couple of parties filed PRA requests to obtain those

20    documents, we released them. The statements that have been made by the

21    public regarding the rate of spill are highly misleading. None of these

22    comments have mentioned the caveats. These figures that they're

23    referencing are highly caveated in many ways. No one has mentioned any

24    of the caveats whatsoever. They're just simply representing this as

25    fact. Frankly, it's a little frustrating from our perspective to have a

COSB AR006884

1    draft document of this nature released to the public and then have the

2    public quote it as if it's the gospel. It's not accurate. And that's

3    generally the context of that particular issue.

4         COMMISSIONER BRIDLEY: Okay, I'm going to pivot then over to

5    County Council because, it's been a long time since I went to a CEQA

6    seminar, but I know that admin draft EIRs are hardly ever released by a

7    public agency for that very reason that Mr. Briggs just pointed out. So

8    how is it that this is now something we should consider, or should we

9    not consider, because it never rose to the level of public release

10    after everyone's review including County Council's review. Can you help

11    me out with that?

12         MS. RICHARDSON: Chair Martinez and commissioners, so some

13    information related to this document has been discussed by the public

14    comment, but as discussed in the presentation earlier, the CEQA

15    determination today is that it's not a project. So staff has discussed

16    what they think about the admin draft information, but that draft

17    document is not before the Commission today.

18         COMMISSIONER BRIDLEY: Okay, I think that was the only questions.

19    I can't believe that's the only questions I have, but yeah, thank you.

20         COMMISSIONER MARTINEZ: Commissioner Reed?

21         COMMISSIONER REED: During the public comment we heard a number of

22    comments about the financial strength and solvency of the company, and

23    alleged perils due to a perceived inadequacy after restart. A lot of

24    them referred to it after restart, potential liabilities. But again,

25

COSB AR006885

1    what we're dealing with today, the decision does not involve any

2    restart. Correct? It's a transfer of permits. Is that correct?

3          ERRIN BRIGGS: Mr. Chair and Commissioner Reed, that's correct.

4          COMMISSIONER REED: Okay. Thank you.

5          COMMISSIONER MARTINEZ: Commissioner Parke?

6          JOHN PARKE: But we are looking at financial responsibility if

7    something happens after Sable takes over, right?

8          ERRIN BRIGGS: Mr. Chair and Commissioner Parke, so I think that

9    the discussion surrounding financial responsibility has gotten a little

10   off track as well, and really what's before the commission today is the

11   findings that are required related to financial responsibility.

12         COMMISSIONER PARKE: I get it.

13         ERRIN BRIGGS: And they're much more narrow than the conversation

14   that we've been having with the public here today.

15         COMMISSIONER PARKE: Yeah, I guess what I was getting at is it's

16   going to be hard for Sable to earn much revenue if it doesn't restart,

17   and it's not likely to a pipeline failure if they don't restart. So

18   even though today is not about restart, the issue is assumed there will

19   be a restart or else most of today's discussion will be irrelevant. You

20   don't have to agree with that, you don't even have to understand it.

21   But what I'm going to do is ask a series of questions and I'm asking

22   you folks to go first and try to answer them. If you don't know and you

23   think it's a Sable question, well, you punt and we'll ask Sable, but

24   let me start with you first, okay? So I heard the questions from Ms.

25   Bridley and the answers, so if you believe that EIR for that withdrawn

100

COSB AR006886

1    project, let's call it that, is not a reliable source of evidence, but

2    it was submitted as evidence, can you answer the questions that that

3    EIR was referred to for? And one of them is, okay, what's the

4    likelihood of another spill from the pipeline? And what we heard from

5    the people that were using the EIR as evidence is that it thinks

6    there's going to be one every year. Do you have a determination? Does

7    P&D have a determination from some source? I haven't seen it.

8        [05:55:00]

9        ERRIN BRIGGS: So Mr. Chair and Commissioner Parke, no, we don't.

10   Again, that analysis was never completed, it's a draft analysis.

11       COMMISSIONER PARKE: I understand your criticism of that one, I'm

12   just saying do you have a different one, do you have something that

13   gives us that information?

14       ERRIN BRIGGS: No, because we never completed that project, we

15   never went through with that EIR. The study of the risk associated with

16   the existing pipeline being restarted has never been done, especially

17   considering the valve project, the anomaly repairs, the Consent Decree,

18   all the requirements of the Fire Marshal. When you add up this huge

19   package of changes that are being made to the line, that has never been

20   studied.

21       COMMISSIONER PARKE: Got it. And that EIR we're not supposed to

22   look at, okay, but we may look at maybe if it's the only source of

23   evidence there, I don't know, we'll find that out later. It was also

24   referred to as a source of information on the overall cost of the 2015

25   rupture, and we heard a reference to the overall cost was $700 million.

                                        101

COSB AR006887

1    Does P&D have information for the overall cost of the 2015 rupture? Do

2    you have some different figure, or any figure?

3        JACQUELYNN YBARRA: Yeah, Commissioner Parke through the Chair, so

4    the EDC letter references Plains' SEC filings to get to that $750

5    million. I did look at that and confirmed, but that assumption from

6    Plains, that's the entire cost of cleanup, including estimated future

7    legal fees, lawsuits, etcetera. The estimates I found for the cleanup

8    of the Refugio oil spill itself was between $64 million and $96

9    million. So those are numbers for you, but I also wanted to caveat

10   that, again, the permit condition in Chapter 25B doesn't require Sable

11   or the current owner/operator to have any financial guarantees for a

12   pipeline spill. It's only for the SYU.

13       COMMISSIONER PARKE: Okay. If it's not for the pipeline spill, why

14   are we even interested in if they have financial responsibility for

15   operating the pipeline? What, that they can pay their employees to do

16   what they need to do? It's not related to liability?

17       JACQUELYNN YBARRA: Commissioner through the Chair in regards to

18   the change of operatorship and guarantorship for the pipeline: the

19   financial guarantees aren't part of the findings.

20       COMMISSIONER PARKE: We heard some questions about Exxon's

21   liability, kind of a backdoor kind of thing, and what it did, it just

22   confused me more than it clarified things. So if Exxon doesn't take

23   back the asset, does Exxon have any continuing liability for spill or

24   anything else?

25

102

COSB AR006888

1       ERRIN BRIGGS: Mr. Chair and Commissioner Parke, I'm not sure that

2   they have a financial responsibility for a spill, but they certainly

3   have responsibility for abandonment.

4       COMMISSIONER PARKE: For what?

5       ERRIN BRIGGS: Abandonment. Because a spill would be part of

6   operations, right? That would be the operator's responsibility at the

7   time of the spill.

8       COMMISSIONER PARKE: No, I get it.

9       ERRIN BRIGGS: But again, if Sable were to go bankrupt and not be

10  able to pay for or carry out abandonment activities, that would fall

11  back to ExxonMobil.

12      COMMISSIONER PARKE: And I think that's an important point, and

13  it's an important thing.

14      ERRIN BRIGGS: Very much so.

15      COMMISSIONER PARKE: But a spill is also very important.

16      ERRIN BRIGGS: Understood.

17      COMMISSIONER PARKE: And so you mentioned being a responsible

18  party, essentially being on chain of title for a dirty property. You

19  know, that's whether you sell it or not, and it lasts forever. But I

20  don't think that's what Exxon has here, is it? They're not stuck with

21  liability no matter what happens, right? They're not a continuing

22  guarantor for spill, for operations?

23      ERRIN BRIGGS: I don't think so, no.

24      COMMISSIONER PARKE: No, I didn't think so either. And then we

25  heard some questions mainly through our chair about if Exxon takes it

103

1    back under a security agreement. Of course, this is all kind of

2    speculating because I haven't seen any of these documents.

3        [06:00:00]

4        But if they take it back under a security agreement in case of a

5    default by Sable, then would Exxon have liability for cleanup for a

6    rupture that had already occurred under Sable's watch? Do you know?

7        ERRIN BRIGGS: I don't. I don't know.

8        COMMISSIONER PARKE: I mean, these are awful questions to answer,

9    but they're awful things that could happen.

10        ERRIN BRIGGS: Sure. Understood. No. I mean –

11        COMMISSIONER PARKE: Kind of got to get to them. Okay. What's a

12    cathode protection system? What's it actually look like? What is it? I

13    know I can't go down to the hardware store and pick one up.

14        ERRIN BRIGGS: Yeah. So the cathodic protection system on the

15    pipeline is fairly complicated. To simplify the concept, we're all

16    familiar with boats being corroded when they're put in salt water. And

17    oftentimes on a motor or some exposed metal part of a boat, they'll put

18    a sacrificial anode on the boat that corrodes quicker than the metal of

19    the motor. And basically what's happening is the corrosion, rather than

20    attacking the motor, is attacking the anode. So that general concept is

21    also applied to the pipeline. But then there are other systems involved

22    in the cathodic protection system that go well beyond this simple

23    concept. And I'm not a petroleum engineer, so I'm not the best person

24    to explain exactly how all that works, but I'm sure that the applicant

25    team has someone that could really dive into that for you.

104

COSB AR006890

1        COMMISSIONER PARKE: Okay. Mark that one's Sable. I'll ask that.

2    Okay. So I think I understood from Sable, they're actually repairing

3    the pipeline right now, or maybe not right now.

4        ERRIN BRIGGS: They are. Yes, right now.

5        COMMISSIONER PARKE: Yeah. But how much of it is going to be

6    repaired? All the way to Pentland? What's being repaired?

7        ERRIN BRIGGS: So I'll speak to this a little bit from a layman's

8    perspective, and then maybe the applicant could get it…

9        COMMISSIONER PARKE: Well, I'm a layman, so that's probably how we

10    can communicate best.

11        ERRIN BRIGGS: So they took a comprehensive look at the line. And

12    they were...

13        COMMISSIONER PARKE: I'm sorry, I didn't hear that.

14        ERRIN BRIGGS: They took a comprehensive look at the line by using

15    an inspection tool. And there are various tools that they can run

16    through the line and get a reading of where the anomalies are, how deep

17    they are, if there's a crack, if there's a seam that's failing, all

18    these things, right? So they inspected the line, and they have a

19    program that is intended to repair anomalies that reach a certain

20    percentage or a certain characteristic. And there are thresholds that

21    are required by PHMSA, or in this case, the state fire marshal, and

22    then operators are free to go above and beyond the minimum requirements

23    of what's required by the state. And in this case, they're going well

24    beyond what's required by the state. And rather than attacking the

25    anomalies that meet that state-mandated threshold, they're attacking

105

1    anomalies that meet a much lower threshold. So if, say, just for

2    instance, the state required every metal loss anomaly at 50 percent or

3    greater to be repaired, these guys are targeting a much lower number

4    than 50 percent.

5        COMMISSIONER PARKE: So do you have a figure for how many

6    anomalies are being attacked, as you stated?

7        ERRIN BRIGGS: They do, yes. It's a lot. It's a very

8    conservative...

9        COMMISSIONER PARKE: I heard a figure of 90 for something, but I

10   don't know what the...

11       ERRIN BRIGGS: They're more than 90, and it's a very conservative

12   approach to integrity.

13       COMMISSIONER PARKE: Okay, now when we were looking at replacement

14   of the pipeline, we had all these property owners up in arms, and they

15   filed a lawsuit and said, "Oh, you can't replace it. You'll dig up all

16   the pipeline on our property." And then we also had concerns over EIR

17   that had to do with how many oak trees were taken out, and it was going

18   to be in the thousands, and where would they farm some new oak trees?

19   And we talked about all this stuff. But if they're digging up the

20   pipeline anyway to do repairs, are we running into those same issues?

21       ERRIN BRIGGS: So Commissioner Parke, the existing line is a

22   previously disturbed area, right? They dug up that entire line in order

23   to install the original pipeline. And so everything along that line has

24   been disturbed back in the late '80s. So there are some biological

25   features that have grown back over the line that may be disturbed as

106

COSB AR006892

1    part of this maintenance program, but it's far less than what would

2    have been disturbed by building a brand-new line.

3        COMMISSIONER PARKE: But the new line was going to go in the exact

4    same spot?

5        ERRIN BRIGGS: Well, not in the exact same location. It would be

6    adjacent to the existing line.

7        COMMISSIONER PARKE: Yeah, but not hundreds of feet away. It was

8    going to be in the same easement, correct? I know that easement. I

9    litigated over it once.

10        ERRIN BRIGGS: Generally speaking, in a very similar location,

11    you're right. I mean, it ran parallel to the existing line, but it

12    would have resulted in much greater disturbance to biological resources

13    than these repairs.

14        [06:05:11]

15        COMMISSIONER PARKE: Okay. I've got to ask some questions that are

16    kind of based on my experience with due diligence and representing

17    landlords and tenants and businesses and going through this whole

18    system we're kind of going through here of approving a transfer of an

19    asset, like an assignment, and the kind of review you go through. And

20    I'm used to reviewing insurance policies. I've even been involved in

21    doing manuscript changes at Lloyd's of London on insurance policies,

22    and to do all this I have some idea what's going on. And I look here in

23    my packet, and what I have is one certificate of insurance for a

24    liability policy. So the first thing I want to ask is, well, what did

25

COSB AR006893

1    you review? Did you just review that certificate of insurance, or did

2    you review the policy language? Or either? Or anything? Or more?

3         JACQUELYNN YBARRA: Commissioner through the Chair, we just

4    reviewed the certificate itself.

5         COMMISSIONER PARKE: Okay. And just looking at the certificate,

6    and I can't tell where it is in your staff in the packet, but you must

7    know because you put the packet together. I think it's at the very end,

8    near the end.

9         COMMISSIONER MARTINEZ: It is.

10        COMMISSIONER BRIDLEY: Last page.

11        JACQUELYNN YBARRA: I think attachment G, toward the end.

12        COMMISSIONER PARKE: And I'm looking at the liability insurance,

13   of course, not the property insurance. And for the commercial general

14   liability, it has a limit of a million for each occurrence, but that's

15   not what we're worried about here. That's going to be, I don't know,

16   somebody slipping on a banana on a platform. We're more interested in

17   the energy package. It says, "Energy package dash COW extra expense,

18   OPA dash 90 oil spill FR." Did you review the rider or endorsement that

19   has the language for that package?

20        JACQUELYNN YBARRA: Commissioner through the Chair, we just

21   reviewed the certificate itself.

22        COMMISSIONER PARKE:  Okay. And it shows a limit, an aggregate

23   limit of $100 million, and for each incident, $35 million. Did you

24   undertake to determine whether that was an appropriate amount for what

25   might be the liability if there's a spill, is $35 million?

COSB AR006894

1          JACQUELYNN YBARRA: Commissioner, through the Chair, that $35

2     million, I believe, is specific to wells. Sable, they did give me a

3     rundown and explain the certificate to me, so they'll be able to

4     explain it better than I can. But from their explanation and me

5     reviewing the certificate itself, we determined that was sufficient

6     coverage for the SYU.

7          COMMISSIONER PARKE:  Gotcha. And I notice there's no named

8     insureds, additional named insureds under this certificate of

9     insurance, and I'm not saying there should be, but is the county's

10    concern more about, do they have the money to fix something, or is the

11    county concerned about obtaining reimbursement for county expenses to

12    deal with a spill? Do you want me to explain that question a little

13    bit? The City of Santa Barbara, 1969, okay, I was here, okay, and I

14    remember it very well. City of Santa Barbara filed suit to seek

15    reimbursement of its own expenses. So that was an example of something,

16    obviously it wasn't pipeline, that was a platform, of where the

17    municipal entity itself wanted reimbursement for its own expenses, and

18    that's an example. And I don't know if the county is concerned about,

19    "Oh gosh, we're going to be cleaning things up and we need $100 million

20    reimbursement," or is it more a concern that on an oil spill, if

21    there's liabilities, it might be to all sorts of claimants, fishermen

22    and farmers and whatnot, and the county hopes it all happens right, but

23    is not directly involved. This goes to my prior question about who's an

24    additional named insured or not. Does it even matter whether the county

25    is not an additional named insured, I guess is what I'm asking.

COSB AR006895

1          JACQUELYNN YBARRA: Yeah, Commissioner, through the Chair, I

2     understand now. So just for the findings of 25B and the financial

3     development permit, 25B only requires that county bonds are in place

4     for the facility. That would be when the county is an additional

5     insured.

6          [06:10:02]

7          However, there's no bonds required for the SYU, not POPCO yet,

8     nor for the Las Flores Pipeline. So then when you go down into the

9     permit conditions for the SYU, there's a permit condition that just

10    says the operator shall be responsible for a spill, and to demonstrate

11    that, they need to provide certificates of insurance, they did, and

12    that's what we reviewed, and then they needed to provide copies of

13    their OSPR COFRs, which they did. So our findings and our review was

14    limited to what was just needed to make the findings for chapter 25B

15    and to meet their conditions.

16         COMMISSIONER PARKE: You know, you just mentioned a COFR, and so I

17    know my mind is wandering a bit, but you mentioned it, so I'll ask my

18    coffer question. And I looked over the COFRs, okay, which follow, in

19    the packet, the certificates of insurance. And without reciting them

20    word for word, they appear to say, "You, Sable, are the right party,"

21    okay, "you're the ones who will owe it." They don't say, "We think that

22    you're able to do it," they don't say that "you have enough assets to

23    do this." They just say, "You're the right party for us to look at." Do

24    you interpret it the same way, or differently? And that's what the

25    words appear to say to me.

COSB AR006896

1        JACQUELYNN YBARRA: So Commissioner, through the chair, the COFRs,

2    as we know, are approved by OSPR, CFW OSPR, so they're outside of the

3    county's realm. For the limited view of 25B and the permit condition,

4    the permit condition just requires that the operator provide the county

5    copies, which they did. But I know, just from experience, the COFRs are

6    based on estimates of a worst case oil spill, and once the applicant

7    demonstrates that, then OSPR approves the COFRs.

8        COMMISSIONER PARKE: Okay, well, so we just have to read what it

9    says, and I don't read it to say that, I read it to say that we

10    recognize you as the party that we will hold responsible, but that's

11    all right. I'm getting near the end. I'm actually not used to something

12    that you described in the staff report, of looking at insurance

13    policies as a substitute for net worth in determining the financial

14    responsibility of an institution. I'm used to seeing, in my law world,

15    that you'd require a showing of net worth by a guarantor, and you'd

16    also require insurance policies by a tenant or anybody else in the

17    transaction. In fact, it's funny that I'm here today, because the one I

18    remember the most clearly, I negotiated with Commissioner Bridley's

19    husband when he was Waterfront Director for the City of Santa Barbara.

20    And is there something in 25B, or elsewhere, that says we can supply

21    evidence of insurance coverage as a showing of net worth or financial

22    stability for the purposes that we're looking at, something specific?

23        JACQUELYNN YBARRA: Commissioner Parke, through the Chair, I don't

24    believe there is, no.

25

111

COSB AR006897

1    COMMISSIONER PARKE: Last thing I'm going to ask about is the

2    contingency plans. You heard people from EDC saying the ones that are

3    on file were Exxon's and those are withdrawn, and that there's one for,

4    I think it was for wells, but not for operations, and it hasn't been

5    approved by, I'm not going to say OSPR, but I just said it, OSPR. I

6    hate these acronyms, I hope the next time I see you, you have a

7    glossary in your otherwise excellent staff report of OSPR and PHMSA and

8    ooky-dooky and all these things. Okay, so contingency plan -- can you

9    address that, do we have them or not?

10   ERRIN BRIGGS: Yeah, so Mr. Chair and Commissioner Parke, so it's

11   my understanding, and again, the applicant can get a little bit more

12   deeply into this. The contingency plans are effective upon submittal.

13   And so in this case, as Linda had said, they have submitted their

14   contingency plans and they haven't been approved yet, and that today is

15   the last day of their 30-day review period. I'm being told that the

16   plan is effective upon submittal and may be adjusted as necessary by

17   OSPR.

18   [06:15:00]

19   So in this case, what they did was they looked back to the

20   contingency plans that were previously deemed adequate for Exxon and

21   said, "Hey, this was deemed adequate before, these spill volumes are

22   still the same because the pipeline hasn't really changed, here's our

23   estimates, which are the same that you saw 10 years ago for Exxon." So

24   I think that they're expecting those certificates to be approved.

25   COMMISSIONER PARKE: And you'll know tomorrow or something.

COSB AR006898

1      ERRIN BRIGGS: Yeah, but for the purposes of effectiveness,

2   they're deemed effective upon submittal.

3      COMMISSIONER PARKE: So as my last statement to you, I'm going to

4   ask you a favor, please do not come to our hearing on Friday, okay,

5   with evidence of contingency plans on this case, we'll have other

6   things to do.

7      ERRIN BRIGGS: [Laughs] Okay.

8      COMMISSIONER PARKE: I'll let you guys stand down, and I know

9   Sable was listening to my questions, I don't know if they made any

10  sense to you, but on I'd like to get a Sable person up to bat to answer

11  those. But I don't know if that's the right thing because they haven't

12  had a chance to rebut yet. Maybe the thing to do is let's give them a

13  chance to their rebuttal and they –

14     COMMISSIONER MARTINEZ: Well, they're going to have the rebuttal,

15  and then you're going to have questions.

16     COMMISSIONER PARKE: And they might decide to answer those

17  questions because they've been listening I'm sure, and then I can ask

18  them again if I need to. Let's do that.

19     COMMISSIONER MARTINEZ: Sure. You already said you were going to

20  ask them some questions.

21     COMMISSIONER PARKE: Yeah.

22     COMMISSIONER MARTINEZ: How much time have we got left? You used

23  your whole time.

24     COMMISSIONER PARKE: Then maybe I just better [Crosstalk

25  06:16:33].

113

COSB AR006899

1          COMMISSIONER MARTINEZ: I think it's just time to ask answer the

2     questions, because I think that's what's really at issue. I have a

3     question for staff, though.

4          ERRIN BRIGGS: So Chair, I would recommend that we do give them at

5     least two minutes for rebuttal and then go into questions.

6          COMMISSIONER MARTINEZ: I'll ask them, but it looks like they're

7     ready to just answer the questions. That's what I'm thinking.

8          DAVID VILLALOBOS: Yes.

9          COMMISSIONER MARTINEZ:  Okay, you'll just answer the questions

10    then. But to the staff, in regards to contingency plans, in my mind I'm

11    having two different kinds of senses of contingency plans. Right now,

12    if they're doing any repairs to the pipeline or something, we're not

13    talking about a spill, of an operating spill, we're talking about

14    taking out something maybe you have some fluid come out of the pipeline

15    if they're replacing it. Are there differences in the contingency?

16         ERRIN BRIGGS: Yes.

17         COMMISSIONER MARTINEZ: We're at a different stage right now.

18    We're not an operating stage.

19         ERRIN BRIGGS: Correct.

20         COMMISSIONER MARTINEZ: So is there a contingency plan in regards

21    to our status as of right now where they're working on it, putting

22    safety valves, doing all that, and then later on when we look at

23    operating when it comes to us – because it's eventually going to come –

24         ERRIN BRIGGS: So that's where we started, Chair Martinez. They

25    started by submitting contingency plans that address the current state,

114

COSB AR006900

1    which is a zero spill volume, because there's no fluids. But what the

2    public was talking about and what we were engaging with Commissioner

3    Parke on was the updated contingency plans that are to address

4    operations.

5    COMMISSIONER MARTINEZ: Okay. That's my question. Commissioner

6    Parke, your light is still on. Do you still have a question for staff

7    or are you ready to move on?

8    COMMISSIONER PARKE: No, not for staff. I asked staff questions

9    and some of them really are better suited for Sable to answer.

10    COMMISSIONER MARTINEZ: I see Commissioner Reed's light on.

11    COMMISSIONER REED: Yeah, I still have a number of questions

12    relative to the operation of the pipeline itself, but I think they may

13    be better addressed to Sable rather than staff because they're pretty

14    specific, so I'll reserve those until that time.

15    COMMISSIONER MARTINEZ: Okay, so we're still doing good on time.

16    Are we okay?

17    COMMISSIONER BRIDLEY: I want to hear Sable.

18    COMMISSIONER MARTINEZ: Okay, you're up. Who's going to start

19    asking the first questions, because you're not going to be speaking, we

20    agreed that you're going to be answering the questions. Commissioner

21    Parke, you were the one biting to the bit — or do you want to go,

22    Commissioner Reed? Commissioner Parke's looking at you like, please go

23    first. [Laughs]

24    COMMISSIONER PARKE: No, I'm just being a gentleman for once.

25    COMMISSIONER REED: Okay, I'll go.

COSB AR006901

1        COMMISSIONER MARTINEZ: Okay, Commissioner Reed.

2        COMMISSIONER PARKE: If you don't want to go, I'll go. If you do,

3    you do.

4        COMMISSIONER MARTINEZ: Commissioner Reed's up.

5        COMMISSIONER REED: Actually, I did bring my own glossary I made

6    up of terms. I suggested that to Commissioner Parke and he took it.

7    You've got to be careful what you tell him. It comes out again later.

8    Okay. No, my area of concern is with the pipeline operation Aside from

9    the fact we hear a variety of things when we hear public comment, like

10   people in California want to transition from oil and gas, 72% of people

11   don't want offshore oil etc. etc. But I think those are often the

12   product of a vocal minority, because if I look around Santa Barbara

13   County, they keep reminding me the citizens haven't had a vote on oil

14   and gas for years.

15       [06:20:00]

16       Well, I remember Measure P, pretty much a ban on in-county

17   production, and it was resoundingly defeated. And sure, we may not have

18   had any elections since then but I think the citizens of the county

19   really vote every day when they go purchase a vehicle or provide fuel

20   for the vehicle of their selection, and thus far that's still

21   overwhelmingly in favor of gasoline and diesel-powered vehicles. So I

22   think people here really see the need for that. We've had so many of

23   these -- every time an oil project comes on, no matter how narrowly

24   confined, the opposition seeks to expand it and turn it into

25   Oilmageddon, when these are often much simpler, need to have a narrower

116

COSB AR006902

1    focus. So with respect to the pipeline, we've heard about the

2    heartbreak and devastation from the oil spill, the animals, the birds,

3    but I think we also need to consider the heartbreak and devastation of

4    the families, the contractors, all the people that were supported by

5    the offshore oil operations in this county. And to date, nothing has

6    really been done for them. I think we need to address that one. And

7    looking back at the spill. We look at the various elements, the various

8    units here. As I said in the last public meeting regarding the trucking

9    plan for Exxon, actually, the only statement I ever made in a meeting

10   like that that resulted in receiving a threat,  okay, here it is: When

11   that spill occurred Exxon was not at fault. POPCO was not at fault.

12   What generated the whole problem was the negligence -- negligence is a

13   point later reiterated by one of the judges who handled the matter in

14   an interview, which was published in the paper -- but the negligence,

15   the lack of proper operations by a Texas-based pipeline company, which

16   happened to be All American. So I have a concern -- and I think it's

17   been alleviated when I look at the materials -- in that when I even

18   look so far as back in…we're looking at consistency with Chapter 25b

19   page 17, you're looking at the transition plan, and it appears that

20   you've selected employees who were not previously employed with Plains,

21   and in particular not employed with Plains All American at the time of

22   the 2015 rupture. Is that correct?

23        STEVE RUSCH:  That's correct.

24        COMMISSIONER REED: Okay, and that's again, I think, reiterated

25   later on when we look in the transition plan later on.  I mean, I don't

117

COSB AR006903

1    really hold…any other field employees here? I think that most of the

2    responsibility would go to upper levels of Plains, and perhaps the

3    people in the control center in Midland, Texas, who appear, well, to

4    have had gauge shutoffs, overall kind of neglect to check what they

5    should have, which was adjudicated during the many trials, etcetera.

6    But looking at the control center, I was impressed that you plan to

7    have it in Santa Maria.

8          STEVE RUSCH:  Yes, Sir.

9          COMMISSIONER REED: You're going to have round-the-clock. And how

10   many employees are going to be on call in that center at any given

11   time?

12         STEVE RUSCH:  Five.

13         COMMISSIONER REED: In the center. So if somebody has to go out to

14   visit, so it's always going to be well monitored.

15         STEVE RUSCH:  And I didn't mention, but there is a secondary

16   control center that'll be at Las Flores Canyon at the facilities, a

17   backup.

18         COMMISSIONER REED: Okay, so in the event of communications or

19   power failure or something –

20         STEVE RUSCH:  Yes, exactly.

21         COMMISSIONER REED: -- it's always going to be well controlled in

22   real time by people here and not out playing penuckle or whatever they

23   were doing back in Texas.

24         STEVE RUSCH:  Right.

25

COSB AR006904

1       COMMISSIONER REED: I don't know, but I've got relatives from

2    Texas I know they spend a lot of time playing penuckle, so neither here

3    nor there.

4       STEVE RUSCH:  Probably Texas Hold'em.

5       COMMISSIONER REED: So I find that reassuring. We've heard a lot

6    of talk about your systems and everything you're going to have in

7    place. I'm sure on May 18, 2015, if we'd happened to have management

8    from Plains All American sitting here and ask them similar questions,

9    they'd also give us great representations on their operational

10   abilities and history and ability to control any adverse events on the

11   18th, although 24 hours later we knew that things were different.

12       [06:25:07]

13       And being that when I'm in this position, it's not like years ago

14   when I got involved in public affairs and things kind of promoting,

15   well, oil projects on our own ranches, and then kind of got into other

16   things. But nonetheless, when we're looking at this, well they may have

17   said on May 18th things were in great shape. And in California, I know

18   for years and years, oil businesses correctly have stated that when you

19   have California production -- I've said it, I've written about it

20   myself -- we have the most carefully regulated, well managed, safest,

21   cleanest production on Earth, so I have very little patience for

22   operators. And we had an on-land operator in this county who failed to

23   meet that standard. Fortunately, they're gone after decades of trying

24   to get rid of them. And you know when I make these decisions, it's not

25   just for me, it's not just for the pro-oil people in my district --

COSB AR006905

1    it's for all the people in all of the county. So when we make a

2    decision like this, it needs to be transparent and very well-reasoned,

3    because it's for everyone despite their feeling on the issue. So I'd

4    just like to know: if you're entrusted with this project, how do we

5    know that your responses and the end result of your management and

6    capabilities is really going to be any different than the performance

7    we saw from Plains?

8        STEVE RUSCH:  That's a good question. And I'd first respond by

9    saying, under our management, the current management under a prior

10   company, PXP, as I mentioned earlier, we received the one and only Good

11   Operator Award essentially at Santa Barbara County issued by your Board

12   of Supervisors. That's the type of company we are. It's really, you

13   have to look at the management, and our history. The staff found no

14   major incidents in our past. It's our commitment to safety and

15   operational excellence, as we kind of went through on the prior slides,

16   that we're going to be implementing all those things so that we don't

17   have any situation close to what was in 2015 obviously. And with the

18   additional -- I mentioned the Integrity Management Program -- a lot of

19   that's prescriptive by the Consent Decree, the amount of things that we

20   have to do to bring that pipeline up to a state where the Office of

21   State Fire Marshal can approve it, that pipeline will essentially be as

22   new, or new. And we've already also pegged or sent internal

23   measurements through the offshore lines which go out to the platforms,

24   we're in the process of going through all that, and those initial

25   reports show those lines are in very good shape. So you have to look at

120

1    kind of the overall picture our history and our experience dealing with

2    deep water platforms in the Gulf. We are operating Point Aguayo and

3    platform Irene off Point Conception without incident. The relationships

4    we have with the regulators. Those are all kind of combined. We're not

5    out of sight, out of mind. We're in the community. We live in the

6    community. So I can give you my word that we will have safety and

7    operational excellence on this project. We're committed to it. We all

8    want to go home safe every night. Every one of these guys will say the

9    same thing.

10        COMMISSIONER REED: Well, thank you. I mean, I hope that bears

11   out. A lot of people are depending on those particular words, the

12   people of the county who want a clean ocean and clean beaches, right

13   down to all the union members, hard-working employees, contractors, and

14   the families they support, that are going to be depending on you,

15   someday when you get to restart, or the maintenance before, to give

16   them a stable work environment that'll support themselves and their

17   families.

18        STEVE RUSCH:  And the complement to that is the regulatory

19   oversight. I mean, we have county oversight. We have state oversight.

20   We have federal oversight. So our performance, you know, overlaid by

21   the county and the agencies that ensure that we comply.

22        [06:30:00]

23        You know, we've gone through all those compliance plans, we've

24   got dozens of compliance plans to comply with. So the oversight on

25   projects in California is the greatest of any in any oil state. So

121

COSB AR006907

1    you've got the comfort that you've got the oversight and hopefully you

2    have the comfort that we provide is that we are going to comply to the

3    T and even go beyond in some of these things that we're doing, so that

4    we're a partnership that results in -- in our case, we're going to be

5    displacing a million barrels a month of foreign based crude tankering

6    into our ports in LA and San Francisco. The carbon index on SYU crude

7    is 3.5. You're displacing Iraq, Iranian, Iraqi crude at 12.6 or Libya

8    up in the uppers. So it's up to a fourth cleaner fuel. And that's

9    greenhouse gases. So when we bring the co-gen, that's already factored

10   into it. So if it's a global issue then it actually is a net benefit to

11   the environment by bringing this project back on.

12         COMMISSIONER REED: Okay, thank you.

13         COMMISSIONER MARTINEZ: Yes, Mr. Parke?

14         COMMISSIONER PARKE: Okay, you heard my questions and I kind of

15   starred four of them that look like they were not answered and you need

16   to answer them. But if there's something else that I missed, you can

17   just remind me when I go through this. I mean of a question that I

18   asked and you thought you're to answer it. Okay, so you're in the

19   process of repairing the pipeline.

20         STEVE RUSCH:  Yes, sir.

21         COMMISSIONER PARKE: And even with this Notice of Violation for

22   coastal, are you still able to do it in the inland and all that?

23         STEVE RUSCH:  Yes.

24         COMMISSIONER PARKE: So that's ongoing.

25         STEVE RUSCH:  We have 31 union crews out working that pipeline.

122

COSB AR006908

1      COMMISSIONER PARKE: Okay, and will that be the whole length of

2    it?

3      STEVE RUSCH:  All 125 miles, ex the 10 miles on the coast that's

4    currently.

5      COMMISSIONER PARKE: Right, but anyway, when you have the

6    opportunity you will repair the whole pipeline?

7      STEVE RUSCH:  Absolutely.

8      COMMISSIONER PARKE: And are you able to break that down into

9    number of anomalies or number of repairs?

10     STEVE RUSCH:  Anomaly per mile. An anomaly dig, if you will. So

11    when you do the tool, you find the anomalies, and we're required by the

12    Consent Decree to repair everything up to 40% wall loss. Then you go

13    out and you have to dig hopefully where you think that anomaly is which

14    with the tools these days is very close to where you find it. And you

15    expose the pipe, you find that anomaly. Of course when you expose the

16    pipe then you have other anomalies that you can repair while you've got

17    that hole open. So the number of anomalies that we end up repairing are

18    in greater number than were required, because when we replace a piece

19    of pipe, 10 feet of pipe for one anomaly, well, you're replacing it for

20    maybe 10-percenters, 5-percenters. I mean, eventually you're going to

21    have all new pipe.

22     COMMISSIONER PARKE: Or you might see something while you're there

23    that you're going to do.

24     STEVE RUSCH:  Right, and you take off… The issue with the 2015

25    spill was the insulation, water in the insulation. So we strip off the

123

1    insulation and rewrap it with the current standards of today with that

2    new section that we put in. So we either cut the pipe out and replace

3    the segment, or we what they call composite wrap, or you put a sleeve

4    on it. So you put the same thickness sleeve around the anomaly and then

5    you weld that on. So you've got the same brand new pipe now on that

6    section. Those number of digs end up being about one every 4,000 to

7    5,000 feet on average over that 125 miles.

8        COMMISSIONER PARKE: And you're repairing those because they were

9    corroded, right?

10       STEVE RUSCH:  When we ran the tool, that's what they picked up.

11   Now the tools are so good that they can pick up dents, which five years

12   ago, or three or two years ago, you couldn't pick up dents. Because

13   dents occur when you install the pipeline, you know, you've got a

14   mechanical strike, so now they can even pick up those. So we're also

15   picking up those as we do the anomaly digs. So that's how you end up

16   with a situation where when you've completed all these anomaly digs and

17   we've repaired more than are actually required, and we're sending a

18   tool through every year instead of every five years or every ten years,

19   you get to a situation where you don't get enough corrosion to really

20   even require repairs for a number of years.

21       [06:35:07]

22       COMMISSIONER PARKE: So does the fact that there was corrosion

23   mean that the cathodic protection system didn't work a hundred percent?

24       STEVE RUSCH:  Yes.

25

124

COSB AR006910

1      COMMISSIONER PARKE: Okay, and are you repairing and replacing

2  cathodic protection system as you go along?

3      STEVE RUSCH:  As I mentioned earlier, the cathodic protection

4  system is in place and working, and there is test stations I think

5  every mile or something like that, and you've got these cathode beds

6  like Errin was describing, like the anode on a boat, similar to that.

7      COMMISSIONER PARKE: Every outboard motor has them.

8      STEVE RUSCH:  Every mile you've got your boat with the anode on

9  it. It's a lot more complicated than that. But as we go through those

10  anomaly digs, sure, we are repairing the cathodic protection system, as

11  part of the overall, as I mentioned, integrity management program.

12  Because again, cathodic protection is one thing we do, but really the

13  big hitter is the inspection tool now being run every year.

14      JESSICA STEBBINS BINA: Twice a year.

15      COMMISSIONER PARKE: How is it that it's there now and it's

16  working, except it didn't stop the corrosion 100% and that's why you're

17  repairing the pipeline? I'm having a hard time adding those numbers up.

18      STEVE RUSCH:  Say it again?

19      COMMISSIONER PARKE: You're telling me that it's in place and

20  working, but you're also telling me that it didn't work a hundred

21  percent and that's why you have corrosion in the pipeline that you're

22  fixing in a hundred and thirty plus places.

23      STEVE RUSCH:  Well, so 10 of 125 miles it wasn't working as well

24  as it is on the balance of that, the 115 miles. So it's basically the

25  coastal section that had the issues.

125

COSB AR006911

1    COMMISSIONER PARKE: Oh, so it corroded for other reasons in the

2    inland portions?

3    STEVE RUSCH:  Very little corrosion that far out. The largest

4    number of anomalies are between here and the top of the mountain on the

5    way to Bakersfield.

6    COMMISSIONER PARKE: Got you. So the bulk of the work will be over

7    on this side of the mountains.

8    STEVE RUSCH:  The balance of it would be, yes.

9    COMMISSIONER PARKE: Okay. Do you have a ballpark time estimate

10   for how long it'll take to fix all this, the pipeline?

11   STEVE RUSCH:  The balance, 30 more days, 3 weeks.

12   COMMISSIONER PARKE: Okay, so you can fix the whole thing in a

13   month.

14   STEVE RUSCH:  Well, we have 31 crews. We have six or seven that

15   we can call back, because they're shutting right now, and we can bang

16   it out that fast. And we actually, this is what we're talking to the

17   Coastal Commission about, we currently have 27 open holes on the coast

18   because we were told to stop, which we believe have safety, corrosion,

19   integrity and security issues having those holes open. So that's what's

20   under discussion right now. So in total we could have the entire

21   pipeline done in a month.

22   COMMISSIONER PARKE: By the end of the year, something like that?

23   STEVE RUSCH:  Yep.

24   COMMISSIONER PARKE: And do you have a ballpark estimate of what

25   that's going to cost?

126

COSB AR006912

1     STEVE RUSCH:   I think our 8k says our total all-in is $190

2     million or I forget what the number was, which takes into account all

3     the facilities including the pipeline.

4     COMMISSIONER PARKE: To do the repairs?

5     STEVE RUSCH:  Yeah, to do the repairs, upgrade the offshore

6     facilities, the onshore facilities, the whole thing. I don't have a

7     number just for the pipeline.

8     COMMISSIONER PARKE: And so you're spending money now. You're not

9     making money right now, right? There's no revenue coming in.

10    STEVE RUSCH:  But, to just speak to one of the issues, which is

11    kind of obfuscating things, is the value of the company based on recent

12    third-party engineering analysis of reserves, and that present value is

13    ten billion dollars. So that attracts a ton of capital. And once we

14    start producing that capital, the amount of capital that's going to

15    come in to replace the loan and things like that we'll be able to pay

16    everything down in the time frames responsible. There's talk about an

17    $800 million dollar debt. Our debt to equity ratio is the same as the

18    rest of the industry. 800 million debt sounds like a big number to us,

19    but it's not in the financial world. So you've got the ten million, and

20    you've got a mark cap of 1.79 billion, the price of stock times the

21    outstanding shares, which is only going up, which is why we're

22    attracting so much capital. This is a big project, and like I say, it

23    brings on a million barrels of oil a month to displace that Mideast

24    crew.

25         [06:40:02]

127

COSB AR006913

1    COMMISSIONER PARKE: Well that that goes to my next question then,

2    and that was, I was figuring okay, you're spending money now, and

3    you're not making money now. You get to a point where you can restart

4    and your best hope for that is when?

5    STEVE RUSCH:  By the end of the year.

6    COMMISSIONER PARKE: Okay, so you restart and then you've got 90

7    days to pay $790 million to Exxon, but what you're suggesting I think

8    from what you just said is you'll have, you know, oil that's

9    recoverable and you'll be able to raise capital that way to pay that

10    790.

11    STEVE RUSCH:  Absolutely.  I mean you'll have revenue from the

12    oil obviously. But the attraction of equity money, because you're now

13    starting and producing that oil is just going to track more and more

14    capital. It allows you to refinance. All sorts of things happen in the

15    financial world once you get going.

16    COMMISSIONER PARKE: And you're probably not going to raise $790

17    million in three months from the revenue that's generated for the

18    project, but what you're saying is the value will go up and you can

19    refinance it in one way or another.

20    STEVE RUSCH:  That's one way, yeah. Absolutely.

21    COMMISSIONER PARKE: Hang on here. You understand this controversy

22    about the contingency plans?

23    STEVE RUSCH:  Absolutely.

24    COMMISSIONER PARKE: Approved by OSPR?

25    STEVE RUSCH:  Absolutely.

COSB AR006914

1          COMMISSIONER PARKE: I hate using these acronyms because I don't

2     even know what they mean. And someday I'm going to test everybody in

3     the room and see is there one person that can take a quiz and know

4     every single one of these stupid acronyms we use all the time because

5     I'll bet there's some agencies where you know the acronym but you don't

6     even know what it stands for or even what country it's in.

7          STEVE RUSCH:  How about PHMSA?

8          COMMISSIONER PARKE: There you go. All right. So let's hear your

9     story on the contingency plans. Are all your contingency plans in and

10    approved? And explain why and how.

11         STEVE RUSCH:  I think a staff mentioned when you submit a

12    contingency plan, it's effective. It becomes effective and that's what

13    you drill to and that's what you'd implement. Now if you look at a

14    contingency plan, 300 pages of it, the only thing you're changing is

15    the worst case discharge. That's it. One number.

16         COMMISSIONER PARKE: Because you already had Exxon's.

17         STEVE RUSCH:   The response team, the response organization, all

18    that is already in place and that's what we drilled to in July and

19    September successfully to match up with 25B. So they're in, they're

20    effective, they're in for the new worst case discharges. If you look at

21    the certificates which are with the staff report, it lists the worst

22    case discharge for the Coastal Line of 1,935 barrels which is 40% less

23    than the 2015 incident. And then there's another number for inland. And

24    then for offshore, we've got the crude line that goes out to Harmony.

25

129

1    COMMISSIONER PARKE: I think I've asked you the questions that I

2    asked staff and they couldn't answer.

3    JESSICA STEBBINS BINA: Can I just add something briefly?

4    COMMISSIONER PARKE: Please, but you've got to tell us who you

5    are.

6    JESSICA STEBBINS BINA: Yes, I was just about to. I apologize. I'm

7    Jessica Stebbins Bina, Council for Sable. I just wanted –

8    COMMISSIONER PARKE: Oh, you're at the Latham firm?

9    JESSICA STEBBINS BINA:  Yes. I just wanted –

10    COMMISSIONER PARKE: I'll talk to you afterwards. I have very warm

11    regard for the Latham firm because they made me a lot of money many

12    years ago and I'll explain to you afterwards.

13    JESSICA STEBBINS BINA:  I'm glad to hear it. It's an excellent

14    firm. I just wanted to kind of -- we've been talking about a lot of

15    things but I wanted to bring back on the contingency plans. It's

16    exactly as we said that it's an iterative process, right? You submit a

17    contingency plan, it's valid and effective upon submittal. If it's

18    rejected or adjusted, then there are adjustments made. But the

19    certificates of financial responsibility have already been issued.

20    They're valid. They are for the maximum amount and they are based not

21    on zero barrels but on real numbers of barrels. Why do I bring this up?

22    Because if you look back in 2001 when this commission adopted 25B, it

23    was very careful to say plans take a really long time, and what we

24    don't want -- and we're going to intentionally make this a narrow,

25    change the name on the plans, don't require all the plans to be

130

1    finalized and in order because that can take months. And what the

2    purpose of 25B is, is to acknowledge the reality of a new owner and

3    operator who is here and present and make sure that they are the ones

4    who are in the relationship with the county and the commission by

5    changing the name on the permits. So there is actually, the 2001 staff

6    findings speak to the very issue of do you wait for the perfect plan?

7    The answer is no. You base it on the plans that you have and that's an

8    intentionally narrow process.

9        [06:45:00]

10    STEVE RUSCH:  So in July and September, we actually drilled on a

11    plan that had zero worst-case discharge because we weren't producing.

12    So we submitted the new plans -- the revised number, the plans were the

13    same, just changed the worst-case discharge number -- in anticipation

14    of having oil flowing through the pipeline. So that was the most recent

15    submittal that Linda was talking about. But as soon as they were

16    modified or "submitted" they became effective. Because if we were

17    operating and had a spill, then you'd have something to respond to, and

18    that's what we train on.

19    COMMISSIONER PARKE: I think I've asked you the questions that

20    staff wasn't comfortable with. Is there some question that I forgot to

21    ask you that was one that looked like a Sable question?

22    JESSICA STEBBINS BINA:  Unless there's something that's giving

23    you heartburn about the process that you'd like us to answer.

24    COMMISSIONER PARKE: I wouldn't use the word "heartburn." [Laughs]

25

131

COSB AR006917

1    JESSICA STEBBINS BINA: I do think, we've spoken a lot about

2    cathodic protection. I do want to remind the Commission that this issue

3    was looked at last year. The cathodic protection issues with respect to

4    the pipeline as a whole haven't changed. The Celeron settlement takes

5    all of that out of county jurisdiction into state jurisdiction and the

6    Office of the State Fire Marshal, and an extremely extensive consent

7    decree with a number of state and federal agencies involved is

8    supervising the safe repair of the pipeline.

9    COMMISSIONER PARKE: You know, you don't have to tell me. We

10   looked at it last year. I made the same argument. I called you guys up

11   and told you I made the same argument so you'd be prepared for it.

12   There was a difference, though, because I don't know if the Commission

13   will listen to me today, the other commissioners, but they didn't last

14   year because everyone was so excited, well, it's going from Plains,

15   which has long fallen apart, to Exxon, which has some money behind it,

16   and this is a somewhat different situation, so we'll see in a few

17   minutes. [Laughs]

18   JESSICA STEBBINS BINA:  I would respectfully submit that the

19   standard shouldn't change based on the applicant.

20   COMMISSIONER PARKE: You're just being logical.

21   STEVE RUSCH:  I did want to make one clarification. I got a tap

22   when we were talking about the ten billion dollars and what happens

23   when we start. Because I'm not a finance guy, I'm actually an engineer

24   trying to talk about finances. The debt that matures when production

25   resumes will be refinanced with debt capital based on the ten billion

132

COSB AR006918

1    of oil and gas reserves. That's how I should have said it. I apologize

2    if I misconstrued it.

3        COMMISSIONER PARKE: Well, that's what I heard.

4        STEVE RUSCH:  Good.

5        COMMISSIONER PARKE: Thank you.

6        COMMISSIONER MARTINEZ: Well, since you're there, since you're on

7    this thing, you mentioned $190 million  would be utilized for redoing

8    the pipeline. But I thought, and you correct me if I'm wrong, there was

9    like 200-and-some-million dollars you guys have in cash. Am I wrong?

10       STEVE RUSCH:  Going back to the -- I won't put it up there -- the

11   slide that we had that showed the insurance and the cash, we had $112

12   million of cash as of June, so that may have changed, and then we have

13   raised another $200 million in equities.

14       COMMISSIONER MARTINEZ: Okay, so that would leave you a little

15   over $100 million in the bank, then, in doing what you were saying you

16   were going to do. $190 million dollars, minus that from $300 million

17   dollars would leave you about a hundred million.

18       STEVE RUSCH:  Yeah.

19       JESSICA STEBBINS BINA:  I think the answer is we're awaiting the

20   next quarter's official financials, and there's not a certified

21   financial result of exactly how much cash had…exactly what's been spent

22   down. But there was $112 million at the close of the last quarter.

23       STEVE RUSCH:  Right, in addition.

24

25

                                   133

COSB AR006919

1    JESSICA STEBBINS BINA:  There's been $200 million raised. Where

2    that nets out at this very exact moment, we'll know when the updated

3    financials are posted.

4    STEVE RUSCH:  Shortly.

5    COMMISSIONER MARTINEZ: Yeah, well, my concern is that you spend

6    so much money doing what you're doing now, and you have no money to go

7    on to the next step. Kind of like going on vacation, taking all the

8    pictures, not having enough money to develop the pictures.

9    STEVE RUSCH:  Right. That's where the additional $200…I mean,

10   we're raising money all the time. So at that "snapshot" in June was

11   $112 and then $200 since then, and I think we'll be filing fairly soon.

12   COMMISSIONER MARTINEZ: Okay. And now my question to the gentleman

13   who was the last person speaking, who was the one who mentioned he was

14   vetting clean up there -- I asked him the question, and I know I

15   suggested I was going to ask you, is that if you don't make up the

16   payment that is due and owed to Exxon, does Exxon have the ability to

17   basically recoup, in other words?

18   [06:50:00]

19   It's a default. A default situation occurs. Who gets back the…is

20   Exxon's remedy, "Hey, everything comes back to me," that's the way it

21   is? Because the comment that was being made, it's left for the

22   taxpayers, and that's what I wanted to make sure about. No, it's Exxon

23   who will be coming in.

24   ANTHONY DUENNER: Anthony Duenner with Sable Offshore Corp. Okay.

25   Sorry. So if I can back up for a second on some of the questions you

134

COSB AR006920

1    previously asked. Sorry. Can you hear me? Anthony Duenner with Sable

2    Offshore Corp. So if I can back up one question to the amount of

3    capital that's being spent.

4            COMMISSIONER MARTINEZ: Sure.

5            ANTHONY DUENNER: And how the 100 -- the cash that was on the

6    balance sheet, that was a snapshot in time, which under our accrual

7    system, a lot of the pipeline expense had already been, if this makes

8    sense, would have been already subtracted. So those commitments -- so

9    the pipeline expenses and the expenses to -- for some of the

10   enhancements for the platforms etcetera -- so those expenses already

11   would have been netted out of the cash on the balance sheet at the end

12   of June. And since then, we've raised -- we've had another equity raise

13   of $150 million before expenses. And then we have another cash infusion

14   coming in from warrants that will be announced, so the results of which

15   will be announced, but that is another raise of up to $165 million, the

16   results of which will be announced on November 4th. So the results of

17   all of which will be announced in our 10Q. You know, we're a publicly

18   traded company. Our quarterly financials will be announced in November

19   around the 14th. But long story long, we have significant cash on the

20   balance sheet and available. All of these projects have more than

21   sufficient capital available for the conclusion of all the repairs and

22   maintenance and additional safety enhancements. Okay. So on to the next

23   question. So could you rephrase -- I just want to make sure I get the

24   exact circumstances under which Exxon could come in?

25

135

COSB AR006921

1    COMMISSIONER MARTINEZ: Well, of the comment that I addressed with

2    -- I forget his name, but the gentleman was saying, "Look, if you don't

3    pay Exxon that $790 million," I may have the figure wrong, "it's going

4    to be left for the taxpayers." And my question to him is, "Well, what

5    would happen in that default situation?" which is what I'm asking you.

6    Would it be left for the taxpayers is what I'm saying.

7    ANTHONY DUENNER: So under our purchase and sale agreement, Exxon

8    would have the right but not the obligation to take the assets back,

9    but… So depending on the circumstances under which that occurred, there

10   are a number of let's say safety nets in place, there are performance

11   bonds, there are also kind of for…there are P&A bonding in place, which

12   would survive even if something were to happen to Sable, which is

13   highly unlikely. But if something were to happen to Sable, you would

14   still have plugging and abandonment bonding in place, which would

15   survive. Despite what was said here earlier by one of the commenters, I

16   think insurance and bonding and P&A, all of which is backed by highly

17   rated -- all of it's placed through Lloyds of London, highly rated, the

18   highest ratings -- that would survive. And that is who you would be

19   looking to, to come in and fund the plugging and abandonment. So for

20   P&A for the offshore, it starts at $350 million. And then

21   contractually, it could -- is scheduled to go up in 2025 to $500

22   million. I mean, I've heard some concern about orphan wells in

23   platforms, etcetera, that is not the case here. Just full stop.

24       [06:55:00]

25    COMMISSIONER MARTINEZ: So your P&A bond is $350 million dollars?

136

COSB AR006922

1          ANTHONY DUENNER: Correct.

2          COMMISSIONER MARTINEZ: It's a blanket bond or bonds or well

3     specific?

4          ANTHONY DUENNER: Blanket.

5          COMMISSIONER MARTINEZ: Blanket. Okay. And how many wells are

6     underneath that blanket bond?

7          ANTHONY DUENNER: 90….

8          MALE: 112.

9          ANTHONY DUENNER: 112.

10          COMMISSIONER MARTINEZ: And how much per -- to plug each well?

11          MALE: 600 to a million dollars.

12          ANTHONY DUENNER: 600 to a million dollars.

13          COMMISSIONER MARTINEZ: Okay. So there should be enough there.

14          ANTHONY DUENNER: Yes.

15          COMMISSIONER MARTINEZ: Those are the questions I had. Thank you.

16     Commissioner Bridley:

17          COMMISSIONER BRIDLEY: I don't have anything for Sable, but I have

18     one really simple question left for staff. And if you want to stay

19     there, that's fine. A lot of conversation today about concerns about

20     starting the production again, and you're in the process of repairing

21     the line, and you have the approval, and you're working out -- well,

22     maybe you can answer this. The Coastal Commission resolution of this,

23     you didn't have probably the right follow-up CDP, but you were doing

24     the work that was authorized under the Consent Decree or some other

25

COSB AR006923

1    kind of an approval. You had an entitlement, but maybe not the final

2    clearance from Coastal Commission. So where does that stand?

3         STEVE RUSCH:  Tag team.

4         JESSICA STEBBINS BINA:  We're going to introduce another one of

5    my colleagues.

6         STEVE RUSCH:  [PH 06:56:31] We're phoning a friend.

7         JESSICA STEBBINS BINA:  [Laughs] Yeah, phoning a friend.

8         D. J. MOORE: Good afternoon, Commissioner. I'm D. J. Moore with

9    Latham and Watkins, outside council to Sable. So we're still in

10   negotiations with Coastal Commission staff. I actually had an hour-long

11   conversation with them about this yesterday. We don't have the final

12   resolution as to approach on permitting. I think we're all still --

13   both Coastal Commission and we are still lining up exactly the approach

14   that we would like to take, but we're in cooperative negotiations and

15   looking to try and find a solution in the very immediate term.

16        COMMISSIONER BRIDLEY: Okay. I mean, my experience with them is if

17   somebody does something they don't realize they needed a coastal permit

18   or it's an emergency and they had to do it, otherwise their house is

19   going to fall in the ocean, they work with you pretty proactively to

20   get to the point of permit compliance. So I'm fine with that. My other

21   question is so fundamental, I can't believe I'm still asking it here.

22   If Sable wanted to start producing oil and use that pipeline after the

23   repairs are done and all the inspections are done by all of the other

24   state and federal agencies, does it need anything else from the county?

25   Is there any other action by the County of Santa Barbara that does not

138

1    come back to the Planning Commission in order to flip the switch,

2    correct?

3        ERRIN BRIGGS: Mr. Chair and Commissioner Bridley, that's correct.

4    I would look at this in two different ways. You may be asking if

5    there's some kind of permit touch or any other additional approvals

6    required. The answer is no. And then the other way you could look at

7    this would be is there any need for the county to approve an

8    operational plan or a safety-related plan or anything like that? And

9    the answer to that is also no, because we're preempted from doing that.

10       COMMISSIONER BRIDLEY: Interesting. Okay. I had a feeling that was

11   it, because that's why we're getting all the concern about all these

12   things, you know, precedent to starting production. So all right, thank

13   you for stating that clearly on the record. That was all I had.

14       COMMISSIONER MARTINEZ: I'm going to be honest here, which I'm

15   trying to be all the time, but… Well, all this concern about spills,

16   then, is a real concern, because if the insurance is not enough to

17   cover a spill, this is the time to address it? It's not going to come

18   back to us. I was thinking it was coming back to us.

19       ERRIN BRIGGS: So Chair Martinez, the item before us today is 25-

20   B.

21       COMMISSIONER MARTINEZ: I understand that.

22       ERRIN BRIGGS: And a change of the name on the permit.

23       COMMISSIONER MARTINEZ: I understand that. I also understand that

24   after operations begins, then the issue becomes if something happens

25   after that, somebody opens the faucet and it goes into the ocean by

139

COSB AR006925

1   accident, that's when it comes down to your insurances. Yours meaning,

2   I'm sorry for just pointing over to you, I mean, to your company's

3   insurances. That's what my question is leading to.

4       JESSICA STEBBINS BINA:  And Mr. Chair, I think the answer here is

5   this is a matter of state law and regulation. I'll direct you back to

6   the COFRs, the certificates of financial responsibility. Those in turn

7   cite government code section 8670.37.53, which says, "To receive a

8   certificate of," and I'm quoting the code here:

9       [07:00:00]

10      "To receive a certificate of financial responsibility for a

11  facility the applicant shall demonstrate to the satisfaction of the

12  administrator, the financial ability to pay for any damages that might

13  arise during a reasonable worst-case oil spill into waters of the state

14  that results from the operations of the facility." And then there's a

15  number of criteria that the state organization considers and they're

16  implementing regulations. The county has not set, and I would submit it

17  cannot set a different amount than the figure that is set by state

18  authorities. This is regulated by the California Department of Fish and

19  Wildlife, by the Office of the State Fire Marshal. These are state

20  agencies that will green light or not green light the safe restart of

21  production.

22      COMMISSIONER MARTINEZ: But this is our time to look at your

23  financial ability to be financially responsible, correct?

24      JESSICA STEBBINS BINA:  Yes, but it has to be consistent with the

25  areas that are within the county's jurisdiction and scope, and it has

140

COSB AR006926

1    to be consistent with the final development plans that are approved and

2    in place. And you've heard staff say there are no additional bond

3    requirements. There are no additional insurance requirements. And you

4    also heard staff say the actual out-of-pocket costs for the 2015 spill,

5    while horrible, were under $100 million dollars. The 750 million figure

6    included a lot of follow-on penalties, litigation, etcetera. We've

7    presented evidence of over $400 million in insurance, and we have the

8    state's certificates of financial responsibility. I would submit that

9    that should end the county's inquiry.

10    COMMISSIONER MARTINEZ: Okay. Do you guys want to go straight into

11    deliberations right now, or do you want to just take a little break and

12    then go into deliberation? Let's take a break. Let's take a 15-minute

13    break. Thank you.

14    [Break]

15    [07:22:58]

16    COMMISSIONER MARTINEZ: Okay, everyone, we're back. If you could

17    all take your seats, and this is our final session of our afternoon

18    session, let's put it that way. So we're at the point of deliberations,

19    and I'm hoping that maybe if staff has anything to add at this moment.

20    ERRIN BRIGGS: So Mr. Chair, we're going to try and land the plane

21    here, and we seem to be struggling a little bit with the confines of

22    this financial responsibility conversation, and we're hearing talk of

23    do they have enough money to pay for a spill, what's a spill going to

24    cost, this could be billions of dollars, they can't afford it. So I

25    want to kind of reframe the conversation and bring us back to what's

141

COSB AR006927

1   required for the item that's before us today, which is a change of

2   owner operator guarantor under the county's 25B ordinance. So if we

3   look at the findings that are required under 25B, there's nothing that

4   says that they have to have enough insurance for an oil spill or a

5   worst-case scenario. The findings under 25B essentially point back to

6   the individual permits, and it points back to the financial

7   responsibility conditions that are included in those permits. And for

8   these assets, we have three separate permits. We have one for the

9   pipeline, one for the POPCO gas plant, and one for the SYU facility

10  that processes the oil from the offshore platforms. So if we start with

11  the pipeline and we look at the original final development plan for the

12  pipeline, there's really no financial responsibility conditions there.

13      COMMISSIONER MARTINEZ: Let me ask you this one. When you say

14  really, my question is, there's none?

15      ERRIN BRIGGS: There's none. There's nothing in that permit that

16  says they have to have a certain level of insurance. There's nothing in

17  there that says they have to cover the cost of an oil spill. So if we

18  look at the pipeline permit, we really don't have anything. So that's

19  one.

20      [07:25:03]

21      Number two, the POPCO gas plant, the condition that relates to

22  financial responsibility speaks to abandonment, and it requires the

23  operator to put up a bond for abandonment at the time of the facility

24  ceasing operations. So we're not there yet, so there's no bond

25  requirement. So for permit number two, we really have no financial

142

COSB AR006928

1    responsibility requirements at this time. They happen much later. The

2    third permit is for the San Ynez unit, which processes the offshore

3    oil. And in this case, back at the time that the permit was approved,

4    the commission or the board understood that that facility was going to

5    be processing oil from offshore, and that there was this

6    interconnection of the pipeline between the onshore facility and the

7    platforms, and that there was the potential for an offshore spill. So

8    in that permit, there's a condition that requires the operator to

9    demonstrate the ability to respond to an oil spill in the form of

10   obtaining their OSPR Certificate of Financial Responsibility. And

11   that's one of the items that we've been discussing here today. They

12   have that certificate. It covers them up to, I think, $100 million

13   dollars. And so the financial responsibility requirements of that

14   permit have been met. And therefore, when we back up again to 25B and

15   we're looking at the findings that need to be made, the findings

16   related to financial responsibility really are focused on them

17   obtaining their OSPR COFR certificates. And they've done that.

18           COMMISSIONER MARTINEZ: And that language, the financial

19   responsibility for that OSPR, is what, up to a million dollars or –

20           ERRIN BRIGGS: A hundred million.

21           COMMISSIONER MARTINEZ: A hundred million. But the language is "up

22   to," or "at least," or –

23           ERRIN BRIGGS: I don't have the exact language, Jax?

24           JACQUELYNN YBARRA: Yeah, Chair Martinez, there's actually no

25   language in the permit itself that has that threshold for the COFR

143

COSB AR006929

1    certificates. It just requires that the certificates be submitted to

2    the county.

3        COMMISSIONER MARTINEZ: And who gives those certificates?

4        JACQUELYNN YBARRA: The state. It's the Office of Spill Prevention

5    and Response.

6        COMMISSIONER MARTINEZ: Okay. So they're the ones making the

7    determination whether they're "financially" –

8        ERRIN BRIGGS: Capable.

9        COMMISSIONER MARTINEZ: Capable.

10       ERRIN BRIGGS:  Correct.

11       COMMISSIONER MARTINEZ: Okay. So any questions? Shall we enter

12   deliberations? Let's go into deliberations. Who wants to go first?

13   Don't all raise your hands at one time. [Laughs]

14       COMMISSIONER BRIDLEY: I'll go.

15       COMMISSIONER MARTINEZ: Well, I don't mind going first. I'll go

16   first. I'll go. No problem. Okay. From what you just said, I mean,

17   these were exact questions which I had and which I have concerns,

18   because at the very end of our last session, I was really getting

19   confused as to -- well, not confused -- concerned. The last thing I

20   want to happen is what happened just a few years ago, and nobody wants

21   to see that. I lived here for 30 years, and I plan on living here for

22   the rest of my life, and I don't ever want to see that again. I

23   appreciate the fact that in regards to the many contractors and

24   independent contractors and those who are working with Sable right now

25   are confirming that the safety efforts are being carried out and that

144

1    the safety and the operations are being carried out in a manner which

2    it is -- I'm trying to find the right word -- well, in a professional

3    manner. I mean, there is this industry standard, and you meet that

4    industry standard, and sometimes people exceed it, and it sounds like

5    they're exceeding it. I also appreciate the fact, and I know there were

6    some comments about this before, but I also want to go on the record

7    and say I appreciate every single person who takes the time and effort

8    and energy to come up here and speak. I don't care if you're a college

9    student. I don't care if you're a worker. I don't care. That is why

10   we're here, because that is our democratic way of allowing people to

11   speak their way and not be fearful of ever speaking their way. And

12   those same kind of people, they may be young and stuff, and I hear

13   that. We're all there, at least I was. Those…you learn. And I can

14   appreciate every single word that's being said out there, because I do

15   want to hear them. I do read them. And giving your time for an effort

16   or that you're passionate about or a belief in or an interest in or a

17   concern about because it affects your working ability is critical,

18   taking your time to be here. That shows a lot.

19        [07:30:00]

20        The way that it's been curtailed down in regards to the financial

21   responsibility, to me I'm understanding that we don't have anything to

22   say about it is what I'm hearing right now. It's just basically, does

23   that certificate come through? Which leaves me kind of humbled to say,

24   well, why did they even bring it in front of us? Is it just because of

25   a couple of these elements and stuff? So I'm one that's thinking that

145

COSB AR006931

1    if we're limited to that, then obviously, and things are met and the

2    boxes are checked off, it's an administrative function. But I'm going

3    to say it right now. I am not the one making the decision of if they're

4    financially responsible or not. I'm not the one that has the ability to

5    confirm or make them do that. Oil companies sometimes say, "I'll put it

6    in a sinking fund. Every time I get a barrel, I'm going to put some

7    money aside, and it's always going to be there to grab one." That

8    hasn't been said or offered or whatever, but it's not my ability to

9    make them offer that. But that's why I ask the hands, for all those out

10   there, you may work in the industry, and you live here, and I hope you

11   have the same concerns, because I work with just as many of these

12   contractors, too, representing different people, environmental and non-

13   environmental people, and I'd like to think we share in that one

14   concern about that we have a professional operation and a safe

15   operation. That's what I have to say. Commissioner Reed?

16        COMMISSIONER REED: Okay. It's always an interesting day when an

17   oil issue is before us. We have people from industry looking to

18   maintain or create their jobs and their ability to support their

19   families. We have people from the environmental community who profess

20   they're here to save the planet, etc. I think everyone…I would like to

21   believe everyone is very sincere, but in the end we're tasked with

22   making a decision. Not everybody is going to be thrilled with it. And

23   often a lot of peripheral issues are raised to try to expand the area

24   of concern and of decision-making to consider such things as saving the

25   planet, this or that, greenhouse gas, even the strategic value of

COSB AR006932

1    responsible production of domestic oil. Nonetheless, in a case like

2    this, which is narrowly defined, some might liken it to a clerical

3    function in transfer of permits from one owner to another, and for

4    which the methodology of making the decision is very well defined by

5    County Code Section 25B. Of necessity, I believe we are required to

6    rule on what is before us. I thought that's what I agreed to do when I

7    took my pledge to become a commissioner, to rule on, make a

8    transparent, fact-based decision on what lies before us, not on any

9    sort of hyperbole that could be injected into the process in an attempt

10   to justify some other sort of a decision. So toward that end, I look at

11   the requirements of Code Section 25B, I look at each section, which is

12   upon making the findings listed in Section 25B.10.1, "The Planning

13   Commission shall" -- it's shall, not may -- bringing me back to my

14   permit to carry arguments, but not germane to this one. "The Planning

15   Commissioner shall approve the change of operator." And the findings

16   are the fact that the applicant will agree to the findings and

17   conditions of the original permit. So for each of these, for the change

18   of owner, guarantor, and operator of the Santa Ynez unit, has the

19   applicant and staff, have they provided the materials sufficient for me

20   to make the findings? I say yes.

21        [07:35:04]

22        And I would indicate that for me, that means I shall approve it.

23   That's the Santa Ynez unit. For POPCO, for me, similar case, I agree

24   that I've seen materials, and as confirmed by staff, to substantiate

25   making the findings, and I would think me, as the Planning

147

COSB AR006933

1    Commissioner, I shall approve. Similarly for the Las Flores Pipeline, I

2    had concerns about that, they've been satisfied, based on the public

3    comment, and so far, other information I have heard.  I've seen nothing

4    that rises to a level sufficient to prevent me from making those

5    findings. So I'll just say, right now, I'm in a position where I would

6    certainly approve all three.

7         COMMISSIONER MARTINEZ: Okay, Commissioner Parke?

8         COMMISSIONER PARKE: Well there's a saying that reasonable people

9    may reasonably disagree, and I know that Commissioner Reed is very

10   reasonable, you'll have to judge whether I am. This is a case involving

11   hundreds of millions of dollars, if not well over a billion, and it's

12   very important to people that have been working and will work on the

13   project. It's very important to people that live in the area and come

14   through the area. This is an important case. And we're asked to make a

15   decision based on documents we got, was it last Thursday? Maybe it was

16   late Wednesday. And, you know, to make a responsible decision, I have

17   to look at what I have in front of me, and I don't have certain things

18   that are very, very important. I don't even have all of 25B, but I can

19   go look that up. But I need the time to look it up, and look at the

20   cases and interpret that in statutes and so forth. I would like to see

21   the insurance policies that are referred to in that certificate of

22   insurance, because I can guarantee you that no one on this side of the

23   room has ever looked at those, or even has any idea what they say, and

24   yet we have a staff report that basically says the financial

25   responsibility here comes from insurance policies. So I have a lot of

148

COSB AR006934

1    questions, and I'm somewhat annoyed that I'm asked to make a decision

2    on this in just a matter of days. It feels more like a guess than the

3    kind of analysis I did for 50 years doing this kind of thing. I can

4    tell you one thing, that yes, I agree with Commissioner Reed and staff

5    and any others, that we have a narrower range of decision-making here

6    than the public has discussed in their public comment. It's really not

7    up to the Planning Commission right now to vote on whether we think oil

8    should be shut down or not shut down. It's not up to us to vote on

9    whether there should be no oil in Santa Barbara to protect wildlife and

10   the beaches. These are all important things, but it's not our

11   jurisdiction to look at it today. It's not our jurisdiction to look at

12   is this good for the workers that have stayed in here and tried to get

13   jobs holding on since 2015? It's an important thing, I believe it is,

14   but it's not for us today. For us today, we have to make certain

15   findings under 25B and relevant documents. I brought up a relevant

16   document on the corrosion and whether we have -- EDC called it

17   effective corrosion protection, I would call it actual corrosion

18   protection. I feel, based on what I've seen today, if I have to vote

19   today, I can't make those findings. I might change my mind in a few

20   months. In a few months we'll have had the work done, the pipeline will

21   be repaired, we'll have a better idea of what's going on. Right now

22   we're looking at a case where Exxon has transferred its liability to a

23   company that is not Exxon. I'm not going to attack Sable. I like the

24   Sable people, I enjoyed my time with Jim Flores, and I think that

25

149

COSB AR006935

1   you'll do a good job running it, so I'm not going to vote in that

2   regard,

3       [07:40:09]

4       But with regard to whether there's the financial responsibility

5   there, I think this goes more than just that we don't really have any

6   authority because there's nothing in the original permits. Because I

7   would agree with Mr. Martinez, why are we even here if that's the case,

8   and why wasn't that stated in the staff report in the first place. But

9   based on what we have in front of us, I can't make a very good decision

10  right now. I'd like to wait, gather more information, see the

11  documents, read the documents, read the law, then I'd make a better

12  decision. But if I have to make a decision today, and that depends on

13  the rest of the commission, then I will vote to deny because I cannot

14  make the findings, particularly compliance with existing requirements

15  and also the financial responsibility one.

16      COMMISSIONER MARTINEZ: Commissioner Bridley?

17      COMMISSIONER BRIDLEY: Thank you, Mr. Chair. There's a lot of

18  things going through my head, but I'm trying to stay very organized and

19  I really, first of all, really thank staff for doing such a good job on

20  the staff report and guiding us and trying to bring the plane in. You

21  know, I've been a planner all my life and so I stand behind the effort

22  and the cost of an entitlement. And Sable, this site and this pipeline

23  has an entitlement that's valid. There was an accident there and that

24  has rolled forward. However, that entitlement is valid. So I don't

25  think lightly about doing something and making a judgment to risk that

150

COSB AR006936

1    entitlement. Staff has reiterated that the findings for 25.9, their

2    interpretation of that is very narrow. Clearly, the interpretation, and

3    the public, about financial strength and risk assessment is -- I can't

4    see it being more different. We have 180-degree opposite view of what

5    some of the members of the public and the environmental community feel

6    is that that finding should be versus what staff is telling us is being

7    very narrow. So I'm really divided because I want to go down the path

8    from what the environmental community is saying and they're concerned

9    about this operator in the future. However, what I've heard from Sable,

10   and what I've heard from people speaking and the number of contractors

11   that have been here in front of us today, I actually am confident that

12   Sable would be a good operator. And I am confident enough with the

13   financial information we have, understanding that our discretion is

14   quite limited when it comes to financial strength for this, and that

15   instead goes to the OSPR COFR, OSPR. So I'd be inclined to support the

16   transfer. And if the Commission chooses to follow Commissioner Parke's

17   lead and continue it, I would support that too. But right now I'm

18   inclined to support the case and I would be okay making the findings

19   laid out by staff.

20        COMMISSIONER MARTINEZ: With that being our deliberations, then

21   I'm looking for a motion from one of the Commissioners. Commissioner

22   Reed?

23        COMMISSIONER REED: I would like to make a motion to go along with

24   staff's recommendations to…sorry, got to make sure I get this right?

25

COSB AR006937

1          COMMISSIONER MARTINEZ: Commissioner Reed, we have it on the

2     screen if you'd like.

3          COMMISSIONER REED: Oh, that's easier. Okay. That stuff up on the

4     screen. I would like to make a recommendation that we make the required

5     findings, determine the requests are not a project pursuant to CEQA,

6     and approve the request to adopt conditions of approval for Change of

7     Owner, Operator and Guarantor for the Santa Ynez Unit, Change of

8     Operator and Guarantor for the POPCO Gas Plant, and for Change of

9     Operator and Guarantor for the Los Flores Pipeline System.

10         COMMISSIONER MARTINEZ: Do I hear a second?

11         COMMISSIONER BRIDLEY: I'll second.

12         COMMISSIONER MARTINEZ:  Okay, that being seconded, shall we take

13    a vote? Do a roll call.

14         DAVID VILLALOBOS: Commissioner Bridley.

15         COMMISSIONER BRIDLEY: Aye.

16         DAVID VILLALOBOS: Commissioner Parke.

17         COMMISSIONER PARKE: No.

18         DAVID VILLALOBOS:  Commissioner Reed.

19         COMMISSIONER REED: Aye.

20         DAVID VILLALOBOS:  Chair Martinez?

21         COMMISSIONER MARTINEZ: Aye.

22         DAVID VILLALOBOS:  Motion passed, it's three to one. [Applause]

23    Mr. Chair, are we adjourned? I'm sorry. Are we adjourned?

24         COMMISSIONER MARTINEZ: Adjourned.

25         [07:45:19]

152

COSB AR006938

1          I, Anders Nelson, do hereby certify:

2          That I supervised the transcription and proofreading of the

3     foregoing in a remote location at the time and place herein set forth;

4     that the proceedings were transcribed through computerized

5     transcription; that the foregoing is a true record of the proceedings

6     taken to the best of my ability to hear and understand the speakers;

7     and that I am not interested in the event of the action.

8          Witness my hand dated May 2, 2025.

9

10          *Anders Nelson*
           Anders Nelson (May 2, 2025 12:44 EDT)
11          _____

12          Anders Nelson

13          Project Manager

14          TransPerfect Legal Solutions

15

16

17          May 2, 2025

18

19

20

21

22

23

24

25

COSB AR006939

1          [00:05:00]

2          [00:10:00]

3          [00:15:00]

4          [00:20:00]

5          [00:25:00]

6          CHAIR CAPS:  Oh, good job, everybody.  Nice to see everyone here.

7     My name is Laura Caps, and it's my pleasure to call to order the

8     February 25th 2025 meeting of the Santa Barbara County Board of

9     Supervisors hearing.  Madam Clerk, please call the role.

10         CLERK:  Supervisor Lee.

11     MR. LEE:  Here.

12         CLERK:  Supervisor Hartman.

13     MS. HARTMAN:  Here.

14         CLERK:  Supervisor Nelson?

15         CLERK:  And Supervisor Nelson's participating remotely from DC.

16     MR. NELSON:  Here.

17         CHAIR CAPS:  Oh, there you are.  Great, thank you, and Supervisor

18     [PH 00:29:24] Lavanino.

19         MR. LAVAGNINO:  Here.

20         CLERK:  And Chair Caps?

21         CHAIR CAPS:  Here.

22         CLERK:  At this time, please, join me in Pledge of Allegiance.

23     Ready to begin.

24

25

1

1          ALL:  I pledge allegiance to the Flag of the United States of

2     America and to Republic for which it stands, One Nation, under God,

3     Indivisible, with Liberty and Justice for All.

4          CHAIR CAPS:  Okay, the next item in business is the approval of

5     the minutes from our last hearing, which was February 11th

6          [00:30:00]

7          2025.

8          MS. HARTMAN:  Move approval.

9          CHAIR CAPS:  Thanks, Supervisor Hartman.

10         MR. LEE:  Second.

11         CHAIR CAPS:  Thank you, Supervisor Lee.  Madam Clerk, roll call

12    vote please.  When you're ready.

13         CLERK:  Supervisor Lee?

14         MR. LEE:  Aye.

15         CLERK:  Supervisor Hartman.

16         MS. HARTMAN:  Aye.

17         CLERK:  Supervisor Nelson?

18         MS. HARTMAN:  Aye.

19         CLERK:  Supervisor Lavanino?

20         MR. LAVAGNINO:  Aye.

21         CLERK:  And Chair Caps?

22         CHAIR CAPS:  Aye.

23         CLERK:  Motion passes unanimously.

24         CHAIR CAPS:  Okay.  Next item is our CEO's report.  CEO [PH

25    00:30:27] Miasato?

2

1      CEO MIYASATO:  Good morning, Chair Caps and board members.  We

2   have two quick announcements this morning.  One is the county's office

3   of emergency management has launched a new AM radio network to bring

4   disaster preparedness and emergency information to our residents.  The

5   stations are spread across the central and northern parts of Santa

6   Barbara County and the communities of the San [PH 00:30:45] Nunez

7   Valley through Lompoc and up through Santa Maria.  All stations will

8   broadcast critical preparedness and disaster response messaging 24/7 on

9   AM 5:30 in English and Spanish.  More stations will be launched in the

10  coming months in the Cuyama Valley and the southern part of the county.

11  Now's the time to save AM 5:30 to your radio favorites list, so you can

12  get an update on emergency information straight from your public safety

13  officials.  The second item is some exciting news regarding Goleta

14  Beach.  The Elwood restaurant at Goleta Beach officially opened just

15  before Valentine's Day after undergoing a complete renovation.  In

16  addition to the restaurant, the county has invested $2 million in

17  public improvements.  These include repairs to parking lots damaged

18  during the 2023 and 2024 storms, irrigation and lawn replacement

19  upgrades to a popular group area, barbecues, and installation of a new

20  pedestrian walkway, funded by a $500,000 National Fish and Wildlife

21  Foundation grant.  So, please, everyone, please, go to Goleta Beach and

22  enjoy the restaurant.  That concludes my announcements today.

23      CHAIR CAPS:  Thank you, CEO Miasato.  Madam Clerk, do you have

24  any announcements for us with the agenda?

25

3

1          CLERK:  Chair Caps and members of the board, I do have a couple

2     quick announcements this morning.  As previously noted, I would like to

3     note for the record that Supervisor Nelson is participating remotely,

4     as noted on our agenda, from Washington DC, and all votes will be taken

5     via roll call vote today, and lastly, for participation for the Board

6     of Supervisors, methods of public participation and to provide public

7     comment on general public comment or an item on the board's agenda,

8     please see page two of the agenda.  Individuals that would like to

9     provide verbal public comment may do so via Zoom by registering in

10    advance via the link available on page two.  If you have any questions,

11    please contact the clerk of the board's office at area code 805-568-

12    2240.  Again, that's 805-568-2240, and additionally, for those members

13    of the public who are participating in person today, just a friendly

14    reminder to get your speaker slips in.  They are available in the back

15    of the room, and those folks that are standing in front of that table,

16    if you can please find an alternate location to stand, so that table is

17    visible to the public, that would be greatly appreciated.  Again, any

18    members of the public, whether you're in one of our overflow rooms, if

19    you haven't yet filled out a speaker slip, please come up to the

20    hearing room and do so now, and I see a number of you have already done

21    so.  So, I appreciate that, and that concludes my announcements this

22    morning.

23          CHAIR CAPS:  Thank you, Madam Clerk, and I'm just going to echo

24    what our clerk just communicated.  Democracy is born in conversation.

25    This is an incredible display of democracy in action.  There are

4

COSB AR006943

1     several hundred people here today, overflow everywhere, but in order to

2     have that conversation, we need to be able to hear each other, and we

3     need to be able to be respectful.  That is what I'm going to require as

4     Chair.  That means, as much as we're excited, there will be no

5     clapping.  There'll be no jeering.  If you're really excited, you can

6     do this, which doesn't impact our conversation.  Certainly, during the

7     resolution portion of this hearing, you're allowed to clap for those

8     who are being celebrated, but not during the board's business later on.

9     Again, let's please be respectful and show that we can pull off a very

10    respectful civil display of democracy.  Thank you.  Okay.  So, now, we

11    move on to our administrative agenda.  Would any board members like to

12    pull any items from the administrative agenda?  I would like to pull

13    item A8.  Okay, Madam Clerk, I will now entertain…

14         CLERK:  Chair Caps and members of the board, my apologies.  We do

15    have one request to speak from the public on A5.  Okay.

16         CHAIR CAPS:  So, that means we have pulled… the public has pulled

17    A5.  I have pulled A8.  Let me just double check that it was A8, yes,

18    and now, I'll entertain a motion to approve the balance of the

19    administrative agenda, except for A5 and A8.

20         MS. HARTMAN:  So moved.

21         MR. LEE:  Second.

22         CHAIR CAPS:  A motion by Supervisor Hartman, second by Supervisor

23    Lee.

24         [00:35:00]

25         When you're ready, roll call vote, please.

5

COSB AR006944

1    CLERK:  Supervisor Lee?

2    MR. LEE:  Aye.

3    CLERK:  Supervisor Hartman?

4    MS. HARTMAN:  Aye.

5    CLERK:  Supervisor Nelson?

6    MR. NELSON:  Aye.

7    CLERK:  Supervisor Lavanino?

8    MR. LEE:  Aye.

9    CLERK:  And Chair Caps?

10    CHAIR CAPS:  Aye.

11    CLERK:  Motion passes unanimously.

12    CHAIR CAPS:  Okay.  Now, let's move to the resolutions

13 [INDISCERNIBLE 00:35:26] presented.

14    CLERK:  Chair caps and members of the board, administrative item

15 number one is sponsored by Supervisor Lee.  It is to adopt a resolution

16 of accommodation honoring Sheila Lodge for her outstanding

17 contributions to the Santa Barbara community, and joining us in person

18 today, we have Sheila Lodge, and if Sheila can please make her way to

19 the podium, I'll go ahead and read the resolution.  Whereas Sheila

20 Lodge has dedicated over 24 years of public service as a city of Santa

21 Barbara's planning commissioner and councilmember, an impressive 12

22 years as the city's first woman and longest serving mayor, leaving an

23 indelible mark on the city's history, and whereas Sheila has balanced

24 an extraordinary public career with a rich personal life, serving as a

25 wife, mother of four daughters, author, architect in training, painter,

COSB AR006945

1    photographer, amateur geologist, courthouse, docent, and gardener,

2    while always advocating for preserving the unique charm of Santa

3    Barbara since her arrival in 1952, and whereas during her tenure,

4    Sheila played a pivotal role in key developments, including the

5    completion of Highway 101's, freeway expansion, the construction of the

6    desalination plant, the development of Santa Nuevo and the city's

7    general plan update, which shaped Santa Barbara's growth while

8    safeguarding its historic character, and whereas Sheila has been a

9    passionate protector of Santa Barbara's heritage, authoring 'Santa

10   Barbara, an Uncommon Place, American Town', advocating for thoughtful

11   planning, and urging residents to stay involved to ensure the city

12   retains its distinctive charm and community centered identity, and

13   whereas Sheila Lodge's dedication, involvement, including welcoming

14   Queen Elizabeth II at the Santa Barbara County Courthouse in 1983, to

15   being a hands-on advocate for sustainable water use during droughts,

16   becoming a docent at the Santa Barbara Botanic Garden, and exploring

17   the San Andreas fault through her love of geology, reflecting her

18   lifelong passion for learning and service.  Now, therefore, be it

19   hereby ordered and resolved that this board of supervisors of Santa

20   Barbara County does hereby recognize and honor Sheila Lodge for her

21   unparalleled service, leadership, and enduring contributions to

22   preserving the beauty, integrity, and community spirit of Santa

23   Barbara, passed and adopted today.

24       CHAIR CAPS:  We can all clap for Sheila Lodge

25

7

COSB AR006946

1          SHEILA LODGE:  Supervisor Lee told me that he was going to do

2     this.  So, I was really touched, and I'm really touched to be here and

3     have people recognize what I've done.  I've served the city of Santa

4     Barbara for 36 years, and it's just… I have a passion for this place,

5     for Santa Barbara, the city, the county, and it hasn't always been fun.

6     There was the time when I was blamed for the drought.  You know, if

7     there isn't any rain, it's mother nature's fault.  If there isn't any

8     water, it's the mayor's fault.  So, anyway, it's been several decades

9     since I stood at this podium.  When I was mayor, in n1981 to 1993, I

10    came here several times to express the city council's view on issues

11    that the county was dealing with, and it affected the city sometimes,

12    and sometimes, they were on oil issues.  Most often, they involved

13    Exxon.  I'm not mayor anymore, but I urge you to continue to protect

14    this special place and grant the appeals.  Please, do not enable a

15    [INDISCERNIBLE 00:39:29].  May you all continue to work to keep Santa

16    Barbara County the special place that it is.  Thank you.

17         CLERK:  You want to say anything?

18         MR. LEE:  Yeah, okay.

19         CLERK:  Supervisor Lee?

20         MR. LEE:  Sheila, I just want to say that a lot of showed up here

21    today for

22         [00:40:00]

23         your resolution.  So, thank you, everybody, for being here.  I

24    just want to say thank you for even done, and I have nothing but trust,

25    respect, and love for you.  So, thank you.

8

1      CLERK:  Supervisor Hartman?

2      MS. HARTMAN:  Well, I just wanted to add a personal note of

3      gratitude.  Sheila's always been somebody I can go to for advice, and

4      she's never shy about calling me out, and especially on issues of

5      housing and affordable housing.  She saw this coming long before many

6      other political leaders.  So, thank you for your long history of

7      service.  It's really exemplary.

8      CLERK:  And I'll just add to that.  I grew up with, literally

9      with Sheila Lodge as my embodiment of a female leader who served with

10     integrity, and the fact that you still are so incredibly engaged and

11     call me out in a very respectful way, g me advice.  I continue to learn

12     from you.  I know so many others have, and thank you for the longevity

13     of your service and really the integrity by which you serve, thank you.

14     CHAIR CAPS:  Okay.  Let's go now to the administrative items

15     pulled by the board and the public.

16     CLERK:  Chair Caps and members of the board, administrative item

17     number five is from the Behavioral wellness department.  It is to

18     consider recommendations regarding Transitions Mental Health

19     Association, TMHA, first amendment to the fiscal year's 2024 through

20     2026 services agreement for mental health and other supportive

21     services, and we have one request to speak from the public on this

22     item, and we are going to Santa Maria with Jill Bolster white.  Jill?

23     JILL BOLSTER WHITE:  Thank you, everyone.  Jill Bolster White

24     from Transitions Mental Health Association.  I really just wanted to

25     take this opportunity to thank you for 33 years of partnership.  We are

9

COSB AR006948

1    a longstanding CBO.  I noticed that it says we're not a local vendor,

2    but we are.  We have a great office here in Santa Maria and one in San

3    Luis Obispo.  I also wanted to underscore how much the CBO community is

4    working with the Behavioral Health Department to accommodate the

5    changes in Cal Aim to be ready for Proposition One, and just that we

6    continue to appreciate your partnership very much, and for those of you

7    who live in North Santa Barbara County, please, prepare for the spring

8    garden season and come to Growing Grounds Farm and buy your veggie

9    starts.  Thanks very much.

10        CLERK:  And that concludes public comment on administrative item

11    number five.

12        CHAIR CAPS:  Okay.  So, we need a motion for that, for item…

13    administrative item number five.

14        MS. HARTMAN:  Move staff recommendation.

15        MR. LEE:  Second.

16        CHAIR CAPS:  We have a motion by Supervisor Hartman a second by

17    Supervisor Lee.  Roll call vote, please.

18        CLERK:  Supervisor Lee?

19        MR. LEE:  Aye.

20        CLERK:  Supervisor Hartman?

21        MS. HARTMAN:  Aye.

22        CLERK:  Supervisor Nelson?

23        MR. NELSON:  Aye.

24        CLERK:  Supervisor Lavanino?

25        MR. LAVAGNINO:  Aye.

10

COSB AR006949

1          CLERK:  And Chair Caps?

2          CHAIR CAPS:  Aye.

3          CLERK:  Motion passes unanimously.

4          CHAIR CAPS:  Okay, our second polled item is one that I've

5     pulled.  Item A8, please.

6          CLERK:  Chair Caps and members of the board, administrative item

7     number A8 is from the community services department.  It is to consider

8     recommendations regarding an agreement to provide affordable housing

9     and rental restrictive covenant for St. George residential building

10    22DVP10, 22CUP18, and 22CDP91, and this is in the second district.

11         CHAIR CAPS:  Thank you.  I just wanted to pull this for highlight

12    in the spirit of Sheila Lodge.  This is an affordable housing project

13    in Isla Vista, which is at the epicenter of our housing crisis with so

14    many low-income folks living there and needing this.  So, this would…

15    this is just a wonderful project, step in the right direction of

16    affordable housing project in Isla Vista.  So, just wanted to pull it

17    for acknowledgement, and with that I will move approval of staff

18    report… of staff suggestion for item A8

19         MS. HARTMAN:  Second.

20         CHAIR CAPS:  Thank you.  When you're ready, we'll have a roll

21    call vote.

22         CLERK:  Supervisor Lee?

23         MR. LEE:  Aye.

24         CLERK:  Supervisor Hartman?

25         MS. HARTMAN:  Aye.

11

COSB AR006950

1          CLERK:  Supervisor Nelson?

2          MR. NELSON:  Aye.

3          CLERK:  Supervisor Lavanino?

4          MR. LAVAGNINO:  Aye.

5          CLERK:  And Chair Caps?

6          CHAIR CAPS:  Aye.

7          CLERK:  Motion passes unanimously.

8          CHAIR CAPS:  Okay.  Now, we're here for public comment.  If my

9    math serves, we will be here for about four or five hours today for

10   public comment on general, but also, the two items.  So, in concert

11   with the clerk, we've made the decision that if anyone would like to

12   speak for a minute or less, they are welcome to go first, to

13   incentivize us to all be as succinct as possible.  So, I'll use that,

14   also, for public comment.  I'm not sure how many requests we have to

15   speak, but we'll start that trend now and be consistent throughout the

16   rest of the meeting, that again, you'll be able to speak longer, your

17   three minutes, but if you choose to speak just one minute, you get to

18   go first, and hopefully, that will move things along for everybody.

19         CLERK:  Chair Caps and members of the board, we have 13 requests

20         [00:45:00]

21         to speak from the public in general public comment today.  If you

22   are a member of the public and you are on Zoom and would like to speak

23   for one minute, please, use the raise hand feature.  If you're a member

24   of the public and you like to speak for one minute, please, use the

25   raise hand feature.  If you are a member of the public and you are here

12

COSB AR006951

1    in person, please, begin to line up behind the podium.  I will go to

2    Zoom first, but if you can please start to line up behind the podium,

3    if you'd like to speak for one minute, that'd be great.  One-minuters?

4         CHAIR CAPS:  And just to be clear, this… I'm sorry to cut you

5    off, this is for items that are not on the agenda, which means we're

6    not talking about an oil project.  We're not talking about anything

7    else at this point.

8         CLERK:  Yes, exactly, thank you.

9         CHAIR CAPS:  I had a feeling.  I had a feeling.

10        CLERK:  Chair Caps, this is just for general public comment on

11   items not on our agenda today.

12        CHAIR CAPS:  So, with that, I'll close public comment and invite

13   you to include the first person.

14        CLERK:  Chair Caps and members of the board, we'll begin on Zoom

15   with Camilla Leon to be followed by Diana Sandoval.  Camilla?  Camilla,

16   we have unmuted you on our end.  If you can please unmute on your end

17   to provide your comments.  Camilla Leon?

18        CAMILLA LEON:  You can move forward.

19        CLERK:  All righty, thank you.  We will now go to Diana Sandoval

20   to be followed by Catherine Orlena.  Diana?  And Diana, if you can

21   please unmute yourself to provide your comments?  Diana Sandoval, we

22   have unmuted you on our end.  If you can please unmute yourself to

23   provide your comments.  Yes, absolutely.  Diana, thank you.  We will go

24   to Diana Sandoval here in person and then we will return back to Zoom

25   with Catherine Orlena.  Diana?

13

1    DIANA SANDOVAL:  Hi, everyone, my name is Diana Sandoval, and I'm

2    here for the eighth time before the Santa Barbara County Board of

3    Supervisors.  I'm here to share with you the unethical practice of

4    planning and development, and now, the county executive office.  Let me

5    give you some background.  My ultra-wealthy neighbor was allowed by

6    planning and development to build a commercial bridge and tertiary road

7    that had been abandoned since 2006 2007, according to county records,

8    which by the way, they withheld these records from me.  This illegal

9    bridge is located in an environmentally sensitive habitat area, and

10   it's in an area known to cause flooding for the adjacent neighborhood.

11   For more information regarding the illegal bridge in environmental

12   violations, please, visit illegalbridge.com.  Again, illegalbridge.com.

13   So, in 2024, without permits or even a site inspection, my neighbor was

14   allowed to build this dangerous bridge.  Keep in mind, this same bridge

15   was already involved in a previous lawsuit after a person allegedly

16   fell in 2017 and sued my previous property owner.  Despite this

17   history, planning development approved rebuilding the bridge on failed

18   abutments, which is incredibly dangerous to the public, but here's

19   where it gets even worse.  To make the illegal bridge seem legitimate,

20   the building official issued a same-day permit knowing, that the bridge

21   was on my private property.  This is an illegal taking to my land by

22   the county.  Even though they stole my land, they can't use it, because

23   I have a lawful fence.  Despite the ongoing litigation, starting this

24   Saturday, Director Plowman and the county is attempting to pressure me

25   with a $3,000 fine, plus an additional $100 per day for maintaining a

14

COSB AR006953

1    lawful fence they've known about and approved of since 2021, if not

2    since the 2017 accident.  They plan to find me $30,000 for simply

3    preserving my constitutional and property rights until my trial on

4    November 19th, 2025.  Additionally, in the notice I received, they

5    state, you can request an extension, which I've done five times in

6    writing, but they're completely ignoring my request.  To me, this feels

7    like retaliation for taking legal action to protect my rights,

8    especially considering the history of favoritism afforded to my

9    neighbor.  For instance, Assistant Director Aaron Briggs from planning

10   development, who has a history of exempting the same neighbor from

11   zoning regulations and is even allowing the same neighbor to block a

12   public hiking trail.  Specifically stated, please, make this a priority

13   regarding pursuing a violation against me.  Furthermore, the

14   characterization of my fence as a gate appears to be a deliberate

15   misrepresentation, seemingly designed to facilitate the continual

16   unlawful seizure of my property.  I thought that being in litigation

17   would encourage the county to act with some ethics, but this hasn't

18   been the case.  I even asked from oversight from the CEO, Mona Miasato,

19   since she oversees the departments involved, but I never got a

20   response.  Right, Mona?  Wade Horton, the assistant CEO, responded by

21   saying they will respond, because as he puts it, the litigation needs

22   to play out.  Funny how the county picks

23        [00:50:00]

24

25

15

COSB AR006954

1          and chooses when we seem to be in litigation.  When I spoke to my

2     former board of supervisor, Joss Williams, he's described the county as

3     operating as a pirate cove…

4          CLERK:  Thank you, Diana, that is your time.

5          DIANA SANDOVAL:  Well, thank you so much.

6          CLERK:  And it appears that Catherine Orlena is no longer on

7     Zoom.  So, we're going to return to Santa Barbara with Jenna McGovern

8     to be followed by Everett Mathinson.  Jenna?  Is Jenna here?  If you

9     are in a remote location, please, make your way up and announce

10    yourself when you do get here.  We will go to Everett Mathinson to be

11    followed by Jacqueline Inda, and friendly reminder, this is general

12    public comment, items not on today's agenda, thank you.

13         JENNA MCGOVERN:  I'll be speaking at the department one.

14         CLERK:  Thank you, and your name is?

15         JENNA MCGOVERN:  Jenna McGovern.

16         CLERK:  Jenna, great, thank you.  Everett Mathinson?

17         EVERETT MATHINSON:  I too am speaking for Sable, thank you.

18         CLERK:  Is Jacqueline Inda available?  Jacqueline Inda to be

19    followed by Stephanie Caters to be followed by Hailey Rowan.

20    Jacqueline Inda, Stephanie Caters, Hailey Rowan, if you are in one of

21    our remote locations, please, make your way up to the hearing room.  I

22    will continue calling names.  Ruth Hyler?  Karen Hoenstein?  Karen?

23    Again, I'll repeat those names.  These are for general public comment.

24    Jacqueline Inda, Stephanie Caterers, Hailey Rowan, Ruth Hyler, and

25

16

1    Karen Hoenstein.  Chair, perhaps we can wait a few moments, in case

2    anyone is trying to make their way upstairs with the one elevator.

3         CHAIR CAPS:  Okay.

4         CLERK:  We will now take Karen Hoenstein, and if any other of

5    those members of the public that heard their name, if you could please

6    make your way up to the hearing room and line up behind the podium,

7    thank you.  Karen?

8         KAREN HOENSTEIN:  Good morning, board of supervisors.  I came

9    down here this morning from Lompoc, a constituent who is not being paid

10   to be here.  I would like to echo my pleasure with what is happening at

11   the national level.  We need rampant accountability in government

12   agencies, especially government agencies that handle grants that go to

13   nonprofits in our community.  I've been watching this very closely for

14   the last three years, and this morning, when I went to take my children

15   to school in Mission Hills, at the wonderful public school, Los

16   Sparrows Elementary School, which is a performing arts school, and is

17   recognized as such, I passed right by the property owned by [PH

18   00:53:34] Alex Shuribe, where the state wants to place state housing

19   for homeless people on private property, so that the owner can be paid

20   in perpetuity.  Now, this is being investigated.  I want everyone who

21   is an authority in administration in this county to understand that

22   your actions have consequences, if they're illegal, and if there's any

23   impropriety or corruption in any way.  We don't pick on our neighbors.

24   We don't gang up against our neighbors to target them individually.

25   We, the people, demand accountability, and I believe that with our

17

COSB AR006956

1     great Donald Trump as President, and he is the greatest President we

2     have ever seen, we're going to see that also in our county.  We are

3     part of the country.  We're not our own little

4        [00:55:00]

5        planet out in the middle of the ocean.  We are part of the United

6     States.  Thank you.

7        CLERK:  And has any of the members of the public whose names I

8     had announced earlier make their way here?  Jacqueline Inda, Stephanie

9     Caterers, Hailey Rowan, Ruth Hyler, are any of those members of the

10    public here?  I will assume they have… oh.

11       HAILEY ROWAN:  This is Hailey Rowan, and I'd like to speak on the

12    Sable topic as well.  Thank you.

13       CLERK:  Thank you.  All righty, with that, Chair Caps and members

14    of the board, I believe we can safely assume those members of the

15    public have left or will be speaking at a later time.

16       CHAIR CAPS:  Thank you to our public, and it's confusing to know

17    exactly when is the right time to speak.  So, we got through that.  So,

18    anyway, now, that moves us to item number one, Sable Offshore

19    Corporation Appeals.  Madam Clerk, will you please read departmental

20    item into the record and…  Supervisor Hartman?

21

22       MS. HARTMAN:  Yeah, before she does that, I must recuse the

23    pipeline runs through the northeast corner of my property.  So, I am

24    affected differently than the general members of the public and can't

25    influence my fellow board members.

18

COSB AR006957

1    CHAIR CAPS:  Yeah.  I understand, thanks.

2    CLERK:  I'm waiting on something.  Chair Caps and members of the

3    board, departmental item number one is from the Planning and

4    Development Department.  It is a hearing to consider recommendations

5    regarding the appeals of the planning commission approval of the Sable

6    Offshore Corporation's change of owner operator and guarantor for the

7    Santa Ynez Unit, Pacific Offshore Pipeline Company Gas Plant and Los

8    Flores Pipeline System, final development plan permits, and this is in

9    the third, fourth, and fifth districts, and I am waiting for a document

10   from my staff on late items that need to be voted into the record.  We

11   had quite a few emails come in late last night.  So, they are

12   finalizing that.  So, perhaps we can begin staff's presentation, and

13   then vote items into the record.

14   CHAIR CAPS:  Or ex parte?

15   CLERK:  Or ex parte.  Great, thank you.

16   CHAIR CAPS:  Yeah, let's… would you like?  Okay, at this moment,

17   because this is a quasi-judicial hearing, that means myself and my

18   colleagues need to disclose ex parte conversations that we've had

19   leading up until this department item.  Supervisor Lee, would you like

20   to go first?

21   MR. LEE:  Thank you, Chair Caps, I'll go first.  On January 28th,

22   2025, I met with the EDC to discuss Sable.  On February 6th, 2025, I

23   also met with EDC to discuss Sable as well.  On February 12th, I met

24   with Sable representatives to talk about the oil pipeline.  On February

25   20th, I met with Sierra Club to talk about Sable, and on February 20th,

19

COSB AR006958

1   2025, I met their environmental coalition, and I listened to their

2   Zoom, and on February 2024, 2025, met with UCSB students to listen and

3   discuss about Sable Oil Pipeline.

4        CHAIR CAPS:  Thank you, Supervisor Lavanino. O or do you need

5   more time?  I can…

6        MR. LAVAGNINO:  I'm good.

7        CHAIR CAPS:  Okay.

8        MR. LAVAGNINO:  My list is short.  So, on February 3rd, I met

9   with Linda Crop and the team from EDC via Teams.  I'm not sure of all

10  the people that were listed on there, but the usual suspects, and then

11  on February 12th, and I meant that in the best way possible.  Sorry, I

12  just didn't know everybody's name.  February 12th, I did meet with the

13  Sable team, and both obviously discussed both of their points about

14  today's hearings.

15       CHAIR CAPS:  Thank you, and Supervisor Nelson, if you're ready?

16       MR. NELSON:  Yes.  Thank you, Chair Caps.  On February 12th, I

17  met with Linda Prop, Katie Davis, Jeremy Frankel, and a few others that

18  EDC invited to discuss the project as well as I also met in person with

19  Steve Rush, Lee Danielson, and James Flores on February 12th in Santa

20  Barbara

21       [01:00:00]

22       to discuss the project.

23       CHAIR CAPS:  Okay, thanks, and I'll do my ex parte disclosures.

24  Yesterday, I met with representatives of Sable.  I also met yesterday

25  with members of the UCSB Santa Barbara City College Associated Students

20

COSB AR006959

1    Environmental Affairs Board, as well as CALPER.  I have had many

2    meetings over the last few months with EDC related to Sable, as we meet

3    regularly.  I've spoken with Katie Davis from the Sierra Club, who was

4    part of one of those meetings, as well as folks affiliated with the

5    Community Environmental Council, including John Steed and Sigrid

6    Wright, and Vicki Riskin related to Blue.living.  I think that should

7    cover it.  Okay.  Yeah, he… Supervisor Nelson is… So, I believe we're

8    ready for staff presentation.

9        CLERK:  And Chair Caps, members of the board, before we proceed

10    with staff's presentation, I did receive the list of documents that

11    were received after noon on Friday, February 21st, and as per board's

12    policy resolution 91-333, these items need to be voted into the record

13    prior to being accepted into the record.  I'll begin with a public

14    comment from Evie Lynn, received February 21st at 5:18, public comment

15    from John Day, February 23rd, at 12:21, public comment from Janice

16    Rootstem, February 24th at 8:55, public comment from Karen Dorfman,

17    February 24th, 9:51 Public comment from Rachel Rhodes, February 24th at

18    1152.  Public comment from Lauren French, February 24th, 12:27, public

19    comment, support letters from Fiona Hutton and Associates on behalf of

20    Sable, the applicant, February 24th, 1:16, public comment from Heal the

21    Ocean, February 24th, public comment, City of Bealeton, February 24th,

22    public comment from Linda Stewart Oaten, February 24th, public comment

23    from Laura Hasten, February 24th, public comment, Katie Dodds, Dobbs,

24    my apologies, February 24th, public comment from David Huron, February

25

21

COSB AR006960

1    24th, and lastly, a presentation replacement number one from the

2    applicant, Sable, received February 24th at 12:01.

3          CHAIR CAPS:  Okay.  So, that means we need to vote on whether or

4    not to accept materials that were provided after our deadline.  I'm

5    personally not a fan of things coming in so late that are large

6    quantities.  Anything under a page doesn't require a vote, but I

7    believe that is a roll call vote that we need to take.  Is that right,

8    county council?

9          COUNTY COUNSEL:  Madam chair, yes, that's correct, and so, since

10   one of those is… well, we'll talk about it after the vote.

11         CHAIR CAPS:  Yes.

12         MR. LAVAGNINO:  I'll make a motion to bring all those into the

13   public record.

14         CHAIR CAPS:  Thanks, Supervisor Lavanino.  I need a second.

15   Supervisor Nelson, would you like to second?

16         MR. NELSON:  You know, I'm thinking about it.  Traditionally, we

17   always do.  So, this would be an unusual circumstance for us not to.

18   I, like you, are not a fan of the process.  There's no way for us to be

19   able to fully be able to vet that information, and yet, it's on the

20   record, but we tend to do this with all projects.  So, I would hate to

21   just bias this singular one by not accepting it.  So, I guess I'm going

22   go ahead and second that motion, and I'll probably be voting for it,

23   but I think in the future, the board, we should, as board, discuss

24   whether we want to do that ongoing, because I think we've trained the

25   public to continue to do it, because I think we always do accept it.

COSB AR006961

1    So, maybe we should eventually come at board policy to really send a

2    strong signal in the future.

3        CHAIR CAPS:  Yeah, I agree, if we can just deliberate for a

4    second.  I understand people who are commenting members of the public

5    if it comes in late, but for an applicant or appellant to be changing

6    presentations and sending them past the deadline, which was Friday, is

7    not really fair for us in terms of all the information that we need to

8    absorb.  That being said, I understand that, you know, a presentation

9    can be… you can say whatever you'd like in a presentation, but we're

10   really talking about now, which what is accepted into the public record

11   in terms of documents.  So, I'll be voting no, but we can call the role

12   unless there's other discussion.

13       MR. LAVAGNINO:  Just the discussion for me is that it is …it's

14   the public's, it's not anything that we've blessed.  We're just saying

15   this is what we received from the public.  I do agree that, I mean, who

16   didn't know that this hearing was happening?  Obviously, everybody's

17   here.  So, this wasn't any big secret.  So, I'm not sure why people

18   take so long to get their last word in.  I do agree that, you know,

19   appellants and applicants should have the materials to us far in

20   advance,

21       [01:05:00]

22       but just because I'm accepting it into the record doesn't mean

23   I'm blessing it.  This is what you're presenting to us.  So, it's not…

24   if you have inaccuracies in there, it's not like you're getting by

25   anybody.

23

COSB AR006962

1          MR. LEE:  As for me, I'll be voting no, because just because

2     we've done it previously doesn't mean we have to do it now, and we have

3     to start somewhere.  So, today is that somewhere.

4          AUDIENCE MEMBER:  Can you [INDISCERNIBLE 01:05:24] the mic,

5     because it's hard to hear back here.

6          CHAIR CAPS:  Yeah, is there a volume issue?  Are we able to… we

7     just, we'll speak a little closer.  Sorry about that.  Thank you.

8     Okay.  Okay.  So, with that, I think we're ready for a roll call vote.

9          CLERK:  And Chair Caps, members of the board, that was a motion

10    by Supervisor Lavanino and a second by Supervisor Nelson?

11         MR. NELSON:  That's correct.

12         CLERK:  Supervisor Lee?

13         MR. LEE:  No.

14         CLERK:  Supervisor Nelson?

15         MR. NELSON:  Aye.

16         CLERK:  Supervisor Lavanino?

17         MR. LAVAGNINO:  Aye.

18         CLERK:  Chair Caps?

19         CHAIR CAPS:  No.

20         CLERK:  Motion fails, two to two.

21         CHAIR CAPS:  Thank you.  So, county council, since this is very

22    technical, can you please explain what we just did?

23         COUNTY COUNSEL:  Madam Chair, members of the board.  So, under

24    the board's procedures, anything that's filed with the clerk after… no,

25    on Friday, before the hearing has to be voted in on a four-fifths vote,

24

COSB AR006963

1    if it's over a page.  There's only four members participating today.

2    So, it would require all four votes, and so, as a two-two, the board

3    has taken no action on these items.

4         CHAIR CAPS:  Okay, thank you.  We will move on then to staff's

5    presentation.

6         MR. NELSON:  Actually, Chair Caps?

7         CHAIR CAPS:  Yes, Supervisor Nelson?

8         MR. NELSON:  Yeah.  So, I'm okay with where the vote went there,

9    but I do think this should be a message to all those out there in the

10   county that this is something the board may not be doing in the future.

11   Like I said, I voted for it in part because we do this by tradition

12   typically.  If we're now going to set us new standard, I'm happy in the

13   future to also vote against these moving forward from this day on, and

14   I'm making sure that, any of those out there watching, that I'm going

15   to look at these a lot more skeptically in the future as well to go

16   with being the board's majority on this in the future.

17        CHAIR CAPS:  Excellent.  Yeah, Supervisor Lavanino?

18        MR. LAVAGNINO:  I totally agree.  I will not be making any

19   exceptions from here on out for anybody.  So, it's what it is.  We all

20   agree.

21        CHAIR CAPS:  There we go.  So, split vote, but unanimously, we

22   all agree on the fact that this is… we're moving forward with a new

23   plan here.  So, okay.  With that, I'm going to… we are going to close

24   public comment.  I think we have close to 80 if not more.  At this

25   point.  122.  Okay.  So, remember what I said about those who want to

COSB AR006964

1    do a minute.  Be thinking about your comments, and if you'd like to

2    move things along, you're welcome to be editing in your mind to come

3    down and be towards the beginning.  Okay.  With that, we'll move it

4    over to staff presentation.

5        DIRECTOR PLOWMAN:  Good morning, Madam Chair, members of the

6    board.  Today, we have the appeal of the planning commission approval

7    of the Sable Offshore Corporation's change of owner operator and

8    guarantor for the Santa Ynez Unit, the Pacific Offshore Pipeline

9    Company Gas Plant, and the Los Flores Pipeline system.  We have Aaron

10   Briggs, who's the deputy director of our Energy Minerals and Compliance

11   Division here to present, as well as Jacqueline Ibarra, who has been

12   the planner on this case, and with that, I'm going to turn it over to

13   Ms. Ibarra, and she can make the presentation.

14       MS. IBARRA:  Okay.  Good morning.  Good morning, chair.  Good

15   morning, supervisors and members of the public.  As Director Plowman

16   mentioned, today, the board is considering the appeals of the county

17   permit transfers to Sable Offshore Corporation for a change of owner

18   operator and guarantor of the San Nunes Unit, the Pacific Offshore

19   Pipeline Company, or POPCO Gas Plant, and the Los Flores pipeline

20   system.  You're going to hear a lot of information today.  So, my goal

21   with staff's presentation is to keep it fairly high-level and concise,

22   knowing that there are 13 detailed appeal issues.  So, please, bear

23   with me as we get through them all.  Since there are multiple parties

24   involved, I wanted to introduce who's who.  The energy division has

25   been processing these cases.  I'm the staff planner, Jacqueline Ibarra,

26

COSB AR006965

1    and Deputy Director Briggs is with me today.  The applicant is Sable

2    Offshore Corporation, and the appellants consist of two groups: first,

3    the Center of Biological Diversity, together with the [INDISCERNIBLE

4    01:09:39] Foundation, and secondly, the Environmental Defense Center,

5    together with Get Oil Out and the Santa Barbara County Action Network.

6    The applicant's request is to consider the following county transfer

7    permits for: one, a change of owner operator and guarantor of the San

8    Nunes Unit from Exxon Mobil

9         [01:10:00]

10        to Sable, two, a change of operator and guarantor of the POPCO

11   plant permit from Exxon to Sable, and three, for a change of operator

12   of the Los Flores Pipeline Systems permit from ExxonMobil Pipeline

13   Company and a change of guarantor from Exxon to Sable.  Under these

14   requests, POPCO remains the legal owner of the gas plant, and Pacific

15   Pipeline Company remains the legal owner of the pipeline system.

16   Important to note, these requests are to transfer the county permits

17   for the individual assets and not the underlying assets themselves.

18   Also, these transfers do not include authorization for restart of the

19   facilities or any work or continued operations.  This slide shows the

20   facility locations.  On the left are the SYU facilities, outlined in

21   white, which are located in the Los Flores Canyon along the Gaviota

22   Coast.  The gas plant is a very small portion of that area located in

23   about the middle of the canyon.  On the right shows the Los Flores

24   Pipeline system.  It stretches 122 linear miles, starting at the Los

25   Flores Canyon and ending in Kern County.  A bit of background on the

27

COSB AR006966

1    facilities and permit transfers.  The SYU treats oil and gas produced

2    from offshore platforms Hondo, Harmony, and Heritage.  Oil is normally

3    transported via the Common Carrier Los Flores Pipeline system.  A

4    pipeline spill in 2015 under Plains All American, a separate company,

5    caused the pipelines and facilities to shut in.  However, activities

6    still occur to maintain facility integrity.  Pacific Pipeline Company

7    acquired the system in 2022, and your board approved that permit

8    transfer in 2023.  Sable acquired these assets in February of 2024,

9    submitted applications to the county in March of that year, and the

10   planning commission approved them on October 30th.  Appeals were

11   submitted in November, and now, were before the board in accordance

12   with Chapter 25 B, which governs the process to transfer these permits.

13   This slide quickly covers environmental review and code consistency for

14   the requests.  So, under CQA, the permit transfers do not constitute a

15   project, as they don't result in the direct or indirect physical

16   changes to the environment.  For code consistency, this table outlines

17   what 25B requires for each: a change of owner, operator, and guarantor.

18   It's limited to nine findings, which are summarized in the left-hand

19   column.  Okay, getting into appeal issues.  The first few are related

20   to financial guarantee findings that require all facility fees to be

21   paid, and that any existing financial documents are updated to reflect

22   the new permitee.  Under appeal issue number one, the appellant state

23   that Sable must be issued final certificates of financial

24   responsibility for the SYU, or San Nunes Unit.  That's a state document

25   issued by the California Office of Spill Prevention and Response, OSPR.

28

1     The appellants also state that the county must require these

2     certificates for the pipeline system as well.  In response, only the

3     SYU permit requires financial documents to be submitted to the county,

4     which are limited to SYU's offshore certificate of financial

5     responsibility.  We confirmed that OSPR issued Sable a certificate in

6     October of last year, which demonstrates their financial responsibility

7     of $101 million.  That's based on state regulations, and it's not based

8     on the approval of any associated oil spill contingency plan.  The

9     pipeline permit nor the POPCO permit requires sable to submit any

10    financial documents, and the county cannot require documents where they

11    are not already required.  Finally, not related to the board's

12    findings, but for information only, OSPR also issued certificates for

13    the pipeline system.  Those are under state requirements.  So, we know

14    that they exist.  They're just not required for the county's permit

15    transfer.  For appeal issue number two, the appellants state that Sable

16    must pose decommissioning bonds prior to the permit transfer, as

17    required by county permits and state law.  In response, the findings

18    require existing bonds to be updated.  However, there are no current

19    bonds in place.  The permit conditions state that decommissioning bonds

20    will be posted to the county at final facility abandonment.  For the

21    SYU and pipeline system, the permit conditions state that the county

22    will determine if bonds are required or if the permitee shall continue

23    to pay property

24         [01:15:00]

25

29

1      taxes through final abandonment.  For state bonding requirements,

2      the county has no jurisdiction over that process, and it's not required

3      for the county permit transfers.  For appeal issue number three, the

4      appellants state that Sable does not have enough insurance to cover a

5      worst-case oil spill from the facilities.  So, in response, similar to

6      issue number one, only the SYU permit requires financial documents to

7      be submitted.  However, the permit does detail that insurance

8      certificates are only required for users of marine terminals, which is

9      no longer applicable for the SYU, and therefore, not required for the

10     permit transfer.  Outside of the board's consideration and for

11     information only, Sable also previously provided certificates of both

12     their property insurance and their liability insurance.  So, again, we

13     know that they exist and are in place but are not required for the

14     county's permit transfer.  For appeal Issue number four, the appellant

15     state that if Sable cannot remediate oil spills or pay for

16     decommissioning costs.  The county and its taxpayers would be

17     responsible.  In response, the financial findings of 25B are limited to

18     what's outlined in the code, and those findings have been met through

19     the submittal of the SYU Certificate of Financial Responsibility.  In

20     addition, county code and the permits clearly outline that abandonment

21     and liability responsibilities for the permitee.  Any failure to comply

22     with the permit or code would be subject to fines and penalties.

23     Outside of the board's consideration, for information only, Sable will

24     also post upwards of a $500 million bond with Exxon for those

25     abandonment responsibilities, and there are other state and federal

30

COSB AR006969

 1      regulatory protections in place for offshore decommissioning and oil

 2      spills if they were to occur.  Now, we're moving on to chapter 25B,

 3      findings related to compliance with the existing permits.  So, this

 4      finding requires that the permitee be in compliance with the permit as

 5      of the date of application completeness, which was July 30th of last

 6      year.  So, under appeal issue number five, the appellants state that

 7      Sable is not in compliance with the pipeline permit, specifically

 8      condition A7, that state that they state requires effective cathodic

 9      protection.  In response, the permit itself does not list any

10      conditions specific to the [PH 01:17:43] cathodic protection system or

11      its effectiveness.  Condition A7 has standard permit language that

12      states that the project description that received environmental review

13      is required as elements of the project.  So, the pipeline's

14      environmental document outlines the cathodic protection requirements.

15      It's limited to descriptions of a certain equipment type and location.

16      It also outlines that insulated coating would also be applied to the

17      pipeline in addition to the cathodic protection system.  The pipeline

18      does use I'm pressed current cathodic protection, which meets the

19      description outlined in the environmental document and summarized in

20      the check marks here.  For appeal issue six, we move on to findings

21      that require all county compliance plans be updated with the new

22      operator's emergency contact information.  The appellants state that

23      Sable has not submitted final approved oil spill contingency plans from

24      OSPR, and therefore, the county findings can't be made.  In response,

25      we confirmed that all compliance plans were submitted with the required

31

1    information back in August of last year. 25B does not require these

2    plans be approved by non-county regulators. Outside of the board's

3    consideration, and for information only, BSEE approved the SYU

4    contingency plan in June of last year, and that plan is currently in

5    review by OSPR. It might already be approved. Sable can speak to

6    that, and similarly, OSPR also reviewing the pipeline's contingency

7    plan. These plans are really considered living documents. They're

8    routinely updated, and they're considered effective upon submittal,

9    which means that Sable is mandated to follow the most current version

10   of the plan in the event of an oil spill or upset event. The next two

11   issues relate to operator capability findings, which requires the

12   operator to demonstrate the skills, training, and resources to comply

13   with county permits and county code. So, under appeal issue number

14   seven, the appellants state

15        [01:20:00]

16        that Sable has not demonstrated enough capital to restart and

17   operate the facilities. In response, this finding really focuses on

18   the operator's technical skills and safety records, not financial

19   resources. Those specific financial requirements are outlined in

20   separate findings, as we've discussed in appeal issues one through

21   four, and as detailed in the board's record, we determined that the

22   operator does have sufficient technical skills, training, and safety

23   records that show their ability to comply with county permits and

24   county code. Outside of the board's consideration, and for information

25   only, Sable does have the capital to restart and is currently worth

32

COSB AR006971

1    $2.5 billion, and margins will increase once production restarts and

2    oil goes to sale. For appeal issue eight,, the appellants state that

3    Sable has recently been issued various violations for the pipeline

4    system, demonstrating that they cannot operate in compliance with state

5    permits and regulations. In response, the finding requires that the

6    operator does not have a record of systemic non-compliance or unsafe

7    operations related to major incidences for similar facilities. The

8    county defines a major incident as either an oil spill entering the

9    environment, a serious injury or fatality to a member of the public,

10   major facility evacuations, or major facility fires. We confirmed that

11   Sable's previously operated companies, including those within the

12   county of Santa Barbara, operated with zero major incidences,

13   confirming a sufficient safety record. Chapter 25B does not require

14   current compliance with non-county permits or non-county regulations to

15   approve this permit transfer. Outside of the board's consideration,

16   and for information only, Sable has and is implementing safety measures

17   on the pipeline, including installation of valves and conducting

18   inspections and repairs. State agencies have issued violation notices

19   for that work, and it's our understanding that Sable is in ongoing

20   communications to resolve those potential violations. However, again,

21   those are under state required permits and regulations, not county

22   ones, and those activities do not reflect systemically unsafe

23   operations related to major incidences. The last group of appeal

24   issues isn't connected to any specific 25B findings. So, I grouped

25   these in as other. Under appeal issue number nine, the appellants

33

COSB AR006972

1    state that environmental review should be conducted for both the permit

2    transfers and for the restart of the facilities.  In response, as I

3    mentioned earlier, the permit transfers are not considered a project

4    under CEQA.  They are an administrative process that wouldn't result in

5    any physical changes to the facilities.  Restart is not part of the

6    permit transfer process, as the facilities are already permitted to

7    operate under their individual county permits.  An environmental review

8    was previously conducted for these operations prior to original project

9    approvals.  For appeal issue ten, the appellants state that restarting

10   the pipeline could result in an oil spill every one to four years, and

11   that Sable intends to restart without correcting any issues.  In

12   response, the permit transfers are limited to the board's ability to

13   make the required findings of chapter 25B, and chapter 25B only.

14   Outside of the board's consideration, and for information only, that

15   spill data that the appellant site is from an incomplete administrative

16   draft document prepared for a separate project.  That data was based on

17   national pipeline failure rates and was increased five times to reflect

18   a rate of failure for pipelines not equipped with cathodic protection.

19   In reality, the pipeline is equipped with cathodic protection, and

20   Sable is required to meet a host of safety conditions prior to restart,

21   some of which are listed here, and a reminder that the county has no

22   authority to oversee those state and federal restart requirements.  For

23   appeal issue 11, the appellants state that planned and ongoing

24   modifications to facilities would require new or revised county

25   permits.  In response, the permit conditions do have standard language

34

COSB AR006973

1    that outlines any new development, modifications, etc. would require a

2    substantial conformity determination or a new or modified permit.

3        [01:25:00]

4        However, if any development at any of the facilities does trigger

5    the county's permitting jurisdiction, that would be under chapter 35 of

6    the county zoning code and not chapter 25B of the permit transfer

7    process that's in front of you.  For appeal issue 12, the appellants

8    state the county must approve pipeline restart plans that are under the

9    jurisdiction of the office of the state Fire Marshal.  In response,

10   Chapter 25B requires the permitee to be in compliance with county

11   permits and county codes.  Again, we have no authority over state

12   required restart plans.  What we do have safety oversight of is annual

13   audits and reviews of the onshore SYU facilities and the gas plant.  We

14   have oversight of the pipeline system through our permit conditions,

15   and there's additional oversight through other county departments.

16   Finally, for appeal issue 13, the appellants state that the planning

17   commission hearing was not fair or impartial, as planning and

18   development did not provide the entirety of the record for public

19   review.  In response, we maintain that all relevant materials related

20   to the required findings of Chapter 25B were provided in the record,

21   and all other documents not required for the permit transfer were not

22   included.  In conclusion, staff recommends that the board of

23   supervisors: one, deny the appeals, two, make the required findings for

24   approval, including CQA findings, three, determine that the requests

25   are not a project pursuant to CQA, and four, grant de-novo approval of

35

COSB AR006974

1 the permit transfers subject to the conditions of approval.  That

2 concludes staff's presentation, and we are happy to take questions.

3 Thank you.

4   CHAIR CAPS:  Thank you, Ms. Ibarra.  Any questions from the board

5 at this point?  Supervisor Lee?

6   MR. LEE:  Just a question.  So, who pays an event that insurance

7 company cannot… that insurance cannot cover the total cost of a spill?

8   MS. IBARRA:  So, Supervisor Lee, through the chair, if insurance

9 can't cover the cost of an oil spill, there's other protections in

10 place.  There are certain state and federal laws that allow certain

11 pools of other funds to be pulled from.  Yeah, do you have anything to

12 add to that?

13   MR. LEE:  I'll clarify.  Do we pay?  Does the county pay, the

14 taxpayers?

15   MS. IBARRA:  I don't believe so, no.

16   MR. LEE:  Got it.

17   CHAIR CAPS:  Other questions from the board?  Supervisor Nelson?

18   MR. NELSON:  Yeah, thank you.  The pool of funds that you're

19 talking about, those are funds that are… that all oil companies pay

20 into to cover kind of as a kind of a self-insurance among the oil

21 industry.  Is that kind how that works?

22   MS. IBARRA:  Supervisor Nelson, through the chair, that's

23 correct.  That's my understanding.

24   MR. NELSON:  Okay.  So, I think that's helpful for the board and

25 the public, and if we go back to that last slide for a minute, I just

COSB AR006975

1    want to make sure I understand correctly, that the staff recommendation

2    is to deny the appeals, and I just want to make sure I understand that

3    staff has evaluated each of one of those appeal issues and believe that

4    they're not warranted.  Is that correct?

5         MS. IBARRA:  Supervisor Nelson, through the chair, yes, that's

6    correct.

7         MR. NELSON:  All right, thank you.

8         CHAIR CAPS:  Supervisor Lavanino?

9         MR. LAVAGNINO:  I have a question about… and I don't remember

10   what slide it was on, I was talking about previous notices of violation

11   or existing notices of violation.  If Sable's name is not on the permit

12   right now, who are we sending them to?

13        MR. BRIGGS:  I got it.  Madam Chair and Supervisor Lavanino, so,

14   that's an interesting point.  Clearly, we know that Sable is in control

15   of the assets and is conducting the work, and so, predominantly, the

16   communications have been to and from Sable.  There have been some

17   important communications where we've copied ExxonMobil representatives,

18   just to make sure that they're in the loop, because technically

19   speaking, like you mentioned, they still are on the permit guarantee.

20        MR. LAVAGNINO:  Okay, and this might… this goes back before my

21   time.  What was the impetus for 25B?  How did… when was that created

22   and for what reason?

23        MR. BRIGGS:  Yeah.  So, Madam Chair and Supervisor Lavanino, in

24   the late 1990s and early 2000s, the county began to notice a trend of

25

37

1    the major oil and gas operators, who had developed these assets

2    initially, starting to sell them off to smaller and smaller companies,

3        [01:30:00]

4        and when we have companies like ExxonMobil or Shell or Chevron,

5    we don't really have questions about can they afford to clean up a

6    spill, are they qualified to operate these assets.  No one ever really

7    second-guessed their ability to do that, but as they began to sell to

8    smaller and smaller companies, the county became concerned that these

9    smaller companies didn't have the financial assets or the expertise, or

10   generally, the capability of operating these assets in a safe manner,

11   and so, the ordinance was created as a way for the county to analyze a

12   company's ability to operate assets safely before the permit was

13   transferred to the new company.

14      MR. LAVAGNINO:  Okay, but it seems like, and I don't know if

15   anybody was here at the time, but it does seem like 25B is more of a

16   checklist of did they file with the proper state or federal agency, not

17   so much us digging into the financial records of the company.  So, I

18   think what the intent was, was for us to analyze these and determine

19   whether or not we thought that they were capable, but because there are

20   other overarching, you know, jurisdictions that we're basically looking

21   at this and saying, did you file this properly with this state agency,

22   did you file this with…

23      MR. BRIGGS:  So, Supervisor Lavanino, we don't want to

24   oversimplify the importance of 25B.  We, in putting this together,

25   understood the importance of what we're here for today, and we did a

COSB AR006977

1     pretty deep-dive into the records that we have in P&D, and there are,

2     you know, if you go back and you read the staff report for when 25B was

3     created and some of the other internal staff documents that we have,

4     you could kind of see that there was another piece of 25B that may have

5     been intended to come along with it, and in fact, if you look on page

6     12 of the EDC comment letter, they mentioned that there was kind of a

7     part two to 25B that was really going to dive into the financial stuff,

8     and for one reason or another, that never came to be. So, what we have

9     today is 25B, and, you know, at first glance, it does read like

10     somewhat of a checklist, that you have, you know, certain documents,

11     safety plans, and financial assurances where you've changed the name

12     from the previous owner to the current owner. The tasks that are

13     involved are fairly straightforward, and 25B as it is now doesn't

14     require staff or the decision maker to dive deep into the company's

15     financials in a way that may have been intended in that second part

16     that never came to be.

17          MR. LAVAGNINO: But is it your opinion that there are other state

18     agencies or federal agencies that are actually doing that?

19          MR. BRIGGS: So, with respect to a potential oil spill,

20     certainly. We have Bessie Offshore, we have OSPR, with their

21     certificates of financial protection. So, there are other agencies,

22     particularly federal, that are responsible for making sure that a

23     bonding is set in place in the event of a spill could be used to

24     address that.

25          MR. LAVAGNINO: Okay. Thank you for now. Yeah.

39

COSB AR006978

1          CHAIR CAPS:  Yeah.  I think, Supervisor Lavanino, you asked the

2     $750 million question, is really the narrowness or expansiveness of

3     this scope.  So, I had a couple questions, because really the first is

4     about process and as mentioned other agencies in their role.  Clearly,

5     so many people care about this issue and have real concerns about this

6     project going forward.  We heard from the city of Bealeton.  We heard

7     from the city of Santa Barbara, officially.  We heard from the city of

8     Goleta, who've weighed in negatively against advancement of this

9     project.  So, if we're looking at sort of a checklist here, what other…

10    is this really the only time in which the people that we represent have

11    a voice in this process here at the county?  Are we having another

12    vote?  Are we having another hearing?  Is this it?

13         MR. BRIGGS:  So, Madam Chair, I think what you're getting at is,

14    as Sable continues to move towards restarting the assets, are there

15    other checkpoints in the process that would allow the county to have

16    public hearings and have a decision making capacity, and to answer that

17    question directly, the answer is no.  You know, 25 B in the transfer of

18    the permit from Exxon to Sable, this is really the county's kind of one

19    and only opportunity to hold a public hearing and take public comment.

20         CHAIR CAPS:  So, okay.  So,

21         [01:35:00]

22         yet what is in front of us, according to staff's interpretation,

23    is a very narrow interpretate… or is a narrow interpretation of what

24    the charge is today.  So, for example, we've just confirmed this.

25

40

COSB AR006979

1    We've seen that they have a certificate of insurance, but have we seen

2    that insurance policy?

3        MR. BRIGGS:  Again, to answer your question directly, we have not

4    seen the policies in detail.

5        CHAIR CAPS:  So, they have not had to submit their insurance

6    policy to us, just the fact that they have a certificate of insurance?

7        MR. BRIGGS:  Correct.

8        CHAIR CAPS:  Given the way the ordinance is interpreted.

9        MR. BRIGGS:  Correct.

10       CHAIR CAPS:  Okay, and similarly, have we conducted our own

11   independent assessment of the pipeline condition, or is this, at this

12   stage, given what we're doing here today, we just rely on their

13   assessment of safety?

14       MR. BRIGGS:  Madam Chair, so, when the spill occurred in 2015, at

15   that time, the pipeline was under the jurisdiction of FIMSA, which is a

16   federal agency, and FIMSA did an a thorough investigation of why the

17   spill occurred, and then they developed what they called the corrective

18   action order, and the corrective action order details all of the steps,

19   comprehensively, that the operator would need to take in order to

20   restart the line, and it's a very detailed list of safety related

21   improvements and testing that would need to be done.  So, prior to

22   restart, the operator, and in the meantime, that that jurisdiction has

23   been transferred from FIMSA to the State Fire Marshal, and so, Sable

24   has now been going through this process with the Fire Marshal, checking

25   off all the items on the list as they move along, and notably, in the,

41

COSB AR006980

1     I believe it was in December, the State Farm Marshal granted a waiver

2     for cathodic protection, and within that waiver, there are even more

3     requirements that Sable needs to meet in order to essentially address

4     the lack of cathodic protection in the system, and it requires more

5     frequent inspections of the line, more rigorous testing, hydro testing

6     prior to restart, all kinds of safety related features that have been

7     incorporated into that waiver, and so, that kind of provides a little

8     context on the regulatory side.

9         CHAIR CAPS:  But that's not the role of the county to provide

10    those.  So, I said, I have… I'm toggling a little bit between two

11    categories.  I have deep concerns about safety.  I have deep concerns

12    about financial stability.

13        MR. BRIGGS:  So, bringing that discussion back locally, the

14    county, we do have what we call the system Safety, Reliability, and

15    Review Committee, and operators who operate onshore facilities that are

16    processing oil and gas from offshore are required to go through the

17    safety committee, and that includes P&D, our petroleum engineer, the

18    fire department, APCD, and other county departments where we all look

19    at the facility holistically and make sure that, as they are either

20    restarting or in operation, that all of the federal safety related

21    requirements are being met.  I mean, it's a very rigorous review, and

22    we're going through that with them right now, and that's an ongoing

23    process that would basically prepare them for restart, and then also,

24    provide for our annual oversight, as we move forward.

25

42

1          CHAIR CAPS:  Thank you, and the city of Santa Barbara brought up

2     the risk of, you know, wildfire threats, seismic risk and just said,

3     you know, that those severe risks would call for updated safety reviews

4     and risk assessment.  So, similar to like a new housing project, would

5     the Fire Marshal, our own Fire Marshal be… what's the role?

6          MR. BRIGGS:  Madam Chair, I wouldn't want to speak for the Fire

7     Marshal and how they look at the facility, but certainly, protecting

8     the facilities from a potential fire are a major concern, and if you

9     look back historically, there's been at least one fire that I can think

10    of that basically came to the property line there.  So, I mean, the

11    operator is well aware of that, I'm sure.  I don't, again, I don't want

12    to speak for the Fire Marshal, but I have confidence that they're

13    deeply involved in making sure that, you know, all of those precautions

14    are taken.

15         CHAIR CAPS:  Thank you.  Two more questions.  Back on financial

16    stability, do you… I understand that they met the requirements of this

17    sort of checklist, but do we have, do you share any concerns that many

18    people do in the community about financial stability regarding this,

19    especially regarding the fact that Exxon sold them a company but then

20    had to loan them $622 million?

21         MR. BRIGGS:  So, certainly, we've taken the concerns of the

22    public very seriously,

23         [01:40:00]

24         and we've looked into Sable's financial condition as much as we

25    possibly can.  They do have a pretty sizable cash balance.  If you look

43

COSB AR006982

1     at the New York Stock Exchange today, the company's valued at $2.6

2     billion.  Certainly, they have pretty significant resources on hand.  I

3     would really like to defer specific questions about their financial

4     ability to them.  I'm sure they could speak to that.

5          CHAIR CAPS:  Fair enough.  Last question on the insurance policy.

6     I asked about this.  So, we've seen this.  They've produced the

7     certificate, but we have not seen the insurance policy.

8          MR. BRIGGS:  Correct.

9          CHAIR CAPS:  I understand that's the requirement, but could we

10    have seen the insurance policy?  Could we have asked for the insurance

11    policy?  Can we still ask for the insurance policy to actually review

12    it?

13         MR. BRIGGS:  Madam Chair, we can ask for any information at any

14    time, and if you wanted to do that today with them here in the room,

15    I'm…

16         CHAIR CAPS:  Excellent.  Thanks for that, appreciate it.  Okay.

17    I realize I might have skipped over Supervisor Nelson.  If you had any

18    questions?

19         MR. NELSON:  I have questions [INDISCERNIBLE 01:41:03].

20         CHAIR CAPS:  Yeah, sorry about that.  Just feel free to…

21

22         MR. NELSON:  No, no, no, I asked my questions.

23         CHAIR CAPS:  Okay, you did.  I just wanted to make sure.  Okay.

24    All right, any other questions for staff before we move on to the

25    appellant?  Supervisor Lee?

44

COSB AR006983

1        MR. LEE:  I do.  Can we get some background on this?  It's my

2    understanding that Exxon originally tried to build a new pipeline.  So,

3    what happened with that, and why are we here today?

4        MR. BRIGGS:  Madam Chair and Supervisor Lee, I believe it was

5    2018 or '19 when Planes Pipeline, the former owner of the pipeline

6    system applied for a new development plan to build a new line, and

7    essentially, the concept was they would build a new pipeline with

8    today's latest and greatest technologies in the same alignment as the

9    existing line, and staff processed that request for, I think, four

10   years, and we got pretty far into the permitting process.  We got

11   pretty far into the environmental review process.  We referred earlier

12   to a draft EIR that staff had written but never really released for

13   public review, and so, we had spent a very significant amount of time

14   and effort trying to process that request, and it never came to

15   fruition, because the applicant had withdrawn the request before it was

16   considered by a decision maker, and I don't know exactly what their

17   motivations were for withdrawing that application, but that

18   application, I believe, it was withdrawn by ExxonMobil.

19        CHAIR CAPS:  Supervisor Lavanino?

20        MR. LAVAGNINO:  I just have a question about vesting.  If I'm not

21   mistaken, the pipeline was permitted in '88 or '89, somewhere in that

22   timeframe, but 25B didn't come into effect until '02 or somewhere

23   around there.  How does that work as far as why are they, first off,

24   held accountable to 25B, and then are they still vested?  Is that

25   permit still vested, whether or not they meet 25B or not?

45

1           MR. BRIGGS:  Madam Chair and Supervisor Lavanino, so I think the

2      two issues are separate from each other.  They're subject to 25B,

3      because Sable came in recently and requested a transfer of the permit.

4      So, clearly, they are subject to 25B.  I don't believe there's any

5      vesting in regards to 25B, but certainly, the permits for the pipelines

6      and for the San Nunes unit and POPCO Gas Plant, the assets that we're

7      talking about here today are all fully permitted and have been operated

8      for many decades.  So, I mean, certainly, they're vested there, and

9      then kind of the conclusion of your question, that might be a better

10     question for counsel.

11          COUNTY COUNSEL:  Madam Chair and supervisors, I think the last

12     piece you're asking about is just Sable's position on vesting, and they

13     are asserting, in their lawsuit against the Coastal Commission, that

14     they are vested right to own and operate the pipelines.

15          MR. BRIGGS:  Okay.

16          MR. LAVAGNINO:  One last one.

17          CHAIR CAPS:  Go for it.

18          MR. LAVAGNINO:  Can we go to… what was the slide about the… where

19     it showed the test stations along 122 miles, 143 test stations, weekly,

20     bimonthly, and annual inspections?  It said… you had mentioned on there

21     that they meet all the requirements.  Let's see, where does it say?

22     Let's see. Okay, pipeline uses impressed, current cathodic protection

23     meets requirements.  Who does that test… where does that testing

24     information go to?  I mean, like,

25          [01:45:00]

46

1    is that public information?  Does that come to the county?  Does

2    that go to a state agency?  Do we see any of that?

3        MR. BRIGGS:  Madam Chair and Supervisor Lavanino, so, the

4    pipeline is governed by federal regulations 49CFR195, and the county

5    does not have specific standards for pipeline construction or

6    operation, and so, all of this kind of floats back up to the federal

7    level, and if we remember back to the early '90s, the county was

8    closely regulating Celeron at the time, when they got the permit for

9    the original construction, and they were undergoing the original

10    construction, and there were some disagreements about whether or not we

11    had authority.  So, Celeron sued the county, and we ended up settling,

12    and through that settlement agreement, we essentially backed off on

13    being able to regulate the pipeline.  So, the features for cathodic

14    protection are really overseen previously by FIMSA and now, going

15    forward, by the State Fire Marshal, and we may not have the ability to

16    regulate the pipeline in that way unless Sable offers it up to us.

17        MR. LAVAGNINO:  Okay.  So, I think that's an important topic,

18    important point, is that we do not regulate the pipeline.

19        MR. BRIGGS:  Correct.

20        CHAIR CAPS:  Okay.

21        MR. LAVAGNINO:  Thank you.

22        CHAIR CAPS:  Okay.  think we're ready to move on to the

23    appellant.  Doesn't mean that we can't ask staff questions going

24    forward.  It's really important to me that the board here has plenty of

25    opportunity to ask questions of everyone involved here.  So, we'll move

47

COSB AR006986

1    on to the appellant.  Thank you, Mr. Briggs, and we'll move on to the

2    appellant, Environmental Defense Center, for ten minutes.  Oh, there we

3    go.

4         MS. CROP:  Can the timer be set to the ten minutes, so we can

5    track it?  Thank you.

6         CLERK:  Are you good?

7         MS. CROP:  Or you can set it to 15 or whatever.

8         CLERK:  Please, proceed  We'll start the clock when you're ready.

9         MS. CROP:  Okay.  Well, good morning.  My name is Linda Crop.  I

10   am chief counsel with the Environmental Defense Center, and I'm here

11   today with Jeremy Frankel, one of our attorneys.  We are here today on

12   behalf of our clients, the EDC, Get Oil Out, and Santa Barbara County

13   Action Network.  We can't talk about these facilities without talking

14   about the catastrophic oil spill that they already caused.  We know the

15   risks of operating these aged, defective facilities.  We've already

16   seen it.  Another major accident from these facilities is not just

17   possible, but likely.  Whatever entity operates these facilities must

18   be held to the highest possible standard when it comes to financial and

19   operational capacity.  With that in mind, Chapter 25B requires that

20   Sable demonstrate that it, one, has the financial wherewithal to

21   respond to a disaster and abandon the facilities, two, is capable of

22   responsibly operating them, and three, is in compliance with all

23   conditions of the facility permits.  As we and the Center for

24   Biological Diversity will explain, the board cannot make any of these

25   findings.  A brief summary of Chapter 25B's history is helpful here.

48

COSB AR006987

1    In the 1990s, there was a growing trend in which the majors would

2    offload depreciating assets to small, speculative companies, like

3    Sable.  For the county, there were serious concerns regarding whether

4    these companies would be capable of safely operating proper abandonment

5    and remediating a spill or other accident.  For many years, the county

6    would address these concerns by processing transfers under the zoning

7    ordinance.  The county would take an in-depth look at a new company's

8    history and finances and evaluate, on a case-by-case basis, whether the

9    company had the financial and operational capacity to responsibly

10    operate.  Chapter 25B, which EDC supported, was introduced to codify

11    and expand on the county's historical practice of broadly evaluating a

12    new company's capability.

13        MR. FRANKEL:  All right.  Thanks, Linda.  With that in mind,

14    let's turn first to the ordinance's financial

15        [01:50:00]

16        requirements, which are outlined in part in the provision shown

17    here.  Staff takes this provision to mean that Sable only needs to

18    provide specific financial documents contemplated in the permits at

19    issue.  Accordingly, it says, that Sable does not need to submit any

20    financial documents.  According to staff, Sable does not need to

21    demonstrate that it has the financial capacity to abandon any of the

22    facilities or remediate an accident, despite the clear intent of

23    Chapter 25B to ensure exactly that.  Unsurprisingly, the legislative

24    record for Chapter 25B reveals that staff is incorrect.  The ordinance

25    does require that new operators show they have the financial

COSB AR006988

1    wherewithal for both remediation and abandonment.  Part of staff's

2    apparent confusion is due to the fact that Chapter 25B was intended to

3    be accompanied by another ordinance, as Aaron pointed out, which never

4    came to fruition.  Nonetheless, unless and until such an ordinance is

5    adopted, staff were clear that Chapter 25B would continue the county's

6    historical practice of evaluating a company's financial wherewithal on

7    a case by case basis.  In the record, you'll find a letter from John

8    Day, former planning staff and one of the authors of this ordinance.

9    He confirms that this is how the ordinance is supposed to be applied.

10   Additionally, as explained in our letter, other provisions clarify that

11   this is not a ministerial exercise.  In fact, Chapter 25B specifically

12   allows the county to exact financial guarantees where necessary.

13   That's 10B.  Now, staff also ignored this other provision, 10A9.  This

14   provision separately requires that Sable show it has the resources,

15   i.e. money, to operate in compliance with the permits, each of which

16   contemplate liability for abandonment and remediation.  So, no matter

17   how you cut it, the ordinance does require that Sable demonstrate it

18   has the financial wherewithal for both remediation and abandonment, and

19   Sable has unequivocally failed to demonstrate as much.  So, let's start

20   first with remediation, and the risk of an accident is not just

21   hypothetical.  Sable's pipeline is defective, and it has already caused

22   a spill, and events outside of Sable's control can also cause a major

23   disaster.  Pictured as the burn scar from the 2021 [PH 01:52:31]

24   Allisol Fire, which came dangerously close to Sable's processing plants

25   at Red Arrow.  Having already seen the damage that these facilities can

COSB AR006989

1    cause, it would be incredibly irresponsible and inconsistent with

2    Chapter 25B not to ensure Sable can respond to a similar disaster.

3    According to Plains, the Refugio spill has already costed upwards of

4    $870 million.  Sable is not Exxon.  It is a debt-laden, speculative

5    company with no operational assets and no current revenue stream.  The

6    limited cash that Sable has will continue to diminish unless and until

7    the SYU is restarted.  Thus, as Sable itself acknowledges, it could

8    have little to no capital on hand at the time it resumes production,

9    and importantly, Sable's entire $800 million debt comes due just 90

10   days after restart.  So, consider what would happen if Sable diminishes

11   its remaining cash and a spill occurs during or shortly after restart.

12   Between the cost to respond to the spill and its $800 million debt,

13   Sable's total possible liabilities could be well north of a billion

14   dollars, all but guaranteeing its insolvency.  Sable's one certificate

15   of insurance that it submitted does nothing to assure the county that

16   it can remediate a bill, as noted here.  Without reviewing the

17   underlying insurance policies, it's impossible to assess the adequacy

18   of Sable's insurance, which prohibits the county from making any

19   financial assurance findings.  So, let's turn next to abandonment, and

20   I'd like to call your attention to a likely scenario.  By our count,

21   there's at least 20 outstanding approvals, permits, tests, etc., that

22   Sable still needs before restarting, including a new easement from

23   state parks, which may require environmental review.  Accordingly, it's

24   possible, if not likely, that Sable never restarts the facilities,

25   forcing it into bankruptcy, but don't take it from me.  Take it from

51

COSB AR006990

1    Sable.  As Sable itself acknowledges, it may never restart, either

2    because it fails to get all necessary approvals, or it exhausts its

3    remaining capital before it's able to do so.  Because these facilities

4    are Sable's only assets, if Sable fails to restart them, it will

5    bankrupt.  Yet Sable has not provided the county with any assurances

6    that it can

7        [01:55:00]

8        properly abandon the facilities in this likely scenario.  Unable

9    to escape the obvious, that Sable does not have the financial

10    wherewithal for abandonment or remediation, staff point to third

11    parties, like Exxon, who could potentially be on the hook, but the

12    question before the board is not whether some third party can

13    conceivably be held liable through protracted and expensive litigation.

14    The question is whether Sable, who is applying to be the guarantor of

15    these facilities, can assure the county that it's financially capable.

16    Because it has not and cannot do so, the board cannot make the

17    financial assurance findings required by Chapter 25B.  Lastly, and

18    contrary to what staff suggests, Chapter 25B also requires that Sable

19    demonstrate it's capable of safely and responsibly operating the

20    facilities.  As with financial assurances, the board cannot make this

21    finding.  Sable has never actually operated in oil and gas facility.

22    All we have to judge its competency is its conduct over the last year.

23    In that short time, Sable has repeatedly violated state law, racking up

24    close to a dozen notices of violation and cease and desist orders.

25    Even more concerning is that Sable has willfully ignored all of these

52

COSB AR006991

1    directives.  Sable's conduct paints a picture of a company that is

2    unreliable, unpredictable, and dangerous.  Such conduct is

3    disqualifying for any entity, yet alone a speculative company that is

4    attempting to operate some of the riskiest and most highly regulated

5    facilities in the state.  So, this is not a ministerial exercise.  This

6    ordinance serves a very important purpose, and it's to prevent this

7    exact situation.  The board cannot make the requisite financial and

8    operational capacity findings to approve Sable's transfer applications,

9    nor, as CBD will explain, can it find that Sable's defective pipelines

10   are in compliance with their permit.  Thus, with great concern for our

11   county and our coast, we ask you to faithfully administer Chapter 25B

12   and deny Sable's applications.  Thank you.

13        CHAIR CAPS:  Thank you.  Thanks to our crowd.  Okay, any

14   questions from the board?

15        MR. LEE:  I do.

16        CHAIR CAPS:  Yeah, Supervisor Lee?

17        MR. LEE:  Do you have an estimate of the total cost of what the

18   2015 oil spill was?

19        MR. FRANKEL:  So, pursuant to Plain's most recent quarterly

20   report, which was November 8th, 2024, they've estimated that, thus far,

21   they've spent about $870 million, and that's between cleanup and

22   remediation.  They spent $100 million in just six weeks.  It's $200

23   million in property damage and damage to businesses and lost profits to

24   the county and things like that, yeah.

25

COSB AR006992

1        MR. LEE:  Got it, and a follow-up.  How can you verify the work

2    that's being done to correct the problems that's in the current

3    pipeline?

4        MR. FRANKEL:  How can we?

5        MR. LEE:  How can anybody, how can EDC, how can Sable?

6        MR. FRANKEL:  So, I think what's important to remember is that

7    Sable, everyone knows, including the Office of the State Fire Marshal,

8    that this pipeline does not have effective cathodic protection.  Yes,

9    it has a cathodic protection system.  It's not effective in the entire

10    pipeline.  That is why they've sought state waivers to operate, despite

11    the limited effectiveness of cathodic protection.  So, when they

12    restart this pipeline, it will still have that same defect, which means

13    more corrosion, pervasive corrosion, and they're relying on just more

14    inspections to potentially catch that corrosion.  Those inspections

15    didn't work for planes, and they might not, again, for Sable.

16        MS. CROP:  Yeah.  Thank you for your question.  Appellant

17    submitted a report by [PH 01:59:00] Acufax, which is a pipeline safety

18    engineering company, that analyzed the waiver and pointed out that

19    there's two types of inspections.  So, first of all, as Jeremy

20    mentioned, Sable is not being required to equip the pipeline with an

21    effective corrosion prevention system.  We need to know that from the

22    start.  We know this is a corroded pipeline.  The inspections that are

23    required in the waiver will not be sufficient to detect and prevent

24    another oil spill, and we know that from the county's own expert

25    analysis, but the Acufax report that we submitted last week explains

54

COSB AR006993

1    that, for the inline inspections, they don't address all types of

2    corrosion.  There's four types of corrosion.  Inline inspections do not

3    pick up some of the types of corrosion.  Even if they did, as we know

4    from the 2015 spill, they were inaccurate.  So, they were inaccurate

5    for the types of corrosion

6        [02:00:00]

7        they detect.  They don't detect some types of corrosion.  The

8    Acufax report also goes into great detail about the deficiencies and

9    weaknesses of the hydro tests, that are also required, and why they

10   don't necessarily apply, especially in places that have elevation, like

11   on line 325.  So, I do, you know, implore you to take a look at that

12   analysis, because it shows, you know, number one, there's nothing to

13   prevent corrosion, and number two, the tests are not going to be

14   adequate to predict and prevent another accident.

15       MR. NELSON:  I have a question.

16       CHAIR CAPS:  Yes, Supervisor Nelson?

17       MR. NELSON:  Thank, Chair Caps.  I was just curious from the

18   comment, does the appellant, or did the appellant support the

19   replacement of the pipeline?

20       MS. CROP:  That was not before us.  We were waiting for the

21   environmental review.

22       MR. NELSON:  Out of just curiosity, were you guys supporting that

23   publicly?

24       MS. CROP:  We can't… we're a law firm.  We can't take a position

25   until we see all the information.  So, we were waiting for the

55

COSB AR006994

1    environmental impact analysis to be completed and the policy analysis

2    to be completed.

3          MR. NELSON:  In concept?

4          MS. CROP:  Again, we make our decisions based on law and science

5    and we didn't have all the information.

6          MR. NELSON:  Good, me too.  Thanks.

7          CHAIR CAPS:  Supervisor Lavanino, are you good?

8          MR. LAVAGNINO:  I'm just curious about one thing when you're

9    talking about the integrity of the pipeline.  How much interaction have

10   you had with the actual bodies that are going to be permitting that

11   pipeline?

12         MR. FRANKEL:  So which bodies in particular are referring to?

13         MR. LAVAGNINO:  That's what I'm asking you.

14         MR. FRANKEL:  The Fire Marshal?

15         MR. LAVAGNINO:  Because it's not us.  Yes, with the Fire Marshal.

16         MR. FRANKEL:  Yeah.  So, we're in touch with basically every

17   agency that's overseeing aspects of this project in the restart

18   proposal.  Most of those agencies don't deal specifically with pipeline

19   safety.  That's mostly the Fire Marshal and potentially a little bit of

20   the coastal commission, and I know that the county's own permit does,

21   as CBD will explain, require effective cathodic protection.

22         MR. LAVAGNINO:  So, I guess what I'm thinking is, so you disagree

23   with the state Fire Marshal's perspective, or his position.  Is that

24   something that you would possibly seek legal remedy with?

25

56

1       MR. FRANKEL:  So, we disagree with the basic presumption that the

2    Fire Marshal makes, that this pipeline can be made as safe or safer

3    than, if it had effective cathodic protection.  These inspections are

4    unreliable.  You're just trying to track down corrosion and put band-

5    aids on the pipeline.  We don't think that it's as safe as proactively

6    preventing corrosion in the first place.  Yes, we disagree.  What, you

7    know, our options to…

8       MR. LAVAGNINO:  I don't want to interrupt you, but I think this

9    is really important for everybody right now.  For me, if I'm getting

10    this, is that I'm not… I think what everybody's worried about is we

11    start up, the pipeline fails, and I'm looking at this as this isn't

12    something we're regulating.  The person that is signing off on this

13    somehow is not in this room.  Everybody here expects us to… that we're

14    basically the deciding body on this, which we are not, and, you know,

15    the issue that we're talking about today is so divorced from what we're

16    on, but that's what everybody's worried about.  So, we got to talk

17    about it is what everybody's worried about is that the pipeline fails,

18    and what are we going to do about it, and the reality is, if you have

19    information that says that that's what the state Fire Marshal is

20    signing off on is inaccurate and unscientific, then I'm trying to

21    figure out at what public forum do we get at that?  Because…

22       MS. CROP:  Right.  Yeah, thank you.  So, unfortunately, the Fire

23    Marshal did not solicit public input or expert input.  So, we sent a

24    letter to the Fire Marshal last fall explaining that we believe that

25    they had to conduct public and environmental review and hold a formal

COSB AR006996

1    public hearing, and they did not.  So, we've been submitting

2    information, and we have this new expert report, but we are still

3    trying to get the Fire Marshal to have a public process, because we

4    think it's important, as you all do.  You have a public process to hear

5    from experts and the public and other entities and agencies.  So, we

6    are still… we're not trying to jump to a lawsuit.

7         MR. LAVAGNINO:  No, I understand that.

8         MS. CROP:  I understand your question.  We're trying to get the

9    Fire Marshal to still allow for public review and hold a public hearing

10   and comment.  So, we still have that request.  We have not received a

11   response to it, but we think that's really important.

12        MR. LAVAGNINO:  Thank you.

13        MR. FRANKEL:  And just a couple other quick things.  The Fire

14   Marshal never released an analysis publicly supporting its decision.

15   So, that's still in limbo, and then

16        [02:05:00]

17        also, this is an issue that's not divorced from this proceeding.

18   As CBD will explain, the Los Flores pipeline permit does require that

19   it have effective cathodic protection, and you're about to hear all

20   about that.  So, okay.

21        MR. LAVAGNINO:  Okay, thank you.

22        CHAIR CAPS:  Okay, thank you.  I had a couple questions about,

23   first, about safety, as we've talked about here.  So, you talked about

24   prevention and your concerns about the protections that have been in

25

58

1    place, but what about oil response of spill, spill response?  Have you

2    been able to review plans?  What's your assessment of those plans?

3        MS. CROP:  Yeah.  Well, again, there was no public review and

4    comment.  So, we have seen the oil spill contingency plans, and it's

5    important to note that they do indicate, especially for the inland

6    plan, that there could be a spill five times as large as the 2015

7    spill.

8        MR. FRANKEL:  14 times.

9        MS. CROP:  Pardon?

10        MR. FRANKEL:  14.

11        MS. CROP:  Oh, 14 times, excuse me.  So, we do have concerns

12    about the oil spill contingency plans.  We think that they understate

13    the worst-case scenario.  For example, for the coastal portion, the

14    worst-case spill scenario identified in the current plan is smaller

15    than what happened in 2015, even though we know that it could actually

16    be greater.  It could actually be twice the size.  So, we do have

17    concerns, and again, there was no public process to comment on that.

18        MR. FRANKEL:  And I would just add that the process for the

19    Office of Spill Prevention and Response, they don't account for things,

20    like we saw with Refugio, including operator error.  It's a very

21    conservative estimate, and I'd also like to point out that the

22    contingency plan that Sable actually submitted to the county estimated

23    a spill of zero barrels.  That was roundly rejected OSPR.  They've gone

24    through several iterations over many, many, many months.  It took them

25    to finalize a contingency plan.  This is one of the most basic and

COSB AR006998

1    fundamental responsibilities of an oil and gas operator, and it took

2    them months to try to finalize an acceptable plan.

3         CHAIR CAPS:  Wait.  So, if I understand this right, they

4    submitted a contingency plan that had zero gallons spilled.

5         MR. FRANKEL:  That's correct.  That's the one they submitted to

6    the county initially, and to OSPR.  OSPR rejected that plan.  They've

7    since submitted, I think, two or three revised plans, but again, it

8    took them many months to actually finalize a plan, which I think was a

9    couple weeks ago, it was approved.

10        CHAIR CAPS:  And OSPR, the Office of Spill and Prevention and

11   Response, rejected at least twice, these contingency plans?

12        MR. FRANKEL:  I think three times.

13        CHAIR CAPS:  So, and what was the rationale?  I will ask them

14   when it's their turn as well, but what was the rationale for a

15   contingency plan after zero gallons was included initially to be

16   smaller than the one in 2015?  What's the logic there, if you're able

17   to interpret?

18        MR. FRANKEL:  That might be in part because of the installation

19   of new shutoff valves on the pipeline, but at the same time, again, it

20   doesn't account for many of the things that we saw in 2015, namely

21   operator error, turning the switch back on after they see a pressure

22   loss, things like that, and then we also have an estimate from the

23   county, an analysis prepared for the county that contradicts that as

24   well.  It assumed that, with the addition of safety valves, that a

25

60

1       spill could still be twice as large in the coastal segment of the

2       pipeline.

3               CHAIR CAPS:  Thank you, and so, again, still on the safety

4       category, as supervisor Lavanino has mentioned, there's many layers of

5       government in this, and the Coastal Commission certainly has safety

6       front and center.  Can you speak to their… of Sable's compliance with

7       the Coastal Commission regulations currently?

8               MR. FRANKEL:  Yeah.  So, this goes all the way back to November,

9       when Sable started doing repairs on the pipeline.  They were very

10      quickly issued a notice of violation from the Coastal Commission,

11      stating that… and it's not just pipeline safety.  They had specific

12      concerns about the excavations that they were doing, which was in a

13      very environmentally sensitive habitat.  We're talking about the

14      Gaviota Coast.  Sable ignored that first violation, kept working for a

15      few days, got a second one stopped, followed by a cease-and-desist

16      order.  Fast forward to today, well, they also got violations from

17      other agencies along the way.  Fast forward to today.  They've ignored

18      all those violations.  They went out there and continued to do work.

19      They were digging up in creeks, drainages, really sensitive areas along

20      the Gaviota coast, all willfully ignoring these agency directives.  I

21      think it paints a very concerning picture of what we can expect them to

22      be like as an operator.  This is not normal behavior

23              [02:10:00]

24

25

61

1        for a responsible entity, and most recently, they got another

2    cease-and-desist order from the Coastal Commission, have ignored that

3    as well.

4        CHAIR CAPS:  What would you expect from a responsible operator,

5    in dealing with the Coastal Commission in [INDISCERNIBLE 02:10:13].

6        MR. NELSON:  At the very basic level, a responsible operator

7    should comply with agency directives, should cooperate, try to, you

8    know, submit a permit under protest.  That's something that the Coastal

9    Commission does often.

10       CHAIR CAPS:  And you've seen that?

11       MR. NELSON:  We've been informed by staff that that's something

12   that they do, yeah.

13       CHAIR CAPS:  Sure.  Okay.  So, thank you for starting your

14   presentation with the 25B, because I do think this confusing, because

15   again, literally what's written in front of us in terms of emotion is

16   very narrow in terms of interpretation, but it's unprecedented in my

17   time here to see that the actual author of the ordinance, you know,

18   wrote us a letter to sort of say, here…  So, we have two different

19   interpretations, in my characterization.  One is narrow, one is

20   expansive, and then the actual author surfaces from retirement, I'm

21   imagining, to tell us his interpretation.  So, I'm just going to read a

22   couple of the sentences.  I think the letter has been submitted on

23   time.  They wisely went to… he says that, her writes that Chapter 25B

24   was devised for this exact purpose.  So, of this growing trend of brand

25   name oil companies unloading their projects under lesser known

COSB AR007001

1    companies.  That's my language, but he wrote, the primary purpose of

2    25B, from the get go were, one, to protect the public and safeguard the

3    environment by ensuring that changes of owners and operators did not

4    result in increased risk of accidents or spills or inadequate spill

5    response, and two, to help ensure the responsible parties could pay the

6    cost of cleanup and not leave the public, us, holding the bag.  So, as

7    I, you know, a lot of things, as we do these jobs, we have a lot of

8    conversations in the grocery store, in the street.  The first aspect of

9    what we're talking about here is sort of this incredibility that you're

10   starting, restarting a pipeline that burst?  Wow!  That's incredible.

11   The second piece is, when I try to explain this, as we, you know, been

12   preparing for months for this, is that there was this big company,

13   Exxon, everyone's heard of it, that had this pipeline, sold it to a

14   company, no offense, that no one's really heard of, Sable.  They didn't

15   have enough money to buy it.  So, Exxon loans them the money to buy

16   this thing, and I just, as someone who… you live in the world of oil

17   industry.  I do not.  Is this common?  Does it make logical sense that

18   Mr. John Day, who worked here for the county, created an ordinance so

19   that it gave us an actual role, not a toothless role, not a checklist

20   role, but an actual role for the people, those of us who represent the

21   people to actually say, hey, that smells fishy?  No, no, no,

22   appreciate… Let's keep going.

23        MS. CROP:  I appreciate your inquiry, and I was actually here.

24   Well, I was in kindergarten… no.  I was actually here, and the

25   Environmental Defense Center and other groups supported 25B, and it

63

COSB AR007002

1   went through a multi-year process.  This didn't just, you know, come

2   out, you know, on a moment's notice, but there was a concern about

3   whether or not these new, smaller companies could safely operate these

4   facilities and cover oil spill response, remediation, and abandonment.

5   Exxon is the last major that hasn't done that, but there was a growing

6   trend with Arco and Shell, etc.  So, if you read the board staff… the

7   planning commission staff report, the board staff report, which are all

8   in your packet, if you read the findings, it's very, very clear that

9   this was the exact type of situation that the county was concerned

10  about, and why the county has broad discretion to make this decision.

11  It's not a check-the-boxes type of exercise.  The county intentionally

12  wanted to be able to deny some of these transfers, based on safety or

13  financial considerations, and that's why the findings are there.  If

14  you look at the findings that the board adopted, it's very clear that

15  this was all about public safety.  It was about protecting the

16  environment.  It was about protecting the community.  It was about

17  making sure that there were, you know, assurances that these companies

18  were strong and able to handle all of these responsibilities.  So, it's

19  very clear that the board has discretion.  In fact, if you look at the

20  findings and the staff reports, it's not just to make sure

21      [02:15:00]

22      that a company can comply with county permits, which they can't,

23  in this case, but also, that they have to comply with all applicable

24  laws.  That's what the county was concerned about, and we showed you,

25

64

COSB AR007003

1    they are not complying with so many laws.  I've been doing this for

2    over 30 years.  I've never seen anything like this before

3        CHAIR CAPS:  Because, because otherwise, why would we have 25B.

4    County counsel, you're welcome to…

5        COUNTY COUNSEL:  Madam Chair, so, I just want to make sure that

6    we are staying to the appeal timeline.  So, part of that time is that

7    you can ask each of the parties questions, just like you'll be able to

8    ask the next appellant questions, as well as the applicant, but when

9    the answers get beyond that, we have to start tracking time, and so, I

10    just want to remind…  Yeah, there will be an opportunity, there's going

11    to be a rebuttal, and then there's going to be more time later for

12    discussion.

13        CHAIR CAPS:  Fair enough, thanks.  I think, with that nice,

14    polite nudge, I will conclude my questions for now, but we certainly

15    have more opportunity.

16        MR. FRANKEL:  Thank you.

17        CHAIR CAPS:  Thank you.  So, that means we move on to the second

18    appellant, which is the Center for Biological Diversity, which… ten

19    minutes.

20        MR. PATRONELLA:  Good morning.  My name is [PH 02:16:14] Mark

21    Patronella.  I'm speaking on behalf of the Center for Biological

22    Diversity and the [PH 02:16:19] Weshtoyo Foundation.  The people of

23    Santa Barbara County have every right to be concerned about this

24    project.  A company with a history of regulatory violations, an amount

25    of debt is seeking to take on famously troubled production facilities.

COSB AR007004

1      To make matters worse, Sable proposes restarting the Los Flores

2     Pipeline system without addressing the systemic flaws that caused the

3     2015 oil spill.  The definition of insanity is doing the same thing and

4     expecting a different outcome.  As public officials, you're tasked with

5     taking a clear-eyed look at the situation in front of you and making a

6     decision in the best interest of this community, and it's clear that

7     these permits must not be transferred at this time.  My colleague,

8     Rachel Matthews, will explain why systemic issues with the Los Flores

9     pipeline system require a new or substantially revised permit, and I'll

10    use the remainder of my time to discuss abandonment and

11    decommissioning.  All three permits specifically require

12    decommissioning when the project is concluded, but it's very clear that

13    financial assurances are needed now to ensure that decommissioning will

14    actually occur.  My colleagues at EDC have explained that the county

15    has ample legal authority to impose these requirements at this time,

16    and indeed, it's both necessary and appropriate to impose these

17    requirements when we're moving from a household name to an entity with

18    $800 million in debt and no revenue.  Unfortunately, across the U.S.,

19    decommissioning has been stalled as a result of enforcement issues, and

20    we can look no further than what happened in the Marine Coen Island oil

21    facilities to see exactly what that looks like and what could happen

22    here.  Their, you know, authorities proposed that the facility be

23    decommissioned.  The operator went bankrupt and was able to avoid its

24    decommissioning obligations, and as a result, you know, authorities

25    went on to… predecessor entity, surety bonds, all of that was

COSB AR007005

1     inadequate.  So, as a result, decommissioning remains ongoing.  So,

2     there are a number of lessons that we can draw from that experience, as

3     well as decommissioning issues all over the U.S.  The first is that we

4     should be particularly skeptical of small entities like Sable,

5     particularly ones that don't have only one source of revenue.  Second,

6     I think we have to acknowledge that, if these permits are transferred,

7     it's going to be exceptionally time consuming and difficult to obtain

8     decommissioning funds from Exxon.  Third, we have to acknowledge that

9     the property taxes discussed here are wholly insufficient to compel

10    decommissioning from Sable.  If you look at the value of the property

11    taxes relative to the tens and hundreds of millions of dollars of

12    decommissioning costs, there's just no leverage here, and finally, I

13    think it's important that we discuss a false solution that's been

14    mentioned earlier, which is that there's a purchase agreement between

15    Sable and Exxon in which Sable commits to seeking surety coverage for

16    decommissioning, but ultimately, that's inadequate for several reasons.

17    The first is the county's not a party to that transaction, meaning that

18    it can enforce its provisions.  Second, the contemplated charity

19    coverage is grossly insufficient to cover the decommissioning costs

20    we're looking at.  I mean, just for example, the U.S. federal

21    government has estimated that decommissioning just the infrastructure

22    in federal waters will cost about $470 million.  That's before we get

23    to any of the onshore facilities discussed here today.  So, the

24    coverage contemplated is wholly insufficient to ensure protection for

25         [02:20:00]

67

1      this community.  Now, as a result, it's incredibly important that

2      financial assurances be added now, and a wholly preventable problem be

3      avoided.  Thank you.

4          RACHEL MATTHEWS:  Good morning, and if you could return the slide

5      presentation.  My name is Rachel Matthews, and I'm also here on behalf

6      of the Center and the Weshtoyo Foundation.  The board has a choice that

7      it can make today.  It can either rubberstamp the permit transfer of an

8      old corroded pipeline that ruptured disastrously in 2015 and hope that

9      it won't happen again, or as we request, it can deny the permit

10     transfer, because operating these pipelines in 2025 looks vastly

11     different than it did when this permit was approved decades ago, and

12     the existing permit conditions just aren't enough to protect the county

13     from another spill.  The existing permit conditions, in the underlying

14     1985 environmental analysis, assumed that these pipelines would have

15     two major defenses against oil spills: functioning cathodic

16     protections, which prevent corrosion using an electrical current, and

17     the pipeline's so-called modern design.  Both of those assumptions were

18     wildly wrong.  This pipeline's design and its lack of effective

19     cathodic protections caused the disastrous rupture that spilled

20     hundreds of thousands of gallons of oil into the ocean, damaged

21     thousands of acres of habitat, and killed hundreds of birds and

22     mammals.  These pipelines have a perfect storm of design flaws.  As the

23     federal investigation into the 2015 pipeline rupture explained, the

24     pipe's coating tends to separate from the pipe, which prevents cathodic

25     protections from working.  The foam insulation wrapped around the pipe

68

COSB AR007007

1    actually traps moisture against it, which promotes corrosion, and then

2    there's tape that's actually wrapped around that foam insulation, which

3    also interferes with the cathodic protections.  On top of that, the oil

4    actually has to be heated up in order to get it across Santa Barbara's

5    hilly terrain, and at these high temperatures, the rate of corrosion is

6    actually 32 times that of a pipe operating at typical soil

7    temperatures.  Given all of these issues, it's unsurprising that

8    Sable's own numbers show a stunning 121 repair sites along the

9    pipeline.  That's nearly one repair site for each mile.  Because the

10    pipeline's cathodic protection system will never work as intended to

11    prevent corrosion along the pipeline, Sable has, as we've discussed,

12    asked the Fire Marshal to waive compliance with the regulations that

13    require effective cathodic protections, but the waivers don't make

14    these old pipelines any safer.  All they do is they manage the risk of

15    oil spills through monitoring and repair.  This is emphatically not a

16    substitute for proper pipeline to sign and effective cathodic

17    protections, and it also introduces significant opportunity for error.

18    Another thing that hasn't been discussed is that these waivers will

19    actually require more frequent excavation of portions of the pipeline.

20    The terms of the waiver, by our count, require 192 digs in excavations

21    over the next decade, just to validate the results of inline

22    inspections.  That doesn't include any additional digs or excavations

23    that have to occur for repairs.  This is far more construction activity

24    along the pipeline than would be required of a pipe that has effective

25    cathodic protections, and this level in frequency of work was never

69

COSB AR007008

1    contemplated under the prior environmental analysis or the prior

2    permits.  So, as I said before, operation of this pipeline in 2025

3    looks radically different than it did when these permit conditions were

4    adopted in the 1980s.  Under these circumstances, the existing permit

5    conditions direct the county to require a new or modified permit, or at

6    the very least, to find that these changes conform to the existing

7    permit, which they don't.  I also want to make a note about preemption.

8    We've heard some discussion about the county being unable to deal with

9    pipeline design.  The county has classic police powers to protect the

10   health, safety, and welfare of its people, and so, we're not suggesting

11   that the county try and interfere with pipeline design or operation,

12   but it does have the authority to adopt mitigation measures, financial

13   assurances, and also, to assess financial capability.  All of that is

14   well within the county's authority.

15       [02:25:00]

16       Finally, the county deserves to understand the environmental

17   risks of restarting this post-bill, decades-old, corroded pipeline.  It

18   also deserves to consider the alternatives and the mitigation measures

19   that are available, and the board can make that happen today by

20   requiring a CEQ analysis before any rights are transferred.  This is

21   not simply an exercise in switching out one name for another on a

22   permit.  It's a consequential decision that does impact the

23   environment.  You know, your decision today comes down to what is more

24   important: the residents, wildlife, and ecosystems of Santa Barbara

25

70

COSB AR007009

1    County or the shot shareholders of an out-of-state oil corporation, and

2    we hope you choose Santa Barbara.

3            MR. LAVAGNINO:  I have a question.

4            CHAIR CAPS:  Thank you.  Yeah, Supervisor Lavanino?

5            MR. LAVAGNINO:  Well, first off, that was an awesome political

6    speech, but the reality is in what legal world can I, as a regulator,

7    tell somebody, you have a vested right, and you got a permit back in

8    the day, but you know what, thanks?  I don't know.  I'm just trying to

9    figure out, in real-world, it sounds great, and for people that are for

10   listening today, it sounds so easy.  I mean, all you got to do is just

11   make them get a new permit.  The world doesn't work that way.  That's

12   not legal.  You would open yourself and everybody up in this room and

13   everybody in this county to legal repercussions, not just the oil

14   industry.  A restaurant industry, a clothing industry, we don't like

15   the way you're doing business now.  I'm just trying to figure out where

16   you came up with that idea, that you would require a new permit, and in

17   how many years should it be, the new permit, under what restrictions?

18   I'm just curious if you have a response to that.  That just seems very

19   pollyannish to me.

20           MS. MATTHEWS:  Sure.  Well, thank you for the question, for

21   allowing me to clarify.  If you look through the existing permit

22   conditions, throughout, for all three permits, but in particular, we're

23   talking about the pipeline permit, there are specific permit

24   conditions, and they're cited throughout my presentation and the

25   center's comments, that specifically allow, and actually in some cases,

71

1    require a new or modified permit in response to changes in the

2    operations or design of the pipeline.  That's baked into the permit

3    terms, and so, in this case, well, in this case, we're just asking you

4    to deny the transfer of the permits, because we don't believe that you

5    can make the findings.  As all of my colleagues have discussed, there

6    is authority within the permits themselves that require new or modified

7    permits or a finding of substantial conformity, and in staff's

8    presentation, they also discuss that, that that might require a

9    different proceeding.

10        MR. LAVAGNINO:  Okay, thank you.

11        CHAIR CAPS:  Other questions?  Supervisor Lee?  No  Supervisor

12    Nelson, you good?

13        MR. NELSON:  I'm good.

14        CHAIR CAPS:  Okay.  I'm good at this time too.  Thank you very

15    much.  So, now, we're going to move on to the applicant who has 20

16    minutes to present.  Just a little housekeeping, we'll probably take a

17    break after the board has questions for the applicant, just a short

18    ten-minute break, and we have 122 speakers.  So, as folks are coming up

19    to the podium, and you all, by my math, that would be about six hours.

20    So, I would just be really thinking about one-minute comments, or

21    perhaps you can not… everything doesn't need to be said all the time.

22    Supervisor, Lavanino?

23        MR. LAVAGNINO:  I just have a question.  The other time that we

24    got over a hundred speakers, I know that we posted a list, because

25

72

1    we've got people all over the building.  We're doing that?  Okay.  So,

2    if you want to… I think that'd be a good idea to talk about.

3         CLERK:  Yes, thank you, Chair Caps and members of the board.

4    Wonderful lead.  I was going to announce to all those members of the

5    public who are joining us today.  As you will see on Zoom, you are

6    numbered.  So, that is the order, the speaking order for today.  You do

7    not need to use the raise hand feature unless you are going to opt for

8    the one-minute.  I will call for those when we do get to public

9    comment.  My apologies to the applicant, this will be brief, and to all

10   those in our rooms, in the planning commission room, the conference

11   room, and here, we have posted, it's a seven-page document with

12   everyone's names listed next to a number.  So, that is your order.  I

13   will be calling five speakers instead of the usual two.  So, please

14   hear for your name.  If you hear your name, and you are downstairs or

15   in another room, please make your way to the hearing room, just so you

16   have enough time and lineup behind the podium.  That is much

17   appreciated.  So, that list is posted in all the rooms.  If you can't

18   find a list, please, go to Leah Graham in the back of the hearing room

19   here, and she will show you where you are.  Thank you.

20        CHAIR CAPS:  Thanks to our clerk and your office, awesome team.

21   So, again, just if everyone spoke at one minute, we have two hours of

22   public comment.  So, let's

23        [02:30:00]

24

25

73

1    just keep that in mind when you're thinking about what you'd like

2    to say as you hear this information.  Okay, apologies, it's your turn.

3    Thank you so much.

4        CLERK:  Could someone put up the presentation, please?

5        MR. RUSCH:  Here we go.  Well, good morning, Madam Chair and

6    supervisors.  My name's Steve Rusch, and I'm Sable Offshore Corps' Vice

7    President of Environmental Regulatory Affairs.  As staff has already

8    recommended, we're here to seek approval of our application for change

9    in owner operator and guarantor for the SY project, POCP Gas Plant, and

10   the Los Flores Canyon pipeline system to Sable Offshore Corp.  Sable is

11   an independent oil and gas company.  Our team has extensive experience

12   in California, and we currently have about 100 employees here in

13   California, and we continue to hire more.  We're a seasoned oil and gas

14   company and oil and gas operators.  We have skills and training

15   necessary to operate facilities safely and in full compliance with all

16   county permits.  Our management team and executive team even have more

17   than 20 years of experience operating oil and gas facilities right here

18   in Santa Barbara County and the Santa Barbara Channel.  Personally, I

19   started my career on this very project back in 1981 and supervised the

20   receipt of permits and startup in 1993.  So, it's deja-vu all over

21   again for me.  We're passionate about what we do here, and we're

22   passionate about being safe and ready to start operations.  As you

23   know, Sable acquired the facilities in February of '24 and have been

24   working with this county, state, and federal agencies ever since, and

25   to just be really clear on one point, we own these facilities.  We

74

COSB AR007013

1      bought the facilities.  We're operating the facilities.  We hire staff

2      on the facilities, and we're paying taxes on the facilities.  The

3      matter before you is simply a change of name of the permits.  The

4      limited purpose of this hearing is to seek approval of the transfer of

5      the county permits from Exxon to Sable.  Your planning commission

6      approved these transfers, and county staff recommends that you approve

7      them as well.  To be clear, the permit transfer does not affect the

8      restart of the operations.  It's just simply a transfer of the name

9      from Exxon to us, just like it would be in a business, change the

10     marquee.

11         MS. STEBBINS-BINA:  Good morning, Chair Caps and supervisors.  My

12     name is Jessica  Stebbins-Bina.  I'm with Latham and Watkins, outside

13     counsel for Sable, and Mr. Rusch and I will be trading back and forth.

14     Chapter 25B is a narrow code with a limited purpose, and we'll talk

15     about that more in a little bit, because you've heard some pretty

16     misleading information today about Chapter 25B, but what it does is it

17     puts the county in a direct relationship with a new owner, author,

18     operator, and guarantor.  It doesn't change who owns the facilities, it

19     doesn't authorize repairs.  Sable's restart activities are separately

20     governed by state and federal agencies, who are tasked by law with

21     ensuring pipeline and oil processing facility safety.  Appellants have

22     made a number of arguments against approval, but what I want to bring

23     up now is that the board rejected, already, many of these very same

24     arguments a mere 18 months ago in September 2023, when you approved the

25     permits from Planes to ExxonMobil.  Appellants argued at that point

75

COSB AR007014

1    that transfer was a project under CQA, and this board properly rejected

2    that argument.  Appellants argued at that point that new FTPs were

3    required because of the supposed failure of cathodic protection over

4    the 2015 spill.  This board properly rejected that argument as well.

5    Appellants argued that the 2015 spill meant there was a failure to

6    comply with county permits authorizing a denial, and this board

7    rejected that argument.  It rejected the argument that the pipeline

8    being inactive somehow meant there were additional hurdles for

9    transfer.  All of that was dealt with 18 months ago, and there is no

10   lawful, non-arbitrary basis to revisit any of those issues now.

11   Nothing has changed.  Approval of the transfers under Chapter 25B is

12   mandatory when conditions are met, and they are met here, as the

13   planning commission found.

14       MR. RUSCH:  As the staff pointed out, Sable supplied all the data

15   information necessary to make the 25B findings.  After reviewing the

16   record evidence, including extensive comment, letters, public

17   testimony, and county staff recommendations, the county planning

18   commission found all the findings were met.  We've included quotes from

19   the planning commission's findings confirming that Sable has met all

20   the county code requirements.

21       [02:35:00]

22       This one?  After the planning commission approved the transfers,

23   two appeals were filed.

24       MS. STEBBINS-BINA:  Something's gone wrong here with the slides.

25   So, we'll just go back.  I think we're going the wrong way, sorry.

76

1          MR. RUSCH:  Bear with us here.

2          MS. STEBBINS-BINA:  I think this is the… if we can pause for a

3     moment, t is the version of the PowerPoint that you didn't adopt into

4     the record, and we are reading from the one that you did.  So, I guess

5     we can go through either version, but I don't know if you want to

6     switch it to the one that you've actually admitted to the record.

7          MR. RUSCH:  There's a two-slide difference

8          CLERK:  Members of the board, it's up to the applicant to

9     determine which they would like to present.  So, either one is fine.

10         MS. STEBBINS-BINA:  I'm happy to present the one that that is up.

11    I didn't want to run afoul of your procedures.  So, we can do that if

12    you… you're fine, okay.

13         MR. RUSCH:  Yeah.

14         MS. STEBBINS-BINA:  Apologies for the interruption.

15         CHAIR CAPS:  And I would like to note, I did pause your time for

16    that exchange.

17         MS. STEBBINS-BINA:  Thank you kindly.  Yeah.  So, now, we just

18    have to go back to the right page.  Sorry, it's not clicking for me.

19    Could someone get us back to the beginning?  I apologize.  Yes.

20    [INDISCERNIBLE 02:36:27].  Bear with me one more moment.  We'll get to

21    right place.

22         MR. RUSCH:  It's right after that, right there.

23         MS. STEBBINS-BINA:  Yeah. So, this is… yeah.  Actually, we did

24    this one.  Here you go.

25         MR. RUSCH:  Right.

77

1      MS. STEBBINS-BINA:  Thank you.  Pardon for the interruption.

2      MR. RUSCH:  Next one.  Do the next one?

3      MS. STEBBINS-BINA:  Yeah, skip that one.

4      MR. RUSCH:  We'll get it straight here in a second.  Sable

5  exceeds the financial requirements under 25B, as the planning

6  commission found, and the staff report confirms.  There's a lot of

7  details on this particular slide, but basically, there's more than $700

8  million currently available to address any incident.  As I mentioned,

9  Sable exceeds the 25B requirements.  We have obtained certificates of

10  financial responsibility from OSPR, or the Office of Oil Spill

11  Prevention Response, that show we have complied with the state

12  financial requirements.  The certificates show we are insured at the

13  maximum level the state can require, excuse me, but in fact, we have

14  four times the amount shown, and just to address another comment, these

15  are certificates based on an integrated contingency plan that the state

16  confirmed earlier this month to have no deficiencies.  That plan is

17  based on an operating pipeline and not in a pipeline without flowing

18  oil, as claimed earlier by the appellants.  As you know, there are

19  multitudes of compliance and contingency plans required of Sable by

20  Santa Barbara County, all of which have been updated and reviewed by

21  staff, as required by 25B.  There's the plans.  Also, regarding

22  required emergency response drills, we've conducted two successful

23  emergency response drills and were complimented by the agency present

24  for our professionalism and a well-trained response team.  Our

25  management team, next slide, has extensive experience in operating

78

1    facilities on the Santa Barbara channel in an exemplary fashion, and

2    the last time the team operated in Santa Barbara County, it received

3    numerous awards from the state authorities for its excellent

4    operations, including Santa Barbara County's only resolution for good

5    operator, recognizing outstanding operating performance. It's the same

6    team and folks today that are managing this project, that operate those

7    projects. Sable has demonstrated a strong commitment to world-class

8    safety and quality. Sable implements rigorous testing programs to

9    ensure that the production facilities operate safely. We know everyone

10   is worried about a spill, as it has been talked about today and

11   forever. We're going above and beyond the regulatory requirements to

12   ensure that that does not happen again. Sable offers one of the safest

13   possible solutions to the fact that California still needs oil. Oil

14   not only fuels cars and planes and powers our homes, but is a key

15   ingredient in building materials, cosmetics, plastics, clothing, etc.

16   When SYU is operational, it will replace approximately one million

17   barrels of imported oil per month, oil that, right now, is exclusively

18   shipped in by tankers traveling off our shores. That's the oil that it

19   will displace. The worst-case scenario spill from the Los Flores

20   scanning pipeline rupture is less than 1% of what the smallest tankers

21   that are traveling through the Santa Barbara channel can hold.

22       [02:40:00]

23       Sable's enhanced safety protocols and management systems are

24   overseen by our experienced team, who are key to our longstanding

25

79

1    record of safely and successfully operating oil and gas production

2    facilities in California.  You want to take that one?

3         MS. STEBBINS-BINA:  That's you still.

4         MR. RUSCH:  Go down.

5         MS. STEBBINS-BINA:  Sorry, we rearranged everything, and now, we

6    have to go back.  There you go.

7         MR. RUSCH:  So, there's been a lot of discussion on cathodic

8    protection, and we'll talk a little bit about the enhancements.  The

9    board's already looked at cathodic protection when it approved the

10    transfers to ExxonMobil.  Well, cathodic protection remains fully in

11    place on the pipeline.  There's 125 miles of pipeline.  This board

12    already correctly found that cathodic protection is not a condition of

13    the FDP.  The staff report confirms again that Sable is in full

14    compliance, that there's no changes from September 23, when that

15    transfer took place.  With respect to the board's with cathodic

16    protection findings, there's some confusion about the waiver we

17    received from the Office of State Fire Marshal.  The waiver does not

18    reduce any requirements or remove cathodic protection.  What it does is

19    allow us enhance pipeline integrity, which is the overarching program,

20    far and above what exists today, and we'll talk some more about that

21    later, with 68 new requirements, and again, this has nothing to do, of

22    course, with 25B.

23         MS. STEBBINS-BINA:  After the planning commission approved, the

24    transfer two appeals were filed, and that's why we're here today.

25    These appeals misstate the facts and misrepresent, fairly egregiously,

COSB AR007019

1    the county code requirements.  They're an effort to distract this board

2    from the mandatory requirements of 25B.  The appellants presented the

3    same arguments to the planning commission, which properly rejected

4    them.  This is not a procedure about enabling a particular company.  It

5    is about applying the county code in an even-handed, unbiased way that

6    complies with the law.  Sorry.  First, the appellant's wrongly claim

7    that new permits are required to authorize the facilities.  As staff

8    has correctly explained, the existing permits are valid, and none of

9    the circumstances that would allow the county to revoke or modify them

10   have occurred, and chapter 25B does not authorize the modification of

11   permits.  It's simply a transfer statute.  Appellants also demand

12   additional financial assurances far beyond those authorized by 25B,

13   which we'll talk about in more detail in a moment, but as a Supervisor

14   Lavanino appropriately pointed out, there is no authority to simply

15   tear up the FDPs and require new ones, and to appellant's arguments

16   that there should be a decommissioning bond, there is no bond

17   requirement in any of the FTPs prior to actual decommissioning.  This

18   board has not interpreted the FTPs to require such a bond at any point

19   in their 40-year history, and to do so now would be wholly arbitrary.

20   Without signing to specific conditions of approval, appellant's claim

21   were non-incompliance with permit requirements based on the 2015 spill.

22   Again, this board found the opposite last 18 months ago when it

23   approved the transfer to ExxonMobil.  Appellants urge this board to

24   adopt a sweeping interpretation of 25B, but their arguments are

25   extremely misleading.  It is true that it was a multi-year process to

81

1    adopt this statute, and they have attached memos from very early

2    drafts, where staff was proposing a very broad, bold statute that would

3    require all sorts of assurances, and those memos defend those arguments

4    and address concerns about them, but that's not what was actually

5    enacted, in part because a number of the procedures that the board

6    would have thought about enacting back in 2001 were patently illegal,

7    like tearing up the permits and requiring completely different ones.

8    So, if you look here, you can see the language from the ordinance that

9    was originally proposed and then what is actually adopted.  So,

10   originally, there was a proposal that the board could require, or the

11   planning commission could require all necessary instruments or methods

12   of financial responsibility necessary to comply with any permit or

13   county ordinance.  The updated version simply says that the actually

14   adopted version simply says that those materials have been updated, if

15   necessary, to reflect the new owner and will remain in full effect.

16   Similarly, the draft originally said in order to ensure that the new

17   operator owner, temporary operator guarantor, the board could seek

18   assurances to ensure that those maintained adequate financial

19   guarantees

20        [02:45:00]

21        for operations and abandonment.  Now, that's very broad, but

22   what's actually adopted is only to ensure that any insurance or other

23   financial guarantees that were submitted to and relied on by the

24   planning director as a basis to make any of the findings by this

25   chapter are maintained.  So, you can see that is a drastic narrowing

82

COSB AR007021

1    from the original draft.  Similarly, on abandonment, originally, there

2    was an entire provision requiring a new operator to make a plan and

3    funding for abandonment.  That does not exist in the final statute.  It

4    was eliminated, and we are limited by what the code actually requires

5    here.  Because 25B is such a narrow statute and a mandatory one,

6    appellants ask this board to look basically everywhere but 25B, and

7    they've attached a whole host of other things related to: pipeline

8    restart, safety operations, various things they think matter, but they

9    are not within 25 feet.  They are within the exclusive jurisdiction of

10   federal and state agencies that this board does not have the authority

11   to usurp.  This board should not take the bait and should follow the

12   law as enacted.  Oops, I went two slides over.  I do also want to

13   briefly talk about the NOVs from the Coastal Commission.  Appellants

14   made a bold statement that Sable is simply ignoring the Coastal

15   Commission NOVs, but in fact, when Sable began operations, they

16   understood that the repairs on the pipeline, which are required by the

17   Office of the State Fire Marshal were fully covered by the existing

18   permits, and in fact, county staff has expressly confirmed that in

19   writing.  So, it is not the case that Sable is simply operating in

20   violation of the NOVs.  It is operating under the express authority of

21   the county.  In addition, when the NOV was issued, Sable did stop work.

22   It undertook only necessary work, which by the way, all the work, at

23   all time, was supervised by biologists and bicultural protectors.  They

24   took steps only necessary to secure the site, and then they engaged in

25   months of negotiation, addressing these issues, trying to figure out

COSB AR007022

1    who did have authority here.  Was it the Coastal Commission's

2    jurisdiction?  Was it the counties?  Was it covered by the original

3    plans?  Was it not?  It was only after the county confirmed, in

4    writing, that it was within the original FTPs and covered by the

5    existing permits that Sable resumed operations, and they did that, I

6    think, earlier this month.  At that point, the Coastal Commission

7    issued another notice of violation and say, we filed a lawsuit, and

8    that is now before the courts, but a legitimate dispute about who has

9    jurisdiction is not a sign of disrespect for the law.  You have jump to

10   the end here.

11        MR. RUSCH:  Right, well, we've covered a lot of points, but the

12   bottom line here is pretty simple.  We've met all the chapter 25B

13   requirements.  We've demonstrated all operator capabilities and

14   financial requirements, and we've gone above and beyond those

15   requirements, and nothing the board does here today authorizes or

16   prevents restart, as I mentioned earlier.  So, we respectfully request

17   that the board deny the appeals, confirming the planning… or deny the

18   appeals and confirm the planning commission's decision, determine that

19   the requested change of owner operator and guarantor applications are

20   not a project and are exempt from CQA, make the findings under Santa

21   Barbara code 25B9 and 10 and confirm the approval of the change in

22   owner operator and guarantor applications.  We're available for

23   questions.  Thank you.

24        CHAIR CAPS:  Thank you so much to you both.  Let's see, any

25   questions from the board?

COSB AR007023

1          MR. NELSON:  I have a question.

2          CHAIR CAPS:  Oh, thanks, Supervisor Nelson.  Go ahead.

3          MR. NELSON:  Yes, thank you, Chair Caps.  Getting back to an

4     issue that was brought up previously that I wanted and hope that you

5     could clarify for us was the OSPR spill response that you previously

6     had said that there'd be zero barrels of oil that would be spilling.  I

7     think I know the answer to this, but I think, you know, you're the

8     expert.  So, hopefully, you'd be able to expand on that.  that's oil

9     coming from offshore into the ocean, right, and could you speak to how

10    that, the iterations of those initial plans, and how you guys came to

11    the number that you did and why you initially proposed zero?

12         MR. RUSCH:  Sure, Madam Chair, Supervisor Nelson.  When we

13    originally submitted the oil spill contingency plan, we had zero

14    barrels in there, because we weren't producing anything, and at the

15    time,

16         [02:50:00]

17         it was pretty early into the process as we were doing everything

18    else.  So, ultimately, we updated that as we got closer to restart,

19    restarting this project, and we put the appropriate spill response

20    volume or the potential worst-case discharge into that application.

21    So, it was just basically the timing.  So, it now has the correct

22    numbers in there, and they've essentially approved the plan, or they

23    taken no more exceptions as of a couple weeks ago.  So, everything's

24    fine.

25

COSB AR007024

1    MS. STEBBINS-BINA:  One other note on that is that the ultimate

2    worst-case scenario discharge are very materially lower than they were

3    under the old pipeline, in part, due to the installation of the safety

4    valves into the other extensive additional safety measures that the

5    office of the state Fire Marshal is overseeing.

6    MR. RUSCH:  Right.  There's AB864, as I'm sure you're familiar

7    with, or heard of right, created the coastal best-available technology

8    requirements for pipelines, of which this pipeline falls under that,

9    and that's the regulation that requires essentially safety valves.  So,

10   there was a CBAT, we call it, report that was done and approved back in

11   '21, I think it was, under Planes, that had what they call an FRD

12   analysis, which is a risk analysis that determines, okay, how many

13   sections of pipeline you divide up into and put safety valves in.  So,

14   as a result of that as opposed to what some of the other testimony has

15   been here today, is it's reduced the worst-case discharge on the

16   coastal line by 40%, but it's also reduced the inland… you're getting a

17   number of the inland of 15, 14,000, whatever the number, about that,

18   which is inland San Joaquin Valley or Cuyama.  So, there's two

19   pipelines here.  There's kind of an inland section of the coastal

20   section.  The spill was on, 2015 spill was on the coastal section.  So,

21   that now has it, purely from a potential leak standpoint, been reduced

22   by 40%.  Then the other thing that we committed to, and this is all

23   posted online on the CBAT plan, we've added a couple of spill response

24   teams, one Gaviota and one at Las Flores Canyon, to reduce the time to

25   respond to a spill.  The response, the inadequate response to this

86

COSB AR007025

1    spill was out of Bakersfield.  They did not have spill response plans

2    on the coast.  So, we've doubled up the spill response on the coast,

3    and we did an analysis and submitted to the Fire Marshal, which shows

4    that, and this is the plan that was rejected, that actually reduces the

5    spill… the amount of oil to water down to less than 400 barrels.  So,

6    there's been significant work done on that pipeline, and all the safety

7    valves are installed, ready to go, as we gear up towards restart here.

8    So the claims that there's some greater spill potential is absolutely

9    false, and the Fire Marshal has reviewed that plan, and it's available

10   for review by the county, and the county has a plan.

11       MR. NELSON:  Mr. Rush, if I could continue, one of my other

12   questions was just trying to compare what was back in 2014 until now,

13   you know, at that time, my understanding is we had two assets out

14   there.  We had a pipeline and a plant, two different ownerships, right?

15   Now. moving forward, it's under a common ownership.  What does that

16   look like, and does that end up helping or hurting the future and the

17   potential for spills?

18       MR. RUSCH:  Yes, Supervisor Nelson, Madam Chair, absolutely,

19   right.  We now own the pipeline and the offshore facilities and the

20   onshore facility.  So, we have a direct interest in ensuring our aorta,

21   our pipeline going out of Las Flores Canyon operates as, you know, as

22   safely as possible and does not leak.  We have direct interest in that.

23   Prior to that, you had a separate company owning that pipeline, one of

24   many pipelines they own in the entire United States, and it was not

25   probably as high a priority as some other places.  This is our number

COSB AR007026

1    one priority.  I mean, it's been mentioned, this is our only assets.

2    That's true, but it provides the benefit that you just alluded to in

3    that we're now responsible for everything.  So, we have a direct

4    interest in making sure that's all operating safely.

5         MR. NELSON:  Thank you, Mr. Rush.

6         MR. RUSCH:  Thank you.

7         CHAIR CAPS:  Any questions?  So, thank you.  You just talked about

8    this.  Thank you, Mr. Rush, and Ms. Bina, thank you very much.  So,

9    you just mentioned this is your only asset.  So, yeah.  So, just to

10   state, how many other pipelines do you operate?

11        MR. RUSCH:  Well, there's…

12        [02:55:00]

13        within the SYU project, there are the federal lines coming from

14   the platforms to shore.  So, there's a natural gas pipeline and an oil

15   pipeline, a water pipeline.  Those come into the facility, and then the

16   oil and gas is treated, gas is sold to SoCal into the SoCal line, and

17   the oil enters, now, our pipeline at Las Flores Canyon and travels

18   pumped all the way to San Joaquin Valley,, where it goes in the line,

19   2,000 other pipelines either go to LA or up north.  So, those are the

20   lines that we now own, or the 125 miles of pipe to get to that

21   connection in Bakersfield and the lines from offshore, in between the

22   platforms and from offshore to shore.

23        CHAIR CAPS:  But it's correct that Sable does not own, operate

24   any other, has no experience operating any other pipelines?

25

88

COSB AR007027

1          MR. RUSCH:  No, it's that we don't have… the management team that

2      that's here, that was here before at one time, I think we operated 17

3      platforms off the coast of Santa Barbara, Ventura County, and even LA.

4      So, we had experience operating pipelines all along the channel, with

5      Point Pit Analysis under Planes Exploration Production, and then

6      Freeport ran the same management team operated all those facilities,

7      and many of the people that are now working for us that we're bringing

8      on board in Las Flores East Canyon have operated some of those

9      facilities.  So, we have a lot of experience operating the types of

10     pipelines we're talking about, but currently, this management team

11     under Sable operates the pipelines I'd mentioned previously.

12         CHAIR CAPS:  But you have experience operating the offshore

13     pipelines like this one?

14         MR. RUSCH:  Absolutely.  Absolutely.

15         CHAIR CAPS:  Okay.  I'm just going to… okay.  So, back to the

16     insurance policy.  You can understand why there's a lot of emotion and

17     concern.  I don't know if you were here in 2015 and the years have

18     proceeded, but it was incredibly devastating to every single sector.

19         MR. RUSCH:  I live in Santa Monica.

20         CHAIR CAPS:  The economy, our fishermen of, of course, those who

21     worked on the pipeline, our environmentalists… it was, is still

22     shocking, and so, insurance policies are really important, and a lot of

23     it has been made.  I understand you've satisfied the requirement of

24     just providing a certificate of insurance, but would you be willing to

25     provide the actual policy?

COSB AR007028

1           MR. RUSCH:  Want to speak to that?

2           CALDWELL FLORES:  How are you doing, Madam Chair?  Hi, I'm [PH

3    02:57:36] Caldwell Flores, President of Sable.  It's nice to meet you.

4           CHAIR CAPS:  Yeah.

5           CALDWELL FLORES:  We have to review our contractual language with

6    our underwriters, but to this day, we have not been asked by any

7    entity, including staff here or OSPR or federal staff to provide

8    anything more than certificates.  We have over $400 million in

9    liability insurance and another $35 million in pre-restart, open $90

10   spill additional coverage.  That number can go up to $101 million.  So,

11   it makes about $500 million.  Then you put our cash on top of that,

12   plus post restart.  You take revenue and put that on top of that.  So,

13   you start talking about an alleged $870 million in a worst-case

14   previously, and then the upgrades made to the line referenced by staff

15   here and acknowledged by staff here, and you can see why we feel very

16   comfortable.  We are well capitalized.  Plus, being a public company

17   worth nearly $3 billion, we feel very comfortable with the ability to

18   secure capital in any other extraneous scenario.  Thank you.

19          CHAIR CAPS:  So, okay.  So, you haven't been asked to provide

20   your full insurance policy, you don't intend to do.

21          CALDWELL FLORES:  Not to this date, no, ma'am.

22          CHAIR CAPS:  Okay.

23          MR. RUSCH:  And we provided the certificates of insurance, which

24   is what's is standard in a transaction.  They're reviewing the policies

25

COSB AR007029

1    to see if anything additional can be provided, consistent with those

2    contracts.

3             CHAIR CAPS:  Okay, perfect.

4             CALDWELL FLORES:  Thank you, ma'am.

5             CHAIR CAPS:  Thank you very much.  Any other questions from the

6    board before we move on?  Okay.  We are just going to take a ten-minute

7    break, because we've been going for about two hours and 45 minutes.

8    Thanks to everyone.  You've been quite respectful of people's time, and

9    again, we will be back in about ten minutes.

10            [03:00:00]

11            [03:05:00]

12            [03:10:00]

13            CHAIR CAPS:  All right, I'm happy to… hello.  Let's have some

14   quiet, please.  Thank you.  All right, everyone.  Now, we're at the

15   public comment portion.  As a reminder that if we went to full public

16   comment for three minutes, we'd be here until… this item would go until

17   7:00… no, until 9:30.  The whole hearing would go until 9:30 PM.  So,

18   with that, as I

19            [03:15:00]

20            advertised already, we're going to let those who are electing to

21   give one minute or less comments go first, but we do have, as chair's

22   prerogative, we have former supervisor, Mike Stoker, who's requested to

23   speak.  I'm going to allow him to speak first, but he is in those that

24   one-minute category wherever you are, Mr. Stoker

25

91

1          CLERK:  And Chair Caps, members of the board, while Mike is

2     making his way to the podium, he may be in another room, I just want to

3     remind members of the public on Zoom to please use the raise hand

4     feature, if you want to speak for one minute.  Please, raise your hand

5     on Zoom if you want to speak for one minute, and we will go to you

6     first, and if you are in person here in Santa Barbara, if you can

7     please start forming a line behind the podium, the one-minuters, that

8     would be greatly appreciated.  Anyone downstairs or in the board

9     conference room who wants to speak for one minute, please, make your

10    way to the hearing room now.  We will be taking you first.

11         CHAIR CAPS:  And at 12:30, we're breaking for a closed session

12    for 30 minutes.

13         CLERK:  Okay, and, sorry, one more, we'll begin with Mike Stoker,

14    but for all other one-minutes, if you can please first begin with

15    stating your name, and then I will start the clock.  Thank you.

16         CHAIR CAPS:  Okay, Former Supervisor Stoker, welcome.

17         MR. STOKER:  Madam Chair, thank you very much.

18         CHAIR CAPS:  You're welcome.

19         MR. STOKER:  I really appreciate the courtesy.  You know, what I

20    want to really underscore today, and I'm here as president of CEO of

21    the Santa Barbara County Taxpayer Advocacy Center, and on behalf of our

22    300 members, we support the planning commission action and would ask

23    you and urge you to uphold the action.  You know, I think what I'm

24    trying to underscore is what's happened to this process, and we all

25    know Santa Barbara County Oil's a real hot issue, and they're for oil

92

COSB AR007031

1    against oil, and I was in this room decades ago with three days of

2    hearings for Exxon that we had 300 plus here people testifying, and

3    that those were the hearings that started really what we're here today

4    about, and I think a lot of people think this is about shutting them

5    down or not, but that's not really what's here, because what really

6    happened is decades ago, we approved Exxon, and they got vested rights,

7    and they sold the company to Sable, and they got those vested rights

8    when they bought and purchased that company, and really, what's only on

9    the table is 24B, and 24B isn't about whether they get to operate or

10   not.  That has to do with the Fire Marshal and other people that make

11   other decisions, and really, where we're at on this whole issue of

12   change of ownership is at the end of the day, when you look at the

13   change of ownership, we know it took place.  We know Harry Hagen and

14   the assessor's office says it takes place.  The property bill goes to

15   Sable.  They pay the bill, and at the end of the day, if you look at

16   all the financial requirements, they complied with it, and that's why

17   your staff has made the recommendations that they've made.  I thought I

18   was on a three-minute.  Sorry.

19       CHAIR CAPS:  [INDISCERNIBLE 03:18:18] So, it's the one-minute,

20   but it's fine.  Feal quick, if you could conclude.

21       MR. STOKER:  Thank you.  So, you know, two things are going to

22   happen.  One is going to get denied and Sable's going to keep doing

23   everything that we're going to do anyway, because your attorneys are

24   going to probably say don't stop them, and all these people in the room

25   that think they are going to be stopped, they're disappointed, because

93

COSB AR007032

1   they were misled, or you're going to try to stop them, and I don't

2   think you will, but if you do, you're going to probably be in that

3   executive session room, because you're going to get a taking lawsuit,

4   and they're going to tell you how serious that taking lawsuit is in

5   terms of exposure to the county. So, you're going to come back, like

6   the AMR situation. You weren't happy with the outcome, but you had to

7   do what you had to do to avoid the exposure, and you're going to end up

8   agreeing to the change of ownership, and I just want to leave, you

9   know, one thing with Supervisor Lee, who I think the world of. You

10  know, you have a permit with the Environmental Health Department,

11  owning Uncle Jim's restaurant. Can you imagine if you went to sell

12  that, if Environmental Health said, we're not going to let you change

13  the name from you and your wife or whoever's, I think it's just you on

14  there as the owner/operator, the responsible party, to who the new

15  owner would be, and we really need to change the process so we don't

16  have these kind of issues.

17          CHAIR CAPS:  Okay, thank you.

18          MR. STOKER:  Thank you very much.

19          CHAIR CAPS:  Thank you.  Okay, we'll move along there.  Thanks to

20  everyone who's lined up to speak for one minute.  Really appreciate it.

21          CLERK:  And friendly reminder, please, state your name first.

22          DOVE JONES:  Hi, my name is Dove Jones, and this is my friend

23  Halo.  So, I brought Halo with me today, because she's an honorary

24  explorer in the Explorer Club, and she is wild, or she was born wild,

25          [03:20:00]

94

COSB AR007033

1          and she represents a fraction of the wildlife that our decision

2     making today would affect, all through the food chain, starting with

3     small animals up to us, and as a dolphin explorer and ocean

4     conservationist, I've been working on trying to protect the planet

5     since I was a child, and I've seen firsthand what pollutants and, you

6     know, plastics do to destroy coral reefs, ecosystems. and animals.  If

7     any of you have ever taken care of an injured or dying animal, you know

8     that they experience the same emotions that we do, and so, today is

9     really a legacy decision day.  So, I ask you, do you want to be

10    remembered as someone that your grandchildren, your family, and future

11    generations for protecting and preserving what makes Santa Barbara so

12    amazing and beautiful, , biodiversity on land and sea?  Gas fracking…

13         CHAIR CAPS:  Thank you, Dove.

14         DOVE JONES:  You know, destroys water systems, and it's right

15    above Gaviota.  So, thank you for this opportunity.

16         CHAIR CAPS:  Thank you.

17         CLERK:  Thank you, and if members of the public can please stick

18    to the one minute, if you do choose to speak for one minute, and also,

19    a friendly reminder, this is only for those that have submitted a

20    speaker slip and your name is on the list.  So, if your name is not on

21    the list, you cannot speak for the one minute.  Thank you.

22         NANCY AVOSE:  Good morning, chair, council, and supervisors.  My

23    name is Nancy [PH 03:21:43] Avose, and I'm here on behalf of the

24    organization Santa Barbara County Action Network, SPCAN.  Some of our

25    peers and colleagues said it best: our elected officials should

COSB AR007034

1    represent us and not Sable, and I'm confident that together we will

2    make the correct decision today. Organizations like SPCAN care about

3    social justice elements beyond solely environmental justice. We strive

4    to promote economic justice as well, and sustainable job creation. We

5    support the job creation that will come of getting rid of the corroded

6    pipelines. We support the job creation that may redirect oil

7    companies, oil company employees to jobs that will secure resources for

8    our population in an environmentally conscious manner, and we can work

9    together to accomplish this. We hope that you recognize that all of

10   us, including Sable employees, benefit from our beautiful earth and our

11   beautiful oceans. Thank you.

12       ALAN VILLESCORREIA: Hello. Thank you, Chair Caps, and thank you

13   to the board of supervisors. My name is Alan [PH 03:22:46]

14   Villescorreia, and I'm here to represent the Community Environmental

15   Council, and I'm also a board member of SPCAN. So, my message from the

16   Community Environmental Council is that we urge the board of

17   supervisors to deny the permit transfer to Sable Offshore and to

18   prevent the restart of oil production in our region. Protecting our

19   coast, climate, and community must be the priority, not reviving a

20   dying industry with a history of environmental and financial failures.

21   Beyond the immediate threats, the continued expansion of oil operations

22   undermines our county's climate goals. This stationary source of

23   greenhouse gas emissions in the county be could be the largest

24   stationary source of GHG emissions and would make it impossible for us

25   to reach our county's targets. I also want to say, as a native of

96

COSB AR007035

1    Santa Maria, as a resident of Guadalupe, and I know that multiple

2    supervisors have actually represented district three, we have a history

3    of oil spills.  In Guadalupe, we dealt with diluent oil spills for over

4    40 years, and we did not get enough attention.  So, please, deny the

5    transfer of the permits.  Thank you.

6        CLERK:  Thank you.  Come on down.

7        ETHAN MIDDAY:  Hi, I'm Ethan [PH 03:24:05] Midday.  I'm 14, and I

8    go to Santa Barbara Middle School.  I am a ninth grader there, and I am

9    a surfer.  I've lived my whole life in Santa Barbara, and it is deeply

10   concerning to me to know that we're trying to restart an oil spill.

11   This oil platform will spill.  We've seen the pictures of the lines,

12   we've seen the facts, we've seen the corrosion.  This is not a safe

13   thing for our environment or for us to be supporting.  We need to say

14   no to this.  At my school, I organized for over 50 of our students, and

15   all 50 of these students sent you guys emails, telling you why they

16   care about the ocean, and why this is not something that we should be

17   supporting.  The youth population is saying no to this, and if we are

18   denying, and if we aren't using the very bill that we designed to

19   protect our coastline

20       [03:25:00]

21       and our community from this specific instance, we're losing faith

22   in our democratic system.  Thank you so much.

23       LORI BAILEY:  Hi, I am Lori Bailey.  Thank you so much for

24   letting us have this.  My late husband Owen was the former executive

25   director of the Environmental Defense Center, and I know some of you

97

COSB AR007036

1    knew him.  One thing I learned from him is these emotional decisions

2    are best made with two things in mind, one, what is the actual

3    evidence, and what is the worst-case scenario, and from everything I've

4    heard today from everyone who's spoken, I have yet to hear that every

5    inch of that pipeline has evidence of corrosion product protection

6    right now.  Might it someday?  Maybe.  Does it right now, the day

7    you're deciding whether they get the permit?  Does every inch of that

8    pipeline have protection against rust and corrosion and a massive

9    spill?  It does not.  It does not.  The second part of it is worst-case

10   scenario.  From grief, I know that there's bargaining when tragedy

11   happens, this is the moment before the tragedy happens.  This is the

12   moment we'll all look back on and say, did we make the right decision

13   back then?  This is the back then.  Thank you so much.

14        CHAIR CAPS:  Thank you.

15        ANDREW ROBBINS:  Hello, my name's Andrew Robbins.  I was born and

16   raised in Santa Barbara County, grew up in [INDISCERNIBLE 03:26:31].

17   Now, I live in Santa Barbara, and I would just ask you to deny the

18   permit transfer.  I don't think Santa Barbara needs this.  I think the

19   facts have been laid out pretty clearly, and I just want to thank you

20   for your consideration in this issue and all your thoughtfulness in

21   making this hard decision.  Thank you.

22        KEYONG HADUSI:  Hi, my name is [PH 03:26:56] Keyong Hadusi.  I'm

23   a Santa Barbara resident, and I want to speak here, because I'm pro-

24   American Oil.  I'm also pro accountability, and insurance is not

25   accountability.  Federal backup funding in the case of disaster is not

COSB AR007037

1    accountability.  No large company, Exxon included, wants to drill

2    offshore in Santa Barbara, because they would have to be accountable.

3    They have large enough money in order to be held accountable to the

4    negative consequences.  Sable Corporation fits the description of 25B,

5    which is a corporation that does not have the funding or financial

6    backing to be held accountable to their disaster.  They are playing

7    with house money here.  If everything works well, then they make a

8    profit, but if something goes wrong, they don't bear the full

9    repercussions of this, and that is enough criteria to deny them, and

10   everything from here is… everything from here, beyond this is just

11   support for the reason for this criteria.  Them not meeting permits,

12   them trying to bulldoze, telling you this is a mandatory approval is

13   them trying to bulldoze you.  Please, deny them this change of name and

14   ownership.  Thank you for your time.

15        SOLANGE AGUILAR:  [INDISCERNIBLE 03:28:10].  My name is Solange

16   Aguilar.  There is no such thing as a safe oil pipeline.  This has been

17   proven time and time again.  Things grow.  They burst.  They have been

18   poisoning the land across the country, across this very land, this

19   ocean, and it's not a matter of if this pipeline will fail, but when it

20   will fail.  The land is still healing from the oil spill ten years ago,

21   and to restart it would be detrimental to the health of the land,

22   water, animals and people.  We all have a responsibility to protect the

23   land and speak out for the earth, and this is your opportunity to do

24   the right thing and protect [INDISCERNIBLE 03:28:41] land not only for

25   this generation, but for future generations.  Please, deny them.

99

1          FEMALE 1:  Hello, board of supervisors.  I'm sorry, [PH 03:28:54]

2     I'm not seeing Joan here, also.  I spoke about this at the planning

3     commission, also, and oil is part of our environment, and we didn't

4     make it.  God made the oil, and it seeps out of the ground naturally

5     into our ocean.  I used to get covered with it when I used to play in

6     the ocean as a child.  We need to support our local community, the

7     taxpayers, the workers, the property owners, the property taxpayers.

8     We really do, because you guys are running a business.  Thank you.

9          REBECCA WILLIAMS:  Hello, my name is Rebecca Williams, and I'm

10    here as a concerned student.  ExxonMobil and Sable Offshore's

11    irresponsible attempts to repair and restart the pipeline are deeply

12    alarming.  People from all over

13         [03:30:00]

14         the world come to Santa Barbara to see the natural beauty and

15    wildlife along the Gaviota coast.  The damage done by the 2015 Refugio

16    spill was irreversible.  Any drilling is a threat to local ecosystems.

17    The ocean is not safe unless all oil drilling is shut down.  I urge the

18    board of supervisors to learn from the past and protect the livelihoods

19    of the wildlife and people in the Santa Barbara community.  Do not

20    approve this lease transfer.  Thank you for your time.

21         KYLIE MIKADI  Hello, board of supervisors.  My name is Kylie

22    Mikami, and I'm here as a concerned student.  The actions taken by both

23    ExxonMobil and Sable Offshore to irresponsibly repair and restart the

24    pipeline is deeply troubling, and though I understand you have many

25    opinions to consider, I urge you to listen to those who have shown up

100

1      today to voice their concern.  In order to protect the safety and

2      wellbeing of current and future Californians, it's of the utmost

3      importance that the board of supervisors act now and deny the transfer

4      of permits from ExxonMobil to Sable Offshore.  It's a likely event that

5      a spill occurs.  Sable cannot afford to clean it up, and it should not

6      fall on us to clean up that mess.  I hope that, like myself, you will

7      choose decency over profit and recognize the potential human, animal,

8      and natural suffering that will occur if the permit is approved and the

9      pipeline is restarted.  Thank you for your time.

10         ABIGAIL YOUNGBLOOD:  Hello, board.  Thank you for having me

11     today.  My name is Abigail Youngblood, and I'm here to express my

12     strong disapproval of the transfer of ownership of the pipeline and

13     related facilities to Sable.  As a Santa Barbara resident and lover of

14     the ocean, I believe we cannot allow Sable to restart operations to the

15     pipeline, especially due to the uncertainty surrounding its funds and

16     its non-compliance with state and county safety warnings.  This company

17     is clearly chasing profits and does not care for the health and safety

18     of the Santa Barbara communities, human and biological alike.  Please,

19     help Santa Barbara prevent horrific damage to our ocean.  Let us not

20     forget the legacy of the 1969 spill.  We are a community that stands

21     against the dangerous practices of oil companies off our coast.  Thank

22     you for your time.

23         SETH DOLAK:  Thank you to Chair Caps on the board of supervisors.

24     My name is Seth Dolak.  For the last four years, I have studied our

25     planet, and I've studied how it is suffering.  I have studied how it is

COSB AR007040

1    suffering because of our actions.  I want our children, our

2    grandchildren, and for every generation to come to witness the

3    abundance and the biodiversity of the Santa Barbara channel, but today,

4    I don't hold the power.  You make this decision.  I urge you to accept

5    the appeals and deny the transfer of operator from Exxon to Sable.

6    This reinstatement of this pipeline, which Sable is unable to operate

7    safely and cannot afford to clean up in the instance of a spill, can

8    and will devastate the Santa Barbara coast.  We must learn from our

9    mistakes.  We are not separate from nature.  If our planet suffers, we

10    suffer.  Please, do not let this happen again.  Thank you.

11        MIA DIGOSTANZA:  Supervisors Caps, Levanino, Lee, and Nelson,

12    thank you for hearing our comments today.  My name is Mia DiGostanza,

13    and I'm the President of the Environmental Law Club at UCSB.  I'm here

14    today to ask you to deny Sable's request as owner, to transfer permits

15    as owner and operator of ExxonMobil facilities.  This company has

16    proven time and time again that it is unfit to run a responsible

17    business.  Unsurprisingly, they have chosen to ignore the law and

18    resume unauthorized work on the pipeline.  To give them the permits

19    that they're asking for would serve as an unfit justification of their

20    illegal activities.  This old, corroded pipeline is essentially

21    guaranteed to have a massive leak if operations are ever to resume.

22    Adding insult to injury, Sable's insufficient financial status will not

23    be able to pay for the damages that they have caused by trying to make

24    a buck off of our coast.  We will be the ones bearing the burden of

25

102

COSB AR007041

1    that cost.  Luckily, there's something that you can do to stop this

2    from happening.  Please, deny Sable's applications.  Thank you.

3        EVERETT MATHESON:  Hello, board of supervisors.  My name is

4    Everett Matheson, and I'm a student from UCSB.  I'm here because I care

5    deeply about our oceans.  I've grown up in Southern California, living

6    near the coast my entire life, and I do not want to see this coast

7    destroyed by a burst pipe.  Sable's operation will directly threaten

8    the safety of our oceans, and so, I'm asking that the board of

9    supervisors to deny Sable's application to transfer permits today.  For

10   the sake of brevity, I'll simply reiterate the facts stated by appeals.

11   Sable has not fulfilled the condition of adding critical corrosion

12   protection to the pipes.  The Refugio spill was caused by corrosion,

13   and so, Sable's inaction demonstrates a gross negligence that they will

14   carry into their operations.  In the event of a spill, Sable will

15   declare bankruptcy, and the burden of cleaning will fall onto the

16   taxpayers.  I cannot sit by and watch another injustice like the

17   Refugio oil spill happen again.  When the pipeline bursts, and it will,

18   the blame will fall not only on Sable but on the board who allowed such

19   a critically unsafe operation to be restarted.  I hope that you can

20   understand my frustration with the situation and consider my thoughts.

21   Thank you for your time.

22       HAILEY RONAN:  Hello, my name is Hailey Ronan, and I'm here as a

23   concerned

24       [03:35:00]

25

103

1      UCSB student.  I urge you to deny the request of the transfer of

2      the pipeline to Sable.  Sable may be able to pay for the damages they

3      may cause, but that does not undo the potential permanent damage to our

4      oceans and species, habitat destruction, and water pollution risks.

5      Although this may seem just like the transfer of a permit, it's more

6      than that.  It's sending a message to the hundreds of people that

7      showed up today about your stance on our future environment, health,

8      and that your priority is not with the people but with big business.

9      Thank you.

10     MALIA MARTINEZ:  Hello, board of Supervisors.  My name is Malia

11     Martinez, and I'm a student at UCSB.  Today, I urge you to deny Sable's

12     application to transfer permits for the pipeline.  While I was born and

13     raised in Los Angeles, I've had the privilege of visiting Santa Barbara

14     frequently, thanks to my family's affection for the community and

15     coast.  These visits left a lasting impression, encouraging me to

16     choose Santa Barbara as a place to live and learn.  I'm a film major,

17     and I aspire to create films that highlight the beauty of this region,

18     as Santa Barbara is a great biodiversity hotspot, but recently, I

19     watched the documentary titled Broke, which showcased the devastating

20     aftermath of the 2015 spill, which made it clear that it's not a matter

21     of if another spill will occur, but when.  If we continue down this

22     path, the films I'll have an opportunity to make will not highlight the

23     coast biodiversity but only serve to warn of the harm caused by

24     decisions like the one before you today.  The scars of the past are

25     still fresh in our memories.  So, we cannot approve a project that is

104

1     already proved to cause harm to our environment and physical wellbeing.

2     I ask you to make the choice, so we'll prioritize the protection of

3     this region and its people.  Thank you.

4          XEREK MCDONALD:  Good afternoon, supervisors.  I'm [PH 03:36:50]

5     Xerek McDonald.  I'm a student here at UCSB, and I've grown up along

6     the coast my whole life, and to see such a beautiful part of, oh my

7     gosh, a beautiful part of the coast and such a biodiverse part of the

8     coast threatened by this project is very concerning.  I urge the board

9     of supervisors to deny Sable's application to transfer permits, because

10    when these facilities eventually fail, the damage to our ecosystem will

11    be devastating.  It will take countless hours to recover from, and it

12    will bring with it an enormous bill.  Sable likely cannot afford the

13    bill, and the responsibility will fall on the public, which is

14    unacceptable.  This Texas oil company does not have our best interest

15    in mind.  It should not be in charge of something so important.  Thank

16    you.

17         ALEX BORDES:  Good afternoon, supervisors.  My name's Alex [PH

18    03:37:40] Bordes.  I'm from UC Santa Barbara.  I had a lot more written

19    out about the environmental impacts of this, but I think the people

20    before me and after me as well as the EDCs report has made it

21    abundantly clear that an environmental disaster is likely.  I think

22    another thing that we should focus on is Sable themselves.  I mean,

23    this is a company that has ignored multiple cease and desists.  They

24    have inadequate liability insurance.  They still owe hundreds of

25    millions of dollars to Exxon and other companies.  They're massively in

105

COSB AR007044

1  debt, and functionally, they're gambling with taxpayer money.  When the

2  oil spills, and it will, they will be bailed out by the government and,

3  you know, use our taxpayer's monies to get out of it, and if they're

4  successful, then they get to just pollute and make the money off that

5  and get away Scott free.  Under 25B, it's clear they do not have the

6  financial means to properly run this, and that's also just on top of

7  the fact that, you know, you shouldn't just sell us out for some oil

8  company from Texas that for sure does not have her interest in mind.

9  Thank you.

10      JOHNNY RODRIGUEZ MCONVILLE:  Hi, my name is Johnny Rodriguez

11  McConville, and I've been a campaign coordinator at UCSB with CALPER,

12  which represents over 25,000 dues-paying members across California, and

13  I've had the amazing privilege of working on the Stop Sable campaign

14  over the past few months.  I also had the wonderful opportunity to talk

15  with students at UCSB and the greater Santa Barbara area about the

16  pipeline and the Stop Sable campaign, and I can say, without a shadow

17  of a doubt, that the people who live here in Santa Barbara as UCSB

18  students or as lifelong residents are wholly and unequivocally opposed

19  to the transfer of permits to Sable Offshore Corporation.  Your

20  constituency, the people who live right here in Santa Barbara, that are

21  here on their own volition, the people and schools that are missing

22  lecture and work, the people that aren't here because of a paycheck

23  don't want the fiscally, you know, unresponsible company that is able

24  to be given these permits.  Again, why would Exxon take on a multi-

25  billion-dollar loss to hand over this pipeline?  Please, vote no.

COSB AR007045

1    CLERK:  John, my apologies, what was your last name?

2    JOHNNY RODRIGUEZ MCONVILLE:  McConville.

3    CLERK:  Can you say that again for the... on the mic?

4    JOHNNY RODRIGUEZ MCONVILLE:  McConville.

5    CLERK:  McConville?

6    JOHNNY RODRIGUEZ MCONVILLE:  Yeah.

7    CLERK:  Thank you.

8    [03:40:00]

9    JESSE RUMPKIN:  Good afternoon, supervisors.  My name is Jesse

10   Rumpkin, and I wanted to thank you all for listening to our comments

11   today.  I'm here as a very concerned member of this community, and many

12   people here have a lot of concerns for what's happening today.  I'm

13   here to urge you to deny the transfer of applications and deny the

14   transfer of permits.  You've all heard the facts today.  You've heard

15   the systemic and continual denial and action from the violations and

16   cease and desist orders Sable has been given.  We cannot trust them to

17   say what they're going to do.  Even if the proposal goes perfectly and

18   according to plan, the question of a spill is not if.  It's when.  It's

19   heartbreaking to imagine our land and coasts covered in oil again.  I

20   will never forget the black waters and the silenced waves.  I urge you

21   to listen to us.  Thank you.

22   OLIVIA SCHROEDER:  Good afternoon, supervisors, and thank you for

23   the opportunity to speak today.  My name is Olivia Schroeder, and I am

24   an undergraduate student and researcher at UCSB.  Currently, I'm

25   conducting research within the Santa Barbara watershed, specifically

107

1   examining the impact of extreme weather events on native frog species

2   in the watershed region.  However, the Sable pipeline has directly

3   hindered my ability to continue this important work.  This pipeline not

4   only poses a risk to marine life by disrupting their habitats and

5   increasing likelihood of future oil spills, but also, endangers the

6   habitat of the already enlisted and endangered California red-legged

7   frog.  The Sable pipeline runs directly through the habitats of these

8   frogs, which are critical to my research.  As a result of the pipeline,

9   I'm unable to complete my comprehensive studies of the endangered red-

10  legged frogs in the creeks along the [PH 03:41:57] Regio Coasts.  It

11  makes me question why I can't do scientific research with the permit,

12  but Sable can and has worked on this pipeline without correct

13  permitting.

14          CLERK:  Thank you, that is your time.

15          HOLLY SHERWIN:  Hello, my name is Holly Sherwin.  I am a water

16  user and active outrigger paddler, and I'm on the advisory committee

17  for Santa Barbara channel keeper.  First off, thank you for your

18  service, board of supervisors, and for allowing public comment.  It's a

19  right that I don't take for granted.  As we all know, Santa Barbara is

20  a special place, dare I say, sacred place.  Generations of inhabitants

21  have worked hard to be good stewards of this most amazing coastline and

22  all the wildlife that depend on it.  It takes a long time to heal after

23  an oil spill.  We know that all too well, and it has been determined

24  that another spill from these facilities is likely, and I believe that

25  to be true.  It's a shame we could not have done this better and built

COSB AR007047

1      a better pipeline to begin with, rather than a startup of a pipeline

2      that is sorely damaged.  I urge you to lead from your ,hearts to do the

3      right thing for us, for the sacred beauty of this place, and for the

4      many generations yet to come.  We are Santa Barbara, and we can do

5      better.  Thank you.

6          GILLIAN HEALD:  Hi, thank you for your service.  My name's

7      Gillian Heald.  I'm representing the Santa Barbara Planet Protectors.

8      We're a local volunteer organization that diverts plastic from the

9      landfill.  Collectivism.  Thomas Payne, a founding father, argued for a

10     republic where the power belongs to the people, not a monarchy.  He

11     wrote about collectivism stating public good is not a term opposed to

12     the good of individuals.  On the contrary, it is the good of all

13     individuals collected.  It is the good of all.  This pipeline is not

14     for the good of all.  It is not for the collective.  It is risky, and I

15     am deeply concerned about the likelihood of a spill.  I'm here to speak

16     on behalf of the collective as a voter.  I voted for you, Mr. Lee, as

17     my representative, and as a community member of Santa Barbara, having

18     graduated in 1988, I vote you… I urge you to vote no on transferring

19     the operation permit to Sable.  Thank you.

20         REESE RAYGOZA:  Good afternoon, supervisors, board members and

21     community members.  My name is [PH 03:44:43] Reese Rejo Raygoza, and

22     I'm a student at UCSB, representing the I Live as a Surf Rider

23     Foundation.  I want to start my comment by urging you to [PH 03:44:2]

24     invite me in a collective deep breath, so we can all ground ourselves

25     for a sec.  This matter is very important, and

109

1            [03:45:00]

2            it is evident by all the community members here today, especially

3     the young ones.  As an environmental studies student and supported by

4     community, we are deeply concerned with this proposal to transfuse this

5     application, and I think it is very important to realize and consider

6     why we are taking the time out of our academic day, not compensated,

7     amidst the busy schedules, we have finals in two weeks, why we're so

8     invested in this issue.  It is going to directly impact our communities

9     and impact, those especially who don't have voices, including non-

10    humans and humans, and also, I just want us to consider our

11    positionality in this in the first place.  If you're in support of this

12    transfer, must wonder why.  Like, your individual collectiveness will

13    urge you to say yes, but yeah, thank you for your time.

14            BILL HICKMAN:  Hello, supervisors.  My name is Bill Hickman with

15    the Surf Rider Foundation.  Thank you for the opportunity to speak

16    today.  I think it's really important to refer to oil spills by the

17    company that causes them rather than the community that is impacted.

18    The 2015 Planes All American spill is one example, and the transfer of

19    the permit today would lead to the Sable oil spill in the future.  A

20    publicly traded company like Sable has a top priority to increase

21    shareholder equity.  That's in hopes that there's not an oil spill.  We

22    are really concerned that they don't have the financial responsibility

23    and the financial backing to properly address an oil spill, and it's

24    not only going to impact Santa Barbara.  The 2015 oil spill also

25    impacted Ventura, South Bay, LA.  It expands and impacts wildlife in

110

COSB AR007049

1   addition to tourism.  So, please deny the transfer of the permit.

2   Thank you for your time.

3        ELLA BONHAM:  Hi, my name is Ella Boham.  I'm a student at Santa

4   Barbara City College, and I work out in Gaviota, right next to the

5   pipeline.  To the board of supervisors, I would like to speak to you as

6   a young person whose future will be deeply impacted by the

7   environmental choices you make today.  I want to ask you that you

8   consider long-term impacts of approving this project before short-term

9   profits, that you place the people of Santa Barbara County before an

10  oil company from Texas.  We have seen oil spills before and the

11  destruction they cause, and we have all asked ourselves how these

12  mistakes can happen.  This is how they happen.  You choose to repeat

13  the mistake of placing profit before people, and the people sitting

14  before you today, including Sable employees, will be the ones to pay

15  for it, and not just us, but our children and our grandchildren and all

16  future generations, if they even exist.  Please represent us before an

17  oil company.  Ensure our futures.  Deny the transfer of permits,

18  please.  Thank you.

19       JENNA MCGOVERN:  Hello, supervisors.  My name is Jenna McGovern,

20  and I'm representing UCSB's Environmental Affairs Board and the Stop

21  Sable Student Coalition.  Thank you for taking my comment.  I urge you

22  to exercise your power provided by Chapter 25B, which allows for extra

23  screening on lease transfers to new owners and was intended for this

24  exact situation.  Along with the environmental implications, I'm

25  particularly concerned about Sable's integrity and ethics.  From the

111

COSB AR007050

1    notices of violation in September and Sable's subsequent

2    unresponsiveness, the cease and desist order did say Sable off for some

3    time.  Yet less than a week after this order expired this month, Sable

4    resumed development.  It's not my place to understand why this company

5    would yet again engaged in what the Coastal Commission calls un

6    permitted development just weeks of today's hearing, but I believe this

7    speaks volumes.  Allowing a company that has an unmasked disregard for

8    compliance and permits to operate in one of the most highly regulated

9    industries is a massive concern.  Our beautiful city cannot handle a

10   company like stable, and we don't deserve it.  Thank you.

11        MAYA ALDRIDGE:  Good afternoon, supervisors.  My name is Maya

12   Aldridge, and I'm a student at UCSB, and I'm in the CALPER

13   organization.  I just want to bring to your attention that, since the

14   year 1980, America has faced over 400 climate disasters, which has cost

15   us nearly $3 trillion and lost 17,000 lives.  Just in the past year, we

16   faced Hurricane Melton, Hurricane Helene, and of course, the

17   devastating fires of Palisades and the Eaton fires.  Disasters like

18   these just cost the public and not the people that are truly at fault

19   here, and we cannot continue to enable these fossil fuel companies to

20   destroy our environment for temporary profit, while the rest of us

21   watch our futures and the livelihoods of future generations burn, and I

22   also just want to say that there's nothing natural about a pipeline in

23   our oceans or climate change.  Thank you.

24

25

COSB AR007051

1          BENJAMIN BRAY:  Thank you for the opportunity to speak today,

2     supervisors.  My name is Benjamin Bray.  I represent the Excursion Club

3     at UCSB and am an expedition guide on the Channel Islands.

4          [03:50:00]

5          I urge you today to deny Sable's application to transfer permits

6     for the Santa Inez unit, POPCO Gas Plant, and Los Flores pipelines.

7     Sable has received notices of violations from three state agencies and

8     recently received a second cease and desist order from the Coastal

9     Commission for continuing its work on pipelines without a proper

10    permit.  The behavior of Sable's management team shows that the board

11    cannot trust them to responsibly operate on this project.  Another

12    spill from these facilities is likely and will be devastating to Santa

13    Barbara County and the Gaviota Coast.  As a student at UCSB, a spill

14    would directly impact our living environment, wildlife, and homes.  As

15    an employee and a diver working on the Channel Islands, a spill would

16    directly impact my work.  The public should not have to pay to clean up

17    another spill, and it is necessary for the people and the environment

18    of Santa Barbara that we do not approve the transfer of permits.

19         JOSHUA MEDRANO:  Good afternoon, board, Madam Chair.  My name is

20    Joshua Medrano.  I am the Tri-Counties Billing and Construction Trades

21    Council's Executive Secretary Treasurer, representing San Luis Obispo,

22    Santa Barbara, as well as Ventura County's.  We are in favor of staff

23    recommendation of moving forward with the process to transfer over.

24    One of the things I want to point out is that the fact that this room

25    is filled with a young generation, and this future is looking bright,

113

COSB AR007052

1   as they are coming forward with concerns.  One of the things that I

2   want to encourage this room is to seek me out after this meeting, as

3   you can be a part of the solution and not only bring problems to the

4   table.  What I have heard is nothing but problems and no solutions.

5   The solution that I can bring you today is a fact that the building

6   trades offer skilled and trained labor to help with the mitigation,

7   remediation, and the safety moving forward that is needed to go past

8   what we have done and move forward with that just transition.  Thank

9   you very much for your time.  Please, seek me out.

10          ELIZABETH MARTINEZ:  Good afternoon, Madam Chair and board of

11   directors.  My name is Elizabeth Martinez and I'm here with Doty

12   Brothers.  I am here in strong support for Sable Offshore, a valued

13   partner in our community.  We have worked with Sable for years,

14   providing good-paying union jobs.  The hardworking men and women who

15   rely on these jobs appreciate the partnership.  Doty Brothers employs

16   over 400 people in safe, union-backed pipeline construction jobs.

17   Sable will create 300 new jobs with family supporting wages that are

18   sustainable.  This project will also generate important tax revenue for

19   Santa Barbara County.  Keeping oil production domestic is essential.

20   Keeping then relying on overseas imports brought in unsustainable

21   tanker shipments.  As we all see today, the high cost of food and

22   living is making it harder for families to get by.  Now, more than

23   ever, we need to protect good paying jobs that support our local

24   workforce.  I strongly support Sable and respectfully ask you to deny

25

114

1    this appeal. Keeping our economy strong and ensuring safe, reliable

2    jobs is crucial. Thank you.

3    DAVID CASADA: Good afternoon, supervisors. My name is David

4    Casada. I've been a utility worker here in Southern California for 30

5    years. Whether I was working for the oil company, electric company,

6    water company, or the gas company, I quickly learned that we all

7    strictly adhered to a common rule of never politicizing our utility

8    work and never discriminating against any customer for any reason. As

9    a utility worker and a patriot of this country, I want every single

10    person in this room and everyone in this state to have reliable and

11    affordable natural gas, water, gasoline, electric, and oil-based

12    services, regardless of who they vote for and how they think. I worked

13    for the Doty Brothers, a minority owned business, performing pipeline

14    construction work in southern California since 1935. We work with

15    Sable, and they have more than proven to be a trusted partner, who

16    understands the oil and gas industry and how to apply the most

17    stringent safety protocols during the course of construction and during

18    the course of operation. I'm asking that the county vote yes on the

19    restart. Vote yes on badly needed local jobs. Vote yes on…

20    CHAIR CAPS: Thank you, that is your time.

21    DAVID CASADA: …Needed tax dollars and vote yes on revenue for

22    the county. Thank you.

23    KEVIN SCHMITT: Hello, supervisors. My name is Kevin Schmitt.

24    I'm the watershed scientist for the Wishtoyo Foundation and associate

25    director of Ventura Coastkeeper. On behalf of Wishtoyo and its Ventura

COSB AR007054

1    Coastkeeper program, I urge the board of supervisors to reverse the

2    planning commission's approval of stables permit transfer.  External

3    corrosion of line 901 caused the massive spill near Refugio State Beach

4    in 2015.  These pipelines have undergone an additional ten years of

5    exposure

6        [03:55:00]

7        since this oil spill and pose a significant risk to public health

8    and safety if they're allowed to once again transport crude oil.  The

9    2015 oil spill caused substantial harm to Chumash cultural resources

10   and lifeways.  The spill impacted Refugio Beach, which is the location

11   of the Chumash Village, Castile.  To this day, Castile is an important

12   cultural site for Chumash peoples, for ceremony, and to launch [PH

13   03:55:20] tumbles.  Another oil disaster would be devastating for

14   Chumash peoples and their ability to partake in cultural practices.

15   Considering the amount of time that these facilities have not been

16   operational, the immediate risk they pose to the communities of Santa

17   Barbara County, and the devastation that these facilities have caused,

18   the county must deny the permits transfer.  If Sable wants to restart

19   the Santa Ynez operations, the county must prepare an EIR to analyze

20   and mitigate the impacts to the environment, public safety, and

21   cultural resources.  Thank you for your time.

22       CHAIR CAPS:  My apologies, Kevin, what was your last name?

23       KEVIN SCHMITT:  Schmitt, S-C-H-M-I-T-T

24       DR. HELLIER:  Board of Supervisors, I am Dr. Ruth Hellier,

25   professor of music at the University of California Santa Barbara.  I

116

1    teach courses on sound and environmental sensitivities to our amazing,

2    intelligent undergraduate students, who are here in force today,

3    because they care for their futures.  I'm also a volunteer surveyor for

4    the marine protected area near the pipeline.  This area is full of

5    sounds and life: birds, gulls, cormorants, pelicans, seals, otters,

6    dolphins, and whales.  What will happen to these sounds after the next

7    oil spill, when the Sable pipeline fails, and it will?  The sound of

8    silence will mean the destruction of millions of lives and life.  The

9    sound of silence will also mean that we, the stewards of Santa Barbara

10   County, were not listened to by our county Board of Supervisors.

11   Please, for the continuation of the multifarious and vibrant sounds of

12   the Gaviota coast, do not enable Sable.  Deny the transfer of permits.

13   Thank you.

14        CHAIR CAPS:  And my apologies, I did miss your name in the

15   beginning as well.  Can you please state your name for the record one

16   more time?

17        DR. HELLIER:  Ruth Hellier.

18        MR. LAVAGNINO:  Great.  Thank you, Ruth.

19        JUAN MONTELONGO:  Good afternoon, supervisors.  My name is Juan

20   Daniel Montelongo, and I'm a proud resident of Lompoc and a recent

21   graduate from UC, Merced, and with a degree with applied mathematics,

22   focused on engineering.  I'm here today, because I believe Sable

23   Offshore is an incredible opportunity for this community.  As a recent

24   graduate, I understand the struggle of finding meaningful work.  Many

25   of us graduate with a degree, but face difficulty securing stable,

117

COSB AR007056

1    local jobs, all while dealing with student debt.  I experienced this

2    firsthand when I couldn't find work despite my education.  Then I found

3    Sable Offshore.  They offered me a role as a lab technician at Los

4    Flores Canyon, where I'm gaining valuable experience and the tools to

5    grow in my career.  With this project, Sable will be creating an

6    additional 300 jobs.  I'm proud to be part of the company that invests

7    in its people and its region.  It's given me the chance to build the

8    future here, and I'm excited to see what the future holds for all of us

9    in Santa Barbara County.  I respectfully request that you deny this

10   appeal.  Thank you.

11        PASQUALE MORALES JR.:  Hello, supervisors.  My name is Pasquale

12   Mario Morales Jr.  I'm a proud alumnus of Norwich University.  At 23, I

13   recently began my journey as a laboratory technician at the Los Flores

14   Canyon Facility, a role that not only offers a competitive salary, but

15   also, promises a pathway to a long-term career.  Finding an entry-level

16   position in the oil and gas industry can be especially daunting.  This

17   opportunity with Sable not only allows me to break into the field, but

18   also, serves as an inspiration to those starting out their careers.

19   It's more than just another job on my resume.  It's a chance to grow

20   professionally and make a meaningful contribution to an industry that

21   is vital to our everyday lives.  At Los Flores Canyon Facility, I'm

22   receiving exceptional training and operational procedures and

23   regulatory compliance.  These critical skills enhance my expertise.

24   I'm grateful to be a part of a company that believes in nurturing young

25   talent.  For many of us, just starting our careers, having a supportive

COSB AR007057

1    environment and the tools for professional development is invaluable.

2    Thank you for providing me with the opportunity to learn and contribute

3    to the future of energy.  Please, and respectfully, ask that you deny

4    this appeal.

5         ELENA DANIELSON:  Hello, my name is Elena Danielson.  I'm a Santa

6    Barbara resident.  As an immigrant and a proud American, I believe in

7    freedom of choice, and selling business or buying business, it should

8    be private matter, and not being heard here, and the only reason we are

9    here, because Sable is an oil production company.  Otherwise,

10        [04:00:00]

11        there would be no matter, and today, we're all for safe

12   environment.  We all want the best for our children and grandchildren,

13   but let's be honest, there is no other energy at the moment.

14   Everything, what we have surround, our shoes, phones, microphone,

15   everything is based on oil.  So, safe production should be the focus on

16   the on the matter.  I'm a grandmother of three and a mother.  I love

17   the ocean.  I love walking barefoot.  I love taking my grandchildren to

18   surfing lessons.  As I said, the effort should be today in supporting

19   Sable, that they would put all the best technologies, the newest

20   technologies, and produce the oil we all need with the best

21   technologies.  Thank you so much.

22        CHAIR CAPS:  Thank you, Elena.  That is your time.  We will now

23   go to Zoom.  For anyone on Zoom that would like to speak for one

24   minute, I see a few hands raised.  For anyone else that would like to

25

119

1    speak for one minute, please, use the raised hand feature.  We'll begin

2    with Emily Ingall to be followed by Kelsey Perry.  Emily?

3            EMILY INGALL:  Hi, can you guys hear me?

4            CHAIR CAPS:  Yes, we can.  Please, proceed.

5            EMILY INGALL:  Good morning.  My name is Emily Ingall.  I'm a

6    mother of two children, a resident of Santa Barbara District one, and

7    I'm here as also a leader in the Sierra Club.  My testimony will focus

8    on Sable's likely inability to effectively respond to an oil spill or

9    other accident, in which case, the community will suffer substantial

10   harm, and the public may be left holding the bag.  An oil spill is

11   highly likely from the onshore pipelines and could also occur also from

12   the offshore pipelines or platforms.  When we learned that the cause of

13   the 2015 pipeline spill was pervasive corrosion and defective design,

14   no one expected the pipeline would be restarted.  In fact, Planes and

15   then Exxon proposed to build a new pipeline with different materials

16   and technology to prevent corrosion.  This is not a situation where the

17   spill was caused by a discreet rupture or break.  Instead, the entire

18   pipeline suffers from corrosion, which increases the likelihood of a

19   spill.  Experts hired by the county determined that, even with new

20   valves, another spill could happen every year.  A rupture could happen

21   every four years, and a spill along the coast could be nearly twice the

22   size of the 2015 spill… Sable's own oil spill [INDISCERNIBLE 04:02:13].

23           CHAIR CAPS:  Thank you, Emily.  That is your time

24           EMILY INGALL:  Indicates…  Thank you, all.  Thanks.

25

120

1        CHAIR CAPS:  We will now go to Kelsey Perry to be followed by

2    Chris Lang.  Kelsey?  Six…

3        KELSEY PERRY:  Can you hear me?

4        CHAIR CAPS:  Yes, we can.  Please, proceed.

5        KELSEY PERRY:  Hi, my name is Kelsey Perry.  I'm a mother of two.

6    I live in Goleta, California.  I am currently on a walk with my son,

7    and he's taking a nap, and I'm deeply concerned about his future

8    ability to live, recreate, and work on this coast.  I hear a lot of

9    concern about jobs, and I'd like to remind any Sable employees that

10   there are opportunities for clean energy that do not destroy our

11   communities.  I wanted to also add that there has been plenty of

12   evidence that 25B was created specifically for a case just like this,

13   and if there is any intimidation tactics that occur, if you vote to

14   deny the transfer of permits, I want you to look in this room and see

15   how the public has shown up and know that we would show up again in

16   support of you to go ahead and deter those intimidation tactics in a

17   public forum.  I want to remind you of the safe San Marcos Foothills

18   campaign that was successful here in recent years and know that we

19   would be there to support you and our public would show up strongly to

20   fight their intimidation tactics, if you were intimidated after today's

21   vote.  Thank you.

22       CHAIR CAPS:  We will now go to Chris Lang to be followed by

23   Merrill Brooks.  Chris?

24       CHRIS LANG:  Can you hear me now?

25       CHAIR CAPS:  Yes, we can.  Please, proceed.

121

1          CHRIS LANG:  Thank you.  I'm Chris Lang.  I've been a resident

2     and activist in Goleta and Santa Barbara since 1978, Friends of the

3     Elwood Coast and Monarchs Unlimited.  I have submitted a letter, and I

4     will not go through everything I had to say.  I'm very proud of the

5     community for speaking up here.  I think we all know that, if you don't

6     have corrosion protection technology, you're not safe.  I think

7     scofflaws and negligent maintenance operators make bad neighbors.  I

8     got to know my first bad neighbor in Goleta with Exxon Clearview

9     Project.  So, I know what it can be and can be a bad thing, indeed.  I

10    really would like you to… listen, Sable's management doesn't have a

11    clean record of responsible operation.  I don't trust them, and why

12    would you?  Why the residents of Goleta and Santa Barbara spent so many

13    years preserving the Gaviota Coast and Elwood?

14         [04:05:00]

15         Because there is no other place like it.

16         CHAIR CAPS:  Thank you, Chris.  That is your time.

17         CHRIS LANG:  Our job is to protect and defend this place.  Thank

18    you.

19         CHAIR CAPS:  We will now go to Merrill Brooks to be followed by

20    [PH 04:05:10] James Curiaco.  Merrill?

21         MERRILL LBROOKS:  Yes, good afternoon, chair and supervisors.  My

22    name is Merrill Brooks.  I'm speaking today on behalf of Citizens

23    Planning Association.  Citizens Planning Association has been following

24    oil development and issues in Santa Barbara County since even before

25    the 1969 catastrophic oil spill.  We did submit more technical comments

COSB AR007061

1    for the planning commission.  We did not agree with that decision and

2    the findings that were made at that time. We believe you cannot make

3    the findings to before you today to approve the transfer of this

4    problematic pipeline and oil infrastructure.  Regarding jobs, and I

5    hadn't planned on focusing on this, my husband and I drove from Lompoc

6    to Santa Barbara a week ago Sunday.  We passed dozens, dozens of spots

7    along the highway, and they were digging up the pipeline.  We had no

8    idea what was going on, because we were under the impression that this

9    coastal commission had issued a cease and desist…

10       CHAIR CAPS:  Thank you, Merrill, that is your time.  We'll now go

11   James Curiaco to be followed by Benjamin Bhutani Godert.  James?

12       JAMES CURIACO:  Thank you, James Curiaco, Goleta City Council.

13   You've already received our unanimously passed resolution.  I won't

14   rehash that.  I will just remind you of something, which is we already

15   know that this pipeline is past its useful life.  Trying to restart it

16   is much like trying to restart a vehicle that is way past its useful

17   life.  Would you really want to put your children in it?  Would you

18   really want to risk your livelihood for it?  Think about it in those

19   terms.  For those of you who are contemplating the risk of not

20   approving something that you're being told is largely paperwork or

21   ministerial, I would just ask you to reflect on what would happen if

22   what has happened before happens again, and during the summer months,

23   you suddenly find that one of your major revenue sources, transient

24   occupancy tax, and another one, sales tax, significantly impacted for

25   months or years because of the economic impacts of a very preventable

COSB AR007062

1    oil spill.  How would you do your deferred maintenance?  How would you

2    maintain your roads?  How would you ensure public safety, mental

3    health, homelessness, and other services?  How would you meet your

4    obligations?

5        CHAIR CAPS:  Thank you, James.  That is your time.  We'll now go

6    to Benjamin Bhutani Godert to be followed by Lily Polar.  Benjamin?

7        BENJAMIN GODERT:  Hi, good afternoon, board of supervisors.  My

8    name is Benjamin Bhutani Godert.  I'm a long-time resident of Santa

9    Barbara, an active member of our community, and a proud board member of

10   Santa Barbara Channel Keepers.  I'm here today to share my opposition

11   to the Sable Pipeline project and to encourage you to vote no on the

12   Sable project.  Reopening these types of projects will only make

13   another oil spill imminent, and environmentalism, as you all are well

14   aware, is a huge part of our community culture, and this is a

15   significant step backwards against our shared beliefs.  We have an

16   opportunity to continue to be leaders in the environmental movement,

17   and this project is just a display of short-term thinking and contrary

18   to the benefit of our planet and the values of our community.  Let's

19   keep Texas oil corporations out of Santa Barbara.  Thank you.

20       CHAIR CAPS:  We will now go to Lily Polar to be followed by

21   Catherine Henry, who is our final one-minute speaker.  Lily?

22       LILY POLAR:  Hello, my name is Lily Polar, and I am a UCSB

23   student and Santa Barbara native.  I remember vividly when the 2015

24   Refugio oil spill devastated the Gaviota Coast, killing seabirds,

25   marine mammals, harming fisheries, and preventing recreation in the

124

1    area. We cannot repeat history. Another spill from these facilities

2    is likely, considering that the thick oil must be heated to be

3    transported, causing corrosion in the pipeline. Additionally, to

4    mitigate climate change, we must transition away from fossil fuels.

5    Allowing more fossil fuel development, like this Sable pipeline,

6    further locks us into fossil fuel infrastructure. Please, stop the

7    restart of the Sable pipeline. Thank you.

8         CHAIR CAPS: We will now go to Catherine Henry. Catherine?

9         [04:10:00]

10        CATHERINE HENRY: Good afternoon, chair, board, and staff. My

11   name is Catherine Henry, and I am a community organizer here on behalf

12   of Planned Parenthood Central Coast Action Fund. At the Action Fund,

13   we are actively working toward improving health outcomes and reducing

14   health disparities in our community. Environmental protection is a

15   health equity issue, because environmental disasters such as the 2015

16   oil spill, many have brought up today, can worsen and do worsen

17   existing health disparities due to pollution, poor living conditions,

18   various forms of discrimination, as well as psychological stress.

19   These environmental disasters have a direct impact on specifically the

20   reproductive health of our communities. As many have brought up,

21   another spill from this pipeline is likely, and it would have

22   devastating consequences for the health of the county and the Gaviota

23   coast, and Sable currently doesn't have an approved plan to respond to

24   this oil spill. This jeopardizes the health and safety of our

25   community, and it highlights the lack of care on Sable's behalf. As a

125

COSB AR007064

1    part of an effort to create a healthier, safer, and more equitable

2    county and coastline, we ask that the board deny the transfer of

3    permits to the pipeline to Sable.  Thank you.

4          CLERK:  Chair Caps and members of the board.  It looks like we

5    had an additional request to speak from Dr. Linda Phelps for one

6    minute.

7          DR. PHELPS:  I would just like to urge you to, at the very least,

8    get a proper environmental analysis of this before you make your

9    decision.  I believe that that's the only way we can answer some of the

10   questions and the…

11         CLERK:  And Chair Caps, members of the board, I believe that

12   concludes the one-minute requests to speak.

13         CHAIR CAPS:  Thank you, everyone, that was incredibly efficient

14   and respectful.  We do need to break for closed session, which will be

15   30 minutes.  I'm just looking at the clock.  So, we'll come back.

16   We'll resume at 1:30, and again, those are all our one-minutes we have

17   requested so far.  Maybe others will follow suit, so we can keep

18   rolling like we have.  It's a good way to do it.  So, we'll see you all

19   back at 1:30.  Oh, I'm sorry.  County counsel needs to read us out and

20   tell us what we're actually doing.

21         COUNTY COUNSEL:  Madam Chair, members of the board…

22         CLERK:  Oh, sorry, everybody.  That was my fault.  Here you go.

23         CHAIR CAPS:  This needs to happen.  County counsel needs to tell

24   everybody what we're working on in closed session.

25

126

COSB AR007065

1          COUNTY COUNSEL:  The board's scheduled to meet in closed session

2     on one item.  It's conference with labor negotiators.  The employee

3     organization is Santa Barbara County Deputy Sheriff's Association, and

4     the agency designated representatives are CEO, Mona Miasato, and Human

5     Resources Director, Christine Schmidt, and again, the time estimate's

6     30 minutes.

7          CHAIR CAPS:  Okay.  We'll be back at 1:30.  Thanks.

8          [04:15:00]

9          [04:20:00]

10         [04:25:00]

11         [04:30:00]

12         [04:35:00]

13         [04:40:00]

14         [04:45:00]

15         [04:50:00]

16         [04:55:00]

17         [05:00:00]

18         CHAIR CAPS:  Okay, everybody, welcome back here.  I'll just do a

19    little gavel.  Thanks, everybody.  Sorry, we're a little behind here.

20    We had a little glitch, but everyone's been doing an excellent job with

21    this public comment.  I'll just reiterate that one minutes are still

22    back up.  If anyone wants to speak for one minute, you have priority.

23    So, let's see.  You can make a line here or identify yourself on Zoom.

24    Madam Clerk, do we have any one-minute requests?

25

127

COSB AR007066

1          CLERK:  Chair Caps and members of the board, I have not seen any

2    raised hands.  Have any members of the public who are on Zoom that

3    would like to speak for one minute, please, use the raise hand feature

4    on Zoom.

5          CHAIR CAPS:  And I believe we have 88 more requests to speak?

6          CLERK:  Yes, Chair Caps and members of the board.

7          CHAIR CAPS:  So, you all do the math.  If you want to be here

8    that long, then you have the right to speak for two minutes.  If you

9    want to speed things along, I highly encourage that.

10         [CROSSTALK 05:02:36]

11         CHAIR CAPS:  Oh, no, we're not yet to… no, we're at one minute.

12   We're at one minute right now.  Are you… okay

13         [CROSSTALK 05:02:44]

14         CLERK:  And please, if everyone can, before they… if you could

15   please state your name for the record.

16         FEMALE 2:  My name is [INDISCERNIBLE 05:02:52], and I'm a

17   resident of Santa Barbara.  Immigrant 40 years ago, taxpayer, law

18   abiding citizen, and I never got any penny from the government.  I

19   worked my way up, little, but still.  Now, what you're saying, I wasn't

20   going to talk about the pipeline, anything, but if you don't want it

21   here, it's going to be somewhere else.  You don't want the windmills,

22   the ones that create a lot of environment issues.  Someone, one of the

23   kids talk about the money that is going to be spent in the cleanup, for

24   example, but I'm going talk about the national debt is almost… it's $36

25   trillion.  So, a lot of people, they don't have a concept of a of a

128

COSB AR007067

1    million, of a billion, which is 1,000 million, and if you go online,

2    get a chart, go online, get the clock, really fast, if I start counting

3    right now, one number per second, continuously, for non-stopping 24/7,

4    it will take me 32 years to count one billion.  That will be 2036.

5    I'll be dead by now.  It will take 31,000 years to count one trillion,

6    and 1 million years to 30 trillions.  We are going up.  So, we need

7    [INDISCERNIBLE 05:04:15] here, because we need someone to come and see

8    when money's gone.  About your raise, 4.8 will do, no, 48%.  Thank you

9    very much.

10        CLERK:  Thank you, that is your time.  Anyone else for one

11   minute?

12        CHAIR CAPS:  So, we can move to two minutes.  We're just going to

13   keep it at two minutes.  That's been a strong request I've gotten from

14   many, many people.  So, there will not be three-minute requests.  We're

15   going to move to two-minute requests.  A two minute time allotment to

16   speak, that's still, I think we're now at 87 of those.  So, again, last

17   call for one-minutes.  You can certainly take one minute in your two-

18   minute slot.  Okay, Madam Clerk.

19        CLERK:  All right, we will begin on Zoom with Pasha Mondavi to be

20   followed by Annmarie Gott.

21        [05:05:00]

22        Pasha?

23        PASHA MONDAVI:  Good afternoon.  Can the board hear me?

24        CHAIR CAPS:  Yes, we can.  Please, proceed.

25

COSB AR007068

1          PASHA MONDAVI:  Excellent.  My name is Pasha Mondavi.  I am an

2     associate professor and vice chair of political science, affiliated

3     professor of environmental science and management, and director of the

4     Energy Governance and Political Economy Lab, all at UC, Santa Barbara.

5     I'm here today to provide an overview of an economic analysis, which

6     I'll note to the board, is in the record, as attachment 25, appellant

7     Economic Analysis, Environmental Defense Center.  Regarding claims that

8     Sable made to the Planning Commission on October 30th, 2024, as to the

9     impacts of restarting or not restarting production from the Santa Ynez

10    Unit on foreign imports, market conditions and greenhouse gas

11    emissions, including comments made by Sable today regarding displacing

12    barrels of foreign imports.  I'll note that my analysis is rooted in

13    well-established models in energy economics and statistics and draws

14    upon data provided by Sable itself in investor facing documents.  It

15    comprises three major findings, which I summarize here in the interest

16    of time, but again, I note that this is submitted in in the record.

17    Number one, restarting SYU production will not reduce foreign imports.

18    This is based on both statistical analysis of the 2015 pause and an

19    economic analysis of costs compared to major suppliers of crude

20    imported to California.  Number two, not restarting SYU will not have

21    significant impacts on consumer markets over time, given declining

22    demand for petroleum products in California, outpaces the loss of

23    supply from SYU production.  Instead, it is likely that the overtime

24    economic gains Sable aims to achieve from restarting the SYU will come

25    from exporting the oil from California to other markets, and number

COSB AR007069

1    three, production from the SYU will increase global greenhouse gas

2    emissions given the higher greenhouse gas intensity of operations

3    compared to global averages.  So, it's clear from this analysis that

4    Sable has not represented its market and economic position faithfully,

5    and there's little reason to believe it is representing its financial

6    requirements faithfully to the county, with respect to chapter 25B,

7    thank you.

8         CHAIR CAPS:  Thank you, that is your time, and it appears

9    Annmarie is no longer on Zoom.  So, we are going to Andy McNeil to be

10   followed by Robert Almy.  Andy?  My apologies, it appears that Andy is

11   also not on Zoom.  We are going with Robert Almy to be followed by Ken

12   Huff.

13        ROBERT ALMY:  Good afternoon, board members.  My name is Robert

14   Almy.  I'm the former manager of the Santa Barbara County Energy

15   Division.  I performed the environmental impact report impact statement

16   for the Celeron All-American Pipeline and was instrumental in taking

17   the permitting through the planning commission and through your board.

18   I knew many of your predecessors, including Mr. Stoker, and before I

19   get into it, I want to make a comment.  When we were working on a

20   number of oil projects, and we had as many as six at a time within the

21   energy division, we had high regard for Exxon.  Even though they were

22   in conflict with the county, MR. RUSCH:  and the team he was part of,

23   were considered our A students.  I'm going to focus on the pipeline,

24   and I hope you give me a little bit of extra time, because I worked on

25   a three-minute presentation.  After I was with the Energy Division, I

131

1   spent 18 years managing the County Water Agency and starting the county

2   storm water protection plan, Project Clean Water, also taught an upper

3   division class on preparing environmental impact reports in the

4   environmental studies program at UCSB. As I said earlier, I directly

5   managed the pipeline through the planning commission and board of

6   supervisor permitting process, and I was involved in the lawsuit

7   regarding county access to steel specifications and welding records.

8   To this day, to this day, who knows what quality steel or what the

9   welding records indicate? Again, I have high regard for SYU. This,

10  I'm focusing on the pipeline. Obviously, Planes ignored whatever

11  monitoring and control plans were in effect for their project, and

12  obviously, no agency was doing any kind of meaningful oversight.

13      CHAIR CAPS: Thank you, Robert. That is your time. We will now

14  go to Ken Huff to be followed by Michael Lyons.

15      [05:10:00]

16      Ken?

17      MR. HUFF: Thank you, Chair Caps and supervisors. I'm Ken Huff,

18  representing Santa Barbara County Action Network. I'll speak on the

19  report submitted by John Day, the former energy division planner, who

20  authored 25B. As he points out, and what was submitted, the ordinance

21  was to be discretionary and not ministerial. This means your board can

22  apply its best judgment to the questions at hand. Mr. Day points out

23  that 25B requires the county to consider a new operator's ability to

24  operate in compliance with existing permits and plans. Where the

25  applicant does not have a performance record, as in this case, the

132

COSB AR007071

1    county must look elsewhere for the evidence of that ability.  Mr. Day

2    points out that Sable's recent track record of numerous violations,

3    quote, does not bode well for its ability or willingness to comply with

4    regulations and permit conditions and operate within the regulatory

5    framework, end quote.  Finally, Mr. Day confirmed that 25B 10B

6    authorizes the county to impose additional conditions, such as bonds,

7    to ensure adequate financial assurances and insurance guarantees.  In

8    conclusion, your board needs to carefully review Sable's financial

9    capacity and its performance record, and based on the evidence in the

10   record, the board cannot make the finding that Sable possesses the

11   necessary financial or operational capacity to comply with safety and

12   environmental regulations, respond to oil spills and other accidents,

13   or properly decommission its facilities.  SB CAN urges your board to

14   deny the transfer of the permits.  Thank you.

15        CHAIR CAPS:  We will now go to Michael Lyons to be followed by

16   Katie Dobbs.  Michael?  And Michael, we have unmuted you on our end.

17   If you can please unmute on your end to provide your comments.  There

18   we go.

19        MICHAEL LYONS:  Okay, all right.  Can you hear me now?

20        CHAIR CAPS:  Perfect.  Yes, we can please proceed.

21        MICHAEL LYONS:  Sorry about that.  Michael Lyons, Board

22   President, Get Oil Out.  My testimony summarizes a report submitted by

23   Acufax regarding concerns of the State Fire Marshal's waiver of safety

24   requirements for the Los Flores pipeline system.  The main conclusion

25   of the report is that the waiver does not provide an equal level of

133

protection against corrosion as if it had an effective cathodic
protection is required by the pipeline permits, nor will Sable's repair
result in pipelines that are as good as new, as the company states.
The cathodic protection system was required to prevent corrosion on the
pipeline.  As we now know, the defective design and failure of the
system was the direct cause of the 2015 Refugio oil spill.  The Acufax
report points out that the existing cathodic protection system is
ineffective throughout most of the length of the pipelines.  First, the
report points to the many factors that create risks of corrosion, heavy
shielding, operating temperature, potential for moisture buildup, and
the environment around the pipelines.  A major deficiency with the
waiver is the lack of tracking for multiple interactive threats.
Second, the report explains that there are several types of corrosion,
many of which are difficult to detect or predict.  The waiver relies
heavily on in-line inspection tools, which are inadequate to detect
certain types of corrosion, corrosion such as corrosion cracking.  This
is a major concern.  Third, the report points out that, although hydro
tests are helpful to evaluate pressures, they're limited, because they
only reveal the condition of the pipe at the time of the test and do
not characterize time-dependent threats or corrosion growth rates.
Fourth, the waiver does not require sufficient test for line 325B,
which has very significant elevation changes, which can contribute to
the corrosion risk.  The report concludes the incompleteness of the
waivers lead me to conclude that I cannot determine the waivers provide
sufficient information to assure an equal or greater level of safety

COSB AR007073

1    for the pipelines of the operator had an unshielded coating that

2    complied with federal minimum pipeline cathodic protection, intended to

3    avoid pipeline failure from external corrosion, as such, cannot…

4        CHAIR CAPS:  Thank you, Michael, that is your time.

5        MICHAEL LYONS:  …Demonstrate compliance.  Thank you.

6        CHAIR CAPS:  We will now go to Katie Dobbs followed by Bart

7    Dickens.  Katie?

8        KATIE DOBBS:  Hi, can you hear me?

9        CHAIR CAPS:  Yes, we can.  Please, proceed.

10       KATIE DOBBS:  Hi, thank you for your time.  My name is Katie.

11   I'm an environmental scientist, and I'm here to request that the board

12   of supervisors deny Sable's application

13       [05:15:00]

14       to transfer permits.  I echo all of the concerns brought forward

15   by the appellees and by the community, especially those around

16   financial and safety concerns and Sable's previous violations.  I'm

17   concerned about the impacts of a spill on our local economy, community,

18   wildlife, and ecosystems, and I also want to point out that this

19   project is in direct opposition to the county's climate action plan,

20   where a commitment was made to take meaningful action on climate

21   change, and if you want to talk about solutions, I recommend you review

22   this plan.  It's on the county's website.  It provides a new vision for

23   a community without pollution and environmental disaster, and it

24   provides a plan for clean energy, clean industry, and job creation.

25   This project would directly undermine that plan, and we need to be

COSB AR007074

1    taking climate action seriously.  Santa Barbara is vulnerable to fires,

2    floods, droughts, landslides, all of which are exacerbated by climate

3    change.  So, we need a better way forward.  The county has spent

4    valuable time, energy, and money on a plan that brings a new vision to

5    life, and Sable is not consistent with that.  Thank you

6        CHAIR CAPS:  We will now go to Bart Dickens to be followed by

7    Nate Irwin.  Bart?  And Bart, we have unmuted you on our end.  If you

8    can please unmute on your end to provide your comments.  Bart, if you

9    can hear me, please, unmute on your end to provide your comments.  All

10   righty.  Perhaps Bart's having some technical difficulties.  We will

11   now go to Nate Irwin to be followed by Thomas Becker.  Nate?

12       NATE IRWIN:  Good afternoon, Chair Caps and members of the board.

13   My name is Nate Irwin, and I'm the policy associate at Santa Barbara

14   Channel Keeper.  Our organization works to protect and restore the

15   Santa Barbara Channel and its watersheds, and just like the hundreds of

16   other community members here today, and on behalf of Channel Keeper's

17   3,000 supporters, we urge you to deny Sable Offshore's application per

18   change in owner operator and guarantor of the sending as unit and

19   related infrastructure.  How many times must we repeat the same

20   mistakes?  Another oil company, an aging pipeline, another spill

21   washing onto our shores?  Repeat again until when?  You all know what a

22   special place Santa Barbara is, and a big part of what makes it so

23   special is the incredibly diverse Santa Barbara channel and resulting

24   biologically sensitive ecosystem, boasting unparalleled species density

25   and diversity, which include endangered, threatened, and sensitive

136

COSB AR007075

1   marine species, including blue, gray, and humpback whales, Southern

2   Sea, southern steelhead, marble [INDISCERNIBLE 05:18:18], and brown

3   pelican to name a few.  This is now your moment to break the cycle, to

4   choose the future where the Gaviota coast remains wild and unspoiled,

5   where the channel is protected, where our children inherit clean

6   waters, instead of oil soaked beaches, where we honor the vision of the

7   newly designated Chumash Heritage National Marine Sanctuary, not

8   undermine it with more drilling.  Sable offshore has no history here,

9   no proven commitment to protecting our coasts, only a plan to extract

10  profits while leaving us with the risk.  If we allow this transfer, we

11  invite another Refugio oil disaster, another catastrophe written in

12  black tides and dying marine life.  Santa Barbara County has long stood

13  at the crossroads of industry and environmental responsibility.  This

14  is your chance to set our course in the right direction.  Reject this

15  permit transfer.  Protect our future.  Let this generation be the one

16  that finally says no more.  Thank you for your time.

17      CHAIR CAPS:  We will now go to Thomas Becker to be followed by

18  Annamarie Gott.  Thomas?

19      THOMAS BECKER:  Hi, can you hear me?

20      CHAIR CAPS:  Yes, we can.  Please, proceed.

21      THOMAS BECKER:  Thank you.  It's perfectly allowable to appeal

22  the finding of staff and planning commission concerning issues that are

23  within the jurisdiction of that commission or the county.  It's

24  absolutely not allowable to launch an appeal for issues beyond the

25

137

COSB AR007076

1       jurisdiction of the county.  If there are issues, if you have issues

2       concerning safety and things like that, that are not within

3           [05:20:00]

4           the jurisdiction of the county, then go to the state or federal

5       agencies that have jurisdiction.  It is entirely unfair to this

6       applicant to subject them to review of issues that you don't have

7       jurisdiction over.  This is ridiculous, especially what's really I find

8       really insulting is when people are asking the applicant to submit

9       their insurance information, when all they're legally required to do is

10      submit a certificate of insurance.  Imagine if you were stopped by a

11      law enforcement officer, and you have to show proof of insurance, and

12      that law enforcement officer told you to show your insurance policy to

13      them.  No, you don't have to do that.  So, this is ridiculous.  You've

14      just spent two hours on a hate fest against oil, when really, the

15      issues involved here are very narrow to your jurisdiction, and this is

16      a real, real problem.  It's like you're activist judges that don't like

17      somebody, and you're going to go beyond your jurisdiction or the law to

18      get them, especially you, madame second district supervisor, in your

19      inane questions that have, and statements, that have nothing to do with

20      any issue within your jurisdiction.  Thank you very much.

21          CHAIR CAPS:  We will now go to Annamarie Gott, who's our final

22      speaker on Zoom, and then we will go to Santa Maria with Seth Steiner.

23      Annamarie Gott?  Anna, if you can please unmute to provide your

24      comments.  We've unmuted you on our end.  I see you are unmuted, but we

25

                                        138

COSB AR007077

1    cannot hear you in the room, and perhaps your microphone is not

2    connected.  I see you are unmuted, but we can hear you.

3         ANNAMARIE GOTT:  Hi, can you hear me now?

4         CHAIR CAPS:  Yes, we can.  Please, proceed.

5         ANNAMARIE GOTT:  Great, sorry about that.  So, the one question I

6    have for the board members regarding this is: are all of you prepared

7    to actually pass a living wage ordinance, and if you are, let's go

8    ahead and table this decision, put that on your agenda, passing the

9    living wage ordinance, and then consider having you all increase your

10   own wage, because there are a lot of people that live in the county.

11        CHAIR CAPS:  Ms. Gott, do you not…?

12        ANNAMARIE GOTT:  Yes?

13        CHAIR CAPS:  I think you're speaking to the wrong item.  We're

14   still on the Sable oil discussion, item number one.

15        ANNAMARIE GOTT:  Oh, I'm sorry…  I had you guys.  I'm sorry, I

16   had you guys on mute.  I apologize.

17        CHAIR CAPS:  That's okay.

18        ANNAMARIE GOTT:  But I'm so sorry about that.  I had planned to

19   speak on this item and just walked away, but I completely agree with

20   all of the previous speakers.  I absolutely want you guys to deny this

21   particular app… excuse me, uphold the appeal and deny Sable Oil the

22   ability to have the potential to wreak havoc, you know, with another

23   oil spill, because we know that it is going to happen, and we know that

24   they do not have the wherewithal to actually clean it up.  Thank you.

25

COSB AR007078

1          CHAIR CAPS:  Thank you.  We are now going to Santa Maria with our

2     one speaker in Santa Maria, Seth Steiner, and then we are going to

3     return to Santa Barbara with Lauren Keen to be followed by Vivian [PH

4     05:24:13] Chen-Kai to be followed by Dean Plaster.  So, if your name

5     has been called, please, make your way to the hearing room, and we'll

6     begin, again, in Santa Maria with Seth Steiner.  Seth?

7          SETH STEINER:  Yeah, good afternoon, chair and board members.

8     It's clear that the pipeline that failed catastrophically ten years ago

9     is still not trustworthy, and that Sable Oil is not sufficiently

10    indemnified to handle the next accident.  State regulatory authorities

11    have not stood up to the challenge, and our county's energy planners

12    have been timid, allowing themselves

13         [05:25:00]

14         to be gamed.  Couldn't county legal advisors be less reactive and

15    more imaginative?  It's equally apparent that the clean energy

16    transition is alive and well here and does considerably more economic

17    benefit and less harm than old oil.  Furthermore, any accounting of the

18    true costs of fossil fuels must recognize the enormous price of fire

19    damage, rising temperatures, and sea levels, drought, land and

20    mudslides, environmental and species destruction, and air and water

21    pollution, and their resulting harm to health and escalating home

22    insurance premiums.  Our county government must find ways to advance

23    the energy transition and do more to protect us from big, dirty oil.

24    Two of our district supervisors always stand in the way of progress

25    here.  My sense is that the fifth district supervisor, Mr. Levanino,

140

COSB AR007079

1    knows better, but is seduced by tens of thousands of dollars from the

2    oil industry.  The fourth district supervisor, Mr. Nelson, appears to

3    be a climate denier and is also awash in oil donations.  We should do

4    what we can to…

5         CHAIR CAPS:  Thank you, Seth, that is your time.

6         SETH STEINER:  Thank you.

7         CHAIR CAPS:  We will now return to Santa Barbara with Lauren Keen

8    to be followed by Vivian Chen-Kai to be followed by Dean Plaster, to be

9    followed by Izzy [PH 05:26:58] Sissick, to be followed by Bill

10   Woodbridge.  If your name has been called, please, make your way to the

11   hearing room.  We will now go to Lauren Keen.

12        LAUREN KEEN:  Good afternoon, supervisors.  Thank you for letting

13   me share my comment.  My name is Lauren Keen, and I'm here on behalf of

14   CALPER to express concerns about the restart of the Sable offshore

15   pipeline.  We're told that restarting the pipeline is necessary for

16   jobs, but let us clarify one problem.  These jobs are temporary.  When

17   the pipeline inevitably spills again, workers and taxpayers will pay

18   the price.  The workers would suddenly be out of a job.  If oil

19   companies like Sable truly care about their workers, they'd invest in

20   long-term programs.  They would transition employees into stable, long-

21   term jobs and not clinging to a fading industry that puts our community

22   at risk.  Additionally, the economic consequences of fossil fuels and

23   fossil fuel disasters are staggering.  California is already facing

24   rising insurance rates and catastrophic losses from extreme weather,

25   with some estimates putting the cost of recent fires up to $275

141

COSB AR007080

1    billion.  Why should we invite more risk, when we know that another

2    spill would be inevitable if the pipeline were to restart?  And beyond

3    the numbers, there's something more personal at stake.  The beach is

4    the heart of Santa Barbara.  It's a place for surfers, divers, fishers,

5    and most importantly, families.  It's where our community gathers, but

6    if this pipeline spills again, it won't just be an economic disaster.

7    It'll be a disaster for our way of life.  I know people who fish here

8    for food and community.  They love our ocean, as do I.  What happens

9    when the fish aren't there to be caught?  Instead, they wash up dead in

10    black water.  Please, look out for the people of Santa Barbara, not the

11    profits of oil executives.  All I ask is that you listen to us and

12    reject the restart of this pipeline.  Thank you.

13        CHAIR CAPS:  Excuse me.  We'll now go to Vivian [PH 05:29:07]

14    Shaka, to be followed by Dean Plaster, to be followed by Izzy Sissick,

15    to be followed by Bill Woodbridge, to be followed by Milenia Seymour.

16    Vivian?

17        VIVIAN SHAKA:  Yeah.  Good afternoon, Madam Chair and

18    supervisors, and thank you for taking my comment.  My name is Vivian

19    [PH 05:29:23] Shanghai, and I am representing UCSB's Environmental

20    Affairs Board.  I urge you to deny Sable Offshore's application to

21    transfer the permits of the Santa Ynez Unit, the POPCO Gas Plant, and

22    the Los Flores Pipeline.  Sable poses a dangerous threat to our county

23    and should not be trusted.  As stated in John Day's letter, county Code

24    25B allows the county to review these ownership transfers on a case by

25    case basis rather than a ministerial approach.  The purpose of County

142

1    Code 25B is to protect the environment and public health of Santa

2    Barbara, and many aspects of Sable Offshore currently do not resonate

3    with the purpose of 25B.

4         [05:30:00]

5         With Sable's questionable finances, clear history of non-

6    compliance, and lack of transparency regarding their operations, there

7    should be considerable doubt as to whether they have in mind the best

8    interest of the county by attempting to own these facilities.  Sable is

9    trying to rush through these approvals to meet the promises they have

10   made to their shareholders, not the county, the people, or the

11   environment of Santa Barbara.  The county does not have to operate on

12   Sable's timeline.  Above all, we should not have to deal with the

13   immense environmental and public health consequences of an

14   irresponsible company.  I urge you to deny this transfer.  Thank you.

15        CHAIR CAPS:  We'll now go to Dean Plaster to be followed by Izzy

16   Sissick to be followed by Bill Woodridge to be followed by Milenia

17   Seymour to be followed by Nikki [INDISCERNIBLE 05:30:46].  Dean?

18        DEAN PLASTER:  Chair Caps, members of the board, my name is Dean

19   Plaster, and I'm a 50-year county resident and member of the Executive

20   Committee of Surf Rider Santa Barbara chapter.  Obviously, I'm here to

21   urge you to deny the transfer of Exxon's permits to Sable.  Sable Oil

22   is a new and untested company.  They had to borrow money from Exxon to

23   buy Exxon's infrastructure.  Maybe that arrangement works out

24   financially between the two of them, but what happens in the event of

25   an expensive blowout somewhere along their decrepit pipeline?  Is their

143

1    insurance really sufficient for a cleanup?  Will they go bankrupt if

2    such a pipe failure means they can't repay Exxon?  But money aside, can

3    our local environment, land, or sea see afford another mess like the

4    very same pipeline caused in 2015?  It was a disaster and, I saw it up

5    close and personal, helping with an unofficial grassroots cleanup of in

6    Vito Beach, just south of Refugio, scooping up oil into five-gallon

7    buckets.  Waves coated in oil really are silent as they break.  It's

8    surreal and horrifying.  For quite a while after that, there was no

9    safe surfing, swimming, or paddling, and that was the least of the

10   spill's adverse effects on our region.  The oil industry is fighting

11   tooth and nail to extract the last of an antiquated, doomed energy

12   source that spews hydrocarbons in its production and usage.  To

13   greenlight the reemergence of oil production in the channel with a

14   company that has no history and struggles to satisfy conditions of

15   operation on a fully disgraced pipeline is just asking for more harm to

16   our health, economy, and the natural systems of Santa Barbara County.

17   Please, deny the transfer of permits.  Thank you.

18       CHAIR CAPS:  We will now go to Izzy Sissick to be followed by

19   Bill Woodbridge, then Milenia Seymour and Nikki [INDISCERNIBLE

20   05:32:49], then Jonathan Ulman.  If your name has been called, please

21   make your way to the hearing room.  Izzy Sissick.

22       IZZY SISSICK:  Good afternoon, supervisors.  My name's Izzy

23   Sissick, and I'm here representing UCSB's environmental affairs board.

24   I urge you to deny Sable's application to transfer permits for Santa

25   Inez unit, POOPCO Plant, and Los Flores pipelines.  Allowing Sable to

144

COSB AR007083

1    operate here would be a grave mistake for Santa Barbara County.   Sable

2    Offshore is a company that has shown, time and time again, it will

3    ignore local rules and regulations in pursuit of its own interests.   It

4    has already been hit with multiple notices of violation from three

5    different state agencies, including the Coastal Commission, Fish and

6    Wildlife, and Water Quality Control.   It has ignored these notices,

7    leading to two separate cease and desist orders from the Coastal

8    Commission, including one issued just last week.   These repeated

9    failures to comply with the law are clear signs that Sable is not fit

10   to operate in our community, especially when the stakes are so high.

11   Santa Barbara has a painful history with oil spills, and we do not need

12   to go through this again.   It's vital that we protect our residents and

13   wildlife from companies that come in, ignore regulations, and endanger

14   our communities' wellbeing for their own gain.   As young people who

15   will live with the consequences of these decisions, we should not have

16   to ask why we are allowing dangerous, outdated operations to be

17   restarted by companies that have shown a blatant disregard for the law

18   and for the future of Santa Barbara.   We ask you, as our elected

19   leaders, to protect our community from outside companies like Sable who

20   would exploit our county and leave us vulnerable to environmental harm.

21   Denying the lease transfer is an important step you can take to protect

22   our future.   Thank you for your time.

23        CHAIR CAPS:   We will now go to Bill Woodbridge to be followed by

24   Milenia Seymour, to be followed by Nikki [INDISCERNIBLE 05:34:36] to be

25   followed by Jonathan Ullman to be followed by Mike Caldwell.   Bill?

145

COSB AR007084

1          CLERK:  Bill left.

2          CHAIR CAPS:  Oh, Bill left?  Thank you.  We will now go to

3    Milenia Seymour to be followed by Nikki [INDISCERNIBLE 05:34:49].

4    Milenia?

5          MILENIA SEYMOUR:  Hi, my name is Milenia Seymour, and I'm

6    affiliated with UCSB's Environmental Law Club.  It has been a whole

7    decade since the 2015 Refugio oil spill, yet on some

8          [05:35:00]

9          days, you can still catch the whiffs of oil that are swept onto

10   our campus by strong winds.  On my first day of freshman year, in 2023,

11   the university handed out tar removal wipes to new students, because

12   you can't avoid getting oil stuck to you if you go in the water.  My

13   studies as an ecology major include the long-term environmental effects

14   of disasters, both natural and unnatural ones.  The 2015 spill was not

15   natural, destroying an area used by researchers as a marine protected

16   area control site.  It also harmed many different species, coating the

17   feathers of birds and the fur of seals and causing internal

18   physiological damage to phytoplankton and other primary producers,

19   which are the source of our energy.  We cannot let this happen again.

20   I urge you, for the sake of every living being in our county, to put an

21   end to this battle we should not have to fight.  It is a human's right

22   to have clean air, clean water, and clean land.  It is an animal's

23   right to freedom from torture, and that is exactly what an oil spill

24   causes, torture on all fronts.  Thank you.

25

146

1          CHAIR CAPS:  We will now go to Nikki [INDISCERNIBLE 05:36:07] to

2     be followed by Jonathan Ullman, then Mike Caldwell, then Nathaniel

3     Williams, then Steve Balcom.  Nikki?

4          NIKKI:  Good morning.  My name is Nikki [INDISCERNIBLE 05:36:19],

5     and I'm representing the Environmental Affairs Board at UC Santa

6     Barbara.  Thank you for taking my comment.  I firmly believe that

7     Sable's attempt to restart the Santa Ines Pipeline Unit is not in the

8     interest of the people of Santa Barbara.  There is no way to ensure

9     that a spill would not happen, especially given its history of

10    corrosion and leaks.  Sable ignoring the Coastal Commission's multiple

11    cease and disorders by continuing construction, as well as the many

12    other violations presented by EDC today are signs that the company is

13    not concerned with following guidelines that are set in place to

14    protect the people and environment of Santa Barbara.  In the event of a

15    spill, there would be extreme loss in the fishing industry, loss of

16    jobs and revenue in one of Santa Barbara's largest economies.

17    Additionally, Sable Offshore's financial ability has been called into

18    question.  While there may be arguments that Sable has a large market

19    value, in the event of a spill, this value would drop.  So, I urge you

20    to look deeper into their ability to hold financial responsibility,

21    because if it falls through, taxpayers will eventually be the ones

22    responsible for this.  This inability to hold responsibility for

23    financial damages along with their disregard for the coastal

24    commission's orders are proof that Sable Offshore is not a reliable

25    company.  Instead of reinvesting in this energy source that is likely

147

COSB AR007086

1        to harm the environment, we should be committing to the emissions

2        reduction goals that we set for Santa Barbara in the Climate Action

3        Plan and create jobs by investing in renewable energy instead.  As a

4        resident of Santa Barbara, I am asking you to please vote for the

5        protection of our coast.  Thank you.

6            CHAIR CAPS:  We will now go to Jonathan Ullman to be followed by

7        Mike Caldwell to be followed by Nathaniel Williams, to be followed by

8        Steve Balcom.  Jonathan?

9            JONATHAN ULLMAN:  Thank you.  Hi, my name is Jonathan Oman.  I

10       thank the board of supervisors for having us speak today, and I am the

11       director of the Santa Barbara Ventura chapter of the Sierra Club,

12       representing 12,000 members and supporters.  Our members were adversely

13       affected by the 2015 Refugio Pipelines disaster, which spilled 450,000

14       gallons of crude into Santa Barbara channel and along our coasts,

15       killing thousands of wildlife, including marine animals, like sea lions

16       and dolphins.  In seeking to restart the pipeline, Sable Offshore has

17       continued to defy a cease-and-desist order the California Coastal

18       Commission imposed on February 18th.  This is the second time the

19       Coastal Commission has had to send a cease-and-desist order to Sable

20       for working without a proper permit.  As supervisors, you must ask

21       yourselves, is disobeying state orders the kind of behavior that

22       demonstrates the responsibility to run a project as risky and dire as

23       this.  Sable Offshore does not have critical corrosion technology

24       required in the permits they're seeking to be transferred.  Why is this

25       important?  Because according to the county's own analysis, restarting

148

COSB AR007087

1    the pipeline would likely lead to another spill every year and a major

2    rupture every four years.  Another spill every year, and a major

3    rupture every four years.  It's going to happen again.  Sable Offshore

4    is a new, small, untested company that likely cannot cover the cost of

5    another major spill.  We've seen what

6        [05:40:00]

7        happens when companies pack up after the damage is done.

8    Fortunately, this county has stood up to unreasonable requests before.

9    In 2015, county assistant planning director Diana Black, said no, when

10    ExxonMobil sought to resume production by trucking days after the

11    disaster.

12        CHAIR CAPS:  Thank you, Jonathan.  That is your time.

13        JONATHAN ULLMAN:  Here, we have another opportunity…

14        CHAIR CAPS:  We will now go to Mike Caldwell to be followed by

15    Nathaniel Williams to be followed by Steve Balcom to be followed by Ted

16    Roche.  Mike?

17        MIKE CALDWELL:  Good afternoon, board.  My name is Mike Caldwell.

18    I'm here to support Sable.  I work for one of the contractors that's

19    working on the project, ARB.  I'm here today to provide representation

20    for a contracting company that I have worked for, for over 20 years and

21    to hopefully instill confidence that the company that we are doing work

22    for, Sable Offshore, will undoubtedly be able to complete the project

23    with the most experienced craftsmen in the industry.  Both Sable

24    Offshore and the contractors working for them have had many years of

25    experience completing just this type of work.  We all have excellent

149

1   reputations that we would not want to jeopardize.  We have worked on

2   many projects just like this over the years, with all, most every oil

3   company and utility company around.  We have worked in just about every

4   environmental situation possible and have been successful in protecting

5   the environment and all the animal species, endangered, and

6   unendangered.  I can say quite honestly that, of all the oil companies

7   we have worked for, Sable Offshore is one of the better partners we've

8   partnered with.  Thank you.

9       CHAIR CAPS:  We will now go to Nathaniel Williams to be followed

10  by Steve Balcom to be followed by Ted Roche to be followed by Mario [PH

11  05:41:55] Luperchio.

12      NATHANIEL S:  Good afternoon.  My name's Nathaniel Williams, my

13  [INDISCERNIBLE 05:41:58].  I'm from LA, UA Local 250.  We're supplying

14  all the labor: welders, helpers, fitters, supervision for this project.

15  We are very well skilled and trained, and this is what we do for a

16  living.  What is going on now is that they're replacing most of the

17  pipeline that is bad, that's corroded, putting in the safety valves,

18  and working on cathodic protection, and this is going to be a safer

19  pipeline than it was when it was built.  So, we're here to support

20  Sable and to ask that you let them have the permit.  Thank you.

21      CHAIR CAPS:  We will now go to Steve Balcom to be followed by Ted

22  Roche to be followed by Maria Luperchio to be followed by Steve

23  Caldrone to be followed by Brian Troutwine.

24      STEVE BALCOMB:  Good afternoon, everybody.  My name is Steve

25  Balcomb with ARB.  I'm senior vice president of our underground

COSB AR007089

1    pipeline group. We've been around for 75 years. until I got here, I

2    thought I knew everything about pipeline work. Heard a lot of things

3    here, a lot of mis-reputations, okay? I've got over 100 people working

4    for Sable right now. One of my biggest duties of my job is to keep my

5    people working and keep their families fed, and Sable has done a great

6    job of that. Sable's in a hurry to get this done, but I've watched

7    this company. They're in a hurry, but not at the sense of if they have

8    a safety problem, that they'll push forward and not worry about safety.

9    That is not happening with this company, and that's how I kind of look

10   at reputations of companies of what's most important for them. Right?

11   gosh, there's so many things people brought, they brought up the toad,

12   endangered species.

13       CHAIR CAPS:  Steve, if you can please speak into the microphone.

14   Thank you.

15       STEVE BALCOMB  I'm sorry, endangered species, toad.  Nine years

16   ago, Kinder Morgan Project, Camp Pendleton, we had to put up a toad

17   fence.  This toad fence cost the company $1.4 million for us to put

18   this around the pipeline right away.  At the end of the job, it was

19   probably the most expensive frog in the world.  They caught one, okay?

20   I want to make something perfectly clear on the environmental side, I

21   thank God that we have you guys.  I really do.  It's necessary, right,

22   and it really is, but it comes to a point where there's got to be

23   common sense brought to the table.  Southern California Gas, drilling

24   underneath the railroad tracks, nine months ago, environmentalists shut

25

COSB AR007090

1    us down.  Bird started nesting.  We couldn't get the equipment out.

2    Had to leave it there.  We charged the customer.  We had to.

3         [05:45:00]

4         24-hour guard for I forget how many months.

5         CHAIR CAPS:  Thank you, Steve.  That is your time.

6         STEVE BALCOMB:  Thank you.

7         CHAIR CAPS:  We will now go to Ted Roche to be followed by Mario

8    Luperchio to be followed by Steve Coldiron to be followed by Brian

9    Troutwine to be followed by Evelyn Lynn.  Ted?

10        TED ROCHE:  Good afternoon, Chair Caps and the board.  Thank you

11   for the opportunity to discuss Sable Offshore and its operations.  I

12   fully support the transfer of ExxonMobil's SYE permit to Sable, and I

13   believe I bring a unique perspective to this discussion.  I'm Ted

14   Roche, former CEO of Aqueous Corporation, a subsea marine construction

15   and commercial diving company I co-founded here in Santa Barbara nearly

16   25 years ago.  Aqueous, we have a stellar reputation in the offshore

17   marine industry, and my experience as a commercial diver since 1975 has

18   given me a deep understanding of the rigorous standards for safe oil

19   and gas extraction.  Also, please note that my company, we've completed

20   subsea inspection work on every offshore platform and subsea pipeline

21   here in the channel.  As a Santa Barbara native, I have a personal

22   stake in our marine environment.  My background is a former commercial

23   abalone diver.  My son's work as a commercial fisherman and my passion

24   for surfing connect me deeply.  It's a vital part of my life and our

25   community's heritage.  Having collaborated with Sable Offshore and its

152

1    leadership for nearly two decades, I can attest to their unwavering

2    dedication to safety and environmental protection.  They embody these

3    values in every aspect of their operations, ensuring meticulous

4    attention to detail.  Currently, we're working with Sable at the San

5    Diego's unit, conducting vital subsea platform inspections and

6    maintenance, including deploying skilled divers and our remote

7    operating vehicle for thorough subsea pipeline inspections.  These

8    efforts are essential for the integrity of our infrastructure and the

9    health of our environment.  I also strongly advocate for the blue

10   economy, which promotes the sustainable use of ocean resources.

11   Recently, I participated in a panel at Sandbar City College, discussing

12   how we can work together to promote sustainability.  Sable Offshore

13   exemplifies this balance, creating jobs and stimulating local

14   businesses while driving economic growth in Santa Barbara County.  In

15   conclusion, I strongly support the planning commission's approval of

16   Sable Offshore's ownership from ExxonMobil.  Their commitment to

17   safety, environmental stewardship, and community engagement makes them

18   a valuable partner for our future.  Together, we can ensure responsible

19   operation.  Thank you.

20        CHAIR CAPS:  Thank you, that is your time.  We will now go to

21   Mario Luperchio to be followed by Steve Coldiron to be followed by

22   Brian Troutwine to be followed by Evelyn Lynn.  Is Mario here?  Is

23   Mario here?  It appears Mario has left.  We'll now go to Steve Coldiron

24   to be followed by Brian Troutwine to be followed by Evelyn Lynn to be

25   followed by Jared [PH 05:48:02] Fresis.  Steve?

153

```
 1              STEVE COLDIRON:  Good afternoon.  You know, I practiced my speech
 2         last night in front of my little ones, and I kept making them laugh.
 3         So, we'll see how this goes.  My name is Steve Coldiron.  I'm with the
 4         Operating Engineers Local Union Number 12.  We represent the men and
 5         women who are heavy equipment operators, surveyors, dredgers,
 6         inspectors, and crane operators.  Our signatory companies have been
 7         contracted to work on the Los Flores pipelines with Sable Offshore.
 8         Our members are the best at what they do.  We have the skills, the
 9         experience, the knowledge, the training to get the job done
10         efficiently, and most importantly, safely, and I believe that these are
11         principles that Sable Offshore will subscribe to as well on this
12         project, but we aren't just simply construction workers with hardhats.
13         We are the men and women who are raising families in these communities.
14         We are the families that frequent your beaches.  We are the men and
15         women you might see at the playground with our kids or even at the
16         grocery stores.  I just want to be clear we are part of this community
17         every much as, I'm sorry, we are part of this community just as much as
18         everyone else's, and I want to ensure that our voice is heard.  We
19         strongly support Sable and respectfully ask that you deny this appeal.
20         This project is not just about job creation.  It's about strengthening
21         the local economy, increasing tax revenue, and ensuring that operations
22         are conducted safely and with environmental responsibility.  Thank you
23         for your time.
24
25
```

COSB AR007093

1        CHAIR CAPS:  We will now go to Brian Troutwine to be followed by

2    Evelyn Lynn to be followed by Jared [INDISCERNIBLE 05:49:47] to be

3    followed by Charlotte Brayer.  Brian?

4        BRIAN TROUTWINE:  Good afternoon, Chair Caps and supervisors.

5    I'm Brian Troutwine, EDC senior analyst and program director.  Last

6    fall, I surveyed the pipeline route and documented Sable excavating

7        [05:50:00]

8        in wetlands, creeks, and sensitive habitats.  These activities

9    require permits from the Coastal Commission and two other state

10   agencies.  U.S. Fish and Wildlife Service also notified Sable it needs

11   Endangered Species Act approval.  One worksite may even threaten a

12   resident's home.  EDC reported these excavations to the state and

13   federal agencies, and three agencies issued violations, but Sable did

14   not stop working in the wetlands, the creeks, and habitats.  The

15   Coastal Commission had to issue a cease-and-desist order.  Then on

16   February 14th, Sable resumed excavating in wetlands, streams, and

17   protected habitats.  This includes federally designated critical

18   habitat for the red-legged frog and other endangered species' habitats

19   in numerous locations, including right in the county's own treasured

20   Barone Ranch.  The Coastal Commission issued a second cease and desist

21   order on February 18th, but Sable kept working day and night, rushing

22   to complete the major repairs without the required per permits or

23   species protections.  To our knowledge, Sable still has not applied for

24   permits despite the California Department of Fish and Wildlife,

25   Regional Water Quality Control Board, and Coastal Commission's findings

155

COSB AR007094

1    that Sable is violating numerous important laws.  When Sable addressed

2    its violations today, it only addressed the Coastal Commission

3    violations, not the Cal Fish and Wildlife or the Regional Water Board

4    violations, over which the county has no authority.  Our point is

5    simple.  If Sable cannot obtain or even apply for the required state

6    and federal permits for repairs, they do not have the operational

7    capacity, the wherewithal, or expertise to operate the entire Santa

8    Ynez Unit.  The stakes are too high.  Sable cannot be trusted to safely

9    operate and abide by the environmental and public safety laws.

10    Therefore, the board must make the findings to deny the transfer of

11    permits and operator status to Sable.  Thank you.

12         CHAIR CAPS:  We'll now go to Evelyn Lynn to be followed by [PH

13    05:51:57] Jared Umphres to be followed by Charlotte Breyer to be

14    followed by Ted Morton to be followed by Danny Zaragoza.  Evelyn?

15         EVELYN LYNN:  Good afternoon, Madame Chair and fellow

16    supervisors.  I'm the Vice President, Director of Operations, and

17    helicopter pilot at Aspen Helicopters Incorporated on Oxnard,

18    California.  Prior to my job with Aspen Helicopters, I served on active

19    duty with the United States Coast Guard for 24 years, flying

20    helicopters and supporting the Coast Guard statutory emissions.  As

21    part of this time, I spent eight years flying in the Gulf of Mexico,

22    amongst many oil and gas industry platforms and have conducted hundreds

23    of flight operations.  Two include landings on various offshore

24    production facilities.  I come before you to share my experience with

25    Sable.  During the past 23 months, I have conducted multiple flight

156

COSB AR007095

1    operations with Sable to the three offshore facilities, Hondo, Harmony,

2    and Heritage.  Through my observations, I have seen Sable's team take a

3    proactive safety approach, always evaluating the condition of the

4    platforms, valuing feedback from us and from the team, and making

5    improvements.  For example, during initial flight operations to one of

6    the platforms, the team noted large tanks that were in the way of a

7    safe flight path.  They immediately took those tanks, and they removed

8    them, thereby making a safer approach.  Throughout the course of my

9    career, I have encountered all manner of helipads, and there are many

10   times that I have wondered about the safety, security, and the

11   capabilities to actually hold the advertised weight listed on the

12   helipad.  I have never had that problem with Sable.  I never questioned

13   the weight allowances that's listed on the platform with them.  In my

14   role with Aspen, I've also had the chance to talk with the pilots that

15   I assigned to do these flights and to receive feedback.  Their feedback

16   is positive, and they have received positive support from Sable when

17   they have declined missions or suggested a different flight route to

18   ensure the safety of all.  This ability of Sable proves that they are

19   part of a continuous safety mindset that they are working to achieve

20   and that they want all of their partners that participate with them to

21   conduct.  This is also a demonstration of Sable's willingness to

22   prioritize safety over production in their operations.  Thank you.

23            CHAIR CAPS:  We will now go to Jared Umphres to be followed by

24   Charlotte Breyer to be followed by Ted Morton To be followed by Danny

25   Zaragoza.  Jared?

157

1        JARED UMPHRES:  Hello, everyone.  I'm Jared Umphres.  I'm a

2    student, and I also work at a farm.  So, I could tell everyone here

3    about how the erratic rains and the hotter temperatures affect the

4    crops, which is the food that we eat, and I can't talk about restarting

5    oil production while ignoring the fires that blaze just south of us in

6    LA.  No one is immune to climate change.  We should not be drilling

7    more into this earth when it is telling us that we have done far too

8    much.  Let's be leaders in moving away from fossil fuels, because what

9    we do here will be a message to the world.

10        [05:55:00]

11        We'll have to make this transition, whether right now to prevent

12    further damage, or when the effects of climate change are on our

13    doorstep.  If the fossil fuel industry really cared about jobs in the

14    future, they would use their billions of dollars in annual profits

15    accumulated to invest in programs that allow workers to transition to

16    other industries.  What type of planet do we want our children to

17    inherit?  Because surely, the red deserts of Mars don't sound too

18    appealing to me.  So, how about let's work to ensure that our children

19    can inherit a livable earth.  Thank you.

20        CHAIR CAPS:  We will now go to Charlotte Brayer to be followed by

21    Ted Morton to be followed by Danny Zaragoza to be followed by

22    Christopher Alexander to be followed by Sean Kennedy.  Charlotte?

23        CHARLOTTE BRAYER:  Good afternoon, supervisors and community

24    members.  My name is Charlotte Brayer.  I'm sure we're all aware of and

25    hopefully proud of our Santa Barbara community's environmental activism

COSB AR007097

1    and consciousness. Following the 1969 oil spill in the Santa Barbara

2    channel, our community did not sit back and accept the effects. We

3    jumped right into activism and lawsuits after witnessing the deaths of

4    thousands of birds and sea mammals and fish, after smelling oil rather

5    than saltwater from the ocean, after seeing beaches cloaked in oil.

6    Out of this came nationwide environmental consciousness, with Earth Day

7    celebrations and environmental legislation and progress all starting

8    right here. I appreciate deeply that truth, facts, and evidence are

9    important to the board's decisions. Therefore, we cannot make a

10   decision today to transfer permits to Sable. As a Sable representative

11   mentioned earlier, if permits are passed, this could be the last

12   opportunity for the community to have a say and hold the company

13   accountable to everything that they have outlined. We're lacking some

14   confirmation of facts from environmental analysis. We're lacking

15   detailed documents, such as insurance, and we're lacking reliability of

16   the applicant's resources and compliance to permits. We cannot make

17   such a permanent decision that has lasting effects. How could the very

18   community who acted as a catalyst for environmental progress across the

19   nation come here today to pass a permit transfer that could repeat the

20   damage that those before us worked so hard to prevent and undo? They

21   thought of the generations to come after them, and we must do the same.

22   Thank you for your time.

23         CHAIR CAPS: We will now go do Ted Morton to be followed by Danny

24   Zaragoza to be followed by Christopher Alexander to be followed by Sean

25   Kennedy to be followed by Karen Kennedy. Danny?

COSB AR007098

1    TED MORTON:  Thank you, Chair Caps and supervisors.  My name is

2    Ted Morton, and I'm the executive director of Santa Barbara Channel

3    Keeper.  Today, I'll focus my comments on Sable's many violations.

4    Chapter 25B-10 and its findings required that a new operator

5    demonstrate the ability to operate its facility safely and in

6    compliance with applicable permit conditions and laws.  Sable's recent

7    track record shows anything but the ability to follow the law.  On

8    September 27th, the Coastal Commission issued a notice of violation

9    based on Sable's Unpermitted construction activities.  On October 4th,

10   the commission issued a notice of intent due to Sable's failure to

11   comply with a notice of violation.  On November 12th, after Sable

12   willingly ignored and violated the notices, the commission took the

13   rare step of issuing a cease-and-desist order.  On November 25th, the

14   U.S. Fish and Wildlife Service informed sable that it must take action

15   to comply with the Endangered Species Act.  On December 13th, the

16   Regional Water Quality Control Board issued two notices, sable for

17   unlawfully discharging waste into California waters and indicated

18   potential future steps on unpermitted polluted stormwater discharges.

19   On December 17th, the California Department of Fish and Wildlife issued

20   a notice of violation.  On January 22nd, the Water Board issued a

21   second notice of non-compliance, after Sable failed to comply with the

22   December 13 notices.  On February 11th, the Coastal Commission issued a

23   notice of violation for Sable's unpermitted offshore construction

24   activities.  On February 16th, the commission noted Sable's continued

25   unpermitted work and failure to comply with its prior notices.  The

160

1    commission was forced to issue another cease-and-desist order on

2    February 18th, and unbelievably, Sable has not complied with that

3    order.  To date, Sable has not complied with agency's orders or applied

4    for the necessary permits.  Accordingly, the board cannot find that

5    Sable has shown it's capable of operating the facilities in compliance

6    with applicable laws, regulations, and permits.  I urge you to deny the

7    transfer of permits today.  Thank you.

8        CHAIR CAPS:  We'll now go to Danny Zaragoza to be followed by

9    Christopher Alexander then Sean Kennedy then Karen Kennedy then

10   [INDISCERNIBLE 05:59:53].  Danny?

11       DANNY ZARAGOZA:  Thank you.  Good afternoon, supervisors.  My

12   name is Danny

13       [06:00:00]

14       Zaragoza, and I was born and raised here in Santa Barbara, and I

15   am secretary treasurer for Labor's Local 220.  We represent about… a

16   little bit over 2,700 members that live in Santa Barbara, San Luis

17   Obispo, and Kern County.  We have about 800 members that specifically

18   live here in Santa Barbara County, and we hope you deny the appeals and

19   approve the transfer to Sable.  Thank you.

20       CHAIR CAPS:  We will now go to Christopher Alexander to be

21   followed by Sean Kennedy to be followed by Karen Kennedy to be followed

22   by [INDISCERNIBLE 06:00:30] to be followed by Matthew Camper.

23   Christopher?

24       CHRISTOPHER ALEXANDER:  Good afternoon.  My name is Christopher

25   Alexander.  I'm with a company called Apex and right now, today, 17 of

161

1    our most experienced, our most meticulous, our most dedicated pipeline

2    inspectors are serving at worksites all throughout the Los Flores

3    Pipeline system.  These folks are seasoned professionals.  They're

4    safety leaders who are working side by side with not only the

5    maintenance crews, but biologists, archeologists, all to ensure that

6    this work gets done right.  Our team members also love the outdoors.

7    When they're not inspecting pipelines, they're camping, they're

8    fishing, they're enjoying the coastline with their friends and family,

9    and that's why every single time they step on a jobsite, the protection

10   of people and the environment is their highest priority.  Sable shares

11   these values, and that's why we are proud to be working with them.

12   I'll tell you that Sable stands out amongst its industry peers.  Our

13   company provides inspection services for many different energy

14   companies, many different pipelines, not just here in California but

15   across the United States, and I can tell you that the repair work that

16   Sable is doing in Santa Barbara County is in line with the very highest

17   standards of our industry.  Our inspectors are seeing it, they're

18   seeing it firsthand in the field every single day.  Sable's commitment

19   to safety, to quality, and to environmental stewardship promises to

20   make their restart a true energy success story for California, where,

21   by the way, this pipeline will be one of the most stringently regulated

22   pipelines in the history of the state, right here in Santa Barbara

23   County.  It promises to add hundreds of good jobs and bring in millions

24   in additional tax revenue.  Our team strongly supports Sable, and we

25

162

1    respectfully ask the board of supervisors to deny this appeal and

2    permit this success story to move forward.  Thank you.

3        CHAIR CAPS:  We will now go to Sean Kennedy to be followed by

4    Karen Kennedy to be followed by [PH 06:02:39] Callan Shay to be

5    followed by Matthew Camper, to be followed by Gail Teton Landis, and

6    just to give members of the public an update, we have 23 speakers

7    remaining, so a little more than 45 minutes.  Thank you for hanging in

8    there with us.  Again, we'll go to Sean Kennedy.  Sean here?  How about

9    Karen Kennedy?  All righty.  Moving along to Callan Shay, my apologies

10   for mispronouncing, to be followed by Matthew Camper to be followed by

11   Gail Teton Landis.

12       CAILEAN SHEA:  Good afternoon, supervisors.  I'm [PH 06:03:17]

13   Cailean Shea, here on behalf of UCSB's Environmental Law Club, you must

14   reverse the planning commission's decision to approve Exxon's permit

15   transfer to Sable.  A draft environmental impact report by the county

16   indicated that, if you uphold the transfer, it won't be a matter of if

17   an oil spill like the one in 2015 happens.  It will simply be a matter

18   of when.  We should not dismiss that report out of hand simply because

19   it was a draft, as it's the best direct analysis currently available.

20   Yet, even if you ignore the real risks that that draft report warned of

21   a spill every year, a major rupture every four years, the fact is that

22   Sable lacks the financial solvency necessary to afford cleanup and

23   decommissioning costs, as required by Chapter 25B of the county code.

24   Appellant's presentation makes that especially clear, but I want to

25   reemphasize for the record, Sable recently reported just $288 million

163

1    in cash on hand, but a worst-case spill, like Refugio in 2015, would

2    cost $870 million to clean up, and before Sable can even become

3    profitable, it must pay an $814 million debt, a debt that continues to

4    grow.  If Sable cannot meet these obligations, it will default, declare

5    bankruptcy, and leave taxpayers to foot the bill for any environmental

6    disaster and the inevitable decommissioning costs.  Chapter 25B was

7    designed to protect the public from exactly this kind of financial and

8    environmental

9         [06:05:00]

10         risk.  The conclusion that Sable meets its obligations is simply

11    not supported by sound legal interpretation or financial reality.  For

12    the foregoing reasons, I ask that you reverse the planning commission's

13    decision.  Thank you.

14         CHAIR CAPS:  We will now go to Matthew Camper to be followed by

15    Gail Teton Landis to be followed by Lorraine Woodman to be followed by

16    Craig Woodman.  Matthew?

17         MATTHEW CAMPER:  Good afternoon, supervisors.  My name's Matthew

18    Camper.  I'm the founder and attorney advisor to the UCSB Environmental

19    Law Club.  I want to ask the supervisors to take a step back and to ask

20    themselves, in the most straightforward and commonsense way possible,

21    what did those supervisors intend in 2001 and 2002 when they enacted

22    Chapter 25B?  Was it that it should be a toothless ministerial check-

23    the-box formality?  Or was it that it should be a bulwark?  Indeed, the

24    sole mechanism by which the county could ensure that multi-billion-

25    dollar corporations don't extract millions in profits from our oceans

164

1    and then dump off dangerous, aging, costly facilities to newly formed

2    corporations that have neither the track record nor the finances to

3    cover a catastrophic oil spill.  In support of its extremely narrow

4    interpretation both Sable and county staff repeatedly emphasized the

5    mandatory 'shall' language and chapter 10B of chapter 25.  However,

6    they gloss over the key operative language in that same section, that

7    is that that only takes place and only activates if the board here

8    reaches the findings that's required, and one of those findings is that

9    they ensure that new operators have the skills, training, and resources

10   to operate, abandon, and to respond to an oil spill.  A common sense

11   understanding of resources includes assets, it includes cash, and for

12   those reasons and like the many others that have been discussed today,

13   I ask that you guys use your discretion and apply a commonsense

14   approach to chapter 25B and grant the appeal.  Thank you.

15        CHAIR CAPS:  We will now go to Gail Teton Landis.  I don't see

16   her.  Is she here?  Then we'll go to Lorraine Woodman to be followed by

17   Craig Woodman to be followed by Angie [INDISCERNIBLE 06:07:26] to be

18   followed by Sineha, to be followed by Jason Wall.  Lorraine?

19        LORRAINE WOODMAN:  Good afternoon.  I'm Lorraine Woodman, and I

20   managed environmental impact studies for more than 35 years.  This is

21   clearly a project, as defined by CEQA, with the potential to cause

22   significant environmental impacts, and I do not understand why no CEQA

23   review for restarting the sable pipeline has been conducted.  A number

24   of our state legislators asked the state Fire Marshal's office to do

25   this, as did the Environmental Defense Center.  This has not occurred.

165

1    The Fire Marshal's office says that they are not responsible for

2    conducting CEQA review, that the determination of whether a new CEQA

3    analysis is required is made by the lead agency.  CEQA says that if a

4    project is to be carried out by a non-governmental entity, like this

5    one, the lead agency shall be the public agency with the greatest

6    responsibility for supervising or approving the project as a whole.

7    The Fire Marshal's office says that it doesn't have this

8    responsibility, because it just ensures compliance with safety

9    regulations.  Santa Barbara County, where the pipeline is located, says

10   it doesn't have this responsibility, because it's only responsible for

11   approving the transfer of the county permits for individual assets to

12   Sable.  So, out of the long list of agencies involved, who is the

13   agency with the greatest responsibility for supervising and/or

14   approving the project as a whole, and why are they not conducting CEQA

15   analysis, which would disclose potential impacts, identify mitigation

16   measures for these impacts, and allow public input.  This is critical,

17   because our coastal resources are at risk, as we saw in 2015.  It is

18   also critical that the project's greenhouse gas emissions be fully

19   disclosed.  Our county has a climate action plan.  We know what the

20   risks from continued fossil fuel are.  Approving the transfer of this

21   old corroded pipeline and other assets to Sable, a company with a

22   record of flouting state orders, would be unconscionable in light of

23   the risks involved and in the absence of full disclosure of the

24   project's impacts with adequate public input.  Thank you.

25

166

1        CHAIR CAPS:  Thank you, Lorraine.  That is your time.  Thank you.

2    We'll now go to Craig Woodman to be followed by Angie [PH 06:09:55]

3    Golzia to be followed by [PH 06:09:57] Sineya, to be followed by Jason

4    Wall to be followed by Katie Davis.

5        [06:10:00]

6        Craig?

7        CRAIG WOODMAN:  Good afternoon.  My name's Craig Woodman, and I

8    managed environmental impact reports and environmental studies for 34

9    years, including for major oil and gas pipeline projects in our county.

10   The administrative draft EISEIR prepared earlier was for the complete

11   replacement of the pipeline, and while it contains updated

12   environmental information along the pipeline route, and much of it is

13   undoubtedly relevant to the current project, the current project does

14   not have to adhere to the updated impact analysis or reflect updated

15   data found in that administrative draft.  Sable's current project does

16   not have an approved offsite consequence analysis, which is required to

17   identify the location, size, frequency, and duration of potential oil

18   spills and their impacts to environmental, cultural, and economic

19   resources, but I ask you, how can Sable realistically identify such

20   impacts when its analysis and permit requirements are based on

21   environmental studies conducted in the early 1980s, when survey and

22   analytical methods were not nearly as rigorous or as accurate as they

23   are today?  I know, because I've managed literally hundreds of

24   environmental studies in California, and many of them showed older

25   studies missed resources, mapped them incorrectly, or both.  More to

167

1    the point, environmental conditions can change dramatically over 40

2    years.  For example, erosion can expose archeological sites that were

3    once buried.  Buried archeological sites were once exposed, and erosion

4    and modern activities can destroy entire sites.  Biological resources

5    are not stable over a 40-year period either, and resources of concern

6    back then may be much different today.  So, I believe that we can't

7    trust any offsite impact analysis of this pipeline project until it

8    reflects updated data, impact analysis, and mitigation measures.

9    Please, deny the transfer.  Thank you.

10       CHAIR CAPS:  We will now go to Angie Golzia to be followed by

11   Sineha to be followed by Jason Wall to be followed by Katie Davis.

12   Angie?

13       ANGIE GOLIZIA:  Good afternoon, supervisors.  My name is Angie

14   [PH 06:12:26] Golizia, and I'm an environmental study student at UC

15   Santa Barbara.  I would like to do a little thought exercise with you

16   all.  Let's say a house had an explosion in a gas pipe that killed the

17   family inside, and it was found that the pipes as a whole were faulty.

18   Despite the imminent risks of it happening again, the hole was patched

19   up, and the landlord requested that the building be put up for sale

20   again.  Would you approve that sale?  Would you approve of your family

21   living in that home?  This is what is happening with this pipeline.  It

22   is not a matter of if another spill will happen, but a matter of when.

23   This pipeline is dangerous, and when the spill happens, it will impair

24   our ecosystems, the fishing industry, tourism, and affect everyday

25   people like me.  Another oil spill would continue to harm the city and

COSB AR007107

1    county of Santa Barbara that we all know and love.  I also understand

2    well that people have to work, and I want to remind everyone that we

3    can create more jobs through a just transition to clean energy.  You

4    can help us make that transition and help us also meet the climate and

5    emissions goals outlined in the Santa Barbara County General Plan by

6    denying these permits.  I truly hope that you do.  Thank you for your

7    time.

8        CHAIR CAPS:  We'll now go to Sineha to be followed by Jason Wall

9    to be followed by Katie Davis to be followed by John [INDISCERNIBLE

10   06:13:51].  Sineha, thank you.

11       SINEHA:  Hi, everyone.  My name is Sineha, and I am a student

12   from UCSB.  I live in Santa Barbara County.  Coming to Santa Barbara,

13   taking walks along the beach has become a normal part of my everyday

14   routine, and I saw immediately how these beaches make Santa Barbara

15   glow.  These beaches provide so much life to our county, life and

16   ecosystems that are placed at risk if this pipeline is restarted.  We

17   have seen in the past how pipelines off our coast have caused spills

18   and disasters that have had too devastating of a toll on our

19   communities and on the beings that rely on our oceans to thrive.

20   However, it's not just a threat of a spill, but the pipeline, its

21   excavations, and the drilling itself that does this.  That is, the

22   pipeline does not have to fail for it to cause damage.  Unclean,

23   decommissioned, and uncapped pipes continue to leak and pollute our

24   oceans.  These pipes are old and corroded and do not have the required

25

169

1      permits and critical corrosion protection technology.  Moreover, facing

2      numerous violations and cease and desist orders,

3          [06:15:00]

4          Sable has shown that they are unable to adhere to your laws and

5      to the rules.  Waiving compliance rules removes the purpose of these

6      measures in the first place.  Sable's finances and management are not

7      trustworthy.  They will not be able to pay for any remediation, when

8      inevitably, another major spill occurs, and this responsibility should

9      ,not yet again, fall upon the public, and when this next oil spill

10     occurs, and the people leave our beaches, and the plants and animals of

11     our shores die, respectfully, the blood will be on your hands, but it

12     is our responsibility to care about the environment and our future.

13     I'm up here talking, instead of going to class to fight, not just for

14     my future, but yours too.  Do not give up our land and oceans to people

15     that do not respect it.  I urge you to protect your constituents in

16     denying Sable's application for a transfer and permits, and by not

17     allowing sable to restart this villainous pipeline.  It all starts

18     somewhere.  Thank you for your time.

19         CHAIR CAPS:  We will now go to Jason Wall to be followed by Katie

20     Davis to be followed by John [PH 06:16:06] Hulutner.  Jason?

21         JASON WALL:  Good afternoon.  Thank you for giving me the

22     opportunity to speak today.  My name is Jason Wall on behalf of Doty

23     Brothers.  Doty's been working with Sable since the start to fix the

24     anomaly repairs, the valve installations, as well as the pipeline

25     remediations to the most stringent and to the regulations that

170

1        California, as far as the state and the State Fire Marshal has laid out

2        to us.  We're proud of the work we have done with Sable and proud of

3        our men and women that are part of the team to getting this pipeline to

4        beat those standards into the regulations.  The restart is good for the

5        local economy.  It will create good paying jobs and tax revenue for the

6        county.  At Doty Brothers, we have firsthand seen, firsthand have seen

7        how Sable prioritizes safety to the environmental responsibilities.

8        Their management team is not only knowledgeable, but is also locally

9        rooted.  They understand the unique environmental and economic needs of

10       the county of Santa Barbara.  Many of us here today are part of that

11       team that ensures the San Nunez facilities are operated in a safe,

12       efficient, and responsible manner.  Additionally, producing oil

13       domestically here in California will be cleaner and more cost effective

14       for California rather than producing oil overseas and bringing it here

15       by tanks.  I strongly support Sable and respectfully ask that you deny

16       this appeal, and also, wanted to make note that, a UC San Diego

17       graduate, from the mechanical engineer and aerospace department, I've

18       talked to my old professors who've reached out to their colleagues in

19       the industry, and they all are in full support of this notion as well,

20       and they understand that the importance of this.  So, I strongly ask

21       for Sable to be the operator and for them to be… to grant their

22       permission for the permits.  Thank you.

23            CHAIR CAPS:  We will now go to Katie Davis to be followed by John

24       Hulutner to be followed by Larry [PH 06:17:58] Berent to be followed by

25       Mariza Sullivan.  Katie Davis?

                                      171

1          KATIE DAVIS:  Hello, Katie Davis, and I know this seems like a

2    lot of public comment, but there were actually people who couldn't even

3    get into the building before public comment sign up closed.  So, that

4    just shows the level of concern and feeling here.  You heard from the

5    author of Chapter 25B and the proponents who were there when it was

6    passed about the reason for it.  It exists specifically for this

7    situation, where an oil major sells questionable and risky assets to an

8    oil minor, putting the county at increased risk.  That's why we have

9    this.  That's why we are considering it, and firstly, assets do not get

10   more questionable than this: a pipeline along the most sensitive

11   coastline in California that already caused a major oil spill with

12   known issues of lack of effective corrosion control, where we know the

13   line testing didn't work in the past.  Exxon knows this pipeline's

14   unsafe.  That's why they proposed building a new pipeline, and we're

15   talking about a major polluting gas plan in the most wildfire-prone

16   area, where two fires have burned onto the property in the last ten

17   years, and the Refugio fire this last summer came very close, where

18   they've had gas leaks before.  Secondly, oil minors don't get more

19   minor than this, an indebted company started specifically to operate

20   and buy this one single asset.  It's their only asset.  If it doesn't

21   start, or it's shut down because of a spill, they're gone.  Having the

22   bare minimum of insurance is not a sufficient guarantee.  The latest

23   estimate from Planes is the spill costs them $870 million, 70% of which

24   was not covered by their insurance, and they had a similar insurance

25   coverage to what Sable says they have.  Planes was on the hook for

172

COSB AR007111

1    hundreds of millions, not just for cleanup, but also, compensation to

2    other businesses, to fisheries, to property owners, to the oil workers

3    themselves, who are affected by the spill.  That's who we're also

4        [06:20:00]

5        protecting.  Who do we want to be responsible in the event of a

6    disaster?  Do you want Exxon and their deep pockets to bear

7    responsibility or do you want to put the fate of the county in the

8    hands of a speculative limited liability company with a single asset?

9        CHAIR CAPS:  Thank you, Katie.  That is your time.

10       KATIE DAVIS:  Thank you.

11       CHAIR CAPS:  We will now go to John Hulutner to be followed by

12   Larry Berent Rent to be followed by Mariza Sullivan to be followed by

13   Emily [PH 06:20:23] DiFeed.  John?

14       JOHN HULUTNER:  Hi there.  Thank you for hearing my conversation

15   today.  My name's John Hulutner.  I'm a lifelong resident of Santa

16   Barbara County and a beautiful Santa Maria Valley.  I've been employed

17   in the oil industry since I got out of high school in '18, and also,

18   the transportation industry.  I hear a lot about how Sable is not

19   competent to operate that.  That's not true.  They have the same

20   management when Planes Exploration in California had a major operation

21   going in the state.  They're the ones I could sleep at night.  Their

22   employees brought in stop work authority, which meant a lot to our

23   company.  All one of our employees could stop a job at any time with no

24   repercussions.  It'll bring a lot of jobs and a lot more stability of

25   the oil industry and the state of California and our country by

173

COSB AR007112

1    supplying the oil here naturally.  So, I want to have you guys vote in

2    favor of that.  Thank you.

3         CHAIR CAPS:  We will now go to Larry Berent to be followed by

4    Mariza Sullivan to be followed by Emily DeFeed to be followed by Janet

5    Garcia.  Larry?  Is Larry not here?  All righty.  We will go to Mariza

6    Sullivan.

7         MARIZA SULLIVAN:  Good afternoon, everybody.  My name is Mariza

8    Sullivan.  I am the former tribal chair for Coastal Ban of the Chumash

9    Nation, and I am… call myself a Chumash elder.  No.  I was thinking it

10   might bring a little bit of the Chumash in this room.  There's been

11   some talk a little bit.  Typically, people know and acknowledge that

12   this is Chumash land, and I have to ask something about one of the

13   Sable gentlemen mentioned that they were working with a cultural

14   monitor.  I would actually like to know who that is, because in our

15   community, we're not aware of monitors actually being out there with

16   them to be part of the excavating that they're doing and the land

17   movement that's going on right now.  I, myself, tend to want to try to

18   figure out why people do the things they do.  So, I'm not going to

19   have… this is a bit of a non-high level of information I'm going to

20   give right now.  What I'd like to do is read a story from a book that

21   is entitled December's Child.  It's a book of Chumash oral narratives

22   that many of us have been able to revitalize in our culture.  We're

23   going back to trying to find stories that were taken away from us.

24   This is a story entitled Gain is All, and it goes like this.  A man

25   once played the following song on his four-holed flute.  The words are

174

1    'gain or profit will always exist'.  He was a very close observer, and

2    he began to study the world.  He found conflicts that went as far as

3    people killing one another, and the cause of it all was gain.

4         CHAIR CAPS:  Thank you, Mariza.  That is your time.

5         MARIZA SULLIVAN:  Thank you, I just want to make sure that we

6    think a lot about what we're doing.  We all hear a lot about lots of…

7    two sides to every story.  So, lots to think about.

8         CHAIR CAPS:  We'll now go to Emil DiFeed to be followed by Janet

9    Garcia to be followed by Stephanie Cater to be followed by Kim Kimball.

10   Is Emil, Emily?  My apologies.

11        EMILY DIFEED:  Good afternoon, supervisors, and thank you so much

12   for taking my comment.  I'm a PhD student at the UCSB [INDISCERNIBLE

13   06:24:38] School of Environmental Science and Management.  I'm before

14   you here today as a fellow citizen, concerned about the health and

15   safety of my neighbors, family, friends, and future children.  To start

16   off, I wanted to share a quote from a fellow citizen of Santa Barbara

17   County, Craig McKellar.  Recounting his experience of the 2015 oil

18   spill, he said,

19        [06:25:00]

20        my son was feeling dizzy.  I was feeling dizzy, and the smell was

21   overwhelming to your body, mind, and brain.  We had a congested chest.

22   We couldn't breathe.  Unfortunately, I've come here today to tell you

23   that this isn't some scene from a dystopian film.  This is an everyday

24   citizen of our county, recounting his experience of this very same

25   pipeline we are discussing reopening today.  He was just one of

175

COSB AR007114

1    countless citizens of Santa Barbara County who have repeatedly been the

2    victims of oil spills and their ongoing health impacts.  As the Santa

3    Barbara County Board of Supervisors, these are the citizens that you

4    are representing.  Allowing this project to continue would be an

5    unfathomable betrayal to your very own citizens and neighbors.

6    According to an analysis given to Santa Barbara County, this oil

7    pipeline would lead to a spill every single year and a major rupture

8    every four years.  So, when this pipeline ruptures, and the millions of

9    dollars hit us in the face, crushing our local seafood industry,

10   devastating the health of our citizens, and bringing chronic and

11   irreversible health impacts and medical expenses, contaminating our

12   water supplies, and burdening us with cleanup costs, who's going to pay

13   for it?  I can tell you one thing: it won't be Sable.  Sable is a

14   speculative and financially unsustainable company that is operating at

15   a $682 million deficit.  So, if you're considering this project for an

16   imagined economic benefit, it will simply bring devastation to our

17   citizens.  The decision before us today is about more than just a

18   pipeline.  It is about the safety of our citizens.

19        CHAIR CAPS:  Thank you, Emily.

20        EMILY DIFEED:  We've seen the consequences before, and you have

21   the power to…

22        CHAIR CAPS:  We will now go to Janet Garcia to be followed by

23   Stephanie Caters to be followed by Kim Kimball to be followed by

24   Hillary Houser.

25

COSB AR007115

1          JANET GARCIA:  Hi.  My name is Janet Garcia.  I am a [PH

2     06:27:03] Kabahi clan member, and also, here from Coastal Band of the

3     Chumash Nation, culture resource management committee member.  We do

4     not support oil, and we never have.  We have engaged in consultation to

5     protect our sacred sites and cultural landscapes, because local, state,

6     and federal agencies approve these projects, and it is our inherited

7     obligation to do so.  Sable has only been in operation since 20-25

8     years.  So, likely, they are new, a new company.  You asked the

9     question about transferring from one oil company to another.  It is not

10    unusual.  This has been happening since '88.  I initially worked all

11    American Pipeline.  I seen the welds, I seen the pipe that went into

12    the ground, I seen the destruction of our sites.  The pipeline is not

13    going to protect our culture resource.  There's 63 recorded sites

14    within the pipeline corridor, identified from line 901 and 903

15    replacement.  According to Albion, the archeological firm, no tribal

16    monitors have been contacted to observe any of the ground disturbance

17    by Sable.  EIR of 85 is not acceptable.  40 years' old information is

18    not enough to mitigate the culture impacts.  So, I ask you, at this

19    time, to not support the transfer.  They are inadequate and a band-aid

20    isn't going to fix this pipeline.  I've seen it with my own eyes.

21         CHAIR CAPS:  We will now go to Stephanie Caters to be followed by

22    Kim Kimball to be followed by Hillary Houser.  Stephanie?

23         STEPHANIE CATERS:  Good afternoon.  My name is Stephanie Caters.

24    My husband and I have lived in Santa Barbara for several decades.

25    We've raised our son here.  I love the beauty and splendor of the

177

1     place.  We appreciate it.  We support it.  I am an environmentalist,

2     and I have worked in Los Flores Canyon for almost 15 years now.  I

3     worked there with Exxon, and I work there now with Sable.  I've heard a

4     lot of vilification today of oil and gas, and it's by people who I

5     don't… I think they don't understand the pervasive nature of petroleum

6     use in our society.  They're railing against it, while they're wearing

7     clothes

8          [06:30:00]

9          and shoes that are made from petroleum products, eyeglasses,

10    sunglasses that are made with petroleum products, even to the point,

11    let's say they, rode their bikes here today, because they wanted to be

12    very green, green energy, which is great, but the tires on the bicycle

13    are made using petroleum products.  The paints and the metals on the

14    bicycle that they're made of come from petroleum products.  There's

15    actually a very synergistic relationship between green energy and the

16    petroleum industry.  If you just look at wind farms, the huge propeller

17    blades are made using polymers that come from petroleum products.  The

18    gigantic pillars, made from steel, the steel can't be made without

19    fossil fuels, powering it to heat it up enough to make the steel.  Same

20    with the concrete.  You can't make concrete without the gen… it starts

21    with limestone, and to break that apart, you need fossil fuels.

22    Imagine a world without concrete or steel.  We're not there.

23          CHAIR CAPS:  Thank you, Stephanie.  That is your time.

24          STEPHANIE CATERS:  Thank you.

25

COSB AR007117

1          CHAIR CAPS:  We will now go to Kim Kimble to be followed by

2     Hillary Houser to be followed by Juan Salis to be followed by Candace

3     Menaghan.  Kim Kimball?  Is there no Kim Kimball?  All righty.  We will

4     go to Hillary Hauser to be followed by Juan Salis to be followed by

5     Candace Menaghan to be, and then we are actually going to return to

6     Zoom with Terry Fernandez and Jeff Mason, and those are our final six

7     speakers.  So, if you do have your name on the list, and you haven't

8     heard it called, please, come to the hearing room and talk to Leah in

9     the back, and we will get that sorted out.  Hilary?

10         HILLARY HOUSER:  Good afternoon, Chair Caps.  Honorable

11    supervisors, you're thanking us for hanging in there.  We thank you for

12    hanging in there and for listening to us for hours and listening to our

13    concern.  I am Hillary Houser from heal the Ocean, and I appreciate the

14    questions that you've been asking.  The insurance questions, let's see

15    this, let's see that, there are things that you have not seen enough

16    of.  We have not seen CEQA either.  I was an ocean reporter before Heal

17    the Ocean, and I was here from a Washington DC newspaper, covering the

18    1969 oil spill.  I remember it totally.  My letter to you that arrived

19    too late was about coming on the Refugio Oil spill.  I drove right into

20    it on the 101, and again, this nightmare of… this nightmare.  Santa

21    Barbara is all about, well heritage site, marine sanctuaries, and so

22    forth, but one of the questions that you brought up was about

23    insurance.  What happens if it's no longer there?  Heal the Ocean

24    started in 1998 to focus on wastewater infrastructure, but somewhere,

25    and we did that, but somewhere along the line, the Summerland oil

                                      179

COSB AR007118

1    spill, the oil mess in Summerland, and there was no one around to deal

2    with it, goo, so forth.  So, we did, and the reason we're doing it,

3    there's no money, there's no insurance, there's no… there's nothing,

4    and we've been raising the money to remediate that, and so, we don't

5    want to get into another situation where we are incapable of dealing

6    with whatever could happen, and I encourage this board, you

7    supervisors, please, represent this community of ocean lovers and don't

8    be afraid of being bullied by lawsuits and stuff like that.  I really

9    appreciate you representing us.  Thank you.

10    CHAIR CAPS:  We will now go to Juan Salis to be followed by

11    Candace Menaghan.  Juan?

12    JUAN SALIS:  Hi.  Good afternoon, Madam Chair and members of the

13    board.  My name is Juan Salis.  I've worked in gas and oil transmission

14    for over 30 years.  Working for oil has… oil and gas helps pay for my

15    son's and daughter's university tuition.  A good question: do we need

16    oil?  Yes, everything around us uses natural gas and oil, our clothes,

17    our homes, our chairs, our beds, our flooring, our roofs, our

18    transportation, and most importantly, our food.  Sable helps all of us

19    not to

20    [06:35:00]

21    be dependent on foreign oil.  Sable also provides jobs and income

22    for the county.  The team Sable has gathered is prioritized on safety

23    first.  They are experienced and trained to provide safe transportation

24    of the product.  Up-to-date standards and instrumentations have been

25    installed for safe transportation generations to come, work around

180

1   Sable employees, brings no doubt in my mind that they are a great

2   company and are focused on being better than the predecessor.  Ten

3   years after the spill, I cannot see any traces of the spill.  I've

4   walked the areas myself, and all I see is the natural spillage, or

5   natural seepage, which is really good.  I mean, just naturally

6   occurring oil seepage that I see.  People were… I mean, also, here,

7   let's learn from our mistakes.  Sable has learned from the previous

8   owners and is ready to be better.  We can only grow and move forward.

9   As Sable moves forward, more jobs will be available.  Hopefully, some

10  of these young people here will fill out those jobs at Sable.  All I

11  can tell you is that there's a great team that will prevent any future

12  spills, and I really appreciate your time.  Thank you, guys.

13       CHAIR CAPS:  We will now go to Candace Menaghan, who's our final

14  speaker in person.  Then we're going to return to Zoom with Terry

15  Fernandez to be followed by Jeff Mason.  Candace?

16       CANDACE MENAGHAN:  Good afternoon, Chair Caps and supervisors.

17  My name's Candace Menaghan.  I'm the executive director of Coastal

18  Ranches Conservancy.  We are a nonprofit organization that does

19  protection, restoration, and education along 76 miles of the Gaviota

20  coast.  I'm here to ask you not to move this permit over to Sable.

21  Ultimately, 25B is indeed the local authority backstop when state laws

22  are inadequate to safeguard our communities.  Before joining Coastal

23  Ranches Conservancy, I covered environmental issues for a county

24  supervisor in Ventura County, where we have a similar tension between

25  oil and gas and the environment, and we found that the state insurance

181

COSB AR007120

1    requirements left a huge gap in coverage, leaving our communities,

2    environment, and water supply at risk, and under your police powers to

3    oversee public nuisance as well as your land use authority for

4    conditional use permits of land use actions, of course, this board of

5    supervisors has the jurisdiction to protect and safeguard our

6    communities.  These grandfathered oil and gas permits don't allow

7    companies… they allow companies to avoid regulation that protects their

8    environment, public health, and water supplies.  In 2022, Ventura

9    County was able to close that loophole, and oil and gas spent $8

10   million to try and push a misinformation campaign that overturned

11   measures A and B, but you have the jurisdiction.  Ventura County did

12   it.  Santa Barbara County can do it.  You can move from administerial

13   to discretionary and address these grandfathered permits that don't

14   address the modern environmental needs.  Southern Steelhead was listed

15   in 1997 at a federal level.  It's at a state level.  This pipeline

16   covers Cuyama Valley, Santa Ynez River, Gaviota Coast, a host of

17   coastal watersheds, such as the Royal Honda, where we know there is

18   critical steelhead habitat, historically and existing, which is all at

19   threat under this 1985 antiquated permit that needs to be addressed

20   through proper environmental review.

21        CLERK:  Thank you, Candace, that is your time.  We will now

22   return, excuse me, to zoom with Terry Fernandez, and we did lose Jeff

23   Mason on Zoom.  So, Terry Fernandez on Zoom will be our final speaker.

24   Terry?  Terry, we have unmuted you on our end.  If you can please

25   unmute on your end to provide your comments.  Terry, if you can hear

COSB AR007121

1    me, if you can please unmute on your end to provide your comments.

2    Unfortunately, it appears we're having some technical difficulty with

3    Terry.  So, that concludes public comment on departmental item number

4    one.

5         CHAIR CAPS:  All right.  Thank you, everybody.  Thank you, Madam

6    Clerk, for managing that so smoothly, and thanks to everybody for

7    participating in such a respectful way.  That kind of came upon me.

8    So, now, I need to find my notes here of what's next, and that would be

9    I believe it's time for the appellant rebuttal, which is EDC.

10        [06:40:00]

11        Five minutes.

12        MS. CROP:  A couple minutes.

13        CHAIR CAPS:  Do you want… to get ready?  Is that what you need?

14   Sure, you can take a minute or… yeah.  You're welcome to take a minute

15   to gather your stuff.  Yeah, we'll just take a… I just need to use the

16   restroom.  So, we'll just take like a very quick break.  Two minutes.

17        [06:45:00]

18        CHAIR CAPS:  Okay.  All right.  Thanks, everybody.  So, what

19   happens next is the, each… the appellant has five minutes.  Each

20   appellant has five minutes for battle.  So, we have two appellants, and

21   then the applicant has ten minutes for a rebuttal, and then staff may

22   comment on anything they heard today, and then the board will

23   deliberate.  So, that's the roadmap.  We're almost there.  I appreciate

24   everybody's respect, and EDC, it's your platform.

25

COSB AR007122

1          MR. FRANKEL:  Okay, whenever you're ready.  Is there a timer?

2     Okay.  So, we've heard a lot today, but here's what we haven't heard:

3     any assurances that this company will be able to remediate a spill or

4     abandon these facilities, and we haven't heard any valid justification

5     for ignoring these agency directives, especially the Waterboard and

6     Fish and Wildlife.  So, I want to bring us back to chapter 25B and what

7     it is that's required on the ordinance and specifically the financials.

8     Sable, in their presentation, had a slide that suggested that the

9     ordinance had been changed, that language had been added to some of

10    these provisions, and that the original intention of staff was also

11    changed in that process.  That's actually incorrect.  So, if you look

12    at 9E1 in particular, which is for guarantors, the financial assurances

13    finding, that was the same.  That was the same when it was in the

14    planning commission and the same afterwards, and so, the staff

15    recommendations for how that's supposed to be applied, that it requires

16    a searching inquiry into financial wherewithal, that is completely

17    intact, and in fact, as far as this additional language goes, the board

18    agenda letter that staff submitted before the board, back in 2002, it

19    specifically said why that language was added.  It's not a mystery.  It

20    said it was only added to alleviate confusion.  Apparently, there was

21    confusion that there was duplicate requirements between owner,

22    operator, and guarantor.  It was just saying there is no duplicate

23    requirements.  So, that's all that that was for, and we don't have to

24    guess about what chapter 25 B means.  We have a letter from the person

25    who wrote it, saying what it means, commenting on the final ordinance

184

1       as adopted, and even putting that aside, the interpretation that that

2       Sable is proposing undermines the entire purpose of the ordinance.

3       It's inconsistent with basic principles of statutory interpretation.

4       It renders all these other provisions superfluous, like the one

5       allowing the county to exact financial guarantees, and then just

6       quickly, I want to just bring our attention back to a likely scenario,

7       which is that Sable never restarts, and then they bankrupt.  What

8       happens with abandonment?  They don't have the financial capability to

9       do that.  We've had no assurances today that they will be able to

10      properly abandon

11          [06:50:00]

12          these facilities.  The county, by approving these transfers, is

13      just wide-open, walking into that likely scenario.  Bankruptcy, no

14      funds for abandonment, and millions of dollars in taxpayer money to

15      clean it up, and then Linda wants to add something.

16          MS. CROP:  Sure.  I want to address two quick issues: their

17      compliance record and lack of information about their insurance.  So,

18      with respect to the compliance, we know they have multiple notices of

19      violation of cease-and-desist orders.  They're violating them to this

20      day, and their response was, well, we filed a lawsuit.  We didn't like

21      it, so we filed a lawsuit.  That's not how you do it.  You comply with

22      the orders.  If you want to challenge them, you file a lawsuit, and

23      it's the judge that decides if you are bound by them or not.  The judge

24      will decide whether or not to issue an injunction or not.  Sable can't

25      decide on its own that these don't apply.  So, that's their attitude,

185

1    and the fact that they have a county letter has nothing to do with

2    notices issued by other agencies.  You know, we hear about preemption

3    when it's convenient, but here, they're saying the county is preempting

4    state agencies.  That's just not true.  They are not complying with

5    orders from state agencies.  That is huge.  The final thing I wanted to

6    mention was, on the insurance, we heard from staff that the county can

7    ask for the insurance policies, and yet, when the board asked for them,

8    you got an non-answer.  It was, well, we issued the certificate.  You

9    know, we submitted the certificate.  That's all we have to do, but

10   staff even said, you can ask for them, and that's important because we

11   know that Planes has not recovered fully on its insurance from the 2015

12   spill.  Why?  We don't know for sure.  Is it because planes was found

13   negligent?  Is it because the policy had limitations on coverage to

14   begin with?  You need to look at the policy to find out what is

15   covered, what the exclusions are, what the exemptions are, what the

16   indemnifications are.  You need all of that information, and so, it's

17   really important.  This is your one chance.  You were also told that.

18   This is your one chance to look at this issue.  You need to look at

19   their compliance record.  You need to look at their financial

20   situation.  You need to look at whether or not this pipeline adheres to

21   all the conditions, as CBD will talk about more.  So, we urge you to

22   step back.  Be really, really careful.  This is why this ordinance was

23   written, was for issues like this that are facing you today.  Thank

24   you.

25

186

COSB AR007125

1          CHAIR CAPS:  Thank you.  Any questions?  Just real quick, any

2     questions from the board?  Okay.  All right.  We'll move to you.  Five

3     minutes for our second applicant, appellant.

4          MALE 1:  Okay.  Good afternoon.  Thank you for hearing us out.

5     I'd like to start by clearing up a few misconceptions.  You know, I

6     want to begin with pointing out that this is a de novo review, which

7     means you're not bound by the mistakes made by the planning commission.

8     I want to also point out that, you know, there's been some dispute as

9     to whether this is a CEQA project but it's very clear that this is part

10    and parcel of a restart, and that you can't piecemeal a project to

11    avoid  CEQA analysis by dividing it into infinite discreet projects,

12    and there's unequivocally going to be environmental effects.  We're

13    already seeing environmental effects during the operations in the

14    coastal zone going on right now.  I also want to talk about

15    decommissioning.  It's crucial that these bonds be imposed now.  If you

16    look at the language of all three permits, there's no requirement that

17    they be imposed after the facilities are closed, and so, there's really

18    no reason to wait.  If you look at the way the federal government does

19    things, the state government does things, they don't wait until the

20    facilities are closed to impose decommissioning requirements.  You

21    don't impose bonds when a payment is due.  That's just a nonsensical

22    interpretation of this rule.  If you look at section B2 of the LFP and

23    POPCO permits, it's also very clear that these permits can be

24    supplemented to ensure environmental protection, as well as financial

25    protections occur.  Moving on to cathodic protection.  There's been

COSB AR007126

1    some back and forth on that.  Some groups have said cathodic protection

2    exists.  Don't worry about whether it works, but if you're buying a

3    car, you don't ask if it has brakes.  You ask if the brakes work, and

4    what's very clear is that the cathodic protection system here is not

5    effective.  In fact, they've had to go to the state to obtain a waiver,

6    and so, that kind of brings us to the last action item here, which is

7    the difference between preventing corrosion, preventing spills, and

8    monitoring for spills.  If we look at the days leading up to the

9    Refugio oil spill, the affected pipeline section was actually

10   inspected, and the inspectors failed to flag the issue, and several

11   days later, that area ruptured.  So, you know,

12        [06:55:00]

13        the concern here is, if you're not going to actually prevent the

14   corrosion, are we really comfortable with a system that just involves

15   monitoring and was not effective in preventing the last oil spill?

16   Thank you very much.

17        CHAIR CAPS:  Thank you.  Okay, we'll move on to rebuttal from the

18   applicant.  Ten minutes.

19        MS. STEBBINS-BINA:  Good afternoon and thank you for your

20   patience with this process today.

21        CHAIR CAPS:  Sure.

22        MS. STEBBINS-BINA:  Reasonable minds can and do differ about

23   whether it's better to restart domestic oil production or to import

24   foreign oil, with all of the complications that involves, and people of

25   good faith feel very strongly one way or the other about restart, about

188

COSB AR007127

1    the fate of oil in California, in the United States, and Santa Barbara

2    County.  All of that is very fair and there are many, many different

3    and good faith views, but that's not why we are here today.  We are

4    here today on a very narrow issue: whether or not to transfer permits,

5    and while we've heard a lot about the claimed intent of the statute,

6    ultimately, this county and this board is bound by what the statute

7    says, not a draft, not someone's idea of what it must have might… it

8    must have meant, and that draft, and that final enacted statute simply

9    does not permit the kinds of sweeping changes that appellants have

10    proposed today.  It does not permit additional funding for abandonment.

11    It does not permit any kind of additional funding.  It only requires

12    compliance with the permits, and county staff has confirmed repeatedly

13    that no additional funds are due.  It is not a sweeping inquiry into

14    operations and abandonment.  That language was proposed and was not in

15    the final statute.  Rather, the only insurance and financial guarantees

16    that are permitted to be considered are those that were submitted to

17    and relied upon the director to make the findings that have since been

18    appealed.  There is no legal basis for any additional requirements.  I

19    do want to address some of the specific comments today.  First, with

20    respect to experience.  While Sable is a new company, as you've heard

21    repeatedly, this management team has been operating for 25+ years,

22    including in this county for many, many years.  You've heard testimony

23    from a number of people who are currently working on the pipeline, many

24    of whom worked for ExxonMobil as well, and you've heard them attest to

25    Sable's capabilities, it's safety-mindedness.  I don't think there's

COSB AR007128

1    any genuine dispute that Sable has the experience and skillset to

2    operate these facilities.  We've already talked about finances.  There

3    isn't anything required in the statute that has not been provided, but

4    nonetheless, Sable has demonstrated already $435 million in insurance,

5    which is more than twice the cost of the direct costs of the 2015

6    spill.  It was not 850 million in direct costs.  It was about a $100 in

7    direct costs, and then some additional, about $230 in settlements with

8    landowners and fishermen and folks of that nature, but it was not $800

9    million in direct cleanup costs, and Sable's insurance of $435 million

10   that will go to $535 million upon restart is more than adequate,

11   setting aside the $350 million they have in cash and their $2.6 billion

12   valuation.  With respect to cathodic protection, it is in place on the

13   pipeline.  It is also within the exclusive jurisdiction of the office

14   of the State Fire Marshal, as this board has confirmed in the Celeron

15   settlement, and as this board confirmed again last year in the valve

16   settlement there is no jurisdiction over the county over pipeline

17   safety.  With respect to CEQA, again, 18 months ago, when ExxonMobil

18   acquired this very permit from Planes, it was determined to be not a

19   project, and that is a correct determination, because it is only the

20   transfer of the permit paperwork.  Every other part and parcel of this

21   restart process is outside the hands of the county, and I know that

22   that is a frustrating situation, but it is the truth, and the reason

23        [07:00:00]

24        the broad version of the statute that was contemplated probably

25   was not enacted is that it would've been patently illegal.  It would

190

1    have removed vested rights.  It would have been preempted by federal

2    law and by state agencies.  The ability of this county to regulate this

3    space is narrow, and while that might be a difficult truth, it is the

4    truth, and we talked about the NOVs extensively with the Coastal

5    Commission earlier.  There have been a mention of a few others with

6    respect to the Department of Fish and Wildlife and the Water Board.

7    There were inadvertent issues there, and contrary to what you heard

8    today, it is not the case that Sable ignored a notice of violation.  In

9    fact, they have submitted habitat modification plans, and they have

10   applied for permits with those agencies, and they are in ongoing

11   discussions with those agencies.  It is not the case that they have

12   simply been ignoring it, and with respect to the Coastal Commission,

13   again, the county confirmed, in writing, that the Coastal Commission…

14   that no further permits were required.  We've also heard about a draft

15   EIR, I think, again, that's been addressed, but it was for an

16   unrepaired, un-valved safety valve protected pipeline, not the pipeline

17   that is going to exist.  It was never submitted through proper review,

18   and it is not a basis for accurately assessing Sable's spill potential.

19   Again, the pipeline spill potential is in the exclusive jurisdiction of

20   the state Fire Marshal, but it is substantially reduced over what it

21   was in 2015.  With that, I will turn to my colleague for some closing

22   thoughts.

23       MR. RUSCH:  Madam Chair and supervisors, we just had a few

24   closing comments.  EDC and CBD and other activists don't own the sole

25   right to say they can protect our precious beaches.  We and all the

191

COSB AR007130

1    people you've heard supporting our efforts also have a right to protect

2    our environment and earn a living.  Those two things are not mutually

3    exclusive.  The very qualified pipeline construction crews, which we've

4    heard from today, are helping make the Los Flores pipeline like new to

5    protect their beaches, our beaches, and they're doing it for everyone

6    to enjoy the benefits of safely producing a California source of low-

7    carbon crude oil, oil that will reduce greenhouse gases globally by

8    100% or more, even after the local SYU co-gen plant comes online.  It

9    is disingenuous and self-serving to claim otherwise, and while they may

10   believe the world ends at the Santa Barbara County line, we're all in

11   this together, and Sable intends to be a prominent part of the Santa

12   Barbara County community for decades to come.  We will be excellent

13   operators, we will be safe operators, we will be great neighbors and

14   friends, and we'll be supportive of the many organizations that help

15   make Santa Barbara one of the greatest places to live and work.  I say

16   this as a native Californian.  I say this as a longtime resident of the

17   Tri Counties.  I say this as part of the management team who will

18   ensure our commitments are met.  Accordingly, I ask that you approve

19   this straightforward and narrow decision to approve the permit

20   transfer.  Thanks.

21       CHAIR CAPS:  Thank you both.  Any questions from my colleagues

22   before we turn it back to staff Supervisor Nelson, did you have a

23   question?

24       MR. NELSON:  Well, I'll have some questions for staff.  I'll let

25   them speak first.

192

1          CHAIR CAPS:  Okay.  All right.  So, Director Plowman, I leave it

2     to you to address anything you'd like to address, or Mr. Briggs, or Ms.

3     Ibarra.

4          MR. BRIGGS:  So, Madam Chair and members of the board, we did

5     want to clarify one issue that's been discussed today, and that is the

6     requirement for abandonment and responsibility for abandonment, and

7     this is in Chapter 25B, section 25B4I, and it's titled Liability for

8     Abandonment, and I'm just going to read one sentence.  The current

9     owner or operator, as determined by the records of the director, of a

10    facility subject to this chapter, shall be responsible for the proper

11    abandonment of the facility.  If the director determines that the

12    current owner or operator does not have the financial resources to

13    fully cover the cost of abandoning the facility, the immediately

14    preceding owner operator shall be responsible for the cost of

15    abandoning the facility.  So, in essence, this provision here would

16    hold Exxon on the hook and be responsible for abandonment in the

17         [07:05:00]

18         case that Sable is not able to follow through on that

19    responsibility.

20         CHAIR CAPS:  Anything else?

21         MR. BRIGGS:  No.

22         CHAIR CAPS:  No.  Okay.  So, now I just want to, before we maybe

23    move to deliberation, if there's any questions from my colleagues.

24    Supervisor Lavanino?

25

COSB AR007132

1        MR. LAVAGNINO:  Sure, I've got one.  You know, we keep going over

2    25B.  What did 25B mean?  What do other counties do?  How many other

3    people have a process like this, because…?

4        MR. BRIGGS:  So, Madam Chair and Supervisor Lavanino, in our

5    preparations for this item and just generally researching this process,

6    we have not been able to find any other city or county or state

7    jurisdiction that has a similar process, and in fact, other

8    jurisdictions, like City of Huntington Beach or the City of Long Beach,

9    who do have similar oil and gas assets, what they require is that the

10   operator make the fire department aware of a change of owner operator

11   and essentially provide, you know, contact information.  There's no

12   formal discretionary process that they go through that would be similar

13   to 25B.

14       MR. LAVAGNINO:  Okay, thank you

15       CHAIR CAPS:  Supervisor Nelson, you had a question, right?

16       MR. NELSON:  Yeah, a few questions.  I guess my quick first

17   question for staff was I just want to make sure I understand about

18   additional technical oversight from other… I heard the Fire Marshal.

19   What else is out there?  Obviously, there's federal agencies.  Could

20   you maybe just kind of enumerate those again for me, so they're fresh

21   in my head as I deliberate on this, the pipeline and the facility?

22       MR. BRIGGS:  Supervisor Nelson, could you clarify what it is that

23   you're asking?

24       MR. NELSON:  Yeah, I'm sorry.  I'm just trying to make sure, I

25   know the state Fire Marshal is one of the agencies that is going to be

194

COSB AR007133

1     looking at this moving forward before we start.  What are the other

2     agencies that will be looking over these issues?

3          MR. BRIGGS:  Okay.  So, to answer your question, I think you're

4     asking about restart, correct?

5          MR. NELSON:  Yeah.

6          MR. BRIGGS:  Yeah.  So, it would be primarily the Fire Marshal

7     who is responsible for overseeing restart of the pipeline, and then

8     Bowman Bessie would be overseeing the restart of the offshore

9     platforms.

10          MR. NELSON:  Are those federal agencies, or are those state

11     agencies?

12          MR. BRIGGS:  Those are federal agencies, and then the county, we

13     would be responsible for overseeing activities at the San Nunes unit

14     onshore facility.  The Fire Department would be a part of that, of

15     course, APCD… no, there may be others that don't immediately come to

16     mind, but those are the major ones.

17          MR. NELSON:  That's helpful.  Most of those agencies, or all

18     those agencies, they have engineers and scientists that are involved in

19     this process to look over these plans?

20          MR. BRIGGS:  Yes, we do.

21          MR. NELSON:  Okay, great, and again, most of this kind of lays on

22     the shoulders of the Fire Marshal, and maybe you don't know his staff,

23     but maybe counsel might know or somebody else, but the Fire Marshal,

24     the state Fire Marshal, how's that position obtained?  Is that an

25

195

COSB AR007134

1    elected position, or how's that work?  Does anybody know, State Fire

2    Marshal Marshall?

3         MR. BRIGGS:  I personally do not know.

4         MR. NELSON:  Okay.  I mean, ChatGPT tells me it's the governor

5    that appoints.  Okay, I mean, ChatGPT could be wrong, but the reason…

6    so, that's somebody that was appointed by Gavin Newsom, I assume,

7    right?  I mean, if that's correct.  Just wanted to clarify that, and

8    then as far as the Coastal Commission with their cease-and-desist

9    order, they have the opportunity to go to court and stop the ongoing

10   actions out there, right, if they wanted to?

11        MR. BRIGGS:  I believe they do.

12        MR. NELSON:  And they haven't done that at this point?

13        MR. BRIGGS:  Correct.

14        MR. NELSON:  Okay.  Interesting.  All right, those are my

15   questions.

16        CHAIR CAPS:  Okay.  I think that we are done with questions, and

17   so, then now, it's time for the board to deliberate, and Supervisor

18   Nelson, just make sure we hear you if you need to weigh in here,

19   because I would like this to be as collaborative as possible, or we

20   could just, if someone's ready to speak, we can do that too.

21        MR. LAVAGNINO:  Well, I think everybody is ready for me, right?

22        CHAIR CAPS:  Okay, there you go.

23        MR. LAVAGNINO:  So, an oil spill is one of the most traumatic

24   events that can happen to a community.  We all lived through it.  Some…

25   let's see, I guess I was five the first time.  So, I don't think I

196

COSB AR007135

1    remember too much about the first one, but so, I understand why so many

2    people have expressed themselves so passionately today, and whether I

3    disagree with you or

4        [07:10:00]

5        agree with you, I want to thank everybody for being here and

6    being as considerate as possible to everybody else in the room and for

7    most of you to us as well.  I also want to thank our staff.  This is…

8    these, items like this that really divide the community and get

9    everybody fired up.  It's very difficult for them.  They have to sit

10   through many public meetings.  You know, they're not… they're trying to

11   look at this just as an umpire.  Whether it's a ball or a strike,

12   they're not trying to weigh in on their personal position, you know,

13   their preferences.  So, and county counsel's office as well, as well as

14   planning and development, done an outstanding job.  For me, it's

15   interesting, because there's no project, really, here to be approved or

16   denied, and I think the other thing that's strange is that we don't

17   regulate this pipeline.  So, then you sit here and say, okay, well what

18   are we doing here today, and as much as some would like to expand the

19   scope of this hearing, my job today is to determine really whether or

20   not this applicant meets the requirements 25B, not what we wish it

21   said, not what the draft copy stated, not what some retired employee

22   thought, but what it actually says, and a speaker asked us to consider

23   what was the intent of the staff when they wrote it, and after seeing

24   the draft and after seeing the real part, it's… being here for a while,

25   I'm sure staff and maybe even the board wanted it to be stronger, and I

197

1    would assume then county counsel reviewed it and realized maybe there

2    were parts of it that possibly were illegal.  A woman asked today, and

3    I think she summed up the thoughts of so many today, was she's asking

4    us, rhetorically, do you stand with the people, or do you stand with

5    big business, and in my mind, I realized that's when I came to the

6    conclusion that I'm not on either side.  We have to stand by the law.

7    This pipeline was legally permitted, and as we heard, and in any other

8    county, this change of ownership would've been a simple checklist

9    signed off by the Fire Department.  So, the reason why you're here

10   today and so passionate is because the actual regulating agencies that

11   have jurisdiction have basically ducked their responsibilities, and

12   they will not hold a public meeting and let you have… vent your

13   frustrations.  So, unless there's an organization that I'm waiting for

14   that wants to step up and indemnify the county against the lawsuit, I

15   will be absolutely supporting the planning commission and our staff

16   recommendation.

17        CHAIR CAPS:  Thank you, supervisor Lavanino.  Supervisor Lee?

18        MR. LEE:  Thank you.  Thank you, chair.  When I came in this

19   morning, around 7:00, I saw hundreds of people were outside.  So, I

20   want to say thank you for being patient and being here and sitting

21   through this.  My takeaway of all this is: we have a pipeline that

22   leaked in 2015, that devastated our environment, our coastline,

23   economy, and killed so many wildlife, and we want to restart it.  To

24   me, that's an insane idea.  That's a very bad idea, but yet, we are

25   having this conversation right now.  After considering listening to the

COSB AR007137

1    appellant and Sable and listening to the public, and I came to conclude

2    that I support upholding the appeals, because that's the right thing to

3    do, and that's where I'm at.  Thanks.

4        CHAIR CAPS:  Thank you, Supervisor Lee.  Supervisor Nelson, would

5    you like to go next?

6        MR. NELSON:  Yeah, thank you.  Thank you, Chair Caps.  I

7    appreciate the opportunity, and I want to thank the public too, and I

8    just want to let sure everybody in the room understands that I have

9    this meeting in Washington DC on behalf of the county scheduled before

10   this hearing.  I would've loved to be there in person, and I wanted to

11   thank all the staff and my colleagues and the public for braving a long

12   day that's not quite over yet.  The first point that I wanted to make…

13   to focus in on was the idea of this sometime legislative intent for Mr.

14   Day.  You know, legislative intent doesn't go down to the staff member

15   that writes the ordinance.  It's the first draft that goes to the

16   board, and the board deliberates, and then we give board legal

17   opinions, and then we talk among each other, and then we, as a body,

18   elected body by the citizens or the voters of Sambar County, we're the

19   ones that have the legislative intent there.  So, you know, that whole

20   issue there and from Mr. Day, you know, just didn't hold water for me

21   on what 25B is maybe supposed to mean, or what it was intended to mean.

22       [07:15:00]

23       The other issue that I have, I'm concerned about is the Coastal

24   Commission.  I think we all in the room don't always agree with

25   agencies.  You know, I might disagree with the state agency.  I'm sure

COSB AR007138

1    there's people in the room that might be disagreeing with some federal

2    agencies, and sometimes, they get it wrong, and I think that this is

3    the case here, both Coastal Commission, and I think if they truly

4    believe that they needed a permit, that they would've taken Sable to

5    court by now to stop, get a stay in place, but I do think this has

6    gotten political.  It's not the first time the Coastal Commission's

7    gotten political.  They got politically recently with Vandenberg Space

8    Force Base, and this is unfortunately another black eye.  I feel bad

9    for most of the speakers who have been here, and they were told that

10   today, well, that the decision will impact the restart.  I have to bury

11   the lead.  It won't.  No matter what happens here, the decision here

12   won't make that difference.  This is political theater, and in some

13   cases, gaslighting.  It's asking me to think that many of the young

14   people that showed up will believe that their government doesn't care

15   or didn't listen to them.  This is about politics, not the environment.

16   This is about the dislike of oil, not law and science.  If it was

17   really about the environment, we would've seen people come out in

18   droves a year ago when we had untreated sewage, ten times the amount of

19   the Refugio oil spill, spill into the Pacific Ocean, and it barely made

20   a week's worth of news.  This is about oil.  The appellants don't care

21   about the liability.  This is subterfuge.  They opposed the trucking.

22   They opposed a new pipeline, they even opposed safety valves, and now,

23   they're opposing the transfer of a name on a permit.  They will stop at

24   nothing for the restart of the oil operations, and for me, that sounds

25   a lot more like religion and politics than law and science.  For me,

200

1    I'm compelled by the engineers and the scientists and the legal experts

2    at the county, at the state, and the federal government, and I will

3    support the [PH 07:17:09] PC and the staff recommendations to deny the

4    appeal and approve the transfer of the permit.

5        CHAIR CAPS:  Okay, thank you.  Like Supervisor Lavanino, I was a

6    little kid after the oil spill of 1969, and it's actually the reason

7    why I went into a world of politics and advocacy.  It was the first

8    issue that really struck me.  My parents were very engaged, would take

9    me to early rallies, early days of Goo, and all of the activism that

10   sprouted up, and obviously, the birth birthplace of Earth Day.  So, I

11   just have to say that I really appreciate how everyone's hung in here

12   today in such, again, such a conducive, collaborative way of respect.

13   I mean, this was a marathon, and I have to say too, I'm so proud of

14   UCSB and our gauchos for showing up in such force.  I had no idea.  I

15   mean, I shouldn't be surprised, but they just one after one after one

16   really putting your future where your heart is by speaking so

17   eloquently, and by being here and being so dedicated.  So, thank you.

18   It's an honor to represent you.  It really is, and it has been stated.

19   This is our one shot.  I agree.  I do agree with my colleagues, even

20   though I'm not going to vote with them, this is not fair to the public

21   that this is the one shot that you've all had here in Santa Barbara,

22   where we experienced a devastating spill in 2015, and this is what you

23   get, a technicality on a permit change for a hearing, because there's

24   so many layers.  It's designed to be completely confusing.  It's

25   designed to be completely in favor of big interests, big, powerful

201

1    interests with lobbyists and influence, so that we don't know why

2    things are being decided the way they are.  We don't know why things

3    are not moving forward.  This was this one chance, and it's extremely…

4    I agree with you.  It shouldn't be… it's not fair for some folks to

5    walk out of here and think, okay, we stopped the pipeline, or we

6    started the pipeline.  That is not what we're doing here, and that is

7    completely unfair.  But there are too… so, even within the narrow

8    confines of what we're actually doing here, there are too many red

9    flags, because we are, this is about fiscal oversight, and we do sit up

10   here with a fiscal responsibility of a budget of $1.6 billion annually,

11   and to me, it's too risky to have an applicant that was formed when a

12   major company decided that having this pipeline was potentially too

13   risky.  So, then it's just too, it's just… as I said earlier, it's

14   fishy to me

15       [07:20:00]

16       that you would sell a pipeline to a new company that doesn't have

17   the funds for it, and again, maybe this is extremely common, but it

18   doesn't pass my smell test, and then loan them the money.  If they had

19   wanted to show the insurance policy, they could have, and so much has

20   been made over the last several months about this policy.  Why not just

21   show it?  Why not just go above and beyond the checklist?  That is

22   another red flag for me.  Compliance with the Coastal Commission is

23   another red flag for me.  Why have a cease and desist?  Why not just

24   cooperate with this governing body?  So, really, what we're looking at

25   is fiscal stability.  That's what we're charged with trying to do, and

202

COSB AR007141

1    there are far too many flags.  It was said by Mr. Day, in his

2    interpretation of the ordinance that he wrote, that it's a gamble.

3    This was not meant to be toothless.  Our job, I get the tension of what

4    we're being asked to do, but I do feel I was elected to look at the big

5    picture and to extrapolate of what we're actually doing here, and I

6    cannot, in good faith, say that this transfer gives me reassurance of

7    fiscal stability.  So, I will be voting to uphold the appeal.  So,

8    let's do a roll call vote.  A motion.  So, I would need a motion from

9    somebody.

10        MR. LAVAGNINO:  Well, this is going to be weird.

11        CHAIR CAPS:  We can just do two.

12        MR. LAVAGNINO:  Yeah.  Okay.  Why don't you guys do your

13    questions?

14        CHAIR CAPS:  Wait, well, I'll go [INDISCERNIBLE 07:21:37].

15        MR. LAVAGNINO:  Yeah, because I'm trying to find the language.

16        CHAIR CAPS:  I could make a motion.  Thank you.  We have our

17    most…

18        MR. LAVAGNINO:  Yes.  All right, I will move staff

19    recommendations A through D.

20        MR. NELSON:  I will second that motion.

21        CHAIR CAPS:  So, then, Madam Clerk, when you're ready, we'll do a

22    roll call vote.

23        MR. LAVAGNINO:  Pins and needles.

24        CLERK:  Supervisor Lee?

25        MR. LEE:  No.

COSB AR007142

1        CLERK:  Supervisor Nelson?

2        MR. NELSON:  Aye.

3        CLERK:  Supervisor Lavanino?

4        MR. LAVAGNINO:  Aye.

5        CLERK:  Chair Caps?

6        CHAIR CAPS:  No.

7        CLERK:  Motion fails two to two.

8        CHAIR CAPS:  Okay.  Well, then I'll make an alternative motion to

9   uphold the appeal.  Is that sufficient as a motion?  County counsel?

10       COUNTY COUNSEL:  Madam Chair and members of the board, so, the

11  record does not actually contain the findings to deny the appeal or to

12  uphold the appeals.  So, my recommendation would just to go ahead and

13  do a conceptual motion, so we can see where the board stands, rather

14  than develop the findings.  It sounds to me like we might not need to

15  get that next step.  So, I just recommend doing a conceptual motion.

16  We'll see where we stand, and then we can decide next steps.

17       CHAIR CAPS:  Even though I think it's rather clear, but we'll do

18  a conceptual motion to uphold the appeal.  I make that motion.

19       MR. LEE:  I'll second.

20       CHAIR CAPS:  Okay, roll call vote, please.

21       CLERK:  All right.  Supervisor Lee?

22       MR. LEE:  Aye.

23       CLERK:  Supervisor Nelson?

24       MR. NELSON:  No.

25       MR. LAVAGNINO:  Supervisor Lavanino?

204

1    MR. LAVAGNINO:  No.

2    CLERK:  Chair Caps?

3    CHAIR CAPS:  Yes.

4    CLERK:  Motion fails two to two.

5    CHAIR CAPS:  All right, two votes, two to two.

6    MR. LAVAGNINO:  [INDISCERNIBLE 07:23:49] open Monday, Wednesday,

7    and Friday.

8    CHAIR CAPS:  Okay, that concludes.  I know that's maybe a

9    potentially odd result for all of you, but I appreciate everyone's

10   participation and my understanding, I don't know if I can interpret

11   what two-two does.  County counsel, if you could?

12   COUNTY COUNSEL:  Madam Chair, members of the board, so, in order

13   for the board to take any action, the board needs a majority vote.  So,

14   it's every action we take, it's at least three votes, and sometimes,

15   it's four votes.  You saw that earlier.  So, on a tie vote, that's no

16   action of the board.

17   CHAIR CAPS:  There we go.  Thank you, everybody, for

18   participating in that action, departmental item number one.  Thank you.

19   [CROSSTALK 07:24:58]

20   [07:25:00]

21   [07:30:00]

22   CHAIR CAPS:  All right, we are back.  County counsel, will you

23   please read out from closed session?

24   COUNTY COUNSEL:  Thank you, Madam Chair.  The board met in closed

25   session on one item, which is conference with labor negotiators for

205

1    Santa Barbara County Deputy Sheriff's Association, and the board took

2    no reportable action.

3         CHAIR CAPS:  Okay, thank you.  Now, we will move to item number

4    D2.

5         CLERK:  Two Chair Caps and members of the board, departmental

6    item number two is from the public health department.  It is a hearing

7    to consider recommendations regarding the Santa Barbara County Health

8    Center Board 2024 annual report.

9         MOHANED:  Good afternoon, Madam Chair and supervisors.  It seems

10   we chose the right time to come to you and present this report, and

11   judging on the next item that you have to also tackle, it seems that

12   we'll provide you with a little bit of relief.  So, we're happy to be

13   that cushion in between.  I'm glad to present to you the annual report

14   of our health centers.  As you know, the health centers are what are

15   called federally qualified health centers that have their own board.

16   Earlier, we had the chairwoman of our health centers' board with us.

17   Unfortunately, she couldn't make it back, Cynthia [PH 07:33:18]

18   Aguerro, but I'm happy that with me is Dr. Preciado, who is our Chief

19   Medical Officer, as well as Dana Gamble, who is our Deputy Director for

20   clinical care.  So, today, we will update you on the performance of our

21   health centers and the progress that has been made, as well as some of

22   the new projects and initiatives that we have that are improving

23   healthcare and healthcare delivery for our patients in addition to our

24   roadmap towards Cal AIM and enhanced care management.  It's been quite

25   a journey, 35 years celebrating healthcare for the homeless.  In '89,

206

1       the county applied for a grant through HRSA, the federal entity that

2       provides FQHCs, and initially, it was to provide healthcare for the

3       homeless in Santa Barbara County.  That started with three public

4       health nurses and a county van that would go and deliver services.

5       This evolved to now encompass five stationary health centers that are

6       across the county, from Carpentaria all the way to Santa Maria, in

7       addition to three clinics that are in homeless shelters, that are based

8       in homeless shelters.  We still are true to our vision and our mission.

9       We still serve the majority of the homeless in Santa Barbara County.

10      We served, last year, almost 2,000 people that are experiencing

11      lessness, of which 450 people were at over the age of 60, 89 were

12      children, and almost 1,000 were women.

13          [07:35:00]

14          Almost three-quarters of those that were served were insured by

15      Medi-Cal, and the rest were uninsured.  I'll hand it to Dana to walk us

16      through some of the statistics of those that we serve at our clinics.

17          DANA GAMBLE:  Thank you, [PH 07:35:18] Mohaned.  Thank you, Chair

18      Caps and the board of supervisors.  We are so excited and honored to be

19      here today to share with you some of the highlights from 2024 and our

20      health center program.  So, who we serve, we represent each area of our

21      county.  We're serving predominantly those who are at 200% of poverty

22      or below, and the significant majority of our patients are at or around

23      130% of poverty.  We served over 23,000 patients last year, and this is

24      a bit of an increase from the two years prior.  Of our patients, 96,000

25      were male, 13,000 were female, and 5,777 were children under the age of

207

COSB AR007146

18.  2,800 of our patients were 65 years or older.  On the other slide,
we also talked about the number of visits, and our visits were
increasing significantly over the last couple of years.  Following the
pandemic response, the number of visits were just slightly over 100,000
visits, all told, and currently, at the last half of '24, going through
the rest of this fiscal year, we estimate we'll be at about 106-107,000
patient visits.  Our financial performance, we rely on public insurance
plans, Sen-Cal, Medi-Cal being our largest payer, with Medicare being
our second-largest.  The majority of our patients are covered by Medi-
Cal, 76% of our patients, and this drives our revenues for the Health
Center Program.  Last year, we raised about almost $62 million in
revenue, and this matches our health center expenses, equaling the same
amount.  We are required to have a balanced budget at the end of every
fiscal year, and so, that's why you see those dollar amounts perfectly
matched.  With our clinical services, we rely heavily on data, and for
data, we track visits, we track finances, we track patient
satisfaction, and we're very pleased with last year's patient
satisfaction data, where our overall satisfaction scores are higher
than comparable FQHCs in California, in the entire Western region, and
in fact, across the United States.  So, we are very pleased that we are
able to meet the needs of our patients, and that they demonstrate that
when they're reached out to ask how things went.  Dr. Preciado will now
talk about some of our new services and projects.

DR. PRECIADO:  Good afternoon, Madam Chair and board of
supervisors.  This is my first time presenting.  So, if you hear a

COSB AR007147

1    little bit of a quiver, it's a little bit of nervousness, but other

2    than that, I'm really happy to be here.  I'll be talking about some of

3    the services we offer at our healthcare centers.  The first one is

4    improved care delivery.  We implemented team-based care this past year.

5    Team-based care actively engages our patients in full participation in

6    their care.  It allows for all staff to function to the full extent of

7    their education, certification, licensure, and experience.  It enhances

8    how healthcare teams work together.  It positively influences patient

9    experiences, and it prioritizes preventive care and health promotion.

10   The goal of team-based care is really to increase communication amongst

11   teams to deliver quality patient care.  Another project that

12        [07:40:00]

13        we're really excited about is our behavioral health services

14   expansion.  The HRSA awarded, the Public Health Department, the

15   Behavioral Health Services Expansion Award to help launch and expand

16   mental health and substance use disorder services in our healthcare

17   centers and shelter-based clinics.  It includes telepsychiatry, which

18   services 16 hours per week, four-hour sessions rotating through our

19   health centers and our shelter based clinic locations in Carpinteria,

20   Santa Barbara, Santa Maria, and Lompoc.  Our third project, and not our

21   last, but that I'll be presenting, is on our medically assisted

22   treatment for substance use disorder.  So, we have… we are providing

23   MAT at all of our healthcare centers.  We have MAT champions, so to

24   speak, at each center that bring, take in patients who have substance

25   use disorders and provide care.  We have appropriate and consistent

209

COSB AR007148

1    testing processes in place, namely urine drug screens that we ensure

2    are provided.  We do cures.  We check the database for their, you know,

3    history of drug use.  We provide patient treatment.  Access is constant

4    at all our healthcare centers.  We have resources for our clinicians to

5    access.  We have harm reduction resources, such as Naloxone, and our

6    program development is such that we have quarterly MAT meetings amongst

7    the providers at all healthcare centers.

8        MOHANED:  If I may add to the significance of the behavioral

9    health expansion grant that we got, is that it truly compliments, and

10   it bridges the efforts that behavioral wellness is currently doing.  In

11   the past, we weren't able to be the bridge and the step down or the

12   step up if needed, because we did not have the psychiatric services,

13   but now, with psychiatry on board, then we are able to integrate

14   better, and this would also pave the way for us to be an integrated and

15   coordinated effort towards Cal-Aim.  So, that's something that is very

16   exciting that we are embarking on.

17       DR. PRECIADO:  Thank you.

18       DANA GAMBLE:  Thank you, Dr. Preciado.  Thank you, Mohaned.  So,

19   last year, at the start of the year, Medi-Cal expanded to cover all age

20   groups who otherwise were eligible for Medi-Cal financially.  So, what

21   this meant for us was that those that were previously uninsured, age 26

22   to 49, now had Medi-Cal coverage, and so, people did not have to worry

23   about accessing care because they couldn't afford it.  They now had

24   coverage, and with this rapid expansion, we went, we saw an increase of

25   nearly 10% of Medi-Cal members in one month's time.  So, that is a

210

COSB AR007149

1    great benefit for the patients, and also, because of Medi-Cal being our

2    primary payer source, it was a great benefit to our revenues as well.

3    Finally, last year, after a couple years of working towards it, we

4    finally implemented our ECM, enhanced care management component of Cal-

5    Aim at the healthcare centers, and this is an exciting move forward for

6    people with Medi-Cal and for those who serve them, as it ensures care

7    management for someone beyond just their healthcare needs.  So, if a

8    patient of ours has a tenuous housing situation, or is in need of

9    childcare or some other kind of resource that they're lacking, we are

10   now reimbursed to do that care management, to ensure that whatever else

11   is going on in their life does not prohibit them from coming into the

12   clinic for healthcare.  We ended up the year with 61 cases assigned to

13   us, and actively case managing 31 of those people.  So, that's a

14   fantastic move forward.  Collaborations and partnerships, we couldn't

15   do the work that we do at the

16       [07:45:00]

17       healthcare centers without our collaborations and partnerships.

18   Two that are noteworthy, especially noteworthy here today, one is

19   related to ECM.  There was a large grant opportunity provided by the

20   state, and Public Health collaborated along with American Indian Health

21   and Services and Cottage Health to apply for that grant.  Nearly $2.5

22   million dollars was the funding available, and that's the funding that

23   we received.  The Public Health Department was approved for a total of

24   $1.2 million, and we brought that grant to this board, I think, in

25   December, and you accepted that funding for the county, and we have

211

COSB AR007150

1    since gone on to recruit for two RNs, one administrative office

2    professional, and one departmental business specialist, that will help

3    assist our ECM Cal-Aim efforts.  The departmental business specialist

4    will be instrumental in ensuring that the CARE Everywhere and the other

5    shared data components of Cal-Aim are available and functioning across,

6    across systems.  The second collaborative partnership is with ATSU, the

7    PA school up in Santa Maria, physician assistant, and we are working

8    with them as a trainer of their students.  They're coming in for

9    rotations through Santa Maria and through Lompoc Healthcare Center.

10   So, that's a huge benefit to the students, but also, to us, to our

11   patients, and insurers that as students graduate, and they want to stay

12   local, that they will be aware of the work that we do, and we will use

13   that as a recruiting pipeline in addition.  So, wonderful, wonderful

14   partnership.  Mohaned?

15         MOHANED:  So, we are very excited about future opportunities as

16   well.  There is an expansion through Syn Cal to now look at those that

17   are duly eligible, those that are on Medicare and Medicaid, a program

18   that's called DSNP, that we are partners as well, as we are going to

19   expand.  That is going to increase our scope of services and capture

20   those that also needed, and they have a much-needed care coordination

21   and case management.  We also are involved, as you all know, in the

22   Cal-Aim Justice Involved, and specifically providing enhanced care

23   management as the county provider, and we are looking at opportunities

24   to be more efficient.  So, we are looking at technology solutions as

25   well as some AI tools that would improve our performance as well as

COSB AR007151

1    patient outcome, and we certainly understand the challenges of

2    recruiting and retaining at our workforce.  So, we're investing in our

3    workforce development as part of our strategic plan.  With that, we ask

4    that the board receive and file the Santa Barbara County Health Center

5    Board annual report for 2024, and determine that it is not a project

6    within the CEQA.  Thank you.

7        CHAIR CAPS:  Thank you so much.  Thank you to all of you,

8    especially Dr. Preciado.  Welcome to the county, and you did a

9    wonderful job.  So, any questions from the board?  Supervisor Lavanino?

10       MR. LAVAGNINO:  Thank you.  I don't have a question.  Just

11   comment, your patient satisfaction scores.  I don't know what you guys

12   are doing different than everybody else.  Is there any…

13       DR. PRECIADO:  We're great doctors.

14       MR. LAVAGNINO:  Yes, okay, great.  Good answer, but what I really

15   wanted to focus on was just your… you really need to be applauded for

16   your outreach to ATSU, and how that's really going to affect the Santa

17   Maria community, because AT still, their model is taking people into

18   underserved communities, and then they're trained there, and then they

19   actually stay there.  So, this is such a great opportunity for them and

20   for you.  This thing is such a great collaboration.  There's probably

21   100 ways that it could fall apart and not work, and there's really only

22   one way that you can make it work, and so, I'm really proud of the fact

23   that you figured out a way to make it work, and I hope it's successful

24   into the future.

25       DANA GAMBLE:  Thank you.

213

1          CHAIR CAPS:  Yeah.  Oh, yeah, Supervisor Nelson.

2          MR. NELSON:  Yeah, thank you, and I just wanted to echo

3     Supervisor Lavanino's praise about your collaboration with AT

4     [INDISCERNIBLE 07:49:55] University.  It's one of the best kept secrets

5     in our county, and ultimately, our relationship with AT still

6          [07:50:00]

7          is hopefully going to lead to some greater health outcomes for

8     our entire community, and so, we're excited that the county's

9     partnering with them and looking forward to other opportunities in the

10    future for us to continue to find ways to work with them.  What I

11    wanted to also look at was the financial performance.  I think it might

12    have been slide five, and you had some various numbers up there, and I

13    just want to kind of go over those just briefly to better understand,

14    you know, how it's all funded, and I see down there, on the revenue

15    side, local and state funds.  So, is that state dollars?  Is there a

16    general fund in there?  I wanted to better understand that as a

17    percentage

18         DANA GAMBLE:  Supervisor Nelson, through the chair, thank you.

19    Great question, and so, no, there's no general fund that comes back to

20    support the healthcare centers.  Local funds, we have a revenue

21    agreement with the state that comes down through [PH 07:51:10] Sen-Cal

22    and comes back to us in portion.  So, those count as local funds.  We

23    also have a fund balance that we, when we have good years, it helps to

24    fund the leaner years, and so, we use the fund balance, and that's also

25

214

COSB AR007153

1      considered local funds, but no general fund is in the health center

2      program.

3          MR. NELSON:  Well, I think it's important to get that out,

4      because I think sometimes people think about these things and wonder

5      where these dollars come from and what are we not doing that was maybe

6      a general fund that were, potentially, the general fund is subsidizing

7      services such as this, and it's… I think it's good for the public to

8      understand that the general fund isn't subsidizing this, that it's

9      self-sufficient already with the other tax dollars it gets from other

10     agencies and state and federal funds.  I do see in there, you know, 11%

11     are uninsured, but only 2% of our revenues come from self-pay.  Can you

12     help me with that?

13         MOHANED:  Yes, uninsured are those that do not have any

14     insurance, and self-pay, as part, as being a federally qualified health

15     center is that it is not a free clinic.  So, patients should be paying

16     any portion of the cost of care, but on a sliding fee scale, and this

17     is what is considered self-pay.  Sometimes, they cannot even afford

18     that, and this is where it goes into uncollected or bad debt, but in

19     general, the model for FQHC is that anybody who walks through the door

20     is receiving healthcare.  If they have insurance, we're able to build

21     their insurer.  If they do not, then they have to pay based on family

22     income, number of… it's called a sliding fee that keeps updated by the

23     federal government every year, and this is what we use.

24         MR. NELSON:  Okay, and to that extent, you know, in theory that

25     11% of uninsured, that generally exists, right?  I mean, those are

215

1   people that probably qualify for Medi-Cal, but haven't applied for it

2   yet?  Is that what I may be seeing, and in that case, do we help some

3   of those people get those coverages that they need to need to move

4   forward?

5        DANA GAMBLE:  Yes.  Thank you, Supervisor Nelson.  That's, we

6   are… every uninsured person that we identify when they come in, we are

7   working to establish them with some type of payer source, and so, we

8   have front office staff that are certified enrollers, and they're

9   working with Department of Social Services to get people into Medi-Cal

10  if they haven't done that already.

11       MR. NELSON:  Okay, and just from an experiential point of view,

12  is that usually what the case is, that they're often, they qualify but

13  haven't gone through the paperwork yet?

14       MR. RUSCH:  There are those.  There are others that let their

15  coverage lapse, and they didn't know they were going to get sick, and

16  so, they come in, and then soon after, they are on Medi-Cal.

17       MR. NELSON:  Okay.

18       MOHANED:  We are seeing, Supervisor Nelson, we are seeing, based

19  on reviewing past years, we are seeing a downward trend in self-pay and

20  an increase in those that are on Medi-Cal, and we believe that that is

21  part of why we are seeing that trend, is that they are qualifying and

22  getting enrolled as well.

23       COUNTY COUNSEL:  Okay.  Thank you all for those answers.

24  Appreciate it.

25       CHAIR CAPS:  Supervisor Hartman?

COSB AR007155

1   MS. HARTMAN:  Well, I just wanted to note that the high

2 satisfaction numbers come with an expanding population and a lot of

3 expanding responsibilities, including enhanced care management and Cal-

4 Aim.  So, I think that speaks volumes for how effective you are and

5 just wanted to note that.

6   [07:55:00]

7   MOHANED:  And I have to give credit to everybody that works at

8 our centers, from the frontline towards our physicians.  We have a

9 great team that are so dedicated, that against all the challenges that

10 we have been experiencing and against everything that the national

11 landscape is experiencing when it comes to this type of healthcare,

12 they are the most dedicated team, and I'm so proud that we have them on

13 board.

14   CHAIR CAPS:  Yeah, I just wanted to also add my appreciation.  I

15 was really happy to see this report and to just see how accessible

16 you're making our work and bringing it to people, especially our most

17 vulnerable.  So, thank you very much for the work.

18   MOHANED:  Thank you.

19   CHAIR CAPS:  I think we need a motion.  Oh, public comment on

20 this.

21   CLERK:  Chair Caps and members of the board, I would like to

22 note, for the record, we have no request to speak on this item from the

23 public.

24   CHAIR CAPS:  Okay.  Okay.  Then I will… Supervisor, Hartman, you

25 ready?

COSB AR007156

1        MS. HARTMAN:  I'll move AB in today's staff report.

2        MR. LAVAGNINO:  Second.

3        CHAIR CAPS:  Got a second.  Okay.  So, we'll do a roll call with

4    Supervisor Nelson.

5        CLERK:  Supervisor Lee?

6        MR. LEE:  Aye.

7        CLERK:  Supervisor Hartman?

8        MS. HARTMAN:  Aye.

9        CLERK:  Supervisor Nelson?

10       MR. NELSON:  Aye.

11       CLERK:  Supervisor Lavanino?

12       MR. LAVAGNINO:  Aye.

13       CLERK:  And Chair Caps?

14       CHAIR CAPS:  Aye.

15       CLERK:  Motion passes unanimously.

16       CHAIR CAPS:  Okay.  We are now moving to our final item of the

17   day, which is department item number three.  Thanks to our health team.

18       CLERK:  Chair Caps and members of the board, departmental Item

19   number three is from the Human Resources Department.  It is a hearing

20   to consider amendments to the compensation ordinance and resolution for

21   elected officials, and Chair Caps…

22       CHAIR CAPS:  I know.

23       CLERK:  …Members of the board, I do have a brief announcement on

24   this item before we proceed.  Pursuant to section 54953C3 of the

25   government code, prior to taking final action, the legislative body

COSB AR007157

1    shall orally report a summary of a recommendation for a final action on

2    the salary, salary schedules, or compensation paid in the form of

3    fringe benefits of any local agency executive during the open meeting

4    in which the final action is to be taken. The oral reading of the

5    recommendations with this action is intended to satisfy that

6    requirement, and approving staff's recommended salaries, salary

7    increases today, if the board were to move ahead, results in new annual

8    salaries for local agency executives, effective May 12th, 2025, as

9    follows: auditor controller $267,487, clerk recorder assessor,

10   $267,487, district attorney, $30,122, sheriff, $307,459, treasurer/tax

11   collector $267,487, county counsel, $298,763, public defender,

12   $300,548, and members of the board of supervisors $171,309,

13   additionally set the biweekly allowance for the chair of the board of

14   supervisors to a 2% of their salary. That concludes my salary

15   announcement on this item.

16        CHAIR CAPS: Thank you. Thank you to our team. You're welcome

17   to present.

18        KRISTY SCHMIDT: Okay, thank you very much, Chair Caps and

19   members of the board. I'm Kristy Schmidt. I'm the Human Resources

20   Director, and I have with me, assisting, Aaron Jeffrey, who is our

21   division chief over workforce planning. Go ahead. Next slide, please.

22   Today's items is the final step in a multi-year project to related to

23   management classification and compensation that established

24   classifications, compared those classifications to the labor market,

25   analyzed compaction and internal alignment, and established a salary

COSB AR007158

1    system that is objective and transparent.  In December, we committed to

2    returning to the board with a similar analysis of the comparable labor

3    market, compaction and parity, related to elected department heads and

4    supervisors.  In today's presentation, I'll cover the data that we

5    collected, and what it tells us, and then our recommendations for

6    adjustments for salaries for elected department heads and members of

7    the board of supervisors.  Next slide, please.  Next slide.  So, the

8    first datapoint that we looked at were the labor market results, and we

9    used the same labor market that counties that we've used for other

10    management positions, which included the counties of Marin, Monterey,

11    Orange, San Luis Obispo, San Diego, Santa Cruz, Sonoma, and Ventura.

12    You'll see from the analysis that all of our salaries were below median

13    or the midpoint of the market to differing degrees.  The auditor

14    controller was about 5.4% below the market median.  Clerk recorder,

15    slightly below the market median, at 0.3%.  The district attorney was

16    16.9%

17        [08:00:00]

18        below the market median.  The sheriff, 12.9% below the market

19    median.  Treasurer/tax collector, 1.4% below the market median, and

20    then our most significant market inequity is with the board of

21    supervisors members, which were 32.8% below that market.  So, the next

22    data point that we look at is for compaction.  So, for our department

23    heads, we look at the salary differential over the next level down of

24    management, or the assistant director of the department.  The

25    differentials we look for are consistent with best practices, and these

COSB AR007159

1    are 10% for an attorney or a public safety department head, and 15% for

2    department heads in the other professions.  Using this analysis, you

3    can see that we do have a moderate compaction issue for the auditor

4    controller, who's currently 12.7% above her assistant director.  We

5    don't have an issue of compaction with the clerk recorder assessor, but

6    with the district attorney and the sheriff, you can see that they're

7    making almost the same as their assistant directors of their

8    department.  So, we do have a compaction issue there, and with the

9    treasurer and tax collector, we don't have a structural compaction

10    issue, but because the assistant director is eligible for a 5% CPA

11    allowance, in practice, we actually, at this point, do have slight

12    compaction there.  Next slide, please.  So, in the past, the board has

13    asked human resources to look for approximate parity between our top

14    attorney positions.  We say approximate, because the actual salaries

15    can fluctuate, because the positions are set with different mechanisms.

16    The board of supervisors sets the salary, and through performance

17    evaluation of the county council, the CEO has the public defender, and

18    then of course, the board of supervisors sets the district attorney.

19    As you can see with the top salaries set at the median for the county

20    counsel, we do have parity between the public defender and the county

21    counsel.  We have a lack of parity, though, with the district attorney,

22    whose salary is set both the top of the range, and in actuality, about

23    15,000 below those two other positions.  So, we do not currently have

24    parity between those positions.  Let's see here.  Finally, we look at

25    the data for the board of supervisors.  As we mentioned, our salaries

221

COSB AR007160

1    are 32.8% below the market median, with the median at $171,309 per

2    year, and our salary at $115,151.  Our salary was the lowest in our

3    comparable market, with the exception of San Luis Obispo.  A

4    significant observation is that the board member's chief of staff tops

5    out at 27.8% higher than the member, of the board member that they

6    report to.  We also wanted to note that we see a growing trend for

7    agencies to set their salaries as a percent of a California Superior

8    Court judge to provide an objective measure and get their boards out of

9    the business of setting their own salaries.  In our market median, it's

10    about 70% of a supervisor court, I mean, excuse me, a superior court

11    judge salary, and ours is just 47% of that number.  Next slide, please.

12    So, here's more detail on the market comparison.  As you can see, the

13    agencies range from a low end of $105,560, and then a high end of

14    $219,546 on the high end, but we use the median rather than the lower

15    the high, and that helps us to determine what's really the middle of

16    the road without it being influenced by the highest number and the

17    lowest number.  When we look at the median, we're looking at the middle

18    value, which is $171,309.  That is where the counties of Monterey and

19    Ventura currently are.  We're about 32.8% below median.  That

20    translates to, as a percent of our current salary, 48.8%.  So, we're

21    talking about the same difference, which is an annual salary of

22    difference about $56,158.  It's just which number you're looking at it

23    as a percent of.  This slide just gives more detail on those examples

24    of counties who are setting their salaries to a superior court judge, a

25

222

COSB AR007161

1    salary of a superior court judge.  In our comparison agencies, we've

2    got Orange,

3        [08:05:00]

4        Ventura, Monterey, the county of Slough, and the County of Marin.

5    We also have other agencies listed here just as examples.  They are not

6    part of our comparison agency.  So, we don't look at them when we're

7    saying, okay, what's the median salary, but we did want to show you

8    there that there are agencies using 80% and some of the bigger

9    counties, other bigger counties using a comparison to the superior

10   court judge.  So, this gets to our recommendations for elected

11   department… thank you, sorry.  For elected department heads, we're

12   recommending salary ranges similar to our appointed department heads,

13   with the top of the range at the market median, except for the clerk

14   recorder and assessor and the treasurer tax collector would maintain

15   the historical equivalence to the auditor controller salary range.  A

16   newly elected department head in this structure would start at step one

17   and progress to another step when the range with each year in office.

18   The exception would be someone coming from within county service, would

19   be placed at that step that's 5% above their current salary, if higher.

20   That mirrors our promotion rules in our other positions.  We would

21   place incumbents based on their current time in office, as reflected in

22   red on this slide, and thereafter, we would tie our elected department

23   heads to the same annual increase cost of living increase as our

24   appointed department heads.  So, that's our recommendation there on

25   salary ranges.  For attorneys, as we mentioned, our recommendation is

223

1    to set the district attorney to the top of the range at the market

2    median for district attorney, and in order to maintain parity between

3    the top attorneys, we'd recommend a slight adjustment of 2.7% to the

4    ranges for county council and public defender, so that the top of the

5    range is the same for all three positions and has parity.  None of the

6    incumbents would currently be at that top of the range, but they'd be

7    eligible to progress toward that median based on annual reviews of

8    their performance, in the case of the county council and the public

9    defender, and based on time in office for the DA.  Next slide, please.

10   For the board of supervisors, our recommendation is to set them at 70%

11   of a superior court judge, adjusted annually in January.  The chair

12   would receive a 2% assignment pay for serving in that capacity.  We

13   recommend that the increase be implemented immediately for several

14   reasons.  It addresses the problem most quickly.  It's the least

15   burdensome administratively.  It can be absorbed within the budget, and

16   I'll have a slide about the budget impacts later, and it's similar to

17   the way we addressed other management salary and equities, and also,

18   next slide, this is not a new recommendation.  In 2015, an ad hoc

19   committee was formed to look at the issue.  It included six members, a

20   Santa Maria council member, the presidents of the Santa Barbara and

21   Lompoc Chambers of Commerce, the president of the Taxpayers

22   Association, a bank president, and a representative of local business.

23   After considering the duties and responsibilities and relative

24   compensation, the ad hoc committee recommended that the supervisors be

25   paid at the market median, which at the time, was just over $125,000.

COSB AR007163

1    It's worth noting that this is also what the HR department had

2    recommended at that time.  I think it's… had salaries been set, I think

3    this is an important point.  Had salaries been set at that level, at

4    that median back then in 2015 and increased by the CPI, we would

5    already be at the level if salary that we're recommending today.  So,

6    it would be just slightly of… the increase they would get this year

7    would be putting them just slightly above what we're recommending

8    today.  Next slide.  So, the policy reasons for the change are the

9    same.  The median recognizes that these are full-time jobs requiring

10   significant work outside of the Tuesday meetings, including but not

11   limiting to reviewing numerous documents, serving on state and regional

12   boards and committees and commissions on behalf of the county,

13   attending community events on behalf of the county, developing policy

14   recommendations, and coordinating services for residents and districts,

15   and much more.  The duties are complex and require highly qualified

16   people to perform, including overseeing a budget of $1.6 billion,

17   serving 441,000 constituents, and 4,700 county employees.  It includes

18   city-like services for our

19       [08:10:00]

20       unincorporated areas, as well as county-wide justice system

21   social services for the whole county health services, and other unique

22   functions, not to mention countywide emergency management and response.

23   Supervisors have to step away from their careers, their career

24   progression, and small businesses for years in order to serve.  The

25   salary paid to a supervisor allows highly qualified people with the

COSB AR007164

1    ability to put themselves forward to serve, without needing a source of

2    independent wealth or income.  Shooting for the median for a set of

3    comparable counties gives us an objective measure of how other

4    communities value this work.  It's not a competitive measure, but it is

5    a measure of how other communities, when they look at this work, how

6    they value it.  I did want to note that, internally, when we look at,

7    okay, where would our recommendation put the salary for a member of the

8    board of supervisors within our structure, it's about the same as a

9    principal analyst, which is a mid-level management analyst in our

10   structure, and so, that doesn't seem, to me, overly highly aligned,

11   compared to our other employees.  Next slide, please.  So, from a

12   budget standpoint, the recommendations put forward today are still

13   within the funds that were initially contemplated and set aside to

14   address management salary issues countywide.  In the current year, the

15   cost for the elected increases would be approximately $101,000, with an

16   annualized cost of $629,000, and there would be an additional cost for

17   the recommended increases to the two appointed attorneys of $3,900 in

18   the current year and $23,450 annually.  Next slide, please.  So, if our

19   recommendation is approved today, we'll bring the second reading for

20   the proposed ordinance back on March 4th and implement the recommended

21   increases on May 12th.  Thank you.  That concludes my presentation.

22        CHAIR CAPS:  Thank you, Ms. Schmidt.  That was a very thorough

23   presentation.  Questions from the board?  Supervisor Nelson?

24        MR. NELSON:  Not at this time?

25

226

COSB AR007165

1          CHAIR CAPS:  I did have a question.  I'll go for it then.  So,

2     two questions, actually.  Some people have been legitimately asking why

3     now, and can you tell, just briefly, the process that you've gone

4     through for all staff to get to now finally elected at the end of a

5     process?  Just briefly, if you can refresh us on that.

6          KRISTY SCHMIDT:  Certainly.  You know, I came in at the final

7     year of this, but it was a really three-and-a-half-year process that

8     started by looking at all of our classifications for management

9     positions and re-looking at the duties and the responsibilities and

10    establishing new classification specifications and descriptions for

11    those classifications and then going out and looking at the labor

12    market to make sure that we were paying an appropriate salary for those

13    duties in our labor market, and so, we came back in April of 2024 to

14    the board of supervisors and made a preliminary set of recommendations.

15    We came back again in June for the final recommendations, and then we

16    did go back, and we refreshed the salary survey for our elected, excuse

17    me, our managers and appointed department heads in December, and so,

18    that was sort of the end of that process.  So, the positions that we

19    still have that we have not addressed are the elected department heads

20    and the board of supervisors.

21         CHAIR CAPS:  So, this is the final stage?

22         KRISTY SCHMIDT:  Final stage

23         CHAIR CAPS:  In kind of a course correct or market analysis and

24    adjustments across the board.

25         KRISTY SCHMIDT:  Yup.

                                    227

```
1          CHAIR CAPS:  Okay, and then my second question relates to tying
2     it to judges, because we've, you know, heard a lot of public comment.
3     I feel badly for people, most of what they wrote was based on things
4     that were not at all true, but one thing I do agree with the public,
5     that they, you know, have legitimate outrage that we are actually
6     voting on our own salary.  That's not something that is comfortable.  I
7     think anyone would understand that and not also comfortable for the
8     public to, to sort of understand how can that be.  So, I just was
9     hoping you can explain this further, because I find this proposal
10    really smart in a lot of ways, but one way is that it ties it to the
11    judges.  So, 70% of what judges make, and so, can you explain sort of
12    what that would mean for the future?  Does that mean that that would
13    make it so we don't have to go through this exercise again of an
14    elected body voting on their own salary increase?  Is that the idea?
15         KRISTY SCHMIDT:  Chair caps, yes, that is the idea.  Ny tying it
16    to the judge's salary, and the judge's salaries are set,
17         [08:15:00]
18         based, they're increased annually based on the average salary
19    given to a state employee.  So, there's that kind of control there on
20    that, and so, that would continue to increase every year in July, and
21    then in January, we would go back and look at, okay, where did they end
22    up with the superior court judge salary, and we would adjust our salary
23    accordingly, and so, it would not require the board of supervisors to
24    set their own salary.  That would be following that state lead on
25    setting salaries.
```

228

1        CHAIR CAPS:  So, ostensibly, by doing this uncomfortable exercise

2    now, for both for the public and for us, we're making it so future

3    boards don't have to go through this process.  Is that the vision, or

4    at least the intention?

5        KRISTY SCHMIDT:  Chair Caps, I believe that is why so many

6    agencies have gone this way, and yes, that would be the intent of this

7    recommendation.

8        CHAIR CAPS:  And you had that slide up there, of seven or eight

9    counties that also tie it to the judges.  So, is that the most common

10    way to do this?

11        KRISTY SCHMIDT:  It is… oh, I don't know if I would say it's the

12    most common.  It's hard to get, you know, 100% of the data out there,

13    but it is a very common way to do it.

14        CHAIR CAPS:  And I know.  So, there's, judges are set, as you

15    said, I think by the legislature, and potentially, originally, there

16    was a commission.  I know it's a bit unclear, as it has, but at least

17    an independent body sets the judges' salaries.  The judges don't set

18    their own salaries, as far as you understand.

19        KRISTY SCHMIDT:  Exactly.  There's a government code section.

20    It's determined by a formula based on the salaries given to all state

21    employees.

22        CHAIR CAPS:  Okay.  That's it for my questions.  So, I think

23    we'll turn it over to public comment.  Let's do it.  128 speakers, I'm

24    kidding.  I'm kidding.  How many do you have, Madam Clerk Chair?

25

COSB AR007168

1        CLERK:  Chair Caps and members of the board, we have 18 requests

2    to speak from the public on this item.

3        CHAIR CAPS:  Okay.  Yeah, with that, I'll close for public

4    comment.

5        CLERK:  We'll begin on Zoom with Annamarie Gott to be followed by

6    Lee Heller.  Anna?  And Anna, we have unmuted you on our end.  If you

7    can please unmute on your end to provide your comments.

8        ANNAMARIE GOTT:  Good evening, board members.  Before you decide

9    to vote to give yourself a pay raise, I want you to consider that 50%

10   of the residents in the county live in poverty.  We also have a minimum

11   wage of $16.50 cents an hour.  That's not a living wage.  You're, you

12   know, worried and concerned, rightly so, that you work seven days a

13   week.  There are many people that actually work seven days a week, so

14   they can keep a roof over their head, and even then, they're barely

15   making ends meet.  So, I would really urge you to consider postponing,

16   you know, giving yourself a raise, and instead bringing an item to the

17   board to actually go ahead and consider implementing a living wage in

18   the county.  That is going to do a lot for your constituents, and I

19   think that your constituents would appreciate what you do more if you

20   did that.  Thank you very much.

21       CLERK:  We will now go to Lee Heller, and then we will return to

22   Santa Barbara with [INDISCERNIBLE 08:18:49].  Lee Heller?

23       LEE HELLER:  Chair Caps and members of the board, greetings from

24   New Zealand.  I feel so strongly about this issue that I'm Zooming in

25   to speak in support.  It is shocking to me, and has been shocking to me

230

1    for years, how underpaid you are relative to the work you do and to

2    people in the same position in other counties, and even to your chiefs

3    of staff, who are also incredibly hardworking people.  I don't want to

4    diss them.  Several of them are my friends, but I know from working

5    with supervisors for 20 plus years now, you work seven hour days, seven

6    days a week, 12-16 hour days.  You don't get days off, you don't get

7    left alone.  I text you at all hours, and most of you, Supervisor

8    Lavanino excepted, respond to me, and when I talk to members of the

9    public, as I often do, yes, Steve, what I see is that they do not

10   understand how hard you work.  When I canvas for people, when I just

11   talk to them about issues, they do not know what the life of an elected

12   official is like, especially five people

13       [08:20:00]

14       who oversee a county of 450,000 people, a $1.6 billion budget.

15   We are lucky that we have had, historically, smart, educated,

16   intelligent, committed, compassionate people willing to do this work

17   for very little pay.  It is not a reasonable expectation, however,

18   especially when compared to the salaries of department heads and other

19   elected positions, how much less you get paid.  Ms. Gott is not wrong.

20   The rest of the people who live in our county need to be paid better,

21   but that doesn't mean delaying what is already a nine-years delayed

22   process for catching you up.  That study from 2015 has apparently been

23   sitting there for nine years, not being acted on.  So, yeah, you're

24   going to get a lot of people abusing you about what this means, but the

25   reality is the buck stops with the five of you.  You make the hardest

COSB AR007170

1    decisions.  You have to know about everything that happens in this

2    county.  You have those hideously long binders you have to read every

3    weekend, the endless constituent meetings, public comment, like what

4    I'm doing right now.  We need to pay our board of supervisors to

5    reflect the reality of the work you do as the most important leaders of

6    our county, mediating between people like me and the rest of the

7    county, and if I'm going to come and ask you again and again for a

8    better veterinarian salary, I certainly want you to get paid what you

9    are entitled to.  So, I hope that something will move forward today to

10    reflect that.  Thank you.

11    CLERK:  We'll now return to Santa Barbara with [PH 08:21:32]

12    Purnina Wei to be followed by Karen Hoenstein.  Purnina?  Have they

13    left?  We will now go to Karen Hoenstein to be followed by Leonardo

14    DeCasas.  Has Karen left?  How about Leonardo Decasas?  Great, to be

15    followed by Laura Robinson.  Leonardo?

16    LEONARDO DECASAS:  So, Laura Robinson couldn't be here.  So, I'm

17    going to be making two quick speeches, if that's okay, during my time

18    here.  So, I'm going to start with Laura Robinson's comments.  She's

19    the executive director of SCIU, local 620.  We're the hardworking

20    employees who keep this county running.  We want to be clear that we do

21    not begrudge anyone for advocating for fair compensation here, and we

22    think you deserve it.  I understand that this board is below market,

23    and I recognize how hard you work in what is undoubtedly a full-time,

24    often thankless job.  So, we're not here to shame you for seeking

25    equity, but we are here to say that to show the same commitment for our

COSB AR007171

1    members as well, and why was it that just eight months ago, we had to

2    fight tooth and nail for a 5% cost of living adjustment?  Why, when we

3    identified classifications over 10% below market, did we hear that

4    there simply wasn't enough money in the budget to make it right?  Why

5    is it that there's always room in the budget for those at the top, but

6    never for the frontline employees, the maintenance workers, the park

7    rangers, and the mental health professionals, who deliver the services

8    that the public depends on every single day?  How is their money for

9    nearly 50% raises here, but we can't recruit and retain our essential

10   employees?  A specific example of this was our social services case

11   aids, who start at just $24 an hour and top out at $28.52 cents, well

12   below the market by double-digits.  This is mutually agreed upon by

13   local 620 and county HR.  Yet during bargaining, the county couldn't

14   find a fraction of a tenth of a percent to address this inequity.  In

15   your own board letter, it states that the goal of this study is to

16   align pay at or above the labor market median and ensure pay equity for

17   incumbents doing similar work.  This is a noble cause, but it shouldn't

18   start at the top.  It should start with those paid the least.  So, yes,

19   we support your right to fair pay, but remember this moment, because in

20   2027, when our contract expires, and we are back at the table, this

21   union and your staff won't forget it.  And how much?  44 seconds, okay.

22   So, I want to continue with my speech.  My name is Leo DeCasas.  I'm a

23   union representative with SCIU Local 620.  I represent the employees

24   here at the County of Santa Barbara.  I'm glad that today this body is

25   considering a resolution that emphasizes the importance of equity, an

COSB AR007172

1    important value, and equity, parity, compassion, all are important

2    factors to address, and the membership of Local 620 thanks this board

3    for your efforts towards exemplary public service towards our county.

4    As a representative of our membership, I would like to state that they

5    too are deeply committed to ensuring that they provide the best public

6    service in their respective

7        [08:25:00]

8        roles across every department.  We, too, deserve to have our

9    inequity proposals considered in earnest and with the same enthusiasm

10   that the county has been showing for its highest paid executives and

11   management staff.

12       CLERK:  Thank you, Leonardo.  That is your time.

13

14       LEONARDO DECASAS:  Thank you, I appreciate it.  Have a good one.

15       CLERK:  We will now go to Sueann McKellen, to be followed by Tony

16   Guy.  Sueann?  Sueann still here?

17       CHAIR CAPS:  Is it Suzanne or Suanne?

18       CLERK:  I see a Sueann.  There is a Suzanne later.  Tony Guy to

19   be followed by Tom Woodrow.  Tony?

20       TONY GUY:  Yes, thank you.  Honorable Santa Barbara County

21   supervisors, my name is Tony Guy, and I'm a resident of Northern Santa

22   Barbara County, although I have lived in Santa Barbara County for 40

23   years, both South County and North County.  I believe, as Santa Barbara

24   County supervisors, it is absolutely your responsibility to pay the

25   role of supervisor a fair and equitable wage, not only for yourself,

234

COSB AR007173

1    but most importantly, for those that follow after you in your

2    footsteps.  As you leave your positions, h will we ever attract new

3    future qualified supervisor candidates to support the residents of

4    Santa Barbara County, if we don't offer a wage that's commensurate with

5    the job responsibilities?  As previously stated by some supervisors, I

6    do not believe your position is a simple 40-hour per week job.  The

7    position of county supervisor requires each of you to be available and

8    interact with county residents.  The position of county supervisor

9    offers an opportunity to serve the community, which requires you to

10   attend events with community members and attend meetings to support

11   your residents and constituents, as well as your normal job

12   responsibilities.  Nobody talks about what are your normal job

13   responsibilities.  You know what they are, and you're doing them every

14   day.  Yesterday, I read Tom Woodrow's opinion piece in News Hawk

15   relative to the same subject of county supervisor salaries.  As a

16   retired local businessman, I agree with Tom, when he says total

17   compensation in the private sector would be far higher considering the

18   expertise and commitment required.  It is imperative that we pull from

19   our community the best candidates to represent us as county

20   supervisors.  That will require appropriate compensation, allowing

21   future candidates to live and survive in our region.  If I may, I

22   appeal to you, as a local resident.  Please, accept a pay increase.

23   I'm asking you, please, but please, also allow the Compensation

24   Committee to determine what's fair and equitable.  I hate the fact that

25   you have to try to figure out what's fair and equitable for your own

235

COSB AR007174

1     salaries.  I'm happy to see that somebody has done this for us today.

2     Please, open the door to future supervisors to be able to exist in our

3     region and support our county and support their families.  Thank you

4     very much for your time today.

5          CLERK:  We will now go to Tony Guy, or sorry, that was Tony.  We

6     will now go to Tom Woodrow to be followed by Andy Caldwell.  Tom?

7          TOM WOODROW:  Andy said it took too long for me to get to the

8     mic.  So, Madam Chair, members of the board of supervisors, I'm Tom

9     Woodrow, and yes, I am executive director of the Santa Barbara County

10    Taxpayers Association, but I'm going to speak to you right now as an

11    individual and let my esteemed colleague, our illustrious president,

12    Lanny Ebenstein, get a chance at the microphone.  You know, so, I

13    started my career in this room many years ago working for then

14    Supervisor Chamberlain, and I think there's a couple people in this

15    room, including Andy Caldwell of CoLab and former Supervisor Stoker who

16    was here.  We all remember that as an exciting time.  My associate, Jim

17    Youngson, and our executive assistant, Regina Barry, we all worked

18    really hard.  We worked long hours.  There were general plans.  There

19    were lots of big issues at the time and lots of controversy.  I

20    remember going through, you know, board packets until late.  I remember

21    the supervisors, Willie, having to travel back up to San Nunez Valley,

22    you know, in order to get himself home at a late hour after a long

23    board meeting.  I guess what I'm trying to say to you is I have a

24    personal kind of affinity and affiliation for the work that you do, and

25    I do believe that your compensation is well below market, and it

236

COSB AR007175

1    deserves to be addressed.  So, I know that those who choose to work

2    with all four of you, and actually, with Supervisor Nelson, who I think

3    is remote, so, who

4         [08:30:00]

5         have interacted with you know that you're faithful public

6    servants.  We may disagree from time to time, and you disagree with one

7    another from time to time, but I do believe it's a full-time job, and

8    it requires expertise, strategic input.  It requires judgment,

9    consideration, excellent communication skills, and above all, an

10   extraordinary amount of patience.  If you do keep it at this level,

11   where you're at now, I do not believe… the only people that you will

12   attract to this position to run for this office, which is not easy, are

13   going to be people who are on pensions or perhaps people who are not

14   qualified to do the work.  So, that's my take.  I thank you all for

15   your public service, and yeah, I wish you well as you try to make this

16   decision.  Once again, I don't think it's fair that you have to do that

17   out in public, yourselves.  So, the idea of turning it over to a third

18   party, I think, is excellent.  Thank you.

19        CLERK:  We'll now go to Andy Caldwell to be followed by James [PH

20   08:31:00] Fechner.  Andy?

21        ANDY CALDWELL:  Madam chair, members of the board, Andy Caldwell

22   representing CoLab.  I have a statement from Brooks Firestone.  This

23   was unsolicited by us.  He said, as a retired supervisor, I'm opposed

24   to the substantial raise proposed by the supervisors.  The position is

25   a part-time occupation that should be a public service and not a

237

1    lucrative career at Brooks Firestone.  Now, I know you took umbrage

2    that I said this is a part-time job.  Now, on a week, like, when you're

3    meeting, I know that you're meeting for this week, you're going to have

4    40, 50, 60 hours in, but back when Brooks was a county supervisor,

5    before they started taking four weeks off in the summer, two at

6    Christmas, one at Thanksgiving, plus they didn't take off the fourth

7    Tuesday.  They may have took off the fifth Tuesday.  I looked it up.

8    You can look it on your own agenda.  They met 59 times that year as a

9    board, compared to your 36 times.  That is part of where I'm coming

10   from, not the weeks that you work.  Plus, we know that some of the

11   after-hour things that you are doing, they may be community oriented,

12   but like Greg Hart was at the Santa Barbara County Cattleman's

13   Association.  He's going to put that down, but he didn't have any work

14   to do there.  He was working the room.  You know, you do not have the

15   consent of the governed.  We have reached out to probably about 70 to

16   80,000 people, and we've not got one person that agrees with this

17   raise.  Some of them would give you a little bit more, but there's not

18   one person that responded to our polling that said, this is a good

19   idea, not one.  You'll be getting the same pay, within $3,000, of

20   members of Congress, the House of Representatives, and U.S. senators.

21   You'll get more than a state senator and a state assemblyman.  The one

22   thing that really irked me, and I brought this up two weeks ago, is

23   this department did not use your benchmark counties.  I believe their

24   report is a spin job.  It's nothing less than a spin job.  You didn't

25   use Tulare County, which is one of your historic benchmark counties.

COSB AR007177

1    You use three of them, and like, San Luis Obispo is lower.  Why not

2    put, if you're going to put all counties, put them all, or you're going

3    to use benchmark, but don't pick and choose which counties you're going

4    to compare yourself to, you know, and we would ask, I didn't ask a

5    single person to come here.  I asked people to email you, and we didn't

6    put words in their mouth.  We just said, please, email them as to what

7    you think about these raises, whether or not you support them.  That's

8    all we did.  I can show you what we sent out, but the bottom line here

9    is we didn't ask people to come.  Reason number one is we didn't even

10   know when this meeting was going to occur, because you put it after

11   Exxon.  We would like a time-certain meeting in Santa Maria as your

12   next meeting, not two South County meetings where people will not know

13   when to show up.  We'd like a time-certain in Santa Maria if you want

14   to hear from the public.  Finally…

15        CLERK:  Thank you, Andy, that is your time.

16        ANDY CALDWELL:  …Think of the people that are struggling with

17   inflation.  What you're doing is a slap in their face right now.  It's

18   a slap in the face to your constituents.  Thank you.

19        CLERK:  We will now go to James Fechner to be followed by Suzanne

20   Cohen.  James?

21        JAMES FECHNER:  Hello, supervisors.  It's my first time speaking

22   here, and I did want to read a resolution, but beforehand, I want to

23   address this issue of benchmarking, and I think there's a little, and I

24   hope the word's not too strong, sleight of hand that's going on.  I

25

239

1    don't dispute that you put in long hours, and this is an important job,

2    but the comparison is not

3        [08:35:00]

4        a job that you can otherwise get.  This is an elected position.

5    So, you're not like the lawyer, who could go to another county.  You

6    have to be elected by that county, and as such, what I would propose as

7    a benchmark, rather than looking at a judge, which also requires you to

8    pass the bar and/or have ten years of experience, would be to benchmark

9    it upon the electorate.  I think some of the earlier speakers were

10    alluding to that, in that looking at the median family income in Santa

11    Barbara and putting yourself right there means that you're fairly

12    compensated relative to those you serve, who are the electorate.  So,

13    what I'd like to do is to read this resolution from the local GOP.

14    Whereas the spirit of Abraham Lincoln's government 'of the people, by

15    the people, for the people', has been compromised in Santa Barbara with

16    nearly all elected officials earning far more in salary and benefits

17    than those whom they were elected to serve, whereas true representation

18    requires elected officials to live within the economic realities of

19    their constituents, not as overlords, with taxpayer funded pay and

20    compensation packages.  Whereas the Board of Supervisors of Santa

21    Barbara County, not by advocating for their own pay reductions to match

22    the median income of those they serve, demonstrate a disconnect from

23    the core principle of public service, which is service above self.  Be

24    it resolved that the government of Santa Barbara County must align its

25    compensation for elected officials to reflect the median income of its

240

COSB AR007179

1    residents, ensuring that our government truly represents of, by, and

2    for the people, by living under, not over the same financial conditions

3    as those they govern.  Thanks for your consideration.

4         CLERK:  We will now go to Suzanne Cohen to be followed by Mike

5    Stoker.  Suzanne?

6         SUZANNE COHEN:  Hi.  Thank you, Chair Caps.  Thank you,

7    supervisors.  My name is Suzanne Cohen.  I'm a local resident, a local

8    business owner.  I live in Santa Barbara's District One.  So, I'm a

9    constituent of Supervisor Lee's.  I'm here to speak in support of the

10   proposed changes to the supervisor's pay scale.  I appreciate all the

11   work that the staff has done to get us to this point.  I did not

12   realize it was nine years to get here, or three years, depending upon

13   how you look at it.  Competitive pay attracts qualified candidates from

14   diverse backgrounds, allows more residents, not just those who can

15   afford to serve or who are independently wealthy to serve.  It allows

16   more people to serve in public office.  Proper compensation also

17   recognizes the significant amount of work and responsibility required

18   to make the informed decisions that all of you have been tasked with

19   here.  Additionally, transferring to an independent system and a

20   structure that eliminates the needs and challenges of you voting on

21   your own salary, an awkward issue, even when well deserved, it helps to

22   strengthen our local government and to build public trust in the

23   compensation process.  Thank you very much.

24        CLERK:  We will now go to Mike Stoker to be followed by Larry

25   Epstein.  Mike?

241

1       MIKE STOKER:  Madam Chair, honorable board members, first, I

2   apologize for this.  When I left at 1:30, there was a consensus among

3   several staff members that you'd be getting over your first hearing in

4   about ten more minutes, and so, when I went home to [INDISCERNIBLE

5   08:38:52], I was a little bit alerted when I turned on the live stream

6   45 minutes ago, and I didn't change.  I just got down here.  I want to

7   focus, with the limited time on my comments, on the assumption that

8   there's going to be the salary increase to hopefully give some just

9   proactive comments.  Madam, I'm sure in terms of your question on

10  comparable counties, to give a little history.  So, I guess I'm a

11  little biased on whether I think they should be used.  In the early

12  '90s, I was the supervisor that urged the comparable county study to

13  get our cops and our firefighters pay increases and safety retirement,

14  and I think that's perfectly the appropriate way to approach doing

15  comparisons.  In this staff report, u, Los Angeles, San Diego, Santa

16  Clara got in there, and I wouldn't do that in the future.  I really

17  think it confuses the public.  I think everything should be limited to

18  those comparable counties.  Secondly, in regards to this issue of part-

19  time, full-time I've gone on public records saying it is what a

20  supervisor makes it.  I know when I worked, it was definitely

21      [08:40:00]

22      a full-time job.  It was a whole lot harder than it was.  When I

23  was chair of the Ag Labor Relations Board, which is a full-time job and

24  has a statutory prohibition against getting outside earned

25  compensation, it was a whole lot harder than when I was a Deputy

242

1    Secretary of State.  It was a whole lot harder when I had my own law

2    firm, and I worked really hard in my law firm, and probably, the only

3    thing that was harder was being a southwest administrator of the EPA,

4    and it is what you make it.  My colleague, when I was on the board,

5    Bill Wallace, and we didn't make anywhere near even what you make

6    today, to be able to make a living, he was a veterinarian, and he

7    worked two to three days in his vet practice, but that was 30 years

8    ago, and a lot has changed, and so, you know, from everything I know,

9    all five of you work full-time, and I applaud you for that.  I'm not

10   going to… I don't have to repeat.  Tom Woodrow really covered it when

11   he talked about all the things he had to do as a staffer, and I want it

12   to be a part-time, or a full-time job.  I will never support somebody

13   running that thinks it's a part-time job.  As your staff said, the

14   complex issues, a budget approaching almost $2 billion.  I want to be

15   able to attract people to run for your seat that are smart people, that

16   aren't going to always just believe what the staff says because it's in

17   a staff report, that are going to question them on it, and that's what…

18   literally, the five of you are CEOs.  You're not CEOs if you're part-

19   time.  So, it is… you're allowed by statute to do what you want, but

20   I'd like to see it a full-time job, and I'd like to end with, I think,

21   to end the debate, one of the best things you could do to show that you

22   all mean it to be a full-time job, is consider having a prohibition

23   against having outside earned compensation, just like many positions in

24   state government and federal government, and you could have your staff

25   come back in the next 60-90 days with that kind of prohibition.  That

243

COSB AR007182

1    sends a message to the public, you all consider this as a full-time

2    job.  Thank you very much.

3        CHAIR CAPS:  We will now go to Larry Epstein to be followed by

4    Jefferson Litton.  Larry?

5        LARRY EPSTEIN:  Madam Chair, members of the board, my name is [PH

6    08:42:04] Lanny Ebenstein, and I'm speaking today on behalf of the

7    Santa Barbara County Taxpayers Association.  As Tom, our executive

8    director, Tom Woodrow, indicated.  Our view is that we're sympathetic

9    to the position that the Santa Barbara County Board of Supervisors'

10   compensation should be reevaluated.  You know, typically, when I

11   address public bodies, I start out by saying, thank you for your

12   service, and as I said, I mean it sincerely, thank you for your

13   service, and as I say, it is something that is, was noted earlier in

14   the presentation that when there was a task force some years ago, the

15   Santa Barbara County Taxpayers Association participated in that and

16   participated in a recommendation that actually would've resulted in a

17   slightly higher salary than is being proposed at this point in time.

18   So, as I said, from having been involved in that proposal at that point

19   in time, we can hardly be anything other than supportive of saying that

20   this is an appropriate issue to look at, that we recognize the work

21   that the members of the board of supervisors do, that we're sympathetic

22   to the arguments, that if you want people to run for office, that if

23   you want people who are going to be able to battle the bureaucracy,

24   that you're often going to have to pay to do that, and maybe at one

25   point in time, these positions could be more public service, but at

244

1    this point in time, I think that that it's a different circumstance.

2    So, as I said, we're not that far apart in terms of… and so, the

3    question then is how do you achieve that goal, and our view is that the

4    best approach would be, as in 2015, to establish a committee of some

5    sort with a short timeframe, to review the materials, be able to get

6    input from a larger group of people than perhaps has occurred to this

7    point in time, and then come in with a proposal that is something that

8    would have a broader support, and we think that that might lead to a

9    better outcome and be the best way to go, and we would be happy to be

10   involved in that process, if that were the direction that, that you

11   would choose to go.  So, we're sympathetic.  We think that it's

12   appropriate to consider more compensation for the board of supervisors

13   at this time, but we feel the best method to accomplish that would be

14   to establish a short-term taskforce to come back with you with a

15   recommendation, potentially, to be starting in the coming fiscal year.

16   Thank you for your time and thank you for consideration.

17        [08:45:00]

18        CLERK:  We will now go to Jefferson Litton, and we will go to

19   Santa Maria with Robert McLeod.  Jefferson?

20        JEFFERSON LITTON:  Good afternoon, Chair Caps and fellow

21   supervisors, very good to see you.  My name is Jefferson Litton.  For

22   six and a half years, I served as Joan Hartman's chief of staff, and in

23   that role, I feel uniquely qualified to speak to the hours and the

24   dedication to which all of you devote to this job, and I'm here to say

25   that the raise which the board is considering today is merited,

245

COSB AR007184

1    appropriate, and overdue.  First, why this raise is appropriate.  It's

2    appropriate because it sets a salary that makes the job of being a

3    county supervisor accessible to all.  It makes this role accessible to

4    the single parent who would have to pay for childcare in order to do

5    this job and the many, many hours that it requires.  It also makes this

6    job accessible to the individual who he or she's qualified for the job,

7    has the expertise, has the knowledge, but really, it doesn't make an

8    attractive career choice for them.  We want the best people for this

9    job, because it's an incredible, incredible responsibility.  This

10   salary adjustment is merited.  Being a county supervisor is not a part-

11   time job.  Being a county supervisor is a grueling, all-encompassing,

12   incredibly time-consuming job.  This job takes you away from your

13   families.  It takes you away from your loved ones, and by choosing to

14   be a county supervisor, you've chosen to give up your evenings and your

15   weekends.  Most people don't know that, every Thursday, you get a stack

16   of binders this big that you need to process through in order to make

17   decisions on the following Tuesdays.  That means that you've given up

18   your weekend in order to process all that information.  Not to mention

19   SP CAG, not to mention APCD, not to mention the six other commissions

20   and committees that you all sit upon, and yours is a job that does not

21   end at 5:00 PM.  At 5:00 PM, that's actually when the hard work begins,

22   when you are speaking at a town hall that you've organized in your

23   communities, when you're speaking at an event that you've been invited

24   to, or whether you're fitting in a site visit for a land use appeal on

25   your way home from work, and even when you're not at one of those

246

1    events, when you're out to dinner, or you're going to the grocery

2    store, you are on, and somebody's approaching you, lobbying you, and

3    asking you to help you with your problems.  Many people also don't

4    understand that all of you are first responders.  The next call after

5    911 is a call to you when disaster strikes in this county, which

6    happens with a more than annual frequency.  I've witnessed all of you

7    help your constituents gain access to services, help get their homes

8    dug out, help get their animals evacuated, help getting access to a

9    cooling center.  I witnessed the great lengths that you go to, to serve

10    all of these people, and I witnessed the burden that that puts on all

11    of you, making sure that they get those services.  Being an elected

12    official, it's a great honor and a privilege.  It's also an incredible

13    responsibility.  You oversee a $1.6 billion budget.  You have 440,000

14    people answering to you.  You're responsible for the framework that our

15    county's economy is built upon: public safety, public health, and the

16    roads that allow goods and services to leave our county.  I thank you

17    for your service, and I hope that you vote for this adjustment, which

18    is long overdue.

19        CLERK:  We will now go to Santa Maria with Robert McLeod to be

20    followed by Dr. Scott Flava, who is our final speaker.  Robert?

21        ROBERT MCLEOD:  Good evening, Chairman Caps and members of the

22    board.  I'm Robert McLeod.  I am a retired county employee.  I worked

23    in human resources and employee relations for 11 years.  My whole

24    career, I worked in labor relations, primarily negotiating wages,

25    hours, and terms and conditions of employment for county employees.

COSB AR007186

1    I've worked for both the unions, representing employees, and here in

2    Santa Barbara County, as your chief of employee relations, negotiating

3    with all of the unions.  I'm very familiar with wage comparisons, and I

4    have worked with them my entire career.  The board members are the most

5    underpaid employees in the county.  That's been true ever since I

6    entered this business in 1973.  It continues to be true today, and it

7    will also be true if you go ahead and implement the proposal you have

8    before you today.  Private sector positions with similar scope of

9    responsibilities would pay three to five times as much as you're being

10   proposed to be paid.  Even if you do these, your salaries are going to

11   be between 55 and 80% less than the department heads who report to you.

12   That's not equitable in any use of the term.  I work closely with

13   supervisors in both Orange and Santa Barbara County, including three of

14   the current supervisors.  Several people have mentioned

15       [08:50:00]

16       the board books.  What happens is, late on Thursday afternoon,

17   each board member gets a stack of materials that relates to the

18   following Tuesday's agenda.  It is frequently a foot tall.  I've seen

19   them in department head meetings.  I've seen them in meetings with the

20   CEO.  This is routine.  It's not something unusual.  They have to go

21   through those books and be prepared to deal with complicated, difficult

22   issues just a few days later.  Their weekend is trash.  When I worked

23   at the county of Santa Barbara, I was frequently there, 7:30 in the

24   morning, going to work, and often, I met supervisors in the parking lot

25   who were getting there at the same time, and I would leave work at 7:00

248

COSB AR007187

1  or 8:00 o'clock at night, and they'd still be there, working, and that

2  wasn't just on weeks when there were board meetings.  That was routine.

3  This has come up before, and it's always, this isn't the time to do it.

4  Well, there's never going to be a good time to some people, but this is

5  the right time to do it.  I support this inquiry to increase 100%.

6  It's long overdue.  It's the right thing to do, not just for

7  yourselves, but for all the supervisors who are going to follow you,

8  and for all the people who might otherwise not run for office, because

9  the salary is so ridiculous.  So, do it now.  Do it now for yourselves

10  and for future supervisors and for the members of the public, and I

11  want to state that this coming forward is no slap in the face to this

12  constituent.  It might be, if you don't approve it, but bringing it

13  forward, I support 100%.  Thank you for your service.

14      CLERK:  We will remain in Santa Maria for Dr. Scott Flava, who is

15  our final speaker on this item.

16      SCOTT FINA:  Good afternoon.  I'm [PH 08:51:52] Scott Fina.  I

17  support the 48.8% raise that brings our county supervisors' annual

18  salary to approximately $171,000.  Here's why.  First, I'll comment on

19  the opposition by Andy Caldwell, executive director of nonprofit,

20  CoLab.  I refer to the 2022 Form 990 for CoLab.  On page seven of that

21  form, Mr. Caldwell is listed as working 40 hours weekly, with a

22  compensation totaling $215,673.  I don't begrudge this compensation,

23  but our supervisors have far greater public responsibilities than Mr.

24  Caldwell.  Secondly, a typical supervisor meeting agenda is crowded,

25  with items, with reports, and related studies that are often highly

249

COSB AR007188

1      detailed and technical.  To do their job, county supervisors need to

2      examine and become familiar with these materials and the issues they

3      refer to, which certainly require an average of 40 or more hours per

4      week over the course of a year, but I see a hypocrisy by our honorable

5      county supervisors who are financially secure.  This morning, as I do

6      most Tuesdays, I volunteered at a food distribution program in North

7      County that served approximately 170 farm worker families, farm

8      workers, who are essential to our regional economy, who have heavy

9      physical jobs, with limited career tenures, who face seasonal layoffs,

10     do not earn a living wage.  Our farm workers and their families are

11     food challenged, extremely housing challenged, and even clothing

12     challenged.  Two highly respected organizations, [PH 08:53:39] Cause

13     and Mic Up, have presented to our supervisors a compelling study on the

14     pressing need for a higher minimum wage for farm workers.  I strongly

15     criticize our supervisors for putting that report aside and for looking

16     away from the full needs and injustice our farm worker families suffer.

17     With all due respect, thank you.

18          CLERK:  And that concludes public comment on this item.

19          CHAIR CAPS:  Okay, thank you so much to our speakers.  Really

20     appreciate it.  Now, I go to the board.  Any other questions before we

21     move, or…?

22          MR. LAVAGNINO:  Yeah, I've got a question.  I'd like to go to the

23     detail of BOS market comparisons on page seven.  So, what I really want

24     to do is tie back to how we connect where we are right now to 2015, and

25     I know that that's not the same comparison counties.  Well, first off,

COSB AR007189

1     I want to ask, let's do this real quick.  Let's go to the next slide,

2     which is the example counties that are tying to a judge's salary, and

3     that's where we have LA, Orange, Riverside, Santa Clara, but we

4         [08:55:00]

5         weren't using any of their compensation data in this proposal,

6     correct?

7         KRISTY SCHMIDT:  Supervisor Lavanino, through the chair, no, we

8     don't use those as our comparison agencies.  They're clearly much

9     bigger, and they're not the coastal counties that we use for

10    comparison, but…

11        MR. LAVAGNINO:  So, we do not use the largest counties in the

12    state of California to compare our salaries?

13        KRISTY SCHMIDT:  No, and I'm sorry for the confusion that that

14    caused, because we do not do that.

15        MR. LAVAGNINO:  It's okay.  Well, I don't think it was confusing.

16    I think, when we talked about spin, it was used in a different way.

17        KRISTY SCHMIDT:  Absolutely.

18        MR. LAVAGNINO:  But so, if we go through that detail of board of

19    supervisor market comparison.  So, Marin smaller than us, correct?

20    Monterey is smaller than us.  San Luis Obispo is half our size.  Santa

21    Cruz is smaller than us.  I think Sonoma is exactly the same size.  So,

22    the difference between this and what we had in 2015 was, I think,

23    Stanislaus and Teleri were included.  So, and maybe it's a question for

24    the CEO, those are now no longer considered benchmark counties for us,

25    correct?  I mean, how do we make that determination?

251

COSB AR007190

1      CEO MIYASATO:  That's correct.  Some years, maybe two HR

2      directors ago, we had a consultant help us look at what our comparable

3      counties, and they came up with the list you see before you.

4      MR. LAVAGNINO:  Okay.  So, mostly because coastal?

5      CEO MIYASATO:  It was coastal, cost of living, lots of different

6      factors played into what, how they determine what were our comparable

7      counties.

8      MR. LAVAGNINO:  Okay, and then when you tried to figure out the

9      median in there, so you're basically taking out the high and the low.

10     Okay.  So, you're pretty much eliminating San Diego or Orange anyway.

11     Okay, questions-wise, I think that was the only question I had.  I'm

12     ready to go.  Wouldn't mind leading off.

13     CHAIR CAPS:  Okay, unless any other questions?  We're good?

14     Okay, Supervisor Lavanino, keep going.

15     MR. LAVAGNINO:  Okay.  So, I thought the public comment was

16     interesting, and I appreciate the people that showed up and really

17     spoke from the heart.  I think the people closest to this job, and

18     maybe we're the only ones…  Okay, first off, I did get a million

19     emails.  Andy, we put you back on the map.  You should be so happy.

20     You're relevant again.  So, and the reason is, is because, the reason

21     why I got so many emails, I was curious.  I was like, man, I don't get

22     normally this many emails, and you said that you're not telling people

23     what to say.  They were just upset, and then I read the current and I'm

24     like, well, yeah.  I can see why they're upset.  I mean, what was in

25     there was misleading at best, I would say.  I'm going to bring it up

252

COSB AR007191

1    real quick, because… okay.  So, first off, one of one of the sayings

2    here is gripping and grinning costs to taxpayers, $1.5 million for five

3    supervisors.  Yeah, that would get me upset if I was out in the public.

4    We'll start… to me, I got to go through these one at a time, because I

5    want my constituents to understand what exactly we do, and what they've

6    been told that we do.  So, let's get to the question of full-time or

7    part-time.  Anybody that's around this dais knows that this is a full-

8    time job, or even more so.  I think even Peter Adam yesterday, in News

9    Hawk, he's our most conservative member I think we've ever had on this

10   board, and he's like, it's an all-encompassing job, from the moment you

11   wake up until the time you go to bed.  I always tell people, because

12   they're like, oh, you're not working this week, you guys don't have a

13   meeting?  I'm like, sometimes, this is the easiest part of the job, is

14   being here.  A lot of times, when you hear in sports, players will say

15   the game was the time off.  Practicing, getting ready, doing all the

16   other things, training, all the other things you had to do as the

17   actual job, but so, I thought it was interesting, and I respect Brooks

18   Firestone immensely, and the job has changed in the last 20 years, I

19   will admit that, but going to probably the wealthiest individual that's

20   ever been on our board is probably not the best person to talk to us

21   about what our salary range should be, I would imagine.  I've worked

22   with… well, I'll get into that too.

23          CHAIR CAPS:  You mean, you're not an heir of a global company?

24          SHEILA LODGE:  No, I'm not, but I wish I was.  So, part-time, I

25   think is just a joke in saying it's a part-time job.  Anybody that says

253

1    that just has no clue, but then it says what's the dirty little secret,

2    and it's that we get paid to grip and grin.  I don't consider all the

3    events I go to.  I don't consider

4        [09:00:00]

5        them as part of my 40-hour work week.  That's extra time, and by

6    the way, I don't get paid to be in a parade.  I don't get, you know,

7    none of that stuff.  I don't want to be there in the first place.  It's

8    part of the job.  No one likes being in a parade, but to close your

9    argument, with drop off a letter to Steve Lavanino, and by the way, 576

10   California politicians have been convicted on federal corruption

11   charges.  Bro, that's pretty… and then to say, well, I don't know why

12   they're upset.  I'll tell you why they're upset.  They just read what

13   you just said.  So, I have some prepared remarks, and I'll go into

14   those now, but what I want to say is, so many of the emails I received

15   over the last two weeks, and a lot of people have said is, man, it must

16   be nice to increase your own salary.  Maybe in concept, but I promise,

17   you it is not, and if it was, and it was so easy, why are we 35% below

18   the market?  Because you can't do it.  I wish we could have just had a

19   discussion about what the proper level for compensation should be.

20   That's normal in any job, but we didn't get that opportunity, because

21   people went out and tried to minimize the board's accomplishments and

22   mislead the public about the facts surrounding this issue.  I talked

23   about a full-time job.  I've worked with Janet Wolf, Salut Carbajal,

24   Doreen Farr, Greg Hart, Peter Adam.  They all put in way more than 40

25   hours a week.  Do I get paid to get grip and grin?  I've worked for

254

COSB AR007193

1    free for hundreds, if not thousands of events in my district, helping

2    raise money for many nonprofit organizations, all in the name of public

3    service, but I think because a lot of people don't believe anything I'm

4    saying, I will go to March 10th, 2015 at our board of supervisors

5    hearing when we talked about this last time, and Andy Caldwell said,

6    quote, I realize that your job technically is a full-time job, and many

7    of you work… more than likely work more than 40 hours a week in the

8    current.  You also said, well, we take off all this time.  You know, we

9    take off time during the summer, and we take… that's taking off time

10   from having a board meeting, not taking off time from constituent

11   service, meeting with department heads, doing all the things that we

12   actually have to do, all the boards and commissions.  We're just not

13   meeting here on Tuesdays.  So, basically, I just got to the point where

14   I realized that 90% of the people that were yelling at me had no idea

15   what my job even was.  So, I just started asking people, would you just

16   support a citizens' commission that would analyze our compensation

17   package and make recommendations, and almost unanimously, the answer

18   was, yeah, that's actually a good idea.  Why haven't you guys thought

19   of that?  Well, why hadn't anybody heard of that idea before was

20   because, in all the information that went out, in multiple different

21   email blasts, not once did you say, hey, they actually had a commission

22   fail to tell the public that, that we had had this back in 2015.  By

23   the way, on that special commission, we had six very highly qualified

24   individuals representing the private sector and the nonprofit

25   community.  So, we had two chambers of commerce represented.  We had a

COSB AR007194

1    CFO from Good Samaritan Shelter, we had the Santa Barbara County

2    Taxpayers Association president, and we had the former president of the

3    Santa Barbara Human Resources Association.  They all met publicly

4    numerous times.  They took public comment.  They sifted through all the

5    data, and on a five to one vote, five to one, not controversial, these

6    independent professionals determine that using benchmark counties is

7    the correct standard by which our salary should be set.  Wasn't my

8    decision, wasn't my colleagues' decisions, it was the independent

9    citizens' commission.  So, had we adopted their recommendation, we

10   wouldn't be in the mess we are today.  So, that's on me, because I

11   felt, at the time, the timing wasn't right.  The reality is, I found

12   out ten years later, the timing's never right, and now, I only have a

13   short time left to fix something, so that the next person that sits in

14   this job doesn't go through what I had to go through for the last two

15   weeks, and honestly, I'm going to lay that at the feet of somebody that

16   I've lost friendships over this now, because they were misinformed.

17   I've had people that respected me for 15 years, that sent me the

18   nastiest emails I've ever seen because of misinformation.  If this is

19        [09:05:00]

20        as easy as a job as you say it is, and the pay's so overly

21   excessive, why doesn't anybody want the job?  Supervisor Cap came in

22   without a challenger.  Greg Hart came in unopposed.  Supervisor Nelson

23   had one challenger.  I've ran three times.  Not one person said, oh,

24   I'll try it.  This job will eat you up and spit you out, and I don't

25   know what salary that equates to, but I'm going to support the

256

COSB AR007195

1    recommendations of the 2015 citizens commission, and I'm just really

2    disappointed.  This wasn't a great two-week period in my life.

3           CHAIR CAPS:  Thank you, supervisor.  Supervisor Hartman?

4           MS. HARTMAN:  Well, first, I want to thank the people who came

5    and understand the nature of this job.  It's clear that a lot of people

6    don't know what county government does, and many people don't know what

7    a supervisor does, and maybe some people want to exploit something,

8    maybe to raise their own salary and donations.  I want to talk a little

9    bit about what a county supervisor does, and I always think about it in

10    terms of five Cs.  We do the county business that you hear see here

11    today.  For every hour we're here, we're spending many, many hours

12    doing site visits, meeting with department heads about agenda items,

13    doing research, trying to figure out what is the best strategy to move

14    forward on a very complex agenda.  Then the second C is committee work.

15    I serve on a dozen committees.  Each of those has, and hefty

16    committees, some of them.  I mean, Supervisor Lavanino on our [PH

17    09:06:58] SB Sirs.  We have supervisor Nelson on our debt advisory.  I

18    mean, these are really important, and the criminal justice,

19    [INDISCERNIBLE 09:07:07], and community choice energy.  I mean, each of

20    these has big agendas and subcommittees and major responsibilities.

21    Then we talked about constituent services.  It's emails, it's texts,

22    it's at the grocery store.  It's office hours.  I mean, it's just being

23    available, and people come to us.  Often, they don't understand county

24    government.  So, they're asking us to deal with the utilities or

25    they're asking us to deal with state or federal issues, and we always

COSB AR007196

1    do our best to try to connect people, because our job is to build trust

2    in government and to be available to our constituents.  The fourth and

3    fifth Cs, I think people may not fully understand, but we each

4    represent communities, and those communities have goals, and they look

5    to us to help achieve those goals, whether it be trails, whether it be

6    at theater, whether it be senior centered, whether they want us to hold

7    forums on topical issues, like renter's rights or fire safety or gun

8    violence or other things.  So, we take the initiative, and we get out

9    there, and we have community conversations where people can figure out

10   a way forward, and we're the ones who are the leaders, very often, in

11   that process, and the fifth one that's been talked about a lot, but

12   it's celebratory activities.  People invite us to many, many events,

13   and they do it not because they want us to engage in self-promotion,

14   and I really resent that.  What they want us to do is we represent the

15   public, and we say, we're here because the public thinks your

16   organization is important.  Your mission contributes to the public

17   welfare, and we're here to acknowledge that and to validate that, and

18   that is a big part of the job.  I want to just turn a minute, because

19   I'm very proud to be part of this board and the board that just

20   preceded it.  When I came into… and I'm proud of the previous board,

21   but when I came into office in 2017, in our first budget, the county

22   was preparing to lay off 120 people.  The pensions were woefully

23   underfunded.  We had significant underfunding of our infrastructure,

24   and our pavement condition index was unacceptable on falling.  Our

25   rainy-day fund wasn't fully funded, and over the past years, we've had

258

COSB AR007197

1    no service level reductions.  After reducing our… we reduced our

2    assumptions about return on investment

3         [09:10:00]

4         for our pensions, but we're almost fully funded.  It's 85-90%.

5         MR. LAVAGNINO:  86.4%.

6         MS. HARTMAN:  Okay.  I mean, that's huge.  That is really huge.

7    We're hitting our investment targets in roads, parks, county

8    facilities.  We did have a year, two years ago, where we had a big

9    property tax surplus that we hadn't expected.  We didn't spend that up.

10   We invested that in our capital improvement projects.  Our rainy-day

11   fund is now fully funded, and we've had over 20 different disaster

12   declarations and EOC activations in the last ten years.  What you have

13   to understand is we have to keep the business as usual going while

14   we're dealing with emergencies.  If you imagine somebody who's sick, I

15   mean, is it chronic, or is it acute, and we've got both going at once,

16   and that takes a lot.  We now have set aside, we're very prudent

17   fiscally, we've set aside contingencies specifically for emergencies,

18   for litigation.  We've also now set aside reserves for major systems,

19   like the public safety radio systems, so that we don't have a big… when

20   that fails, we'll have a reserve set aside to be able to get a new one

21   of huge significance.  We've made major, major investments in

22   information technology.  We have Workday, ACELA, HMIS, criminal justice

23   systems.  We have our new IT department, and so, all of this is going

24   to give us savings over time and make us more efficient, and I think

25   that's… we've invested tremendously, and I'm just proud of us for

259

COSB AR007198

1    thinking forward.  We've had KPMG doing studies to see how we can be

2    more efficient.  We're trying our best to make government effective for

3    our community.  We focus very much on issues of homelessness, criminal

4    justice, housing, mental health.  These are things that have become

5    much more complex in the last five or ten years.  I won't go into

6    detail, but I just… they take much more than they ever did in the past.

7    So, when you think of our compensation that we make, half county

8    workers make as much or more than we do, that we 28% less than our

9    chiefs of staff.  I think of my colleague on the board, Supervisor

10   Lavanino, and had he voted for this, I mean, all the foregone money

11   that he's not had, and he's used the best earning years of his life

12   here, invested here.  So, he wasn't accruing a lot of retirement

13   benefits and a lot of savings, and that is a sacrifice that he's

14   standing up today and saying, I don't want my successor to have to do

15   that.  I want somebody who's in the prime of life, the prime of their

16   earning capacity, to be able to do this job, because it's a really

17   demanding job, very rewarding job.  So, I guess you can tell by what

18   I'm saying that I really do support this.  I want people to understand

19   what the county does, what county supervisors do, and that we, as a

20   county, are functioning at a very high level, and I think the people in

21   this county should be very proud of the service that we get.

22        CHAIR CAPS:  Thank you, Supervisor Hartman.  I can go next,

23   unless Supervisor Nelson or Supervisor Lee would like to go.

24        MR. NELSON:  Please.

25

                                   260

1     CHAIR CAPS:  Supervisor Nelson?  I'll continue?  Whichever you'd

2  like.

3     MR. NELSON:  Yeah, I don't mind speaking, if Chair Caps, thank

4  you.

5     CHAIR CAPS:  Sure.

6     MR. NELSON:  [INDISCERNIBLE 09:14:16] all right?

7     CHAIR CAPS:  Yep.

8     MR. NELSON:  All right, cool.  Yeah, I would like to just add to

9  that it has been a difficult couple weeks here, and I think especially

10  for Supervisor Lavanino and I, who, we share a base of supporters and

11  residents that CoLab speaks to, and so, that messaging has been really

12  unfortunate, unfair, untrue.  I know my colleagues have already talked

13  about the fact that, that it's ridiculous to think that this job's a

14  part-time job in any way.  Also, I was really appreciative of the

15  comments there by Supervisor Hartman about the financial status of our

16  county.  If we

17     [09:15:00]

18     were as mismanaged as has been reported out there, if we were in

19  financial peril, you would, you know, $115,000 would be overpaying us.

20  You know, I think back in 2015, because I was the chief of staff at

21  that time, for Supervisor Adam, he talked about the board of

22  supervisors might be worth more if we actually had some performance

23  measures that we were meeting.  Well, almost all his performance

24  measures that he put out there in 2015, this board's meeting today.

25  You know, we're no longer deferring maintenance on our roads.  We have

261

COSB AR007200

1    longest or the largest strategic reserve in county history.  We're, I

2    believe, five years away from retiring the pension debt.  I think we

3    might be one of the only jurisdictions in the State of California that

4    will be in such a position, and it's become, because of how fiscally

5    prudent this board has been, just like what you would expect from a

6    board of directors, from any type of large corporation with the budget

7    that we have.  I'm really saddened, though, that because of the

8    information that's gotten out there, that the will has been poisoned

9    with my constituents, and that's what's made this very difficult for me

10   to deal with, is that there's been a full-time engine, pushing out

11   misinformation and putting us in a light that even a 1% raise, I

12   believe, at this point would make us look self-serving, especially with

13   the amount of information that's gone out there.  I had a lot of

14   conversations after our raise, I think, two years ago that actually

15   opposed, where I heard from a lot of my friends and constituents that

16   their biggest issue was not the raise itself.  It's the fact that we

17   vote to do it ourselves, and so, where I'm currently at is I'm where

18   the Taxpayers Association is.  I could support another commission

19   moving forward, similar to what it did in 2015.  I likely would imagine

20   it would come somewhere similar to where it did in 2015, now.  Maybe

21   they might even pick it higher, but I think just because of the way

22   that the misinformation's been spread in the community, today, it'd be

23   hard for me to move forward with the staff recommendation.

24        CHAIR CAPS:  Thank you, supervisor.  Oh, yeah.  So, I'm really

25   proud of this board, and today just solidifies it, and this whole

262

COSB AR007201

1    process, this whole day today, honestly, but this just means we're

2    going to have to work harder, given the last couple weeks and the

3    misinformation campaign that has been, you know, really tough, and I

4    acknowledge it was more tough in the North County.  Most of the

5    misinformation was put out in Northern County publications, but it's

6    ugly, and it's too bad, because of all the things that Supervisor

7    Hartman talked about in terms of our role, if I boil it down a little

8    bit, what we really do is we strengthen that bond between people and

9    their government.  They don't really necessarily think about it, but

10   every time they email us about something, and we respond, and we do,

11   and we put our heart into it, or our team does, you know, just

12   recently, with fire preparedness, people are so worried,

13   understandably, and to have someone reach out to my office with

14   concerns about a dry creek bed behind her house, that's county, and

15   then our guys are out there two days later, clearing it up, and then

16   she writes back to me, even though I didn't… I'm just a facilitator,

17   but I take it seriously, that she can sleep better now.  That bond of

18   trust with our government, especially now, I think is just incredibly

19   valuable, and it's not political.  It's just services.  It's the basic

20   function of why a government is necessary, and why, thankfully, it

21   attracts people to serve in those roles who really love this work, who

22   really love making sure that people are taken care of, and I want that

23   to continue.  I don't want it to be a type of job that people do part-

24   time.  I don't want it to be a type of job that people do only because

25   they're independently wealthy, and they can somehow figure it out.  I

263

1    don't want it to be a job that people can't… they can only do if they

2    don't have kids or they don't have family, young kids at home.  I mean,

3    I find it curious that a man is telling me how little I work.  I just

4    have to tell you that.  You can ask my son how little I work.  It's

5    quite a curious experience.  So, that bond has been damaged a little

6    bit, thanks to, you know, churning out erroneous op-eds and blasting

7    our email address, but we'll work harder.  We'll get it back.  Those

8    folks don't know.  I put out my own information.  Immediately, I got so

9    many.  I'm just going to read a couple lines.  Thank you so much for

10   getting back to me so much so quickly, Ms. Caps.  I'm afraid I feel

11   rather foolish, requesting the

12       [09:20:00]

13       proposed raise.  Now, apparently, I've succumbed to that awful

14   thing known as social media misinformation, even though what I read was

15   actually an email sent to me.  As it turns out, when I looked back, it

16   was… the article that got me riled up was from a local right-wing

17   activist.  I truly appreciate the information you provided me.  I was

18   not aware of most of the responsibilities you as supervisors are tasked

19   with.  I want to thank you again for setting me straight, and I would

20   like to let you know that I will spread the word to anyone who might

21   broach the subject with me in the future.  This is from a woman named

22   Janice.  A lot nicer than a lot of emails that I got, got called the C-

23   word.  That was interesting.  So, I'm just telling you, we'll just keep

24   marching on, and I'm fully supportive of this proposal.  I appreciate

25   the method that went into it.  As I mentioned at the top, what I most

                                    264

COSB AR007203

1    appreciate is that future boards will not have to go through this

2    process, because it'll be tied to an external factor that has been

3    thought through and is used by other jurisdictions. So, if we set this

4    today at 70%, we will not have to do this ourselves, and hopefully,

5    future people who run for this office and have the same level of

6    integrity as the five of us do will not have to go through this. So,

7    I'm happy to give it my support, and again, but I do want to say before

8    I end, people are hurting. So, I don't mean to dismiss all of this as

9    misinformation. People are financially hurting, and that's why it

10   strikes a chord, because we have such a high poverty rate, and when

11   people got a sliver of information that wasn't the full picture, it

12   strikes a chord really internally about how unfair life is for a lot of

13   people right now, and to kind of use that is really sad. I want to be

14   on the other side of things. I want to actually be working to get

15   affordable housing, to make sure people have, as we just heard about,

16   access to healthcare in their community, you know, with vans driving

17   around. I want to be on that side of efforts to make sure we build

18   people up, and that's what I'll continue doing and happy to support

19   this. Thank you. It's you.

20       MR. LEE: Thank you, [INDISCERNIBLE 09:22:15]. Well, I want to

21   say, I love parades. So, I must… I love parades. So, as the new guy…

22       MR. LAVAGNINO: Well, you've only had to be in two, okay? When

23   you've done your fiftieth one, let me know.

24       MR. LEE: As the new guy who's coming in this role for close to

25   two months now, I understand that the work that each and every one of

265

COSB AR007204

1    you do, because I experienced it.  It is not easy, and coming from a

2    small business background, where I work 80 hours a week for the past,

3    since I was a kid, this is hard.  You take it home with you.  Your

4    family experiences it.  You sleep, going to bed, knowing that you, the

5    moment you wake up, you're on it, but I love it, and I know that each

6    of you all love it, but as a… being here, I fully support each and

7    every one of you, but I cannot vote on it, because I'm still just very

8    new to the role.  So, I'll be abstaining from the vote.

9        CHAIR CAPS:  Okay.

10       MR. LAVAGNINO:  I just had a staff question.

11       CHAIR CAPS:  Sure, go for it.

12       MR. LAVAGNINO:  So, I just want to be perfectly clear.  So, I'm

13   going to be saying this right when I put this out, is: so, you did a

14   calculation.  I just want to make sure that, if we say that the staff

15   recommendation right now was 171, if we use the 2015 Citizens'

16   Commission, plus the [INDISCERNIBLE 09:23:40] that the commission had

17   recommended, it would be at, I think, a little bit slightly higher than

18   171 right now.

19       KRISTY SCHMIDT:  Supervisor Lavanino, the chair, yes, that is

20   correct.  So, when you use the CPIU for the LA area applied to the

21   recommendation back in 2015 for the median, the prior years' CPIU, you

22   come up with about 72.5 for this year's increase.

23       MR. LAVAGNINO:  170.  Yeah, okay, perfect.  So, if we take it

24   down a notch and tie it to 70% of the judges, that's what the staff

25

266

COSB AR007205

1   recommendation was then.  Okay.  I'm comfortable with that.  I'll make

2   that my motion, that we move forward with staff recommendation, then.

3          MS. HARTMAN:  I will second.

4          CHAIR CAPS:  Okay.  Excellent.  All those in favor, o…, let's

5   see, we need to do a roll call.  Our last one of the day, it's 6:11.

6          CLERK:  Supervisor Lee?

7          MR. LEE:  Abstain.

8          CLERK:  Supervisor Hartman?

9          MS. HARTMAN:  Aye.

10         CLERK:  Supervisor Nelson?

11         MR. NELSON:  No.

12         CLERK:  Supervisor Lavanino?

13         MR. LAVAGNINO:  Aye.

14         CLERK:  And Chair Caps?

15         CHAIR CAPS:  Aye.

16         CLERK:  Motion passes three-one-one.

17         [09:25:00]

18         CHAIR CAPS:  Okay.  With that, we will adjourn this lengthy but

19   productive meeting of the Santa Barbara Board of Supervisors.  We will

20   be back next Tuesday, here in Santa Barbara.

21         MR. LAVAGNINO:  I'll be back down here…

22

23

24

25

267

COSB AR007206

1          I, Anders Nelson, do hereby certify:

2          That I supervised the transcription and proofreading of the

3     foregoing in a remote location at the time and place herein set forth;

4     that the proceedings were transcribed through computerized

5     transcription; that the foregoing is a true record of the proceedings

6     taken to the best of my ability to hear and understand the speakers;

7     and that I am not interested in the event of the action.

8          Witness my hand dated May 2, 2025.

9

10         *Anders Nelson*
           Anders Nelson [May 2, 2025 12:38 EDT]
11

12         Anders Nelson

13         Project Manager

14         TransPerfect Legal Solutions

15

16

17         May 2, 2025

18

19

20

21

22

23

24

25

268

1        LAURA M. BRIDLEY:  Thank you.  Mr. Villalobos, do you want to

2    proceed with the role call vote?

3        DAVID VILLALOBOS:  Yes.  Thank you, Madam Chair, and good morning

4    to the commission.  Planning commission hearings are televised live on

5    County of Santa Barbara Television CSBTV Channel 20 at 9:00 a.m. in the

6    south coast Lompoc Santa Ana Valley, [PH 00:00:18] Samria and Orchid

7    areas.  Rebroadcast of planning commission hearings are on Fridays at

8    5:00 p.m. on CSBTV Channel 20.  This hearing will also be streamed live

9    on the county's website and will be available for download in a day or

10   two, and also streaming on the county's YouTube channel.  Should I move

11   on to role call?

12       LAURA M. BRIDLEY:  Please.

13       DAVID VILLALOBOS:  Thank you.  Commissioner Cooney?

14       C. MICHAEL COONEY:  Here.

15       DAVID VILLALOBOS:  Commissioner Parke?

16       JOHN PARKE:  Ready.

17       DAVID VILLALOBOS:  Commissioner Reed?

18       ROY REED:  Here.

19       DAVID VILLALOBOS:  And Chair Bridley?

20       LAURA M. BRIDLEY:  I am here.

21       DAVID VILLALOBOS:  And we expect Commissioner Martinez to be

22   joining in a while.

23       LAURA M. BRIDLEY:  Thank you.  Do we want to go ahead with the

24   agenda status report?  Mr. Wilson, Secretary Wilson?

25

1

1        JEFFREY WILSON:  Good morning, Madam Chair and Commissioners.  In

2    regards to the status of our agenda, we have two items on our standard

3    agenda.  We have the Mission Isla Vista Partners Housing Development,

4    and then we have the 2024 comprehensive plan annual progress report.

5    It's my understanding that we will be changing the order of those items

6    this morning, and we will begin with the comprehensive plan annual

7    progress report.  And then the second item will be the Mission Isla

8    Vista Partners Housing Development Project.

9        LAURA M. BRIDLEY:  Thank you.  For the other commissioners, I

10   wanted to do that so we had Commissioner Martinez here for the full

11   duration of the item and Isla Vista.  With that, do you want to go

12   forward with the projection report?

13       JEFFREY WILSON:  Madam Chair and Commissioners, looking at the

14   projection report, our next scheduled hearing will be next week, March

15   5th.  It'll be here in Santa Barbara.  That is where we continue the

16   appeal of the G&K Cannabis Processing Design Review Project.  That's

17   the only item on the agenda, and that's next week here in Santa

18   Barbara.  And then moving down the calendar, we will be in Santa Maria

19   on March 12th.  And on March 12th, we continued the Sentinel Peak

20   Resources Truck Rack Project, and then we also have the Key Site 2

21   Ambulatory Surgery Center on that date, and then we had also continued

22   the discussion on the emergency shelter zoning ordinance for March

23   12th.  Again, that's in Santa Maria.  And then further on the calendar

24   is March 26.  We have one item on that date.  That's another housing

25   development project, and that's here in Santa Barbara.  And then April

2

1    2nd, we have one item, which is a tentative map in Santa Barbara.  And

2    then April 9th, two items.  Tier Two Winery.  We're switching a tier

3    two to a tier three, and then an equestrian facility.  And that is in

4    Santa Maria.  So April 9th, we're back in Santa Maria.  And then

5    there's nothing else projected until we get to May 21st.  That's the

6    NPC, so that takes us to the projection report.  And we will coordinate

7    with staff in regards to March 26th and April 2nd being that both of

8    those only have one item on it.  And so we'll either coordinate with

9    staff on combining those or adding more items to those agendas so that

10   there's not just one item on that.

11       LAURA M. BRIDLEY:  Which dates were those?  March 26th and—

12       JEFFREY WILSON:  Yeah.  It's March 26th and April 2nd.  March

13   5th, we've already done noticing, so we have to keep that hearing in

14   play, but giving a gentle reminder to staff to look at March 26th and

15   April 2nd, to make sure that we have sufficient items on those.

16       LAURA M. BRIDLEY:  Okay.  Thank you.  Did you have any questions?

17   Okay.  Let's go to this item on our agenda, which is for public

18   comment.  That means that anybody who's in the room that wants to

19   address the commission of items that is not on our published agenda,

20   this is your time to do so, with three minutes each.  And I'm not

21   having any speaker slips here.  Anyone online, Mr. Villalobos?

22       DAVID VILLALOBOS:  Madam Chair, no hands.  I believe our

23   attendees online are here to speak on the Isla Vista item.

24       LAURA M. BRIDLEY:  Okay.  Well then that brings us to our next

25   item on the agenda, Item 7, which is our Planning Commissioners

3

1    Informational Reports.  Does anyone on the commission have something

2    they want to share today?  Seeing nothing.  We'll move on to the

3    approval of minutes of February 5th and then February 12th.  Does

4    anybody have any corrections?  Commissioner Cooney?

5        C. MICHAEL COONEY:  I move approval of both hearings of the 5th

6    and 12th.

7        [00:05:00]

8        LAURA M. BRIDLEY:  Very nice.

9        JOHN PARKE:  Second the motion.

10        LAURA M. BRIDLEY:  Okay.  We've got a motion and second.  All in

11    favor?

12        ROY REED:  I.

13        C. MICHAEL COONEY:  I.

14        JOHN PARKE:  I.

15        LAURA M. BRIDLEY:  I.  Alrighty.  Okay.  That brings us to our

16    director's report.  Director Plowman.

17        LISA PLOWMAN:  Good morning, Madam Chair, members of the

18    Commission.  I have a short report this morning.  We did not have the

19    board hearing last week, due to the holiday.  And this Tuesday we had

20    the hearing on Sable.  It was probably the most attended hearing I've

21    been at, at the county.

22        LAURA M. BRIDLEY:  Wow.

23        LISA PLOWMAN:  Yeah.  And there were well over a hundred speakers

24    that signed up to speak.  We did not have all of them speak.  I mean

25    they just went on quite long, so people had to leave.  But I think we

4

1    had around 90 people speak.  And passion on both sides.  And passion on

2    both sides of our board.  So, because Supervisor Hartman recuses

3    herself, we had a two/two vote at the board, which essentially is no

4    action.  And we are in the process of sort of determining what that

5    actually means in the long run for Sable and the opponents.

6         LAURA M. BRIDLEY:  Yeah.  So, we heard news reports that both

7    sides thought they won and I'm like I thought a two/two was a denial.

8    But—

9         COUNTY COUNSEL:  Madam Chair, Commissioner, at the planning

10   commission, a two/two is denial, and that's because the planning

11   commission procedures set out that detail.  At the board, a two/two is

12   no action.

13        LAURA M. BRIDLEY:  Okay.  Thanks for that clarification.

14        LISA PLOWMAN:  And then the other thing I have is just the future

15   items that are going to be heard at the board.  And that is we have a

16   HLAC item going to the board on the 4th of March for the designation of

17   the Arroyo Hondo Bridge, a landmark on the [INDISCERNIBLE] Coast.  And

18   then, also on the 4th, it's not our item, but it's an item that affects

19   planning, and that is the inclusionary housing ordinance is getting

20   updated to align with some of the items that were in our housing

21   element.  And that includes rental housing being subject to

22   inclusionary housing requirements.

23        LAURA M. BRIDLEY:  And that's new?

24        LISA PLOWMAN:  That is new.  Used to be for sale, right.  We

25   didn't see a lot of rental projects.  We do see them now, mostly rental

COSB AR007212

1    projects.  Interesting how the economics of a project change over time.

2    However, we mostly see projects taking advantage of the State Density

3    Bonus Law, which then exempts them from our inclusionary.  But in the

4    event that somebody doesn't take advantage of it, then we have a backup

5    for requirements.

6         LAURA M. BRIDLEY:  So, what is the inclusion?  It used to be 20%.

7    What is it?

8         LISA PLOWMAN:  No.  It's lower.  We don't have—I think it's 15%

9    on the South Coast.  So, it's 2.5 very low, 2.5 low, five moderate, and

10   five upper moderate.  And then in the north county it's just very low

11   and low.

12        LAURA M. BRIDLEY:  Okay.  Thank you.

13        LISA PLOWMAN:  And it's possible that moderate and upper moderate

14   could come into play in the north county, depending on the home sale

15   prices or rents.  We're flexible.  If their rents and sale prices are

16   below that rate, then they don't have that requirement.

17        LAURA M. BRIDLEY:  Okay.

18        LISA PLOWMAN:  We have then the cannabis item will be going on

19   the 18th of March to the board.  We have the Laguna Blanca appeal going

20   on the 1st of April.  The art tours on the 1st of April.  And then

21   moving to the 8th of April, we've got work program for long range

22   planning.  And then we have two items that are going that are relevant

23   to the work

24        [00:10:00]

25

6

COSB AR007213

1          that the department does and the things the commission sees, and

2     that is CSD was tasked with preparing a workforce housing study.  And

3     that is going to be going to the board.  That's available now.  And it

4     talks about county-owned sites that could be developed for workforce

5     housing.  And that will be at the board on the 8th of April, and then

6     we are also bringing forward CSD as a lead on this, but it's the pro-

7     housing designation by the state, which will benefit the county for

8     funding and things like that.  I think it's a good thing to have for

9     our community.  I think we can bring more money to our affordable

10    housing projects that way.  And then lastly we've been working through

11    our safety element on evacuation tracking modeling, and so it's an

12    evacuation study.  It's not a plan.  It's a study.  And we're going to

13    be briefing the board on that on May 6th.

14         LAURA M. BRIDLEY:  Great.

15         LISA PLOWMAN:  And that's all I have.

16         LAURA M. BRIDLEY:  You have any questions for this team director?

17    Yes, Commissioner Cooney?

18         C. MICHAEL COONEY:  I was just going to invite a comment on the

19    other item on the board agenda, which I didn't get to see live, but

20    read about, and that was just—I don't care about the results at all,

21    but it was interesting and, I guess, contested.

22         LISA PLOWMAN:  Are we talking about the—

23         C. MICHAEL COONEY:  No.  Increase in salary for the board

24    members.

25         LISA PLOWMAN:  Yeah.

7

1    C. MICHAEL COONEY:  Nothing in there about increase in salary for

2    planning commissioners.

3    LISA PLOWMAN:  There was not.

4    LAURA M. BRIDLEY:  Our stipend has been this way for several

5    decades I think, yeah.  You treat us as well as you can.  Okay.  Any

6    other questions?  Commissioner Parke?

7    JOHN PARKE:  Yes.  This reminds me of something.  When you spoke

8    about the different housing things becoming in front of the board,

9    especially when you were talking about workforce housing, because that

10   was actually a piece of the master plan workshop we did a year and a

11   half ago talking about workforce housing on properties that qualified

12   for the right master plan as one of the incentives.  What I'm minded

13   of, and I'm looking at all these LRP people, and that's reminding me

14   that when we did the re-zones or looked at the rezones, part of LRP's

15   presentation was about 25 policies that would accompany it.  And I

16   thought they were very clever.  And one of them was workforce housing

17   on all projects, which was sort of a big change.  And I'm wondering

18   whatever became of those policies.

19   LISA PLOWMAN:  Commissioner Parke through the Chair, you're

20   referring to the policies in the housing element?

21   JOHN PARKE:  Yeah.

22   LISA PLOWMAN:  Yeah.  So, we are in the process right now.  Those

23   were actually implementation items is what they were, 25 of them.  We

24   have six polices, and then we have 25.  But actually, out of those 25

25   action items, we have 99 implementation items.  And we are working on

8

COSB AR007215

1     those, as we speak, and moving those things forward.  So, the

2     inclusionary housing ordinance amendment is one of those items.  The

3     emergency shelter item that you recently heard is an action item out of

4     the housing element.  So, we have timelines in those action items that

5     we're required to meet.  And that's what we're attempting to do is just

6     follow the timeframes.  But workforce housing is—well it was actually

7     county-owned sites was an action item, and we have some requirements

8     that we have to meet with state HCD on identifying when housing will be

9     constructed on those sites.

10         JOHN PARKE:  I thought that one of the policies or whatever

11     they're called that were included in that presentation for LRP included

12     allowing employee dwelling units on other than just agricultural

13     properties.  Am I just having a wonderful reminiscence in optimistic

14     memory or was that an actual thing that occurred?

15         LISA PLOWMAN:  You want to respond?  Mr. Tuttle is telling me

16     that there is something in there about that,

17         [00:15:00]

18         but I don't recall that one specifically.

19         JOHN PARKE:  Yeah.  I think it would make a big difference, and

20     it goes far beyond our Ag employee dwelling unit, and it kind of goes

21     beyond what we're talking about the rec master plan.  So, I just wanted

22     to keep my eyes on it.  Well, this is good enough.  Will that kind of

23     stuff come in front of us?

24         LISA PLOWMAN:  Some of it will because some of it requires

25     changes to our code.  Some of the items, like the one you saw in the

COSB AR007216

1    emergency shelters.  We're working on developing changes not our

2    density bonus program that's the county density bonus program.  That

3    will come before the planning commission.

4        JOHN PARKE:  And this one I just mentioned, would that come in

5    front of the planning commission?

6        LISA PLOWMAN:  If we have to make changes not our code, which

7    sounds like we would likely have to do, yes, that would come before

8    you.

9        MALE 1:  If I could interject real quick.  I'm just looking at it

10   now.  That's Program 6.  And the action item was about by July 2027.

11   I'm in the ordinance to allow employee dwellings, all employee

12   dwellings, not just farm worker dwellings.  So that was one item that

13   we'd come back to you.  And currently scheduled, not for a couple of

14   years.

15       JOHN PARKE:  I look forward to it, thanks.

16       LAURA M. BRIDLEY:  Okay.  Seeing no other questions on that

17   report, let's move on to the standard agenda, and with our Item 2

18   instead of 1 to begin.

19       DAVID VILLALOBOS:  Thank you, Madam Chair.  [INDISCERNIBLE]

20   requesting that the county planning commission receive and file the

21   2024 comprehensive plan annual progress report.

22       LAURA M. BRIDLEY:  Thank you.  And because this is a report, we

23   don't do Brown Activities disclosures, correct?  This is an

24   administrative item.  Okay.  So, we start off with this beautiful

25

10

COSB AR007217

1    retinue of staff at our table.  Who's going to lead us?  Okay.  Thank

2    you.

3        BREANNA ALAMILLA:  Thank you, Commissioner and the Chair.  My

4    name is Breanna Alamilla and I'm here with Danielle Moore, and we'll be

5    presenting on the 2024 Comprehensive Plan Annual Progress Report.  Can

6    you go to the next slide?  The Annual Progress Report, also referred to

7    as the APR, is a state mandated report that provides information

8    regarding the implementation progress of the county's comprehensive

9    plan and the county's progress in meeting its Regional Housing Needs

10   Allocation or RHNA in 2024.  State law requires the county to subject

11   the APR to the board of supervisors, governor's office of land-use and

12   climate innovation, and state department of housing community

13   development or state HCD by April 1st of each year.  The county also

14   submits the report to the City of Santa Barbara in accordance with

15   policies in the Mission Canyon Community Plan.  County staff made

16   progress preparing comprehensive plan amendments this year, including

17   initiating the circulation element update and open space element

18   update, and continuing work on the environmental justice element and

19   safety element.  County staff also completed various ordinance

20   amendments, implementing the comprehensive plan.  These include the

21   energy element updates, agricultural enterprise ordinance amendments,

22   and various housing built ordinance amendments.  So, the 2024 APR

23   reports on the status of the county's Housing Element program

24   implementation progress as well.  The board adopted the 2023 to 2031

25   housing element update in December of 2023, which contains 25 programs

11

COSB AR007218

1    and 99 actions to help meet the housing goals and needs of the

2    unincorporated county.  In 2024, the county completed nine of these

3    actions, initiated work on 21 actions, and will continuously work on 16

4    ongoing actions.  Most notably, the county adopted ordinance amendments

5    and completed the rezone process for the inland area, along with

6    selection of county-owned sites suitable for development to help meet

7    the county's rezone.  The county is currently working on considerations

8    for density bonus program for moderate income housing, and completing a

9    workforce housing study, amongst other actions.  The county will

10   continuously amend zoning ordinances upon the implementation of new

11   state laws and continue to seek funding for low income communities

12   housing and services, amongst additional actions.  The APR also

13   summarizes the county's progress in meeting its RHNA for the 2023 to

14   2031 housing element period.  2024 marked the second year of the new

15   cycle.  RHNA progress is determined by the number of building permits

16   that the county issued for new housing units in 2024 added to prior

17   year totals.  This includes permits issued for housing units such as

18   single-family dwellings, multi-family dwellings,

19        [00:20:00]

20        Accessory dwelling units, or ADUs, and agricultural employee

21   dwellings.  Previously, state HCD did not include replacement units

22   such as demolition and disaster rebuilds towards the RHNA progress.

23   But as of 2022, these units are now included.  Group quarters, such as

24   dorms, are still not included.  The county's RHNA is divided into four

25   income categories: Very low income, low income, moderate income, and

12

COSB AR007219

1       above moderate income.  To determine the affordability level of each

2       unit, particularly those that are not deed restricted, staff follows

3       the Affordability Methodology, shown on this slide.  Staff first

4       compiles county-wide floor sale prices and monthly rental prices.

5       Staff researches unit prices by zip code, community area, square

6       footage, and number of bedrooms.  Based on HCD's assumptions, the size

7       of a household exceeds a household's bedroom count by one.  Next, staff

8       determines what affordability level the new units fall under.  The

9       affordability level is determined by comparing the monthly rent or

10      mortgage payment for each unit to the portion of income that households

11      in each income category can afford.  Staff uses state HCDs, state

12      income limits, which they release annually.  From this document, staff

13      uses Santa Barbara County's average median income to calculate the

14      maximum monthly mortgage or rent payment for various household sizes.

15          [00:21:28]

16

17

18

19

20

21

22

23

24

25

13

COSB AR007220

1

2

3          I, Anders Nelson, do hereby certify:

4          That I supervised the transcription and proofreading of the

5     foregoing in a remote location at the time and place herein set forth;

6     that the proceedings were transcribed through computerized

7     transcription; that the foregoing is a true record of the proceedings

8     taken to the best of my ability to hear and understand the speakers;

9     and that I am not interested in the event of the action.

10         Witness my hand dated May 2, 2025.

11

12         *Anders Nelson*
           Anders Nelson (May 2, 2025 12:48 EDT)
13         _____

14         Anders Nelson

15         Project Manager

16         TransPerfect Legal Solutions

17

18

19         May 2, 2025

20

21

22

23

24

25

14

COSB AR007221