*Sable Offshore Corp., et al.* v. *County of Santa Barbara, et al.*

Case No. 2:25-cv-04165-DMG

**AMENDED ADMINISTRATIVE RECORD**

**VOLUME 13-7 OF 21**

**Volume 13-7, Part 7 of 7**

**COSB AR 004685 – COSB AR 004750**

*Sable v. County of Santa Barbara*

Case No. 2:25-cv-04165

<u>INDEX TO ADMINISTRATIVE RECORD</u>

| | **1. Planning Commission Materials From October 30, 2024 Hearing** | |
|---|---|---|
| **Date** | **Document** | **Bates No.** |
| 2024-10-30 | Agenda | COSB AR000001-AR000004 |
| Various | Noticing Documents | COSB AR000005-AR000014 |
| 2024-10-22 | Staff Report | COSB AR000015-AR000067 |
| 2024-10-30 | Attachment A – Findings | COSB AR000068-AR000180 |
| 2024-10-30 | Attachment B1 – Conditions of Approval (SYI FDP Permit 87-DP-32cz RV06) | COSB AR000081-AR000160 |
| 2024-10-30 | Attachment B2 – Conditions of Approval (POPCO Gas Plant FDP Permit) | COSB AR000161-AR000187 |
| 2024-10-30 | Attachment B3 – Conditions of Approval (Las Flores Pipeline System FDP) | COSB AR000188-AR000236 |
| 2024-10-22 | Attachment C – CEQA Notice of Exemption | COSB AR000237-AR000239 |
| 2024-03-14 | Attachment D - 25B Permit Amendment Applications | COSB AR000240-AR000312 |
| 2024-07-01 | Attachment E1 – Transition Plans (SYU-POPCO) | COSB AR000313-AR000328 |
| 2024-07-01 | Attachment E2 – Transition Plans (Las Flores Pipeline) System) | COSB AR000329-AR000343 |
| 2024-02-01 | Attachment F – Compliance Plans | COSB AR000344-AR000344 |
| | -     Las Flores Pipeline Integrated Contingency Plan redacted (1) | COSB AR000345-AR000633 |
| | -     Las Flores Pipeline Noise Monitoring and Control Plan Redacted (2) | COSB AR000634-AR000640 |
| | -     Las Flores Pipeline Pump Station Fire Protection Plan_Redacted (3) | COSB AR000641-AR000670 |
| | -     Las Flores Pipeline SIMQAP REDACTED (4) | COSB AR000671-AR000745 |
| | -     Las Flores Pipeline Site Security Plan_Redacted (5) | COSB AR000746-AR000749 |
| | -     SYU City of Santa Barbara Harbor Use Plan (6) | COSB AR000750-AR000775 |
| | -     SYU Groundwater Monitoring Plan (7) | COSB AR000776-AR000799 |
| | -     Integrated Noise Monitoring Plan Redacted (8) | COSB AR000800-AR000901 |
| | -     SYU POPCO ERP Redacted (9) | COSB AR000902-AR001282 |
| | -     SYU POPCO Fire Protection Plan_Redacted (10) | COSB AR001283-AR001518 |
| | -     SYO POPCO NGL Inventory Management Plan Redacted (11) | COSB AR001519-AR001520 |
| | -     SYU POPCO Preservation Task List Redacted (12) | COSB AR001521-AR001528 |
| | -     SYU POPCO SIMQAP redacted (13) | COSB AR001529-AR001572 |
| | -     SYI Security Control Plan Redacted (14) | COSB AR001573-AR001683 |
| | -     SYU TRMPP (15) | COSB AR001684-AR001696 |
| 2024-09-11 | Attachment G - Certificates of Insurance | COSB AR001697-AR001700 |
| 2024-10-03 | Attachment H – Certificates of Financial Responsibility | COSB AR001701-AR001703 |
| 2024-10-22 | Applicant Submittal | COSB AR001704-AR001722 |
| 2024-10-24 | Public Comment Letters | |

**1.      Planning Commission Materials From October 30, 2024 Hearing**

| Date | Document | Bates No. |
|------|----------|-----------|
| | -      Public Comment Letter 1 | COSB AR001723-AR001758 |
| | -      Public Comment Letter 2 | COSB AR001759-AR001772 |
| | -      Public Comment Letter 3 | COSB AR001773-AR001844 |
| | -      Public Comment Letter 4 | COSB AR001845-AR001850 |
| | -      Public Comment Letter 5 | COSB AR001851-AR001861 |
| | -      Public Comment Letter 6 | COSB AR001862-AR001866 |
| | -      Public Comment Letter 7 | COSB AR001867-AR001972 |
| 2024-10-30 | Presentations | |
| | -      Staff Presentation | COSB AR001973-AR001985 |
| | -      Applicant Presentation | COSB AR001986-AR002004 |
| | -      EIR | COSB AR002005-AR002005 |
| | -      Slide | COSB AR002006-AR002006 |
| 2024-10-30 | Minutes | COSB AR002007-AR002009 |
| 2024-11-13 | Minutes | COSB AR002010-AR002013 |

**2.      Board of Supervisors Materials from February 4, 2025 Hearing**

| Date | Document | Bates No. |
|------|----------|-----------|
| 2025-02-04 | Agenda | COSB AR002014-AR002032 |
| 2024-02-04 | Noticing | COSB AR002033-AR002046 |
| 2024-02-04 | Board Letter | COSB AR002047-AR002049 |
| 2024-11-05 | Attachment A1 – CBD Appeal Letter | COSB AR002050-AR002057 |
| 2024-11-07 | Attachment A2 – EDC Appeal Letter | COSB AR002058-AR002169 |
| 2024-10-30 | Attachment B – Planning Commission Action Letter | COSB AR002170-AR002340 |
| 2024-10-22 | Attachment C – Planning Commission Staff Report | COSB AR002341-AR002673 |
| 2024-10-24 | Attachment  D - Public Comment Record | COSB AR002674-AR002923 |
| 2024-12-17 | Attachment E – Facilitation Report | COSB AR002924-AR002924 |
| 2024-02-04 | Minute Order | COSB AR002925-AR002926 |

**3.      Board of Supervisor Materials From February 24, 2025 Hearing**

| Date | Document | Bates No. |
|------|----------|-----------|
| 2024-02-25 | Agenda | COSB AR002927-AR002952 |
| 2025-02-25 | Board Letter | COSB AR002953-AR002969 |
| 2025-02-25 | Attachment A – Findings | COSB AR002970-AR002986 |
| 2025-02-25 | Attachment B – Conditions of Approval (B-1) | COSB AR002987-AR003067 |
| 2025-02-25 | Attachment B - Conditions of Approval (B-2) - POPCO Gas Plant FDP Permit No. 93-FDP-015 AM03 | COSB AR003068-AR003093 |
| 2025-02-25 | Attachment B - Conditions of Approval (B-3) - Las Flores Pipeline FDP Permit No. 88-DPF-033 | COSB AR003094-AR003142 |
| 2025-02-25 | Attachment C - CEQA Notice of Exemption | COSB AR003143-AR003145 |
| 2025-02-21 | Appellant Comment Letter - Center for Biological Diversity | COSB AR003146-AR003181 |
| 2025-02-18 | Appellant Exhibit - Center for Biological Diversity (1) | COSB AR003182-AR003195 |

| 2025 | Appellant Exhibit - Center for Biological Diversity (2) | COSB AR003196-AR003198 |
|---|---|---|
| 2025-02-25 | Appellant Comment Letter - Environmental Defense Center | COSB AR003199-AR003472 |
| 2025-02-21 | Appellant Accufacts, Inc. Report - Environmental Defense Center | COSB AR003473-AR003484 |
| 2025-02-21 | Appellant Economic Analysis - Environmental Defense Center | COSB AR003485-AR003493 |
| 2025-02-18 | Appellant References - Center for Biological Diversity & Wishtoyo Foundation - Volume 1 | COSB AR003494-AR003790 |
| 2025-02-19 | Appellant References - Center for Biological Diversity & Wishtoyo Foundation - Volume 2 | COSB AR003791-AR004014 |
| 2025-02-19 | Appellant References - Center for Biological Diversity & Wishtoyo Foundation - Volume 3 | COSB AR004015-AR004384 |
| 2025-02-19 | Appellant References - Center for Biological Diversity & Wishtoyo Foundation - Volume 4 | COSB AR004385-AR004544 |
| 2025-02-19 | Appellant References - Center for Biological Diversity & Wishtoyo Foundation - Volume 5 | COSB AR004545-AR004691 |
| 2025-02-19 | Appellant References - Center for Biological Diversity & Wishtoyo Foundation- Volume 6 | COSB AR004692-AR005025 |
| 2025-02-19 | Appellant References - Center for Biological Diversity & Wishtoyo Foundation - Volume 7 | COSB AR005026-AR005178 |
| 2025-02-19 | Appellant References - Center for Biological Diversity & Wishtoyo Foundation - Volume 8 | COSB AR005179-AR005232 |
| 2025-02-21 | Applicant Appeal Response | COSB AR005233-AR005257 |
| 2023-09-21 | Applicant Exhibits | COSB AR005258-AR006102 |
| 2025-01-20 | Public Comment - Group 1 | COSB AR006103-AR006124 |
| 2025-02-19 | Public Comment - Group 2 | COSB AR006125-AR006176 |
| 2025-02-20 | Public Comment - Group 3 | COSB AR006177-AR006252 |
| 2025-02-21 | Public Comment - Group 4 | COSB AR006253-AR006425 |
| 2025-02-24 | Public Comment - Group 5 | COSB AR006426-AR006498 |
| 2025-02-24 | Public Comment - Group 6 | COSB AR006499-AR006500 |
| 2025-02-25 | Public Comment - Group 7 | COSB AR006501-AR006509 |
| 2025-02-19 | Public Comment - City of Buellton | COSB AR006510-AR006512 |
| 2025-02-11 | Public Comment - City of Goleta | COSB AR006513-AR006516 |
| 2025-02-19 | Public Comment - City of Santa Barbara | COSB AR006517-AR006519 |
| 2025-02-21 | Public Comment - WE Watch | COSB AR006520-AR006521 |
| 2025-02-21 | Public Comment - Gray Panthers Santa Barbara Network | COSB AR006522-AR006523 |
| 2025-02-21 | Public Comment - Live Oak Unitarian Universalist Congregation of Goleta Social Justice Ministry | COSB AR006524-AR006525 |
| 2025-02-24 | Public Comment - Santa Barbara South Coast Chamber of Commerce | COSB AR006526-AR006527 |
| 2025-02-24 | Public Comment - Exxon Mobil | COSB AR006528-AR006529 |
| 2025-02-24 | Public Comment - Law Office of Janean Acevedo Daniels | COSB AR006530-AR006531 |
| 2025-02-25 | Staff Memorandum - Public Comment Not Considered or Accepted into the Official Record | COSB AR006532-AR006594 |
| 2025-02-25 | Staff Presentation | COSB AR006595-AR006615 |
| 2025-02-25 | Appellant Presentation - Center for Biological Diversity | COSB AR006616-AR006628 |
| 2025-02-25 | Appellant Presentation - Environmental Defense Center | COSB AR006629-AR006647 |
| 2025-02-25 | Applicant Presentation | COSB AR006648-AR006667 |
| 2025-02-25 | Speaker Slips | COSB AR006668-AR006752 |

| 2025-02-25 | Minute Order | COSB AR006753-AR006755 |
| 2025-02-25 | Memo: Planning Project/Appeal Hearing Time Estimate | COSB AR006756-AR006758 |
| 2025-02-25 | Memo: Departmental Presenter List | COSB AR006759-AR006759 |

| 4. Board of Supervisors Materials from Closed Session on April 16, 2025 | | |
|---|---|---|
| **Date** | **Document** | **Bates No.** |
| 2025-04-16 | Closed Session Agenda, 04-16-2025 | COSB AR006760-AR006767 |
| 2025-04-16 | Closed Session Agenda, 04-16-2025 – Attachment | COSB AR006768-AR006770 |
| 2025-02-26 | Applicant Letter to Santa Barbara County Planning Director | COSB AR006771-AR006773 |
| 2025-03-01 | Appellant EDC Letter to Board of Supervisors | COSB AR006774-AR006778 |
| 2025-04-17 | Closed Session Minutes, 04-17-2025 | COSB AR006779-AR006786 |

| 5. Transcripts | | |
|---|---|---|
| **Date** | **Document** | **Bates No.** |
| 2024-10-30 | Transcript of Planning Commission Hearing on October 30, 2024. | COSB AR006787-AR006939 |
| 2025-02-25 | Transcript of Board of Supervisors Hearing on February 25, 2025. | COSB AR006940-AR007207 |
| 2025-02-26 | Transcript of Planning Commission Hearing on February 26, 2025. | COSB AR007208-AR007221 |

24 consecutive months.[2] Many of California's idle wells are long-term idle wells—wells that have been idle wells for eight or more years.[3] These idle wells are potentially at risk of becoming orphan wells. If not properly maintained or plugged, idle and orphan wells can present a potential environmental hazard. In some cases, these wells may provide a source for fluid and gas migration to unwanted zones. For example, they may leak oil, injected fluids, or formation water into nearby underground drinking water or surface water reservoirs, or release methane or other gases into groundwater or the atmosphere.

**From idle to orphan**

Wells are not always plugged and decommissioned immediately after production ceases. Operators often maintain wells in a nonproductive, idle state—either to preserve the option of resuming production in the future, or simply to defer the expense of permanently plugging the well.

It costs much less in the short term for operators to maintain a well in an idle state than to properly plug and decommission a well. In California, the required fees to maintain an idle well range from $150 per year to $1,500 per year. This approach also maintains the potential to return the well to production if energy prices increase. Although this "option value" from the ability to resume production can in principle be quite important, research in Alberta, Canada, has shown the decision to leave a well idle is more often driven by a desire to defer decommissioning costs on wells with little likelihood of resuming production (Muehlenbachs, 2015). Ultimately, some operators may declare bankruptcy in order to relinquish their leases and forfeit any requirement to plug and decommission the well, potentially leaving the costs to the governmental regulator.

Wells deserted by insolvent operators become orphan wells. Since orphan wells have no financially viable operator, the State may become responsible for plugging and decommissioning costs. At this point, the State may use the available indemnity bond funds on file, if any, to contribute toward the cost of plugging and decommissioning the well.

Orphan wells are a concern in every state and region that produces oil and gas. At the federal level, a recent study by the U.S. Government Accountability Office (GAO) made several recommendations to the U.S. Department of Interior in order to better protect against billions of dollars of potential decommissioning liabilities for offshore wells in the Gulf of Mexico (GAO, 2016). In Alberta, Canada, potential liabilities were estimated at between $129 million and $257 million for known orphan wells, with the total costs of well liabilities (when considering potential future insolvencies) estimated at up to $8.6 billion (Dachis et al., 2017).

---

2.  PRC §3008(d) Wells that for 24 consecutive months have not produced oil or gas, or have not produced water used to stimulate production, for enhanced oil recovery, reservoir pressure management, or injection.

3.  PRC §3008(e).

COSB AR004685

### Recent offshore cases in California: Rincon Island and Platform Holly

In California, there have been several prominent cases where the State has had to take responsibility for an oil or gas field. Two offshore facilities in southern California and their associated wells recently became the responsibility of the State: Rincon Island in Ventura County and Platform Holly in Santa Barbara County. Offshore wells are much more expensive to plug and decommission than their onshore counterparts—often amounting to millions of dollars rather than thousands—and have a high priority to plug due to their environmental risk. For these reasons, operators of offshore wells are required to file higher amounts of security than what is required for onshore wells, either as part of their lease with the State or under Division regulations. This security, typically in the form of a surety bond, is intended to protect the State against losses in the event that the operator cannot afford the cost of plugging and decommissioning their wells. However, at Rincon Island and Platform Holly, the security amounts available were not enough for either facility. The State Lands Commission (the Commission) is responsible for managing leases on submerged lands in the state, including the three miles off the Pacific coast. The Commission requested $108.5 million over three years from the state's General Fund to plug and decommission the wells (California State Lands Commission, 2018a), in addition to millions already appropriated to maintain and monitor the wells.

**Finding 1-3:** The amount of an indemnity bond may not be adequate to cover the actual plugging and decommissioning costs. For example, bonds on file from the leases at Rincon Island and Platform Holly, $10 million and $22 million, respectively, were a fraction of the estimated costs of over $100 million for both leases.

In the case of Rincon Island, operated by Rincon Island Limited Partnership, the lease had not produced oil or gas since 2008. According to a staff report, Commission staff were prepared to recommend termination of the lease in August 2016 over regulatory violations (potentially risking environmental contamination) and other lease requirements. However, Rincon Island Limited Partnership filed for chapter 11 bankruptcy before the lease was terminated (Fabel & Blackmon 2018). After bankruptcy and eventual relinquishment of the leases, the Commission—with no responsible operator available to take over—entered into an emergency contract with a company to oversee the wells. The Commission also obtained $8 million in a settlement agreement with prior lessee ARCO and worked to secure a combined $10 million surety bond that was held by Rincon Island Limited Partnership.[4] The cost to plug the 49 wells and decommission the facilities at Rincon Island was estimated to be around $50 million over three years (California State Lands Commission 2018a).

At Platform Holly, which had been non-operational since the Refugio Oil Spill in May 2015, the operator Venoco relinquished its leases of the South Ellwood Field in April 2017 and filed

---

4.  According to a February 2018 SLC staff report (Fabel & Blackmon), the Division requested their combined $350,000 bond be released to the Commission, which holds a $9.65 million bond.

