LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622
Fax: (805) 962-3152

*Attorneys for Environmental Defense Center,
Get Oil Out!, Santa Barbara County Action
Network, Sierra Club, and Santa Barbara
Channelkeeper*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| SABLE OFFSHORE CORP., et al.<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>COUNTY OF SANTA BARBARA, et al.<br><br>Respondents/Defendants,<br><br>and<br><br>ENVIRONMENTAL DEFENSE CENTER, et al.<br><br>Intervenors. | Case No.: 2:25-cv-04165-DMG-(AGRx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF INTERVENORS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PETITIONERS' MOTION FOR SUMMARY JUDGMENT**<br><br>Hon. Dolly M. Gee<br><br>Date: September 12, 2025<br>Time: 2:00 p.m.<br>Place: Courtroom 8C |

1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF INTERVENORS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PETITIONERS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................2

TABLE OF AUTHORITIES ..........................................................................3

INTRODUCTION ..........................................................................................5

FACTUAL BACKGROUND...........................................................................6

STANDARD OF REVIEW ...........................................................................11

ARGUMENT ...............................................................................................12

I.    First Cause of Action: The Board's Tie Vote Did Not Affirm, Reinstate, or Otherwise Leave in Place the Commission's Decision. ...............................12

    A.    The Board Hearing Was a De Novo Proceeding. .........................................13

    B.    The Tie Vote Did Not Affirm, Reinstate, or Otherwise Leave in Place the Commission's Decision. ...................................................14

II.    Second Claim for Relief: The Board's Authority under Chapter 25B Is Discretionary, and Thus Petitioners Cannot Avail Themselves of Traditional Mandamus Relief.....................................................17

    A.    The History, Purpose, and Framework of Chapter 25B Confirm Its Discretionary Nature. ...........................................................17

    B.    Discretionary Nature of Specific Findings and Substantial Evidence Supporting Denial................................................................20

        1.    The Operator Capability Finding ...............................................20

        2.    The Financial Assurance Finding(s) ...........................................22

    C.    Petitioners Are Not Entitled to Their Requested Relief...............................24

III.    Petitioners Third Claim for Relief: Substantial Evidence Supported a Denial...............................................................................24

CONCLUSION ............................................................................................25

2

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF INTERVENORS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PETITIONERS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Cases**

*AIDS Healthcare Found. v. Los Angeles Dept. of Public Health*,
  197 Cal.App.4th 693 (2011) ...................................................................................24

*Alameda Health Sys. v. Alameda Cnty. Employees' Ret. Assn.*,
  100 Cal.App.5th 1159 (2024) .................................................................................24

*Anderson v. Pittenger*,
  197 Cal.App.2d 188 (1961) ............................................................................. 14, 15

*Buchwald v. Katz*,
  8 Cal.3d 493 (1972) ...............................................................................................14

*Clark v. City of Hermosa Beach*,
  48 Cal.App.4th 1152 (1996) ........................................................................... 13, 15

*Collier & Wallis v. Astor*,
  9 Cal.2d 202 (1937) ...............................................................................................15

*Conlan v. Bonta*,
  102 Cal.App.4th 745 (2002) ...................................................................................12

*Desmond v. County of Contra Costa*,
  21 Cal.App.4th 330 (1993) ............................................................................. 12, 25

*Friends of Juana Briones House v. City of Palo Alto*,
  190 Cal.App.4th 286 (2010) ...................................................................................20

*Friends of Westwood, Inc. v. City of Los Angeles*,
  191 Cal.App.3d 259 (1987) ....................................................................................23

*Graves v. Commission on Professional Competence*,
  63 Cal.App.3d 970 (1976) ......................................................................................15

*Grist Creek Aggregates, LLC v. Super. Ct.*,
  12 Cal.App.5th 979 (2017) .....................................................................................16

*Health First v. Mar. Joint Powers Auth.*,
  174 Cal.App.4th 1135 (2009) .................................................................................20

*Karuk Tribe of California v. U.S. Forest Serv.*,
  681 F.3d 1006 (9th Cir. 2012) ................................................................................11

*Lagrutta v. City Council*,
  9 Cal.App.3d 890 (1970) ........................................................................................13

*Las Virgenes Educators Assn. v. Las Virgenes Unified School Dist.*
  86 Cal.App.4th 1 (2001) .........................................................................................22

*Lopez v. Imperial Cnty. Sheriff's Off.*,
  165 Cal.App.4th 1 (2008) .......................................................................................16

*McMillan v. City of Palm Springs*,
  No. E032066, 2003 WL 1521908 (Cal. Ct. App. Mar. 25, 2003) ...........................17

3

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF INTERVENORS' CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO PETITIONERS' MOTION FOR SUMMARY JUDGMENT

*Ortega v. Sacramento Cnty. Dep't of Health & Hum. Servs.*,
   161 Cal.App.4th 713 (2008) ...........................................................................................19

*Prentiss v. City of So. Pasadena*,
   15 Cal.App.4th 85 (1993) ...............................................................................................20

*Protecting our Water and Environmental Resources v. County of Stanislaus*,
   10 Cal.5th 459 (2020) .....................................................................................................19

*Rea Enterprises v. California Coastal Zone Conservation Com.*,
   52 Cal.App.3d 596 (1975) .........................................................................................14, 15

*Serv. Emps. Int'l Union Local 1021 v. Cnty. of Mendocino*,
   No. 20-CV-05423, 2021 WL 3471176, (N.D. Cal. Aug. 6, 2021) ...............................17

*Sierra Club v. Napa Cnty. Bd. of Supervisors*,
   205 Cal.App.4th 162 (2012) ...........................................................................................20

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
   809 F.2d 626 (9th Cir. 1987) ..........................................................................................11

*Thompson v. City of Lake Elsinore*,
   18 Cal.App.4th 49 (1993) ...............................................................................................24

*Today's Fresh Start, Inc. v. Los Angeles County Office of Education*,
   128 Cal.Rptr.3d 822 (2011) ............................................................................................16

*Toigo v. Town of Ross*,
   70 Cal. App. 4th 309, 322 (1998) ...................................................................................21

