LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Phone: (805) 963-1622
Fax: (805) 962-3152

*Attorneys for Environmental Defense Center,
Get Oil Out!, Santa Barbara County Action
Network, Sierra Club, and Santa Barbara
Channelkeeper*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| SABLE OFFSHORE CORP., et al.<br><br>            Petitioners/Plaintiffs,<br><br>    v.<br><br>COUNTY OF SANTA BARBARA, et al.<br><br>            Respondents/Defendants,<br><br>    and<br><br>ENVIRONMENTAL DEFENSE<br>CENTER, et al.<br><br>            Intervenors. | Case No.: 2:25-cv-04165-DMG-(AGRx)<br><br>**INTERVENORS' REPLY IN SUPPORT OF INTERVENORS' CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Hon. Dolly M. Gee<br><br>Hearing: September 12, 2025<br>Time: 2:00 p.m.<br>Place: Courtroom 8C |

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... 2

TABLE OF AUTHORITIES ................................................................................... 3

INTRODUCTION .................................................................................................... 6

ARGUMENT ............................................................................................................ 7

   I.    The Tie Vote did not Affirm the Planning Commission's Decision. .................... 7

      A.    The Board Hearing was De Novo, Not On-The-Record. .................................. 7

      B.    The Tie Vote Did Not Affirm the Planning Commission's Decision. ............. 10

      C.    Because of the Tie Vote, the Applicant was Allowed to Reapply
          Immediately. .................................................................................................... 11

   II.    The County does not have a Mandatory Duty to Act. ........................................ 12

   III.   Chapter 25B Vested the Board with Discretion to Deny the Transfers. ............. 13

      A.    Interpreting Chapter 25B as a Discretionary Process Does Not Run
          Afoul of the Constitutional Principles Cited by Petitioners. ..................... 13

      B.    The Language, History, and Purpose of Chapter 25B Belie
          Petitioners' Narrow Interpretation. ........................................................... 18

      C.    The Financial Assurances Finding Could Not be Made by the
          Board. ........................................................................................................... 21

      D.    The Operator Capability Finding is Discretionary and Could Not be
          Made by the Board. ...................................................................................... 24

      E.    Remaining Contentions Regarding Chapter 25B-1, 25B-10(b), and
          25B-6. .......................................................................................................... 26

CONCLUSION ...................................................................................................... 26

CERTIFICATE OF COMPLIANCE .................................................................... 27

# TABLE OF AUTHORITIES

**Cases**

Alameda Health Sys. v. Alameda Cnty. Employees' Ret. Assn.,
    100 Cal.App.5th 1159 (2024) ...................................................................... 12

Anderson v. Pittenger,
    197 Cal.App.2d 188 (1961) ..................................................................... 7, 9

Association des Eleveurs de Canards et d'Oies du Quebec v. Harris,
    729 F.3d 937 (9th Cir. 2013) ....................................................................... 16

Big Creek Lumber Co. v. County of Santa Cruz,
    38 Cal.4th 1139 (2006) ................................................................................ 14

Brechiesen v. Mondragon,
    833 F.2d 238 (10th Cir. 1987) ..................................................................... 17

Citizens for Uniform Laws v. County of Contra Costa,
    233 Cal.App.3d 1468 (1991) ....................................................................... 14

City & Cnty. of San Francisco v. Superior Ct. of City & Cnty. of San
    Francisco, 53 Cal. 2d 236 (1959) ................................................................. 7

City and County of San Francisco v. Post,
    22 Cal.App.5th 121 (2018) .......................................................................... 14

Clark v. City of Hermosa Beach,
    48 Cal. App. 4th 1152 (1996) ....................................................................... 9

Corp. of America v. State Bd. of Equalization,
    19 Cal.4th 1 (1998) ...................................................................................... 11

Fang Lin Ai v. United States,
    809 F.3d 503 (9th Cir. 2015) ....................................................................... 16

FW/PBS, Inc. v. City of Dallas,
    493 U.S. 215 (1990) ..................................................................................... 16

Great American Houseboat Co. v. U.S., 7
    80 F.2d 741 (9th Cir. 1986) ......................................................................... 16

Kuck v. Danaher,
    822 F. Supp. 2d 109 (D. Conn. 2011) ......................................................... 16

Lagrutta v. City Council,
    9 Cal.App.3d 890 (1970) ............................................................................... 7

Las Virgenes Educators Assn. v. Las Virgenes Unified School Dist.,
    86 Cal.App.4th 1 (2001) .............................................................................. 21

*Lopez v. Imperial County Sheriff's Office*,
   165 Cal.App.4th 1 (2008) ...................................................................... 10

*MHC Operating Limited Partnership v. City of San Jose*,
   106 Cal.App.4th 204 (2003) .................................................................. 11

*Peekay, Inc. v. City of Lacey*,
   2005 WL 1528961 (W.D. Wash. 2005) ................................................. 16

*Protecting our Water and Environmental Resources v. County of Stanislaus*, 10 Cal.5th 479 (2020) ............................................... 21

*REA Enterprises v. California Coastal Zone Conservation Com.*,
   52 Cal.App.3d 596 (1975) ................................................................ 8, 9

*Reeves v. City of Burbank*,
   94 Cal. App. 3d 770 (1979) .................................................................. 10

*San Diego Pub. Libr. Found. v. Fuentes*,
   111 Cal. App. 5th 711 (2025) ............................................................... 11

*Toigo v. Town of Ross*,
   70 Cal. App. 4th 309 (1998) ................................................................. 17

*United States v. Harris*,
   185 F.3d 999 (9th Cir. 1999) ............................................................... 16

*Virginia Uranium, Inc. v. Warren*,
   587 U.S. 761 (2019) ............................................................................ 14

*Yamaha Corp. of America v. State Bd. of Equalization*,
   19 Cal.4th 1 (1998) ............................................................................. 11

**Statutes**

49 U.S.C. § 60104(c) ................................................................................. 14

49 U.S.C. § 60105(a) ................................................................................. 14

**Rules & Regulations**

19 C.C.R. § 2000 ...................................................................................... 14

C.A. Gov't Code § 8670.37.51, 53-4 ........................................................ 15

