JS-6

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

SABLE OFFSHORE CORP., *et al.*,

              Petitioners/Plaintiffs,

              v.

COUNTY OF SANTA BARBARA, *et al.*,

          Respondents/Defendants,

      and

ENVIRONMENTAL DEFENSE CENTER, *et al.*

              Intervenors.

No. CV 25-4165-DMG (AGRx)

**ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT [36] [43]**

Petitioners/Plaintiffs Sable Offshore Corp. ("Sable Offshore"), Pacific Pipeline Company ("PPC"), and Pacific Offshore Pipeline Company ("POPCO") (collectively, "Sable") filed applications seeking the transfer of Final Development Permits ("FDP") to Sable from Petitioners/Plaintiffs Exxon Mobil Corporation ("ExxonMobil"), Mobil Pacific Pipeline Company ("MPPC"), and ExxonMobil Pipeline Company ("EMPCo") (collectively, "Exxon Mobil Affiliates"). Petitioners seek a writ of mandate following the Santa Barbara County Board of Supervisors' (the "Board") tie vote on the appeal of the Santa Barbara County Planning Commission's (the "Planning Commission") decision to approve the transfer of FDPs pursuant to Santa Barbara County Code Chapter 25B (hereinafter "Chapter 25B"). Respondents/Defendants are the Board and the County of Santa Barbara (the "County").

Before the Court are two cross-motions for summary judgment ("MSJ"), brought by Petitioners [Doc. # 36-1 ("Petitioners MSJ")] and by Intervenors Environmental Defense Center ("EDC"), Get Oil Out! ("GOO!"), Santa Barbara County Action Network ("SBCAN"), Sierra Club, and Santa Barbara Channelkeeper ("SBCK") [Doc. # 43-1 ("Intervenors MSJ")]. Both motions are fully briefed. [Doc. ## 40 ("County's Response"), 46 ("Petitioners Opp."), 47 ("Intervenors Reply").]

Pursuant to the Petitioners and Respondents' proposed bifurcated schedule which was ordered by the Court [Doc. ## 17, 24], these cross-motions for summary judgment solely address the Petition/Complaint's first and second claims for relief for writ of mandate pursuant to California Code of Civil Procedure section 1085 and third claim for relief for writ of administrative mandate pursuant to California Code of Civil Procedure section 1094.5. [Doc. ## 1, 17.] At the center of this dispute is the proper interpretation of Santa Barbara County Code Chapter 25B. The Court held a hearing on September 12, 2025. Having duly considered the parties' written submissions and oral argument, the Court **GRANTS in part and DENIES in part** Petitioners' MSJ and **GRANTS in part and DENIES in part** the Intervenors' MSJ for the following reasons.

# I.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

**A.     The Facilities, Pipeline, and FDPs**

The POPCO facility and Santa Ynez Unit (the "facilities") are onshore oil and gas production and transportation facilities located in Santa Barbara County and connected to offshore platforms Hondo, Harmony, and Heritage in the Santa Barbara Channel.  County Staff Report Admin Record ("A.R.") 15–17 (Vol. 1 at 20–22) [Doc. # 13-1].[2]   The POPCO facility is an onshore gas production facility located in Las Flores Canyon. County Staff Report A.R. 17 (Vol. 1 at 22).  The Santa Ynez Unit ("SYU"), as referred to here, consists of the onshore oil processing facility also located in Las Flores Canyon.  *Id.* The Las Flores Pipeline (the "pipeline"), formerly known as the Plains All American Pipeline, transports oil produced from the SYU to the Pentland Station in Kern County. *Id.*

FDPs can be transferred for change of owner, operator, or guarantor.  County Code §§ 25B-2, 25B-4(e), (f), (g).  The transfer applications at issue are:  (1)  the SYU (FDP No. 87-DP-32cz) from ExxonMobil to Sable (owner, operator, and guarantor; (2)  the POPCO facility (FDP No. 93-FDP-015 and 74-CP-11) from ExxonMobil Corporation to Sable (operator and guarantor); and (3)  the pipeline (FDP Nos. 88-DPF-033 (RV01)z, 88-CP-60 (RV01), 88-DPF-25cz, 85-DP-66cz, 83-DP-25cv) from EMPCo to Sable (operator) and ExxonMobil to Sable (guarantor).  County Staff Report A.R. 16 (Vol. 1 at 21); A.R. 162 (Vol. 1 at 167).

---

[1] The facts in this section are drawn from the Administrative Record, except where otherwise indicated.  The Court has reviewed the entire record [Doc. ## 13, 28, 33] but only discusses the facts that are necessary to or affect its analysis.

[2] All citations to the A.R. herein will have the following format:  Bates Citation (Volume Number at CM/ECF Page Number).  All other citations to the docket will refer to the page numbers inserted by the CM/ECF system.  Any citations to Volumes 12 and 13 refer to the Amended Volumes. *See* Doc. # 28 (noticing amendment due to document malformations).

**B.    The Refugio Spill and Sable**

On May 19, 2015, a section of the Las Flores Pipeline ruptured and released oil on land, beaches, and into the ocean near Refugio State Beach (hereinafter the "Refugio Spill").  County Staff Report A.R. 19 (Vol. 1 at 24).  Following the spill, the pipeline was shut down, purged, and isolated, and the facilities were shutdown.  *Id.* A.R. 19–20 (Vol. 1 at 24–25).  The FDPs remain active.  *Id.* A.R. 17 (Vol. 1 at 22).

Sable Offshore, led by Chief Executive Officer Jim Flores, was initially formed as several special purpose entities for the purpose of evaluating the opportunity to acquire the SYU assets.  Appellants Board Comment Letter A.R. 3203 (Vol. 11 at 1061) [Doc. # 13-11].  On February 14, 2024, Sable Offshore acquired the facilities and the pipeline from the Exxon Mobil Affiliates.  County Staff Report A.R. 18 (Vol. 1 at 23); Appellants Board Comment Letter A.R. 3204 (Vol. 11 at 1062).  It also acquired PPC, which owned the pipeline.  *Id.* A.R. 3204 (Vol. 11 at 1062).  To fund the $625,000,000 acquisition, Sable secured an approximately $622,000,000 loan from Exxon.  *Id.* A.R. 3200 (Vol. 11 at 1058).

**C.    Chapter 25B**

Chapter 25B governs the transfer of FDPs.  County Code § 25B.  The purpose of Chapter 25B is:

> to protect public health and safety, and safeguard the natural resources and environment of the county of Santa Barbara, by ensuring that safe operation, adequate financial responsibility, and compliance with all applicable county laws and permits are maintained during and after all changes of owner, operator or guarantor of certain oil and gas facilities.

