LATHAM & WATKINS LLP
  Jessica Stebbins Bina (Bar No. 248485)
  *jessica.stebbinsbina@lw.com*
10250 Constellation Blvd. Suite 1100
Los Angeles, CA  90067
Telephone:  +1 424.653.5500
Facsimile:  +1 424.653.5501

Attorneys for Petitioners Sable Offshore
Corp., Pacific Pipeline Company, and Pacific
Offshore Pipeline Company

O'MELVENY & MYERS LLP
  Dawn Sestito (Bar No. 214011)
  *dsestito@omm.com*
  Lauren Kaplan (Bar No. 294703)
  *lkaplan@omm.com*
400 South Hope Street, 19th Floor
Los Angeles, California  90071
Telephone:  +1 213.430.6000
Facsimile:  +1 213.430.6407

Attorneys for Petitioners and Plaintiffs Exxon
Mobil Corporation, Mobil Pacific Pipeline
Company, and ExxonMobil Pipeline
Company

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SABLE OFFSHORE CORP., et al., | CASE NO. 2:25-cv-04165-DMG-AGR |
|     Petitioners/Plaintiffs, | **AMENDED AND SUPPLEMENTAL VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** |
|     v. | |
| COUNTY OF SANTA BARBARA, et al., | |
|     Respondents/Defendants. | DEMAND FOR JURY TRIAL |
|     and | |
| ENVIRONMENTAL DEFENSE CENTER, et al. | |
|     Intervenors. | |

Petitioners and Plaintiffs Sable Offshore Corp. ("Sable Offshore"), Pacific Pipeline Company ("PPC"), and Pacific Offshore Pipeline Company ("POPCO") (collectively, "Sable") and Petitioners and Plaintiffs Exxon Mobil Corporation ("ExxonMobil"), Mobil Pacific Pipeline Company ("MPPC"), and ExxonMobil Pipeline Company ("EMPCo") (collectively, "ExxonMobil affiliates") (together with Sable, "Petitioners") submit this petition for a writ of mandate and complaint for declaratory relief and damages against Respondents and Defendants the County of Santa Barbara and Santa Barbara County Board of Supervisors ("County"), and allege as follows:

## INTRODUCTION

1.    This case arises from the County of Santa Barbara's continual arbitrary and unlawful refusal to transfer valid Final Development Permits ("FDPs" or "permits") recognizing the owner, operator, and guarantor of three oil and gas facilities—the Santa Ynez Unit ("SYU"), POPCO Gas Plant ("POPCO Facilities"), and Las Flores Pipeline System ("Pipeline") (together the "Facilities")—from the ExxonMobil affiliates, the Facilities' prior owners, operators, and guarantors, to Sable, their current and lawful owners, operators, and guarantors (the "Transfers").

2.    The permits at issue were issued by the County. These FDPs initially authorized the construction and continue to authorize the ongoing operation and maintenance of the Facilities. The FDPs have no expiration and are still valid. Sable Offshore acquired the Facilities and POPCO from ExxonMobil and PPC from MPPC in February 2024. Sable has invested substantial resources, totaling tens of millions of dollars, in repair and maintenance of the Facilities since acquiring them, with the goal of recommencing the commercial production of oil and gas.

3.    Santa Barbara County Code ("County Code") Chapter 25B (hereinafter, "Chapter 25B") , which the County enacted after issuing the permits at issue, provides a limited and formal process, through the County Planning Commission ("Planning Commission") to transfer the FDPs to a new owner,

2

operator, or guarantor ("Change of Owner, Operator, and Guarantor"). Under the County Code, permit transfer is mandatory so long as the narrow requirements of Chapter 25B—which largely focus on demonstrating that the new owner, operator, and guarantor of the permitted facilities have updated the permit information and agreed to comply with the FDPs' requirements—are met.

4. After acquiring the Facilities in early 2024, Sable provided all required information to the County in order to satisfy the FDP transfer process for a Change of Guarantor for all three Facilities, a Change of Owner for the SYU, and a Change of Operator for the three Facilities. As a matter of course, County staff confirmed that Sable met all the requirements under Chapter 25B and recommended approval of the transfers. (Staff Report for a Change of Owner, Operator, and Guarantor for the Santa Ynez Unit, POPCO Gas Plant, and Las Flores Pipeline System, dated Oct. 22, 2024, attached hereto as Exhibit 1 [2024 Staff Report].) In October 2024, the Planning Commission agreed with County staff and confirmed that all requirements for transfer had been met and approved the Change of Owner, Operator, and Guarantor for the Facilities as required by Chapter 25B.

5. The County Code provides that permit transfer approvals under Chapter 25B may be appealed to the County Board of Supervisors ("Board"). The Board's role is solely to review and "affirm, deny, or modify" the Planning Commission's decision. Unlike the Planning Commission, the Board is not authorized to take independent action on Chapter 25B permit transfers; it acts only as a reviewing body.[1]

6. Unfortunately, political forces intervened in this routine administrative process. After the Planning Commission approval, two sets of organizations appealed the decision to the Board. These appeals urged the Board to adopt a

---

[1] Petitioners acknowledge that this Court, in its Order re Cross Motions for Summary Judgment, concluded that the Board's review is "not one strictly of an appellate nature." Dkt. 52. The ongoing inclusion of this allegation and similar allegations by Petitioners is intended to avoid waiver.

3

sweeping construction of Chapter 25B that would—contrary to its plain text—permit the County to bar the Transfers based on alleged "facts" wholly outside the statutory scheme and, in so doing, deny Sable its vested rights in the FDPs, and deny the ExxonMobil affiliates the ability to exit from the permits despite their sale of the Facilities. County staff, in a written report and in a staff presentation to the Board, urged the Board to follow the law and deny the appeals. (Board Agenda Letter for a Change of Owner, Operator, and Guarantor for the Santa Ynez Unit, Pacific Offshore Pipeline Company Gas Plant, and Las Flores Pipeline System Final Development Plan Permits, dated Feb. 25, 2025, attached hereto as Exhibit 2.)

7. At the February 2025 hearing, despite the staff recommendation, the Board did not reach a decision on the appeals. It split the vote of the Board's five members 2-to-2, with the fifth supervisor, Supervisor Joan Hartmann, recusing herself from the vote based on a longstanding conflict of interest. The two supervisors who voted against the denial motion made clear that their votes were not based on the limited criteria in Chapter 25B. One supervisor explained that he thought that allowing oil operations to restart in the County—something wholly outside the scope of Chapter 25B—was an "insane idea." The other stated that she found the method of financing Sable used to purchase the Facilities through a seller-financed transaction "fishy." The two remaining supervisors voted to deny the appeals and urged their fellow supervisors to follow the law.

8. Despite failing to uphold the appeals, the County refused to transfer the FDPs (*i.e.*, it refused to replace references to the ExxonMobil affiliates as the prior owners, operators, and guarantors in the permits with Sable), which left Petitioners in an administrative and legal limbo for nearly nine months.

9. As a result, Sable and the ExxonMobil affiliates initiated this litigation and filed a motion for summary judgment. On September 12, 2025, this Court issued a peremptory writ of mandate ordering the Board to "affirm, reverse, or modify" the Planning Commission's approval of the Transfers, and, in doing so, to "comply with

4

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

AMENDED AND SUPP. VERIFIED PETITION FOR WRIT OF
MANDATE AND COMPLAINT FOR DECLARATORY RELIEF
AND DAMAGES

the requirements of Chapter 25B." (Sept. 12, 2025, Order re Cross-Motions for Summary Judgment ("Order re Cross-Motions for Summary Judgment"), Dkt. 52, p. 25, n. 17.)

10. The Board of Supervisors held a new hearing on the appeals on November 4, 2025. County staff once again recommended that the Board approve the Transfers and deny the appeals. Despite (1) recusing herself from several prior hearings due to a longstanding and well-documented conflict of interest (including hearings regarding the previous permit transfer to the ExxonMobil affiliates from the prior Owner, Operator, and Guarantor) and (2) Sable's request that she also recuse based upon her stated bias against Sable, ExxonMobil, and the fossil fuel industry, Supervisor Hartmann refused to recuse herself from the November 4, 2025 hearing. Chair Capps also refused to recuse herself despite Sable's written requests that she do so on account of her documented bias against Sable, ExxonMobil, and the use of the Facilities.

11. Supervisor Hartmann extensively influenced the November 4 hearing, asking numerous questions related to the potential of a spill (questions that are predicated on the Pipeline's operation, which is outside the County's jurisdiction, rather on than the permit Transfers) and repeatedly seeking confirmation that Sable or its insurers would cover all damages from a spill (something that she, as a property owner adjoining the Pipeline, has a distinct interest in different from the general public). For example, when discussing the rationale for her vote, she said, "I do believe that it helps to keep Exxon on the hook, both for spill and for abandonment if necessary." These are improper considerations wholly outside of Chapter 25B's enumerated criteria.

12. Chair Capps also similarly influenced the hearing despite her clear and unequivocal bias against Sable, ExxonMobil, and the oil and gas industry. During the hearing, Chair Capps again asked for documents that were not required under Chapter 25B, cited concerns regarding "the company['s] exist[ence] due to a loan

5

from [ExxonMobil]," and asked leading questions to EDC Appellants in order to illicit statements disparaging Sable.

13. Moreover, Supervisor Lavagnino stated that his decision was heavily influenced by news articles describing active litigation against Sable and Sable's stock price. He also stated that a news article containing unconfirmed and unsubstantiated allegations was "[t]he final straw for" him.

14. At the end of the hearing, the supervisors voted 4-to-1 to continue the hearing with direction to County staff to prepare written findings to support denying the Transfer of the permits from ExxonMobil to Sable. Notably, the supervisors did not provide staff with specific instructions or grounds for denying the Transfers. Rather, Supervisor Lee simply moved "to continue this hearing to December 16th with direction to staff to return with findings to approve the appeal and deny the Change of Owner, Operator, and Guarantor."

15. The continued Board hearing on the appeals occurred on December 16, 2025. For the first time, County staff recommended denial of the Transfers, as directed by the supervisors at the November hearing. The proposed findings disputed only one required finding under Chapter 25B: the Operator Capability finding required for a Change of Operator. County staff's proposed findings *presented no evidence* with respect to, and made no mention of, the required finding for Change of Guarantor for all three Facilities, the five required findings for a Change of Owner for the SYU, and eight of the nine required findings for a Change of Operator for the three Facilities.

16. In advance of the December 16, 2025 hearing, Sable sent another letter demonstrating that Supervisor Hartmann has a disqualifying, material conflict of interest due to the close proximity of her real property to the Pipeline. Faced with this clear evidence of an ethical violation were she to vote, Supervisor Hartmann reversed course yet again and recused herself. However, the damage had been done: the December 2025 hearing was continued from the November 4, 2025 hearing,

6

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

AMENDED AND SUPP. VERIFIED PETITION FOR WRIT OF
MANDATE AND COMPLAINT FOR DECLARATORY RELIEF
AND DAMAGES

where she had participated extensively and voted to direct staff to prepare findings of denial.  At the December 16, 2025 hearing, the Board voted 3-to-1 to approve the appeals, deny the requests for the Change of Owner, Operator and Guarantor for the Facilities' FDP permits, and adopt County staff's brand-new proposed findings.

17.    In contending that Sable did not meet the Operator Capability requirement, the Board in the findings that it adopted at the December 16, 2025 hearing (the "December Findings") relied on irrelevant, extra-statutory, and extra-jurisdictional considerations, all of which are unmoored from the applicable Chapter 25B requirements and from the substance of Sable's applications, which County staff deemed complete on July 30, 2024.  The December Findings further contain no basis whatsoever—other than the fact that Sable submitted a combined application—justifying denial of the transfer of the Owner or Guarantor permits.

18.    None of the purported evidence cited by the December Findings identifies any non-compliance with the Facilities' FDPs, County codes, or applicable compliance plans, nor do they demonstrate that Sable lacks the "skills, training, and resources necessary to operate the permitted facility" in compliance with such codes and plans within the meaning of Chapter 25B.  Instead, the December Findings rely on (a) minor regulatory violations that do not vary significantly from prior operators or similarly situated entities; (b) unproven and disputed allegations by various state agencies that Sable completed legally required Pipeline repairs without required permits (a number of which were fully resolved); and (c) media accounts and other subjective opinions.  The County's failure to abide by Chapter 25B places unnecessary legal and financial burdens on the Petitioners.  The County's refusal to transfer the permits effectively holds the ExxonMobil affiliates hostage with FDPs for Facilities they have not owned or operated for more than a year.  The ExxonMobil affiliates have a right to a fair and impartial hearing consistent with ExxonMobil's prior experience in front of this same Board.  Instead, the ExxonMobil affiliates were subjected to the current political whims of the Board

7

AMENDED AND SUPP. VERIFIED PETITION FOR WRIT OF
MANDATE AND COMPLAINT FOR DECLARATORY RELIEF
AND DAMAGES

members, resulting in arbitrary enforcement of Chapter 25B's requirements. The County's actions raise significant legal and financial questions that require the ExxonMobil affiliates to invest substantial time, money, and resources, notwithstanding that the Facilities are now owned by Sable and all requirements under Chapter 25B have been met.