COSB AR004686

a petition for relief under chapter 11 bankruptcy, returning the lease and the platform's 32 wells to the Commission. The Division subsequently ordered that the Venoco wells be plugged and abandoned. When Venoco was unable to do so, the Commission called on and received Venoco's $22 million bond. This bond amount was intended to be larger. In August 2013, an amendment to the lease included provisions for increasing the bond amount incrementally by $4 million per year to eventually reach $30 million in September 2018. This amount was intended to be adjusted in 2025 and every 10 years to accurately reflect the full cost of Venoco's liabilities (California State Lands Commission, 2013).

In 1997, Venoco became the third operator assigned to the lease, following approximately 28 years by ARCO and 4 years by Mobil Oil Company. Under California law, the Division can pursue previous operators as far back as January 1, 1996, for plugging and decommissioning responsibilities. After calling on Venoco's bond, the Commission sought an agreement with the prior lessee, now ExxonMobil, to plug and abandon the wells. In August 2017, the Commission and ExxonMobil filed a letter of intent to discuss the plugging and abandonment of the Venoco wells and collaborated to assess needed repairs that would ease the plugging process. Meanwhile, the Commission hired a contractor to take over daily operations of Platform Holly. Anticipating a potentially lengthy process to reach a final agreement on the extent of liability and funding amount with ExxonMobil—and recognizing the urgency of the situation—the Commission requested $58.04 million from the General Fund to manage the platform and plug and abandon the wells  (California State Lands Commission 2018a). In June 2018, the Commission and ExxonMobil entered into a Phase 1 agreement for plugging and abandoning the 32 wells on site, with provisions addressing contested wells modified by Venoco (California State Lands Commission and Exxon Mobil 2018).

In response to these recent offshore bankruptcies, the Governor signed legislation in September 2018 to specifically address any inadequate financial security of offshore oil and gas wells in California (SB 1147, Hertzberg).

**The decommissioning of onshore wells**

Though these recent cases highlight the more expensive and complicated nature of the offshore plugging and decommissioning process, most wells in California are located onshore. In fact, offshore wells account for just over 2% of all wells in California and, as of January 2018, there were only 19 offshore leases remaining in the state (California State Lands Commission, 2018b). No new offshore lease has been approved by the Commission since 1968.

Like their offshore counterparts in California, onshore wells can also be hazardous and expensive to decommission, especially in dense urban areas. In 2004, an orphan well leaked in a neighborhood in the city of Huntington Beach for several hours. An emergency rig was called in to plug the well (Division of Oil, Gas, and Geothermal Resources, 2011). In 2016, two buried orphan wells were discovered on Firmin Street in the residential Echo

COSB AR004687

Park neighborhood of downtown Los Angeles after reports of an odor coming from one of the wells. Drilled before 1903, these wells were deserted by their operators. The Division utilized industry funds from their orphan wells program to properly plug the wells. It cost the Division more than $1 million to plug the wells, according to its own estimates. The expense of such onshore projects, along with the sheer number of onshore wells and their location throughout the state, makes them a major point of concern for the State in terms of potential liabilities.

**Finding 1-4:** The vast majority (nearly 98%) of wells in the state are located onshore. The vast majority of idle wells in the state are also onshore.

**Conclusion 1-1:** Recent cases in California highlight the potentially expensive and complicated nature of plugging and decommissioning offshore wells and the difficulty of determining liabilities following bankruptcy. As most of California's wells are located onshore, it will be important to assess the potential liabilities for onshore wells in situations where idle wells may become orphan wells.

Considering these recent experiences and concerned about the potential cost and liabilities associated with plugging and decommissioning both existing orphan wells and wells that may become orphaned—which may include some of the thousands of idle and long-term idle wells—the Division asked CCST to assess these potential costs. CCST was also asked to look at the policies of other states and regions regarding orphan well management and cost recovery for how they could inform California policy. To accomplish these tasks, the CCST study team undertook a literature review and examined available datasets from the Division and elsewhere. Through meetings, investigations, and literature and data review, the CCST study team has drafted this report to address the questions and concerns of the Division.

COSB AR004688

# Conclusion

Significant financial concerns exist about decommissioning inactive wells—that is, permanently plugging the wells and reclaiming the surrounding well sites. All producing states and regions face challenges with managing and decommissioning what are known as orphan wells, those without a responsible owner. Since drilling began in the United States in the 1850's, over 2.5 million wells have ceased production. As of 2007 at least 149,000 of these are known to be orphan wells, though the actual number of orphan wells requiring potential remediation is almost certainly significantly higher.

Even the most productive well has a certain useful lifetime. Plugging the well properly at the end of this lifetime can be an expensive procedure whose cost can fluctuate significantly depending on numerous factors, including the well's depth, location, and the price of oil. Wells often pass through the hands of multiple operators through their operational lifetime; frequently operators controlling wells near the end of their lifetime are smaller companies more vulnerable to bankruptcy or dissolution, resulting in orphan wells which the state must then step in and plug itself.

As the overall number of wells has increased, so too has the number of orphan wells, and concomitantly the various states' financial burden. In recent years, state legislatures and oil and gas regulators have increased funding for well cleanup by appropriating more money and increasing bonding requirements. They also have tried to make it harder for companies to walk away from their wells, such as by intervening earlier to prod companies to reactivate or plug wells that are sitting idle.

California, like many states, has devoted increasing effort in recent years to designing a regulatory framework which seeks to both reduce the number of operators orphaning wells in the first place and secure financial assurances adequate to pay for plugging the well when necessary. Currently, California requires well operators to obtain individual or blanket bonds prior to drilling, reworking, or acquiring a well or wells. The amount of the bond required depends on the depth of the well, the number of wells owned by the operator, and the location of the well; bond amounts for most wells range from $25,000 for a single well to $3,000,000 for a blanket bond covering multiple wells. Offshore wells, which comprise only 2% of wells in California but are much more expensive to plug, require an additional bond. The State also collects fees on wells that are kept idle by operators. While the effective amount of bond funds varies across wells, an analysis of the Division data shows that bond funds are typically far below likely plugging and remediation costs.

The Division is currently in the process of implementing updates to their idle well fee and management requirements, including new idle well testing and reporting requirements. These requirements are intended to improve management of this population of wells and protect the State and public against both environmental and financial costs. Future

COSB AR004689

evaluation efforts will gauge the success of these new regulations. For now, at least, there remain significant financial concerns about the existing inventory of orphan wells and the stock of inactive wells that could be orphaned.

While the State currently maintains a comprehensive list of idle (non-producing) wells, the share of these wells that are orphan wells is unknown. A coarse analysis of data provided by the Division on 228,648 wells suggests there are 2,565 "likely" orphan wells belonging to operators with no reported California activity in five years, and an additional 2,975 wells at high risk of becoming orphaned, which have had no production over the past five years and are owned by smaller operators with primarily low-producing wells (which other research suggests are more likely to orphan wells). After subtracting out bond funds associated with the wells, the potential net liability to the State for wells in these categories is about $500 million. There are an additional 69,425 idle and marginal wells and 31,722 higher-producing wells. The eventual cost to plug and abandon all existing wells in California is found to be about $9.1 billion. The share of this long-run cost that will be borne by the State (as opposed to operators) will depend on policy, market outcomes, and other factors.

It is too soon to tell whether California's current bond requirements and idle well fee collection will prove adequate to cover the cost of orphan well plugging in upcoming years. One of the most significant challenges facing California, along with every other state, is inadequate data. It is not possible to adequately assess the scope of the problem when information about the status of idle wells is incomplete and gathered intermittently. For one thing, existing wells in California may be grandfathered in under previous bond requirements if operators have not reworked or acquired any wells since the most recent requirements were implemented. Also, some wells may have had their bonds released upon well completion, prior to plugging and decommissioning, under old requirements. This contrasts with the approach taken in other states such as Texas, which has implemented a universal bond requirement applicable to all wells, and which was one of the few whose available bond funds have been sufficient to offset the cost of plugging orphan wells in recent years.

As noted earlier, California's situation is not unique. Analyses have found that most states struggle to meet the costs of plugging orphan wells and typically decommission only a fraction of known orphan wells each year. Like California, the states surveyed have updated their regulations in recent years but these efforts have generally proven insufficient to meet expenses so far.

The estimates we provide in this paper are preliminary and based on coarse sorting criteria using available data. As the Division implements the updated idle well regulations, with mandatory annual reporting requirements, California will gain a more comprehensive and accurate list of remaining hazardous and orphan wells, along with a better sense of responsible operators based on compliance with the updated requirements.

Historical experience and policy analysis in oil-producing regions throughout North

COSB AR004690

Conclusion

America demonstrate the urgency and importance of orphan and idle well regulation. Most studies agree that higher bond requirements for operators will more fully mitigate the State's orphan well liabilities. Laws governing the priority of decommissioning costs are also important in determining potential costs to governments when operators become insolvent.

California's recent regulatory changes are encouraging. However, it is essential that California continue to evaluate the status of its potential financial liability in upcoming years. A more detailed analysis will be necessary once the State's new idle well reporting requirements are in place, in order to ascertain the State's actual and potential liability more accurately.

The State must also be prepared to accept the fact that, due to the rising number of wells overall, cost to plug each well, and number of older wells requiring remediation, it is likely that any financial assurance model based on a static cost level will require periodic revision. Hopefully, the new information collected and subsequent analyses will help ensure that the State is in a better position to understand its liability, and that such revisions may be implemented in a timely manner.

COSB AR004691

Katherine  Douglas    *Appellant  References*    # 1 LATE DIST

| | |
|---|---|
| **From:** | Cynthia Elkins <CElkins@biologicaldiversity.org> |
| **Sent:** | Wednesday, February 19, 2025 11:20 PM |
| **To:** | sbcob |
| **Subject:** | Vol. 6 – References in support of appeal - SYU transfers, case no. 24APL-00025 |
| **Attachments:** | Vol 6_CBD References - SYU Appeal (Docs 33 - 56).pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

**Caution:** **This email originated from a source outside of the County of Santa Barbara. Do not click links or open attachments unless you verify the sender and know the content is safe.**

**Volume 6 of 8 attached**

Dear Supervisors and Clerk Alexander,

Please see the attached references submitted on behalf of the Center for Biological Diversity and Wishtoyo Foundation, which are submitted in support of our appeal of the Planning Commission's approval of Sable Offshore Corp.'s application to transfer the Final Development Permits for the Santa Ynez Unit, Pacific Offshore Pipeline Company Gas Plant, and Las Flores Pipeline System. Our comments were submitted under a separate cover.

Hard copies of the attached are also being sent by FedEx, and they are also available to download at the following link:

https://www.dropbox.com/scl/fo/bilsgpxu2mi3tltl4ct9u/AO88HVAbP3ZuC5KiHT3bTN0?rlkey=pq3yyzbipp074lqqe5w8x8cuh&st=uwx4ibd0&dl=0

Please include these references as part of your administrative record for this matter, and please contact me if there are any questions or problems in receiving them.

Thank you for your time and assistance, and for your consideration of our comments and concerns.

Sincerely,
Cynthia Elkins, Senior Paralegal
Center for Biological Diversity
celkins@biologicaldiversity.org
(707) 358 – 0430

COSB AR004692

# REFERENCES

Volume 6
Documents 33–56

Submitted on Behalf of the Center for Biological Diversity and Wishtoyo Foundation

Case No. 24APL-00025

COSB AR004693

Meeting Date: 08/29/24
Work Order Number: 30134
Staff: C. Herzog,
M. Wiemer

# Staff Report 71

## PARTY:

California State Lands Commission

## PROPOSED ACTION:

Consider certification of a Final Environmental Impact Report, State Clearinghouse No. 2022100043; adoption of a Mitigation Monitoring Program and Statement of Findings; and authorization to proceed with the Rincon Island, Onshore Facility (Option 2), and Onshore Pipeline Connections (OPC) components of the Rincon Phase 2 Decommissioning Project (Project).

### AREA, LAND TYPE, AND LOCATION:

Rincon Island is located approximately 3,000 feet offshore of Punta Gorda in Ventura County, approximately 7 miles northwest of the city of Ventura, California (Figures 1 and 2, below). Rincon Island is located immediately offshore of the community of Mussel Shoals and approximately 0.5 mile south of the community of La Conchita. The Island is located in approximately 55 feet of water. The Rincon Island Causeway (causeway), or access pier, connects the Island to the coast. Rincon Island and the causeway are located on sovereign submerged lands and tidelands and are associated with former State Oil and Gas Lease PRC 1466.

The Onshore Facility consists of a 6.01-acre parcel of sovereign filled tidelands located 1.3 miles to the east and downcoast of Rincon Island at 5750 W. Pacific Coast Highway (PCH), Ventura, and is associated with former State Oil and Gas Leases PRC 145, PRC 410, and PRC 1466. Rincon Island and the Onshore Facility were previously connected by a pipeline system, until they were disconnected in 2021 as part of the well plugging and abandonment process.

The OPC consist of one 6-inch-diameter oil pipeline and one 6-inch-diameter gas pipeline that were used to transport oil and gas production from Rincon Island to

1

shore and that run from the causeway abutment under Ocean Avenue through the community of Mussel Shoals, and then under U.S. Highway 101, to a vault box north of the Union Pacific Railroad and U.S. Highway 101, within the Railroad right-of-way. The OPC are accessed from uplands landward of the mean high-tide line within Assessor's Parcel Numbers (APNs) 060-0-090-010 and 060-0-090-125. The pipelines traverse through a Ventura County right-of-way between these two APNs. The OPC are not on sovereign lands and are outside of the Commission's jurisdiction.

A State Coastal Conservancy (SCC) Parcel, included in the EIR decommissioning analysis, is located just east of the causeway landing (abutment) within APN 060-0-090-425. The SCC Parcel is under SCC's jurisdiction, not within the Commission's jurisdiction, except for the portion of the parcel waterward of the mean high-tide line.

**Figure 1. Site Location Map**

COSB AR004695

**Figure 2. Project Sites Overview Map**



# BACKGROUND:

Rincon Island was constructed in 1959 and, along with the Onshore Facility and the adjacent privately owned Coast Ranch parcel, used for oil and gas production. The Commission historically issued leases to oil production companies for this purpose. Rincon Island Limited Partnership (RILP) was the most recent lessee of these lands, producing oil and gas under State Oil and Gas Leases PRC 145, PRC 410, and PRC 1466.

### LESSEE INSOLVENCY AND QUITCLAIM TO STATE

Oil and gas production from Rincon Island ceased in 2008, due partially to deterioration of and damage to the causeway (which has since been repaired). In November 2014, Commission staff identified regulatory violations at Rincon Island that posed a significant risk to the environment and health and safety and worked with the California Geologic Energy Management Division (CalGEM) to address the violations. After missing key compliance deadlines and making only minimal progress to address well pressurization concerns and other safety and regulatory

3

deficiencies, staff scheduled a recommendation for the Commission to terminate the leases at its August 9, 2016 meeting. Before this could take place, RILP filed bankruptcy on August 8, 2016, and in December 2017, quitclaimed (transferred) its lease interests to the Commission. RILP later liquidated, dissolved, and failed to plug and abandon the oil wells and decommission the facilities associated with these leases, as was required by the leases.

The State of California, by and through the Commission, began decommissioning the oil and gas facilities and preparing for the final decommissioning of Rincon Island. Throughout this process, the Commission has worked closely with other agencies including CalGEM, the State Water Resources Control Board and Los Angeles Regional Water Quality Control Board (RWQCB, and collectively with the State Water Resources Control Board, the Water Boards), California Department of Fish and Wildlife's Office of Spill Prevention and Response (OSPR), California Coastal Commission, California Department of Transportation (Caltrans), California Department of Forestry and Fire Protection (CAL FIRE), and the County of Ventura, including the Ventura County Air Pollution Control District, Ventura County Resource Management Agency, and Ventura County Public Works Department.

The bankruptcy and liquidation of RILP created legal challenges for public agencies and private landowners seeking to protect against and remediate harms posed by RILP's desertion of its oil and gas facilities.

### DECOMMISSIONING PHASES

Phase 1 of the decommissioning process included the plugging and abandonment of all oil and gas wells and the removal of service equipment at Rincon Island, the Onshore Facility, and the adjacent privately owned Coast Ranch parcel. Phase 1 activities were completed in June 2021, and the facilities are currently in "caretaker" status, meaning they do not require a full-time operator for safety or pollution prevention.

Phase 2 began with the development of the Rincon Phase 2 Decommissioning Feasibility Study (Feasibility Study) that was completed in July 2022 (Item 47, August 23, 2022). The Feasibility Study provided information from technical studies and public input to inform staff's recommendations to the Commission for a proposed Rincon Phase 2 Decommissioning Project to be evaluated in compliance with the California Environmental Quality Act (CEQA). Because decommissioning is a "project" as defined by CEQA, the Commission prepared an Environmental Impact Report (EIR) (see discussion below) to complete Phase 2.

COSB AR004697

The goals of the Project analyzed in the EIR are to remediate and decommission the facilities previously used to produce oil and gas in accordance with existing federal, state, and local laws. The Project activities approved by the Commission will be implemented during Phase 3 (the timing of which is dependent on future funding) to prepare Rincon Island and the Onshore Facility to be leased for new uses, including but not limited to co-management with sovereign tribal nations, consistent with the Public Trust. The Project does not include proposals for future use. Any future use would be subject to additional review under CEQA.

### STATE COASTAL CONSERVANCY PARCEL

In Mussel Shoals, adjacent to the causeway landing, there is a parcel of oceanfront property that a private party donated to SCC several decades ago (the SCC Parcel). At the request of SCC, due to the proximity of the SCC Parcel to Rincon Island, the SCC Parcel was included in the EIR to analyze options for improving that parcel to enhance public access. SCC and Commission staff have discussed potentially transferring the jurisdiction of the SCC Parcel from SCC to the Commission, but to date, no such transfer of jurisdiction has been authorized. Because the SCC Parcel is within SCC's jurisdiction, the SCC Parcel component of the Project analyzed in the EIR is not recommended for consideration and approval by the Commission.