*Witt Home Ranch, Inc. v. Cnty. of Sonoma*,
   165 Cal.App.4th 543 (2008) ...........................................................................................20

**Regulations**

C.C.P. § 1085 ...........................................................................................................................11

C.C.P. § 1094.5 ........................................................................................................................12

C.C.P. § 1094.5(b) ...................................................................................................................24

C.C.P. § 1094.5(f) ....................................................................................................................25

S.B. Cnty Code § 25B-1 ..........................................................................................................19

S.B. Cnty Code § 25B-10(a)(2) ...............................................................................................23

S.B. Cnty Code § 25B-10(a)(9) .................................................................................20, 21, 22

S.B. Cnty Code § 25B-10(b) ...............................................................................................19, 23

S.B. Cnty Code § 25B-12(b)(4) ...............................................................................................13

S.B. Cnty Code § 25B-6(f)(2) ..................................................................................................19

S.B. Cnty Code § 25B-9(a)(2) ...........................................................................................22, 25

S.B. Cnty Code § 25B-9(e)(1) ...........................................................................................22, 25

S.B. Cnty Code, Chapter 25B ...........................................................................................passim

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF INTERVENORS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PETITIONERS' MOTION FOR SUMMARY JUDGMENT

# INTRODUCTION

This case involves a longstanding practice in Santa Barbara County ("County") to ensure that major established oil companies do not offload their assets near the end of their productive lives to smaller, less resourced and experienced companies that lack the ability to safely operate the facilities, respond to an accident such as an oil spill, and fulfill their decommissioning obligations. This practice is now formally codified in Chapter 25B of the County Code.

Under Chapter 25B, proposed changes in owners, operators, or guarantors of certain oil and gas facilities must be approved by the County through a discretionary process carefully designed to vet such changes. Intervenors Environmental Defense Center ("EDC"), Get Oil Out! ("GOO!"), Santa Barbara County Action Network ("SBCAN"), Sierra Club, and Santa Barbara Channelkeeper ("SBCK") (collectively, "Intervenors") seek to defend the intent and purpose of Chapter 25B, which has always been to prevent "the transfer of [County oil and gas permits] that would place the environment at risk," or threaten public health. ECF No. 39 at 6.

In this case, the County Board of Supervisors ("Board") appropriately did not approve the request to transfer ExxonMobil's permits to Sable Offshore Corp. ("Sable"). Intervenors—as well as numerous community members and other non-profit organizations—raised well-founded concerns about Sable's financial solvency and ability to comply with regulatory requirements at every possible stage of the Chapter 25B administrative proceedings. Although Sable had the opportunity to respond to concerns raised by the public and decision-makers, it refused to do so, and the Board ultimately voted 2-2 on its applications.

Sable challenges the validity of the Board's tie vote, which resulted in "no action" and thus did not approve the requested transfers. Contrary to Sable's claims, the Board's vote did not revert to the Planning Commission's decision because the Board's action was taken at a de novo hearing. As such, the Board was required to consider the matter

anew—as opposed to reviewing the propriety of the Commission's action—and render a decision based on the evidence before it.

For the reasons detailed below, Petitioners are not entitled to their first claim for relief because the Board's tie vote did not affirm the Planning Commission's decision. Petitioners' second claim for relief likewise fails because the findings under Chapter 25B are discretionary, not ministerial. Finally, Petitioners' third (alternative) claim fails because the Board appropriately applied the factors set forth in Chapter 25B, and the decision not to approve the transfers was based on substantial evidence in the record. Accordingly, Petitioners' Motion should be denied, and Intervenors' Cross-Motion granted.

## FACTUAL BACKGROUND

The Santa Ynez Unit ("SYU") is a dormant oil and gas production unit located on the Gaviota Coast. ECF No. 13-11, AR003202. It consists of three offshore platforms, on- and offshore pipelines, and onshore oil and gas processing facilities. *Id.* The onshore pipelines and processing facilities are within the County's land use authority. The oil processing facility is permitted under Final Development Plan ("FDP") Permit No. 87-DP-032cz (RV06) (the "SYU Permit"). ECF No. 13-11, AR002954. The natural gas is processed at the Pacific Offshore Pipeline Company ("POPCO") Gas Plant, which is permitted under FDP Permit No. 93-FDP-015 and 74-CP-11(RV1) (the "POPCO Permit"). ECF No. 13-11, AR002954.

Once processed, crude oil travels from Las Flores Canyon inland through CA-324 and CA-325, collectively referred to as the Las Flores Pipeline System ("LFPS," and together with the SYU and POPCO Gas Plant, the "Facilities"). ECF No. 13-11, AR003202. The LFPS is permitted under FDP Permit Nos. 88-DPF-033 (RV01)z; 88-CP-60 (RV01); and 88-DPF-25cz, 85-DP-66cz, 83-DP-25cz (the "LFPS Permit," and together with the SYU and LFP Permits, "FDPs" or the "Permits"). *Id.*

On May 19, 2015, pipeline CA-324—then owned by Plains Pipeline, L.P. ("Plains")—ruptured at Refugio State Beach Park, releasing more than 120,000 gallons

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF INTERVENORS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PETITIONERS' MOTION FOR SUMMARY JUDGMENT

of heavy crude oil into the surrounding environment. ECF No. 13-11, AR003202. Thousands of acres of shoreline and subtidal habitat were destroyed, and untold numbers of wildlife were injured or killed. *Id.* The spill forced the closure of fisheries and beaches, which jeopardized local businesses and caused an estimated 140,000 lost recreational user days between Santa Barbara and Ventura Counties. *Id.* at AR003202-03.

It was later determined that the spill was a result of pervasive corrosion, and that cathodic protection—intended to prevent such corrosion—is ineffective on the pipeline system. *Id.* at AR003203. Effective cathodic protection is, and always has been, required by the LFPS Permit. *Id.* at AR003225-28.