C.A. Pub. Res. Code § 3106.1(a) .............................................................. 16

S.B. Cnty Code § 25B-1 ............................................................... 13, 24, 26

S.B. Cnty Code § 25B-10 .......................................................................... 25

S.B. Cnty Code § 25B-10(a)(2) ........................................................... 19, 20

S.B. Cnty Code § 25B-10(a)(9) ...................................................................17, 21, 24, 26

S.B. Cnty Code § 25B-10(b).............................................................................21, 22, 26

S.B. Cnty Code § 25B-12(b)(1) ....................................................................................8

S.B. Cnty Code § 25B-12(b)(2) ..................................................................................10

S.B. Cnty Code § 25B-12(b)(4) ...............................................................................8, 11

S.B. Cnty Code § 25B-4(c) .........................................................................................18

S.B. Cnty Code § 25B-4(i)...........................................................................................20

S.B. Cnty Code § 25B-6 ..............................................................................................26

S.B. Cnty Code § 25B-6(f)(2) .....................................................................................23

S.B. Cnty Code § 25B-9(g) .........................................................................................20

S.B. Cnty Code § 35-182.5(C)-(D)..............................................................................11

INTERVENORS' REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

# INTRODUCTION

Central to this dispute is the effect of a tie vote by the Santa Barbara County ("County") Board of Supervisors ("Board") after a de novo hearing. Petitioners ask this Court to issue a ruling that would be contrary to Chapter 25B's appeal procedures and a long line of established California case law holding that a tie vote after a de novo hearing does *not* affirm the lower body's decision. Defendants, on the other hand, defer the decision to this Court, but only after first making clear that the Board's hearing on appeal is de novo, new evidence may be taken into the administrative record, and the Board must make de novo findings without deference to the lower body. As an entirely de novo proceeding, the Board does not merely review the Planning Commission's decision for error. Rather, the Board was required to independently decide whether the facts support granting or denying the permit transfers under the provisions of Chapter 25B.

In reaching a tie vote at the February 25 Board hearing, Petitioners did not get the majority vote they needed for de novo approval of their permit transfers; instead, the Board took no action. During a similar proceeding two years ago, County Counsel analyzed the effect of a 'no action' vote by the Board under an identical appeal provision, and explained that the applicant could reapply without any postponement. RJN, Exh. 4, p. 170, lines 15-17. Critically, the tie vote did not affirm the Planning Commission's decision. This precedent is entitled to deference, and this Court should decide that the Board's tie vote did not affirm the Planning Commission's decision. If the Court so rules, Petitioners have additional administrative remedies available because they may reapply for the permit transfers at any time.

Having failed to satisfy their burden under Chapter 25B, Petitioners make a bid to recast the ordinance as a "check-the-box" exercise, advancing an interpretation that would strip the County of any meaningful ability to review Sable's financial and operational capacity. Petitioners' interpretation is at odds with the ordinance's plain text, state purpose, and comprehensive framework, and it would completely obviate the lengthy legislative process that resulted in Chapter 25B's enactment. As codified,

Chapter 25B grants the Board the discretion needed to fulfill its core purposes, and the record amply supported the votes of Supervisors Capps and Lee to deny the requested transfers.

For the foregoing reasons, Petitioners are not entitled to their first, second, or third claims for relief. Thus, Petitioners' Motion should be denied in its entirety, and Intervenors' Cross-Motion granted.

## ARGUMENT

### I.    The Tie Vote did not Affirm the Planning Commission's Decision.

Petitioners argue that despite the de novo nature of the hearing, the Board's tie vote somehow left the Planning Commission's decision intact. They cite the same cases that are clearly inapposite to the present circumstances and selectively excerpt isolated phrases from Chapter 25B without harmonizing the entire framework. Their arguments must fail.

In their Cross-Motion and herein, Intervenors demonstrate that the Board had independent authority to decide whether to grant or deny the permit transfers because the hearing was de novo, new evidence and testimony was permitted on appeal, and the Board had the authority to make its own findings for approval or denial without deference to the Planning Commission. Chapter 25B is therefore akin to the line of cases in which a tie vote at a de novo hearing does not affirm the lower body's decision. This result is also consistent with recent County precedent and allows Petitioners to reapply under Chapter 25B whenever they want.

### A.    The Board Hearing was De Novo, Not On-The-Record.

Whether the Board's deadlock vote had the effect of affirming the Planning Commission's decision (which it did not) is dictated by Chapter 25B's appeal provision. Specifically, a decision by the Planning Commission to approve or deny an application may be appealed to the Board, and the Board's "hearing shall be de novo and the [B]oard shall affirm, reverse, or modify the planning commission's decision at a public hearing." Chapter 25B-12(b)(1), (4). The plain language in the first half of this provision is

1  unambiguous: the "hearing shall be de novo." Stated differently, "the entire case is

2  repeated." *Lagrutta v. City Council*, 9 Cal.App.3d 890, 895 (1970) (hereinafter

3  "*Lagrutta*").

4      In this administrative context, the appeal procedures under Chapter 25B mandate a

5  de novo hearing by the Board, meaning it can hear new evidence and make de novo

6  findings without deference to the Planning Commission. Dkt. 40 at 16; *see, e.g.,*

7  *Lagrutta*, 9 Cal.App.3d at 894-97, *Anderson v. Pittenger*, 197 Cal.App.2d 188, 195

8  (1961) (hereinafter "*Anderson*"). Nothing in Chapter 25B restricts the scope of the appeal

9  hearing issues or the Board's right to hear new testimony. *Lagrutta*, 9 Cal.App.3d at 895

10 ("[I]t appears to be the general practice of city councils in conducting hearings on appeal

11 to hear any relevant testimony offered unless specifically restricted by ordinance."). In

12 fact, the County's appeal form expressly allows for the introduction of new evidence on

13 appeal. Dkt. 43-6, Exh. 3 ("additional information/documents/reports/entitlements may

14 be required"). The Board also accepted new written comments and testimony at the

15 hearing and considered this evidence in its decision-making.