County Code § 25B-1.  Any change in owner, operator, or guarantor, requires application and approval by the County.  County Code §§ 25B-2, 25B-4(e), (f), (g).[3]

---

[3] Applications for change of operator are under the jurisdiction of the Planning Commission. County Code § 25B-8(b).  Applications for change of owner and guarantor are under the jurisdiction of

-4-

### 1. Operator

The Planning Commission "shall approve or deny any application to transfer a permit for change of operator." County Code § 25B-8(b)(1). A public hearing is required. County Code § 25B-8(b)(3). "Prior to approval," the Planning Commission "shall make all findings required . . . and shall take all actions necessary []." County Code § 25B-8(b)(2). County Code section 25B-10 states that the Planning Commission "shall approve an application for change of operator only if the [Planning Commission] makes the following findings." The section lists nine findings: (1) fees and exactions, (2) financial guarantees, (3) acceptance of permit, (4) facility safety audit, (5) compliance with existing requirements, (6) compliance plans, (7) transitional plan, (8) emergency response plan drills, (9) operator capability. County Code §§ 25B-10(a)(1)–(9).

### 2. Owner

The Planning Commission[4] "shall approve or deny any application to transfer a permit for . . . change of ownership." County Code § 25B-8(a)(1)(a). "Prior to approval of such application, the [Planning Commission] shall make all findings required . . . and shall take all actions necessary . . . ." County Code § 25B-8(a)(2). The Planning Commission "shall approve an application for a change of owner only if the [Planning Commission] makes the following findings:" (1) fees and exactions, (2) financial guarantees, (3) acceptance of permit, (4) facility safety audit, and (5) compliance with existing requirements. County Code §§ 25B-9(a), (a)(1)-(5). The financial guarantees

---

the Santa Barbara County Director. County Code §§ 25B-3, 25B-8(a). Where, as here, an application includes components under both the Planning Commission and the Santa Barbara County Director's jurisdiction, the application may be processed with a combined application and decided by the Planning Commission. County Code § 25B-8(c). The Court will therefore refer to the Planning Commission as the decisionmaker for changes of owner and guarantor in the combined application at hand.

[4] Changes of owner and guarantor do not require a public hearing. County Code § 25B-8(a)(3). But because Sable made a combined application and the Planning Commission handled all three components, the Planning Commission was required to hold a public hearing. *See* County Code § 25B-8(b)(3).

finding for change of owner is identical to the financial guarantees finding for change of operator. *Compare* County Code §§ 25B-9(a)(2) *with* 25B-10(a)(2).

### 3. Guarantor

The Planning Commission "shall approve an application . . . for a change in guarantor only if the [Planning Commission] makes the following finding" with regard to financial guarantees:    "[t]he proposed guarantor has provided all necessary instruments or methods of financial responsibility approved by the county and necessary to comply with the permit and any county ordinance." County Code §§ 25B-9(e), (e)(1).

### 4. Appeals

Decisions by the Planning Commission may be appealed to the Board by the applicant or any interested person adversely affected by such decision. County Code § 25B-12(b)(1). In the appeal, the appellant must "state specifically" how the Planning Commission's decision is "inconsistent with the provisions or purposes of this chapter" or "there was an error or abuse of direction" by the Planning Commission. County Code § 25B-12(b)(2). The Planning Commission transmits to the Board copies of the application and "a statement of findings setting forth the reasons for the planning commission's decision." County Code § 25B-12(b)(3). The Board's hearing "shall be de novo" and the Board "shall affirm, reverse, or modify the planning commission's decision at a public hearing." County Code § 25B-12(b)(4). The hearing must be noticed. *Id.*

### D. Sable's Applications to the Planning Commission

On March 14, 2024, Sable submitted a combined application to the Planning Commission for change of owner, operator, and guarantor of the FDPs. SYU Application A.R. 240 (Vol. 1 at 245); POPCO Facility Application A.R. 254 (Vol. 1 at 259); Pipeline Application A.R. 269 (Vol. 1 at 274). Under Chapter 25B, if an application is found

incomplete, County Staff[5] issue a notice of incompleteness and the applicant shall provide "any additional information" required through an incompleteness letter. County Code § 25B-8(d). Sable was required to supplement its applications in response to notices of incompleteness three times. A.R. 284 (Vol. 1 at 289); A.R. 294 (Vol. 1 at 299); A.R. 307 (Vol. 1 at 312).

The County Staff deemed Sable's application complete on July 30, 2024. County Staff Report A.R. 18 (Vol. 1 at 23). The County Staff found that Sable had satisfied the requirements under Chapter 25B and recommended the Planning Commission approve Sable's applications. County Staff Presentation A.R. 1985 (Vol. 10 at 234) [Doc. # 13-10]. The Planning Commission held a public hearing on October 30, 2024. A.R. 2170 (Vol. 11 at 28). The Planning Commission, by a vote of three to one, made the required findings for approval under Chapter 25B and approved the change of owner, operator, and guarantor for the facilities and pipeline. A.R. 2170 – 2171 (Vol. 11 at 28-29). In a letter to Sable, the Planning Commission attached its findings of approval. A.R. 2172 – 2184 (Vol. 11 at 30–42).

## E.    The Appeal to the Board

On November 7, 2024, Intervenors EDC, GOO!, and SBCAN (hereinafter "Appellants"),[6] filed an appeal of the Planning Commission's approval.[7] Appeal Letter A.R. 2058 (Vol. 10 at 307). They previously submitted a comment letter with the same concerns to the Planning Commission. Planning Commission Comment Letter A.R. 1867

---

[5] Although Chapter 25B states the Director will issue the notice of incompleteness, the County Staff Report states the County Staff were responsible for deeming the application complete. County Staff Report A.R. 18 (Vol. 1 at 23). In Sable's incompleteness letters, it also refers to the County as the notice issuer. *See, e.g.*, A.R. 284 (Vol. 1 at 289).

[6] Appellants did not include Intervenors Sierra Club and SBCK. A.R. 2058 (Vol. 10 at 307). The Sierra Club and SBCK retained EDC to represent them following the appeal. A.R. 3200 (Vol. 11 at 1058).

[7] The Center for Biological Diversity and the Wishtoyo Foundation filed a separate appeal. A.R. 2050 (Vol. 10 at 299). Because that appeal is not at issue in this action, the Court will not address it.

(Vol. 10 at 116).   Appellants argued the Planning Commission made findings unsupported by evidence, plainly controverted by evidence, and/or inconsistent with Chapter 25B.  Appeal Letter  A.R. 2059 (Vol. 10 at 308).