19.     The County's refusal to transfer the permits also runs contrary to recent executive action. On March 13, 2026, the Secretary of Energy issued an order pursuant to the Defense Production Act directing Sable to "immediately prioritize and allocate pipeline transportation services from the offshore Santa Ynez Unit through the [Santa Ynez Pipeline System], including transportation service activities at the onshore facilities in Las Flores Canyon, California." (Exhibit 11 [DPA Order as defined *infra*], p. 359.)

20.     Because the County refuses to transfer the permits to Sable as required under applicable law, Sable cannot take full advantage of the benefits of the Facilities it purchased. Sable has made significant investments of money, resources, and time in the Facilities based on vested entitlements derived from the FDPs, including a vested right to lawfully operate the Facilities in the County. The County's refusal to act as required by law unfairly deprives Sable of those vested entitlement rights and unlawfully deprives the Petitioners of the benefit of their bargain.

## JURISDICTION AND VENUE

21.     This action arises under the laws of the United States and the State of California. This Court has jurisdiction over the federal claims pursuant to 28 USC § 1331. This Court has supplemental jurisdiction over the California state law claims pursuant to 28 USC § 1367.

22.     This Court has jurisdiction to grant mandamus relief pursuant to sections 1085 and 1094.5 of the California Code of Civil Procedure.

23.     This Court has authority to grant declaratory relief under 28 USC

8

§§ 2201 and 2202 and California Code of Civil Procedure § 1060.

24. Venue in this Court is proper pursuant to 28 USC § 1391(b).[2]

## THE PARTIES

25. Petitioner/Plaintiff Sable Offshore is a Delaware corporation, registered to do business in California, with its principal place of business in Texas.

26. Petitioner/Plaintiff PPC is a Delaware corporation, registered to do business in California.

27. Petitioner/Plaintiff POPCO is a California corporation.

28. Petitioner/Plaintiff ExxonMobil is a New Jersey corporation with its principal place of business in Texas.

29. Petitioner/Plaintiff EMPCo is a Delaware Limited Liability Company with its principal place of business in Texas.

30. Petitioner/Plaintiff MPPC is a Delaware corporation with its principal place of business in Texas.

31. Respondent/Defendant County of Santa Barbara is a political subdivision of the State of California. The Facilities are located within the jurisdictional limits of the County of Santa Barbara.

32. Respondent/Defendant Board of Supervisors of the County of Santa Barbara is Santa Barbara County's legally constituted legislative body and is composed of five elected Board members.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES
## AND STANDING

33. Petitioners have exhausted all administrative remedies available, and have no plain, speedy, or adequate remedy in the ordinary course of law, to compel the County's issuance of permits listing Sable as the owner, operator, and guarantor

---

[2] The filing of this complaint and Petitioners' participation in this lawsuit shall not be construed as a waiver of personal jurisdiction defenses in any other matter. Petitioners do not consent to personal jurisdiction in California in connection with any other matter.

9

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

AMENDED AND SUPP. VERIFIED PETITION FOR WRIT OF
MANDATE AND COMPLAINT FOR DECLARATORY RELIEF
AND DAMAGES

of the Facilities.

34.    Petitioners have a direct and substantial beneficial interest in the County's full and complete compliance with all applicable laws.  Absent obtaining judicial relief, the ExxonMobil affiliates will still be listed on the FDPs and Sable will not be able to lawfully hold the permits for its Facilities in Santa Barbara, forcing Petitioners to incur substantial unnecessary and unlawful financial and legal burdens.

35.    Petitioners complied with the California Government Claims Act with respect to the claims for damages to which it applies.  On August 20, 2025, within a year of accrual, Sable presented written claims for money damages to the County of Santa Barbara Board of Supervisors which accrued on February 25, 2025 in connection with the Board's tie-vote, and failure to deny the Appeals and approve the Transfers.  The County did not provide written notice of action on the claim within forty-five days and did not serve any written notice of rejection thereafter.  The claim was thus rejected by operation of law.

36.    On January 20 and 21, 2026, Petitioners presented written claims for money damages to the County of Santa Barbara Board of Supervisors, which accrued on December 16, 2025 in connection with the Board of Supervisor's actions to grant the Appeals and deny the Transfers.  The County rejected Sable's claim by letter dated March 3, 2026; the County rejected the ExxonMobil affiliates' claim by letter dated March 3, 2026.

37.    The amended Sixth and Eighth Causes of Action for damages *infra* are filed as of this 16th Day of March, which is within the timeframes set forth in Cal. Gov't Code Section 945.6(a).

## GENERAL ALLEGATIONS

### The Facilities

38.    Sable owns the Facilities, which are oil and gas processing and transportation facilities spanning from Santa Barbara County to Kern County.  Of

10

AMENDED AND SUPP. VERIFIED PETITION FOR WRIT OF
MANDATE AND COMPLAINT FOR DECLARATORY RELIEF
AND DAMAGES

these facilities, the Las Flores Pipeline ("Pipeline"), the POPCO facilities ("POPCO Facilities"), and Santa Ynez Unit ("SYU") are County-permitted facilities located within unincorporated Santa Barbara County that process and treat crude oil and natural gas from offshore platforms.

39. The Pipeline is a crude oil pipeline that generally runs from the Gaviota Coast to the Kern County boundary. The Pipeline is authorized by the County under County FDPs 88-DPF-033 (RV01)z, 88-CP-60 (RV01), 88-DPF-25cz, 85-DP-66cz, and 83-DP-25cz.

40. The POPCO Facilities are onshore gas midstream processing facilities located in the Las Flores Canyon. The POPCO Facilities are authorized by the County under County FDPs 93-FDP-015 and 74-CP-ll (RVl).

41. The SYU is comprised of certain onshore and offshore pipelines and associated components connecting off-shore platforms Hondo, Harmony, and Heritage to the associated onshore processing facilities and the POPCO Facilities. The SYU is authorized by the County under County FDPs 87-DP-32cz (modified on July 25, 2001, with 87-DP-032cz (RV05) Synergy Project) (modified on Feb. 19, 2003, with 87-DP-032cz (RV06) Offshore Power Cable Repair & Enhancement Project).

### State and Federal Agency Jurisdiction

42. The federal Pipeline Hazardous Materials Safety Administration ("PHMSA") holds exclusive jurisdiction over safe Pipeline repair, restart and operation. While the Pipeline was previously regulated as an "intrastate pipeline" by the California Office of the State Fire Marshal ("OSFM") under delegation from PHMSA, an agency within the United States Department of Transportation (49 U.S.C. § 108(b); Gov. Code §§ 51010, 51013.1(c)), on December 17, 2025, PHMSA issued a Determination of Interstate Classification, which confirmed that the Pipeline is part of a larger "interstate pipeline" system which is "subject to the regulatory oversight of PHMSA." (*See* PHMSA Determination, attached as Exhibit

11

3). This pipeline system includes the oil pipeline within the SYU connecting the offshore platforms to the oil processing facility, the POPCO Facilities (which are a mid-stream processing facility considered by PHMSA as part of a pipeline facility under the federal Pipeline Safety Act), and the onshore Pipeline segments. Accordingly, PHMSA now has exclusive jurisdiction to regulate the entirety of these Facilities with respect to safety.

43. The County previously entered a binding settlement with Petitioners' predecessors confirming the County's lack of jurisdiction over Pipeline operations ("Celeron Agreement").[3] Prior to entering the 1988 Celeron Agreement, Sable's predecessor, the Celeron Pipeline Company of California ("Celeron"), received construction permits from the County. However, Celeron objected to some of the permit conditions, claiming that the conditions were outside the County's jurisdiction and represented an exaction upon Celeron. After Celeron filed suit, the County and Celeron entered into the Celeron Agreement to confirm the scope of the County's jurisdiction over the Pipeline. In the Celeron Agreement, the parties agreed that "[a]s to areas covered by Part 195, the County is generally without jurisdiction." (Celeron Agreement, p. 2.) Applicable here, 49 CFR Part 195 [Transportation of Hazardous Liquids By Pipeline] ("Part 195") "prescribes safety standards and reporting requirements for pipeline facilities used in the transportation of hazardous liquids and carbon dioxide," including requirements related to the design, construction, and operation of pipelines. (49 CFR 195.0.) In the Celeron Agreement, the County acknowledged that it has "no authority over the design, construction and *operation*" of the Pipeline except as set forth in the agreement and attached Final Development Plan/Conditional Use Plan. (*Id*., § 2.2 [emphasis added].) Moreover, as memorialized in the Celeron Agreement, the County cannot

---

[3] *See* Settlement Agreement between Celeron Pipeline Company of California and the County of Santa Barbara (Feb. 8, 1988). *See also Celeron Pipeline Company of California v. County of Santa Barbara* (Case No. CV 87-02188).

12

take "any action which involve[s] Part 195 areas and is not authorized under 2.5.1 [in the Celeron Agreement], including suspending or withholding ministerial permits, and which will stop or delay [the permit holder's] construction and/or operation." (*Id.*, § 2.5.3.)

44.    Other federal and, in some instances, state agencies also regulate aspects of the Facilities not governed by PHMSA's exclusive jurisdiction over Pipeline safety and operations.  These federal and state regulations completely "occupy the field" and preempt local regulation of oil and gas production, pipeline operations, and safety work.

45.    As such, the County's review under Chapter 25B necessarily focuses on specific and limited requirements, all of which Sable has met.

### The Facilities' Vested Final Development Permits

46.    In the County, an FDP can authorize the operation of certain oil and gas facilities.  Upon its issuance, the FDP authorizes the construction and operation of such facilities consistent with the terms and requirements of the FDP.  Once issued and relied upon, the FDP is a vested entitlement that runs with the facilities it authorizes, subject to its terms and conditions.

47.    The FDPs for the Facilities were issued in 1987 (SYU), 1988 (Pipeline), and 1993 (POPCO Facilities).  Each permit was issued pursuant to then-existing County requirements.  The FDPs include various conditions regulating the construction, operation, and eventual abandonment of the Facilities.  The conditions outline specific compliance obligations, penalties for non-compliance, and review procedures for requested changes to the authorized uses.

48.    Subsequently, the Facilities' initial owners constructed and began operating them, after obtaining all other necessary state and federal authorizations, vesting the right to continue to operate the Facilities consistent with the FDPs.  Over the years, the Facilities' prior owners, including ExxonMobil, invested many millions of dollars in the Facilities.

13

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

AMENDED AND SUPP. VERIFIED PETITION FOR WRIT OF
MANDATE AND COMPLAINT FOR DECLARATORY RELIEF
AND DAMAGES

49.     The FDPs do not include an expiration date or any conditions that could result in a *de facto* expiration of the FDPs.  Further, the FDPs do not include any requirement that subsequent owners, operators, or guarantors of the Facilities obtain additional approval from the County to take advantage of the vested rights to own and operate the Facilities provided by the FDPs.  Sable, as successor in interest to the original owners of the Facilities, has vested rights vis-à-vis the County to own, restart, and operate the Facilities.

### County Code Chapter 25B

50.     In 2001, approximately a decade to a decade-and-a-half after the first of the FDPs for the Facilities was issued and years after they were built, the County adopted Chapter 25B, which created a formal process for transferring already-issued FDPs for existing facilities to new owners, operators, and guarantors.  The stated purpose of Chapter 25B is to "ensur[e] that safe operation, adequate financial responsibility, and compliance with all applicable county laws and permits are maintained during and after all changes of owner, operator or guarantor of certain oil and gas facilities."  (County Code § 25B-1.)

51.     Petitioners are informed and believe that the County is the only jurisdiction in California to have adopted such a process.  In other California local jurisdictions, permits for oil and gas facilities transfer to new owners automatically or with minimal formalities, such as updating contact information, when existing facilities are sold.

52.     Chapter 25B prescribes certain narrow requirements for permit transfers for new owners, operators, and guarantors and compels the County to approve requests upon determining that those requirements have been met.  As such, Chapter 25B creates a ministerial review process.  Chapter 25B authorizes the Director of Planning ("Director") to process certain transfer approvals and authorizes the Planning Commission to process others.  (County Code § 25B-8(a)-(b).)  Applications that include a component under the Director's jurisdiction and

14

another component under the Planning Commission's jurisdiction may be processed with a combined application before the Planning Commission, though all applicable findings must still be made.  (County Code § 25B-8(c).)