### DECOMMISSIONING FUNDING

The Commission collected a $9.65 million performance bond it held for the leases to fund decommissioning activities. Commission staff also negotiated a settlement with ARCO, a prior lessee of the Rincon facilities, pursuant to a previously approved assignment agreement. ARCO paid $8 million to the Commission to contribute to decommissioning costs incurred by the State. The Commission approved the settlement in closed session at its April 2017 meeting. (See Item 77, August 17, 2017, for more information about the settlement and the history of RILP's lease compliance issues and bankruptcy.)

Because this total of $17.65 million was insufficient to fund decommissioning costs, the Commission received a legislative appropriation of $50.46 million in Fiscal Year 2018-2019 for Phase 1 of the decommissioning process (plug and abandonment of wells) and a second legislative appropriation of $2.5 million in Fiscal Year 2020-2021 for Phase 2 of the decommissioning process (environmental analysis). An additional legislative appropriation will be needed for Phase 3 (implementation of the decommissioning plan).

COSB AR004698

Nevertheless, **MM WF-1a** and **MM WF-1b** would be implemented, as outlined in Impact WF-1, to ensure the impact would be less than significant.

> **MM WF-1a:** Fire Management and Prevention Plan

> **MM WF-1b:** Ventura County Noticing Requirements

LEVEL OF SIGNIFICANCE AFTER MITIGATION. With the mitigation described above, this impact is reduced to a less than significant level.

## D.    FINDINGS ON ALTERNATIVES

As explained in *California Native Plant Society* v. *City of Santa Cruz* (2009) 177 Cal. App. 4th 957, 1000:

> *When it comes time to decide on project approval, the public agency's decisionmaking body evaluates whether the alternatives [analyzed in the EIR] are actually feasible…. At this final stage of project approval, the agency considers whether '[s]pecific economic, legal, social, technological, or other considerations…make infeasible the mitigation measures or alternatives identified in the environmental impact report.' Broader considerations of policy thus come into play when the decisionmaking body is considering actual feasibility than when the EIR preparer is assessing potential feasibility of the alternatives [citations omitted].*

Two CEQA alternatives proposed and evaluated in the Feasibility Study were rejected from further consideration in the Final EIR for the following reasons:

1) **Full Removal of Rincon Island**

   Full Removal of Rincon Island was eliminated from further consideration based on the preliminary assessment within the Project Feasibility Study (https://slc.ca.gov/oil-and-gas/rincon-phase-2-decommissioning-feasibility-study/), which confirmed Rincon Island as a unique marine habitat in this area and concluded that removing Rincon Island would be unfavorable and have greater impacts than any of the other options or Alternatives considered. Additionally, both the general public and regulatory agencies submitted comments during the Feasibility Study and Notice of Preparation regarding interest in retaining Rincon Island in support of potential future reuse, including recreational, tribal cultural, and commercial activities.

2) **Rincon Island Surface Structure Removal and Foundation Replacement (Component Plan 2A from the Feasibility Study)**

   Component Plan 2A from the Feasibility Study was based on removal of

the three remaining surface structures on Rincon Island, including their foundations. The remaining foundation footprints would be paved to match the surrounding paving. The existing island pavement would be left in place. Under Component Plan 2A, the residual hydrocarbon contamination in the soil and interstitial water would remain encapsulated under the existing pavement. This alternative would significantly lessen impacts related to waste transport and disposal but would not meet the Project objective of remediating contamination on Rincon Island.

Prior to preparing the EIR, the Commission prepared a Feasibility Study (https://slc.ca.gov/oil-and-gas/rincon-phase-2-decommissioning-feasibility-study/), completed in July 2022, that provided information from technical studies and public input to inform staff's recommendations to the Commission for a proposed Project to be evaluated in an EIR (Item 47, August 23, 2022). The Feasibility Study evaluated three Project scenarios (referred to in the Study as "Reefing," "Reuse," and "Removal" Alternatives) that included a number of Project components. As summarized in the Study findings, it was concluded that the Feasibility Study Reuse Alternative required the least number of tasks and would result in fewer temporary impacts associated with construction activities as compared to the other Alternatives. Based on this analysis, the Feasibility Study Reuse Alternative was chosen by the Commission (Item 47, August 23, 2022) to be further refined into the proposed Project being evaluated in the EIR.

Because the Project analyzed in the EIR was selected as a result of the Feasibility Study findings, which already included an alternatives analysis, there were no further reasonable alternatives available for consideration in the EIR that would accomplish the basic objectives of the Project and avoid or substantially lessen any significant effects.

However, several different alternatives were included in the EIR analysis in order to present a full range of scenarios based on public and agency input received throughout the Feasibility Study and EIR scoping process. In some cases, these alternatives were included despite the potential for increased environmental impacts in order to provide the Commission, other responsible agencies, tribal nations, and the public with a thorough understanding of the tradeoffs of other alternatives that could be considered.

The five alternatives analyzed in the Final EIR represent a reasonable range of potentially feasible alternatives that could reduce one or more significant impacts of the Project or present a full range of scenarios based on public and agency input. These alternatives include:

- No Project Alternative

- Reefing Alternative

- Abutment and Revetment Retention Alternative

- Partial Causeway Removal Alternative

- Offshore Disposal Alternative (Rincon Island)

As presented in the Final EIR, the alternatives were described and compared with each other and with the proposed Project.

Under State CEQA Guidelines section 15126.6, subdivision (e)(2), if the No Project Alternative is identified as the environmentally superior alternative, the EIR must also identify an environmentally superior alternative among the other alternatives. In the Final EIR, the No Project Alternative is not considered the environmentally superior alternative, therefore the State CEQA Guidelines do not require identification of an environmentally superior alternative among the remaining alternatives.

Based upon the objectives identified in the Final EIR and the detailed mitigation measures imposed upon the Project, the CSLC has determined that the Project should be approved, subject to such mitigation measures (Exhibit A, MMP).

COSB AR004701

# Decommissioning Costs Make Producing Projects Uneconomic

**JPT** jpt.spe.org/decommissioning-costs-make-producing-projects-uneconomic

Dwayne Purvis                                                    December 3, 2024

Decommissioning

**This article examines how decommissioning costs impact project viability, showing that operational profitability can mask uneconomic end-of-life obligations, and advocates for ethical diligence in assessing these costs.**



The difference between economically producible and economic lies in decommissioning costs and, thus, on the expectation of ultimate profits.
MicroStockHub/Getty Images

Contrary to common use of the terms, our resource definitions allow for the paradoxical situation in which reserves remain "economically producible" while the project as a whole is "uneconomic" and "noncommercial." The idea may seem contradictory because the

definitions do not explicitly treat this late-life dynamic, but it follows from the clear and simple definitions.

The difference between economically producible and economic lies in decommissioning costs and, thus, on the expectation of ultimate profits. The resource definitions are explicit about the need to treat decommissioning costs in initial evaluations but less clear about developed projects. Nevertheless, the dramatic effect on overall profit for many producing projects makes the need for treatment as clear as it is hard.

The Petroleum Resource Management System (PRMS) endorsed across our industry recognizes "Abandonment, Decommissioning, and Restoration (ADR)" as the "process (and associated costs) of returning part or all of a project to a safe and environmentally compliant condition when operations cease" (Glossary, 3.1.2). And the system explicitly requires that an undeveloped project cannot be initially deemed "commercial" unless the returns suffice also to pay for the ADR costs (Glossary, 2.1.2).

In practice, evaluations of undeveloped resources focus on financial returns and on the ability to execute, but it only makes sense that qualification must include other considerations: "Also, there must be evidence … the essential social, environmental, economic, political, legal, regulatory, decision criteria, and contractual conditions are met" (2.1.2).

To demonstrate the test of commerciality, the "Guidelines for Application of the Petroleum Resources Management System" (Rev. July 2022) includes an example cash flow reproduced in **Fig. 1**, a notional offshore development presumably designed with representative assumptions. The bars show the net cash flow of each year while the line represents the undiscounted cumulative total of net cash flow on the other axis. The gray region shows the time period during which this example maintains the paradox of economically producible reserves while being uneconomic and noncommercial as a project.



Fig. 1—Example cash flow.
Source: Guidelines for Application of the Petroleum Resources Management System

Section 3.1.2.1 of PRMS defines the three relevant terms. "Economically producible" applies when "net revenue from an ongoing producing project exceeds the net expenses" explicitly excluding ADR costs. However, the definition of "economic" looks at total remaining cash flow without exclusion; the term applies to "a project with a positive undiscounted cumulative net cash flow." A project is not economic when its remaining undiscounted cumulative net cash flow is not positive.

The definition of "commerciality" requires meeting the definition of economic plus other terms: "A project is commercial when it is economic, and it meets the criteria discussed in Section 2.1.2." Thus, no uneconomic project can be commercial.

Applying these terms to the PRMS example, decommissioning costs paid at the end of life equal the projected net cash flow from the last 13 years of operations, assuming no funds have been set aside for the obligation. (Because the PRMS explicitly prescribes evaluation at a project level, the corporate balance sheet does not affect the characterization of an

COSB AR004704

individual project.) During the shaded years (Fig. 1) the volumes continue to qualify as reserves because they remain economically viable to produce while, at the same time, the undiscounted future cash flow is negative.

Thus, despite having volumes characterized as reserves, the project as a whole is financially uneconomic and thus noncommercial, to the extent the term applies to producing projects. In fact, this demonstrative project is uneconomic and noncommercial for more than half of its operating life.

My reproduction of the example cash flow shows that the present value discounted at 10% does not become negative until there are 9 years of life remaining. Thus, a buyer could pay PV10% to purchase a property during mid-life, operate it profitably for many years, and then pay decommissioning costs greater than all its historical proceeds.

Over the period of ownership, the "investor" would lose not only their entire purchase price but also all of proceeds of operations. The concepts of present value and rate of return have very different meanings when the investor loses money at the end of the day. And that is the reason that decommissioning costs must be included and explained in economic evaluations. (For a fuller discussion, see SPE 210226, "Economic Yardsticks for the End of Economic Life: Holdback and Its Adjuncts."

PRMS—and all the other standards for evaluations published by our Society—serve the same purpose: to clearly, accurately, and consistently reflect reality. In the case when "social, environmental, economic, political, legal, [and] regulatory" requirements meaningfully affect cash flow expectations, decommissioning costs become an issue of ethics. Not including decommissioning costs, not evaluating them for reasonableness, and not explaining their significance can all lead to substantially misleading projections.

In my opinion, decommissioning costs should be treated with the same duty and diligence as operating costs. The PRMS can become more explicit, but in the meantime professional engineers can honor the economic significance of decommissioning under the yoke and the aegis of professional ethics. It may be bad news, hard to hear. But it is clearly our responsibility to differentiate become economic and uneconomic projects.

**For Further Reading**

SPE 210226 Economic Yardsticks for the End of Economic Life: Holdback and Its Adjuncts *by D. Purvis.*

# Topics

DecommissioningBusiness/economicsAsset/portfolio management

# Tags

PRMS

Dwayne Purvis

Dwayne Purvis, SPE, is a petroleum engineering consultant, writer, speaker, and trainer based in Texas. He assists operators, investors, NGOs, and others in making thorough analyses and circumspect decisions, especially in hard-to-understand reservoirs and complex situations. With nearly 30 years of practice in multiple leadership roles and projects around the world, Purvis has studied scores of fields and advised clients of all sizes. He graduated from Texas A&M University and recently earned a master's degree in sustainable energy from Johns Hopkins University.

See More Stories by Dwayne Purvis

**SANTA YNEZ UNIT (SYU)**
**Combined Balance Sheets**
*(dollars in thousands)*

|  | December 31, 2023 | December 31, 2022 |
|---|---|---|
| **ASSETS** | | |
| **Current Assets** | | |
| Materials and supplies | $ 16,213 | $ 17,211 |
| **Total Current Assets** | 16,213 | 17,211 |
| **Oil and Gas Properties (Successful Efforts Method)** | | |
| Oil and gas properties | 4,382,289 | 4,382,289 |
| Less: Accumulated depreciation, depletion, impairment, and amortization | (3,693,325) | (3,692,072) |
| **Total Oil and Gas Properties, net** | 688,964 | 690,217 |
| **Other, net** | 6,404 | 7,604 |
| **Total Assets** | $ 711,581 | $ 715,032 |
| **LIABILITIES AND PARENT NET INVESTMENT** | | |
| **Current Liabilities** | | |
| Accounts payable and accrued liabilities | $ 5,384 | $ 8,463 |
| Due to related party, net | 11,370 | 6,581 |
| Other | 1,148 | 1,140 |
| **Total Current Liabilities** | 17,902 | 16,184 |
| **Long Term Liabilities** | | |
| Asset retirement obligations | 349,138 | 329,375 |
| Other | 5,520 | 6,877 |
| **Total Liabilities** | 372,560 | 352,436 |
| **Commitments and Contingencies (Note 5)** | | |
| **Parent Net Investment** | 339,021 | 362,596 |
| **Total Liabilities and Parent Net Investment** | $ 711,581 | $ 715,032 |

The accompanying notes are an integral part of these combined financial statements.

4

# A Study for the Bureau of Safety and Environmental Enforcement (BSEE)



## Decommissioning Cost Update for
## Pacific Outer Continental Shelf Region Facilities

## Volume 2

Conducted by



InterAct PMTI
260 Maple Ct, Ste 210
Ventura, CA 93003
www.interactpmti.com
Project No. 140E0120P0007
September 2020

This report has been reviewed by the Bureau of Safety and Environmental Enforcement and approved for publication. Approval does not signify that the contents necessarily reflect the views and policies of the Bureau, nor does the mention trade names or commercial products constitute endorsement or recommendation for use.



## BSEE-POCSR
## Platform Decommission Task Information
## Harmony

| Task | Sub Task | PMEP | Misc.Work Provision | Weather | Task Cost,$ | Task Cost % |
|------|----------|------|---------------------|---------|-------------|-------------|
| Permitting and Regulatory | Permitting and Regulatory | | | | $ 1,437,000 | 0.77% |
| Platform Preparation | Initial Cost of Immediate Prep. | | | | $ 1,218,200 | 0.66% |
| Platform Preparation | Removal of Salvageable Equipment | | | | $ 1,400,000 | 0.75% |
| Platform Preparation | Lift Prep. | | | | $ 2,446,600 | 1.32% |
| Platform Preparation | Under Water Inspection | | | | $ 43,900 | 0.02% |
| Well Plugging and Abandonment | Phase I | | | | $ 7,058,800 | 3.80% |
| Well Plugging and Abandonment | Phase II | | | | $ 8,523,200 | 4.59% |
| Well Plugging and Abandonment | Phase III, included Conductor Removal | | | | $ 7,813,100 | 4.20% |
| Mobilization and Demobilization | Mob/Demob of Heavy Lift Vehicles | | | | $ 5,153,600 | 2.77% |
| Platform and Structure Removal | Topside Removal | | | | $ 2,479,700 | 1.33% |
| Platform and Structure Removal | Jacket Removal | | | | $ 71,903,200 | 38.69% |
| Pipeline and Power Cable Decommissioning | Pipeline Decom In Place - Federal Waters | | | | $ 3,183,100 | 1.71% |
| Pipeline and Power Cable Decommissioning | Power Cable Decom In Place - Federal Waters | | | | $ 980,000 | 0.53% |
| Platform Transportation and Disposal | Platform Disposal | | | | $ 25,651,500 | 13.80% |
| Platform Transportation and Disposal | Conductor Disposal | | | | $ 3,077,000 | 1.66% |
| Platform Transportation and Disposal | Power Cable Disposal | | | | $ 109,800 | 0.06% |
| Platform Transportation and Disposal | Pipeline Disposal | | | | $ 27,400 | 0.01% |
| Site Clearance | Site Clearance | | ☑ | | $ 776,600 | 0.42% |

| | | | |
|---|---|---|---|
| Sub Task Total | | $143,282,700 | 77.10% |
| Misc. Work Provision (15%) | | $20,719,400 | 11.15% |
| Weather Provision (10%) | | $10,782,600 | 5.80% |
| Project Management, Engineering & Planning (8%) | | $11,050,300 | 5.95% |
| | Total: | $185,835,000 | 100.00% |