Following the spill, the LFPS was idled, and it remains idle to date. *Id.* at AR003203. Due to the unavailability of the pipelines, production at the SYU was suspended indefinitely. *Id.*

Initially, Plains attempted to replace the defective LFPS. However, it later sought instead to divest itself of the pipelines, triggering the Chapter 25B transfer process. On September 19, 2023, the Board granted de novo approval of a transfer of the LFPS from Plains to Pacific Pipeline Company ("PPC") (Owner), ExxonMobil Pipeline Company (Operator), and ExxonMobil Corporation (Guarantor). ECF No. 13-1, AR000022; ECF No. 13-11, AR002292, 2297.

Then, on or around February 14, 2024, ExxonMobil sold the SYU and all associated assets to Sable—a new company formed specifically to acquire the SYU assets. ECF No. 13-1, AR000018; ECF No. 13-11, AR003204. ExxonMobil also divested its exclusive ownership of shares in PPC to Sable, and with them, the LFPS. ECF No. 13-1, AR000269; ECF No. 13-11, AR003204. Because it lacked the capital to finance the $625M acquisition, Sable was forced to secure a $622M loan from ExxonMobil. ECF No. 13-11, AR003204-05.

Notably, Sable intends to restart the LFPS despite its lack of effective cathodic protection, leaving it vulnerable to pervasive corrosion and another spill. ECF No. 13-11, AR003206. One analysis prepared for the County determined that restarting the pipelines

could result in a spill every year, and a rupture every four years. ECF No. 28-12, AR003294-98.

The Permits, which are subject to Chapter 25B of the County Code, do not currently list Sable as the owner, operator, and/or guarantor of the Facilities. ECF No. 13-11, AR002954. The Permits are not transferable, and the owner, operator, or guarantor listed on the Permits cannot be changed, except in accordance with Chapter 25B. Chapter 25B-4(c).[1] Chapter 25B is intended to protect public safety and preserve environmental quality by ensuring responsible operations, financial solvency, and adherence to regulatory requirements. Chapter 25B-1. As recognized by this Court, "Chapter 25B does not merely provide for the transfer of FDPs, it creates an administrative process designed to bar the transfer of FDPs to a transferee that would place the environment at risk." ECF No. 39 at 6.

On or around March 14, 2024, Sable submitted applications to change the owner, operator, and guarantor of the Facilities pursuant to Chapter 25B (the "Applications"). ECF No. 13-11, AR002954. After several incompleteness determinations, a hearing on the Applications before the Planning Commission ("Commission") was set for October 30, 2024. On October 22, 2024, County staff released a report with a recommendation that the Commission make the required findings and approve the Applications. ECF No. 13-1, AR000015-67.

Intervenors submitted written comments opposing the requested transfers. ECF No. 13-9, AR001746-48; ECF No. 13-9, AR001752 to ECF No. 13-10, AR001758; ECF No. 13-10, AR001781-82; ECF No. 13-10, AR001795-97; ECF No. 13-10, AR-001867-972. In their comments, and again at the hearing, Intervenors urged the Commission to deny the Applications due to a lack of evidence to support the findings required by Chapter 25B. ECF No. 13-10, AR001867-972; ECF No. 13-10, AR002058 to ECF No. 13-11, AR002169; ECF No. 13-11, AR003199 to ECF No. 28, 12-1, AR003472. Among other things, Intervenors raised significant concerns regarding Sable's ability to safely

[1] Chapter 25B is attached to Intervenors' Request for Judicial Notice (RJN) as Exhibit 2.

8

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF INTERVENORS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PETITIONERS' MOTION FOR SUMMARY JUDGMENT

restart the Facilities in compliance with the Permits, responsibly operate them, and fulfill its remediation and decommissioning obligations if another spill were to occur. *See, e.g.,* ECF No. 13-21, AR006876-77, AR006879-80, AR006848-50, AR006828-30, AR006867-69, AR006873-74, AR006833-34. Many of the issues raised by Intervenors were echoed by an outpouring of opposition from community members at the hearing. *See, e.g.,* ECF No. 13-21, AR006830, AR006835-37, AR006839-40, AR006845-47. Based on staff's direction and guidance, the Commission nevertheless approved the Applications in a 3-1 vote. ECF No. 13-10, AR002007-09.

On November 7, 2024, GOO!, EDC, and SBCAN filed an appeal of the Commission's decision to the Board. ECF No. 13-10, AR002058 to ECF No. 13-11, AR002169.

County staff issued a Board Letter in advance of the appeal hearing, recommending that the Board deny the appeals and grant de novo approval of the Applications. ECF No. 13-10, AR002047-49; ECF No. 13-11, AR002953-69. On February 21, 2025, GOO!, EDC, and SBCAN submitted a comment letter to the Board with over 200 pages of evidence attached, urging the Board to deny Sable's Applications. ECF No. 13-11, AR003200 to ECF No. 28, 12-1, AR003472. As part of their submittal, they included a letter from John Day, former Planning and Development staff and one of the authors of Chapter 25B, to counter staff's misguided interpretation of its requirements. ECF No. 13-11, AR003208-09; *see also* ECF No. 13-17, AR006294. Intervenors also submitted notices of violation and cease and desist orders from several state agencies to Sable concerning alleged non-compliance with state laws. ECF No. 13-11, AR-003234-35. The letter also compared Sable's cash assets, debt, and insurance limits to the $870 million dollar price tag on the 2015 spill to demonstrate inadequate financial resources to respond to another spill. ECF No. 13-11, AR003215-16.

At the Board's de novo hearing, the Board heard the matter anew, received additional evidence, and decided whether it should grant or deny the Applications. ECF No. 13-11, AR002953. EDC, on behalf of GOO!, SBCAN, and EDC, presented evidence

9

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF INTERVENORS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PETITIONERS' MOTION FOR SUMMARY JUDGMENT

at the hearing to the Board. ECF No. 13-20, AR006630-47; ECF No. 13-21, AR006987-7004. At the hearing, Chair Capps cited evidence that the County "created an ordinance so that it gave us an actual role, not a toothless role, not a checklist role, but an actual role for the people." ECF. No. 13-21, AR007002. During deliberations, Chair Capps stated that "even within the narrow confines of what we're actually doing here, there are too many red flags … this is about fiscal oversight." ECF No. 13-21, AR007140-41. Chair Capps cited the Coastal Commission cease and desist order and questioned why Sable's insurance policy had not been provided to Respondents; "If they had wanted to show the insurance policy, they could have, and so much has been made over the last several months about this policy. Why not just show it?" ECF No. 13-21, AR007141. Chair Capps concluded by stating that she could not "say that this transfer gives [her] reassurance of fiscal stability." ECF No. 13-21, AR007142.