16     As a de novo proceeding, the Board was not limited by the findings of the Planning

17 Commission. *Lagrutta*, 9 Cal.App.3d at 895 (*citing Anderson,* 197 Cal.App.2d at 195

18 ("'If the council were bound by the findings of the commission, there would be no point

19 in requiring the council to hold a public hearing.'")). Chapter 25B-9 and 25B-10 "provide

20 findings that must be made by the decision-maker tasked with reviewing the application."

21 Dkt. 40 at 12. The Board must make these findings de novo prior to taking any action on

22 the underlying approvals. *Id.* at 14; *see City & Cnty. of San Francisco v. Superior Ct. of*

23 *City & Cnty. of San Francisco*, 53 Cal. 2d 236, 250 (1959) ("...it would appear to be an

24 elementary proposition not open to doubt that in the general and customary course of any

25 appeal from a lower hearing...board or tribunal, the standards to be followed by the body

26 of higher authority, unless otherwise authoritatively provided, are the same as those

27 which control the lower....").

28

The actions before the Board at the appeal hearing included whether to make the Chapter 25B findings for approval and whether to grant de novo approval of the permit transfers. Dkt. 13-11, AR002953. At the hearing, the motion to make de novo findings for approval and grant de novo approval of the applications failed 2-2. Dkt. 13-21, AR006755. The scope of the actions for the Board to take at the hearing, namely, whether to make the findings and approve the applications, is also expressly recognized in the hearing Minute Order and the March 3 Board Action Letter. Dkt. 13-21, AR006753-55; Dkt. 33-1, AR007222-24. The Board therefore had the authority and responsibility to make findings and a decision on the underlying applications at the hearing, which is consistent with a de novo proceeding.[1]

Of course, the requirement for a de novo hearing must be harmonized with the second half of the appeal provision, i.e., the "affirm, reverse, or modify" language in Chapter 25B. In doing so, this Court should be guided by the court's reasoning in *REA Enterprises v. California Coastal Zone Conservation Com*., 52 Cal.App.3d 596 (1975) (hereinafter "*REA Enterprises*"). There, the court reasoned that a Public Resources Code provision providing that the state commission, after a de novo public hearing,[2] may affirm, reverse, or modify the decision of the regional commission was "broader in scope

---

[1] Petitioners also incorrectly contend that Chapter 25B must state that a permit transfer is only effective upon final action by the Board, analogizing Chapter 25B's process with appeals to the Coastal Commission (which have no relevance here). Dkt. 46 at 9. That argument is fallacious because when the appeal is before the Board for a *de novo* hearing, the Planning Commission's decision is nullified, and the matter must be heard anew by the Board for the reasons discussed above.

[2] Petitioners attempt to distinguish *REA Enterprises* based on the erroneous assertion that Chapter 25B does not require the Board to make findings or grant the transfers "in the same manner" as the Planning Commission. Dkt. 46 at 9. Citing directly to Chapter 25B-12(b)(4) and referencing past precedent, Defendants establish, and Intervenors agree, that "the Board makes independent findings without deference to the Planning Commission" because the hearing is de novo. Dkt. 40 at 14. Defendants further point out the hypocrisy of Petitioners' argument since they also request that the Court "issue an administrative writ directing the Board to decide the appeals by considering [] the nine factors under Chapter 25B." *Id.*

than 'grant or deny,'" because there was no conceivable action that "the [agency appellate body] might take which would not be encompassed within this language…." *Id.* at 609.

Here, Petitioners' interpretation that the Board was limited to only affirm, modify, or reverse cannot be harmonized with Chapter 25B's mandate for a de novo hearing and would essentially nullify this language. If the Board could only affirm, modify, or reverse the Planning Commission's decision, there would be no opportunity for additions to the record on appeal, yet Appellant-Intervenors submitted substantial new evidence in their February 21 letter to the Board. Dkt. 13-11, AR003200, *et seq.* to Dkt. 28, 12-1, AR003472; Dkt. 13-11, AR002955. If the Board could only review the Planning Commission decision, the Board Letter would have limited County staff's analysis to whether the Planning Commission's decision was inconsistent with Chapter 25B or an error or abuse of discretion by the Planning Commission, but it instead analyzed the appeal issues and provided new findings for approval and conditions of approval for the permit transfer requests. Chapter 25B-12(b)(2).

In sum, the vote before the Board was whether to grant de novo approval or denial of the transfers. Since it lacked a majority to decide, the Board took no action.

**B.    The Tie Vote Did Not Affirm the Planning Commission's Decision.**

Chapter 25B-12's appeal procedures are analogous to the well-established line of California cases in which the courts have held that a tie vote after a de novo hearing does not affirm the underlying decision of a planning commission. *See, e.g., Anderson*, 197 Cal.App.2d at 194–95; *REA Enterprises*, 52 Cal.App.3d at 605–09; *Clark v. City of Hermosa Beach*, 48 Cal. App. 4th 1152, 1176 (1996), *as modified on denial of reh'g* (Sept. 11, 1996). These cases involve de novo hearings that require the decision-maker to make independent findings without deference to the lower body, like the Board under Chapter 25B. Petitioners acknowledge these cases are sound precedent but allege that a separate line of cases should apply here for the Court to reach their desired outcome— that the Planning Commission decision stands. Dkt. 46 at 6-7. Petitioners' cases (which

are merely reiterated in a string cite in their Opposition) are not on point, as thoroughly briefed by both Intervenors and Defendants. Dkt. 40 at 14; Dkt. 43-1 at 16-17. Petitioners make no attempt to analogize *Lopez v. Imperial County Sheriff's Office*, which arises in the employment context and involves an entirely different burden of proof than here. 165 Cal.App.4th 1, 5 (2008); Chapter 25B-12(b)(4). Notably, the court there left it open for the Board to conduct another vote given the tie vote. *Id.*

This Court should reject Petitioners' arguments and decide that consistent with California case law, the Board's tie vote means 'no action' and did not affirm the Planning Commission decision.