**F.     The Board Hearing and Tie Vote**

The Board held a public hearing on February 25, 2025.  A.R. 2949 (Vol. 11 at 807).  County Staff recommended the Board deny the appeal.  Board Agenda Letter A.R. 2953 (Vol. 11 at 811).  The Board has five members, one for each district:  Roy Lee, Laura Capps, Joan Hartmann, Bob Nelson, and Steve Lavagnino.  A.R. 2927 (Vol. 11 at 785).  Hartmann recused herself.  Board Hearing Minute Order A.R. 6755 (Vol. 21 at 11) [Doc. # 13-21].  The hearing lasted over five hours with almost 100 public comments. Board Hearing Minute Order A.R. 6753 – 6754 (Vol. 21 at 9–10).  County Staff (Hearing Transcript A.R. 6965 – A.R. 6975 (Vol. 21 at 221–231)), EDC for Appellants (Hearing Transcript A.R. 6987 – A.R. 6992 (Vol. 21 at 243–248)), and Sable (Hearing Transcript A.R. 7013 – A.R. 7023 (Vol. 21 at 269–279)) each spoke and answered questions from the Board.

As documented in the Minute Order following the Board Hearing, Lavagnino made a motion, seconded by Nelson, to:  (1) deny the appeals; (2) "[make] the required findings for approval" for change of owner, operator, and guarantor; (3) approve, and (4) "grant[] de novo approval" of the change of owner, operator, and guarantor.   Board Hearing Minute Order A.R. 6755 (Vol. 21 at 11).  The motion "failed" at the first stage, with Nelson and Lavagnino voting in favor of denying the appeals and Lee and Capps voting to uphold the appeals.  Board Hearing Minute Order A.R. 6755 (Vol. 21 at 11); Hearing Transcript A.R. 7140 (Vol. 21 at 396) (Nelson), A.R. 7137 (Vol. 21 at 393) (Lavagnino), A.R. 7138 (Vol. 21 at 394) (Lee), A.R. 7142 (Vol. 21 at 398) (Capps), A.R. 7143 (Vol. 21 at 399) ("Motion fails two to two").

As the Supervisors voted, they articulated the basis behind their votes.   Lee remarked the "restart" of the pipeline was an "insane" and "very bad" idea and voted to uphold the appeals "because that's the right thing to do."  Hearing Transcript A.R. 7137 –

7138 (Vol. 21 at 393–394).  Capps, "within the narrow confines" of the FDP transfer, and related to the Board's "fiscal oversight" and "fiscal responsibility" to the County's budget, concluded she lacked the "reassurance of fiscal stability" in evaluating the FDP transfers.  A.R. 7140 – 7142 (Vol. 21 at 396–398).  Capps identified three "red flags," or reasons, in support of her position:  Sable had to obtain a loan from Exxon in order to purchase the facilities and pipeline, Sable did not show the Board the insurance policy, and the California Coastal Commission issued notices of violation against Sable around five to six months after Sable filed their applications at issue here.  *Id.* A.R. 7140 – 7142 (Vol. 21 at 396–398); *see* Planning Commission Comment Letter A.R. 1889 – 1890 (Vol. 10 at 138–139), A.R. 1908 (Vol. 10 at 157), A.R. 1969 (Vol. 10 at 218).

Once the first motion failed, County Counsel advised the Board members that they did not need to reach the next step of making factual findings or granting *de novo* approval of the transfers of the FDPs.  Hearing Transcript A.R. 7143 (Vol. 21 at 399); *see also* Board Agenda Letter A.R. 2953 (Vol. 11 at 811) (recommending findings of fact and *de novo* approval as subsections "b" and "d" following subsection "a" denial of the appeal).  County Counsel recommended the Board make a conceptual motion to uphold the appeals.  Hearing Transcript A.R. 7143 (Vol. 21 at 399).  A conceptual motion was made by Capps, seconded by Lee, to uphold the appeals.  A.R. 6755 (Vol. 21 at 11).  The motion again "failed," as Nelson and Lavagnino voted against it.  A.R. 6755 (Vol. 21 at 11); Hearing Transcript A.R. 7144 (Vol. 21 at 400) ("Motion fails two to two").

**G.    Sable's Letters Following the Vote**

On February 26, 2025, one day after the Board hearing, Sable sent the Director a letter requesting the County transfer the FDPs.  A.R. 6771 – 6773 (Vol. 21 at 27–29).  Sable asserted the legal outcome of the tie vote was that it let the Planning Commission's approval stand, and therefore the County should transfer the FDPs.  A.R. 6772 (Vol. 21 at 28).  On March 1, 2025, EDC sent a letter to the Board in opposition.  A.R. 6774 – A.R. 6778 (Vol. 21 at 30–34).  EDC argued the tie vote constituted "no action," which effectively resulted in denial of the FDP applications.  A.R. 6775 (Vol. 21 at 31).  On

April 11, 2025, Sable sent a second letter with a request that the County transfer the FDPs and accompanied it with a threat to commence litigation for a writ of mandate. A.R. 6768 – 6770 (Vol. 21 at 24–26).

At the time of the vote during the public hearing, Capps asked County Counsel what the "potentially odd result" of the tie vote was. A.R. 7144 (Vol. 21 at 400). County Staff answered that "in order for the board to take any action, the board needs a majority vote. . . . So, on a tie vote, that's no action of the board." Hearing Transcript A.R. 7144 (Vol. 21 at 400). Following Sable's second letter, the Board went into closed session on April 16, 2025 to discuss the County's exposure to litigation regarding the FDPs. A.R. 6783 (Vol. 21 at 39). The action summary reflects the Board did not take any reportable action following the closed session. A.R. 6783 (Vol. 21 at 39). To date, the County has not taken any relevant subsequent action such as transferring the FDPs or holding a second public hearing and vote. *See also* Response at 10.

**H.    Petitioners File Suit**

On May 8, 2025, Petitioners filed the instant lawsuit against Respondents. [Doc. # 1.] On July 25, 2025, the Court granted the Intervenors' Motion to Intervene. [Doc. # 39.] The cross-MSJs seek summary adjudication of the Complaint's first and second claim for relief for writ of mandate pursuant to California Code of Civil Procedure section 1085 and third claim for relief for writ of administrative mandate pursuant to California Code of Civil Procedure section 1094.5.