53.    Permit transfers are prohibited except in accordance with Chapter 25B. (County Code § 25B-4(d).)  Further, any owner, operator, guarantor, or permittee who fails to comply with the statute is subject to civil penalties of up to $25,000 per day as well as criminal penalties.  (County Code § 25B-13.)

54.    When approving combined applications that include a Change of Owner, Operator, and Guarantor of a permitted facility under Chapter 25B, the Planning Commission must confirm compliance with readily verifiable requirements based on objective facts.  These requirements include one required finding for Change of Guarantor (County Code § 25B-9(e)), five required findings for Change of Owner (*id.*, § 25B-9(a)), and nine required findings for Change of Operator (*id.*, § 25B-10(a)).  These findings are as follows:

a.    Fees and Exactions – the Planning Commission must confirm that "all outstanding county-required fees and exactions due for the facility have been paid."  (County Code § 25B-10(a)(1) [Change of Operator]; *see also* § 25B-9(a)(1) [Change of Owner ].)

b.    Financial Guarantees – the Planning Commission must confirm that "all necessary insurance, bonds or other instruments or methods of financial responsibility approved by the county and necessary to comply with the permit and any county ordinance have been updated, if necessary, to reflect the new operator and will remain in full effect following the operator change."  (County Code §25B-10(a)(2) [Change of Operator]; *see also* §§ 25B-9(a)(2) [Change of Owner], 25B-9(e)(1) [Change of Guarantor].)

c.    Acceptance of Permit – the Planning Commission must confirm that "the proposed operator has provided a letter from a responsible official representing the proposed operator formally accepting all conditions and

15

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

AMENDED AND SUPP. VERIFIED PETITION FOR WRIT OF
MANDATE AND COMPLAINT FOR DECLARATORY RELIEF
AND DAMAGES

requirements of the permit."   (County Code § 25B-10(a)(3) [Change of Operator]; *see also* § 25B-9(a)(3) [Change of Owner].)

d.    Safety Audit – the Planning Commission must confirm that the "current owner or operator has provided a copy of the most recent county-conducted comprehensive safety audit of the physical facility, along with a description of the status of implementing its recommendations, to the proposed new operator." (County Code § 25B-10(a)(4) [Change of Operator]; *see also* § 25B-9(a)(4) [Change of Owner].)

e.    Compliance with Existing Permit Requirements – the Planning Commission must confirm that "[a]s of the date that the application is deemed complete, the current operator is in compliance with all requirements of the permit, including any requirements of a county-required safety audit, any notice of violation, and any county ordinance, or the owner and proposed operator have entered into a written agreement with the director that specifies an enforceable schedule to come into compliance with such requirements."  (County Code § 25B-9(a)(5) [Change of Operator]; *see also* § 25B-10(a)(5) [Change of Owner].)

f.    Compliance Plans Contact Information – the Planning Commission must confirm that the "current owner and proposed operator have updated, where applicable, any existing, approved safety inspection maintenance and quality assurance program, emergency response plan, fire protection plan, and oil spill contingency plan, or equivalent approved plans, with current emergency contact information pertaining to the new operator.  The current owner and proposed operator have agreed in writing to revise all other plans required by the permit or any county ordinance, as necessary to reflect the change of operator, and to do so with sufficient diligence to obtain approval of the revised plans by the appropriate county official within six months after assuming operations."  (County Code § 25B-10(a)(6) [Change of Operator].)

g.    Transitional Plans – the Planning Commission must confirm that the

16

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

"current owner or operator and proposed operator have submitted a transitional plan that will demonstrate that the proposed operator shall receive adequate training, including by means of cross training by the current operator, where feasible, and shall have a good working knowledge of the crucial compliance plans listed [in the immediately preceding factor] before assuming control of operations.   The plan has been approved by the director. The planning commission may exempt the current owner and proposed operator from this requirement, or portions thereof, for good cause." (County Code § 25B-10(a)(7) [Change of Operator].)

h.    Emergency Response Plan Drills – the Planning Commission must confirm that "the proposed operator has adequately performed one or more county approved emergency response plan drills necessary to respond to emergency episodes that may occur at the facility."  (County Code § 25B-10(a)(8) [Change of Operator].)

i.    Operator Capability – the Planning Commission must confirm that the proposed operator "has the skills, training, and resources necessary to operate the permitted facility in compliance with the permit and all applicable county codes and has demonstrated the ability to comply with compliance plans listed [above]. The director shall require relevant records of compliance, and corrective actions taken subsequent to any major incidents for facilities, if any, that are similar in nature to those that are the subject of the permit, as may be necessary to make findings.  These records shall be used to provide sufficient assurance that the proposed operator does not reflect a record of non-compliant or unsafe operations systemic in nature for similar facilities to those being considered for operatorship." (County Code § 25B-10(a)(9) [Change of Operator].)

55.    In evaluating requests for Change of Owner, Operator, or Guarantor, the County is limited to reviewing application materials as of the date that the applications are deemed complete.  If the County wishes to consider additional

17

information not submitted as part of the initial applications, it must specifically identify and request such information in an "incompleteness" letter mailed to the applicant within "thirty calendar days of receipt of the application." (County Code § 25B-8(d); *see also id.*, § 25B-10(a)(5) [compliance with County permits, safety audits, any notice of violation, and County ordinance is assessed as of "the date that the application is deemed complete."].)

56.    Chapter 25B requires that "upon making the findings listed in" the ordinance, "the planning commission **shall** approve the change" of operator, owner, or guarantor. (County Code § 25B-10(b) [emphasis added]; *see also id.*, § 25B-9(g).) For combined applications, when the Planning Commission is reviewing an application that would otherwise fall under the Director's jurisdiction (such as Change of Owner or Change of Guarantor), the Planning Commission is charged with making all the findings required for approval (*id.*, §§ 25B-9.1-9.5). (*Id.*, § 25B-5(c).) The Planning Commission is not given discretion to accept or reject a permit transfer; it merely confirms compliance with the specific, enumerated provisions in Chapter 25B. The only additional conditions it may impose are those necessary "to ensure that any insurance or other financial guarantees that were *submitted to and relied on by the planning commission* [or director] *as a basis to make any finding required by this chapter are maintained*." (*Id.*, § 25B-10(b); *see also id.*, § 25B-9(g) [emphasis added].)

57.    Chapter 25B vests the Planning Commission with original jurisdiction to determine whether the requested transfers comply with the provisions of Chapter 25B. The Planning Commission's determination "may be appealed to the board of supervisors by the applicant or any interested person adversely affected by such decision." (County Code § 25B-12(b)(1).) On appeal, the Board must hold a *de novo* hearing and "shall affirm, reverse, or modify the planning commission's decision at a public hearing." (*Id.*, § 25B-12(b)(2).) The Board is thus neither required nor permitted to undertake a different inquiry from the Planning

18

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

AMENDED AND SUPP. VERIFIED PETITION FOR WRIT OF
MANDATE AND COMPLAINT FOR DECLARATORY RELIEF
AND DAMAGES

Commission; rather, its review is limited to affirming, reversing, or modifying *the Planning Commission*'s decision.

## 2023 ExxonMobil Transfer

58.    In recent years, there have been efforts by individuals and organizations opposed to oil and gas development to transform this ministerial, limited ordinance into a means of frustrating operation of the Facilities pursuant to vested entitlements. However, given the narrow scope of Chapter 25B, and the constraints of federal and state law, which fully preempt regulation over safety at the Facilities, and most other aspects of the Facilities' operations, and the County's recognition of its limited role under the Celeron Agreement, these efforts have largely failed.

59.    In 2023—before the events giving rise to this petition—the County resisted such an effort and confirmed Chapter 25B's narrow scope.  Specifically, on June 14, 2023, the Planning Commission approved a transfer of the same FDPs at issue in this litigation from then-owner, guarantor, and operator Plains Pipeline L.P. to PPC (then owned by MPPC), ExxonMobil, and EMPCo, respectively.

60.    In making that determination, the Planning Commission rejected arguments similar to those made by the appellants in the instant proceeding.  For example, the Planning Commission:

- Determined that the permit transfers were not "projects" under the California Environmental Quality Act ("CEQA") section 15378(b)(5), because they were "organizational or administrative activities of governments that will not result in direct or indirect physical changes to the environment";

- Determined that a 2015 spill on the Pipeline did not render it out of compliance with the FDP, within the meaning of Chapter 25B-9(a)(5) and 10(a)(5); and

- Determined that alleged failures in cathodic protection on the Pipeline did not render it out of compliance with the FDP, within the meaning

19

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

AMENDED AND SUPP. VERIFIED PETITION FOR WRIT OF
MANDATE AND COMPLAINT FOR DECLARATORY RELIEF
AND DAMAGES

of Chapter 25B-9(a)(5) and 10(a)(5).  (*See* 2023 Planning Commission Action Letter, dated Jun. 16, 2023, Attachment A - Findings of Approval, attached hereto as Exhibit 4.)

61.    As in this case, interested parties appealed the Planning Commission's 2023 determination to the Board—once again making all these same arguments.  In their appeal letter, the 2023 appellants argued that the permit transfers were a project under CEQA and that "[a] full EIR must therefore be ordered."  The Board rejected this argument and determined that "the proposed action is not subject to CEQA, as it does not constitute a 'project', as defined by CEQA Guidelines Section 15378(a)."  (Board Agenda Letter for a Change of Owner, Operator, and Guarantor for the Las Flores Pipeline System, dated Sept. 19, 2023, attached hereto as Exhibit 5 [2023 Board Letter], p. 151.)

62.    The 2023 appellants also argued that the prior owner was "not in compliance with existing permit conditions," citing to the alleged failure "to install and operate a functional cathodic protection system," and alleged maintenance failures related to the 2015 oil spill.  The Board rejected this argument and found that the prior owner was "in compliance with all requirements of the FDP Permit." (Board Agenda Letter for a Change of Owner, Operator, and Guarantor for the Las Flores Pipeline System, dated Sept. 19, 2023, Attachment A – Findings of Approval attached hereto as Exhibit 6 [2023 Findings of Approval], p. 161.)  On September 19, 2023, the Board denied the appeal and affirmed the Planning Commission's determination approving the requested Change of Owner, Guarantor, and Operator for the Pipeline.  (Board Minute Order, dated Sept. 19, 2023, attached hereto as Exhibit 7.)

63.    In deliberations, the Board acknowledged the limited nature of their inquiry and ultimately agreed with County staff's analysis recommending denial of the appeal.  Supervisor (now Chair) Laura Capps noted that the requested "change of ownership is an administrative action" and that in approving the transfer would

20

ensure that the "County permit actually matches the company that owns the pipeline." (Hearing Transcript excerpt of the Santa Barbara County Board of Supervisors Hearing, September 19, 2023 Meeting, attached as Exhibit 8, p. 170.)

64. Further, in the 2023 Findings of Approval, the Board affirmed that each of the required findings set forth in Chapter 25B had been satisfied, including those related to fees and exactions (Exhibit 6 [2023 Findings of Approval], p. 159, 161), financial guarantees (*id.,* pp. 159, 161-62), acceptance of the permit (*id.*, pp. 160, 162), facility safety audit (*ibid.*), compliance with existing permit requirements (*id.*, pp. 161-62), compliance plans contact information (*id.*, pp. 162-63), transitional plan (*id.*, p. 163), emergency response drills (*ibid.*), and operator capability (*id.*, p. 164).

65. Following the denial of the appeals, the County transferred the Pipeline permits to the ExxonMobil affiliates. Just over two years later, the Board took a contrary position on similar issues—establishing the arbitrary and capricious nature of its application of Chapter 25B.

### Commission Approval of Sable's Chapter 25B Applications and Appeals to Board

66. On February 14, 2024, Sable acquired full ownership of PPC and POPCO, the owners of the Pipeline and POPCO Facilities, from MPPC and ExxonMobil, respectively. Sable also acquired the SYU, which was owned by ExxonMobil.

67. In compliance with Chapter 25B, Sable thereafter submitted applications to the County to authorize the Change of Owner, Operator, and Guarantor for the Facilities.[4]

68. On July 30, 2024, County staff determined the applications to be complete.

---

[4] Because ownership of the Pipeline and POPCO Facility did not change, the County processed applications only for Change of Operator and Guarantor for those facilities.

21

69.     After a monthslong, diligent review of the submitted materials, County staff concluded that the applications were fully compliant with Chapter 25B, and recommended that the Planning Commission approve the Transfers.  (Exhibit 1, pp. 65-66.)   As part of this process, County staff prepared a detailed analysis of consistency with the Chapter 25B requirements and presented draft findings, ultimately adopted by the Planning Commission, going through each and every requirement of Chapter 25B and demonstrating each requirement was fully satisfied. These findings included—consistent with the 2023 transfer determinations—that the prior owners were in compliance with the FDPs, as well as confirming that the permit transfer process is administrative and does not constitute a project under CEQA.