COSB AR004709



**BSEE-POCSR**

**Platform Decommission Task Information**

**Heritage**

| Task | Sub Task | PMEP | Misc. Work Provision | Weather | Task Cost, $ | Task Cost % |
|------|----------|------|----------------------|---------|--------------|-------------|
| Permitting and Regulatory | Permitting and Regulatory | | | | $ 1,437,000 | 0.76% |
| Platform Preparation | Initial Cost of Immediate Prep. | | | | $ 1,224,200 | 0.65% |
| Platform Preparation | Removal of Salvageable Equipment | | | | $ 1,400,000 | 0.74% |
| Platform Preparation | Lift Prep. | | | | $ 2,443,400 | 1.29% |
| Platform Preparation | Under Water Inspection | | | | $ 43,900 | 0.02% |
| Well Plugging and Abandonment | Phase I | | | | $ 11,627,000 | 6.16% |
| Well Plugging and Abandonment | Phase II | | | | $ 13,362,200 | 7.08% |
| Well Plugging and Abandonment | Phase III, included Conductor Removal | | | | $ 8,903,300 | 4.72% |
| Mobilization and Demobilization | Mob/Demob of Heavy Lift Vehicles | | | | $ 5,153,600 | 2.73% |
| Platform and Structure Removal | Topside Removal | | | | $ 2,490,800 | 1.32% |
| Platform and Structure Removal | Jacket Removal | | | | $ 58,598,000 | 31.05% |
| Pipeline and Power Cable Decommissioning | Pipeline Decom In Place - Federal Waters | | | | $ 1,610,700 | 0.85% |
| Pipeline and Power Cable Decommissioning | Power Cable Decom In Place - Federal Waters | | | | $ 4,059,900 | 2.15% |
| Platform Transportation and Disposal | Platform Disposal | | | | $ 25,651,500 | 13.59% |
| Platform Transportation and Disposal | Conductor Disposal | | | | $ 2,355,500 | 1.25% |
| Platform Transportation and Disposal | Power Cable Disposal | | | | $ 264,300 | 0.14% |
| Platform Transportation and Disposal | Pipeline Disposal | | | | $ - | 0.00% |
| Site Clearance | Site Clearance | | ☑ | | $ 776,600 | 0.41% |

| | | |
|---|---|---|
| Sub Task Total | **$141,401,900** | 74.93% |
| Misc. Work Provision (15%) | $20,437,200 | 10.83% |
| Weather Provision (15%) | $15,981,000 | 8.47% |
| Project Management, Engineering & Planning (8%) | $10,899,900 | 5.78% |
| **Total:** | **$188,720,000** | 100.00% |

COSB AR004710



## BSEE-POCSR
## Platform Decommission Task Information
## Hondo

| Task | Sub Task | PMEP | Misc. Work Provision | Weather | Task Cost,$ | Task Cost % |
|------|----------|------|---------------------|---------|-------------|-------------|
| Permitting and Regulatory | Permitting and Regulatory | | | | $ 1,437,000 | 1.48% |
| Platform Preparation | Initial Cost of Immediate Prep. | | | | $ 1,037,300 | 1.07% |
| Platform Preparation | Removal of Salvageable Equipment | | | | $ 1,400,000 | 1.44% |
| Platform Preparation | Lift Prep. | | | | $ 2,101,200 | 2.16% |
| Platform Preparation | Under Water Inspection | | | | $ 43,900 | 0.05% |
| Well Plugging and Abandonment | Phase I | | | | $ 4,915,400 | 5.06% |
| Well Plugging and Abandonment | Phase II | | | | $ 6,219,000 | 6.41% |
| Well Plugging and Abandonment | Phase III, included Conductor Removal | | | | $ 5,087,600 | 5.24% |
| Mobilization and Demobilization | Mob/Demob of Heavy Lift Vehicles | | | | $ 5,153,600 | 5.31% |
| Platform and Structure Removal | Topside Removal | | | | $ 2,468,700 | 2.54% |
| Platform and Structure Removal | Jacket Removal | | | | $ 23,327,100 | 24.04% |
| Pipeline and Power Cable Decommissioning | Pipeline Decom In Place - Federal Waters | | | | $ 1,928,200 | 1.99% |
| Pipeline and Power Cable Decommissioning | Power Cable Decom In Place - Federal Waters | | | | $ 828,100 | 0.85% |
| Platform Transportation and Disposal | Platform Disposal | | | | $ 17,692,500 | 18.23% |
| Platform Transportation and Disposal | Conductor Disposal | | | | $ 1,280,000 | 1.32% |
| Platform Transportation and Disposal | Power Cable Disposal | | | | $ 87,400 | 0.09% |
| Platform Transportation and Disposal | Pipeline Disposal | | | | $ 10,400 | 0.01% |
| Site Clearance | Site Clearance | | ☑ | | $ 776,600 | 0.80% |

| | | | | | |
|---|---|---|---|---|---|
| Sub Task Total | | | | $75,794,000 | 78.09% |
| Misc. Work Provision (15%) | | | | $10,596,100 | 10.92% |
| Weather Provision (10%) | | | | $5,013,300 | 5.17% |
| Project Management, Engineering & Planning (8%) | | | | $5,651,200 | 5.82% |
| | | | Total: | $97,054,600 | 100.00% |

COSB AR004711



# Diversified Energy:

A Business Model Built to Fail Appalachia

Ted Boettner
Kathy Hipple
Anthony Ingraffea
April 2022

Ohio River
Valley Institute

COSB AR004712

## 2.5        Asset Retirement Obligations (AROs) Raise Red Flags

For Diversified, a company built around end-of-life conventional oil and gas wells, the question of its obligations to retire, or decommission, these wells looms large. This report analyzes the company's accounting practices around future P&A costs, its Asset Retirement Obligations (AROs), to determine whether Diversified will be able to fulfill its legal obligations to P&A its roughly 70,000 wells.

Diversified is harvesting cash flows now and deferring future P&A costs. Its business model is to buy marginal wells, restate the ARO using unrealistic assumptions, and defer most costs of well retirements for more than 50 years into the future. One analyst believes the company's core business model is, in fact, ARO accounting.[96]

As described in Section 2.3, Bonding and State Consent Agreements on Plugging Wells, Pennsylvania, West Virginia, Ohio, and Kentucky each require Diversified, through 5-, 10- and 15-year state-level consent agreements, to retire only 20 wells per year.[97] In general, companies that currently own wells have a legal requirement to P&A their wells at the end of their useful life. In Appalachia, the obligation to P&A a well does not extend to prior owners. A series of reports *Capitol Forum* and *Bloomberg* raised questions about Diversified's ability to retire its well inventory. Shortly following the release of these reports, Diversified announced its intention to accelerate its retirement program.[98]

*Diversified's business model depends on buying low-producing wells, restating Asset Retirement Obligations (AROs) using abnormal assumptions, and deferring well decommissioning costs for decades.*

Oil and gas companies must include costs to decommission their wells in their financial statements. These costs are categorized as AROs and appear as unsecured liabilities on a company's balance sheet. This liability does not mean that a company has put actual capital aside to decommission wells. It is, however, an amount the company calculates it will need to spend, in today's dollars, to decommission its wells.

Diversified's accounting practices have reduced the amount of the company's ARO liabilities. The company's assumed decommissioning costs are significantly less than industry averages. If Diversified used assumptions based on industry norms, the increase in its ARO liabilities would make the company technically insolvent.

This next section of this report will offer a summary of Diversified's questionable approach toward its AROs, providing examples as illustrations.

## 2.6        Diversified Slashes Value of ARO Liabilities After Many Acquisitions

Diversified has consistently re-valued the AROs on wells it acquires. Post-acquisition, Diversified significantly discounts its ARO liabilities, recording lower liability amounts than the prior owner had used in its financial accounts. For example, in 2018, Diversified purchased 11,000 wells from CNX Resources, a publicly traded gas producer in Appalachia. CNX had listed the ARO associated with these wells at $197 million.[99] Post-acquisition, Diversified recorded the ARO for the same wells at $14.3 million (Figure 13).[100] The 90% reduction in the ARO was an explicit part of the sale from CNX, which noted, "In connection with the sale, the buyer assumed approximately $196,514 of asset retirement obligations." The ARO reduction was not explained in Diversified's 2018 financial statements. Diversified treated the AROs connected with the roughly 11,000 wells it acquired from EQT in 2018 in a similar way, drastically reducing them post-acquisition.[101]

COSB AR004713

**Figure 13: AROs for Wells Under CNX Ownership and EQT Ownership compared to Diversified Ownership, post-2018 Acquisitions**



Source: Diversified Energy, CNX Resources, and EQT Corporation data

Reducing the amount of ARO liabilities—particularly at the magnitude Diversified has made such reductions—greatly impacts the book value of the company, in effect increasing shareholders' equity by the same amount of the ARO liability reduction. The effect is to boost the book value of the company. Both debt and equity investors look to the company's financial books to make determinations about a company's value. By reducing the ARO liabilities post-acquisition, Diversified may be providing a high value of the company. [Appendix 5 includes additional examples of Diversified's practice of revaluing well AROs post-acquisition.]

## 2.7    Diversified's ARO Liabilities Based on Numerous Unusual Assumptions

Diversified has also used numerous assumptions to calculate the value of its AROs, which include: 1) unrealistically low clean-up costs per well, significantly below industry norms; 2) implausibly long economic lives of wells though 2095, significantly beyond industry norms; 3) extension of the useful life of its wells by nearly 50 years, from 2047 to 2093, which the company did without explanation in 2018; 4) unrealistically low annual inflation costs of roughly 2.5 percent over the next 74 years (the final date Diversified expects to have productive wells); 5) an excessively long ramp-up timeline modeled to begin P&A-ing the vast majority of its wells; 6) overly optimistic calculations to keep classifying idle wells as economically productive; 7) the expectation that non-producing, or idle, wells can be brought back to production, allowing the company to delay P&A costs; 8) unverifiable claims about the company's ongoing asset retirement program; 9) shifting net discount rate assumptions, without sufficient explanation, that reduce the present value of its AROs, well below a realistic level; and 10) failure to incorporate far higher costs to P&A a leaking well than a non-leaker.

Estimating P&A costs depends primarily on three variables: the number of wells, the costs to P&A the wells, and the cost of inflation. Since the costs will occur in the future, two additional variables are used to calculate the cost in today's dollars for future clean-up costs: the timing of the P&A costs, and the discount rate used to convert future costs back to today's dollars.

Diversified's assumed P&A costs have lowered the company's ARO liability.

Two financial assumptions raise questions about the amount of the AROs on Diversified's books and call into question the company's financial wherewithal to fund the actual clean-up of the wells. These include: 1) unrealistically low clean-up costs per well and 2) the estimated economic lives of the wells, which now extend through nearly the end of this century.

**Decommission Costs Well Below Industry Estimates**

In 2020, Diversified used a figure of $20,000 to $30,000 per well to decommission its wells, using an average of $25,000 per well.[102] That amount was further reduced in its 2021 financials.[103] The justification for the further reduction was based on Diversified's costs for the 136 wells it plugged in 2021, which was $22,500, a 10 percent reduction from the prior year. The sample size of 136 is far less than 1 percent of the company's well inventory. The company appeared to use the $22,500 to $25,000 per-well P&A cost[104] to calculate ARO liability and to assure stakeholders—including debt and equity investors, regulators, and credit rating agencies—the company will have sufficient cash in the future to fund these costs. The $22,500 to $25,000 is much lower than industry norms.

**Estimates of Economic Lives of Wells Repeatedly Extended**

From 2017 to 2018, Diversified inexplicably more than doubled the economic lives of its wells from 30 to 75 years.[105] By changing this key assumption, the company was able to radically reduce its ARO liabilities in 2018.[106] In its 2017 financial statements, Diversified calculated its ARO using clean-up costs "presently estimated through 2047, when the company expects its producing oil and gas properties to reach the end of their economic lives."[107] The following year, the economic lives of its wells had been extended and were "presently estimated through to 2093."[108] No explanation was given for the massive extension of its wells' economic lives. Again, in 2020, the company further extended its wells economic lives to 2095.[109] Figure 14 illustrates Diversified's extension of the economic life of its wells. In 2021, the company maintained its estimates of its wells' economic lives through 2095.[110]

**Figure 14: Diversified's Estimates of End of Economic Lives of Producing Wells, 2014-2021**



**Source:** ORVI analysis of Diversified Energy data

*By shifting assumptions about the economic lives of its wells, Diversified has substantially reduced its Asset Retirement Obligation (ARO) liabilities.*

If Diversified used industry norms for decommissioning costs, ranging from $30,000 to $75,000, and included a weighted average life of 15 to 20 years, the present value of its AROs on its books would need to be massively increased. If, for example, the company estimated that wells would cost $50,000 or $75,000 to decommission and assumed an average of 15 years to decommission all its wells, its ARO liability would have increased in 2020 from less than $400 million to nearly $2 billion or $3 billion, respectively. The company increased its AROs to $526 million in 2021, which is still far less than the $2 or $3 billion its ARO liability would be if industry norms were applied.[111,112]

Figure 15 illustrates the magnitude of the amount of ARO liabilities Diversified has recorded on its books based on its assumptions, compared to what the AROs would be using assumptions based on industry norms.

**Figure 15: AROs Using Diversified's Plugging Cost Assumptions Compared to Industry-Wide Estimates**



Source: ORVI analysis of Diversified Energy data

Greater detail about Diversified's financial accounting of its AROs and additional examples of questionable assumptions are provided in Appendix 5.

## 2.8      Gain on Bargain Purchase: Oversized Share of Net Income

From 2014 to 2020, Diversified has regularly recorded a Gain on Bargain Purchase, which is an accounting practice used in rare cases reserved for distressed sales (Figure 16).  The company's regular use of Gain on Bargain Purchase is not used by other companies with similar transactions.  This financial accounting tactic was the biggest contributor to the company's income in many years.

In essence, a Gain on Bargain Purchase allows a company that buys another company or its assets to claim it got such a below-market price, or "bargain," that it can re-calculate these assets at higher value. This accounting practice is used to produce a paper "profit" from the purchase. Assuming the fair market value calculated by the acquiring company is higher than its purchase price, the difference is recorded as negative good will. This accounting practice allows a company to record the paper gain as income and ultimately inflates assets on the company's balance sheet.

Gavin Newsom, Governor
Gabe Tiffany, Acting Director

**California**
# Department of Conservation

September 26, 2024

Sent via electronic mail only to Michael.mills@stoel.com

Dear Mr. Mills:

I am reaching out regarding your client, Sable Offshore Corporation's (Sable)s, acquisition of the Las Flores Canyon Processing Facility (the Facility). Based upon publicly available information, it appears that equipment at the Facility meets the definition "production facility" found in Public Resources Code section 3010.

There are a handful of compliance issues CalGEM would like to discuss with Sable in more detail.

    **I.**     **Equipment at the Facility appears to be equipment regulated by CalGEM.**

CalGEM regulates production facilities, which includes "any equipment attendant to oil and gas production or injection operations, including but not limited to, tanks flowlines, headers, gathering lines, wellheads, heater treaters, pumps, valve, compressors, injection equipment, and pipelines that are not under the jurisdiction of the State Fire Marshal pursuant to Section 51010 of the Government Code." Based upon publicly available information, the Facility includes equipment that meets the definition of "production facility," including at a minimum, pipelines not under the jurisdiction of the State Fire Marshal and tanks.

    **II.**     **Bonding requirements under Public Resources Code section 3205.8.**

The acquisition of the Facility appears to have occurred after January 1, 2024, thereby triggering the requirements of Public Resources Code section 3205.8, including the filing of a bond. Given the unique aspects of the Facility, and the newness of these requirements, Sable was probably unaware these bonding requirements apply to those production facilities attendant to oil and gas production.

**State of California Natural Resources Agency | Department of Conservation**
715 P Street, MS 1900, Sacramento, CA 95814
conservation.ca.gov | T: (916) 322-1080

COSB AR004717

CalGEM would like to develop a timeline for expeditiously getting Sable into compliance, which will require a determination of equipment attendant to oil and gas production at the Facility. CalGEM is requesting your cooperation in timely scheduling an inspection of the Facility.  To facilitate a more productive inspection, in advance of that inspection, CalGEM requests that you provide a facility map which identifies the equipment on site, including pipelines, and point of sale information, as well as the contact information for your operations manager, so that CalGEM may contact them with questions in advance.

Please have Sable contact Michael Takamori (Michael.Takamori@conservation.ca.gov or (661) 434-8163) to schedule an inspection and provide the information described above no later than October 3, 2024.

### III.    Additional requirements for production facilities.

In addition to these important bonding requirements, there are a range of inspection, testing, and maintenance requirements that apply to production facilities, which you should be aware of, outlined below.

First and foremost, it appears that at least a portion of the production facilities at the facility fall within a health protection zone. **Effective June 27, 2024, subject to the exceptions outlined in the regulation, in advance of new construction or operation of a new production facility, an operator is required to submit a notice for CalGEM's approval before undergoing that work**. (Cal. Code of Regs., tit. 14, § 1765.5.) Additional requirements for health protections zones may be found in Article 2.5 of title 14 of the California Code of Regulations.

Additional production facility requirements include, but are not limited to the filing of spill contingency plan, filing of a pipeline management plan, and production facility containment, maintenance, and testing. (Cal. Code of Regs., tit. 14, §§ 1722, subd. (b); 1773.4; 1774.2; 1773-1773.4-1774.1.)

Sincerely,

*Courtney Kasberg*

Courtney Kasberg

COSB AR004718

COSB AR004719

| Lease # | Total (2020) Estimated Decommissioning Cost 2020 | Total (Oct 2016 Update) | Supplemental Collateral | 3rd Party Guarantee | Operator | Guaranteed | Uncovered | LAST_UPDT_DATE | Record Title Interest Owner(s) | Supplemental Financial Assurance (Does not include general bond info for leases or ROWs) |
|---|---|---|---|---|---|---|---|---|---|---|
| P00182 | $188,720,000 | $ 173,604,023 | $ - | $ - | LA. 03726 - Sable Offshore Corp. | | $ - | 01-Sep-20 | 03726 Sable Offshore Corp. | To be evaluated under the new Financial Assurance Rule |
| P00188 | $97,054,600 | $ 100,113,997 | $ - | $ - | LA. 03726 - Sable Offshore Corp. | | $ - | 01-Sep-20 | 03726 Sable Offshore Corp. | To be evaluated under the new Financial Assurance Rule |
| P00190 | $185,835,000 | $ 185,740,882 | $ - | $ - | LA. 03726 - Sable Offshore Corp. | | $ - | 01-Sep-20 | 03726 Sable Offshore Corp. | To be evaluated under the new Financial Assurance Rule |

STATE OF CALIFORNIA                                                   GAVIN NEWSOM, *Governor*

**CALIFORNIA STATE LANDS COMMISSION**

100 Howe Avenue, Suite 100-South
Sacramento, CA  95825-8202



*Established in 1938*

**JENNIFER LUCCHESI,** *Executive Officer*
**916.574.1800**
*TTY CA Relay Service:* **711** *or Phone* **800.735.2922**
*from Voice Phone* **800.735.2929**
*or for Spanish* **800.855.3000**

**Contact Phone: (916) 574-1900**

April 10, 2024

File Ref.: Leases 4977,
7163, 5515, 6371

Dylan Boyer (SENT VIA ELECTRONIC MAIL ONLY:
dylan.w.boyer@exxonmobil.com)
Exxon Mobil Corporation

Subject: Applications for Assignment of Lease, Santa Ynez Unit Facilities, Santa Barabra County

Dear Mr. Boyer:

On March 13, 2024, Exxon Mobil Corporation (Exxon) submitted four applications to assign its lease interest in the referenced leases to Sable Offshore Corporation (Sable). Based on our review of the materials submitted with the applications, it has been determined that the applications are complete for purposes of the California Environmental Quality Act (CEQA) as of April 12, 2024. For the purpose of processing the applications, Exxon may be requested to clarify, amplify, correct, or otherwise supplement the information submitted on the applications.