The Board ultimately voted 2-2 on a motion to grant de novo approval of the Applications. ECF No. 13-21, AR007142-43. As set forth in the Board Letter, de novo approval of the Applications by the Board required a majority vote. ECF No. 13-11, AR002953. A tie vote does not satisfy this requirement, and thus the vote constituted "no action." ECF No. 13-21, AR006774-77; ECF No. 33-1, AR007222-28.

On February 26, 2025, counsel for Sable sent a letter to the County requesting that the County immediately transfer the Permits to Sable. ECF No. 13-21, AR006771-73. The letter contended that the Board's tie vote affirmed the Commission's approval. ECF No. 13-21, AR006772. The letter did not address the de novo standard of review on appeal to the Board under Chapter 25B-12(b)(4) or County staff's recommended action to the Board to grant de novo approval of the Applications.

In a letter to the Board dated March 1, 2025, Intervenors provided support for the position that a tie vote was "no action" and did not affirm the Commission's approval. ECF No. 13-21, AR006774-78. On March 7, 2025, Intervenors submitted a second letter responding to Sable's February 26 letter. ECF No. 33-1, AR007222-28. This letter described County Counsel's recorded statements during the Board's similar de novo

hearing on appeal from the Commission's April 26, 2023, denial of the Existing Oil Lines 901/903 Valve Upgrade Project. ECF No. 33-1, AR007225-26; *see also* RJN, Exh. 4, pp. 140-41, wherein County Counsel explained that the Board's tie vote resulted in "no action," neither affirming nor denying the Commission decision.

On June 27, 2025, the State Fair Political Practices Commission sent County Counsel an advice letter, concluding that Supervisor Hartmann, who had previously recused herself, "does not have a disqualifying financial interest in the County's decisions regarding Sable's application and the related litigation," and California Government Code "Section 1090 does not prohibit [her] from making or participating in the approval of the change of operator, owner or guarantor and permit transfer litigation decisions, and any potential settlement agreement." RJN, Exh. 1, pp. 1-2.

Respondents have not transferred the Permits to Sable. ECF No. 1, ¶ 9. Petitioners filed the instant litigation on May 8, 2025, ECF No. 1, and Respondents filed their Answer on May 30, 2025, ECF No. 21. On June 6, 2025, the Court bifurcated the action into two phases and set a briefing schedule for Phase I regarding Petitioners' first three causes of action. ECF No. 24. On July 25, 2025, this Court granted Intervenors' Motion to Intervene in all phases of the litigation.[2] ECF No. 39 at 8.

## STANDARD OF REVIEW

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012). The evidence must be viewed, and inferences must be drawn, in the light most favorable to the nonmoving party. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987).

Sable seeks mandamus relief under both California Code of Civil Procedure ("C.C.P.") sections 1085 and 1094.5. "[A] writ of mandate under section 1085 is

---

[2] Following the Board hearing, Sierra Club and Santa Barbara Channelkeeper joined the groups represented by EDC in this matter.

available where the petitioner has no plain, speedy and adequate alternative remedy; the respondent has a clear, present and usually ministerial duty to perform; and the petitioner has a clear, present and beneficial right to performance." *Conlan v. Bonta*, 102 Cal.App.4th 745, 752 (2002), *as modified on denial of reh'g* (Oct. 29, 2002)*. Section 1094.5, on the other hand, "is appropriate to inquire 'into the validity of any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal.'" *Id.*

Here, the Board was required to hold a hearing, take evidence, and exercise its discretion in determining whether the evidence supported a finding of compliance with the factors set forth in Chapter 25B. As such, in accordance with section 1094.5, the Court must "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." The burden is on the petitioner to "show there is no substantial evidence whatsoever to support the findings of the [agency]." *Desmond v. County of Contra Costa*, 21 Cal.App.4th 330, 336-37 (1993) (an agency's decision to deny a project "must be upheld" if even *one finding* is supported by substantial evidence).

## ARGUMENT

### I. First Cause of Action: The Board's Tie Vote Did Not Affirm, Reinstate, or Otherwise Leave in Place the Commission's Decision.

The question presented by Petitioners' First Cause of Action is narrow: what is the legal effect of the Board's tie vote within the context of Chapter 25B-12(b)(4)? Petitioners claim that the Board's tie vote affirmed the Commission's approval because the Board acted as a court of review, did not issue its own findings, and did not decide whether to grant or deny the Applications. ECF No. 36-1 at 14, 17. But Petitioners mischaracterize both the nature of the Board's review and the applicable law here. The hearing before the Board was de novo, meaning that the Board was reviewing anew the Applications without regard to the Commission's decision. Where the Board hears a

matter de novo, a tie vote—in which no action is taken by the Board—neither grants an approval nor leaves in place the lower body's decision. Instead, it effectively functions as a denial.

### A.    The Board Hearing Was a De Novo Proceeding.

The basic premise of Petitioners' argument here—that the Board was merely reviewing the Commission's decision—is patently incorrect. Chapter 25B-12(b)(4) unambiguously confirms that "[t]he Board hearing shall be *de novo*." RJN, Exh. 2 (emphasis added).

"Although administrative review is usually called an appeal, in most jurisdictions it is a de novo proceeding in which the entire case is repeated." *Lagrutta v. City Council*, 9 Cal.App.3d 890, 895 (1970). "[U]nless specifically restricted by ordinance," the higher body "may hear the matter de novo and make its own determination as to whether facts are such as to require, under the provisions of the [] ordinance, the granting of the [approval]." *Id.* Indeed, a de novo hearing in the administrative appeal context does not limit the appellate body to reviewing the lower body's decision for error—the appellate body may take additional evidence, and *it* decides whether to grant or deny the application. *Clark v. City of Hermosa Beach*, 48 Cal.App.4th 1152, 1175 (1996), *as modified on denial of reh'g* (Sept. 11, 1996) (hereinafter "*Clark*").