## C. Because of the Tie Vote, the Applicant was Allowed to Reapply Immediately.

County Counsel previously established that a tie vote by the Board at a de novo hearing involving the same appeal language as in Chapter 25B-12(b)(4) did not affirm the Planning Commission's decision but that the applicant could reapply at any time.[3] During that hearing, the Board voted 2-2 on a de novo appeal of the Planning Commission's denial of the Existing Oil Lines 901/903 Valve Upgrade Project Amendment. RJN, Exh. 4, p. 169, line 14 to p. 170, line 25. County Counsel described the legal effect of the tie vote: "It is not a denial. It's also not an approval. So that means that the Applicant could try again and do another application."[4] *Id.* at p. 170, lines 15-17. **Importantly, the tie vote by the Board did not leave the Planning Commission decision in place.**

---

[3] That appeal provision requires that "[t]he hearings on the appeal shall be de novo," and the Board "shall affirm, reverse, or modify the decision of the Planning Commission." Santa Barbara County Code § 35-182.5(C)-(D). The action before the Board as articulated by County staff was whether to "[m]ake the findings for approval of the project, including the CEQA findings," and "grant de novo approval of the project subject to the conditions of approval." RJN, Exh. 4, p. 43, lines 12-19.

[4] In *Reeves v. City of Burbank*, the City Attorney explained that a tie vote did not constitute a denial but left the application pending although the applicant was free to reapply at any time. 94 Cal. App. 3d 770, 775 (1979).

A local government's "interpretation of its municipal code 'is entitled to deference' in [the court's] independent review of the meaning or application of the law." *San Diego Pub. Libr. Found. v. Fuentes*, 111 Cal. App. 5th 711, 726 (2025) (hereinafter "*San Diego Pub. Libr. Found.*") (*citing MHC Operating Limited Partnership v. City of San Jose*, 106 Cal.App.4th 204, 219 (2003)). "Courts are 'more likely to defer to an agency's interpretation of its own regulation than to its interpretation of a statute, since the agency is likely to be intimately familiar with regulations it authored and sensitive to the practical implications of one interpretation over another.'" *San Diego Pub. Libr. Found.*, 111 Cal. App. 5th 711, 726 (citations omitted) (*citing Yamaha Corp. of America v. State Bd. of Equalization*, 19 Cal.4th 1, 12 (1998)) "Other factors supporting an agency's interpretation include … a consistent and long-standing interpretation,…." *Id.* (*citing Yamaha Corp. of America v. State Bd. of Equalization*, 19 Cal.4th 1, 13 (1998)).

Interests in equity and assurances in consistent administrative processes mandate adherence to the County's prior interpretation. Accordingly, this Court should determine that the Board's tie vote did not affirm the Planning Commission's decision, as County Counsel did just two years ago.

Finally, in response to a Supervisor's question about whether the applicant could apply in less than a year, County Counsel responded "correct." RJN, Exh. 4 at p. 170, line 15. The ability to re-apply immediately without the typical year-long delay provides Petitioners with administrative recourse. Not only do Petitioners have the option to reapply, they are also aware of the type of evidence that the Supervisors requested during the hearing to support any findings for approval. *See, e.g.,* Dkt. 13-21, AR006823, lines 11-19; ECF No. 13-21, AR006983, lines 5-16.

## II.    **The County does not have a Mandatory Duty to Act.**

Petitioners' argument that the County has a mandatory duty to act is utterly without merit. Dkt. 46 at 9-10. No legal authority exists for this Court to direct the Board to either affirm the Commission's decision or grant de novo approval of the Applications. *Alameda Health Sys. v. Alameda Cnty. Employees' Ret. Assn*., 100 Cal.App.5th 1159,

1177 (2024) (traditional mandamus will not lie to compel a public agency to exercise its discretion in a particular manner). The County also does not have a mandatory duty to transfer the Permits because the Board's tie vote constitutes no action and did not affirm the Planning Commission decision for the reasons detailed above. Petitioners therefore fail to identify a clear duty to act that can be remedied by the issuance of a writ of mandate.

## III.  Chapter 25B Vested the Board with Discretion to Deny the Transfers.

Chapter 25B vests the Board with the necessary discretion to carry out its purpose: providing a mechanism to protect the County, its resources, and its citizens from unqualified and uncapitalized operators. Chapter 25B-1. Having failed to assure the Board that Sable can be entrusted with the facilities, as envisioned by Chapter 25B's findings, Petitioners' tack is to reimagine the ordinance, offering an interpretation that would hamstring the County from undertaking any necessary review of Sable's finances and operational capacity. Its various attempts to do so, however, are unavailing: Petitioners cannot escape that their preferred interpretation conflicts with the ordinance's plain language, purpose, and overall framework. And, when the ordinance is properly construed, the record amply supported the votes of Supervisors Capps and Lee to deny, upon de novo review, the requested transfers.

### A.  Interpreting Chapter 25B as a Discretionary Process Does Not Run Afoul of the Constitutional Principles Cited by Petitioners.

Petitioners suggest that allowing the Board to inquire into an entity's safety and financial qualifications—and thereon exercise its independent judgment to approve or deny a transfer—would violate principles of pre-emption, vagueness, and vested rights. Thus, they posit, the Court should restrain from construing Chapter 25B to allow such inquiry. As explained below, not only is Intervenors' construction of Chapter 25B constitutionally sound, but it is necessary to carry out its purpose of protecting health and safety.

***First***, Petitioners contend that "exclusive federal and state jurisdiction over pipeline safety and spill-related financial assurances pre-empt the County's authority to evaluate whether Sable can safely operate the Facilities." Dkt. 46 at 8.