**I.    Requests for Judicial Notice ("RJNs")**

Petitioners and Intervenors filed Requests for Judicial Notice ("RJN"). Petitioners request notice of: (1) a transcript of the Board's hearing on September 19, 2023 regarding the transfer of these FDPs to the Exxon Mobile Affiliates; (2) the County's agenda for the September 19, 2023 hearing; (3) the minute order following the September 19, 2023 hearing. [Doc. # 36-3 ("Petitioners RJN").] The transcript is a record of an agency's public hearing and the agenda and minute order are public records of agency action. *Coal. for a Sustainable Delta v. Fed. Emergency Mgmt. Agency*, 812 F. Supp. 2d

1089, 1093 (E.D. Cal. 2011); Fed. R. Evid. 201(b).   The Court therefore **GRANTS** Petitioners' RJN.

Intervenors request notice of : (1) a 2025 letter from the California Fair Political Practices Commission ("FPPC") regarding Board Supervisor Hartmann; (2) Santa Barbara County Code Chapter 25B; (3) Santa Barbara County Planning and Development Department's Land Use Appeal Application Form; and (4) a transcript of the Board's hearing on August 22, 2023.  [Doc. ## 43-6 ("Intervenors RJN"), 46-1, 47-2.]

The Court can take judicial notice of regulations and therefore **GRANTS in part** Intervenors' RJN as to Chapter 25B.  *See Roemer v. Board of Public Works of Maryland*, 426 U.S. 736, 743 n.2 (1976) (taking judicial notice of state regulations); Fed. R. Evid. 201.  The FPPC letter is a public record posted on a public agency's official website and is not subject to reasonable dispute.  *Coal. for a Sustainable Delta*, 812 F. Supp. 2d at 1093; Fed. R. Evid. 201(b).  Intervenors' RJN is **GRANTED in part** as to the letter. Judicial notice is taken to prove the public record's existence and content, but not for the truth of the matters asserted therein.  *Coal. for a Sustainable Delta*, 812 F. Supp. 2d at 1093.  The remainder of Intervenors' RJN is **DENIED as moot** as the Court did not rely upon this evidence.  Because the Court grants Intervenors' RJN as to the 2025 letter, Petitioners' Alternative RJN for a 2016 letter from the FPPC regarding Hartmann is **GRANTED** for the same reasons.  [Doc. # 46-4 ("Alternative RJN").]

The Court also takes *sua sponte* judicial notice of the Procedural Rules Governing Planning, Zoning and Subdivision Hearings Before the Board of Supervisors and Planning Commission (Santa Barbara County Res. No. 91-333) (hereinafter "Governing Procedural Rules").  Resolution 91-333 is posted on the Santa Barbara County website and is a public record.  *See Coal. for a Sustainable Delta*, 812 F. Supp. 2d at 1093; Fed. R. Evid. 201(b).

## II.

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Where the issues before the Court are questions of law, the case is particularly "well suited" for summary judgment. *Del Real, LLC v. Harris*, 966 F. Supp. 2d 1047, 1051 (E.D. Cal. 2013); *see also Asuncion v. Dist. Dir. of U.S. Immigration & Naturalization Serv.*, 427 F.2d 523, 524 (9th Cir. 1970).

A. **California Code of Civil Procedure Section 1085**

A traditional writ of mandate under California Code of Civil Procedure section 1085 "is used to compel a public entity to perform a legal and usually ministerial duty." *Move Eden Hous. v. City of Livermore*, 100 Cal. App. 5th 263, 272 (2024) (quoting *Schmid v. City & Cnty. of San Francisco*, 60 Cal. App. 5th 470, 484–485 (2021); Cal. Civ. Proc. Code § 1085.[8] A writ of mandate under Code 1085 is available "where the petitioner has no plain, speedy and adequate alternative remedy; the respondent has a clear, present and usually ministerial duty to perform; and the petitioner has a clear, present and beneficial right to performance." *Conlan v. Bonta*, 102 Cal. App. 4th 745, 752 (2002).

---

[8] Section 1085(a) states: "A writ of mandate may be issued by any court to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station, or to compel the admission of a party to the use and enjoyment of a right or office to which the party is entitled, and from which the party is unlawfully precluded by that inferior tribunal, corporation, board, or person." Cal. Civ. Proc. Code § 1085(a).

**B.    California Code of Civil Procedure Section 1094.5**

California Code of Civil Procedure section 1094.5, writ for administrative mandamus, "provides the procedure for judicial review of adjudicatory decisions rendered by administrative agencies." *Schmid*, 60 Cal. App. 5th at 483.  Section 1094.5 applies to decisions made by agencies resulting from proceedings where "a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer."  Cal. Civ. Proc. Code § 1094.5(a).   These administrative proceedings are quasi-judicial in character. *Bright Dev. v. City of Tracy*, 20 Cal. App. 4th 783, 793 (1993).  The reviewing court looks to see whether the required findings are supported by the evidence. *Id.*  The inquiry under section 1094.5 is "whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion."  Cal. Civ. Proc. Code § 1094.5(b).

**III.**

**DISCUSSION**

**A.    First Claim for Relief:  Traditional Writ of Mandate Under Section 1085**

Petitioners' first claim for relief turns on the legal effect of the Board's tie vote on the Planning Commission's approval of Sable's FDP applications. *See* Petitioners MSJ at 14; Intervenors MSJ at 12.  Petitioners argue the Board was not required to issue its own findings or take direct action to approve the FDP transfers, and therefore the tie vote leaves the appealed Planning Commission decision intact, similar to a tie vote in an appellate court.  Petitioners MSJ at 14.  Intervenors contend that because the hearing before the Board was *de novo*, the tie vote constitutes "no action" and effectively functions as a denial.  Intervenors MSJ at 12–13.  Respondents decline to take a position on the tie vote.  Response at 8.  Instead, Respondents provide a general overview of applicable law, conclude the effect of the tie vote is unclear, and defers to the Court. Response at 16.

"As a general rule an even division among members of an administrative agency results in no action." *Lopez v. Imperial Cnty. Sheriff's Off.*, 165 Cal. App. 4th 1, 4 (2008) (quoting *Clark v. City of Hermosa Beach*, 48 Cal. App. 4th 1152, 1176 (1996) (quoting *Graves v. Comm'n On Pro. Competence*, 63 Cal. App. 3d 970, 976–977 (1976))). This general rule, however, is subject to an exception dependent upon the nature of the administrative agency's review. "Tie votes mean different things in different contexts." *Vedanta Soc. of S. California v. California Quartet, Ltd.* (hereinafter "*Vedanta*"), 84 Cal. App. 4th 517, 521 (2000).