70.     The Planning Commission took up the matter at a lengthy and thorough hearing—lasting approximately six hours—on October 30, 2024.  At the close of that hearing, the Planning Commission made the required findings and approved the Transfers by a vote of 3-to-1.  (Planning Commission Approval of Change of Owner, Operator, and Guarantor for the Santa Ynez Unit, POPCO Gas Plant, and Las Flores Pipeline System Final Development Plan Permits, dated November 4, 2024, attached hereto as Exhibit 9, pp. 1-2.)

71.     Specifically, consistent with County staff's detailed review and recommendations, the Planning Commission made required findings related to:

- Fees and Exactions (County Code §§ 25B-9(a)(1), 25B-10(a)(1)) – determining that "the requirements of this finding are satisfied" and that there are "no outstanding payments" due for the Facilities. (*Id.* , pp. 178, 180, 184, 187.)

- Financial Guarantees (County Code §§ 25B-9(a)(2), 25B-9(e)(1), 25B-10(a)(2)) – determining that all previously required bonds and endowments under the FDPs have been satisfied, and that the only other County-imposed financial obligations would be triggered solely at the time of permanent closure of the respective Facilities. (*Id.*, pp.

22

178-79, 180-81, 183-84.)

- Acceptance of Permit (County Code §§ 25B-9(a)(3), 25B-10(a)(3)) – determining that the requirements of this finding were satisfied. (*Id.*, pp. 179, 181, 184, 187.)

- Safety Audit (County Code §§ 25B-9(a)(4), 25B-10(a)(4)) – determining that this finding had been satisfied and that copies of the necessary audit information had been provided to Sable as the new owner/operator. (*Id.*, pp. 179, 181, 184-85, 187-88.) Related to the SYU and POPCO, the Planning Commission determined that the County's Systems Safety & Reliability Review Committee had deferred annual audits until the Pipeline restarted operations. (*Id.*, p. 179.) Related to the Pipeline, the Planning Commission noted that the 1988 Settlement Agreement between the County and Celeron/All American "determined that the County does not have the jurisdiction to regulate any aspect of the design, construction, or operation of the pipeline." (*Id.*, p. 188.) While no County-conducted safety audits are required for the Pipeline, safety audit information from PHMSA and OSFM from 2018 to 2023 were provided to the County and Sable. (*Ibid.*)

- Compliance with Existing Permit Requirements (County Code §§ 25B-9(a)(5), 25B-10(a)(5)) – determining that this requirement had been satisfied, as the owner/operator "is in compliance with all requirements of the FDP" and "[n]o notices of violation had been issued" by the County. (*Id.*, pp. 180, 181, 185, 188.)

- Compliance Plans (County Code § 25B-10(a)(6)) – determining that this requirement had been satisfied and that "all relevant compliance plans have been updated with the current emergency contact information" for Sable as required by the County Code. (*Id.*, pp. 181-

23

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
CENTURY CITY

AMENDED AND SUPP. VERIFIED PETITION FOR WRIT OF
MANDATE AND COMPLAINT FOR DECLARATORY RELIEF
AND DAMAGES

82, 185, 188.)

- <u>Transitional Plans</u> (County Code § 25B-10(a)(7)) – determining that Sable had submitted comprehensive transition plans on October 22, 2024, and that this requirement was satisfied.  (*Id.*, pp. 182, 185, 189.)

- <u>Emergency Response Plan Drills</u> (County Code § 25B-10(a)(8)) – determining that this requirement was satisfied, and that Sable had conducted emergency response drills for the Facilities.  (*Id.*, pp. 182, 186, 189.)

- <u>Operator Capability</u> (County Code § 25B-10(a)(9)) – determining that this requirement had been satisfied, citing the extensive subject matter expertise of Sable's management team, experience of the on-site operations team, and that the team has had "zero major incidents involving crude oil and gas facilities within the U.S." while managing facilities between 2009 and 2021.  (*Id.*, pp. 182-83, 186, 189-90.)

72.    Because the Planning Commission determined that all of the requirements of Chapter 25B had been met, the County Code compelled the Transfers.

73.    On November 5, 2024, the Center for Biological Diversity and Wishtoyo Foundation ("CBD Appellants") filed an appeal of the Planning Commission's October 30, 2024 decision to the Board (the "CBD Appeal").

74.    On November 7, 2024, the Environmental Defense Center, Get Oil Out!, and Santa Barbara County Action Network ("EDC Appellants") (together with the CBD Appellants, "Appellants") filed a separate appeal (the "EDC Appeal," and together with the CBD Appeal, the "Appeals").

75.    The Appeals urged the Board to adopt an expansive interpretation of Chapter 25B, by which the Board would undertake a comprehensive audit of Sable's finances, require massive new bonds totaling hundreds of millions of dollars, require new environmental review for the fully-permitted Facilities despite such review not

24

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

AMENDED AND SUPP. VERIFIED PETITION FOR WRIT OF
MANDATE AND COMPLAINT FOR DECLARATORY RELIEF
AND DAMAGES

being authorized by the FDPs, and otherwise essentially gut the FDPs and deny Sable the fully-vested rights attendant therein. The goal of the Appeals was not to ensure compliance with Chapter 25B, but to persuade the Board to ignore the limits of their authority, deny Sable's vested rights, and prevent the ExxonMobil affiliates from ever removing themselves from the FDPs.

76. On February 20, 2025, County staff issued a Board letter ("February 2025 Staff Report") and presentation, recommending the Board deny the Appeals in their entirety. Once again, County staff prepared a detailed analysis. The February 2025 Staff Report addressed and rejected each of the arguments made by Appellants. County staff found that none of the points raised in the Appeals changed their recommendations or otherwise impacted Sable's now-established compliance with the requirements of Chapter 25B. To the contrary, County staff confirmed that the scope of Chapter 25B was narrow, and did not authorize the County to undertake the expansive demands urged by Appellants. The February 2025 Staff Report confirmed that the Planning Commission had correctly approved the Transfers and recommended that the Board deny the Appeals. (*See* Exhibit 2.)

77. Prior to the Board's hearing related to the Transfers, both Petitioners and Appellants filed letters in support of their respective positions. Sable also submitted evidence from the administrative record before the Planning Commission demonstrating its full compliance with Chapter 25B. Appellants, on the other hand, submitted hundreds of pages of materials focused on issues entirely outside the scope of Chapter 25B, such as their claim that a restart of oil operations at the Facilities creates environmental and safety risks, Sable's financial structure and regulatory filings, and Sable's applications for authorizations from other regulatory agencies such as the Office of the State Fire Marshal, which are beyond the scope of the County's jurisdiction.

78. These arguments were intended to draw the Board's attention away from the County's limited review authority under Chapter 25B. Appellants argued

25

that the County should use Chapter 25B as a means to deny the Transfers and attempt to halt operation of the Facilities altogether. As noted above, many of these same arguments were made to and rejected by the Board in 2023, when it affirmed the Planning Commission's decision to approve the Pipeline transfer to the ExxonMobil affiliates.

**February 2025 Board Failure to Act on Appeals**

79. On February 25, 2025, the Board held a public hearing on both Appeals. Appellants urged the Board to exceed its power by granting the Appeals and denying the lawful affirmation of the Planning Commission's approval of the Transfers.

80. As part of their arguments, Appellants also misleadingly urged the Board to rely upon an early draft of Chapter 25B that was never adopted. That draft ordinance would have given the Planning Commission much broader powers, including the power to modify the FDPs, require new financial conditions, and otherwise impose conditions on transfers. That draft ordinance, however, was never adopted. Indeed, it could not have been lawfully adopted, as the contemplated powers would have been wholly outside the County's jurisdiction. Moreover, had the County in fact adopted an ordinance permitting it to simply shred adopted FDPs and effectively revoke vested entitlements any time properties were transferred, it would have also violated the Takings Clause of both the United States Constitution and the California Constitution. As Supervisor Steve Lavagnino remarked at the hearing:

> "[A]s much as some would like to expand the scope of this hearing, my job today is to determine really whether or not this applicant meets the requirements [of] 25B, not what we wish it said, ***not what the draft copy stated, not what some retired employee thought, but what it actually says***, and a speaker asked us to consider what was the intent of the staff when they wrote it, and after seeing the draft and after seeing the real part, it's… being here for a while, I'm sure staff and maybe even the board wanted it to be

26

AMENDED AND SUPP. VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

stronger, and I would assume then County counsel reviewed it and *realized maybe there were parts of it that possibly were illegal*."

81.     At the hearing on the Appeals, Supervisor Joan Hartmann recused herself from the proceedings, due to a longstanding conflict of interest because of the close proximity of the Pipeline property to her real property, stating "I must recuse the Pipeline runs through the northeast corner of my property."  Supervisor Hartmann's recusal left only four of the five supervisors present to consider and act on them.  After an approximately seven-hour hearing and deliberation, the remaining four supervisors split the vote on a motion to deny the Appeals, 2 votes to 2 votes.  Supervisors Steve Lavagnino and Bob Nelson voted in favor of denying the Appeals, and Chair Laura Capps and Supervisor Roy Lee voted against the denial motion.

82.     The justifications advanced by the two supervisors who voted in favor of the Appeals demonstrate a disregard for the limited scope of review mandated by Chapter 25B.  Instead of adhering to the criteria set forth in Chapter 25B, Chair Capps relied on her own subjective "smell test," claiming that her job was "to look at the big picture and to extrapolate of [*sic*] what we're actually doing here."  Instead of basing her decision on the requirements of Chapter 25B, Chair Capps cited numerous arbitrary and irrelevant factors, faulting Sable for (1) not going "above and beyond the checklist" in Chapter 25B because Sable did not provide copies of insurance policies (which are not required by Chapter 25B and were never requested by County staff or the Planning Commission); (2) alleged non-cooperation with the California Coastal Commission, which post-dated the applications and is outside the scope of Chapter 25B, and which was rebutted by County staff; and (3) the manner in which Sable financed its acquisition of the Facilities—something that, again, is wholly outside the scope of Chapter 25B.  Further, Chair Capps disparaged the entire Chapter 25B process, indicating that it is "designed to be completely confusing" and "completely in favor of big interests."

83.     Supervisor Lee likewise made no attempt to apply the criteria set forth

27

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

AMENDED AND SUPP. VERIFIED PETITION FOR WRIT OF
MANDATE AND COMPLAINT FOR DECLARATORY RELIEF
AND DAMAGES

in Section 25B. Instead, he indicated that he would support "upholding the Appeals," because, in his opinion, restarting the Facilities—something that is entirely outside the scope of Chapter 25B—is an "insane idea" and a "very bad idea."

84. As the Board cannot act without three votes,[5] the split vote resulted in Appellants failing to carry their burden to overturn the Planning Commission's approval and accordingly no action being taken by the Board on the Appeals.

85. On April 11, 2025, Sable sent the Director of Planning and Development a letter requesting that the County transfer the FDPs forthwith, and noting that it might need to seek writ relief if the County failed to act. (Letter to L. Plowman re: Change of Owner, Operator, and Guarantor for the Santa Ynez Unit, POPCO Gas Plant, and Las Flores Pipeline System Final Development Plan Permits, dated Apr. 11, 2025, attached hereto as Exhibit 10.)

86. At its April 16, 2025 meeting, the Board went into closed session to discuss Sable's threat of litigation regarding the Transfers. At the conclusion of the closed session, the Board noted that no reportable action was taken.

87. On May 8, 2025, Petitioners filed this case against the County and Board alleging, among other claims, that the County failed to comply with Chapter 25B by failing to act on the Appeals.

88. On September 12, 2025, following a hearing on cross-motions for summary judgment, the Court issued a peremptory writ of mandate ordering the Board to hold a new hearing to affirm, reverse, or modify the Planning Commission's decision in compliance with Chapter 25B. In its order, the Court specifically mandated that "[i]n upholding or denying the appeals, Board members

---

[5] Procedural Rules Governing Planning, Zoning and Subdivision Hearings Before the Board of Supervisors and Planning Commission (Santa Barbara County Res. No. 91-333), Sec, IV,1 ["Any action taken by the Board of Supervisors must be by a majority of the Board of Supervisors. An abstention shall not be counted as an affirmative vote on the motion."].

28

must comply with the requirements of Chapter 25B and Governing Procedural Rules" and that the Board's decision must be limited: "tethered to the factual findings under Chapter 25B-8, 9, and 10." (Order re Cross-Motions for Summary Judgment, Dkt. 52, pp. 24, 25 n. 17.)