While the applications are complete for purposes of CEQA, staff require additional information to continue processing the applications and prior to scheduling them for the Commission's consideration. Please provide the following information at your earliest convenience.

1.  Describe who will staff, operate, and maintain the three offshore platforms, the Las Flores Canyon processing facility, lines 901/903, and other Santa Ynez Unit (SYU) facilities under Sable's ownership, including the authorized improvements under leases 4977, 7163, 5515, and 6371.
    o   Organization chart and brief bios of staff's experience in operations of these assets or similarly situated offshore oil and gas production facilities.

D. Boyer
April 10, 2024
Page 2

2. Provide a copy of the final, executed purchase and sales agreement between Exxon and Sable.

3. Provide an organization chart and brief bios for the Sable senior management team. Include all relevant information related to the individual's experience in the offshore oil and gas industry, including oil and gas pipeline operation and maintenance, and when they last worked in the industry.

4. Provide staff with contingency plans that Sable will implement during periods of extended low oil prices, significant financial losses, and bankruptcy.

5. Provide staff with information addressing how Sable will address financing/operating the SYU if it remains shut-in longer than anticipated.

6. Provide copies of the bonds for Leases 5515 and 6371 and provide verification from the bond issuer that they are in good standing.
   o Lease 6371 requires a bond of $80,000, however, staff is only in receipt of a $25,000 bond (Bond No. 019051655) issued by Liberty Mutual Insurance Company in 2015.
   o Lease 5515 requires a $30 million bond.

7. Update the attached timeline chart previously provided to staff on January 25, 2023.

8. Provide an updated projected reserve and resource summary. The previous summary was provided to staff on February 28, 2023 (attached).

9. Provide Sable Pro Forma projected financial statements (Balance Sheet, Income Statement, and Statement of Cash Flows) for 2024 and any other future periods.

10. On February 28, 2023, Sable provided staff information related to plans for restarting production at the SYU facilities (see response #1). Please provide an update for each of the four primary workflows and the projected SYU restart date. Also provide a detailed summary of the process and timeline for restarting SYU operations.

COSB AR004721

D. Boyer
April 10, 2024
Page 2

11. Provide a detailed summary of the process and timeline for bringing lines 901/903 back into operation.

12. Information detailing the economic life of the SYU facilities under a reasonable range of oil price scenarios, taking into account per barrel price fluctuations over the past 10 years. Sable previously provided information to staff on February 28, 2023, under an assumed $50 flat Brent crude price. Please provide the estimated economic life at varying oil prices, specifically at $40, $80, and $100 per barrel.

13. List of financial securities for decommissioning the federal platforms (including plugging the wells and removing the associated oil infrastructure). Sable previously informed staff that the dollar amount of these securities had not been determined as of February 28, 2023.

14. Provide an independent third party estimate for cost of removal for the lease improvements for leases 4977 and 7163.

You will be advised as to the conduct and needs of this process as it progresses. Please contact me at (916) 574-2275 or at Drew.Simpkin@slc.ca.gov, if you have any questions concerning the applications.

Sincerely,

*Drew Simpkin*

Drew Simpkin
Public Land Management Specialist

Attachments

cc: Nathan Franka (nathan.p.franka@exxonmobil.com)
    Steve Rusch (srusch@sableoffshore.com)
    Chris Workman (CSLC)

COSB AR004722

# Substantial Reserve & Resource Base

*Assumes $50/Bbl and $3/MMBtu; in $MM unless otherwise noted [1]*

## Reserve and Resource Summary [1][2]

| Reserve Category | Net Reserves Oil (MMBbls) | Net Reserves Gas (MMcf) | Net Reserves NGL (MMBbls) | Net Reserves Total (MMBoe) | 2024E Prod. (MBoe/d) | R / P (x) | Cash Flows Capex ($MM) | Cash Flows PV-10 Flat Pricing |
|---|---|---|---|---|---|---|---|---|
| PDP | 108 | 120 | 2 | 130 [3] | 27 | 13.4x | $0 | $815 |
| ESP Installation | 24 | 19 | 0 | 27 | 2 | NA | $80 | $270 |
| **Proved Developed** | **132** | **140** | **2** | **157** | **28** | **15.3x** | **$80** | **$1,085** |
| Development Drilling Program | 223 | 182 | 3 | 256 | 0 | NA | $1,897 [4] | $566 |
| Development Workover Program | 100 | 82 | 1 | 115 | 0 | NA | $300 | $776 |
| **Total Undeveloped** | **323** | **263** | **4** | **371** | **0** | **0.0x** | **$2,197** | **$1,342** |
| **Total Net Reserves / Total Blended NAV** | **455** | **403** | **6** | **528** | **28** | **51.4x** | **$2,277** | **$2,427** |

### Net Sales Reserves (MMBoe)



### PV-10 Reserves ($MM)



### Reserves by Commodity

Note: Management estimates are inherently uncertain. Actual results may differ in a material amount from management estimates and projections.
(1) Assumes $50/Bbl Brent and $3/MMBtu gas pricing and effective date of January 1, 2022.
(2) Oil and gas resources presented as "reserves" in this presentation are currently classified as "contingent resources" rather than as "reserves" because of the absence of means to deliver production to market. See "Oil and Gas Resource and Reserve Information" on page 2 for additional information regarding the presentation of oil and gas reserves in this presentation.
(3) NSAI PDP at Brent Pricing and Management Estimated LOE. NSAI PDP increased due to extension of field life with contemplated drilling program.
(4) Field expenses beyond PDP only life applied to upside drills.



COSB AR004723

1

## SYU Pipeline Status

| Significant Planning Effort Underway to Prepare for Restart |
|---|

- 4/1/21 AAPL submission to the California Fire Marshal ("OSFM") for approval of the AB864/Consent Decree compliance plans
- 12/4/21 OSFM accepts AAPL's AB 864 Supplemental Implementation Plan
- 3Q22 zoning clearance approved; awaiting appeal process resolution before requesting final OSFM approval for 901/903 restart
- 1Q24 Sable targets possible restart of the onshore and offshore facilities
  - March 2020 consent decree establishes path for 901/903 restart
- Exxon purchased pipeline from AAPL

|         |                              | 1Q21 | 2Q21 | 3Q21 | 4Q21 | 1Q22 | 2Q22 | 3Q22 | 4Q22 | 1Q23 | 2Q23 | 3Q23 | 4Q23 | 1Q24 | 2Q24 | 3Q24 | 4Q24 |
|---------|------------------------------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| 901/903 | Approvals                    |      |      |      | ★ Approval AB864 |      |      | ★ Zoning Clearances |      |      |      | ★ OSFM Final Approval |      |      |      |      |      |
|         | Regulatory Work              |      |      |      |      |      |      |      |      |      |      |      |      |      |      |      |      |
|         | Integrity and Construction   |      |      |      |      |      |      |      |      |      |      |      |      |      |      |      |      |
| SYU     | **Field Activities:**        |      |      |      |      |      |      |      |      |      |      |      |      |      |      |      |      |
|         | Restaffing / Contracting     |      |      |      |      |      |      |      |      |      |      |      |      |      |      |      |      |
|         | LFC / SYU Restart            |      |      |      |      |      |      |      |      |      |      |      |      | ★ SYU Full Restart (target) |      |      |      |

19

COSB AR004724

Meeting Date: 12/05/23
Lease Number: 4977
Staff: D. Simpkin

# Staff Report 57

## LESSEE:

Pacific Offshore Pipeline Company

## PROPOSED ACTION:

Amendment of a General Lease – Right-of-Way Use.

### AREA, LAND TYPE, AND LOCATION:

Sovereign land located in the Pacific Ocean, near El Capitan State Beach, Santa Barbara County (as shown in Figure 1).

**Figure 1. Location**



COSB AR004725

Staff Report 57 (continued)

**PROPOSED AMENDMENT:**

- Paragraph 14 is deleted in its entirety and replaced with the following:

    "14. Holding-over: Any holding-over by Lessee after the expiration of the Lease term, with or without the express or implied consent of Lessor, shall constitute a tenancy from month to month and not an extension of the Lease term and shall be on the terms, covenants, and conditions of this Lease with any fixed rental or other consideration provided for in the expired Lease being consideration provided for in the expired Lease being payable in advance on the first day of the month at the rate of one-twelfth (1/12) of the annual amount, and any variable rental or other consideration being payable monthly in arrears in accordance with the rate schedule set forth in the expired Lease. However, in no event shall such hold-over period exceed seven (7) years, ending December 31, 2028."

- Paragraph 9, Surety Bond is amended to $5,000,000.

- The lease provisions are amended to include additional lease provisions related to operational requirements and ongoing inspection, monitoring and reporting.

- Within 6-months of Lessor's adoption of the Analysis of Public Trust Resources and Values (APTR), which will assess the long-term risks and impacts to Public Trust resources for existing offshore oil and gas pipelines under Lessor's leasing jurisdiction, Lessee may submit, either (a) an application and minimum expense deposit for a new lease for the continued use of the Lease Premises or (b) an application and minimum expense deposit  for removal of the improvements and restoration of the Lease Premises.

- Beginning January 2024, Lessee shall meet as needed with Lessor's staff to discuss the status of the improvements, future plans related to the Santa Ynez Unit, or any other topics related to the lease. Eight months prior to Lessee's anticipated restart of the Santa Ynez unit, Lessee shall meet with Lessor's staff no less than monthly until restart of the Santa Ynez Unit occurs or until and unless both parties mutually agree that regular meetings are no longer necessary.

# STAFF ANALYSIS AND RECOMMENDATION:

## AUTHORITY:

Public Resources Code sections 6005, 6106, 6216, 6301, 6501.1, and 6503; California Code of Regulations, title 2, sections 2000 and 2003.

COSB AR004726

either continue the improvements' authorization or to require their removal and have time to complete any required analysis under CEQA. The bonding requirement is amended to $5,000,000 to cover potential liability. In essence, this requirement is designed to protect the State in the event the Lessee is unable or unwilling to remove the improvements. The amendment includes testing and monitoring requirements, in addition to those required by other regulatory agencies, which will enhance public and environmental protection.

The proposed lease amendment does not alienate the State's fee simple interest and does not grant the lessee exclusive rights to the lease premises. The lease requires the Lessee to insure and indemnify the State for any liability incurred as a result of the lessee's activities on the lease premises and to maintain the improvements at its sole expense. The lease also requires the payment of annual rent and a surety bond or other security.

## CLIMATE CHANGE:

California is in the midst of the climate crisis, caused in large part by carbon emissions from the production of fossil fuels and their subsequent use. According to the State's Fourth Climate Change Assessment (Governor's Office of Planning and Research 2018), climate change is making extreme conditions in California more frequent and severe. For example, an estimated 4.2 million acres of land burned in wildfires in California in 2020, more than the previous 4 years combined, and the last three years (2020-2022) is the driest three-year period on record (CAL FIRE, in 2021 SB 100 Joint Agency Report, California Energy Commission; Water Year 2022: The Drought Continues, Department of Water Resources). Average annual temperatures are on the rise in California, and if greenhouse gas emissions are not lowered substantially, air temperatures could increase by an average of 5.8°F by 2050 and 8.8°F by 2100 (California Natural Resources Agency 2022). These impacts endanger natural resources and public health.

The most effective way to prevent the worst impacts of the climate crisis is to reduce greenhouse gas emissions by transitioning the state's energy portfolio from fossil fuels to renewable, non-emitting sources such as solar, wind, and geothermal. The state is already on its way, securing 33 percent of its energy from renewable sources in 2020 (2021 SB 100 Joint Agency Report, California Energy Commission). SB 1020 requires that at least 90 percent of California's energy come from renewable, zero-carbon sources by 2030, 95 percent by 2035, and 100 percent by 2045. The

COSB AR004727

Meeting Date: 12/05/23
Lease Number: 7163
Staff: D. Simpkin

# Staff Report 58

## LESSEE:

ExxonMobil Corporation

## PROPOSED ACTION:

Amendment of a General Lease – Right-of-Way Use

## AREA, LAND TYPE, AND LOCATION:

Sovereign land located in the Pacific Ocean, near El Capitan State Beach, Santa Barbara County (as shown in Figure 1).

**Figure 1. Location**



COSB AR004728

Staff Report 58 (continued)

**CONSIDERATION:**
$178,145 per year, with the State reserving the right to fix a different rent periodically during the lease term, as provided for in the lease.

**PROPOSED AMENDMENT:**
- Section 2, Paragraph 7 is deleted in its entirety and replace with the following:

  "7. Holding Over: Paragraph 15 of Section 4 is hereby deleted, and the following paragraph is substituted therefore:
  Any holding-over by Lessee after the expiration of the Lease term, with or without the express or implied consent of Lessor, shall constitute a tenancy from month to month and not an extension of the Lease term and shall be on the terms, covenants, and conditions of this Lease with any fixes rental, royalty, or other consideration provided for in the expired Lease being consideration provided for in the expired Lease being payable in advance on the first day of the month at the rate of one-twelfth (1/12) of the annual amount, and any variable rental, royalty, or other consideration being payable monthly in arrears in accordance with the rate schedule set forth in the expired Lease. However, in no event shall such hold-over period exceed seven (7) years, ending January 31, 2029."

- Section 1, Surety Bond or Other Security is amended to $15,000,000.

- Section 2 is amended to include additional lease provisions related to operational requirements and ongoing inspection, monitoring, and reporting.

- Within 6-months of Lessor's adoption of the Analysis of Public Trust Resources and Values (APTR), which will assess the long-term risks and impacts to Public Trust resources for existing offshore oil and gas pipelines under Lessor's leasing jurisdiction, Lessee may submit, either (a) an application and minimum expense deposit for a new lease for the continued use of the Lease Premises or (b) an application and minimum expense deposit for removal of the improvements and restoration of the Lease Premises.

- Beginning January 2024, Lessee shall meet as needed with Lessor's staff to discuss the status of the improvements, future plans related to the Santa Ynez Unit, or any other topics related to the lease. Eight months prior to Lessee's anticipated restart of the Santa Ynez unit, Lessee shall meet with Lessor's staff no less than monthly unless both parties mutually agree that regular meetings are no longer necessary.

COSB AR004729

to eliminate greenhouse gas emissions, procure energy from renewable sources, and reduce the impacts from the climate crisis. Next, the lease amendment includes provisions requiring the Lessee to conduct inspections that exceed existing State and Federal regulatory requirements and requires Commission review and approval of the inspection results prior to conveying product through the pipelines. The Lessee is also encouraged to submit a lease application for a new lease for the continued use of the Lease Premises or an application for removal of the improvements and restoration of the Lease Premises within 6-months of the Commission adopting the APTR. This helps ensure that, when considering a possible future lease application, the Commission will have time to gather the information it needs to either continue the improvements' authorization or to require their removal and have time to complete any required analysis under the California Environmental Quality Act (CEQA). The bonding requirement is amended to $15,000,000 to cover potential liability. In essence, this requirement is designed to protect the State in the event the Lessee is unable or unwilling to remove the improvements. The amendment includes testing and monitoring requirements, in addition to those required by other regulatory agencies, which will enhance public and environmental protection.

The proposed lease amendment does not alienate the State's fee simple interest and does not grant the lessee exclusive rights to the lease premises. The lease requires the Lessee to insure and indemnify the State for any liability incurred as a result of the lessee's activities on the lease premises and to maintain the improvements at its sole expense. The lease also requires the payment of annual rent and a surety bond or other security.

## CLIMATE CHANGE:

California is in the midst of the climate crisis, caused in large part by carbon emissions from the production of fossil fuels and their subsequent use. According to the State's Fourth Climate Change Assessment (Governor's Office of Planning and Research 2018), climate change is making extreme conditions in California more frequent and severe. For example, an estimated 4.2 million acres of land burned in wildfires in California in 2020, more than the previous 4 years combined, and the last 3 years (2020-2022) is the driest 3-year period on record (CAL FIRE, in 2021 SB 100 Joint Agency Report, California Energy Commission; Water Year 2022: The Drought Continues, Department of Water Resources). Average annual temperatures are on the rise in California, and if greenhouse gas emissions are not lowered substantially, air temperatures could increase by an average of 5.8°F by 2050 and 8.8°F by 2100 (California Natural Resources Agency 2022). These impacts endanger natural resources and public health.