Despite the plain language in Chapter 25B providing for de novo review on appeal to the Board, Petitioners suggest that the Board was limited to reviewing the Planning Commission's decision for error—i.e., that the hearing was *not* de novo. In doing so, Petitioners selectively cite Chapter 25B-12's language that "the board shall affirm, reverse, or modify the planning commission's decision." ECF No. 36-1 at 14. But the ordinance must be read as a whole. Petitioners ignore the immediately preceding language, which provides that an appeal triggers a new public hearing before the Board, and that "[t]he Board hearing *shall be de novo*." Hence, staff recommended that the Board "[m]ake the required findings" anew and "grant *de novo* approval of the" Applications. ECF No. 13-11, AR002953 (emphasis in original).

Moreover, nothing in Chapter 25B purports to limit the Board's review to the record before the Planning Commission or prohibit the introduction of new or additional evidence on appeal. Where no such limitations exist, "[t]he [Board] is not bound by the findings of the commission or by the testimony of the commission," and the matter is heard de novo. *Anderson v. Pittenger*, 197 Cal.App.2d 188, 194 (1961) (hereinafter "*Anderson*").

Lastly, the court in *Rea Enterprises v. California Coastal Zone Conservation Com.*, 52 Cal.App.3d 596 (1975) (hereinafter "*REA Enterprises*") examined the exact language that Petitioners rely on here—"the board shall affirm, reverse, or modify the planning commission's decision"—and rejected Petitioners' position. *Id.* at 607. The court reasoned that "affirm" could mean "either the granting or denial of the permit," "reverse" could "place in effect a contra-order of either a grant or denial," or "modify" could pertain to "conditions or extent of any grant of permit." *Id.* The court therefore determined "that the State Commission's jurisdiction [was] not limited to merely one of an appellate nature," and an affirmative vote to grant or deny the permit was required. *Id.* at 610.

Thus, the Board's hearing was de novo and required the Board to make its own factual findings and determine whether *it* should grant or deny the Applications.

## B.    The Tie Vote Did Not Affirm, Reinstate, or Otherwise Leave in Place the Commission's Decision.

Where a matter is heard de novo and results, after a tie vote, in "no action," the great weight of cases addressing the issue have concluded the lower body's decision does not stand.

As explained by the Supreme Court of California, a hearing "de novo" is "'a new hearing, or a hearing the second time.… It is in no sense a review of the hearing previously held, but is a complete trial of the controversy, the same as if no previous hearing had ever been held.'" *Buchwald v. Katz*, 8 Cal.3d 493, 501 (1972) (quoting *Collier & Wallis v. Astor*, 9 Cal.2d 202, 205 (1937)). Thus, a decision after a de novo

hearing "takes the place of and completely nullifies the former determination of the matter." *Collier*, 9 Cal.2d at 205.

As here, *Clark* involved an appeal whereby a city council reached a tie vote after "hear[ing] the matter de novo, tak[ing] additional evidence at a public hearing, and decid[ing] whether *it* should grant or deny the [application]." 48 Cal.App.4th at 1175. Because the matter was heard de novo, the court noted that the applicant needed a majority vote from the council for approval and, as such, a tie vote at a de novo hearing "would not suffice" to grant the application, and the vote resulted in "no action." 48 Cal.App.4th at 1176 (quoting *Graves v. Commission on Professional Competence*, 63 Cal.App.3d 970, 976-77 (1976)).

Similarly, in *Anderson*, which involved an appeal of a planning commission's zoning variance approval, the court held that a city council's tie vote resulted in "no action" and "was not an affirmance of the order of the commission." 197 Cal.App.2d at 194-95. As in *Clark*, relevant to the *Anderson* court was that the matter was heard de novo. *Id* at 195.

The court in *Rea Enterprises* went even further. There, the court considered the effect of a state commission's tie vote on an appeal of a development permit. As noted above, the statutory scheme at issue included language that was substantially similar to Chapter 25B-12. Because the state commission heard the matter de novo, the court concluded that the commission's tie vote not only failed to affirm the lower body's decision, but "effectuated a ***denial*** of the issuance of the development permit." 52 Cal.App.3d at 607 (emphasis added).

Thus, in considering the effect of a tie vote, what the courts in *Clark*, *Anderson*, and *REA Enterprises* found dispositive was that the appellate body was hearing the matter de novo. As explained above, that is unequivocally what occurred here. Thus, consistent with these cases, the Board's tie vote did not affirm or otherwise leave in place the Commission's decision.

The cases cited by Petitioners are inapplicable and do not compel a different outcome. ECF No. 36-1 at 14-16. Most importantly, none of the cases analyzed the effect of a tie vote at a *de novo* hearing.

First, *Grist Creek Aggregates, LLC v. Super. Ct.*, on which Petitioners heavily rely, is inapposite. 12 Cal.App.5th 979 (2017) (hereinafter "*Grist*"). The parties in *Grist* actually "agree[d] that the effect of the tie vote was to affirm the issuance of the November ATC." *Id.* at 986. The court did not purport to analyze the effect of a tie vote after de novo review, which is at the heart of the controversy here. The court also specifically pointed out that "tie votes mean different things in different contexts. *In the statutory and procedural context presented here*, the tie vote meant that the Hearing Board effectively allowed the November ATC to stand." 12 Cal.App.5th at 992 (emphasis added). In addition, *Grist* relied, in part, on a depublished opinion to reach its conclusion. *Id.* at 992, n. 6 (citing *Today's Fresh Start, Inc. v. Los Angeles County Office of Education*, 128 Cal.Rptr.3d 822 (2011), *review granted and opinion superseded*, (2011) 262 P.3d 854, *and aff'd.*, 57 Cal.4th 197 (2013) (hereinafter "*Today's Fresh Start*"). Besides being depublished, *Today's Fresh Start* is distinguishable because, unlike here, *it did not involve de novo review*; instead, the role of the appeals board was to review the lower body's decision and determine whether its findings were supported by substantial evidence. *Id.* at 839.