As to pipeline safety, Petitioners point to the Hazardous Liquid Pipeline Safety Act (HLPSA), and specifically, its express pre-emption provision. But the provision applies only to *inter*state pipelines: "A State authority may not adopt or continue in force safety standards for *inter*state pipeline facilities or *inter*state pipeline transportation." 49 U.S.C. § 60104(c) (emphasis added). The Las Flores Pipeline System, however, is an *intra*state pipeline system. Dkt. 13-10, AR001898. The express pre-emption provision does not restrict state or local authorities from regulating intrastate pipelines. *See* 49 U.S.C. § 60104(c). In fact, state authorities have the option to assume exclusive regulatory and enforcement authority over intrastate pipelines, in which case the federal government is prohibited from "prescrib[ing] or enforce[ing] safety standards and practices." 49 U.S.C. § 60105(a).

As Petitioners correctly identify, California's Office of the State Fire Marshal (OSFM) has assumed jurisdiction over the state's intrastate pipelines, pursuant to the HLPSA's certification process. Dkt. 13-10, AR001899. But OSFM's authority is limited to matters of pipeline safety and integrity—i.e., regulating the actual infrastructure. *See* 19 C.C.R. § 2000 *et seq.* Whether a specific operator is capable of safely and responsibly operating a pipeline facility is not a matter entrusted to OSFM. *See Id.* Thus, in overseeing operational capacity, the County does not invade the province of OSFM, as Petitioners suggest.

Tellingly, in support of their argument, Petitioners merely state that "counties are precluded from imposing their own *safety and design requirements*"—not regulating operational capacity. Nor do any of the cases they cite support that OSFM has authority over anything other than technical pipeline safety requirements.

As to financial responsibility for a spill, Petitioners contend that the California Department of Fish and Wildlife, Office of Spill Prevention and Response (OSPR)

occupies the field of "evidence-of-financial-responsibility requirements for oil pipelines." Thus, Petitioners continue, the County is pre-empted, under a theory of "field pre-emption," from separately requiring financial assurances for a spill.[5]

As Petitioners acknowledge, no case supports Petitioners' theory. Instead, Petitioners point to three statutes—Government Code sections 8670.37.51, 8670.37.53, and 8670.37.54—to support their theory that the Legislature intended that OSPR have exclusive jurisdiction over financial responsibility for spill. Nothing in the language of these statutes expressly states, or even suggests, that authority over financial responsibility is reserved to OSPR, exclusive of local governments. *See City and County of San Francisco v. Post*, 22 Cal.App.5th 121, 129-30 (2018) ("'[W]hen local government regulates in an area over which it traditionally has exercised control,' such as land use legislation, 'California courts will presume, absent a clear indication of preemptive intent from the Legislature, that such regulation is *not* preempted by state statute.'" (*quoting Big Creek Lumber Co. v. County of Santa Cruz*, 38 Cal.4th 1139, 1149 (2006)). As the Supreme Court has made clear, some "brooding . . . interest," to the extent it exists here, is insufficient to establish field pre-emption. *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019).

Moreover, the purpose of Chapter 25B's financial assurance requirements and OSPR's Certificate of Financial Responsibility scheme differ in purpose; while the former is primarily intended to assure an entity is capable of remediating a spill, the latter provides a means to clarify what entity maintains liability. *See* Gov. Code § 8670.37.52 (the effect of a certificate is to provide "conclusive evidence that the person or entity holding the certificate is the party responsible . . . for purposes of determining liability pursuant to this chapter."); *see also Citizens for Uniform Laws v. County of Contra Costa*, 233 Cal.App.3d 1468, 1474-75 (1991) (finding no field pre-emption where

---

[5] Importantly, this argument only applies financial assurances for an oil spill or accident; it does not encompass the concomitant requirement in Chapter 25B to provide adequate assurances for proper abandonment.

ordinance and state statute differed in purpose, despite employing similar regulatory tools).

In any event, any doubt about the supposed limits of the County's authority was clarified by recent legislation, which, "notwithstanding any other law," affirmatively grants local governments the power to "impose regulations, limits, or prohibitions on oil and gas operations or development that are more protective of public health, the climate, or the environment than those prescribed by a state law, regulation, or order." Pub. Res. Code § 3106.1(a).

Accordingly, the County is not pre-empted from regulating operational capacity, and it is free to require financial assurances more stringent than those required by OSPR.

**Second**, Petitioners contend that the Court must adopt their narrow construction of Chapter 25B to avoid rendering the ordinance unconstitutionally vague. Dkt. 46 at 11-12. The crux of their argument is that the interpretation offered by Intervenors would "grant the County unbridled discretion to reject permit transfers based on arbitrary and random criteria," and leave the ordinance's findings "so vague and indefinite as really to be no rule or standard at all." *Id.*[6]

Intervenors do not suggest that the County's discretion to determine operational capability is "unbridled," as Petitioners claim. Instead, Intervenors correctly note that Chapter 25B provides the County with discretion to scrutinize the qualifications of a proposed transferee. Such discretion is cabined by express parameters set forth in the required finding, which limits the County to inquiring into a proposed operator's "skills, training, and resources" in the specific context of "compliance with the permit and all applicable county codes." Chapter 25B-10(a)(9). While the finding is broad enough to

---

[6] Petitioners also misrepresent that, in Intervenors' view, "Chapter 25B's purpose is to prevent large oil companies from selling to smaller, less experienced ones, and thus the Board is permitted to do essentially anything to prevent this from happening . . . ." Dkt. 46 at 12. This is incorrect. Intervenors merely claim that Chapter 25B is intended to provide a mechanism whereby the County can ensure new entities have the financial and operational capacity to safely and responsibly operate. They do not suggest it is intended to outright prohibit transfers between major and minor companies.

provide the County with the necessary flexibility to vet new operators, what is required is not so indefinite as to run afoul of due process. *See Peekay, Inc. v. City of Lacey*, 2005 WL 1528961 (W.D. Wash. 2005) ("[A]n ordinance that allows a city to review the general qualifications of each license applicant is not presumptively invalid." (*citing FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990)); *Kuck v. Danaher*, 822 F. Supp. 2d 109, 134 (D. Conn. 2011) (rejecting void-for-vagueness challenge to law that allowed licensing authority to revoke firearm license if holder was found not "suitable" to carry a firearm since the law limited authority's discretion to enumerated factors regarding qualifications); *see also Great American Houseboat Co. v. U.S.*, 780 F.2d 741, 746 (9th Cir. 1986). In this case, Intervenors directed the Board to specific permit conditions that Sable lacks the "resources" to comply with, and they cited Sable's persistent regulatory non-compliance as evidence of a lack of necessary "skills" and "training." Dkt. 13-11, AR003213-19, AR003229-31.