### 1.    California Law on the Effect of Tie Votes

In order to resolve this context-dependent question, the Court turns to cases where California courts considered the issue of a tie vote. In *Vedanta*, the elected board argued the "default" result of a deadlock vote was an adoption of the lower planning commission's findings and explanations. 84 Cal. App. 4th at 528. The Court of Appeal reasoned that a tie vote *can* result in an acquiescence, but not where it constitutes "an affirmative act de novo." *Id.* at 529. According to the Court of Appeal, the "very fact" that findings "must be made *at all* is incompatible with the nature of a tie vote" and findings "are by nature affirmative acts" which inherently require the fact-finder to take "unambiguous" action. *Id.* In support of this, the Court of Appeal pointed to the requirements that the board at issue in *Vedanta* provide brief explanations of their rationale of any findings or state in writing the specific reasons to support its action. *Id.* The regulation required *de novo* review and *de novo* fact finding. *Id.* Although the Court of Appeal in *Vedanta* declined to rule on the effects of tie votes outside of the regulation at issue, its reasoning is persuasive in the case at hand. *Id.* at 534–5.

Similarly, in *Clark*, the Court of Appeal analyzed the effect of a tie vote on a planning commission's decision. *Clark,* 48 Cal. App. 4th at 1175. Petitioners argued one member of the council should have recused himself and, if he did, the resulting tie vote post-recusal would have affirmed the planning commission's decision. *Id.* at 1175. The Court of Appeal rejected this argument. Instead, the Court of Appeal ruled that a

theoretical tie vote would have affirmed one type of appeal provision (the parcel map) but would not have affirmed another (the conditional use permit). *Id.* This result was dictated by the differences between the applicable provisions. *Id.* The conditional use permit provision in *Clark*, presumably unlike the parcel map provision, required the council to hear the matter *de novo*, take additional evidence at a public hearing, and decide whether it should grant or deny the permit. *Id.* The Court of Appeal based this conclusion on language from the municipal code, which stated the council "shall order that the conditional use permit be granted, denied, or modified" and the action by the council shall be by three affirmative votes. *Id.* (internal quotations removed). This language dictated "[a] tie vote would not suffice." *Id.* at 1176. The municipal code in *Clark* was "virtually identical" to the one in *Anderson*. *Id.* (citing *Anderson v. Pittenger*, 197 Cal. App. 2d 188, 194–5 (1961)).

In *Anderson*, the city council ended in a tie vote over an appeal of an application for a zoning variance. 197 Cal. App. 2d at 189. The Court of Appeal ruled the tie vote constituted "no action," and not an affirmance of the order of the lower commission's decision, because: (1) the council was required to hold a public hearing after publishing notice, and (2) the council did not merely review and "affirm, reverse, or modify" the order of the commission, but was required by ordinance to "act upon the appeal." *Id.* at 194, 195. Moreover, the council was not bound by the findings of the commission or the testimony before the commission, and there were no limitations on new or additional testimony. *Id.* If the council were bound by the findings of the commission, there would be "no point" in requiring the public hearing. *Id.* The *Anderson* Court of Appeal concluded the council heard the matter *de novo* and made its own determination as to the facts. *Id.*

The Court of Appeal in *Rea* considered a similar set of facts. *Rea Enters. v. California Coastal Zone Conservation Com.* (hereinafter "*Rea*"), 52 Cal. App. 3d 596 (1975). In *Rea*, the regional commission approved petitioners' application for a coastal zone development permit. *Id.* at 601. The decision was appealed to the state

commission, which conducted a public hearing that resulted in a six-to-six tie vote. *Id.* The state commission's review was a "new, unlimited look at the same request for a permit by a de novo public hearing" and a "redetermination" "of the merits of the application." *Id.* at 605 (quoting *Klitgaard & Jones, Inc. v. San Diego Coast Reg'l Com.*, 48 Cal. App. 3d 99, 108 (1975)). The petitioners argued the jurisdiction of the state commission was one "strictly of an appellate nature" and therefore the tie vote resulted in an affirmance of the regional commission's decision approving the permit. *Id.* at 606–607. In support, they contended the *de novo* public hearing referred only to the process by which the state commission is required to gather evidence and the state commission could only "affirm, reverse, or modify" the regional commission's decision. *Id.* at 607. The Court of Appeal disagreed, noting that the language of "affirm, modify, or reverse" was not dispositive—although "grant or "deny" would have been "clear[er]." *Id.* at 608–609. Rather, the Court of Appeal looked to the legislative intent and other rules of statutory interpretation and concluded the tie vote did not affirm the regional commission's approval. *Id.* at 606–611.

Petitioners rely upon *Grist Creek Aggregates*, but that case is distinguishable. *Grist Creek Aggregates, LLC v. Superior Ct.*, 12 Cal. App. 5th 979 (2017). The *Grist Creek* Court analyzed California case law to address whether the tie votes were subject to judicial review. 12 Cal. App. 5th at 990. Regarding the *effect* of the tie vote, the court relied on three of the parties' *agreement* that the effect of the tie vote was to deny the appeal. *Id.* Accordingly, most of the *Grist Creek Aggregates* opinion is inapplicable.[9]

---

[9] Petitioners' reliance on the unpublished decision in *Serv. Emps. Int'l Union Loc. 1021* is not particularly helpful to their cause. *Serv. Emps. Int'l Union Loc. 1021 v. Cnty. of Mendocino*, No. 20-CV-05423-RMI, 2021 WL 3471176, at *1 (N.D. Cal. Aug. 6, 2021). There, the district court did not perform a robust analysis of the legal effect of a tie vote. Rather, it addressed the plaintiffs' failure to state a claim that a tie vote amounted to a violation of his federal due process rights. *Id.* at *3. In the process of that analysis, the district court tersely found that the tie vote functioned like an appellate court vote and left the original termination decision intact—as alleged in the plaintiffs' complaint. *Id.* at *4.

**2.    The Board's Tie Vote Meant It Took No Action on the Planning Commission's Decision**

Chapter 25B is not identical to any of the applicable regulations in the cases described above.  On one hand, Chapter 25B's procedural rules share some similarities with a purely appellate review.  Rather than "grant or deny" the permits, the Board shall "affirm, reverse, or modify" the Planning Commission's decision to approve the FDPs.  County Code § 25B-12(b)(4).  The Planning Commission is the entity that "approve[s] or "deni[es]" applications for change of operator, owner, or guarantor.  County Code §§ 25B-8(b)(1), 25B-8(a)(1)(a), 25B-9(e).  And, unlike in *Clark*, Chapter 25B does not require any specific number of affirmative votes.[10]  48 Cal. App. 4th at 1175.  The absence of "grant, deny, or modify" language in Chapter 25B, however, is not dispositive, and the cases other than *Clark* do not turn on regulatory language mandating a certain number of affirmative votes.  *See Rea*, 52 Cal. App. 3d at 607–608.  All other aspects of Chapter 25B appear to be consistent with the Court of Appeal's reasoning in *Vedanta*, *Clark*, and *Anderson*.