**November 2025 Board Direction to Staff Contradicts Prior Recommendations**

89. The Board of Supervisors held a new hearing on the Appeals on November 4, 2025.

90. Prior to the November 4, 2025 hearing, on October 30, 2025, Sable submitted letters to Chair Capps, Supervisor Hartmann, the Board, and County counsel requesting that Chair Capps and Supervisor Hartmann recuse themselves from the hearing over due process concerns. Chair Capps' public statements reveal a prejudgment of the issues and bias against the Sable that are incompatible with due process and fair adjudication required in quasi-judicial proceedings. For example, in a June 6, 2025, interview, Chair Capps discussed her opposition both to the oil industry and specifically to actions that she viewed as potentially facilitating Pipeline restart. In the interview, Chair Capps acknowledged intentionally voting against the installation of upgraded valves on the Pipeline in 2023 despite state law requiring the valves be installed: "I voted against [the Valve Upgrade Project] *because it was a way to restart the pipeline*." (*See* Chair Capps Recusal Letter (October 30, 2025).) At the February 25 hearing, she repeatedly expressed alignment with the opponents of the Transfers, stating "*this is our one shot*" and that "this is not fair to the public that this is the one shot." (*Id.*)

91. Supervisor Hartmann has a longstanding conflict of interest arising from the proximity of the Pipeline's property to her real property and a documented bias against the fossil fuel industry and against Petitioners. (*See* Supervisor Hartmann Recusal Letter (October 30, 2025); Supervisor Hartmann Recusal Letter (December 3, 2025).) Despite this clear and overwhelming conflict of interest of

29

which Supervisor Hartmann was well aware,[6] Supervisor Hartmann declined to recuse herself from the November 4, 2025 hearing on the Appeals, citing a June 27, 2025 advice letter from the California Fair Political Practices Commission ("FPPC"), which, based on inaccurate information provided to the FPPC, incorrectly found that her ownership of real property in close proximity to the Pipeline did not create a disqualifying financial conflict of interest in the County's decisions regarding Sable's applications.  Chair Capps also declined to recuse herself.

92.     During the November 4, 2025 hearing on the Appeals, Supervisor Hartmann was an active participant—raising numerous questions about the adequacy of Sable's insurance policy and advocating for her own wide ranging interpretation of Chapter 25B (asserting that ExxonMobil's counsel was not willing to accept "the plain reading of the ordinance" and concluding that "I guess it's a difference of interpretation" following an exchange with ExxonMobil's counsel regarding specific Chapter 25B provisions).  During the hearing, Supervisor Hartmann interrupted County staff, interjecting, "You can stop there," after staff began responding to her question about violations pursued by other agencies with an explanation that such violations "are not necessarily related to Sable's ability to ensure the facilities are safe for operation."  During the Board's deliberations, Supervisor Hartmann muddied the record by making the unfounded allegation that "there is an SEC complaint" against Sable when, in fact, no such complaint exists.  After the close of the public hearing, Supervisor Hartmann advanced a sweeping view of the County's authority, stating, "I don't think that [the County's alleged] responsibility is preempted by other legislation."  She also stated that she was "very concerned about bankruptcies," citing "articles" that show that "[bankruptcies] are very common in the energy sector."

---

[6] Emails between Supervisor Hartmann and her staff and various constituents in advance of the *February* 2025 Board hearing, explain that the Pipeline runs through or grazes Supervisor Hartmann's property and that she must recuse herself as a result of the conflict of interest.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

AMENDED AND SUPP. VERIFIED PETITION FOR WRIT OF
MANDATE AND COMPLAINT FOR DECLARATORY RELIEF
AND DAMAGES

93.    Chair Capps was likewise a full participant, asking numerous questions about Sable's insurance policies, documentation that is not required under Chapter 25B, and requesting that the Appellants—not Sable—"characterize [Sable's] skills" and "put into context either the skills or the training that would lead" to certain outcomes.  In addition, she advocated for her own overly broad interpretation of Chapter 25B.

94.    With Chair Capps and Supervisor Hartmann's participation, the supervisors voted 4-to-1 to continue the hearing with direction to County staff to prepare written findings to support denying the transfer of the permits from ExxonMobil to Sable.  In its motion, the Board failed to provide any direction to County staff regarding what evidence would support the findings to deny the Transfers and reverse the Planning Commission's approval.  During deliberations, Supervisor Lee explained that he was "not going to repeat what Joan [Hartmann] . . . said," but stated "I fully agree with you."  At the conclusion of the Board's deliberations, and prior to the Board's action, Supervisor Hartmann stated: "I guess we have to come back with findings for denial," requesting that County counsel explain "what that would entail."  Following County counsel's explanation, Supervisor Lee made a motion, which Supervisor Hartmann seconded, to continue the hearing to December 16, 2025, with direction to County staff to "return with findings to approve the Appeal and deny the Change of Owner, Operator, and Guarantor."

95.    In effort to align with the Board's desired outcome, despite the Board's failure to identify supporting evidence for its direction, County staff prepared another set of findings, which, for the first time, recommended denial of the Transfers ("December Findings").  These December Findings relied on a host of new evidence and allegations that were not previously raised by County staff or considered by the Planning Commission or the Board.  Petitioners were given less than three days to respond to the December Findings, including the new purported

31

"evidence" cited by County staff.

**December 2025 Board Reversal of Planning Commission's Decision**

96. The continued Board hearing on the Appeals occurred on December 16, 2025. At the start of this continued hearing, Supervisor Hartmann recused herself after Sable submitted another letter on December 3, 2025 requesting that she do so. Sable's letter demonstrated that the FPPC's June 27, 2025 advice letter relied on inaccurate, County-provided estimates that the Pipeline was approximately 900 feet from the edge of Supervisor Hartmann's parcel, when in fact the Pipeline was approximately 8 feet from her property line. During the continued hearing, Supervisor Hartmann announced that she had received updated guidance from the FPPC, indicating that "the distance does create a conflict and therefore I must recuse."

97. Neither Supervisor Hartmann, County counsel, nor any other Board member addressed her participation in the November portion of the hearing, including the fact that she was the first to suggest that County staff prepare findings of denial, that she provided the second vote on the motion to direct staff to prepare findings of denial, and that she participated in the final vote to direct staff to prepare findings of denial and continue the hearing.

98. At the conclusion of the December 16 hearing, the Board voted 3-to-1 to approve the Appeals, deny the requests for the Change of Owner, Operator, and Guarantor for the Facilities' FDPs, and adopt County staff's proposed December Findings.

99. As in each of the prior hearings, several supervisors cited irrelevant and extra-jurisdictional considerations in support of their decision. For example, Chair Capps again asked whether Sable had submitted its insurance policies (which is not required) and stated that she had "unresolved financial concerns." Chair Capps also referred to unadjudicated "criminal charges" and "state enforcement actions"—both of which stem from alleged failures to obtain permits for legally required repairs and

32

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

AMENDED AND SUPP. VERIFIED PETITION FOR WRIT OF
MANDATE AND COMPLAINT FOR DECLARATORY RELIEF
AND DAMAGES

none of which pertained to the Facilities' FDPs, the County Codes, or the applicable compliance plans.

100. In its December 23, 2025 Board Action Letter ("December 2025 Board Action Letter"), the County states that the Board voted "3 to 1" to: "1. Approve the appeals, . . .; 2. Make the required findings for denial of the Change of Owner, Operator, and Guarantor for the respective [Facilities'] FDP permits; 3. Determine that the denial of the requests is exempt from CEQA. . .; and 4. Deny the Change of Owner, Operator, and Guarantor for the respective [Facilities] FDP Permits."  The letter also states, "The attached findings reflect the Board of Supervisors actions of December 16, 2025."

**The December Findings**

101. The December Findings are deficient and do not provide a basis to grant the appeals and deny the Transfers.

102. In three separate provisions, the County Code sets forth distinct sets of findings applicable to requests for a Change of Owner (County Code § 25B-9(a)), Change of Operator (§ 25B-10(a)), and Change of Guarantor (§ 25B-9(e).)  Yet the December Findings include no discussion of the one finding required for a Change of Guarantor under Section 25B-9(e), the five individual findings applicable to the separate request for Change of Owner under Section 25B-9(a), or eight of the nine individual findings for the applications for a Change of Operator under Section 25B-10(a).  Instead, the discussion in the December Findings is expressly limited to a single finding required only for Change of Operator applications: the Operator Capability finding (County Code § 25B-10(a)(9)).

103. The December Findings thus present no evidence to support the denial of the application for a Change of Owner for the SYU or the applications for the Change of Guarantor for all three Facilities.  The December Findings assert that "all applications are denied" on the basis that the Operator Capability finding allegedly cannot be made, but this finding is only required for a Change of Operator.  Thus,

33

the December Findings contravene this Court's direction that the Board's action be "in compliance with the requirements of Chapter 25B—an affirmance, reversal, or modification tethered to the factual findings under Chapter 25B-8, 9, and 10." (Order re Cross-Motions for Summary Judgment, Dkt. 52, pp. 23-24.)

104.   The Operator Capability finding is unsupported, and is not based on the types of evidence that the County is authorized to consider.[7] The December Findings fail to identify a single instance of non-compliance with the County Code, the FDPs, or the relevant Compliance Plans.  Thus, the purported evidence in the December Findings fails to establish that Sable lacks the "skills, training, and resources" necessary to operate the [Facilities] in compliance with the permit and all applicable county codes," nor does it show that Sable has not "demonstrated the ability to comply with compliance plans." (*See* County Code § 25B-10(a)(9).)

105.   The December Findings also rely on rationales that are outside the County's jurisdiction and thus cannot be considered.  The Operator Capability finding is wholly preempted at all three Facilities.  (*See* ¶¶ 42-47, 58, *supra*.) However, the December Findings assert that Sable "reflects a record of *non-compliant or unsafe operations* systemic in nature for the Facilities." (Emphasis added.) In addition, the County relied on various allegations made by state and

---

[7] Chapter 25B authorizes consideration of relevant compliance records and corrective actions "taken subsequent to **major incidents**"[7] at similar facilities, to ensure the proposed operator "does not reflect a record of non-compliant or unsafe operations systemic in nature for similar facilities."  (County Code § 25B-10(a)(9) [emphasis added].)

Major Incident" is defined as "any accident that results in one or more of the following:

(1) An oil spill of fifty barrels or more, not including associated water, that escapes any device designed for spill containment and enters the environment;

(2) one or more fatalities or serious injuries that require significant medical intervention to members of the public who were situated outside the facility's premises when the incident occurred;

(3) evacuation of people outside the boundaries of the facility from which the release occurred; and

a fire offsite or that spread offsite." (County Code § 25B-3.)

34

regional agencies in connection with separate proceedings and regulatory regimes that are outside the County's jurisdiction.

106.   The December Findings raise *no arguments at all* with respect to the POPCO Facilities, yet they still held that the Operator Capability finding cannot be met for the POPCO Facilities.

107.   Moreover, the December Findings cite to irrelevant, conclusory, and unfounded claims as purported evidence.  For example, the December Findings:

- Cite conclusory allegations that certain activities required prior clearance from the County's Systems Safety and Reliability Review Committee, per SYU FDP Permit Condition XI-2.a.  However, no such requirement exists in Condition XI-2.a.

- Assert that Sable "started moving oil from the platforms to the onshore SYU prior to formally notifying the County," without identifying any requirement for such notification, and despite the fact that Sable communicated its intentions to the County's petroleum engineering <u>consultant on multiple occasions.</u>

- Make the unfounded claim that Sable should have submitted Zoning Clearance applications prior to Sable's initiation of the anomaly repair work on the Pipeline, despite the fact that the County expressly confirmed to Sable in a February 12, 2025 letter that no such Zoning Clearance was required.

108.   The December Findings also rely on allegations, including those described in paragraphs 105 and 107, that relate to events that transpired *after* the County deemed the Transfer applications complete on July 30, 2024, which are outside the scope of the Board's review.   Individually and collectively, the December Findings demonstrate a predetermined intention to deny the permit transfers regardless of their merits and without regard to Sable's actual compliance with the requirements of Chapter 25B.

109.   In sum, the "evidence" that the Board relied on to find that the Operator

35

Capability finding was not satisfied is irrelevant, outside the County's jurisdiction, and post-dates the application completeness date. Accordingly, the Board's finding with respect to Operator Capability is not supported by the record.

**National Energy Emergency and Federal Defense Production Act Order**

110. On January 20, 2025, the President of the United States issued Executive Order 14156, declaring a national energy emergency. In the Executive Order, the President determined that the "United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy." (90 Fed. Reg. 8433, 8434.) The President found that the nation's "inadequate energy supply and infrastructure causes and makes worse the high energy prices that devastate Americans, particularly those living on low- and fixed-incomes." (*Id.* at 8433.) The Executive Order further warned that "[i]n an effort to harm the American people, hostile state and non-state foreign actors have targeted our domestic energy infrastructure, weaponized our reliance on foreign energy, and abused their ability to cause dramatic swings within international commodity markets," and that "[a]n affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation." (*Id.* at 8433)

111. The Executive Order specifically identified the West Coast as a priority region for the "Nation's core national defense and security needs." The President directed the heads of executive departments and agencies to "identify and exercise any lawful emergency authorities available to them," including the Defense Production Act, to facilitate the "production, transportation, refining, and generation of domestic energy resources." (*Id.* at 8434.)