COSB AR004730

# OIL SPILL PREVENTION AND RESPONSE
## DISPATCH REPORT
### MARINE FACILITY, EVIDENCE OF CERTIFICATE OF RESPONSIBILITY
By Applicant Name

| App. # | Applicant Name | Facility Name | Cert. # | Cert. Exp. Exp. Date | Evidence Type | Evidence Expires 1 | 2 | 3 | Fin. Resp. Demon | MTU Fin. Resp. Demon. |
|---|---|---|---|---|---|---|---|---|---|---|
| 2611 | AAA OIL INC | MOBILE TRANSFER UNITS | 32611-00-006 | 02/28/2025 | 01 | | | 05/01/2025 | | $1,000,000 |
| 379 | ACTION CLEANING CORPORATION | MOBILE TRANSFER UNIT | 30379-00-054 | 04/30/2025 | 01 | | | 10/16/2025 | | $1,000,000 |
| 379 | ACTION CLEANING CORPORATION | TANK TRAILER | 30379-00-010 | 04/30/2025 | 01 | | | 10/16/2025 | | $1,000,000 |
| 379 | ACTION CLEANING CORPORATION | TANK TRAILER | 30379-00-011 | 04/30/2025 | 01 | | | 10/16/2025 | | $1,000,000 |
| 25.5 | AERA ENERGY LLC | VENTURA PRODUCTION FIELD AND ASSOCIATED LINES AND FACILITIES | 2025-05-007 | 09/30/2025 | 04 | 03/31/2025 | | | $100,000,000 | |
| 2378 | ALCATRAZ ISLAND SERVICES, LLC | ABOVE GROUND STORAGE TANK | 22378-00-001 | 10/31/2026 | 01 | 12/31/2024 | | | $1,093,750 | |
| 2378 | ALCATRAZ ISLAND SERVICES, LLC | ALCATRAZ DIESEL FUEL PIPELINE | 22378-00-002 | 10/31/2026 | 01 | 12/31/2024 | | | $1,093,750 | |
| 2622 | AMMEX TANK INTERNATIONAL | VERTICAL STORAGE TANK | 22622-00-001 | 11/30/2025 | 01 | 12/28/2024 | | | $2,000,000 | |
| 198 | ANCON MARINE | MOBILE TRANSFER UNIT  VT116 | 30198-00-036 | 06/30/2025 | 01 | | | 01/01/2025 | $0 | $5,000,000 |
| 198 | ANCON MARINE | MOBILE TRANSFER UNIT VT 32 | 30198-00-028 | 06/30/2025 | 01 | | | 01/01/2025 | $0 | $5,000,000 |
| 198 | ANCON MARINE | MOBILE TRANSFER UNIT VT 73 | 30198-00-035 | 06/30/2025 | 01 | | | 01/01/2025 | $0 | $5,000,000 |
| 198 | ANCON MARINE | MOBILE TRANSFER UNIT VTK 167 | 30198-00-046 | 06/30/2025 | 01 | | | 01/01/2025 | $0 | $5,000,000 |
| 198 | ANCON MARINE | MOBILE TRANSFER UNIT VTK 168 | 30198-00-047 | 06/30/2025 | 01 | | | 01/01/2025 | $0 | $5,000,000 |
| 198 | ANCON MARINE | MOBILE TRANSFER UNIT VTK 169 | 30198-00-042 | 06/30/2025 | 01 | | | 01/01/2025 | $0 | $5,000,000 |
| 198 | ANCON MARINE | MOBILE TRANSFER UNIT VTK 171 | 30198-00-043 | 06/30/2025 | 01 | | | 01/01/2025 | $0 | $5,000,000 |
| 198 | ANCON MARINE | MOBILE TRANSFER UNIT VTK 172 | 30198-00-044 | 06/30/2025 | 01 | | | 01/01/2025 | $0 | $5,000,000 |
| 198 | ANCON MARINE | MOBILE TRANSFER UNIT VTK173 | 30198-00-045 | 06/30/2025 | 01 | | | 01/01/2025 | $0 | $5,000,000 |
| 198 | ANCON MARINE | VACUUM TRAILER VT 149 | 30198-00-038 | 06/30/2025 | 01 | | | 01/01/2025 | $0 | $5,000,000 |
| 198 | ANCON MARINE | VACUUM TRAILER VT 150 | 30198-00-039 | 06/30/2025 | 01 | | | 01/01/2025 | $0 | $5,000,000 |
| 198 | ANCON MARINE | VACUUM TRAILER VT 151 | 30198-00-040 | 06/30/2025 | 01 | | | 01/01/2025 | $0 | $5,000,000 |
| 198 | ANCON MARINE | VACUUM TRAILER VT 152 | 30198-00-041 | 06/30/2025 | 01 | | | 01/01/2025 | $0 | $5,000,000 |
| 198 | ANCON MARINE | VACUUM TRAILER VT 23 | 30198-00-015 | 06/30/2025 | 01 | | | 01/01/2025 | $0 | $5,000,000 |
| 198 | ANCON MARINE | VACUUM TRAILER VT 24 | 30198-00-016 | 06/30/2025 | 01 | | | 01/01/2025 | $0 | $5,000,000 |
| 198 | ANCON MARINE | VACUUM TRAILER VT 26 | 30198-00-022 | 06/30/2025 | 01 | | | 01/01/2025 | $0 | $5,000,000 |
| 198 | ANCON MARINE | VACUUM TRAILER VT 27 | 30198-00-023 | 06/30/2025 | 01 | | | 01/01/2025 | $0 | $5,000,000 |
| 198 | ANCON MARINE | VACUUM TRAILER VT 28 | 30198-00-024 | 06/30/2025 | 01 | | | 01/01/2025 | $0 | $5,000,000 |
| 198 | ANCON MARINE | VACUUM TRAILER VT 29 | 30198-00-025 | 06/30/2025 | 01 | | | 01/01/2025 | $0 | $5,000,000 |

COSB AR004731

| App. # | Applicant Name | Facility Name | Cert. # | Cert. Exp. | Evidence Type | Evidence Expires 1 | 2 | 3 | Fin. Resp. Demon | MTU Fin. Resp. Demon. |
|---|---|---|---|---|---|---|---|---|---|---|
| 861 | PLAINS ALL AMERICAN PIPELINE, L.P. | PIPELINE | 2086I-00-011 | 11/30/2026 | 04 | 03/31/2025 | | | $100,000,000 | $0 |
| 861 | PLAINS ALL AMERICAN PIPELINE, L.P. | PIPELINE | 2086I-00-012 | 11/30/2026 | 04 | 03/31/2025 | | | $100,000,000 | $0 |
| 861 | PLAINS ALL AMERICAN PIPELINE, L.P. | PIPELINE | 2086I-00-013 | 11/30/2026 | 04 | 03/31/2025 | | | $100,000,000 | $0 |
| 861 | PLAINS ALL AMERICAN PIPELINE, L.P. | PIPELINE | 2086I-00-014 | 11/30/2026 | 04 | 03/31/2025 | | | $100,000,000 | $0 |
| 861 | PLAINS ALL AMERICAN PIPELINE, L.P. | PIPELINE | 2086I-00-015 | 11/30/2026 | 04 | 03/31/2025 | | | $100,000,000 | $0 |
| 861 | PLAINS ALL AMERICAN PIPELINE, L.P. | PIPELINE | 2086I-00-016 | 11/30/2026 | 04 | 03/31/2025 | | | $100,000,000 | $0 |
| 861 | PLAINS ALL AMERICAN PIPELINE, L.P. | PIPELINE | 2086I-00-017 | 11/30/2026 | 04 | 03/31/2025 | | | $100,000,000 | $0 |
| 861 | PLAINS ALL AMERICAN PIPELINE, L.P. | PIPELINE | 2086I-00-018 | 11/30/2026 | 04 | 03/31/2025 | | | $100,000,000 | $0 |
| 861 | PLAINS ALL AMERICAN PIPELINE, L.P. | PIPELINE | 2086I-00-019 | 11/30/2026 | 04 | 03/31/2025 | | | $100,000,000 | $0 |
| 861 | PLAINS ALL AMERICAN PIPELINE, L.P. | PIPELINE | 2086I-00-020 | 11/30/2026 | 04 | 03/31/2025 | | | $100,000,000 | $0 |
| 861 | PLAINS ALL AMERICAN PIPELINE, L.P. | PIPELINE | 2086I-00-021 | 11/30/2026 | 04 | 03/31/2025 | | | $100,000,000 | $0 |
| 861 | PLAINS ALL AMERICAN PIPELINE, L.P. | PIPELINE | 2086I-00-022 | 11/30/2026 | 04 | 03/31/2025 | | | $100,000,000 | $0 |
| 861 | PLAINS ALL AMERICAN PIPELINE, L.P. | PIPELINE | 2086I-00-023 | 11/30/2026 | 04 | 03/31/2025 | | | $100,000,000 | $0 |
| 861 | PLAINS ALL AMERICAN PIPELINE, L.P. | PIPELINE- | 2086I-00-007 | 11/30/2026 | 04 | 03/31/2025 | | | $100,000,000 | $0 |
| 861 | PLAINS ALL AMERICAN PIPELINE, L.P. | PIPELINE - | 2086I-00-002 | 11/30/2026 | 04 | 03/31/2025 | | | $100,000,000 | $0 |
| 2621 | PRIME TIME COATINGS, INC. | POLY TANK | 22621-00-001 | 10/31/2025 | 01 | 10/05/2025 | | | $3,000,000 | |
| 622 | RAMOS OIL CO. INC. | MOBILE TRANSFER UNITS | 30622-00-062 | 04/30/2025 | 01 | | | 03/01/2025 | $0 | $1,000,000 |
| 838 | RIBOST TERMINAL, LLC | RIBOST TERMINAL, LLC, DBA WORLD OIL TERMINALS | 20838-01-001 | 10/31/2025 | 01 | 07/31/2025 | | | $2,750,000 | |
| 2623 | SABLE OFFSHORE CORP. | CRUDE OIL & WATER EMULSION PIPELINE - PORTION IN STATE WATERS FROM | 22623-03-001 | 08/31/2026 | 01 | 08/14/2025 | | | $101,000,000 | |
| 2526 | SAFETY-KLEEN SYSTEMS, INC. | SAFETY-KLEEN SYSTEMS, INC. | 22526-00-001 | 07/31/2026 | 01 | 11/01/2024 | | | $13,412,500 | |
| 2475 | SAN PEDRO BAY PIPELINE COMPANY | CRUDE OIL PIPELINE 16" (SAN PEDRO BAY PIPE) PLATFORM ELLY (FED WATERS) | 22475-00-001 | 05/31/2026 | 01 | 10/31/2025 | 10/31/2025 | | $51,000,000 | |
| 2548 | SC COMMERCIAL, LLC | MOBILE TRANSFER UNIT | 32548-00-010 | 09/30/2025 | 01 | | | 01/24/2025 | | $1,000,000 |

*OIL SPILL PREVENTION AND RESPONSE*
*DISPATCH REPORT*
*INLAND FACILITY, EVIDENCE OF CERTIFICATE OF RESPONSIBILITY*
*By Applicant Name*

| App. # | Applicant Name | Facility Name | Cert. # | Cert. Exp. | Evidence Type | Evidence Expires 1 | 2 | 3 | Fin. Resp. Demon |
|---|---|---|---|---|---|---|---|---|---|
| 25.5 | AERA ENERGY LLC | BELRIDGE PRODUCTION FACILITY | 40025-05-002 | 09/30/2025 | 04 | 03/31/2025 | | | $100,000,000 |
| 25.5 | AERA ENERGY LLC | COALINGA PRODUCTION FACILITY | 40025-05-003 | 09/30/2025 | 04 | 03/31/2025 | | | $100,000,000 |
| 25.5 | AERA ENERGY LLC | MIDWAY SUNSET PRODUCTION FACILITY | 40025-05-004 | 09/30/2025 | 04 | 03/31/2025 | | | $100,000,000 |
| 25.5 | AERA ENERGY LLC | SAN ARDO LOADING FACILITY | 40025-05-006 | 09/30/2025 | 04 | 03/31/2025 | | | $100,000,000 |
| 25.5 | AERA ENERGY LLC | SAN ARDO PRODUCTION FACILITY | 40025-05-005 | 09/30/2025 | 04 | 03/31/2025 | | | $100,000,000 |
| 2488 | ANDEAVOR LOGISTICS LLC | PIPELINE 33 | 42488-04-001 | 09/30/2026 | 03 | 12/31/2024 | | | $91,850,000 |
| 2488 | ANDEAVOR LOGISTICS LLC | PIPELINE 89 | 42488-04-002 | 09/30/2026 | 03 | 12/31/2024 | | | $91,850,000 |
| 2488 | ANDEAVOR LOGISTICS LLC | PIPELINE E40 | 42488-04-003 | 09/30/2026 | 03 | 12/31/2024 | | | $91,850,000 |
| 2500 | ARIZONA AND CALIFORNIA RAILROAD COMPANY | ARIZONA & CALIFORNIA RAILROAD COMPANY | 72500-00-001 | 05/31/2026 | 01 | 12/01/2024 | | | $15,000,000 |
| 2555 | BEACH OIL MAV OWNER, LLC | E-1 | 42555-05-002 | 12/31/2025 | 01 | 06/19/2025 | | | $1,000,000 |
| 2555 | BEACH OIL MAV OWNER, LLC | RECREATION PARK | 42555-05-001 | 12/31/2025 | 01 | 06/19/2025 | | | $1,000,000 |
| 2538 | BERRY PETROLEUM COMPANY, LLC | HILL PROPERTY | 42538-04-004 | 06/30/2025 | 01 | 09/30/2025 | | | $1,000,000 |
| 2538 | BERRY PETROLEUM COMPANY, LLC | NORTH MIDWAY SUNSET - MCKITTRICK (NMWSS - MCKITTRICK) | 42538-04-002 | 06/30/2025 | 01 | 09/30/2025 | | | $1,000,000 |
| 2538 | BERRY PETROLEUM COMPANY, LLC | POSO CREEK | 42538-04-001 | 06/30/2025 | 01 | 09/30/2025 | | | $1,000,000 |
| 2538 | BERRY PETROLEUM COMPANY, LLC | ROUND MOUNTAIN OIL FIELD (MACPHERSON OIL COMPANY, LLC) | 42538-04-006 | 06/30/2025 | 01 | 09/30/2025 | | | $1,000,000 |
| 2538 | BERRY PETROLEUM COMPANY, LLC | SOUTH MIDWAY SUNSET (SMWSS) | 42538-04-003 | 06/30/2025 | 01 | 09/30/2025 | | | $1,000,000 |
| 2501 | BNSF RAILWAY | BNSF'S CALIFORNIA DIVISION | 72501-00-001 | 02/28/2026 | 04 | 03/31/2025 | | | $150,000,000 |
| 2540 | BRIDGE ENERGY, LLC | BREA | 42540-04-001 | 07/31/2025 | 02 | 06/10/2025 | | | $600,000 |
| 2607 | BRIDGELAND RESOURCES, LLC | BREA-OLINDA PRODUCTION FACILITY | 42607-00-001 | 09/30/2025 | 01 | 06/28/2025 | | | $1,000,000 |
| 2607 | BRIDGELAND RESOURCES, LLC | EAST COYOTE PRODUCTION FACILITY | 42607-04-002 | 09/30/2025 | 01 | 06/28/2025 | | | $1,000,000 |

*Thursday, January 9, 2025*

COSB AR004733

| App. # | Applicant Name | Facility Name | Cert. # | Cert. Exp. | Evidence Type | Evidence Expires 1 | 2 | 3 | Fin. Resp. Demon |
|---|---|---|---|---|---|---|---|---|---|
| 2510 | E & B NATURAL RESOURCES MANAGEMENT CORP. | POSO CREEK AREA | 42510-00-001 | 12/31/2025 | 01 | 01/31/2025 | | | $17,250,500 |
| 2510 | E & B NATURAL RESOURCES MANAGEMENT CORP. | SOUTH TORRANCE UNIT | 42510-00-004 | 12/31/2025 | 01 | 01/31/2025 | | | $17,250,500 |
| 848 | EQUILON ENTERPRISES LLC DBA SHELL OIL PRODUCTS US | SAN JOSE TERMINAL | 40848-00-001 | 06/30/2025 | 04 | 03/31/2025 | | | $45,625,000 |
| 848 | EQUILON ENTERPRISES LLC DBA SHELL OIL PRODUCTS US | STOCKTON TERMINAL | 40848-00-002 | 06/30/2025 | 04 | 03/31/2025 | | | $45,625,000 |
| 2609 | KERN OIL & REFINING CO. | BREAKOUT TANK 10010 | 42609-00-001 | 11/30/2025 | 06 | 05/25/2025 | | | $63,900,000 |
| 2609 | KERN OIL & REFINING CO. | BREAKOUT TANK 37000 | 42609-00-003 | 11/30/2025 | 06 | 05/25/2025 | | | $63,900,000 |
| 2609 | KERN OIL & REFINING CO. | OSFM LINE ID# 0184, 1152 & 1287 | 42609-00-002 | 11/30/2025 | 06 | 05/25/2025 | | | $63,900,000 |
| 44 | KINDER MORGAN LIQUID TERMINALS, LLC | SR - WEST CARSON TERMINAL (TANK 150050) | 40044-00-001 | 06/30/2025 | 04 | 03/31/2025 | | | $100,000,000 |
| 2541 | MATRIX OIL CORPORATION | SANSINENA FIELD | 42541-00-014 | 07/31/2025 | 01 | 07/31/2025 | | | $1,000,000 |
| 2516 | PACIFIC COAST ENERGY COMPANY LP | PACIFIC COAST ENERGY COMPANY LP/ ORCUTT HILL FACILITIES | 42516-00-001 | 12/31/2025 | 01 | 05/01/2025 | | | $1,713,100 |
| 2516 | PACIFIC COAST ENERGY COMPANY LP | PACIFIC COAST ENERGY COMPANY LP/WEST PICO (LA) DISTRIBUTION PIPELINE | 42516-00-002 | 12/31/2025 | 01 | 05/01/2025 | | | $1,713,100 |
| 2624 | PACIFIC PIPELINE COMPANY | LAS FLORES PIPELINE SYSTEM | 42624-00-001 | 08/31/2026 | 01 | 08/14/2025 | | | $101,000,000 |
| 2547 | PARAMOUNT PIPELINE, LLC | CSFM 0038 LINE 36-IDLE | 42547-00-008 | 07/31/2026 | 01 | 03/16/2025 | | | $52,250,000 |
| 2547 | PARAMOUNT PIPELINE, LLC | CSFM 0056 LINE 16-IDLE | 42547-00-007 | 07/31/2026 | 01 | 03/16/2025 | | | $52,250,000 |
| 2547 | PARAMOUNT PIPELINE, LLC | CSFM 0110 F-20 NORTH - IDLE | 42547-00-006 | 07/31/2026 | 01 | 03/16/2025 | | | $52,250,000 |
| 2547 | PARAMOUNT PIPELINE, LLC | CSFM 051 LINE #2 | 42547-00-001 | 07/31/2026 | 01 | 03/16/2025 | | | $52,250,000 |
| 2547 | PARAMOUNT PIPELINE, LLC | CSFM 121 LINE #35 | 42547-00-002 | 07/31/2026 | 01 | 03/16/2025 | | | $52,250,000 |
| 2547 | PARAMOUNT PIPELINE, LLC | CSFM 244 (1) CRUDE LINE | 42547-00-003 | 07/31/2026 | 01 | 03/16/2025 | | | $52,250,000 |
| 2547 | PARAMOUNT PIPELINE, LLC | CSFM 534 LINE #1 | 42547-00-004 | 07/31/2026 | 01 | 03/16/2025 | | | $52,250,000 |
| 2547 | PARAMOUNT PIPELINE, LLC | CSFM 558 - IDLE | 42547-00-005 | 07/31/2026 | 01 | 03/16/2025 | | | $52,250,000 |
| 2552 | PBF HOLDING COMPANY, LLC | 306 PRODUCTS PIPELINE | 42552-00-002 | 04/30/2025 | 01 | 03/31/2025 | | | $112,587,500 |
| 2552 | PBF HOLDING COMPANY, LLC | VERNON METERS | 42552-00-001 | 04/30/2025 | 01 | 03/31/2025 | | | $112,587,500 |