Petitioners' reliance on *Lopez v. Imperial Cnty. Sheriff's Off.*, 165 Cal.App.4th 1 (2008) is also misplaced. There, a county employment appeals board "affirmed" the termination of correctional sergeants by tie votes. *Id.* at 3-4. The court found, citing *Clark*, that the board's tie vote was a failure to act, but it did not hold that such failure effectively affirmed the lower body's decision. *Id.* at 4. Instead, it remanded the matter for another vote and, in the meantime, returned the appellants "to the status quo ante"— i.e., terminated. *Id.* Thus, *Lopez* does not compel the result Petitioners seek. Plus, to the extent Petitioners ask to be returned to the "status quo ante," that would leave them in the

same position they are in now—without Permits—since the Planning Commission decision was stayed pending appeal.[3]

In sum, the Board's tie vote at a de novo hearing did not affirm, reinstate, or otherwise leave in place the Commission's decision. Petitioners are thus not entitled to their first claim for relief, and Intervenors' Cross-Motion should be granted.

## II. <u>Second Claim for Relief: The Board's Authority under Chapter 25B Is Discretionary, and Thus Petitioners Cannot Avail Themselves of Traditional Mandamus Relief.</u>

In the alternative, Petitioners contend that the Board had a ministerial duty to act on and deny the appeals. ECF No. 36-1 at 18. Fatal to Petitioners' claim, however, is that Chapter 25B sets forth an inherently discretionary process, vesting County decision-makers with the discretion to determine whether to approve a transfer and under what conditions. Thus, Petitioners' second claim fails.

### A. The History, Purpose, and Framework of Chapter 25B Confirm Its Discretionary Nature.

In the decade leading up to Chapter 25B, there was a growing trend in which major companies operating in the County—e.g., Exxon—would divest themselves of maturing oil fields and offload their assets to new, speculative companies—e.g., Sable. ECF No. 28-12, AR003302. For the County, this raised a very real concern as to whether these "second generation" operators—which tend to "lack the vast array of financial assets … of the first generation"—would be capable of responsibly operating, remediating an oil spill, and decommissioning their facilities. ECF No. 28-12, AR003301-02.

//

---

[3] Petitioners cite two additional cases: *Serv. Emps. Int'l Union Local 1021 v. Cnty. of Mendocino*, No. 20-CV-05423, 2021 WL 3471176, (N.D. Cal. Aug. 6, 2021) ("*Service Employees International*") and *McMillan v. City of Palm Springs*, No. E032066, 2003 WL 1521908 (Cal. Ct. App. Mar. 25, 2003). These cases are unpublished and uncitable. In any event, neither case presents a relevant factual context nor offers any insight into the meaning of a tie vote in the present circumstances.

Before Chapter 25B, the County attempted to address this concern by processing, where allowable, owner/operator changes as permit revisions or substantial conformity determinations on a case-by-case basis under the Zoning Ordinance. ECF No. 28-12, AR003301-02. "The key issues that [were] considered in these evaluations [were] a) that new owners and operators accept the permit, b) that new operators have the experience and expertise needed for safe operations, and c) that adequate financial guarantees for accidents and abandonment have been provided." ECF No. 28-12, AR003302. Importantly, what constituted "adequate" financial assurances was left to the discretion of the County and was evaluated by conducting a thorough review of the facilities at issue and the proposed owner/operator's financial capacity. ECF No. 28-12, AR003302, AR003332.

While this approach allowed the County some amount of oversight, there were concerns that not all permits allowed for such review, and there was a lack of uniform guidance where such review was permissible. ECF No. 28-12, AR003301-02. Chapter 25B was introduced (1) to create a more predictable and uniform transfer process, but more importantly, (2) to codify the County's historical review process, including its broad examination of operational and financial capacity. ECF No. 28-12, AR003302, AR003332.

Thus, Chapter 25B was never intended to be the ministerial process that Petitioners paint it as, void of any County discretion. Rather, it requires that the County conduct a searching inquiry into a proposed owner/operator's finances and capacity to ensure that the entity can safely operate major oil and gas facilities, remediate a spill (or any other type of accident), and abandon the facilities at issue. ECF No. 13-11, AR003201; ECF No. 28-12, AR003240-44. Indeed, without such discretion, the County could not effectuate the ordinance's stated purpose to protect public health and the environment. Chapter 25B-1.

The general framework of Chapter 25B, unsurprisingly, bears out its discretionary nature. To protect residents and the environment from unqualified or underfunded

operators, Chapter 25B authorizes County decisionmakers to engage in deliberation to ensure "safe operation, adequate financial responsibility, and [legal] compliance … during and after" changes in ownership or operation of certain oil and gas facilities. § 25B-1. What qualifies as "*safe* operation" and "*adequate* financial responsibility" requires the exercise of judgment based on information provided by the applicant and requested by the decision-makers.

Chapter 25B-10(b), the "permit re-opener" provision, underscores the breadth of this discretion. It allows decisionmakers to "impose additional conditions on the permit in order to ensure that any insurance or other financial guarantees that were submitted to and relied on by the [P]lanning [C]ommission as a basis to make any finding required by this chapter are maintained." In other words, the provision specifically contemplates that decisionmakers may request assurances to their satisfaction, and that they can condition a transfer accordingly—a hallmark of discretionary action. *Protecting our Water and Environmental Resources v. County of Stanislaus*, 10 Cal.5th 459, 467 (2020).

Moreover, Chapter 25B-6 explicitly grants unfettered discretion to decisionmakers to request "[a]ny … information" that decisionmakers "may require" to make a decision on an application. Section 25B-6(f)(2).[4] This provision likewise indicates that Chapter 25B does not require decision-makers to act in a prescribed manner but vests it with discretion in making findings under 25B. *See Ortega v. Sacramento Cnty. Dep't of Health & Hum. Servs.*, 161 Cal.App.4th 713, 733 (2008) ("[T]he exercise of discretion invariably entails the collection and evaluation of information.").

//

//

---

[4] The utility of this provision was confirmed by County staff during the February 25 Board hearing. AR006983, lines 13-14 ("we can ask for any information at any time, and if you wanted to do that today with [the applicant] here in the room"). Notably, Chair Capps exercised her discretion under this provision to request a copy of Sable's insurance policy, which Sable never produced. ECF No. 13-21, AR006823, lines 11-19; ECF No. 13-21, AR006983, lines 5-16.