Regarding financial assurances for accidents and abandonment, Intervenors merely suggest—based primarily on the plain language of the ordinance, *see infra* Part III.C— that a proposed transferee must demonstrate it has the financial wherewithal to remediate an accident and properly decommission the facility. The costs to do so are readily calculable, especially where, as here, the facilities have already caused a major accident. Indeed, during the administrative proceedings, Intervenors pointed to empirical evidence of the cost of the Refugio Oil Spill (from the same facilities), and they suggested that cost should be used as a baseline to establish adequate financial assurances for a subsequent permittee. Dkt. 13-11, AR003214-15. In any event, the lack of exact, identifiable measurements in a law does not render it unconstitutionally vague. *See Association des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 946 (9th Cir. 2013).

Thus, what is required of transferees—and specifically *Sable*—is established by definite criteria and is not so vague that "a person of ordinary intelligence could not understand." *Fang Lin Ai v. United States*, 809 F.3d 503, 514 (9th Cir. 2015); *see also United States v. Harris*, 185 F.3d 999, 1003 (9th Cir. 1999) (there is a strong presumption

that a law is constitutional when considering a void-for-vagueness argument); *Brechiesen v. Mondragon*, 833 F.2d 238, 241 (10th Cir. 1987) ("When reviewing a statute alleged to be vague, courts must indulge a presumption that it is constitutional, and the statute must be upheld unless the court is satisfied beyond all reasonable doubt that the legislature went beyond the confines of the Constitution.").

*Third,* as to "vested rights," Chapter 25B requires discretionary review of whether to grant a permit transfer. The fact that Sable needs this discretionary review to be listed as a permittee on the County permits issued for the facilities explains why Sable cannot have a vested right. Dkt. 46 at 18. "Courts have yet to extend the vested rights or estoppel theory to instances where a developer lacks a building permit or the functional equivalent, regardless of the property owner's detrimental reliance on local government actions and regardless of how many other land use and other preliminary approvals have been granted." *Toigo v. Town of Ross*, 70 Cal. App. 4th 309, 322 (1998). Under Chapter 25B-4, the permits are not transferable except in accordance with those provisions, and Exxon previously availed itself of Chapter 25B's requirements when it asked the County to grant its requested permit transfers in 2023. Chapter 25B-4(c); Dkt. 40 at 14.

Moreover, Petitioners have further administrative remedies available to secure a final decision from the County regarding the permit transfers. *Toigo*, 70 Cal. App. 4th at 331. As noted above, Petitioners can reapply *immediately*, and can submit additional information in response to the Supervisors' inquiries; as such, Petitioners' claims are not yet appropriate for judicial review. These issues are also reserved for Phase II of this bifurcated proceeding, as stipulated to by both Petitioners and Defendants in furtherance of judicial economy and efficiency. Dkt. 17 at 2-3.

**B.    The Language, History, and Purpose of Chapter 25B Belie Petitioners' Narrow Interpretation.**

Petitioners claim that the plain language of Chapter 25B unambiguously supports the narrow construction they advance, and thus, the Court is precluded from considering

its legislative history. Presumably, Petitioners do so because their preferred interpretation cannot be reconciled with the ordinance's legislative history.

As an initial matter, Intervenors based their arguments, first and foremost, in the plain language of Chapter 25B and the construction of the ordinance as a whole. See, e.g., Dkt. 43-1 at 18-19, 21-22, 23. However, recognizing that the ordinance may be susceptible to multiple interpretations, Intervenors *additionally* rely on the legislative history of the ordinance, which offers compelling evidence of its intent and how the relevant findings ought to be applied.

That the parties here have devoted much of their briefing to advancing different interpretations of the ordinance tends to suggest some ambiguity exists. In light of these apparent ambiguities, Intervenors appropriately sought clarity from the legislative history of the ordinance, which overwhelmingly supports Intervenors' interpretation. *See, e.g., Dkt. at 43-1 at 17, 22, 23.* In their Opposition-Reply, Petitioners attempt to obfuscate that history by claiming that an earlier "unadopted draft differed significantly from the final ordinance," and setting forth a chart purportedly showing that "the broader requirements now urged by Intervenors were specifically removed prior to adoption." Dkt. 46 at 14. Petitioners' arguments in this regard are unavailing.

***First***, Petitioners point out that a proposed finding regarding financial guarantees for abandonment was removed from Chapter 25B-9. Dkt. 46 at 19. But that did not obviate the need for Sable to provide guarantees for abandonment, as Petitioners suggest. Instead, the requirement for such guarantees effectively became subsumed within the broader Financial Assurances finding.

The Financial Assurances finding requires providing assurances "necessary to comply with the permit." Chapter 25B-10(a)(2). The Permits at issue specifically contemplate the posting of performance bonds as security for abandonment. Condition Q-2 of the POPCO Permit expressly "requires the permittee to be responsible for the proper abandonment of the facility," and "*shall* post a performance bond, or other security device acceptable to County Counsel, in an amount determined by the County." Dkt. 13-

1, AR000187 (emphasis added). Likewise, the County has discretion to require performance bonds for the abandonment of the facilities encompassed by the SYU and Las Flores Pipeline Permits. Dkt. 13-1, AR000160; Dkt. 13-1, AR000230.

The Financial Assurances finding also requires providing assurances "necessary to comply with . . . any county ordinance." Chapter 25B-10(a)(2). That includes Chapter 25B-4(i), which provides that "[t]he current owner or operator . . . of a facility subject to this chapter shall be responsible for proper abandonment of the facility." Section 35-170 of the County Code—"Abandonment of Certain Oil/Gas Land Uses"—further contemplates the prompt abandonment of the Facilities.