Chapter 25B provides that the Board's hearing shall be *de novo* and the Board shall hold a public hearing.  County Code § 25B-12(b)(4).  This suggests that the Board has the authority to engage in affirmative acts that go beyond merely reviewing the administrative record and giving a thumbs up or down.  Here, like in *Vedanta*, the Board has the authority to conduct *de novo* fact-finding.  84 Cal. App. 4th at 519.  When appealed, the Planning Commission supplies copies of the application and a statement of

---

[10] The majority vote requirement is instead sourced from separate procedural rules that govern hearings before the Board.  Governing Procedural Rules, Sec. IV, 1 ("Any action taken by the Board of Supervisors must be by a majority of the Board of Supervisors.  An abstention shall not be counted as an affirmative vote on the motion."); *see also* A.R. 6772 (Vol. 21 at 29).

The same rules state "[i]n the event the Board takes no action because a motion on the item failed to carry by the affirmative vote of a majority of the membership, the matter may be continued at the request of any party or any Board member."  Governing Procedural Rules, Sec. IV, 2.  This rule is consistent with the Court's conclusion that a failure to reach a majority vote does not constitute affirmance or denial.

its findings setting forth the reasons for its decision to the Board.  County Code § 25B-12(b)(3).  Chapter 25B does not limit the Board's review to these findings, impose any evidentiary constraints, or mandate deference to the Planning Commission's findings. *See, e.g., Anderson*, 197 Cal. App. 2d at 189; *Clark*, 48 Cal. App. 4th at 1175;  *cf. Today's Fresh Start, Inc. v. Los Angeles Cnty. Off. of Educ.*, 128 Cal. Rptr. 3d 822, 839 (Ct. App. 2011), *review granted and opinion superseded*, 262 P.3d 854 (Cal. 2011), *and aff'd*, 57 Cal. 4th 197 (2013) (holding a tie vote upheld the lower decision where the review was limited to findings made by the lower body).[11]  Instead, it simply states the public hearing "shall be de novo."  County Code § 25B-12(b)(4).  If the Board were bound by the findings of the Planning Commission, there would be "no point" to requiring the public hearing. *Anderson*, 197 Cal. App. 2d at 195.

Furthermore, the requirement that the Board make factual findings logically flows from its *de novo* review of the Planning Commission's decision.  Chapter 25B requires the Planning Commission to make specific factual findings, and the applications for change of owner, guarantor, and operator, shall be approved "only if" those findings are met.  *See* County Code §§ 25B-9(a), (e), 25B-10(a).  The Board must look to the evidence supporting these required factual findings and determine whether those findings are supported.

Finally, it appears everyone throughout the entirety of the Board appeal and public hearing process agreed that the Board was required to make factual findings.  County Staff recommended that the Board "make" the required findings for approval and "grant *de novo*" approval of the applications.  Board Agenda Letter A.R. 2953 (Vol. 11 at 811).  The failed motion, as reflected in the Board minutes following the hearing, was to deny

---

[11] Federal courts may consider unpublished California appellate decisions as persuasive authority.  *Holt v. Noble House Hotels & Resort, Ltd*, 370 F. Supp. 3d 1158, 1165 (S.D. Cal. 2019) (citing California Rule of Court 8.1115(a)).

the appeal, make the required findings for approval, and grant *de novo* approval.[12]  A.R. 6755 (Vol. 21 at 11).  Sable's own response to the appeal is in accordance with this approach (A.R. 5240 (Vol. 14 at 495) [Doc. # 13-14] ("[T]he Planning Commission did not err in approving the Transfers, and [] the Board should *do the same*.") (emphasis added)) (A.R. 5257 (Vol. 14 at 512) ("We respectfully request that the Board . . . deny the Appeals, *make the required findings*, and grant *de novo* approval of the Transfers.") (emphasis added)).

In sum, although Chapter 25B is not a model of clarity, the *de novo* nature of the review and the Board's authority to do fact-finding, combined with the requirement of a public hearing and lack of evidentiary constraints, lead the Court to conclude the Board's review is not one "strictly of an appellate nature."  *Rea*, 52 Cal. App. 3d at 606.  Accordingly, the tie vote by the Board in an appeal under Chapter 25B was "no action," was not "acquiescence," and did not affirm or reverse the Planning Commission's approval of the FDPs.  *Vedanta*, 84 Cal. App. 4th at 529.  Petitioners' MSJ is **DENIED in part** and Intervenors' MSJ is **GRANTED in part** as to Petitioners' first claim for relief to the extent Intervenors assert the tie vote "did not affirm, reinstate, or otherwise leave in place" the Planning Commission's decision.

**B.   Second Claim for Relief:  Traditional Writ of Mandate Under Section 1085**

**1.   Ministerial Duty or Discretionary Duty**

Under section 1085, the Court may issue a writ of mandate in two circumstances: (1) where the agency has a "mandatory" and "ministerial duty capable of direct enforcement" or (2) where the agency has a discretionary "quasi-legislative duty entitled to a considerable degree of deference" and that agency has abused its discretion.  *CV*

---

[12] The motion by the Board includes all proposed findings and execution of all actions recommended in the County Staff's report.  *See* Governing Procedural Rules, Sec. VII, 1 ("In the case of final action by the Board of Supervisors on a motion to affirm the Planning Commission's action or recommendation . . . the motion shall be deemed to include all proposed findings and execution of all actions recommended in the staff report.").

*Amalgamated LLC v. City of Chula Vista*, 82 Cal. App. 5th 265, 279 (2022). Whether a duty is ministerial is generally a question of law, namely statutory interpretation. *Id.*; *see also Rodriguez v. Solis*, 1 Cal. App. 4th 495, 502 (1991).

Where the duty is mandatory and ministerial, a court may issue a writ of mandate to compel a public agency or officer to perform this duty. *CV Amalgamated LLC*, 82 Cal. App. 5th at 279. A "ministerial act" is an act the public officer "is required to perform in a prescribed manner in obedience to the mandate of legal authority and without regard to his own judgment or opinion concerning such act's propriety or impropriety, when a given state of facts exists." *Id.* (quoting *Kavanaugh v. W. Sonoma Cnty. Union High Sch. Dist.*, 29 Cal. 4th 911, 916 (2003)). "A public entity has a ministerial duty to comply with its own rules and regulations where they are valid and unambiguous." *Id.* (quoting *Gregory v. State Bd. of Control*, 73 Cal. App. 4th 584, 595, (1999)).