112. The warnings in Executive Order 14156 regarding the risks of America's reliance on foreign energy have been borne out by recent events. On February 28, 2026, the United States and Israel launched joint air strikes on Iran. In response, Iran launched military strikes targeting oil and other vital infrastructure,

36

severely disrupting global oil flows through the Strait of Hormuz.

113.   The resulting supply disruption is the largest in the history of the global oil market.  Flows through the Strait of Hormuz have fallen to less than 10% of pre-crisis levels.  Oil prices surged to over $110 per barrel following the outbreak of hostilities.

114.   This supply shock underscores the critical importance of domestic energy production on the West Coast, including from the Santa Ynez Unit.  With global oil supplies severely constrained by the conflict with Iran, the Santa Ynez Unit—one of the largest known offshore oilfields in the United States—represents a critical domestic resource that can help address the energy emergency facing the nation and the West Coast in particular.  The Santa Ynez Unit has an estimated 904 million barrels in place, and from 1981 to 2014, it produced more than 670 million barrels of oil.

115.   On March 13, 2026, the Secretary of Energy issued a Pipeline Capacity Prioritization and Allocation Order pursuant to the Defense Production Act, Executive Order 13603,[8] and Executive Order 14156 (the "DPA Order").  The DPA Order, attached hereto as Exhibit 11, is directed to Sable and specifically addresses the Facilities at issue in this case.[9]

116.   The DPA Order states that "Sable is directed to immediately prioritize and allocate pipeline transportation services for hydrocarbons from the offshore

---

[8] Exec. Order No. 13603, 77 Fed. Reg. 16651 (Mar. 22, 2012), available at: https://www.federalregister.gov/documents/2012/03/22/2012-7019/national-defense-resources-preparedness

[9] On March 13, 2026, President Trump issued an Executive Order entitled "Adjusting Certain Delegations Under the Defense Production Act," which amended Executive Order 13603 to delegate authority to the Secretary of Energy in addition to the Secretary of Commerce, and to clarify Section 2(a) of Executive Order 14156.  The President's March 13, 2026 Executive Order is available at: https://www.whitehouse.gov/presidential-actions/2026/03/adjusting-certain-delegations-under-the-defense-production-act/.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

AMENDED AND SUPP. VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

Santa Ynez Unit through the [Santa Ynez Pipeline System ("SYPS")],[10] including transportation service activities at the onshore facilities in Las Flores Canyon, California, to the Pentland Station terminal in Pentland, California." (Exhibit 11, p. 359.)   The DPA Order further states that "Sable is directed to immediately commence performance under contracts or orders for services, including contracts or orders hereinafter entered into or sought, for hydrocarbon transportation capacity in the SYPS." (*Id*.)   The DPA Order provides that contracts for hydrocarbon transportation services from the offshore Santa Ynez Unit platforms through the "SYPS shall take priority over other non-SYPS hydrocarbon transportation contracts or orders for such services." (*Id*.)

117.   Importantly for Petitioners' present action with the County, the DPA Order expressly states that "**Sable** is ordered to comply with this order immediately and to maintain such compliance until such time as the conditions necessitating the issuance of this order abate or until Sable is directed otherwise." (*Id.* at 359 (emphasis added).)

## FIRST CAUSE OF ACTION

### Writ of Mandate – Abuse of Discretion

### (Cal. Code Civ. Proc. § 1094.5)

118.   Petitioners allege and incorporate by reference each and every of the above allegations.

119.   Because Chapter 25B is necessarily narrow, the Board abused its discretion by refusing to deny the Appeals and uphold the Planning Commission's determination based on the record before it.   The Board adopted the December Findings even though they are not supported by the record, and the December Findings, even if they were supported by the record, do not support the Board's decision to deny the Transfers as they are based on materials outside the County's

---

[10] The DPA Order's reference to the "Santa Ynez Pipeline System" includes the Pipeline and associated infrastructure discussed in this Petition.

38

jurisdiction and outside the scope of Chapter 25B. In voting to adopt the December Findings and uphold the Appeals, the Board acted arbitrarily and in a capricious manner, without evidentiary support, and contrary to law.

120. Sable complied with all County Code requirements and obtained the required approvals from the Planning Commission. County staff provided the Board with a detailed analysis of each of the points raised by the Appellants and confirmed that the Transfers fully comply with Chapter 25B. As County staff confirmed in its February 2025 Staff Report to the Board, the requirements of Chapter 25B are so narrow in scope that the Board lacked legitimate discretion to grant the Appeals and deny the Transfers. Still, the Board voted to uphold the Appeals and reverse the Planning Commission's determination, adopting the December Findings that are not supported by the record and do not support a decision to deny Sable's applications for Change of Owner, Change of Operator, and Change of Guarantor.

121. In addition, members of the Board publicly indicated their intent to ignore the requirements of Chapter 25B and to instead deny the Transfers for policy-based reasons having nothing to do with the Chapter's requirements. At the February 25, 2025 hearing, Supervisor Lee indicated that he was opposed to the restart of operations even with full compliance with the FDPs. And Chair Capps stated that she found Sable's purchase of the Facilities "fishy" and faulted Sable for failing to provide documents that were neither required by Chapter 25B nor requested by the County. At the November hearing, Supervisor Hartmann claimed that there was an "SEC complaint" against Sable, which was not true. She also stated that she was "very concerned about bankruptcies," citing "articles" that show that "[bankruptcies] are very common in the energy sector." At the November hearing, Chair Capps explained that she "really was concerned about the fact that the company existed due to a loan from the company that had sold it." Chair Capps repeated this concern at the December hearing, in addition to asserting that she had "unresolved financial concerns." At the November Hearing, Supervisor Lavagnino

39

cited various press articles that he read, "fallout" from press coverage, Sable's stock price, and unadjudicated allegations made in a complaint filed by the County District Attorney. All of these purported concerns are beyond the scope of the Board's review under Chapter 25B.

122. The Board adopted no findings related to the requests for Change of Guarantor. (County Code § 25B-9(e)(1); ¶¶ 102-103, *supra*.) Accordingly, the December Findings fail to articulate any basis to contravene County staff's prior determination or to reverse the Planning Commission's findings that Sable meets the requirements for a Change of Guarantor for all three Facilities. Likewise, the December Findings fail to identify any evidence relevant to the required finding for Change of Guarantor requests, as none was made here. Thus, the Board's decision to deny the Change of Guarantor for the three Facilities is not supported by the December Findings, and the December Findings themselves are not supported by the record.

123. Similarly, the Board adopted no findings related to the request for Change of Owner, meaning the December Findings fail to articulate any basis to contravene County staff's prior determination or to reverse the Planning Commission's findings that Sable meets the requirements for a Change of Owner for the SYU. (County Code § 25B-9(a)(1)-(5); ¶¶ 102-103, *supra*.) Likewise, the December Findings fail to identify any evidence with respect to the required findings for the Change of Owner requests, as none were made here. Therefore, the decision to deny the application for the Change of Owner for the SYU is not supported by the December Findings, and the December Findings themselves are not supported by the record.

124. The Board also adopted no findings for eight of the nine requirements for a Change of Operator. (County Code § 25B-10(a)(1)-(9).) The Board's December Findings addressed only a single requirement, the Operator Capability finding, which is limited to applications for a Change of Operator. (County Code §

40

25B-10(a)(9); ¶¶ 15, 102-104, *supra*.)  The December Findings contend that Sable does not meet the Operator Capability finding by relying on irrelevant, extra-jurisdictional, and extra-statutory rationales.  (*See* ¶¶ 104-107, *supra*.)  All of the purported evidence cited by the December Findings is unmoored from the applicable Chapter 25B requirements and from the substance of Sable's applications, which County staff deemed complete on July 30, 2024.  Further, the Operator Capability finding is wholly preempted with respect to all three Facilities, meaning this finding cannot apply to the Facilities at all (*see* ¶¶ 42-45, 58, *supra*).  Further, the December Findings raise no arguments at all with respect to the POPCO Facilities (*see* ¶ 106, *supra*).  Thus, the Operator Capability finding is not supported by the record, and the decision to deny the applications for a Change of Operator for the three Facilities is not supported by the December Findings.

125.  The Board adopted the December Findings and denied the Transfers, but as the record demonstrates, Sable's applications satisfied all Chapter 25B requirements, and Petitioners have proceeded as required by law.  The December Findings fail to articulate any basis upon which to reverse the Planning Commission's findings with respect to the requirements for a Change of Guarantor for all three Facilities, the five requirements for a Change of Owner for the SYU, and eight of the nine requirements for a Change of Operator for the three Facilities. Likewise, the December Findings present no evidence with respect to those requirements.  The Board's singular finding to support the denial of the Change of Operator is not supported by the record.  Thus, the Board abused its discretion in adopting the December Findings, upholding the Appeals, and denying the Planning Commission's approval of the Transfers.

126.  The County's refusal to transfer the FDPs unlawfully denies the ExxonMobil affiliates the right to relieve themselves of the burden of County permits for Facilities they no longer own or operate, deprives Sable of rights legally acquired under the FDPs, and subjects Petitioners to substantial financial harm.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

127.  For the foregoing reasons, the County has failed to proceed in accordance with the law, and Petitioners are entitled to issuance of a writ of mandate vacating the December 16, 2025 action and directing the County to issue the updated FDPs or directing alternative relief as appropriate and proper.

## SECOND CAUSE OF ACTION

### Writ of Mandate – Failure to Provide a Fair Hearing

### (Cal. Code Civ. Proc. § 1094.5)

128.  Petitioners allege and incorporate by reference each and every of the above allegations.

129.  The Board failed to provide Petitioners with a fair hearing because Chair Capps did not recuse herself from the November 4, 2025 and December 16, 2025 hearings, yet her documented bias against Sable, ExxonMobil, and the Facilities means that she cannot act as an impartial, noninvolved reviewer. Moreover, Supervisor Hartmann's involvement and participation in the November 4, 2025 hearing, which was continued to December 16, 2025, compromised the integrity of the proceedings due to her bias against Sable, ExxonMobil, and the fossil fuel industry and her material, longstanding conflict of interest.

130.  Chair Capps has substantial record of bias against Sable, ExxonMobil, and the use of the Facilities, and she has made numerous public comments indicating her willingness to disregard the merits of applications involving the Pipeline as a means to achieve her broader improper goal of blocking its future use.

131.  Despite this bias, Chair Capps participated in and influenced the hearings on November 4, 2025 and December 16, 2025 by focusing the Board's discussion on issues outside the scope of Chapter 25B. For instance, during the hearings on November 4 and December 16, she asked numerous questions about Sable's insurance policies, documentation that is not required under Chapter 25B, and expressed an irrelevant concern that "the company existed due to a loan from

42

[ExxonMobil]." (*See* ¶¶ 12, 82, 93, 99, *supra*.)

132. She also expressed her bias against Sable and ExxonMobil, asserting that ExxonMobil "mischaracter[ized]" the Operator Capability finding requirements and asking the Appellants—not Sable—to "characterize [Sable's] skills." (*See* ¶¶ 12, 93, *supra*.)

133. In advance of the November 4, 2025 hearing, Sable sent a letter to Cahir Capps, the Board, and County counsel requesting that she recuse herself from the proceedings involving the Transfers due to her bias. She has refused. Chair Capps' participation means that Petitioners were denied a fair hearing.

134. Supervisor Hartmann has made numerous public statements demonstrating her bias against Sable, ExxonMobil, and the fossil fuel industry. Moreover, she has a longstanding disqualifying, material financial conflict of interest under the Political Reform Act because of the close proximity of her real property to the Pipeline. (*See* ¶¶ 16, 91, 96, *supra*.) Yet despite her documented bias and this material conflict of interest, she failed to recuse herself from the hearing on November 4, 2025 and instead participated in and influenced the proceedings. (*See* ¶¶ 91-95, *supra*.) At the November 4, 2025 hearing, she asked numerous questions related to the potential of a spill, reflecting her unique interest as a property owner along the Pipeline, and repeatedly sought confirmation that insurance would cover all damages from a potential spill. (*See* ¶¶ 11, 92, *supra*.)

135. Supervisor Hartmann also influenced the proceedings by advocating for her expansive interpretation of Chapter 25B and interrupting County staff during key explanations. (*See* ¶ 92, *supra*.)

136. During the Board's deliberations, Supervisor Hartmann also influenced the discussion by making an unfounded allegation that "there is an SEC complaint" against Sable when no such complaint exists. (*See* ¶ 88, *supra*.)