COSB AR004734

STATE OF CALIFORNIA – CALIFORNIA NATURAL RESOURCES AGENCY                              GAVIN NEWSOM, *Governor*

# CALIFORNIA COASTAL COMMISSION
455 MARKET STREET, SUITE 300
SAN FRANCISCO, CA 94105-2421
VOICE (415) 904-5200
FAX (415) 904-5400



<u>**NOTICE OF VIOLATION**</u>

<u>**Sent  by Electronic Mail**</u>

September 27, 2024

Steve Rusch
VP Environmental & Regulatory Affairs
Sable Offshore Corp.
srusch@sableoffshore.com

| | |
|---|---|
| Violation File No.: | **V-9-24-0152** (Sable Offshore Corporation) |
| Location: | At various locations along the existing Las Flores Pipelines CA-324 and CA-325 (previously known as Lines 901 and 903), which are part of the pipeline system originally constructed by Plains All American in 1988, spanning from the Gaviota coast to the Los Padres National Forest within Santa Barbara County, on 16 different properties. |
| Violation[1] description: | Unpermitted development in the Coastal Zone, including, but not necessarily limited to, excavation with heavy equipment and other activities associated with the Line 324 and 325. |

Dear Mr. Rusch:

As you have recently discussed with Cassidy Teufel and Wesley Horn of our staff, it has come to our attention that unpermitted activities are currently taking place in the Coastal Zone, including excavation and other activities at various locations along the existing Lines 324/325 (formerly known as Lines 901/903) now owned by Sable Offshore Corp. ("Sable")

---

[1] Please note that the description herein of the violation at issue is not necessarily a complete list of all unpermitted development on the subject property that is in violation of the Coastal Act and the Santa Barbara County LCP. Accordingly, you should not treat the Commission's silence regarding (or failure to address) other unpermitted development on the subject property as indicative of Commission acceptance of, or acquiescence in, any such development. Please further note that the term "violation" as used throughout this letter refers to alleged violations of the Coastal Act/County LCP.

COSB AR004735

Steve Rusch
Sable Offshore Corp.
Page 2

associated with a proposed restart of the Santa Ynez Unit. These activities constitute violations of the Coastal Act[2] and Santa Barbara County's Local Coastal Program ("LCP").

As you may know, the California Coastal Act was enacted by the State Legislature in 1976 to provide long-term protection of California's 1,250-mile coastline through implementation of a comprehensive planning and regulatory program designed to manage conservation and development of coastal resources. The California Coastal Commission ("Commission") is the state agency created by, and charged with administering, the Coastal Act of 1976. In making its permit and land use planning decisions, the Commission carries out Coastal Act policies, which, amongst other goals, seek to protect and restore sensitive habitats; protect natural landforms; protect scenic landscapes and views of the sea; protect the marine environment and its inhabitants; protect against loss of life and property from coastal hazards; and provide maximum public access to the sea. The Commission plans and regulates development and natural resource use in the coastal zone in keeping with the requirements of the Coastal Act.

**Violations**

It has been confirmed that Sable is currently performing various unpermitted construction activities in the Coastal Zone associated with upgrades to Lines 324/325 in connection with Sable's proposed restart of that pipeline.[3] As part of that proposed restart, Sable is currently undertaking work including a pipeline upgrade project to address pipeline corrosion in locations within the Coastal Zone and to install new safety valves in portions of the pipeline in the Coastal Zone. These activities constitute development and are not exempt from coastal development permit ("CDP") requirements.

Pursuant to Section 30106 of the Coastal Act and Section 35-58 the Santa Barbara County Local Coastal Program ("LCP"):

> *"Development" means, on land, **in or under water**, **the placement or erection of any solid material or structure**; discharge or disposal of any dredged material or of any gaseous, liquid, solid, or thermal waste; **grading, removing, dredging, mining, or extraction of any materials;** change in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act...change in the intensity of use of water, or of access thereto; **construction, reconstruction, demolition, or alteration of the size of any structure**…*
> (emphasis added)

---

[2] The Coastal Act is codified in the California Public Resources Code, sections 30000 to 30900. Unless otherwise indicated, references to section numbers in this letter are to that code, and thus, to the Coastal Act.

[3] The California Office of the State Fire Marshall has not reviewed or approved the proposed restart of the pipeline, which includes a review of a proposed State Waiver and a final Restart Plan, among other required materials. The Commission's investigation of this matter is continuing, and it reserves its right to review the proposed restart and other associated activities or other matters concerning the pipeline.

COSB AR004736

Steve Rusch
Sable Offshore Corp.
Page 3

Under this definition, the unpermitted development activities, as described above, constitute "development" under the Coastal Act and the County's LCP. Coastal Act Section 30600(a), and Section 35-58 of the Santa Barbara County LCP, require Sable to obtain authorization under the Coastal Act and/or the LCP prior to performing or undertaking any development activity in the Coastal Zone, in addition to obtaining any other permit required by law. Any non-exempt development activity conducted in the Coastal Zone without such authorization constitutes a violation of the Coastal Act/LCP. Thus, the unpermitted development activities described above constitute Coastal Act and LCP violations.

In addition, the upgrade project does not qualify as CDP-exempt repair and maintenance work. Activities that "result in addition to, or enlargement or expansion of, the object" of the activities require a CDP under the Coastal Act and the LCP.  (Public Resources Code § 30610(d); Coastal Zoning Ordinance § 35-169.2; Appendix C, Section I.)  At a minimum, because the project involves the installation of safety valves, this is an addition to the pipeline that does not qualify as "repair and maintenance."  Even if the project could be considered repair and maintenance (which it cannot), Section 30610(d) of the Coastal Act and the Appendix C, Section III of the LCP nonetheless require a CDP for categories of repair and maintenance activities that are designated as presenting a "risk of substantial adverse environmental impact."  These include the following:

(3) Any repair or maintenance to facilities or structures or work located in an environmentally sensitive habitat area, any sand area, within 50 feet of the edge of a coastal bluff or environmentally sensitive habitat area, or within 20 feet of coastal waters or streams that include: . . .

(B) The presence, whether temporary or permanent, of mechanized equipment or construction materials.

Title 14, California Code of Regulations § 13252(a)(3); Coastal Zoning Ordinance § 35-169.2; Appendix C, Section III(a)(3).)

Furthermore, although Sable appears to have taken the position that the upgrade project involves work for which the Coastal Act requirement for a CDP is entirely preempted, this is incorrect.  Although the California Office of the State Fire Marshall has authority over certain aspects of pipeline safety under the federal Pipeline Safety Act (49 U.S.C § 60101 *et seq.*), any resulting preemption is limited in scope.  Other state agencies, as well as local governments, may review and impose requirements related to other issues. Thus, the Commission and the County have jurisdiction to review and impose requirements relating to consistency with the Coastal Act and the LCP that do not pertain directly to pipeline safety. For example, a CDP review for construction impacts to environmentally sensitive habitat areas, cultural resources, water quality, or public access (to name a few) are not preempted. Finally, the 1988 settlement between the County and Celeron Pipeline Company does not affect the preemption analysis because the settlement cannot contractually limit the County's duties under the law or the applicability of the law. Thus, a CDP is required for the upgrade project.

Steve Rusch
Sable Offshore Corp.
Page 4

## Resolution

To begin resolution of the Coastal Act/LCP violations, please cease Immediately any unpermitted activities/development in the Coastal Zone associated with Lines 324/325.[4] At this time, we have no information that any development activities are currently taking place related to the three offshore platforms and offshore pipelines owned by Sable. However, if any such activities are taking place, please cease those as well. These are all activities that require a CDP and/or federal consistency review from the Commission.

Please note that in certain cases when unpermitted development takes place, but Commission staff believe that some version of the work could have been found to be consistent with the applicable standard of review and authorized accordingly, staff recommends that the party undertaking the development submit a CDP application to the regulating authority (in this case, Santa Barbara County), seeking after-the-fact ("ATF") authorization for the previously undertaken unpermitted development within the County's LCP jurisdiction. In other cases, when staff has determined that the unpermitted development is not something for which staff would recommend approval due its inconsistency with the Coastal Act/certified LCP, staff advises the alleged violator to seek resolution through removal, mitigation, restoration, and/or payment of penalties, etc., and not to seek a CDP to authorize such development.

In this case, we are uncertain at this time whether Santa Barbara County would be able to approve a CDP application from Sable that was seeking ATF authorization for the unpermitted construction activities that have already taken place, as well as authorization going forward for continued construction or other development activities related to the pipeline, such as the installation of safety valves. More information regarding the project would be necessary to come to any such conclusion at this time; however, since such an application might be found approvable by the County, we recommend that you submit a CDP application to the County as soon as possible. Please note that should the County grant approval of such a CDP application, those portions of the project that are located within the Coastal Commission's appeals jurisdiction would be appealable to the Commission and those portions of the project, if any, that are located within the Commission's original jurisdiction would require a CDP from the Commission.

To help us evaluate the project, it would be helpful if you could submit to us a complete description of all development activities currently taking place, as well as those activities that are being contemplated (e.g., installation of safety valves; any work to the platforms or offshore pipeline) prior to the anticipated restart of the pipeline, including scope of the project; exact locations of where the development activities are taking place/will take place; project schedule, etc.

## Enforcement Remedies

---

[4] Please note that interim measures to stabilize the site may also be necessary to avoid damages to coastal resources, and any such measures should be coordinated with Commission and County staff to avoid additional harm and to ensure consistency with Coastal Act/LCP requirements.

Steve Rusch
Sable Offshore Corp.
Page 5

Santa Barbara County has declined to enforce the above-noted Coastal Act/LCP violations, and thus, pursuant to Section 30810 of the Coastal Act, the Coastal Commission is pursuing enforcement regarding the Coastal Act/LCP violations described above.

Please note that the recent Settlement Agreement between Sable and the County does not preempt the Coastal Act or the LCP, and does not obviate the need for Sable to seek authorization for development activities in the Coastal Zone.

Whenever possible, Commission enforcement staff prefers to work cooperatively with alleged violators to resolve Coastal Act violations administratively. We are hopeful that we can resolve this matter without resorting to formal action. However, should we be unable to resolve this matter through this process, please be advised that the Coastal Act has a number of potential remedies to address violations of the Coastal Act, including the following:

Section 30809 states that if the Executive Director of the Commission determines that any person has undertaken, or is threatening to undertake, any activity that may require a permit from the Coastal Commission without first securing a permit, the Executive Director may issue an order directing that person to cease and desist. Section 30810 states that the Coastal Commission may also issue a cease and desist order. A cease and desist order may be subject to terms and conditions that are necessary to avoid irreparable injury to the area or to ensure compliance with the Coastal Act. Section 30811 also provides the Coastal Commission the authority to issue a restoration order to address violations at a site. A violation of a cease and desist order or restoration order can result in civil fines of up to $6,000 for each day in which each violation persists.

Additionally, Sections 30803 and 30805 authorize the Commission to initiate litigation to seek injunctive relief and an award of civil fines in response to any violation of the Coastal Act. Section 30820(a)(1) provides that any person who undertakes development in violation of the Coastal Act may be subject to a penalty amount that shall not exceed $30,000 and shall not be less than $500 per violation. Section 30820(b) states that, in addition to any other penalties, any person who "knowingly and intentionally" performs or undertakes any development in violation of the Coastal Act can be subject to a civil penalty of not less than $1,000 nor more than $15,000 per violation for each day in which each violation persists.

Finally, as of January 1, 2022, the Commission's administrative penalty authority was expanded, allowing the Commission to administratively impose penalties for all violations of the Coastal Act. Section 30821 and Section 30821.3 collectively authorize the Commission to impose administrative civil penalties in an amount of up to $11,250 per day for each violation.

Failure to resolve the violations noted above could result in formal action under the Coastal Act. Said formal action could include a civil lawsuit, the issuance of an Executive Director

Steve Rusch
Sable Offshore Corp.
Page 6

Cease and Desist Order or Commission Cease and Desist and/or Restoration Order, and/or imposition of monetary penalties, as described above, including imposition of administrative penalties.

We understand that you will be meeting soon with our staff to discuss the pipeline situation. Please contact me by telephone at **415-904-5269** or by email at jo.ginsberg@coastal.ca.gov within a week of that meeting, or by October 21, 2024, whichever is earlier, to discuss how you intend to resolve the Coastal Act/LCP violations associated with the pipeline. Also, you may contact Wesley Horn at Wesley.Horn@coastal.ca.gov to discuss any permitting or planning issues associated with the pipeline.

Failure to meet the deadline noted above may result in formal action by the Commission to resolve this Coastal Act violation, including initiation of the enforcement remedies discussed above.

Thank you for your cooperation and prompt attention to this matter.   I look forward to speaking with you soon.


Sincerely,

*Jo Ginsberg*

Jo Ginsberg,
Enforcement Analyst

cc:    Kate Huckelbridge, CCC, Executive Director
       Cassidy Teufel, CCC, Deputy Director
       Lisa Haage, CCC, Chief of Enforcement
       Sarah Esmaili, CCC, Senior Attorney
       Pat Veesart, CCC, Enforcement Supervisor
       Aaron McLendon, CCC, Deputy Chief of Enforcement
       Alex Helperin, CCC, Assistant Chief Counsel
       Joseph Street, CCC, EORFC Program Manager
       Jonathan Bishop, CCC, Oil Spill Program Coordinator
       Wesley Horn, CCC, Environmental Scientist
       Jim Hossler, CA State Fire Marshal, Jim.Hosler@fire.ca.gov
       Errin Briggs, Deputy Director, Santa Barbara County Planning & Development, ebriggs@countyofsb.org

STATE OF CALIFORNIA - NATURAL RESOURCES AGENCY                                    GAVIN NEWSOM, *Governor*

## CALIFORNIA COASTAL COMMISSION

455 MARKET ST, SUITE 300
SAN FRANCISCO, CA 94105-2219
FAX (415) 904-5400
TDD (415) 597-5885



**SENT VIA REGULAR, CERTIFIED, AND ELECTRONIC MAIL**

11/12/2024

Sable Offshore Corp.
12000 Calle Real
Goleta, CA 93117

| | |
|---|---|
| Subject: | **Executive Director Cease and Desist Order No. ED-24-CD-02** |
| Date Issued: | 11/12/2024 |
| Expiration Date: | 02/10/2024 |
| Violation File No: | V-9-24-0152 |
| Property Location: | Various open pit locations located along the existing Las Flores Pipelines CA-324 and CA-325[1] (previously known as Lines 901 and 903), where portions of the pipeline have been exposed, within the Coastal Zone between the Gaviota coast and the Las Padres National Forest, in Santa Barbara County, as well as areas surrounding those open pit locations, and any other areas impacted by the development activities at issue here. |
| Violations: | Unpermitted development in the Coastal Zone including, but not necessarily limited to, excavation with heavy equipment; removal of major vegetation; grading and widening of roads; installation of metal plates over water courses; dewatering and discharge or water; pipeline removal, replacement, and reinforcement; installation of safety valves; and other development associated with Las Flores Pipelines CA-324 and CA-325 [2] |

---

[1] The Las Flores Pipeline spans multiple properties, including those designated with the following Assessor's Parcel Numbers, all of which have open pits with exposed pipe in them: 081-230-021; 081-150-006; 081-150-007; 081-150-032; 081-150-033; 081-150-002; 081-150-028; 081-140-019; 081-140-025.