Accordingly, Chapter 25B contemplates a discretionary process whereby the County can carefully scrutinize a proposed transfer and, if necessary, "bar the transfer of FDPs to a transferee that would place the environment at risk." ECF No. 39 at 6.

## B.  Discretionary Nature of Specific Findings and Substantial Evidence Supporting Denial

Ignoring the above, Petitioners incorrectly assert that Chapter 25B is merely a "box-checking" exercise, citing cases that lack any resemblance to the Chapter 25B framework.[5] However, consistent with the discretionary nature of Chapter 25B, the key findings under the ordinance clearly demand independent judgment and analysis. Such discretion is most evident in the findings concerning operational and financial capacity, addressed below.

### 1.    The Operator Capability Finding

To approve a transfer, Chapter 25B requires a finding that:

> The proposed operator has the skills, training, and resources necessary to operate the permitted facility in compliance with the permit and all applicable county codes…. The director shall require relevant records of compliance, and corrective actions taken subsequent to any major incidents for facilities, if any, … as may be necessary to make findings.

Section 25B-10(a)(9).

---

[5] *See Prentiss v. City of So. Pasadena* 15 Cal.App.4th 85, 89 (1993) (stands for the general proposition that the issuance of a building permit, which can involve set criteria under the applicable zoning ordinance and Uniform Building Code, is "ordinarily" ministerial); *Witt Home Ranch, Inc. v. Cnty. of Sonoma*, 165 Cal.App.4th 543, 565–66 (2008) (did not evaluate an *adjudicative* type action, which is what occurred here); *Health First v. Mar. Joint Powers Auth*., 174 Cal.App.4th 1135, 1144 (2009) (committee lacked discretion because, unlike here, review involved a checklist of about 124 yes-or-no questions); *Friends of Juana Briones House v. City of Palo Alto*, 190 Cal.App.4th 286, 305 (2010) (approval of a demolition permit was ministerial act based an ordinance that mandated only two prerequisites for the permit (vacant residence and notify tenants) that, unlike here, were clearly "fixed standards, capable of objective assessment"); *Sierra Club v. Napa Cnty. Bd. of Supervisors*, 205 Cal.App.4th 162, 177 (2012) (ordinance expressly identified lot line adjustments as ministerial acts).

Petitioners propose an absurd interpretation of this provision, claiming "the second sentence makes this section ministerial by detailing steps the County may take," and suggesting that the County's review here is limited to ensuring that "the proposed operator does not have a track record of non-compliant or unsafe operations systemic in nature for similar facilities." ECF No. 26-1 at 23. Petitioners' strained interpretation cannot be reconciled with either the plain language of the provision or its purpose.[6]

First, the most obvious flaw in this interpretation is that the County would be left with no way to vet the capability of *new* operators, like Sable, who may not have a meaningful track record to review. Hence, the provision necessarily requires that the County request and consider other relevant information, including, for example, whether "key personnel have the experience and expertise to operate the facility safety." ECF No. 13-17, AR006294.

Second, Petitioners' interpretation is at odds with the plain language of the provision. Petitioners ignore that the finding also requires a showing that the proposed operator has the necessary "resources"—including financial resources—to operate the facility "in compliance with the [Permits] and all applicable county codes." Section 25B-10(a)(9); see also ECF No. 13-17, AR006294 ("financial resources are a vital part of necessary resources"). Here, for example, that required Sable to demonstrate it has the resources to, at all times, remediate an oil spill from the Facilities and promptly abandon them, as contemplated by the Permits. Intervenors provided substantial evidence that Sable lacked sufficient capital to do so, noting that Sable itself acknowledged it could have little to no capital on hand if/when it resumed production and that "substantial doubt exists about the Company's ability to continue." See, e.g., ECF No. 13-11, AR003214- 25.

---

[6] Petitioners also erroneously assert that Intervenors' interpretation "would interfere with [their] vested rights in the FDPs." ECF No. 36-1 at 24. The fact that Sable needs this discretionary review for Sable to be listed on the Permits explains why Sable cannot have a vested right to operate the Facilities. See ECF No. 39 at 6 ("Sable cannot restart…without an FDP."). *See Toigo v. Town of Ross*, 70 Cal. App. 4th 309, 322 (1998).

Third, Petitioners overlook the discretionary language in the second sentence of this provision: "as may be necessary to make findings." Section 25B-10(a)(9). This clause confirms that the second sentence is intended to be illustrative, not to function as some sort of limit on the County's discretion. Importantly, under Petitioners' interpretation, both this clause and the "resource" requirement above would be rendered superfluous. *See Las Virgenes Educators Assn. v. Las Vírgenes Unified School Dist.* 86 Cal.App.4th 1, 10 (2001) (courts must "avoid[] interpretations which render [a] measure unreasonable, disharmonious, or superfluous in whole or in part.").

Lastly, comments submitted by former County planning staff and one of the authors of Chapter 25B explains the discretionary intent of this provision:

> This section was originally drafted as the '*Operation Record*' finding. It was revised and renamed as the '*Operator Capability*' finding, following input at the 9/17/2001 Planning Commission Hearing. The revised section is broader and ***increases discretionary reach and options***.

ECF No. 13-17, AR006294 (emphasis added). In fact, during the drafting process, the oil and gas industry's primary quarrel with the ordinance was based in this provision, which it recognized as providing substantial discretion to the County to deny a transfer. *See, e.g.,* ECF No. 28-12, AR003247-49.

In any event, substantial evidence supported a denial on this finding. Intervenors presented extensive evidence that Sable had, in the short time it owned the Facilities, repeatedly and flagrantly violated state law and agency directives. ECF No. 28-12, AR003396-3472. That included, among other things, notices of violation and Cease and Desist Orders from multiple state agencies—all of which Sable knowingly disregarded.

### 2. The Financial Assurance Finding(s)

Chapter 25B's financial assurance findings, which are codified, in part, at 25B-9(a)(2), 25B-9(e)(1), and 25B-10(a)(2), are likewise discretionary and require the Board to exercise independent judgment.