Moreover, County Staff confirmed that "[t]he ordinance *does* require new owners, operators, and guarantors to demonstrate the financial wherewithal to cover the cost of timely and proper abandonment . . . ." Dkt. 28-12, AR003247. Contrary to Petitioners' suggestion, *this statement was made at the same time of the abandonment revisions*, and thus bears directly on how Chapter 25B should be construed in its final form. *See id.*; Dkt. 28-12, AR003279.

Accordingly, that the abandonment finding cited by Petitioners was removed does not support its contention that "the County specifically intended not to include . . . abandonment assurances," or that Sable was excused from providing such assurances. Dkt. 46 at 15.

***Second***, Petitioners cite an amendment to 25B-9(g), which, as revised, requires "that any insurance or other financial guarantees that were submitted to and relied on by the [planning] director as a basis to make any finding required by this chapter are maintained." The revision simply clarifies that assurances presented to the County during the administrative process must be maintained. It does not suggest any limitations on the County's ability to require certain assurances during that process or to determine what assurances may be adequate. Indeed, the revision is entirely consistent with, and actually supports, an interpretation that County decisionmakers have the discretion to request

assurances to their satisfaction, and the necessary flexibility to make decisions on a case-by-case basis.

Notably, a companion provision, Chapter 25B-10(b), allows the Planning Commission to "impose additional conditions" to *ensure* financial assurances presented to the County are maintained, recognizing that such assurances may not be in the existing permit. Indeed, what may have been sufficient for a major company (e.g., Exxon) may not be for a new, speculative company (e.g., Sable).

***Lastly***, Petitioners point to changes in the Operator Capability finding, but the changes actually indicate an intention to *broaden* the finding. Instead of just considering an operator's "skills and training," the finding was expanded to include an operator's "resources." *See* Dkt. 28-12, AR003279; Chapter 25B-10(a)(9). Tellingly, the title of the finding was also changed from "Operation Record" to the broader "Operator Capability." *See* Dkt. 28-12, AR003279; Chapter 25B-10(a)(9). As discussed previously, and again below, the addition of the second sentence was simply intended to be illustrative of records the County may consider.

Ultimately, we need not guess at the purpose behind these changes. As County Staff explained at the time the changes were made, "[t]he language of the new Operator Capability finding . . . is broader than the previous Operation Record finding." Dkt. 28-12, AR003312. "To make this finding, the [County] *may* require records of compliance and major incidents," but it is not limited thereto. *Id.* (emphasis added). "[T]he review of a proposed operator could consider track record, experience and expertise, criminal convictions, *and any other information germane to assessing the capabilities of a proposed operator*." *Id.* (emphasis added).

Thus, in sum, none of the three amendments cited by Petitioners support their theory of narrow construction.

## C.    The Financial Assurances Finding Could Not be Made by the Board.

Petitioners maintain that the Financial Assurances finding is "an objective inquiry," limited as follows: "if the instrument is required by the FDPs or the Code, the

County must confirm that Sable has provided or update it; if it is not, the County cannot require it." As addressed at length in Intervenors' Cross-Motion, such an interpretation conflicts with other provisions in Chapter 25B, is inconsistent with the framework of the ordinance, and undermines its purpose. *See* Dkt. 43-1 at 17-19, 22.

The impetus of Chapter 25B was largely the concern that "second generation" operators—which tend to "lack the vast array of financial assets . . . of the first generation"—may be financially incapable of remediating an oil spill and decommissioning their facilities. Dkt. No. 28-12, AR003301-02. With that in mind, the ordinance was specifically constructed to account for the fact that assurances previously required for one entity may be inadequate for a subsequent one. Hence, the ordinance contemplates a discretionary process whereby the County can determine, on a case-by-case basis, what assurances are necessary for a proposed transferee, and "impose additional conditions on the permit in order to ensure that any insurance or other financial guarantees that were submitted to and relied on by the [County] as a basis to make any finding required under [Chapter 25B] are maintained." Chapter 25B-10(b). In other words, the plain language of the ordinance expressly contemplates that financial assurances may be required above and beyond those conditioned in the existing permit—which is the only way the County can effectuate the core purpose of Chapter 25B. *See Protecting our Water and Environmental Resources v. County of Stanislaus,* 10 Cal.5th 479, 494 (2020) (the ability to condition an approval renders it discretionary). Petitioners' preferred interpretation directly contradicts that provision and would render it superfluous. *See Las Virgenes Educators Assn. v. Las Virgenes Unified School Dist.*, 86 Cal.App.4th 1, 10 (2001) (Courts must "avoid[] interpretations which render [a] measure unreasonable, disharmonious, or superfluous in whole or in part.").

During the administrative proceedings, Intervenors submitted extensive evidence showing that Sable lacks the financial wherewithal to remediate an accident. Intervenors pointed out that the cost to Plains All American of the Refugio Spill was $870M (and rising), but Sable had only $288M in available cash, its estimated remaining start-up

expenses were $197M, and its $800M+ debt to Exxon would come due shortly after restart. Dkt. 13-11, AR003214-16. If a spill occurred during or shortly after restart, Intervenors explained, Sable would not have the financial resources necessary to clean up the spill, compensate affected business and property owners, or pay for natural resources restoration. *Id.* Indeed, in all likelihood, such an incident would all but guarantee Sable's insolvency. *Id.*

Intervenors also pointed out the pitfalls of relying on the one-page certificate of insurance that Sable submitted. Dkt. 13-11, AR003217. Without the actual policy, the County was simply unable to assess the scope of the coverage, its limitations, or its adequacy. Sable's refusal to produce the policy when specifically requested by Chair Capps, pursuant to Chapter 25B-6(f)(2), only bred further uncertainty. Moreover, even assuming Sable's insurer paid out the full stated amount of the policy ($401M)—a big if—Sable's insurance would still be insufficient to cover an accident comparable to the 2015 disaster, *which was caused by the same facilities*. *See Id.*

Sable fared even worse when it came to its abandonment obligations. Intervenors' evidence showed that Sable may be unable to restart the facilities—its only assets. Dkt. 13-11, AR003219-23. Thus, there is a distinct risk that Sable bankrupts trying to bring the facilities back online and has no resources to fund their abandonment. *Id.* Accordingly, Intervenors maintain that the only way Sable can provide adequate financial assurances for abandonment is by posting performance bonds. *Id.*

Incidentally, as discussed above, performance bonds are *required* by the POPCO FDP, and may be required under the other two FDPs. Dkt. 13-1, AR000187; Dkt. 13-1, AR000160; Dkt. 13-1, AR000230. As Intervenors explained to the Board, the POPCO bond must be posted contemporaneously with the transfer of the POPCO FDP. Dkt. 13-11, AR003224. Because Sable has failed to do so, the Board could not make the Financial Assurances finding, even under the narrow interpretation advanced by Petitioners.