If a public agency has abused its discretion in carrying out a discretionary function, a court may issue a writ of mandate to correct this abuse of discretion. *CV Amalgamated LLC*, 82 Cal. App. 5th at 279. Discretion is "the power conferred on public functionaries to act officially according to the dictates of their own judgment." *AIDS Healthcare Found. v. Los Angeles Cnty. Dep't of Pub. Health*, 197 Cal. App. 4th 693, 700 (2011) (quoting *Rodriguez*, 1 Cal. App. 4th at 501–502. Discretionary agency action amounts to an abuse of discretion where it is "palpably unreasonable and arbitrary." *CV Amalgamated LLC*, 82 Cal. App. 5th at 280 (quoting *Ellena v. Dep't of Ins.*, 230 Cal. App. 4th 198, 205 (2014)).[13]

---

[13] Petitioners cite to cases interpreting "discretionary projects" and "ministerial projects" within the meaning of the California Environmental Quality Act (CEQA). *See* Petitioners MSJ at 19 (citing *Prentiss v. City of S. Pasadena*, 15 Cal. App. 4th 85, 89 (1993), *Health First v. Mar. Joint Powers Auth.*, 174 Cal. App. 4th 1135, 1142 (2009) and *Friends of Juana Briones House v. City of Palo Alto*, 190 Cal. App. 4th 286, 299 (2010)), 20 (citing *Sierra Club v. Cnty. of Sonoma*, 11 Cal. App. 5th 11, 19 (2017) and *Sierra Club v. Napa Cnty. Bd. of Supervisors*, 205 Cal. App. 4th 162, 176 (2012)). Although CEQA uses the terms "discretionary" and "ministerial," these terms and the interpretations thereof are based upon CEQA regulatory definitions that are not binding in this case. *See* Cal. Code Regs. §§ 15268, 15369.

### 2.     Duties Under Chapter 25B

Petitioners assert two theories of duty:  (1)  the Board had a mandatory ministerial duty to act on the appeal, *i.e.*, affirm, reverse, or modify the Planning Commission's decision, and (2) the Board had a mandatory ministerial duty to deny the appeals once the required findings were met.  Petitioners MSJ at 18.  The Court will first address the duty to act on the appeal.

Chapter 25B mandates that the Board "shall affirm, reverse, or modify the planning commission's decision at a public hearing."  County Code § 25B-12(4).  A cardinal rule of statutory interpretation is that the Court's inquiry "begins with the statutory text, and ends there as well if the text is unambiguous."  *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004); *see also California Priv. Prot. Agency v. Superior Ct.*, 99 Cal. App. 5th 705, 722 (2024) (same under California law); *Herrera v. Zumiez, Inc.*, 953 F.3d 1063, 1070 (9th Cir. 2020) (holding courts apply California rules of statutory interpretation to California regulations).  Statutory interpretation begins with the "plain and commonsense meaning" of the words themselves.  *Herrera*, 953 F.3d at 1070.  The language here is unambiguous.  The Board *shall* affirm, reverse, or modify the decision, but the Board's tie vote did not do any of these things.  Because the language is unambiguous, the Court need not look to Chapter 25B's legislative history or other extrinsic aids.  *BedRoc Ltd., LLC*, 541 U.S. at 183; *see also Herrera*, 953 F.3d at 1071.

The Board's duty to affirm, reverse, or modify the Planning Commission's decision is mandatory and ministerial.  Chapter 25B does not provide the Board discretion to decline—if an eligible appellant appeals with the required specific statement, the Board must hear the appeal and act upon it to affirm, reverse, or modify the underlying decision.  *See* County Code §§ 25B-12(b)(1), (2); *accord     California Priv. Prot. Agency v. Superior Ct.*, 99 Cal. App. 5th 705, 723 (2024) (where the timeline to adopt final regulations "shall be" a certain date, the agency had a mandatory duty to adopt final regulations by that date); *Sustainability of Parks, Recycling & Wildlife Legal Def. Fund v. Cnty. of Solano Dep't of Res. Mgmt.*, 167 Cal. App. 4th 1350, 1359 (2008)

(agency's obligation to hold a hearing upon receipt of a petition was ministerial); *Lazan v. Cnty. of Riverside*, 140 Cal. App. 4th 453, 460 (2006) (where employer "shall apply for disability retirement" upon a certain condition, the employer has a mandatory and ministerial duty to apply because it "has no authority to do otherwise").  The Board has no option, for example, to remand the matter back to the Planning Commission for further consideration.  *Cf. Woody's Grp., Inc. v. City of Newport Beach*, 233 Cal. App. 4th 1012, 1026 (2015) (the municipal code allows the reviewing body to remand).

The use of the word "shall" indicates a legislative intent to impose a mandatory duty.  *California Priv. Prot. Agency*, 99 Cal. App. 5th at 723 (citing *In re Luis B.*, 142 Cal. App. 4th 1117, 1123 (2006)).  Respondents and Intervenors claim the word "shall" does not *necessarily* create a mandatory duty under *AIDS Healthcare Found.*, 197 Cal. App. 4th at 693.  *See* Response at 19, Intervenors MSJ at 24.  Although *AIDS Healthcare Found.* may stand for this general proposition, the facts and reasoning undergirding it are inapplicable to the case at hand.  In *AIDS Healthcare Found.*, the petitioners sought a writ of mandamus to compel the health department to issue a regulatory order requiring adult film industry performers to take certain specific actions.  197 Cal. App. 4th at 696.  The applicable statute stated the health department "shall take measures as may be necessary to prevent the spread of the disease or occurrence of additional cases."  *Id.* at 701.  In this context, the Court of Appeal found the term "shall" did not necessarily create a mandatory duty, because "[e]ven if mandatory language appears in a statute creating a duty, the duty is discretionary if the public entity must exercise significant discretion to perform the duty."  *Id.* (quoting *Sonoma Ag Art v. Dep't of Food & Agric.*, 125 Cal. App. 4th 122, 127 (2004) (internal punctuation removed)).  The Court of Appeal concluded the statute left the "measures as may be necessary," or the prescribed course of action to address the spread of diseases, to the health department's discretion.[14]

---

[14] Intervenors also rely on *Thompson* to claim the duty is not mandatory.  Intervenors MSJ at 24 (citing *Thompson v. City of Lake Elsinore*, 18 Cal. App. 4th 49, 56 (1993)).  In *Thompson*, although the

Here, the Board has no such discretion as to *what* courses of action it can take—it must affirm, reverse, or modify.  Nor does it have the option *not* to take any of those three actions.  It has discretion to decide *which* action of the three to take, and discretion within its *de novo* review process (*see supra* Part III(A)), but these discretionary actions are separate from the mandatory and ministerial process of hearing and affirmatively acting on the appeal.  *See, e.g., CVG Amalgamated LLC*, 82 Cal. App. 5th at 221 (separating the ministerial procedural requirements of the ordinance from the discretionary merit-based scoring portion of the ordinance).