137. At the November 4, 2025 hearing, Supervisor Hartmann actively opposed the Transfers and seconded the motion to continue the hearing to December

43

16, 2025, with direction to County staff to return with findings to support denial and participated in the vote to direct staff to prepare findings to support denial and continue the hearing. (*See* ¶ 94, *supra*.)

138. In advance of the December 16, 2025 hearing, Sable sent a letter to Supervisor Hartman, the Board, and County counsel to again request that she recuse herself to the longtime disqualifying, material conflict of interest as a result of the close proximity of her real property to the Pipeline. (*See* ¶ 16, *supra*.)

139. As the December 16 hearing, Supervisor Hartmann recused herself. Yet without acknowledging Supervisor Hartmann's influence and participation in the November 4, 2025 hearing, the remaining supervisors continued with the hearing and, after public comments and deliberation, voted 3-to-1 to deny the Transfers. (*See* ¶¶ 97-98, *supra*.)

140. While she recused herself in December, the hearing on December 16, 2025 was continued from the November 4, 2025 hearing, where she participated extensively. Instead of acknowledging that Supervisor Hartmann's participation improperly influenced the proceedings during the November 4, 2025 hearing, initiating an action to cure the error, and/or re-voting on the item from the November hearing agenda, the remaining supervisors moved forward with the continued hearing. Petitioners were denied a fair hearing.

141. For the foregoing reasons, the County has failed to proceed in accordance with the law, and Petitioners are entitled to issuance of a writ of mandate vacating the Board's actions on November 4, 2025 and December 16, 2025 and mandating that the Board hold a new, fair hearing in compliance with the narrow requirements of Chapter 25B.

### THIRD CAUSE OF ACTION

**Writ of Mandate – Failure to Comply with County Code Chapter 25B By Failing to Deny the Appeals and Effectuate the Transfers**

**(Cal. Code Civ. Proc. § 1085)**

44

142.   Approval under Chapter 25B is compulsory if the requirements have been met: "upon making the findings listed in" the ordinance, the decisionmaking body "*shall* approve the change" of Operator, Owner, or Guarantor.  Given that each of the required findings for change of Owner, Operator and Guarantor involve ministerial criteria, which have been met, or are fully preempted as applied to the Facilities and outside the County's jurisdiction, the approval of the Transfers and disposition of any appeals is mandatory.

143.   If an appeal to the Planning Commission's determination is filed, Chapter 25B requires the Board to "affirm, reverse, or modify the planning commission's decision."  (County Code § 25B-12(b)(2).)

144.   County staff repeatedly furnished the Board with detailed information demonstrating that the Transfers comply with all relevant ministerial requirements under Chapter 25B, the Board was required by law to deny the Appeals and affirm the Planning Commission's determination.

145.   The Board's review is cabined by the same set of required findings applicable to Planning Commission review of the requests for Change of Owner, Operator, and Guarantor, which are ministerial criteria that once satisfied, give rise to the County's mandatory duty to approve the requests and deny any appeals.

146.   According to the Board's December Findings, the *only* finding which it allegedly could not make is the Operator Capability finding (the December Findings expressly limit discussion "to the required findings which cannot be made for the requests").

147.   Any purported discretion claimed by the County under Chapter 25B's Operator Capability requirement is preempted by federal law with respect to the Facilities.  (*See* ¶¶ 42-45, 110-117, *supra*.)

148.   The Board refused to undertake its ministerial duty to deny the Appeals and uphold the Planning Commission's approval of the Transfers. The Board's refusal to undertake its ministerial duty to deny the Appeals and uphold the

45

Planning Commission's approval of the Transfers unlawfully denies the ExxonMobil affiliates the right to relieve themselves of the burden of County permits for Facilities they no longer own or operate, deprives Sable of rights legally acquired under the FDPs, and subjects Petitioners to substantial financial harm.

149.   Petitioners are entitled to issuance of a writ of mandate vacating the Board's December 16, 2025 action and directing the County to issue the updated FDPs.

## **FOURTH CAUSE OF ACTION**

**Writ of Mandate – Failure to Comply with County Code Chapter 25B**

**By Failing to Make Findings to Reverse the Planning Commission's Grant of the Change of Owner and Change of Guarantor Requests**

**(Cal. Code Civ. Proc. § 1085)**

(Pleaded in the Alternative to the First and Second Causes of Action)

150.   Petitioners allege and incorporate by reference each and every of the above allegations.

151.   The County violated County Code Chapter 25B by failing to make findings to support its decision to reverse the Planning Commission's grant of Sable's requests for Change of Owner and Change of Guarantor.

152.   Under the County Code, requests for a Change of Owner are required to be evaluated on the basis of five required findings set forth in Section 25B-9(a)(1)-(5).   These Change of Owner findings are "Fees and Exactions," "Financial Guarantees," "Acceptance of Permit," "Facility Safety Audit," and "Compliance with Existing Requirements."   (County Code § 25B-9(a)(1)-(5).)   Elsewhere, Chapter 25B refers to these findings as "the findings required by this chapter." (County Code § 25B-6(f)(4).)

153.   Under the County Code, requests for Change of Guarantor must be evaluated only with respect to one enumerated criterion: the Financial Guarantees finding. (County Code § 25B-9(e).)  Neither a request for a Change of Owner nor a

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

AMENDED AND SUPP. VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

request for a Change of Guarantor permit or require the County to make a finding related to "Operator Capability."

154. On October 30, 2024, the Planning Commission made each of the five required findings to approve Sable's request for a Change of Owner for the SYU, and the Planning Commission made the single required finding to approve Sable's request for a Change of Guarantor for the each of the Facilities. Prior to a Board hearing on an appeal of a Planning Commission decision, the Planning Commission is required to "transmit to the board of supervisors copies of the application, including all attachments and related materials, and a statement of findings setting forth the reasons for the planning commission's decision." (County Code § 25B-12(b)(3).)

155. In considering an appeal, the Board is required to "affirm, reverse, or modify the planning commission's decision at a public hearing." (County Code § 25B-12(b)(4).)

156. The Board had a mandatory duty to support its decision with respect to the requests for Change of Guarantor and Change of Owner with written findings.

157. On December 16, 2025, the Board approved the Appeals and reversed the Planning Commission's grant of Sable's request for a Change of Owner for the SYU and its grant of Sable's request for the Change of Guarantor for each of the Facilities.

158. According to the December 2025 Board Action Letter, the Board purported to "[m]ake the required findings for denial of the Change of Owner, Operator, and Guarantor for the respective [Facilities] FDP Permits." However, the December Findings do not refer to any of the five required findings for Change of Owner under Section 25B-9(a), nor do the December Findings refer to the required finding for Change of Guarantor set forth under Section 25B-9(e).

159. Petitioners are entitled to issuance of a writ of mandate vacating the Board's December 16, 2025 action and directing the Board to make the required

47

findings for the Change of Owner and Change of Guarantor requests.

## FIFTH CAUSE OF ACTION

**Writ of Mandate – Violation of the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 19 of the California Constitution**

**(42 U.S.C. § 1983; Cal. Const. art. I, § 19)**

160. Petitioners allege and incorporate by reference each and every of the above allegations.

161. The United States Constitution prohibits the government from taking private property "without just compensation." (U.S. Const. amends. V, XIV.) The California State Constitution likewise provides that private property "may be taken . . . only when just compensation" is provided to the owner. (Cal. Const. art. I, § 19.) Under the Fifth and Fourteenth Amendments of the United States Constitution to the United States Constitution and Article I, Section 19 of the California Constitution, Petitioners have a federal and state right to be free from the taking of their private property and from laws that take or seize property for a public purpose, but on an unreasonable ground and without any mechanism for compensation.

162. Sable invested more than $600 million in the acquisition of the Facilities. Since its purchase, Sable has invested more than $290 million in preparing the Facilities for active operations. Sable has a vested right to continue operations and perform repair and maintenance activities on the Facilities as contemplated and previously authorized under the FDPs, and ExxonMobil and MPPC have a vested right to sell their assets and exit the FDPs without improper County interference. Efforts to utilize the County's process for approving the Transfers to thwart restart or sale of the Facilities, or revoke the FDPs, infringe upon Petitioners' vested rights under the FDPs.

163. Sable has been deprived of all economically beneficial use of its property due to the County's improper interference. The County's distortion of its

48

process for approving the Transfers is tantamount to a direct appropriation of property.

164. The County's refusal to transfer the lawfully acquired rights conferred under the FDPs illegally infringes upon Petitioners' property rights.

165. The County's failure to issue corrected FDPs substantially impairs Petitioners' property rights, for the benefit of the public and without prior compensation.

166. In refusing to issue the corrected FDPs, the County violated the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 19 of the California Constitution.

167. For the foregoing reasons, the County has failed to proceed in accordance with the law, and Petitioners are entitled to injunctive relief pursuant to Section 1983 in the form of issuance of a writ of mandate directing the County to issue the updated FDPs.

## SIXTH CAUSE OF ACTION

**Declaratory Relief and Damages – Violation of the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 19 of the California Constitution**

**(42 U.S.C. § 1983; Cal. Const. art. I, § 19; Cal. Code Civ. Proc. § 1060)**

168. Petitioners allege and incorporate by reference each and every of the above allegations.

169. The County enacted and is charged with enforcing Chapter 25B, which places straightforward requirements on the transfer of existing, active entitlements from one property owner to the next. The Board has repeatedly stepped well beyond the limited scope outlined in Chapter 25B to consider factors and considerations that are irrelevant to the narrow authority prescribed by the County Code. As applied, the Board's failure to uphold the Transfers violates the Petitioners' constitutional property rights under the FDPs.

49

170.   By refusing to focus on the narrow scope of review prescribed by the County Code, the Board overstepped its authority and applied Chapter 25B in a manner that violates federal and state law.  In addition, the County overstepped its authority in its application of Chapter 25B because it already disclaimed its jurisdiction over the Pipeline, including over the operation of the Pipeline, through the Celeron Agreement.  (*See* Celeron Agreement, p. 2; *id.*, § 2.2 (the County has "no authority over the design, construction and *operation*" of the Pipeline" [emphasis added]; ¶ 43, *supra*.))  To the extent Chapter 25B serves a public purpose, the Board's no-action and the County's subsequent refusal to issue updated FDPs deprives Petitioners of their property without providing a mechanism for compensation.

171.   ExxonMobil and MPPC have a vested right to transfer their assets, including the FDPs, and Sable obtained a vested right to operate the Facilities consistent with the FDPs.  The County's failure to effectuate the Transfers consistent with Chapter 25B seriously imperils Sable's significant investment in the Facilities.  Further, the County's failure to proceed as required by law in issuing updated FDPs subjects Petitioners to potential legal and financial exposure.

172.   There is a justiciable controversy in this case as to whether Chapter 25B violates the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 19 of the California Constitution.

173.   Petitioners seek a declaratory judgment that Chapter 25B, as applied by the County here, unconstitutionally takes property, seizes property, or deprives Petitioners of their property rights in violation of the United States and California Constitutions.

174.   As a direct and proximate cause of the County's actions, Petitioners have suffered and continue to suffer substantial damages in an amount to be proven at trial.  Accordingly, Petitioners also seek damages and attorneys' fees for the violations of the United States Constitution.

50

**SEVENTH CAUSE OF ACTION**

**Declaratory and Injunctive Relief – Violation of the Supremacy Clause of the United States Constitution and Article XI, Section 7 of the California Constitution, Pipeline Safety Act, and Defense Production Act**

**28 U.S.C. §§ 2201, 2202; U.S. Const., Art. VI; Cal. Code Civ. Proc. § 1060; 49 U.S.C. § 60104(c)); 50 U.S.C. § 4501 et seq.**

175.   Petitioners allege and incorporate by reference each and every of the above allegations.

176.   Regulation of all aspects of pipeline safety, including those pertaining to restart and operation for interstate pipelines are under the exclusive federal jurisdiction of PHMSA.  As such, regulation of these aspects of pipeline safety is reserved to PHMSA, not the County.

177.   The Supremacy Clause of the Constitution states that "the Laws of the United States . . .  shall be supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State Contrary notwithstanding."  (U.S. Constitution, Art. VI, cl. 2.)  The Supremacy Clause preempts state or local governments from interfering in a field fully occupied by federal agencies and law.

178.   Under the Pipeline Safety Act ("PSA"), state and local authorities "may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation."  49 U.S.C. § 60104(c).  Moreover, only State authorities that have "submitted a current certification under section 60105(a) may adopt additional or more stringent safety standards for intrastate pipeline facilities," and such standards still must be compatible with the federal pipeline safety standards. *Id*.  Only PHMSA has authority to regulate pipeline safety for interstate pipelines and intrastate pipelines not otherwise covered under a state certification under 49 U.S.C. §60105(a).