[2] Please note that the description herein of the violations at issue is not necessarily a complete list of all unpermitted development on the properties in violation of the Coastal Act.

Sable Offshore Corp.
11/11/2024
Page 2 of 10

## I.    ORDER

Pursuant to my authority under California Public Resources Code ("PRC") Section 30809, as the Executive Director of the California Coastal Commission ("Commission"), I hereby issue this Executive Director Cease and Desist Order ("EDCDO" or "this Order"), which orders you, Sable Offshore Corp. ("Sable"), as the owner and operator of Las Flores Pipelines CA-324 and CA-325, to cease and desist from undertaking any further unpermitted development and immediately undertake steps necessary to avoid irreparable injury to the properties at issue in this order until formal Commission action can occur. Those steps include, among other things, safely securing and stabilizing open pits ("Open Sites") along the existing Las Flores Pipelines CA-324 and CA-325 within the Coastal Zone ("Pipelines") and the immediately surrounding areas so as to prevent potentially significant damage to coastal resources until you have received a final coastal development permit[3] for further development or the Commission issues an order to restore the site or otherwise takes action to bring the site into a state that is safe and consistent with the law.

Compliance with the following terms is intended to ensure that all unpermitted development described in Section IV, below, remains halted, ensuring that further damaging effects to coastal resources are avoided, while Sable secures the sites and seeks authorization from the Commission for past and future (proposed) development, and/or for any steps needed restore the site. A future Commission action will likely be needed on a longer-term enforceable document addressing any remaining unpermitted development, any further or longer term remedial steps needed to be taken along the Pipelines, and potentially addressing other enforcement-related matters such as penalties, but this Order provides a more immediate and enforceable mechanism and framework for ensuring the Open Sites are safely secured in the interim.[4]

In addition, and more specifically, I hereby order you to comply with the following terms and conditions to avoid irreparable injury to the Open Sites and surrounding areas, pending any possible action by the Commission under PRC Sections 30810 and 30811 of the Coastal Act[5]:

---

[3] A "final" coastal development permit as used here means one that is: (a) no longer subject to appeal, either within the County system or to the Commission, and whether because the time period for such appeals has elapsed or because all such appeals have been completed; and also (b) no longer subject to judicial review, again whether because the statute of limitations for such a challenge has elapsed or because all such challenges have proceeded to completion.

[4] Please note that the description herein of the violation at issue is not necessarily a complete list of all development on the subject property that is in violation of the Coastal Act that may be of concern to the Commission. Accordingly, you should not treat the Commission's silence regarding (or failure to address) other development on the subject property as indicative of Commission acceptance of, or acquiescence in, any such development. Please further note that the term "violation," as used throughout this letter, refers to alleged violations of the Coastal Act.

[5] The Coastal Act is codified in PRC sections 30,000 *et seq.*

Sable Offshore Corp.
11/11/2024
Page 3 of 10

1. Cease and desist from conducting any further unpermitted development at the Open Sites with the exception of conducting remedial measures, to ensure intermediate securing of the Open Sites, as authorized and required by this Order.

2. Within 3 days of the effective date of this EDCDO, submit an Interim Restoration Plan ("Interim Plan") for the review and approval of the Executive Director of the Commission (the "Executive Director"), that will provide for steps for the interim securing of the Open Sites, including backfilling of the Open Sites, pending the securing of Coastal Act authorization for further development. Implement to completion, and consistent with its terms, the approved version of the Interim Plan, which shall include the following components, and a schedule for setting forth the time frame for commencing and completing each of the following:

   a. Interim Erosion Control Plan

      i. Within 3 days of the Effective Date of this EDCDO, Sable shall submit an Interim Erosion Control Plan.

         1. The Interim Erosion Control Plan shall be prepared by a qualified Restoration Specialist to address ground disturbance and prevent erosion during and after activities undertaken to safely secure the Pipelines under this Interim Plan, and shall include: 1) a narrative report describing all temporary run- off and erosion control measures to be used including replacement and/or recompaction of any excavated materials, and restorative grading to be done during and after removal/restoration activities; and 2) a site plan identifying and delineating the locations of all temporary erosion control measures that will be installed pursuant to this plan, including seeding of location-appropriate plant species to assist in erosion control.

         2. The Interim Erosion Control Plan will include a proposal that will provide a detailed work plan as to the steps to be taken to secure Open Sites, including backfilling the Open Sites with native soil from their respective excavations and compacting the soil, as needed, to achieve a level grade.

         3. The Interim Erosion Control Plan shall indicate that all erosion control measures are required to be installed and fully functional in the area impacted by the unpermitted development prior to, or concurrent with, the initial activities required by this EDCDO and maintained at all times throughout the term of the EDCDO, to minimize erosion across the site.

Sable Offshore Corp.
11/11/2024
Page 4 of 10

4. The Interim Erosion Control Plan shall demonstrate that Sable will strategically place and maintain security fencing to ensure that the Open Sites are safely secured, thereby preventing any potential access to the sites, and further disturbance to biological and coastal resources as well as to protect against adverse impacts to humans, wildlife and other animals.

5. The Interim Erosion Control Plan shall also include installation of appropriate erosion control BMPs in, and around, areas where vegetation was mowed or removed, and applying a hydroseed mix comprised of appropriate native plant species.

6. The Interim Control Erosion Plan shall include the following deadlines:

   a. Implement and complete the approved version of the Interim Plan within 7 days of its approval by the Executive Director

   b. Submit, within 5 days from completion of the work required under the Interim Plan, a report, including photographic evidence, documenting the completion of the work authorized by this EDCDO. If, after reviewing the report required by this EDCDO, the Executive Director determines that the work required by this EDCDO failed in whole or in part, Sable shall undertake any work that is required to ensure compliance with the approved plans or the requirements of this EDCDO.

3. Use of Equipment

   a. The Interim Plan shall include a detailed description of all equipment to be used. It is understood that mechanized equipment will likely need to be used to complete the activities required to implement the Interim Plan. The Interim Plan shall prohibit mechanized equipment that adversely impacts coastal resources, including wetlands and ESHA, protected under the Coastal Act. The Interim Plan shall include limitations on the hours of operations for all equipment.

   b. The Interim Plan shall provide for BMPs to govern the work required in the plan and include a contingency plan that addresses, at a minimum: 1)

Sable Offshore Corp.
11/11/2024
Page 5 of 10

impacts from equipment use; 2) potential spills of fuel or other hazardous releases that may result from the use of mechanized equipment and responses thereto; 3) impacts from equipment and worksite lighting, 4) impacts from equipment sound; and 5) all water quality concerns. The Interim Plan shall designate areas for staging of any construction equipment and materials including receptacles and temporary stockpiles of materials. All stockpiles and construction materials shall be covered, enclosed on all sides, located as far away as possible from drain inlets and any waterway, and shall not be stored in contact with the soil.

c. The Interim Plan shall specify that no demolition or construction materials, debris, or waste shall be placed or stored where they may enter sensitive habitat including wetlands, receiving waters, or a storm drain, or be subject to wind or runoff erosion and dispersion.

4. Within 120 days from effective date of this EDCDO, apply for a CDP for any proposed future work to be undertaken along the Pipelines, as well as for after-the-fact ("ATF") authorization for unpermitted development that has already occurred, by submitting a complete CDP application to Santa Barbara County for any development in its Coastal Act permitting jurisdiction and to the California Coastal Commission for any development in its retained permitting jurisdiction, or by submitting a consolidated permit application to the California Coastal Commission for all such development, if consistent with PRC section 30601.3. The CDP application(s) must include, at minimum, detailed site plans, information on the amount of grading (cut, fill, export) involved, Best Management Practices ("BMPs") to govern the work, wetland and environmentally sensitive habitat area ("ESHA") delineations for any wetlands or ESHA within 100 feet of any of the work, and results of both biological and cultural resource surveys of all areas potentially affected by the unpermitted and proposed development activities.

5. Any submittal to be provided to the Executive Director pursuant to this Order shall be provided by mail to the attention of Stephanie Cook at 455 Market Street, Suite 300, San Francisco CA 94107, with a copy sent via email to Stephanie Cook at Stephanie.Cook@Coastal.ca.gov and Wesley Horn at Wesley.Horn@Coastal.Ca.gov.

## II.    ENTITIES SUBJECT TO THE ORDER

The parties whose actions or inactions are subject to this Order are Sable Offshore Corp; all employees, agents, and contractors of the foregoing; and any other person or entity acting in concert with the foregoing.

## III.    IDENTIFICATION OF THE PROPERTIES

Sable Offshore Corp.
11/11/2024
Page 6 of 10

The properties[6] that are the subject of this Order, including the various Open Sites, areas surrounded by the Open Sites, and any other areas impacted by the development activities at issue here, are located along the Coastal Zone portion of existing Las Flores Pipeline CA-324 and CA-325 (previously known as Lines 901 and 903), which extends from the Gaviota coast to the Las Padres National Forest within Santa Barbara County.

## IV.    DESCRIPTION OF THE VIOLATIONS

The Coastal Act violations addressed by this Order[7] involve development that has occurred in the Coastal Zone without the requisite Coastal act authorization, including, but not necessarily limited to, excavation with heavy equipment; removal of major vegetation; grading and widening of roads; installation of metal plates over water courses; dewatering and discharge of water; pipeline removal, replacement, and reinforcement; installation of safety valves; and other development associated with the Las Flores Pipelines CA-324 and CA-325.

## V.    COMMISSION AUTHORITY TO ACT

The Executive Director is issuing this Order pursuant to her authority under PRC Section 30809, including, but not necessarily limited to, subdivision (a)(2) thereof.

## VI.    EXECUTIVE DIRECTOR'S FINDINGS

As the Executive Director of the Commission, I am issuing this Order pursuant to my authority under PRC Sections 30809(a) to prevent further significant damage to coastal resources that, without this order, would be likely to occur as a result of the current state of the Open Sites, and likely to be exacerbated by the upcoming rainy season. As such, this order requires Sable to take immediate steps to secure the Open Sites and submit a complete CDP application seeking Coastal Act authorization for all proposed future development along the Pipelines, as well as ATF authorization for any work that has already occurred.

Commission enforcement staff informed Sable of the violations of the Coastal Act in an initial Notice of Violation letter sent to Sable on September 27, 2024, in a follow-up letter sent October 4, 2024, and in multiple virtual meetings over the course of the following weeks.  A more detailed recitation of the history is provided below.

With limited exceptions not applicable here, PRC Section 30600(a) states that, in addition to obtaining any other permit required by law, any person wishing to perform or undertake any development in the coastal zone must obtain a CDP. "Development" is defined by Section 30106 of the Coastal Act as follows:

---

[6] See footnote 1

[7] See footnote 2.

Sable Offshore Corp.
11/11/2024
Page 7 of 10

> *"'Development' means, on land, in or under water, <u>the placement or erection of any solid material or structure</u>; discharge or disposal of any dredged material or of any gaseous, liquid, solid, or thermal waste; grading, removing, dredging, mining, or extraction of any materials; change in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act (commencing with Section 66410 of the Government Code), and any other division of land, including lot splits, except where the land division is brought about in connection with the purchase of such land by a public agency for public recreational use; <u>change in the intensity of use of water, or of access thereto</u>; <u>construction, reconstruction, demolition, or alteration of the size of any structure</u>, including any facility of any private, public, or municipal utility…"*   (emphasis added)

The Development described herein clearly constitutes "development" within the meaning of the above-quoted definition and therefore requires a CDP. Sable has not submitted an application for a CDP for any proposed future work, nor has Sable submitted any ATF application for work previously undertaken along the Pipelines and within the Coastal Zone. Because of the potential for significant damage to coastal resources, and inherent danger in leaving the Open Sites in their current state, particularly in light of the upcoming rainy season, this Order is necessary to ensure the Open Sites are quickly and safely secured.

As a jurisdictional requirement to issue this Order, I have determined that Sable has undertaken or is threatening to undertake development that may require a CDP, without first securing a CDP.

On October 4, 2024, I notified Sable of my intent to issue an Executive Director CDO pursuant to PRC section 30809 if certain information and assurances were not provided in a satisfactory manner. More specifically, in that letter, I requested detailed information as to the work that Sable has undertaken at the site, as well as proposed measures to temporarily secure the site, specific project plans, and written confirmation of their commitment to apply for an ATF CDP. Sable has failed to satisfactorily provide the information requested and has further failed to provide written confirmation of such intent.

On September 27, 2024, Commission staff sent a "Notice of Violation" letter informing Sable that the Commission had become aware of unpermitted activities taking place within the Coastal Zone, including excavation with heavy machinery, grading, and other activities at various locations along the Pipelines, apparently in connection with a proposed restart of the Santa Ynez Unit, consisting of three offshore platforms, Las Flores Canyon processing facility, and associated electrical transmission and onshore and offshore oil and gas transport pipelines. Commission staff requested Sable immediately cease all unpermitted development within the Coastal Zone, including all activities associated with Lines 324 and 325, as well as any potential development activities taking place along the offshore platforms and pipelines. Commission staff

Sable Offshore Corp.
11/11/2024
Page 8 of 10

further detailed the need for Coastal Act authorization for any development in the Coastal Zone, which should be sought through the submittal of an application(s) for the required CDP(s). On October 1, 2024, Sable met with Commission staff to further discuss the Coastal Act violations, and steps necessary to secure the Open Sites. In this conversation, Commission staff emphasized the need for additional information before any further work, including interim steps to secure the site, could be taken, and that legal authorization was needed. Nonetheless, on October 2, 2024, Sable emailed Commission staff and said work on Pipelines CA-324 and CA-325 within the Coastal Zone had been suspended, "subject to taking interim measures" they characterized as "necessary to stabilize the sites". In response, Commission staff met with Sable, on October 3, 2024, to, again, discuss the Open Sites and reiterate that whatever they apparently were calling interim measures was also development needing Coastal Act authorization, and that work must stop entirely, pending some legal authorization and offered to work with Sable to reach such agreement on interim authorization. On October 4, 2024, Commission staff sent a letter to Sable providing formal notice of the Executive Director's intent to issue an order, if necessary, to halt the ongoing project work and also to provide for a plan for site stabilization, and requested written assurances, by 2:00 pm that day, that Sable had, in fact ceased work entirely. Before this deadline, Sable emailed Commission staff confirming that all work, including what they were calling interim measures, had ceased. Unfortunately, Commission staff were subsequently informed that work along the Pipelines had not ceased. In response, Commission staff sent an additional email at 3pm on October 4, 2024, informing Sable that staff continued to receive reports stating that work was ongoing and asked that Sable confirm that work had fully stopped to which Sable responded to say they had "confirmed with field that all work has stopped."

Our October 4, 2024, letter additionally requested that information relating to the work being conducted along the Pipelines be submitted by 5:00 pm on October 7, 2024, and further requested that Sable provide written confirmation of intent to apply for a CDP(s) seeking ATF authorization for any work that had already occurred in the Coastal Zone and prospective authorization for any proposed future work. On October 7, 2024, Commission staff received an email from Sable providing a spreadsheet detailing the location of current open pit sites, but that stated that a full response to the information request could not be completed and that more time was needed. On October 8, 2024, Sable sent Commission staff a follow-up document which provided additional information as to work that had been undertaken at the Open Sites and steps required to fully complete the work at each site. However, no information was provided as to potential steps that could be taken to secure the sites temporarily but, instead, only information as to steps necessary to fully complete the project were given. In this document, Sable provided that project plans were in process, however Commission staff have yet to receive any full-scale work plans.

In the following weeks, Commission staff have had multiple virtual meetings and phone calls with Sable and their representatives to discuss the additional requested information, the existing state of the Open Sites, and potential paths forward. Much of these conversations have focused on the current state of the Open Sites and potential

Sable Offshore Corp.
11/11/2024
Page 9 of 10

interim steps to be taken to mitigate further damage to the coastal zone during the period of time needed for Sable to apply for CDPs, as detailed above. However, Sable has yet to satisfactorily provide, as required by PRC Section 30809, detailed information as requested in our October 4 letter, and remains unwilling to provide written confirmation as to commitment to apply for an ATF CDP for work previously undertaken within the Coastal Zone. During these conversations, Commission staff discussed with Sable a potential path forward, to ensure the sites could be safely, and legally, secured during the period of time needed for Sable to apply for CDPs as detailed above, through issuance of a Consent Cease and Desist Order. Unfortunately, Commission staff and Sable were unable to reach mutually agreeable terms.

## VII.    COMPLIANCE OBLIGATION

Strict compliance by the parties subject to this Order is required. Failure to comply with any term or condition of this Order, including any deadline contained herein will constitute a violation of this Order and subject the parties to exposure for penalties under section 30821.6. However, pursuant to PRC Section 30803(b), any person or entity to whom this Order is issued may file a petition with the Superior Court and seek a stay of this Order.

## VIII.    EFFECTIVE DATE

This Order shall be effective upon its issuance and shall expire 90 days from the date issued on 11/12/2024 unless extended consistent with the applicable regulations.

Should you have any questions regarding this matter, please contact Stephanie Cook at Stephanie.Cook@Coastal.ca.gov or Wesley Horn at Wesley.Horn@Coastal.ca.gov.

Signed,

Kate Huckelbridge
Executive Director
California Coastal Commission


Date:   11/12/2024

Enclosure:



Cc:    Lisa Haage, Chief of Enforcement
       Aaron McLendon, Deputy Chief of Enforcement

Sable Offshore Corp.
11/11/2024
Page 10 of 10

Alex Helperin, Deputy Chief Counsel
Wesley Horn, Environmental Scientist
Stephanie Cook, Enforcement Counsel

COSB AR004750