Petitioners incorrectly assert that Sable was not required to demonstrate that it has the financial capability to abandon any of the Facilities or remediate an accident—despite the clear intent of Chapter 25B to ensure exactly that. Instead, Petitioners suggest that this finding could be satisfied merely by the following showing: "(1) all required County bonds and endowments were satisfied, and (2) the SYU Facility abandonment responsibility was met through property tax payments until site restoration completion." ECF No. 36-1 at 21. Again, Petitioners' interpretation is inconsistent with the purpose of Chapter 25B and basic principles of statutory interpretation.

Indeed, at the time the ordinance was introduced, staff established that "[t]he ordinance *does* require new owners, operators and guarantors to demonstrate the financial wherewithal to cover the cost of timely and proper abandonment…and to cover natural resource damage." ECF No. 28-12, AR003247 (emphasis added). During the adoption process, staff noted the financial assurances finding does not specifically state "the appropriate amount of financial responsibility," leaving that to the discretion of the decisionmaker. *Id.* In other words, the finding is inherently discretionary because it is "not something predetermined by 'fixed standards' established by [the] ordinance." *Friends of Westwood, Inc. v. City of Los Angeles*, 191 Cal.App.3d 259, 275 (1987).

The discretion in this provision is also evident when read in conjunction with Chapter 25B-10(b) (the "permit re-opener" provision). At the time Chapter 25B was introduced, the intent of this provision was to "augment[] financial assurances where a new owner or operator may not have the financial wherewithal to cover the costs of spills or abandonment." ECF No. 28-12, AR003263.

Accordingly, whether Sable had the financial capacity to safely and responsibly operate was a finding entrusted to the sound judgment of the Board. And, as discussed previously, Intervenors submitted substantial evidence that Sable lacked the financial wherewithal to do so. *See, e.g.,* ECF No. 13-11, AR003214-25.

//

//

**C.    Petitioners Are Not Entitled to Their Requested Relief.**

Petitioners identify two supposed mandatory duties of the Board here: (1) to act on the Applications, and separately, (2) to approve them.

As to (1), Petitioners merely raise this to obfuscate the discretionary nature of the Board's decision. Grasping for some mandatory duty, they seize on the language in Chapter 25B-12 that, on appeal, the Board "shall affirm, reverse, or modify the planning commission's decision…." ECF No. 36-1 at 18. But this language is plainly directory, not mandatory. As noted in *Thompson v. City of Lake Elsinore*, 18 Cal.App.4th 49, 56 (1993), "the use of the word 'shall' does not necessarily mean that a mandatory duty is indicated." Indeed, "[e]ven if mandatory language appears in [a] statute creating a duty, the duty is discretionary if the [public entity] must exercise significant discretion to perform the duty," as here. *AIDS Healthcare Found. v. Los Angeles Dept. of Public Health*, 197 Cal.App.4th 693, 701 (2011).

In any event, what Petitioners effectively ask for is that this Court direct the Board to affirm the Commission's decision and/or grant de novo approval of the Applications. However, as explained at length above, the Chapter 25B process is replete with discretion, and approval of the Applications was left to the sound discretion of the Board. Thus, Petitioners seek to not merely compel the Board to act or exercise discretion, but to exercise its discretion in a particular manner. And it is axiomatic that traditional mandamus will not lie to compel to do so. *Alameda Health Sys. v. Alameda Cnty. Employees' Ret. Assn.*, 100 Cal.App.5th 1159, 1177 (2024).

Accordingly, as to Petitioners' second claim of relief, Petitioners' Motion should be denied, and Intervenors' Cross-Motion granted.

**III.    Petitioners Third Claim for Relief: Substantial Evidence Supported a Denial.**

Finally, Petitioners seek, in their third claim for relief, an administrative writ directing the Board to either deny the appeals or rehear the matter. ECF No. 36-1 at 28.

Because this claim is cognizable under C.C.P. section 1094.5, Petitioners' claim turns on whether the Board abused its discretion. C.C.P. § 1094.5(b). Petitioners contend

that the Board did so by considering factors beyond the scope of Chapter 25B. Intervenors disagree with Petitioners' characterization considering, as explained above, the broad inquiry and discretion demanded by the ordinance to effectuate its purpose of ensuring public health and safety.

Regardless, the pertinent inquiry here for the Court is whether substantial evidence supported the Board's decision—which, effectively, was a denial. Intervenors presented extensive and compelling evidence that Sable does not have the financial or operational capacity necessary to safely and reliably operate the Facilities. As detailed above, that included a lengthy history of non-compliance with state law, and statements from Sable itself that its very ability to continue was a "going concern" in light of its lack of capital. Thus, substantial evidence supported a denial based on the requirements of, among others, sections 25B-9(a)(2), 25B-9(e)(1), and 25B-10(a)(9). *See Desmond*, 21 Cal.App.4th at 336-37.

Moreover, Petitioners' request that this Court limit the Board's discretion—either by restricting what it can properly consider, or directing it to grant the Applications outright—is wholly inconsistent with C.C.P. section 1094.5. Section 1094.5 specifies that "the judgment shall not limit or control in any way the discretion legally vested in the respondent." C.C.P. § 1094.5(f). Therefore, Petitioners' claim in this regard should be rejected.

### CONCLUSION

For the foregoing reasons, Petitioners are not entitled to their first, second, or third claims for relief. Thus, Petitioners' Motion should be denied in its entirety, and Intervenors' Cross-Motion granted.

Respectfully submitted this 4th day of August, 2025.

*/s/ Linda Krop*

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org

JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Tel.: (805) 963-1622 / Fax: (805) 962-3152

*Attorneys for Environmental Defense
Center, Get Oil Out!, Santa Barbara County
Action Network, Sierra Club, and Santa Barbara
Channelkeeper*

# **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper, certifies that this brief contains 6,989 words, which complies with the word limit of L.R. 11-6.1.

Dated: August 4, 2025        */s/ Linda Krop*

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Tel.: (805) 963-1622 / Fax: (805) 962-3152

*Attorneys for Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*