### D.    The Operator Capability Finding is Discretionary and Could Not be Made by the Board.

Petitioners reiterate their argument that, based on the second sentence of this finding, the County's review of an operator's capability is limited to "relevant records of compliance and documentation of corrective actions subsequent to any major incidents for facilities, if any, that are similar in nature to those that are the subject of the permit." Chapter 25B-10(a)(9). As previously explained, such an interpretation would leave the County with no way to vet the capability of *new* operators, like Sable, who may not have a meaningful track record to review, and thus cannot be reconciled with the ordinance's stated purpose "to protect public health and safety . . . by ensuring . . . safe operation." Chapter 25B-1. Necessarily, the County's review must be broader, and the second sentence of the finding is purely illustrative of records that may be relevant to the County's inquiry.

Indeed, as the drafters of the ordinance explained, "[t]o make this finding, the [County] *may* require records of compliance and major incidents," but it is not limited thereto. Dkt. 28-12, AR003312 (emphasis added). "[T]he review of a proposed operator could consider track record, experience and expertise, criminal convictions, *and any other information germane to assessing the capabilities of a proposed operator*." *Id.* (emphasis added).

During the administrative proceedings, Intervenors appropriately called into question Sable's ability to safely and responsibly operate the facilities, offering compelling evidence of the danger Sable poses to public health and safety. Dkt. 13-11, AR003229-31. Most notably, Intervenors tediously outlined Sable's long, disturbing pattern of willful noncompliance with state laws and agency directives. *Id.* Such behavior is disqualifying for any entity, yet alone a speculative company attempting to operate some of the riskiest and highly regulated facilities in the state.

Intervenors also highlighted that proposed operators must show they have the "resources"—which, according to its standard definition, would encompass *financial*

resources—"necessary to operate the permitted facility in compliance with the permit," underscoring the breadth of the Operator Capability finding. Dkt. 13-11, AR003213; Dkt. 43-1 at 21; *Definition of Resources*, Oxford English Dictionary ("Resources" means "[s]tocks of reserves of *money*, material, people, or some other asset, which can be drawn on as necessary." (emphasis added)).

Petitioners respond by suggesting that the Operator Capability finding cannot encompass financial considerations because those are addressed by the Financial Assurances finding. Again, Petitioners' argument ignores the plain definition of "resources," and that the term was added to the finding with the express intention of broadening its purview. *See* Dkt. 28-12, AR003312. Setting that aside, however, Petitioners' argument also cannot be reconciled with their preferred, narrow interpretation of the Financial Assurances finding.

As Petitioners would have it, neither the Operator Capability nor Financial Assurance findings allow the County to independently assess a proposed operator's financial wherewithal. Yet, as explained, the history, purpose, and framework of the ordinance all confirm the County is empowered to do so. *See* Chapter 25B-10; Chapter 25B-1; Dkt. 28-12, AR003247. If, as Petitioners suggest, the County is not authorized to exercise that authority under the Financial Assurances finding, then the only remaining possibility is that such authority is encompassed in the "resources" portion of the Operator Capability finding.

Finally, the FDPs each clarify that the permittee is liable in the event of an accident, with the SYU FDP specifically stating that, in the event of an oil spill, the permittee "shall be responsible for the cleanup of all affected coastal and onshore resources." Dkt. 13-1, AR000131; Dkt. 13-1, AR000169; Dkt. 13-1, AR000196. Likewise, the FDPs each require that the permittee promptly abandon the facilities at project completion. Dkt. 13-1, AR00160; Dkt. 13-1, AR00187; Dkt. 13-1, AR000230. Under the Operator Capability finding, Sable was required to show it has the "necessary resources" to comply with those conditions. Chapter 25B-10(a)(9). However, as

discussed above, Intervenors presented substantial evidence that Sable lacks the resources to do so.

**E.**    **Remaining Contentions Regarding Chapter 25B-1, 25B-10(b), and 25B-6.**

Lastly, Petitioners claim that "Intervenors incorrectly cite sections 25B-1, 25B-10(b), and 25B-6—which are not part of the findings—as grounds to deny a permit transfer." Dkt. 46 at 22. This is incorrect. Intervenors cite these provisions as guidance for how Chapter 25B and certain, specific findings must be interpreted. Looking to an ordinance's other provisions, its framework, and its purpose are all standard and appropriate means of statutory interpretation.

## CONCLUSION

For the foregoing reasons, Intervenors' Cross-Motion for Summary Judgment should be granted.

Respectfully submitted this 29th day of August, 2025.

/s/ Linda Krop
LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Tel.: (805) 963-1622 / Fax: (805) 962-3152

*Attorneys for Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper, certifies that this brief contains 6,994 words, which complies with the word limit of L.R. 11-6.1.


Dated: August 29, 2025          */s/ Linda Krop*

LINDA KROP (Bar No. 118773)
lkrop@environmentaldefensecenter.org
JEREMY M. FRANKEL (Bar No. 344500)
jfrankel@environmentaldefensecenter.org
TARA C. RENGIFO (Bar No. 307670)
trengifo@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, CA 93101
Tel.: (805) 963-1622 / Fax: (805) 962-3152

*Attorneys for Environmental Defense Center, Get Oil Out!, Santa Barbara County Action Network, Sierra Club, and Santa Barbara Channelkeeper*