Although the Board's failure to act was not purposeful, as the tie vote presumably was unexpected and unplanned, the Board has yet to "affirm, reverse, or modify" the decision following Petitioners' demand letters and the Board's closed session.  *See* Petitioners MSJ at 18.  A traditional writ of mandamus is appropriate here to compel the Board to "affirm, reverse, or modify" the Planning Commission's decision where it essentially has failed to act following the tie vote.  Moreover, "[m]andamus does not lie to compel a public agency to exercise discretionary powers in a particular manner, only to compel it to exercise its discretion in some manner."  *AIDS Healthcare Found.*, 197 Cal. App. 4th at 700–701 (citing *Excelsior Coll. v. Bd. of Registered Nursing*, 136 Cal. App. 4th 1218, 1238 (2006)); *see also* Intervenors Reply at 12–13.  In other words, having concluded that the Board's *de novo* review of the Planning Commission's decision is discretionary rather than purely appellate in nature, the Court may not compel the Board to affirm or reverse the Planning Commission's decision before the Board has made any decision at all.  But the Court may compel the Board to *exercise* its discretion to affirm, reverse, or modify and essentially try again until it reaches a determination in compliance with the requirements of Chapter 25B—an affirmance, reversal, or

---

ordinance stated the building official "shall" issue a permit if the application met all requirements, the Court of Appeal concluded the issuance of building permits is a historically discretionary function. *Id.* at 56 n.9, 57.  This action does not concern building permits—the reasoning in *Thompson* is inapposite.

modification tethered to factual findings under Chapter 25B-8, 9, and 10 would satisfy the Board's mandatory duty to act.

Indeed, the Board has expressed its willingness to hold a new hearing. *See* Response at 24. The trial court in *Lopez* similarly remanded the matter back to the board to conduct another vote. *Lopez*, 165 Cal. App. 4th at 3. The Board here, like in *Lopez*, had five members "to foster decisions by majority votes and to avoid tie votes." *Id.* at 5. The fifth abstaining board member in *Lopez* abstained on an erroneous basis. *Id.* Accordingly, with the Court of Appeal's instruction, the remand restored the board to its intended odd number of members. *Id.* Here, Hartmann recused herself from the vote, but her presumed conflict of interest may not in fact exist.[15] On June 27, 2025, the FPPC sent a letter to County Counsel for Santa Barbara County, at County Counsel's request, regarding Hartmann's purported conflict of interest based upon her ownership of a real property parcel approximately 900 feet from the pipeline. Intervenors RJN, Ex. 1 [Doc. # 43-6 at 6–13.][16] The letter states that under certain conflict-of-interest provisions, Hartmann does not have a disqualifying financial interest in the County's decisions regarding Sable's Chapter 25B FDP applications. *Id.* at 8. That said, as Petitioners point out, Hartmann received a similar letter from the FPPC in 2016 but still recused herself in 2023. Alternative RJN, Ex. 1 [Doc. # 46-5 at 4–8]. Regardless, this factual development does not undermine the Court's ruling as the Court does not rely upon Hartman's recusal status. Whether or not Hartmann participates in the vote, the Board members must vote to "affirm, reverse, or modify" the Planning Commission's decision—which includes

---

[15] Regarding the Sable FDP applications, Hartmann did not state on the record her reasons for recusal. In 2023, however, regarding the Exxon Mobil Affiliates application for FDP transfer of the pipeline, she stated "the pipeline runs directly adjacent to the northeastern corner of my property," so "due to conflict of interest potential" she recused herself. Petitioners RJN, Ex. 1 at 3 [Doc # 36-5]; *see also* Petitioners RJN, Ex. 3 at 2 [Doc. # 36-7].

[16] County Counsel originally made this request to the Attorney General's Office and the Santa Barbara County District Attorney's Office, who forwarded it to the FPPC. Intervenors RJN, Ex. 1 at 6.

upholding or denying the appeals and making the required factual findings under Chapter 25B-8, 9, and 10.[17]

**C.    Third Claim for Relief:  Administrative Writ of Mandate Section 1094.5**

Because the Court remands this matter back to the Board pursuant to Petitioners' second claim for relief under section 1085, it need not reach Petitioners' third claim for relief in the alternative for administrative writ of mandate under section 1094.5.  *See* Petitioners MSJ at 26–28.

**IV.**

**CONCLUSION**

In light of the foregoing, as to the first claim for relief, the Court **DENIES in part and GRANTS in part** Petitioners' MSJ and **GRANTS in part** the Intervenors' MSJ insofar as it concludes that the Board's tie vote constitutes no action and does not affirm or reverse the Planning Commission's decision.  Regarding the second claim for relief, and only as to the Board's ministerial duty to "affirm, reverse, or modify" the Planning Commission's decision, the Court **GRANTS in part** Petitioners' MSJ and **DENIES in part** Intervenors' MSJ.

Petitioners are entitled to issuance of a peremptory writ of mandate pursuant to California Code of Civil Procedure 1085 directing the Board to "affirm, reverse, or modify" the Planning Commission's decision in compliance with Santa Barbara County Code Chapter 25B.  The Court will issue a peremptory writ of mandate forthwith.

---

[17] In upholding or denying the appeals, Board members must comply with the requirements of Chapter 25B and Governing Procedural Rules.  Lee's sparse remarks to the effect that restarting the facilities and pipeline was an "insane" and "bad" idea, and his vote was the "right thing to do," without a single mention of the findings required under Chapter 25B, would not exemplify compliance.  *See* Governing Procedural Rules, Sec. VII, 1 (requiring any final action to be accompanied by written findings); *see also Topanga Assn. for a Scenic Cmty. v. Cnty. of Los Angeles*, 11 Cal. 3d 506 (1974) (agencies making decisions must render findings sufficient to allow the parties to determine whether and on what basis they should seek review and to apprise the reviewing court of the basis behind the Board's findings).

This action is **STAYED and administratively closed** pending the Board's compliance with the Court's peremptory writ of mandate.  Any party may file a motion to lift the stay upon verification of the Board's compliance with the writ of mandate and, as appropriate, move to reopen the case or dismiss it.


**IT IS SO ORDERED.**


DATED:  September 12, 2025

_____
DOLLY M. GEE
CHIEF U.S. DISTRICT JUDGE