179.   In addition, through the Celeron Agreement, the County disclaimed its

51

jurisdiction over areas already covered by federal law, namely Part 195 which "prescribes safety standards and reporting requirements for pipeline facilities used in the transportation of hazardous liquids and carbon dioxide." (49 CFR 195.0.) The County agreed that "[a]s to areas covered by Part 195, the County is generally without jurisdiction." (Celeron Agreement, p. 2; ¶ 43, *supra*.) Moreover, as detailed in the Celeron Agreement, the County is not allowed to take "any action which involve[s] Part 195 areas and is not authorized under 2.5.1 [in the Celeron Agreement], including suspending or withholding ministerial permits, and which will stop or delay [Sable's] construction and/or operation." (Celeron Agreement, § 2.5.3; ¶ 43, *supra*.) Thus, the County acknowledged that it has "no authority over the design, construction and operation" of the Pipeline except as set forth in the agreement and attached Final Development Plan/Conditional Use Plan. (Celeron Agreement, § 2.2; ¶ 43, *supra*.)

180. The Pipeline, SYU, and the POPCO Facilities are all subject to regulation by PHMSA as pipeline facilities within the meaning of the PSA. The County is preempted from regulating interstate pipeline and pipeline facility operations, including authorizing the restart of the Pipeline for commercial hydrocarbon transport or denying Sable's request to transfer the FDPs on the basis of safety concerns.

181. Nonetheless, the Board of Supervisors have repeatedly cited safety concerns as reasons for denying the Transfers under Chapter 25B.

182. The County's reliance on the safety concerns it claims are embodied in Chapter 25B as a reason to vote "no" is federally preempted under the PSA with respect to the Facilities. 49 U.S.C. § 60104(c).

183. Independently, the County's denial of the Transfers is preempted by the DPA Order. On March 13, 2026, the Secretary of Energy issued the DPA Order, directing Sable—the only entity covered by the Order—to "immediately prioritize and allocate pipeline transportation services" for hydrocarbons from the SYU

52

through the Pipeline and to "immediately commence performance" of hydrocarbon transportation services. (Exhibit 11, p. 359.) The DPA Order specifically acknowledges Sable as the "lessee, owner, and operator of the [SYU]" as well as the Pipeline and attendant facilities, which "Sable owns and operates." (*Id.*) As the record makes clear, the Board members who voted to deny the Transfers did so with the purpose of obstructing the operation of the Facilities—a purpose that directly conflicts with the federal objectives embodied in the DPA Order. The County's attempted use of Chapter 25B as a tool to frustrate Sable's compliance with the DPA Order stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress and the Executive Branch, and is therefore preempted under the Supremacy Clause.

184. Under the Defense Production Act, "[n]o person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to" the Act. 50 U.S.C. § 4557. The County's application of Chapter 25B to deny the Transfers is preempted to the extent that it conflicts with Sable's federal obligation to comply with the DPA Order.

185. Article XI, Section 7, of the California Constitution provides that "[a] county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws."

186. Under state law, the California Department of Fish and Wildlife's Office of Spill Prevention and Response, ("OSPR") has the exclusive authority to require that owners and operators have the financial wherewithal to cover costs associated with a worst-case-scenario incident, and sets specific requirements. The County lacks authority to require different or additional requirements not authorized by OSPR or the FDPs. Thus, under Chapter 25B, the County's inquiry is limited to assessing compliance with County-imposed financial requirements. The County is preempted from requiring additional financial assurances, as that is fully within the

53

purview of OSPR and the County's requirement would place it in conflict with state law.

187. Again, the Supervisors who voted against denying the Appeals expressly stated that Sable's finances were a reason for doing so. During the February meeting, in addition to expressing her belief that Sable's financing was "fishy," Chair Capps opined that the Board's decision was "about fiscal oversight," and stated, "it's too risky to have an applicant that was formed when a major company decided that having this Pipeline was potentially too risky." During the November hearing, Chair Hartmann asked whether "the permit require[s] that the owner/operator have financial responsibility to clean up a spill." And in the December hearing, Chair Capps stated that Sable has "unresolved financial concerns."

188. Concerns related to pipeline safety or financial assurances, beyond those required by the County Code, are not a lawful basis for denying the Transfers. Not only are they outside County Code Chapter 25B, they are preempted by federal and state law. Consideration of these factors by Chair Capps and Supervisor Lee as part of the basis for voting against the denial of the Appeals under Chapter 25B violated the Supremacy Clause of the United States Constitution and state law.

189. Petitioners seek a declaratory judgment that Chapter 25B, as applied by the County to the Facilities, is preempted by federal and state law, and an injunction prohibiting the County from further enforcement of Chapter 25B against Petitioners in a manner inconsistent with the provisions cited above.

## EIGHTH CAUSE OF ACTION

### Breach of Settlement Agreement

190. Petitioners allege and incorporate by reference each and every of the above allegations.

191. The Board's adoption of the December Findings and County's failure to transfer the permits is a breach of the February 8, 1988 Celeron Agreement

54

between the County and the previous Pipeline owner, which the parties entered into to confirm the scope of the County's jurisdiction over the Pipeline.[11]  (*See* ¶ 43, *supra*.)

192.   In the Celeron Agreement, the parties agreed that "[a]s to areas covered by Part 195, the County is generally without jurisdiction."  (Celeron Agreement, p. 2; ¶ 43, *supra*.)  Specifically, the County acknowledged that it has "no authority over the design, construction and *operation*" of the Pipeline except as set forth in the agreement and attached Final Development Plan/Conditional Use Plan.  (Celeron Agreement, § 2.2 [emphasis added]; ¶ 43, *supra*.)  Moreover, as memorialized in the Celeron Agreement, the County is not allowed to take "any action which involve[s] Part 195 areas and is not authorized under 2.5.1 [in the Celeron Agreement], including suspending or withholding ministerial permits."  (Celeron Agreement, § 2.5.3; ¶ 43, *supra*.)

193.   The Board adopted the December Findings on December 16, 2025, through which it made a formal determination that Sable does not meet the Operator Capability requirements to operate the Pipeline under the County Code.  (*See* ¶¶ 13, 100, 102, 104-109, *supra*.)  Thus, the Board's adoption of the December Findings and the County's refusal to complete a ministerial permit transfer was based on the County's purported authority over the "operation" of the Pipeline.

194.   Based on the foregoing, the Board and County acted outside their jurisdiction and violated the Celeron Agreement.  The Board and County's violation of the Celeron Agreement has caused Sable incur excessive costs to operate the Pipeline.

195.   Pursuant to Section 13.1 of the Celeron Agreement, Petitioners are entitled to recover their damages and as costs all their attorneys' fees and other costs

---

[11] Petitioners are asserting this claim as current and former Pipeline owner and successors to the Agreement. *See, e.g.*, Celeron Agreement, p. 19("The terms and conditions of this Agreement will be binding upon the County and upon Celeron, its successors and assignees.").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

AMENDED AND SUPP. VERIFIED PETITION FOR WRIT OF
MANDATE AND COMPLAINT FOR DECLARATORY RELIEF
AND DAMAGES

as a result of the County's refusal to approve Transfers.

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioners/Plaintiffs pray for relief as follows:

1. For the First and Third, and Fifth Causes of Action for Writ of Mandate:

    1. For a peremptory writ of mandamus vacating the Board's December 16, 2025 action and directing the County to issue updated FDPs;

    2. For attorneys' fees and other litigation expenses permitted by law in an amount to be proven; and

    3. For such other and further relief as the Court may deem just and proper.

2. For the Second Cause of Action for Writ of Mandate:

    a. For a peremptory writ of mandamus vacating the Board's November 4, 2025 and December 16, 2025 actions and directing the Board to hold a new, fair hearing in compliance with narrow requirements of Chapter 25B;

    b. For attorneys' fees and other litigation expenses permitted by law in an amount to be proven; and

    c. For such other and further relief as the Court may deem just and proper.

3. For the Fourth Cause of Action for Writ of Mandate:

    a. For a peremptory writ of mandamus vacating the Board's December 16, 2025 action and directing the County to make the required findings for the Change of Guarantor and Change of Owner requests;

    b. For attorneys' fees and other litigation expenses permitted by law in an amount to be proven; and

    c. For such other and further relief as the Court may deem just and proper.

4. For the Fifth Cause of Action for Writ of Mandate:

    a. For a declaration that the County's enforcement of Chapter 25B, as applied to Petitioners, violates the Fifth and Fourteenth Amendments of the Constitution and Article I, Section 19 of the California Constitution;

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

b.  For a writ of mandate prohibiting the County from further enforcement of Chapter 25B against Petitioners in a manner inconsistent with the provisions cited above;

c.  For such other and further relief as the Court may deem just and proper.

5.  For the Sixth Cause of Action for Declaratory Relief and Damages:

a.  For a declaration finding that, as applied, the County's Chapter 25B ordinance violates the Fifth and Fourteenth Amendments of the Constitution and Article I, Section 19 of the California Constitution;

b.  For damages in an amount to be proven;

c.  For attorneys' fees and other litigation expenses permitted by law in an amount to be proven; and

d.  For such other and further relief as the Court may deem just and proper.

6.  For the Seventh Cause of Action for Declaratory and Injunctive Relief:

a.  For a declaration finding that, as applied, the County's Chapter 25B ordinance violates the Supremacy Clause of the Constitution and Article XI, Section 7 of the California Constitution;

b.  For an injunction prohibiting the County from further enforcement of Chapter 25B against Petitioners in a manner inconsistent with the provisions cited above;

c.  For such other and further relief as the Court may deem just and proper.

7.  For the Eighth Cause of Action

a.  For a declaration finding that County Code § 25B-10(a)(9), as applied, violates the Celeron Agreement;

b.  For damages in an amount to be proven;

c.  For attorneys' fees and other litigation expenses permitted by law in an amount to be proven; and

d.  For such other and further relief as the Court may deem just and proper.

57

## <u>DEMAND FOR JURY TRIAL</u>

Petitioners/Plaintiffs demand a jury trial for all issues so triable.

Dated:  March 16, 2026

Respectfully submitted,

LATHAM & WATKINS LLP
Jessica Stebbins Bina

By /s/*Jessica Stebbins Bina*
Jessica Stebbins Bina
Attorneys for Plaintiffs and
Petitioners Sable Offshore Corp.,
Pacific Pipeline Company, and Pacific
Offshore Pipeline Company

O'MELVENY & MYERS LLP
Lauren Kaplan

By /s/*Lauren Kaplan*
Lauren Kaplan
Attorneys for Plaintiffs and
Petitioners Exxon Mobil Corporation,
Mobil Pacific Pipeline Company, and
ExxonMobil Pipeline Company

58

AMENDED AND SUPP. VERIFIED PETITION FOR WRIT OF
MANDATE AND COMPLAINT FOR DECLARATORY RELIEF
AND DAMAGES

## VERIFICATION

I, J. Caldwell Flores, am President of Sable Offshore Corp. ("Sable Offshore"), Pacific Pipeline Company ("PPC"), and Pacific Offshore Pipeline Company ("POPCO"), and I am authorized to execute this verification on behalf of Sable Offshore, PPC, and POPCO.  I have read the foregoing **AMENDED AND SUPPLEMENTAL VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** and know the contents thereof.  The matters stated therein are true and correct to my own personal knowledge, except those matters that are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I have executed this Verification on this 16th day of March, 2026, in _____Goleta_____[City], __California____[State].

_____

J. Caldwell Flores, President

59

## VERIFICATION

I, Saul Flota, am the Vice President and US Operations Manager at ExxonMobil Pipeline Company ("EMPCo"), and I am authorized to execute this verification on behalf of EMPCo.  I have read the foregoing **AMENDED AND SUPPLEMENTAL VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** and know the contents thereof.  The matters stated therein are true and correct to my own personal knowledge, except those matters that are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that I have executed this Verification on this 16th day of March, 2026, in Spring, Texas.

Saul Flota

60

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

**VERIFICATION**

I, Nathan Franka, was SYU Asset Manager of Exxon Mobil Corporation ("ExxonMobil"), and I am authorized to execute this verification on behalf of ExxonMobil. I have read the foregoing **AMENDED AND SUPPLEMENTAL VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** and know the contents thereof. The matters stated therein are true and correct to my own personal knowledge, except those matters that are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that I have executed this Verification on this 13 day of March, 2026, in Spring, Texas.

_____
Nathan Franka

61

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

**VERIFICATION**

I, David Welsh, am the President at Mobil Pacific Pipeline Company ("MPPC"), and I am authorized to execute this verification on behalf of MPPC. I have read the foregoing **AMENDED AND SUPPLEMENTAL VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** and know the contents thereof. The matters stated therein are true and correct to my own personal knowledge, except those matters that are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that I have executed this Verification on this 16th day of March, 2026, in Spring, Texas.

_____
David Welsh

VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES