LATHAM & WATKINS LLP
 Jessica Stebbins Bina (Bar No. 248485)
*jessica.stebbinsbina@lw.com*
10250 Constellation Blvd. Suite 1100
Los Angeles, CA 90067
Telephone:  +1 424.653.5500
Facsimile:  +1 424.653.5501

Attorneys for Petitioners Sable Offshore
Corp., Pacific Pipeline Company, and Pacific
Offshore Pipeline Company

O'MELVENY & MYERS LLP
   Dawn Sestito (Bar No. 214011)
   *dsestito@omm.com*
   Lauren Kaplan (Bar No. 294703)
   *lkaplan@omm.com*
400 South Hope Street, 19th Floor
Los Angeles, California 90071
Telephone:  +1 213.430.6000
Facsimile:  +1 213.430.6407

Attorneys for Petitioners and Plaintiffs Exxon
Mobil Corporation, Mobil Pacific Pipeline
Company, and ExxonMobil Pipeline
Company

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SABLE OFFSHORE CORP. et al.,<br><br>     Petitioners/Plaintiffs,<br><br>     v.<br><br>COUNTY OF SANTA BARBARA et al.,<br><br>     Respondents/Defendants.<br><br>     and<br><br>ENVIRONMENTAL DEFENSE CENTER, et al.<br><br>     Intervenors. | CASE NO. 2:25-cv-04165-DMG-AGR<br><br>**PETITIONERS' CONSOLIDATED OPPOSITION TO RESPONDENTS' AND INTERVENORS' MOTIONS TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**<br><br>Complaint Filed:  May 8, 2025<br><br>Date:      July 10, 2026<br>Time:     9:30 a.m.<br>Ctrm.:     8C<br>Judge:     Dolly M. Gee |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................1

II.   PLEADED FACTS .............................................................................................2

    A.    The Facilities and Final Development Permits...................................4

    B.    PHMSA's Exclusive Jurisdiction Over the Facilities........................5

    C.    County Code Chapter 25B ..................................................................6

    D.    The Transfer Applications, Appeals, and Prior Proceedings .............................................................................................7

    E.    November Board Hearing....................................................................8

    F.    December Board Hearing and Denial..................................................9

    G.    The National Energy Emergency and the Defense Production Act Order..............................................................................9

    H.    Defendants' Requests for Judicial Notice........................................10

III.  STANDARD OF REVIEW .............................................................................11

IV.   ARGUMENT ...................................................................................................11

    A.    PETITIONERS HAVE STATED A CLAIM FOR A VIOLATION OF THE TAKINGS CLAUSE ...................................11

        1.    Legal Standards ......................................................................12

        2.    Petitioners Pleaded a Vested Interest ....................................12

        3.    The County's Refusal to Transfer the FDPs Constitutes a Taking Under the *Penn Central* Factors......................................................................................17

    B.    PETITIONERS STATE A CLAIM FOR PREEMPTION UNDER THE SUPREMACY CLAUSE........................................24

        1.    Pipeline Safety Act Preemption.............................................24

2.      Defense Production Act Preemption ........................................30

3.      Office of Spill Prevention and Response
        Preemption ..........................................................................34

C.   PETITIONERS STATE A CLAIM FOR BREACH OF
     CONTRACT .......................................................................................36

V.   CONCLUSION ...........................................................................................38

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Alameda Cnty. Land Use Ass'n.. v. City of Hayward*,
38 Cal. App. 4th 1716 (1995)..................................................................................38

*Altria Grp., Inc. v. Good*,
555 U.S. 70 (2008) ................................................................................................27

*ASARCO, LLC v. Union Pacific R. Co.*,
765 F.3d 999 (9th Cir. 2014) ................................................................................37

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .........................................................................................11, 22

*Avco Cmty. Devs., Inc. v. South Coast Reg'l. Com.*,
17 Cal. 3d 785 (1976)............................................................................................38

*Bad River Band of Lake Superior Tribe of Chippewa Indians of Bad
River Rsrv. v. Enbridge Energy Co., Inc.*,
626 F. Supp. 3d 1030 (W.D. Wis. 2022)...............................................................27

*Bowers v. Whitman*,
671 F.3d 905 (9th Cir. 2012) ................................................................................16

*Bradley v. Sch. Bd. of Richmond*,
416 U.S. 696 (1974) ..............................................................................................30

*Bridge Aina Le'a, LLC v. Land Use Comm'n*,
950 F.3d 610 (9th Cir. 2020) ...........................................................21, 22, 23, 24

*California v. PHMSA*,
Nos. 25-8059, 26-508 (9th Cir. 2026, Dec. 31, 2025) ....................................6, 28

*California v. Wright*,
No. 26-cv-3396-SVW-SSC (C.D. Cal. May 11, 2026).........................................32

*Center for Biological Diversity v. California Dep't. of Forestry and
Fire Protection*,
No. 26-cv-05242 (C.D. Cal.)..................................................................................29

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
CENTURY CITY

iii

CASE NO. 2:25-cv-04165-DMG-AGR
OPP. TO MOTIONS TO DISMISS

*Center for Biological Diversity, et al. v. California Dep't. of Forestry and Fire Protection, et al.,*
   No. 2:26-cv-05242-SVW-SSCx, ECF 43 (C.D. Cal. May 15, 2026) ............... 10

*Couser v. Shelby Cnty., Iowa,*
   139 F.4th 664 (8th Cir. 2025) ......................................................................... 26, 27

*Crosby v. Nat'l Foreign Trade Council,*
   530 U.S. 363 (2000) ............................................................................... 30, 31, 32

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey,*
   95 F.3d 1422 (9th Cir. 1996) ................................................................................ 18

*Delucchi v. Cnty. of Santa Cruz,*
   179 Cal. App. 3d 814 (1986) ................................................................................. 38

*Discovery Builders, Inc. v. City of Oakland,*
   92 Cal. App. 5th 799 (2023) ................................................................................. 38

*DoorDash, Inc. v. City & Cnty. of San Francisco,*
   No. 21-cv-05502, 2022 WL 867254 (N.D. Cal. Mar. 23, 2022) ................ *passim*

*Enbridge Energy, Ltd. P'ship v. Whitmer,*
   813 F. Supp. 3d 777 (W.D. Mich. 2025), *appeal filed*, No. 26-1021
   (6th Cir. Jan. 8, 2026) ..................................................................................... 25, 26

*Engquist v. Or. Dep't of Ag.,*
   478 F.3d 985 (9th Cir. 2007) ................................................................................ 17

*Esplanade Props., LLC v. City of Seattle,*
   307 F.3d 978 (9th Cir. 2002) ........................................................................... 18, 20

*Evans Creek, LLC v. City of Reno,*
   No. 21-cv-16620, 2022 WL 14955145 (9th Cir. Oct. 26, 2022) ........................ 19

*FFV Coyote LLC v. City of San Jose,*
   637 F. Supp. 3d 761 (N.D. Cal. 2022) .......................................................... *passim*

*Fla. Lime & Avocado Growers, Inc. v. Paul,*
   373 U.S. 132 (1963) .............................................................................................. 30

*Gregory v. City of San Juan Capistrano,*
   142 Cal. App. 3d 72 (1983) .................................................................................. 13

*Haaland v. Brackeen*,
599 U.S. 255 (2023) ..................................................................................................30

*Hawai'i Legal Short-Term Rental All. v. City & Cnty. of Honolulu*,
No. 22-cv-247, 2022 WL 7471692 (D. Haw. Oct. 13, 2022) ...............16, 17, 19

*Hercules, Inc. v. United States*,
24 F.3d 188 (Fed. Cir. 1994) ...................................................................................33

*Hercules, Inc. v. United States*,
516 U.S. 417 (1996) ..................................................................................................33

*Hickcox-Huffman v. US Airways, Inc.*,
855 F.3d 1057 (9th Cir. 2017)..................................................................................36

*Honchariw v. Cnty. of Stanislaus*,
No. 1:21-CV-00801-SKO, 2023 WL 2938404 (E.D. Cal. Apr. 13,
2023)..........................................................................................................................19

*Hotel & Motel Ass'n of Oakland v. City of Oakland*,
344 F.3d 959 (9th Cir. 2003)....................................................................................12

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,
702 F. Supp. 3d 809 (N.D. Cal. 2023) .....................................................................13

*Johnson v. Tyson Foods, Inc.*,
580 F. Supp. 3d 382 (N.D. Tex. 2022)......................................................................32

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994) ............................................................................................30, 33

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005) ..................................................................................................22

*Nollan v. Cal. Coastal Comm'n*,
483 U.S. 825 (1987) ..................................................................................................23

*O'Connell v. City of Stockton*,
41 Cal. 4th 1061 (2007)............................................................................................34

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v.
Austin*,
418 U.S. 264 (1974) ..................................................................................................32

*Olympic Pipe Line Co. v. City of Seattle,*
   437 F.3d 872 (9th Cir. 2006)................................................................25, 29, 35

*Pakdel v. City & Cnty. of San Francisco,*
   636 F. Supp. 3d 1065 (N.D. Cal. 2022) ........................................................... 19

*Penn Central Transp. Co. v. City of New York,*
   438 U.S. 104 (1978) .................................................................................. 12, 17

*Portland Pipe Line Corp. v. City of S. Portland,*
   288 F. Supp. 3d 321 (D. Me. 2017)................................................................. 27

*Reed v. Tyson Foods, Inc.,*
   No. 21-cv-01155, 2021 WL 5107725 (W.D. Tenn. Nov. 3, 2021).................... 32

*Sable v. Quintero,*
   No. 2:26-cv-02739-SVW-SSC (C.D. Cal Mar. 13, 2026) ........................... 14, 31

*San Remo Hotel L.P. v. City & Cnty. of San Francisco,*
   27 Cal. 4th 643 (2002)................................................................................... 12

*Silver Dollar Grazing Ass'n v. U.S. Fish & Wildlife Serv.,*
   No. 07-35612, 2009 WL 166924 (9th Cir. Jan. 13, 2009) ................................ 32

*State Farm Mut. Auto. Ins. Co. v. Fernandez,*
   767 F.2d 1299 (1985) ..................................................................................... 37

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency,*
   535 U.S. 302 (2002) ....................................................................................... 12

*Texas Midstream Gas Services, LLC v. City of Grand Prairie,*
   608 F.3d 200 (5th Cir. 2010)........................................................................... 27

*Toigo v. Town of Ross,*
   70 Cal. App. 4th 309 (1998)............................................................................ 14

*United States & California v. Plains All Am. Pipeline, L.P.,*
   No. 20-cv-02415-SVW-SSC (C.D. Cal.) ........................................................ 29

*United States Postal Service v. Berkeley,*
   228 F. Supp. 3d 963 (N.D. Cal. 2017) ............................................................ 24

*United States v. Vertac Chemical Corp.,*
   46 F.3d 803 (8th Cir. 1995)............................................................................ 33

*United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.,*
No. CV 08-2068PSG(FFMX), 2009 WL 650730 (C.D. Cal. Mar. 12, 2009) .................................................................................38

*W. Mining Council v. Watt,*
643 F.2d 618 (9th Cir. 1981) .......................................................28

*Washington Gas Light Co. v. Prince George's County Council,*
711 F.3d 412 (4th Cir. 2013) .......................................................27

*Young v. NeoCortext, Inc.,*
690 F. Supp. 3d 1091 (C.D. Cal. 2023)........................................11

## STATUTES

42 U.S.C. § 1983...........................................................................3

49 U.S.C. § 60104(c) ........................................................25, 29, 30

Cal. Civ. Proc. Code
§ 1085 ......................................................................................3
§ 1094.5 ...................................................................................3

Cal. Gov't Code
§ 8670.37.51 ...........................................................................34
§ 51010 ...................................................................................29

County Code
§ 25B-9(1)(1)-(5) ......................................................................6
§ 25B-9(e)................................................................................6
§ 25B-10(a)(1)–(8) ...................................................................6
§ 25B-10(a)(1)-(9) ...................................................................6
§ 25B-10(a)(9) ..............................................................7, 15, 37
§ 25B-10(b)............................................................................15
§ 25B-12(4).............................................................................16

## RULES

Fed. R. Civ. P. 12(b)(6) ..........................................................1, 11, 37

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

vii

CASE NO. 2:25-cv-04165-DMG-AGR
OPP. TO MOTIONS TO DISMISS

# CONSTITUTIONAL PROVISIONS

Cal. Const. Article I, § 19 ................................................................... 3, 11, 12

Cal. Const. Article XI, § 7 ................................................................... 34

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

viii

CASE NO. 2:25-cv-04165-DMG-AGR
OPP. TO MOTIONS TO DISMISS

## I.    INTRODUCTION

The County of Santa Barbara Board of Supervisors denied Petitioners' applications to transfer three Final Development Permits ("FDPs") despite three separate staff recommendations to approve, a unanimous ministerial record confirming that all Chapter 25B requirements were satisfied, the County Code's mandate that the decisionmaker "shall approve" such applications once these requirements have been satisfied, and this Court's prior mandate that the Board's decision must be "tethered to the factual findings" under Chapter 25B. Accepting Petitioners' well-pleaded allegations as true—as this Court must at the Rule 12(b)(6) stage—the Board rejected the applications on grounds it was not permitted to consider.

The County moves to dismiss Petitioners' claims for takings, preemption, and breach of the Celeron Agreement, and Intervenors move to dismiss Petitioners' preemption claim.  Each motion fails because it asks this Court to resolve disputed factual questions and to credit Defendants' preferred characterization of the record over Petitioners' well-pleaded allegations—precisely the inquiry Rule 12(b)(6) forbids.

On the Takings Clause claims, the County contends that Petitioners have no vested interest in the transfer of permits under Chapter 25B.  This argument is disputed: Petitioners allege that the County's own prior admissions establish that Chapter 25B creates a ministerial, mandatory process, and that the County itself treated it as such when it approved the identical transfers for ExxonMobil in 2023. Moreover, the FDPs themselves are vested property rights that run with the Facilities, issued decades before Chapter 25B was enacted—allegations the Court must accept as true at this stage.

On the Supremacy Clause preemption claim, Defendants argue that federal law does not prohibit local police power, while refusing to concede that the County is precluded—by the Pipeline Safety Act and the California Office of Spill

Prevention and Response—from regulating pipeline safety or operator finances. Petitioners allege that the County interpreted and applied Chapter 25B to regulate pipeline safety and operator spill financial responsibility—the very subjects over which federal and state agencies hold exclusive jurisdiction. If those allegations are accepted as true, as they must be, the County's actions are preempted as a matter of binding Ninth Circuit precedent. Further, Petitioners allege that the intervening Defense Production Act Order commands Sable to operate the Facilities the County seeks to bar it from lawfully operating, creating an irreconcilable conflict that independently preempts the County's denial.

On the breach of contract claim, the County's arguments rest on a selective reading of the 1988 Celeron Agreement, in which the County expressly acknowledged it has "no authority over the design, construction, and operation of the Pipeline." Petitioners have pleaded specific contractual provisions that the County's conduct breaches; the County's contrary interpretation raises a factual dispute that cannot be resolved on the pleadings.

In sum, each of Defendants' arguments requires this Court to impermissibly resolve disputes in Defendants' favor—to go beyond the pleadings to credit Defendants' preferred characterization of disputed facts, to ignore binding Ninth Circuit precedent on preemption, and to treat federally preempted safety determinations as permissible local regulation. The motions should be denied in their entirety.

## II.  PLEADED FACTS

The Court is familiar with this case, which involves the County of Santa Barbara's unlawful and arbitrary refusal to transfer valid FDPs for three oil and gas facilities—the Santa Ynez Unit ("SYU"), POPCO Gas Plant ("POPCO Facilities"), and the Las Flores Pipeline System ("Pipeline")[1] (together the "Facilities") from

---

[1] The Las Flores Pipeline System at issue in the FAC are segments of the onshore portion of the larger Santa Ynez Pipeline System.

Petitioners and Plaintiffs Exxon Mobil Corporation ("ExxonMobil"), Mobil Pacific Pipeline Company ("MPPC"), and ExxonMobil Pipeline Company ("EMPCo") (collectively, "ExxonMobil affiliates") to Petitioners and Plaintiffs Sable Offshore Corp. ("Sable Offshore"), Pacific Pipeline Company ("PPC"), and Pacific Offshore Pipeline Company ("POPCO") (collectively, "Sable") (together with ExxonMobil affiliates, "Petitioners"). First Am. and Suppl. Pet. for Writ of Mandate and Compl. ("Amended Complaint" or "FAC") ¶ 1, ECF No. 64.

Petitioners' Amended Complaint asserts eight causes of action. The first four are administrative writ claims: the First Cause of Action alleges abuse of discretion (Cal. Civ. Proc. Code § 1094.5); the Second Cause of Action alleges the Board failed to provide a fair hearing (*id.*); the Third Cause of Action alleges the Board failed to comply with Chapter 25B by failing to deny the appeals and effectuate the Transfers (Cal. Civ. Proc. Code § 1085); and the Fourth Cause of Action, pleaded in the alternative, alleges the Board failed to make findings to support its reversal of the Planning Commission's grant of the Change of Owner and Change of Guarantor requests (*id.*). FAC ¶¶ 118–59.

The remaining four causes of action are the subject of the pending motions to dismiss. The Fifth and Sixth Causes of Action allege that the County's denial of the Transfers violates the Takings Clause of the Fifth and Fourteenth Amendments of the United States Constitution and Article I, section 19 of the California Constitution; the Fifth Cause of Action seeks a writ of mandate directing the County to issue corrected FDPs, while the Sixth Cause of Action seeks declaratory relief and damages under 42 U.S.C. § 1983. FAC ¶¶ 160–74. The Seventh Cause of Action seeks declaratory and injunctive relief under the Supremacy Clause, alleging that the County's denial of the Transfers is preempted by the Pipeline Safety Act, the Defense Production Act Order, and the authority of the California Office of Spill Prevention and Response. FAC ¶¶ 175–89. The Eighth Cause of Action alleges breach of the Settlement Agreement between Celeron and the County (the "Celeron

Agreement") .  FAC ¶¶ 190–95.  The County moves to dismiss the Fifth, Sixth, Seventh, and Eighth Causes of Action.  ECF No. 69-1 at 7–8.  The Intervenors move to dismiss the Seventh Cause of Action.  ECF No. 70-1 at 5–6.

### A.    The Facilities and Final Development Permits

The Facilities are oil and gas processing and transportation facilities spanning from Santa Barbara County to Kern County.  FAC ¶ 38.  The FDPs were issued by the County in 1987 (SYU), 1988 (Pipeline), and 1993 (POPCO Facilities).  FAC ¶ 47.  The FDPs authorized the construction of the Facilities and continue to authorize their ongoing operation and maintenance.  FAC ¶ 46.  Once issued and relied upon, each FDP constitutes a vested entitlement that runs with the facilities it authorizes.  FAC ¶ 46.  The FDPs have no expiration date.  FAC ¶ 49.  Over the years, the Facilities' prior owners, including ExxonMobil, invested many millions of dollars in the Facilities.  FAC ¶ 48.

In 2023, these same FDPs were transferred from Plains Pipeline L.P. to ExxonMobil affiliates through the same Chapter 25B process.  FAC ¶¶ 59, 65.  The Planning Commission approved the transfer, and, after an appeal, the Board denied the appeal and affirmed the approval on September 19, 2023.  FAC ¶¶ 59–62.  The Board's 2023 Findings of Approval confirmed that each required Chapter 25B finding had been satisfied, including Operator Capability.  FAC ¶ 64.  Significantly, the 2023 Findings expressly acknowledged that the 1988 Celeron Agreement "determined that the County does not have the jurisdiction to regulate any aspect of the design, construction, or operation of the pipeline."  FAC ¶ 71, 170; FAC, Ex. 9, p. 188.  As such, the County disclaimed its jurisdiction over pipeline operations with respect to Chapter 25B and these Facilities.  FAC ¶ 71; 170.

In 2024, Sable acquired the Facilities.  FAC ¶ 66.  Sable has since invested more than $290 million in preparing the Facilities for active operations, including repair and maintenance.  FAC ¶¶ 2, 162.  In September 2024, the Planning Commission voted to approve the transfer of the FDPs under Chapter 25B to Sable,

confirming that each required Chapter 25B finding had been met. The Board, however, has reversed the Planning Commission's decision, despite staff repeatedly recommending that the Planning Commission's decision be affirmed. FAC ¶¶ 6, 10, 76, 98, 144. This underscores the arbitrary and capricious manner in which the County has applied Chapter 25B. FAC ¶¶ 65; 105.

## B.    PHMSA's Exclusive Jurisdiction Over the Facilities

The federal Pipeline and Hazardous Materials Safety Administration ("PHMSA") holds exclusive jurisdiction to regulate the entirety of the Facilities with respect to safety, including restart and operation. FAC ¶¶ 42, 176. The Facilities include the oil pipeline within the SYU connecting the offshore platforms to the oil processing facility, the POPCO Facilities, and the onshore Pipeline segments. FAC ¶ 42.

Long before the current dispute, the prior owner of the Pipeline, Celeron Pipeline Company of California, settled a dispute with the County over the County's attempt to impose conditions that encroached on PHMSA's exclusive federal jurisdiction on Pipeline permits. FAC ¶ 43. In that settlement, the Celeron Agreement, the County acknowledged the preempted limits of its jurisdiction as relevant here in at least three places: (1) page 2 ("As to areas covered by [49 C.F.R.] Part 195, the County is generally without jurisdiction."); (2) Section 2.2 ("The County shall have no authority over the design, construction, and operation of Celeron's interstate pipeline," which "means clearly that the County will not require any permit to construct *or operate* Celeron's pipeline except as specifically set forth in this Agreement") (emphasis added); and (3) Section 2.5.3 ("If after execution of this Agreement, the County is taking or contemplating the taking of any action which involve[s] Part 195 areas and is not authorized under 2.5.1 above, including suspending or withholding ministerial permits, and which will stop or delay Celeron's construction and/or operation, the County shall immediately cease such

action or contemplated action upon receipt of a written notice from Celeron stating its objection.").  FAC ¶ 43.[2]

### C.    County Code Chapter 25B

In 2001, years after the FDPs vested and years after entering the Celeron Agreement, the County adopted Chapter 25B of the County Code, creating a formal process for transferring already-issued FDPs to new owners, operators, and guarantors—the only such process in any California jurisdiction.  FAC ¶¶ 50–51.  Chapter 25B prescribes narrow requirements for permit transfers: one enumerated finding for Change of Guarantor (County Code § 25B-9(e)), five for Change of Owner (County Code § 25B-9(1)(1)-(5)), and nine for Change of Operator, five of which overlap with the Change of Owner findings (County Code § 25B-10(a)(1)-(9).  FAC ¶¶ 52, 54.  The County has not disputed that the first eight Change of Operator findings address discrete, readily verifiable criteria: (1) Fees and Exactions; (2) Financial Guarantees; (3) Acceptance of Permit; (4) Safety Audit; (5) Compliance with Existing Permit Requirements; (6) Compliance Plans Contact Information; (7) Transitional Plans; and (8) Emergency Response Plan Drills.  FAC ¶ 54(a)–(h); County Code § 25B-10(a)(1)–(8); *see also* Respondent's Resp. to M. Summ. J. at 19, ECF No. 40.

Petitioners contend the ninth and final required finding for a Change of Operator—Operator Capability—is ministerial as well.  FAC ¶ 145.  It requires the

---

[2] Between 2016 and December 2025, the Pipeline was regulated as an intrastate pipeline.  During that period, California's Office of the State Fire Marshal held exclusive delegated authority to regulate those portions with respect to safety.  FAC ¶ 42.  In December 2025, PHMSA resumed jurisdiction.  Intervenors have challenged the resumption of jurisdiction by PHMSA in the Ninth Circuit.  In that Court, Intervenors sought to stay certain actions by PHMSA, but the Ninth Circuit denied this request.  *See* Order Denying Stay, *California v. PHMSA*, Nos. 25-8059, 26-508 (9th Cir. 2026, Dec. 31, 2025), ECF 21.  And this jurisdictional challenge is ultimately irrelevant for purposes of Petitioners' preemption claims.  No party disputes that *either* PHMSA or OSFM has exclusive jurisdiction over Pipeline safety under the PSA; *i.e.*, that the *County* lacks such jurisdiction.

Planning Commission to confirm that the proposed operator "has the skills, training, and resources necessary to operate the permitted facility in compliance with the permit and all applicable county codes," noting that the Director may require the proposed operator to "provide sufficient assurance that [it] does not reflect a record of non-compliant or unsafe operations systemic in nature." FAC ¶ 54(i); County Code § 25B-10(a)(9).

### D. The Transfer Applications, Appeals, and Prior Proceedings

Following Sable's acquisition of the Facilities in February 2024, Sable submitted applications to the County to authorize the Change of Owner, Operator, and Guarantor for the Facilities ("Transfers"). FAC ¶¶ 66–67. On three separate occasions, County staff recommended approval of the Transfers. FAC ¶¶ 10, 60, 76. On July 30, 2024, County staff determined the applications to be complete. FAC ¶ 68. County staff concluded that the applications were fully compliant with Chapter 25B, prepared a detailed analysis demonstrating each requirement was satisfied, and recommended approval. FAC ¶ 69. On October 30, 2024, the Planning Commission made the required findings and approved the Transfers by a vote of 3-to-1. FAC ¶¶ 70–71.

In November 2024, two groups of appellants filed appeals to the Board of Supervisors (the "Appeals"). FAC ¶¶ 73–74. The Appeals urged the Board to adopt an interpretation of Chapter 25B far beyond its plain text, arguing, for example, that resuming operations at the Facilities creates environmental and safety risks—areas over which PHMSA holds exclusive federal jurisdiction—and which its predecessor, the California Office of the State Fire Marshall ("OSFM"), held jurisdiction at the time. FAC ¶¶ 75, 77; *supra* note 2. County staff again recommended approval of the Transfers, finding that none of the arguments raised impacted Sable's compliance with Chapter 25B. FAC ¶ 76.

At the February 25, 2025 hearing on the Appeals, the Board vote split 2-to-2, with Supervisor Hartmann recusing herself due to a long-established conflict of

interest based on the fact that her personal residential property abuts the Pipeline. FAC ¶¶ 7, 81. The two supervisors who voted against the denial motion made clear that their votes were not based on the limited criteria in Chapter 25B, with Supervisor Lee calling the restart of the Facilities an "insane idea" and Chair Capps faulting Sable for not passing her subjective "smell test." FAC ¶¶ 7, 82, 83. After voting, Chair Capps publicly acknowledged that her votes concerning the Pipeline were politically motivated, not based on actual findings. For example, she bragged publicly about voting against the installation of legally required upgraded valves on the Pipeline in 2023, because voting for the valves "was a way to restart the pipeline," while voting against them was a way to delay or prevent it. FAC ¶ 90.

Following the tie vote, the County refused to transfer the FDPs, which left Petitioners in administrative and legal limbo for nearly nine months. FAC ¶ 8. On May 8, 2025, Petitioners filed this case against the County and the Board. ECF No. 1; FAC ¶ 87. On September 12, 2025, this Court issued a peremptory writ of mandate ordering the Board to hold a new hearing to affirm, reverse, or modify the Planning Commission's decision in compliance with Chapter 25B, directing that the Board's action must be "tethered to the factual findings under Chapter 25B-8, 9, and 10." FAC ¶ 88; Order re: Cross-Mots. Summ. J. at 24–25 n.17, ECF No. 52 (hereinafter "Order").

### E.   November Board Hearing

The Board held a new hearing on November 4, 2025, at which County staff once again recommended approval of the Transfers. FAC ¶¶ 10, 89–90. Despite Sable's requests that Chair Capps and Supervisor Hartmann recuse themselves due to demonstrated bias and conflicts of interest, both declined to do so. FAC ¶¶ 90–92. Supervisor Hartmann claimed to have received advice from the California Fair Political Practices Commission permitting her to participate, but her exemption was based on wrong information about the location of the Pipeline. FAC ¶ 91. She and Chair Capps participated extensively, asking questions that indicated they were

considering matters far beyond the scope of Chapter 25B. FAC ¶¶ 11, 92, 187. In explaining her vote, Supervisor Hartmann stated: "I do believe that [not transferring the FDPs] helps to keep Exxon on the hook, both for spill and for abandonment if necessary." FAC ¶¶ 11, 92. Supervisor Hartmann also articulated a sweeping view of the County's authority, stating, "I don't think that [the County's alleged] responsibility is preempted by other legislation." FAC ¶ 92. The supervisors voted 4-to-1 to continue the hearing with direction to County staff to prepare written findings to support denying the Transfers. FAC ¶¶ 14, 94.

### F. December Board Hearing and Denial

At the continued December 16, 2025 hearing, County staff, as required by the Board's November 4, 2025 direction, for the first time prepared a report recommending denial of the Transfers. FAC ¶¶ 15, 95. Supervisor Hartmann recused herself. FAC ¶¶ 16, 96–97. The Board voted 3-to-1 to approve the Appeals, deny the Transfers, and adopt the December 2025 Findings. FAC ¶ 98. Several supervisors again cited irrelevant and extra-jurisdictional considerations to justify their decision. FAC ¶¶ 82, 92-93, 99.

Ultimately, the Board's findings for denial ("December 2025 Findings") addressed only one of the required findings under Chapter 25B: the Board asserted that Sable did not meet the Operator Capability finding because it "reflects a record of noncompliant or unsafe operations systemic in nature for the Facilities." FAC ¶ 105. This finding, however, is not only factually unfounded, it is wholly preempted with respect to the Facilities. FAC ¶¶ 15, 102, 105.

### G. The National Energy Emergency and the Defense Production Act Order

On January 20, 2025, the President of the United States issued Executive Order 14156, declaring a national energy emergency. FAC ¶ 110. On March 13, 2026, the Secretary of Energy issued a Pipeline Capacity Prioritization and Allocation Order pursuant to the Defense Production Act, Executive Order 13603,

and Executive Order 14156 (the "DPA Order"), ordering Sable to "immediately prioritize and allocate pipeline transportation services" from the offshore Santa Ynez Unit through the Pipeline system, including the Facilities at issue in this case.  FAC ¶ 115–116.  The DPA Order states that Sable must "immediately commence performance under contracts or orders for services" and "maintain such compliance until such time as the conditions necessitating the issuance of this order abate or until Sable is directed otherwise."  FAC ¶ 117.

### H.    Defendants' Requests for Judicial Notice

Defendants both seek judicial notice of various documents—the County of Sable's March 13, 2026 Form 8-K Report, and Intervenors of a federal court order, two state court orders, and a 2016 MOU between PHMSA and California's OSFM.  ECF Nos. 69-2, 70-3.  Petitioners do not dispute generally that these types of documents are appropriate for judicial notice; however, these documents do not support the propositions Defendants seek to use them for here.  The County seeks judicial notice of the fact of Sable's resumption of oil flow through the Facilities pursuant to the DPA Order, which it argues moots Sable's pleaded claim of a conflict between the DPA Order and the Board's actions.  But the mere fact that production has restarted pursuant to federal compulsion does not moot Sable's pleaded claims.  *See generally* FAC ¶¶ 110–117.  Intervenors, in turn, cite two documents for the undisputed point that the Pipeline was considered intrastate from 2016 to 2025 and regulated by OSFM during that period, and two state court decisions as purportedly persuasive authority interpreting the DPA.  As explained *infra*, the effect of intrastate regulation is irrelevant for purposes of Pipeline Safety Act ("PSA") preemption.  As for the state court orders, the action they are entered in has now been removed and both orders are subject to a pending motion for reconsideration.  *See Center for Biological Diversity, et al. v. California Dep't. of Forestry and Fire Protection, et al.*, No. 2:26-cv-05242-SVW-SSCx, ECF 43 (C.D. Cal. May 15, 2026).  Ultimately, both Defendants improperly rely on the judicially noticeable documents to attempt

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

10

CASE NO. 2:25-cv-04165-DMG-AGR
OPP. TO MOTIONS TO DISMISS

to inject factual disputes into the case, inappropriately at the 12(b)(6) stage. The Court should decline to consider these documents.

## III.   STANDARD OF REVIEW

Dismissal for failure to state a claim under Rule 12(b)(6) is appropriate only "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *FFV Coyote LLC v. City of San Jose*, 637 F. Supp. 3d 761, 767 (N.D. Cal. 2022). A complaint does not require "detailed factual allegations," but only "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). All well-pleaded factual allegations must be accepted as true and viewed in the light most favorable to the plaintiff. *See, e.g.*, *Young v. NeoCortext, Inc.*, 690 F. Supp. 3d 1091, 1098 (C.D. Cal. 2023).

## IV.   ARGUMENT

### A.   PETITIONERS HAVE STATED A CLAIM FOR A VIOLATION OF THE TAKINGS CLAUSE

The County moves to dismiss the Fifth and Sixth Causes of Action, which allege violations of the Takings Clause of the Fifth Amendment of the United States Constitution and Article I, section 19 of the California Constitution. *See* FAC ¶¶ 160–74; Cnty. Mot. at 12–19. The County makes two arguments. First, it argues that Chapter 25B gives the County so much discretion in the permit transfer process that neither ExxonMobil nor Sable have any vested interests that the County could interfere with. Second, it claims that Petitioners fail to adequately plead a regulatory taking—in large part based on the same argument that Chapter 25B gives the County so much discretion that neither Petitioner could possibly have any reasonable, investment-backed expectations. Each of these arguments improperly requires the Court to construe disputed facts in the County's favor and fails as a matter of law.

### 1. Legal Standards

Private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V; *see also* Cal. Const. art. I, § 19.[3] A regulatory taking "occurs when the value or usefulness of private property is diminished by a regulatory action that does not involve a physical occupation of the property." *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 965 (9th Cir. 2003). The County's refusal to transfer the FDPs constitutes a regulatory taking. *See* FAC ¶¶ 160–74.

Three factors determine whether a regulatory action amounts to a Fifth Amendment taking: (1) "the economic impact of the regulation," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). As the County acknowledges, *see* Cnty. Mot. at 12, evaluating regulatory takings under these factors "necessarily entails complex factual assessments of the purposes and economic effects of government actions." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 323 (2002). Dismissal at the pleading stage is thus unwarranted where plaintiffs adequately allege severe economic impact caused by the defendant's actions, because "the extent of the economic impact . . . remains a question of fact that cannot be resolved at the pleadings." *FFV Coyote*, 637 F. Supp. 3d at 770.

### 2. Petitioners Pleaded a Vested Interest

Petitioners have plausibly alleged their takings claims based on the County's refusal to transfer the FDPs. Petitioners' takings claims rest on two distinct, well-

---

[3] California's constitution "protects a somewhat broader range of property values than does the corresponding federal provision" "[b]y virtue of including damage to property as well as its taking." *San Remo Hotel L.P. v. City & Cnty. of San Francisco*, 27 Cal. 4th 643, 664 (2002) (internal citations omitted). "But aside from that difference," state and federal courts "construe[] the [federal and state takings] clauses congruently." *Id.*

pleaded property interests. First, the FDPs themselves are vested entitlements with no expiration date. FAC ¶¶ 47, 49. The Facilities' prior owners constructed and operated the Facilities in reliance on the FDPs. FAC ¶¶ 46, 48. And "[o]nce issued and relied upon, the FDP is a vested entitlement that runs with the facilities it authorizes." FAC ¶ 46. Second, ExxonMobil and MPPC have a separate vested right to "sell their assets and exit the FDPs without improper County interference," and Sable obtained a corresponding vested right to operate the Facilities consistent with the FDPs. FAC ¶ 162; *see also Gregory v. City of San Juan Capistrano*, 142 Cal. App. 3d 72, 88 (1983) (property rights protected by due process include the ability to sell and transfer property).[4] These vested property interests—not the transfer paperwork itself—are the predicate for Petitioners' takings claims.

The County argues that neither ExxonMobil nor Sable had a vested interest in being able to transfer the FDPs because Chapter 25B contains discretionary elements. Cnty. Mot. at 12–14. But this is wrong on multiple fronts.

First, as explained above, the vested interests rest in the FDPs themselves, not just the Transfers. The County's framing inverts the analysis by treating the Chapter

---

[4] While the County argues the ExxonMobil affiliates do not have a takings claim because they were paid $600 million from Sable to acquire the Facilities, the ExxonMobil affiliates pleaded a Fifth Amendment takings claim based on a "vested right to sell their assets and exit the FDPs without improper County interference." FAC ¶¶ 162, 171. As named permittees, the County contends that ExxonMobil affiliates remain potentially responsible for compliance under the still-issued FDPs—as Supervisor Hartmann openly pronounced, "I do believe that it helps to keep Exxon on the hook, both for spill and for abandonment if necessary." FAC ¶¶ 11, 92. By denying the Transfers, the County is seeking to force the ExxonMobil affiliates to retain a property obligation the parties bargained to transfer as part of the $600 million sale price of the Facilities and force ExxonMobil to remain as guarantor for property it no longer owns or controls. The County never addresses this claim, so this Court must deny the motion to dismiss at least as to the ExxonMobil affiliates. *See In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 837 (N.D. Cal. 2023) (denying motion to dismiss as to arguments not raised in the defendants' opening brief).

25B transfer process as the only relevant property interest. *See id.* But the Takings Clause protects the underlying entitlement—*i.e.*, the permits; the County's refusal to process the permit transfers merely operates as the regulatory action that interferes with that entitlement. *See* FAC ¶¶ 160–67 (Fifth Cause of Action), 168–74 (Sixth Cause of Action).

Second, while the County argues that *Sable* could have no vested interests because it acquired the Facilities in 2024, after Chapter 25B was enacted, this argument ignores *ExxonMobil*'s vested interests. And in any event, the underlying property interests, the FDPs themselves, predate Chapter 25B by over a decade. *See* FAC ¶ 50.[5] Chapter 25B was enacted after the FDPs were issued and—with respect to the SYU and POPCO—after they were issued *to ExxonMobil*. FAC ¶¶ 47, 50. To the extent the County argues that its subsequent enactment of Chapter 25B could lawfully curtail the vested entitlements ExxonMobil already possessed when it was enacted, that is wrong. And the County's argument that ExxonMobil went through the Chapter 25B process when it purchased the Pipeline ignores the fact that ExxonMobil's ownership of SYU and POPCO predated Chapter 25B by decades and ExxonMobil never agreed to the imposition of the Chapter 25B process on its right to transfer those Facilities.

Third, whether Chapter 25B is "discretionary" so as to preclude *any* vested rights, as the County claims, involves disputed questions of fact that are not resolvable at the pleadings stage. Petitioners adequately allege that Chapter 25B creates a ministerial, mandatory process, and that the County itself previously treated it as such, including when ExxonMobil acquired the Pipeline in 2023. *See* FAC ¶¶ 58–65. The Chapter contains mandatory language, requiring that, "[u]pon

---

[5] That the FDPs were issued decades ago, authorizing construction and operation of the Facilities, also distinguishes cases such as *Toigo v. Town of Ross*, which provide that where a developer "lacks a building permit or the functional equivalent," there is no vested right. 70 Cal. App. 4th 309, 322 (1998).

making the findings listed in [Section 25B-10(a)], the planning commission *shall approve* the change of operator." County Code § 25B-10(b) (emphasis added); *see also* § 25B-9(g) ("[U]pon making the findings listed in Sec. 25B-9.1 to 9.6 the director *shall approve* the change of owner, operator, or guarantor" (emphasis added)). Consistent with this framework, this Court previously mandated that the Board's decision must be limited and "tethered to factual findings under Chapter 25B-8, 9, and 10." Order at 24.

The County argues that property interests do not arise from "unilateral expectations," but Petitioners plead that the County itself created bilateral expectations. First, Petitioners allege that Chapter 25B creates a ministerial process for permit transfers: Sections 25B-9 and 25B-10 detail certain findings that must be made, which are limited to compliance with discrete County-imposed requirements. Second, Petitioners allege that the regulatory environment at the time Sable acquired the permits was marked by the County's consistent, ministerial application of Chapter 25B. FAC ¶¶ 59–65 (noting that in 2023, the ExxonMobil affiliates were able to transfer the permits without incident). Petitioners also allege that the County's staff repeatedly acknowledged the ministerial nature of Chapter 25B during the permit approval process with Sable. FAC ¶¶ 68–71, 76. Even § 25B-10(a)(9), which the County now argues is discretionary, was previously conceded by County staff to be ministerial. FAC ¶ 76.[6] Finally, the County itself admitted at the prior summary judgment proceeding that at least all but one of the Chapter 25B findings are non-discretionary, and that Sable had met all requirements for transfer according to County staff. *See* Mem. Responding to Pet'r's Statement of Uncontroverted Facts at 23-93, 105, ECF No. 40-1.

---

[6] Moreover, it must be construed by its text and purpose—the standard incorporates objective references to "compliance with the permit and all applicable county codes" (FAC ¶ 54(i)), and the Director's authority to require "relevant records of compliance" presupposes objectively reviewable criteria.

In light of the County's past conduct and concessions, including past acknowledgments of Chapter 25B's ministerial nature, there is a disputed question of fact as to whether Chapter 25B is discretionary, which cannot be resolved on the pleadings alone as the County now urges. The County argues that this Court already determined that Chapter 25B is wholly discretionary, Cnty. Mot. at 13, but that is not so. In the prior summary judgment proceedings, the only question before this Court was whether the Board's duty to "affirm, reverse, or modify the planning commission's decision at a public hearing" was mandatory and ministerial, or whether it involved some element of discretion. Order at 21 (quoting County Code § 25B-12(4)). In mandating that the Board take action, this Court observed that it was ordering the Board to exercise its "discretion" to take one of the three actions required by Chapter 25B: affirm, reverse, or modify the Planning Commission's decision. *See id.* at 23. The Court did not consider the separate question of whether the transfer requirements of Chapter 25B are *themselves* ministerial and mandatory, as Petitioners argue, or discretionary, as the County urges. *See id.*; *see also* Transcript at 15:15-20, ECF No. 55 at 15:15-20 (the Court confirming it was "specifically declin[ing] to address" this argument).

Petitioners have sufficiently alleged that they have a vested interest in the FDPs and in a transfer of the FDPs pursuant to Chapter 25B. *See* FAC ¶¶ 142–48, 162–64; *Hawai'i Legal Short-Term Rental All. v. City & Cnty. of Honolulu*, No. 22-cv-247, 2022 WL 7471692, at *10 (D. Haw. Oct. 13, 2022) (holding plaintiff had established likelihood of success on the merits of takings claim where it articulated "vested entitlement to [its] property right" in the pleadings). The County's reliance on *Bowers* and *Engquist* is misplaced. *See* Cnty. Mot. at 12–13. In *Bowers v. Whitman*, the Ninth Circuit held that the plaintiffs failed to establish a property interest in a demand for compensation from the government arising from a repealed statute. 671 F.3d 905 at 909–10, 913–14 (9th Cir. 2012). Notably, the plaintiffs "failed to articulate any clear characterization of the exact property interest to which

they [were] entitled," "rang[ing] from an accrued cause of action to a right to monetary compensation derived from a statutory entitlement to the right to use their land." *Id.* at 913.  Here, Petitioners have alleged precisely the identified property interest at issue—the vested rights in the FDPs and the ability to transfer them.  *See, e.g.*, FAC ¶¶ 162, 164, 169–71.  And in *Engquist*, the court merely held that the takings clause did not reach wholly speculative, discretionary interests such as punitive damages awarded by a jury and changes to a statutory cause of action. *Engquist v. Or. Dep't of Ag.*, 478 F.3d 985, 1003–04 (9th Cir. 2007).  Here, Petitioners allege discrete, ascertainable property interests that are cognizable under the Takings Clause.  *See Hawai'i Legal Short-Term Rental All.*, 2022 WL 7471692, at *10.

### 3. The County's Refusal to Transfer the FDPs Constitutes a Taking Under the *Penn Central* Factors

The County likewise fails to rebut Petitioners' well-pleaded allegations that the denial was a compensable taking under the *Penn Central* factors.  The (1) "economic impact of the regulation," (2) "extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "character of the governmental action" all weigh in favor of finding a taking.  438 U.S. at 124.

#### a. Economic Impact

Contrary to the County's arguments, the Amended Complaint does allege facts sufficient to allege the economic impact of the County's regulation.  Under *Penn Central*, a regulatory taking in violation of the Takings Clause occurs when, even though the government action does not constitute a *per se* taking by effecting a direct government appropriation or physical invasion of private property, a regulation goes too far and results in a taking considering the (1) "economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." 438 U.S. at 124.

Where a plaintiff plausibly alleges "severe" economic impact caused by the regulation, the economic impact factor weighs in that plaintiff's favor. *FFV Coyote*, 637 F. Supp. 3d at 770; *see also Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1432–34 (9th Cir. 1996) (where a plaintiff complied with a defendant's shifting standards for regulation of property which ultimately rendered the property economically unviable, a taking had been established at trial). In *FFV Coyote*, the court credited the plaintiffs' allegations that the defendant city's designation of land as "agricultural" "preclude[d] any economically viable use" of the subject properties by causing the termination of a purchase agreement with third party developers and blocking any other productive use of the property. 637 F. Supp. 3d at 770. Similarly, in *DoorDash, Inc. v. City & Cnty. of San Francisco,* the court denied a motion to dismiss DoorDash's takings claim arising from an ordinance that required DoorDash to limit its commission rate with restaurants to no more than 15%, crediting DoorDash's allegations that it would have to renegotiate or terminate contracts, scale back marketing and promotions, and raise prices. *See* No. 21-cv-05502, 2022 WL 867254, at *17-18 (N.D. Cal. Mar. 23, 2022).

Petitioners allege that Sable has invested "substantial resources, totaling tens of millions of dollars, in repair and maintenance of the Facilities since acquiring them," exhaustively followed the County's administrative process to no avail, and that it seeks to continue operations and perform repair and maintenance activities at the facilities. FAC ¶ 2. The County's failure to transfer the FDPs has therefore "seriously imperil[ed] Sable's significant investment in the Facilities" and subjected Sable to extensive financial exposure. FAC ¶ 171. These allegations are sufficient to establish at the pleading stage that the County's refusal to transfer the FDPs has had marked economic impact, causing this factor to weigh in Petitioners' favor. *See Esplanade Props., LLC v. City of Seattle*, 307 F.3d 978, 984 (9th Cir. 2002) (takings cases require only "a showing of causation between the government action and the alleged deprivation"). Moreover, if the County were correct that it had unlimited

discretion to grant or deny the FDPs, including based on the improper grounds at issue here, that would only render the assets wholly unmarketable and therefore valueless, unquestionably constituting a taking. *See, e.g.*, *FFV Coyote*, 637 F. Supp. 3d at 770 (regulation which prevented a plaintiff from selling property to third party constituted a taking); *Hawai'i Legal Short-Term Rental All.*, 2022 WL 7471692, at *10.

The County raises three arguments, none of which warrant dismissal. First, the County contends that Sable's allegations are vague and that Sable has not alleged a before-and-after value comparison. *See* Cnty. Mot. at 15–16. This argument ignores the pleading standard. At the motion to dismiss stage, "the extent of the economic impact . . . remains a question of fact[.]" *FFV Coyote*, 637 F. Supp. 3d at 770. Petitioners have alleged specific figures: $600 million for the acquisition, $290 million in additional investment, and potential exposure to $25,000/day financial penalties. FAC ¶¶ 53, 162. These are precisely the type of allegations courts have found sufficient to survive a motion to dismiss. *See FFV Coyote*, 637 F. Supp. 3d at 770; *DoorDash*, 2022 WL 867254 at *18.[7]

Second, the County argues that Sable's March 2026 restart of the Pipeline "undermines its assertion" that it has been deprived of economic use. Cnty. Mot. at 16–17. This argument—which goes beyond the pleadings—assumes that current operations will continue without interference from the County, but the County has

---

[7] By contrast, the County's cases all involve situations in which plaintiffs made only conclusory allegations—or none at all—concerning the diminution in economic value. *See Pakdel v. City & Cnty. of San Francisco*, 636 F. Supp. 3d 1065, 1075 (N.D. Cal. 2022) (dismissing regulatory takings claim based on alleged diminution in value because the plaintiffs did not adequately plead any basis for diminution of value); *Honchariw v. Cnty. of Stanislaus*, No. 1:21-CV-00801-SKO, 2023 WL 2938404, at *6 (E.D. Cal. Apr. 13, 2023) (dismissing takings claim where the plaintiff alleged only "expenses and delay" caused by application of fire-safety ordinance); *Evans Creek, LLC v. City of Reno*, No. 21-cv-16620, 2022 WL 14955145, at *1 (9th Cir. Oct. 26, 2022) (affirming dismissal of takings claim where the plaintiff included no information "about the value of the property").

not committed to such non-interference. Sable is currently operating the Facilities under the compulsion of the federal DPA Order, *see* FAC ¶¶ 115–17, and the County's ongoing refusal to transfer the permits continues to threaten Sable's long-term ability to operate the Facilities without approved permit transfers, *see id.* ¶ 53. The County, to date, has not confirmed that it will *ever* allow the ExxonMobil affiliates to transfer the FDPs—undermining the entire sale of the Facilities and seeking to force ExxonMobil to become the County's involuntary guarantor. Nor has the County provided Sable with any assurances that—absent federal compulsion—it will be able to extract value from its extensive investment in the Facilities without County interference. This is not the economically beneficial use that precluded a takings claim under *Penn Central*. *See DoorDash*, 2022 WL 867254, at *18 (rejecting defendant's argument that DoorDash could simply "adopt[] a modified business model").

Third, the County argues that state agencies, not the County, caused any delay in pipeline restart. *See* Cnty. Mot. at 16. But the existence of other regulatory hurdles does not immunize the County from takings liability for its own separate, ongoing interference. *See Esplanade Props.*, 307 F.3d at 984 (agreeing that causation was required "between the government action and the alleged deprivation"). Moreover, this argument again raises factual questions—*i.e.*, to what extent losses have been proximately caused by the County versus by the state—that cannot be resolved on a pleadings challenge.

### b.    Interference With Investment-Backed Expectations

Petitioners have also adequately alleged substantial interference with investment-backed expectations. ExxonMobil, which acquired two of the Facilities before Chapter 25B was enacted, and received its permits after acquisition via a ministerial application of Chapter 25B for the third, had reasonable, investment-backed expectations that it would be able to sell the Facilities unencumbered to Sable. *See* FAC ¶¶ 47–49; 58–65. Sable, in turn, had reasonable investment-backed

expectations when it purchased the Facilities for $600 million and invested more than $290 million in preparing the Facilities for active operations, that the Chapter 25B process would be applied to it in an impartial, ministerial manner so that it could lawfully own and operate the Facilities in the County. FAC ¶ 162. Instead, the County repeatedly acted to deny the transfers. FAC ¶¶ 59–117. These allegations are sufficient to demonstrate substantial interference with reasonable investment-backed expectations. *See FFV Coyote*, 637 F. Supp. 3d at 770 (sufficiently alleged based on allegations of money spent developing property and allegations the defendant's regulation prevented the collection of return on investment); *DoorDash*, 2022 WL 867254, at *7, *19 (allegations concerning the lack of foreseeability of application of the city's Ordinance caused this factor to weigh in plaintiffs' favor). Here too, Sable alleged that the Facilities constituted a significant investment that has been stymied by the County's consistent refusal to transfer the FDPs, and that the County's action flies in the face of any predictable past practice. FAC ¶¶ 59–65.

The County contends that Sable lacked reasonable investment-backed expectations because Chapter 25B is discretionary and because Sable and ExxonMobil are allegedly not similarly situated in terms of operator capability. *See* Cnty. Mot. at 17–18. Both arguments fail at the pleading stage. Courts use an "objective analysis to determine the reasonable investment-backed expectations" of a property owner, and "what is relevant and important in judging reasonable expectations is the regulatory environment at the time of the acquisition of the property." *Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610, 633–34 (9th Cir. 2020). When Sable acquired the Facilities in 2024, the regulatory environment under Chapter 25B was marked by consistent ministerial application—including the County's approval of permit transfers to the ExxonMobil affiliates just one year earlier. FAC ¶¶ 59–65. Nothing in the regulatory landscape at that time suggested the County would transform Chapter 25B into a vehicle to block facility operations.

*See, e.g.*, FAC ¶ 90 (Chair Capps stating in the February 25 hearing "this is our one shot" to oppose the Transfers and block pipeline restart).

Moreover, the County's contention that Sable and ExxonMobil are "not similarly situated" because of Sable's alleged "noncompliance with state and local requirements," Cnty. Mot. at 17–18, improperly disputes Sable's well-pleaded facts on a motion to dismiss. Sable has alleged that County staff reviewed the record three separate times and each time recommended approval of the transfers—confirming that Sable satisfied every requirement under Chapter 25B. *See* FAC ¶¶ 10, 60, 76. Indeed, the County's own Staff Report to the Planning Commission expressly confirmed that "[t]he Applicants have demonstrated that they meet all of the required findings for the proposed change of owner, change of operator, and change of guarantor." FAC ¶ 58. Whether the Board's subsequent denial was justified by alleged "regulatory violations" is a factual dispute this Court cannot resolve on a motion to dismiss. *See Iqbal*, 556 U.S. at 678 (on a motion to dismiss, the court must accept well-pleaded facts as true). This factor therefore precludes dismissal.

### c.    Character of the Government Action

Sable's allegations demonstrate the "character" of the County's action weighs in favor of finding a taking. *See, e.g.*, *Bridge Aina Le'a*, 950 F.3d at 636. This factor weighs in a plaintiff's favor when that plaintiff can show the government has "forc[ed] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Id.* (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005)).[8] Allegations that a defendant city's actions were "intended to 'preserve' the . . . properties for the benefit of the public" are sufficient to support a takings claim. *FFV Coyote*, 637 F. Supp. 3d at 770–71.

---

[8] Even where this factor is found to weigh against a plaintiff, as in *DoorDash*, a court can still find the first two factors weigh in favor of finding a Penn Central taking. 2022 WL 867254, at *19; *see also Bridge Aina Le'a*, 950 F.3d at 636 (explaining this factor "is not alone a sufficient basis to find that a taking occurred").

Here, Petitioners have adequately alleged that the County, in repeatedly refusing to transfer the FDPs, has emphasized its duty "to the public," *see* FAC ¶¶ 11, 90, forcing Sable to bear a burden which should be borne by the public as whole. *See Bridge Aina Le'a*, 950 F.3d at 636. Petitioners have also alleged that the County has accomplished this goal by twisting Chapter 25B far beyond its ministerial purpose, which is sufficient to support Sable's allegations that the "character" of the County's action weighs in favor of finding a taking. *See FFV Coyote*, 637 F. Supp. 3d at 769–71.

The County responds that Chapter 25B was "adopted to promote the common good" because its stated purpose is to ensure safe operation and adequate financial responsibility, and that this purpose weighs against finding a taking. Cnty. Mot. at 18. But this argument conflates the ordinance's stated purpose with the character of the County's action *as applied*. The relevant inquiry under *Penn Central* is not whether the ordinance serves a public purpose in the abstract, but whether the government seeks to "force some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Bridge Aina Le'a*, 950 F.3d at 636. Here, Petitioners have alleged that the County singled out Sable for discriminatory treatment—approving the same transfer for ExxonMobil in 2023 but denying it for Sable based on pretextual "safety" concerns preempted by federal law. FAC ¶¶ 59–65, 181. This is not a neutral application of a public program; it is targeted action against a single property owner. *See Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 837 (1987) (permit conditions not "reasonably related" to a legitimate public purpose constituted a taking).

Moreover, the County's selective enforcement of Chapter 25B undermines any claim that its action was a neutral "public program." When the County approved the same permit transfers for ExxonMobil in 2023, Board Chair Capps acknowledged that the transfer was merely "an administrative action" with no environmental impacts. FAC ¶ 63. Yet when Sable applied for the same transfer,

Board members invoked preempted "safety" and "financial" concerns to deny the application. FAC ¶¶ 107, 121. Such conduct weighs in favor of finding a taking. *See Bridge Aina Le'a*, 950 F.3d at 636.

### B.    PETITIONERS STATE A CLAIM FOR PREEMPTION UNDER THE SUPREMACY CLAUSE

The Seventh Cause of Action for declaratory relief alleges that the County's attempted regulation of the Transfers through Chapter 25B, as applied, is preempted by federal law. Petitioners allege three bases for preemption. First, under the Pipeline Safety Act, PHMSA holds exclusive federal jurisdiction over the safety, repair, restart, and operation of the Pipeline. FAC ¶ 176. The County violated this exclusive jurisdiction when it denied the Transfers based on pipeline safety considerations preempted by the PSA. FAC ¶¶ 181–82. Second, the County's continued enforcement of its denial of the Transfers stands as an irreconcilable obstacle to Sable's compliance with the DPA Order and is thus preempted by the Defense Production Act. *See* ¶¶ 183–84. Third, the California Office of Spill Prevention and Response ("OSPR") has set exclusive standards over Sable's financial capacity to respond to a spill, and the County impermissibly denied the Transfers based on financial considerations preempted by OSPR. FAC ¶¶ 181–88. A preemption claim survives a motion to dismiss where the plaintiff's "theory is that the particular interference" by the local government "is so potent as to be effectively equivalent to a total frustration" of the ability "to dispose of . . . property." *United States Postal Service v. Berkeley*, 228 F. Supp. 3d 963, 971 (N.D. Cal. 2017).

In their motions to dismiss, Defendants both misstate the law and again improperly inject disputed facts. Their motions should be denied.

### 1.    Pipeline Safety Act Preemption

The PSA grants exclusive jurisdiction over pipeline safety to PHMSA, or, for intrastate pipelines, its designated state agency delegate (in California, the OSFM).

In denying the Transfers based on purported pipeline safety concerns, the County regulated in that preempted space. FAC ¶¶ 176–87, 180–82, 188–89. None of Defendants' arguments for dismissal undercut that well-pleaded claim.

Defendants do not, and cannot, dispute that states are preempted from regulating the safety of interstate pipelines. *See* 49 U.S.C. § 60104(c). "[T]he Pipeline Safety Act precludes *any attemp*t by a state authority to regulate the safety of interstate pipelines," *Enbridge Energy, Ltd. P'ship v. Whitmer*, 813 F. Supp. 3d 777, 792 (W.D. Mich. 2025) (emphasis added), *appeal filed*, No. 26-1021 (6th Cir. Jan. 8, 2026), and "[c]ourts interpreting the Pipeline Safety Act's express preemption provision have uniformly recognized its expansive scope," *id.* at 794 (citing cases). Ninth Circuit authority is clear on this point. "'Federal preemption of the regulation of interstate pipeline safety in *any* . . . manner is manifest' under the PSA." *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 878 (9th Cir. 2006) (emphasis added)).

Petitioners have adequately alleged that the County, through its application of Chapter 25B,[9] improperly attempted to regulate interstate pipeline safety. *Olympic Pipe Line* is on point. Following a pipeline explosion, the City of Seattle suspended a pipeline's operation and refused to renew the operator's franchise unless the operator complied with the City's list of pipeline safety demands. *See* 437 F.3d at 875–76. Although the City's actions were not facially preempted by the PSA, the Ninth Circuit concluded the City's actions were preempted as applied because the City attempted to wield its authority for a preempted purpose. *See id.* (finding preemption where the City "made the safety demands . . . pursuant to its general duty to protect the public health and safety."). Other courts have likewise concluded that the intent of a state or local regulator can determine whether an exercise of broader

---

[9] Of note, the County's motion asserts that Petitioners do not make a facial challenge to Chapter 25B. That statement is correct to the extent that Petitioners allege that Chapter 25B unambiguously does *not* allow the County to deny permit transfers based on preempted criteria. To the extent Chapter 25B's language does purport to allow the County to act on preempted bases, it would be facially preempted.

state or local authority is preempted. *See Enbridge Energy*, 813 F. Supp. 3d at 799–800 (reversing revocation of pipeline easement as preempted where "Michigan's primary motivation . . . was to ensure Line 5's safety" (internal quotation marks omitted)); *Couser v. Shelby Cnty., Iowa*, 139 F.4th 664, 671 (8th Cir. 2025), *cert. denied sub nom. Shelby Cnty. v. Couser*, 223 L. Ed. 2d 509 (Jan. 12, 2026) (concluding that county regulations were preempted because "the effect on safety is not incidental, but rather the 'primary motivation.'").

Here, Petitioners allege the County attempted to misuse Chapter 25B for a preempted, safety-related purpose by construing it to allow the County to regulate pipeline safety, effectively substituting its standards for those created by the PSA and PHMSA. FAC ¶¶ 180–82. The Board's December 2025 Findings justified denial of the Transfers based on the assertion that Sable "reflects a record of noncompliant or unsafe operations" with respect to the Facilities. FAC ¶ 105. Supervisor Hartmann repeatedly questioned Sable and ExxonMobil about the potential for a spill and repeatedly sought confirmation that Sable or its insurers would cover all damage from a spill. FAC ¶¶ 11, 92, 134. When discussing the rationale for her vote to deny the Transfers she said that she did so to "keep Exxon on the hook . . . for [a] spill." FAC ¶ 11. Chair Capps cited a belief that it was "too risky to have an applicant that was formed when a major company decided that having this Pipeline was potentially too risky." FAC ¶ 187. Supervisor Lee likewise stated that he believed restarting the Facilities was "insane" and a "very bad idea" and further stated that he "fully agreed" with Hartmann's safety-based rationale for not approving the Transfers. FAC ¶¶ 83, 94. The Board also considered and did not exclude hundreds of pages of materials submitted by the Intervenors and focused on whether "a restart of oil operations at the Facilities creates . . . safety risks." FAC ¶¶ 77, 105. Intervenors repeatedly asked the Board to consider and adopt their own assertions that the Pipeline lacked sufficient cathodic protection, did not have sufficient protection against leaks, and similar safety criteria. *See, e.g.*, ECF No. 68-

10 at 12-16; ECF 68-7 at 56. Defendants dispute the extent to which safety regulation was a motivation behind the challenged actions, *see* Cnty. Mot. at 19; Intervenors' Mot. at 14–16, but that is a factual dispute that precludes dismissal.

None of Defendants' cited cases support a different outcome even on the merits, much less for dismissal, nor do they support Defendants' claimed distinction between safety regulation and safety "standards." Cnty. Mot. at 19-20 (citing cases); Intervenors' Mot. at 14–15 (same). Moreover, all Defendants' cited cases are out-of-circuit: none of those courts were bound by *Olympic Pipe Line* which, as Ninth Circuit law, governs the resolution of this dispute.[10] Defendants' cases are also distinguishable on their facts. Not one was in a motion-to-dismiss posture and none alleged—as Petitioners do—an attempt by local government to impose requirements on a pipeline beyond those imposed by PHMSA. Rather, they primarily addressed normal, ordinary course laws that had an *effect* on pipeline safety. Thus, *Portland Pipe Line Corp. v. City of S. Portland*, 288 F. Supp. 3d 321, 328, 429 (D. Me. 2017), *Texas Midstream Gas Services, LLC v. City of Grand Prairie*, 608 F.3d 200, 212 (5th Cir. 2010), and *Washington Gas Light Co. v. Prince George's County Council*, 711 F.3d 412, 421 (4th Cir. 2013), all involved generally applicable zoning restrictions, such as setbacks and loading bans, which bore only an incidental relationship to safety. And, as noted above, *Couser v. Shelby County* concluded that local regulations having a "direct and substantial effect on safety" are preempted. 139 F.4th at 671.[11] This is starkly different from the Board here, who have expressly

[10] Only one of Defendants' cited cases even acknowledges *Olympic Pipe Line*, and that case acknowledges that *Olympic Pipe Line* "hold[s] that *state or local actions are preempted by the [Pipeline Safety] Act*."). *Bad River Band of Lake Superior Tribe of Chippewa Indians of Bad River Rsrv. v. Enbridge Energy Co., Inc.*, 626 F. Supp. 3d 1030, 1049 (W.D. Wis. 2022) (emphasis added).

[11] *Altria Grp., Inc. v. Good*, a wholly inapposite case involving whether state fraud law was preempted by federal cigarette label regulation, merely notes that courts consider the scope of preemption even when an express preemption clause exists. *See* 555 U.S. 70, 76 (2008).

argued that Chapter 25B permits the County *to regulate safety* and who repeatedly and directly considered purported pipeline operational safety concerns, and who ultimately denied the Transfers on the basis of specific claims that this particular Pipeline could not be safely operated by Sable.  FAC ¶¶ 94, 95, 105.

Intervenors additionally seek dismissal on the basis that there is currently a dispute between PHMSA and OSFM over which agency has jurisdiction over the Pipeline, and that this Court can dismiss based on the purported fact that OSFM, not PHMSA, has jurisdiction over the Pipeline.  Intervenors' Mot. at 12.  This is wrong on two fronts.  *First*, Petitioners cannot dispute the well-pleaded fact that PHMSA has determined it has jurisdiction over the Facilities:  the FAC alleges that "on December 17, 2025, PHMSA issued a Determination of Interstate Classification," which on the face of the PSA means PHMSA "holds exclusive jurisdiction."  FAC ¶ 42 (emphasis added).  The sole case that Intervenors cite to suggest that the *fact* that PHMSA has determined it has jurisdiction is merely a *legal argument of Sable's* that this court should decide on a motion to dismiss—despite the current litigation in the Ninth Circuit on this very point—says nothing of the sort.  It instead stands for the uncontroversial proposition that a plaintiff's theory of how a statute operates is a legal conclusion, not a factual allegation.  *See W. Mining Council v. Watt*, 643 F.2d 618, 625 (9th Cir. 1981).  To the extent Intervenors wish to challenge PHMSA's jurisdictional determination, they can—and did—sue PHMSA in the Ninth Circuit.  *See California v. PHMSA*, Nos. 25-8059, 26-508 (9th Cir. 2026).  The Ninth Circuit notably *declined* Intervenors' request to stay PHMSA's jurisdiction pending resolution of the jurisdictional dispute.  *See* Order Denying Stay, *PHMSA*, ECF No. 21 (9th Cir. Dec. 31, 2025).  Intervenors cannot collaterally attack PHMSA's assertion of jurisdiction, which also rests on factual disputes, on a motion to dismiss Petitioners' FAC in this case.

*Second*, Intervenors' argument is legally incoherent.  Congress granted PHMSA exclusive authority over interstate hazardous liquid pipelines under the

Pipeline Safety Act, and the ability to delegate that exclusive enforcement authority to a designated state entity for intrastate pipelines. 49 U.S.C. § 60104(c). When that delegation under the PSA occurs, the designated state agency—here, OSFM—is the *only* state agency that may regulate intrastate pipeline safety. *See* 49 U.S.C. § 60104(c); Cal. Gov't Code § 51010. Thus, even if OSFM were the proper regulatory agency, the PSA would *still* preempt any regulation by Santa Barbara County with respect to intrastate pipelines, and Petitioners' arguments with respect to PHMSA preemption would apply equally to OSFM preemption. Indeed, Petitioners made the exact same preemption arguments in their initial Petition, when the Pipeline was regulated as an intrastate pipeline facility. *See* ECF No. 1 ¶¶ 30 & n.3, 121–24. The PSA provides exclusive jurisdiction to PHMSA for interstate pipelines, and to OSFM for intrastate pipelines in California; either way, the *County* does not have jurisdiction and may not adopt safety standards. *See* 49 U.S.C. § 60104(c); Cal. Gov't Code § 51010; *Olympic Pipe Line*, 437 F.3d at 878. Intervenors' arguments regarding the 2020 Consent Decree and a state court's rulings in the *Center for Biological Diversity* matter are also beside the point. Those cases—which are ongoing and subject to further litigation and current motions practice in federal court, *see United States & California v. Plains All Am. Pipeline, L.P.*, No. 20-cv-02415-SVW-SSC (C.D. Cal.) ("*Plains*") (overlapping motions to dissolve (ECF No. 49) and enforce (ECF No. 55) the Consent Decree); *Center for Biological Diversity v. California Dep't. of Forestry and Fire Protection*, No. 26-cv-05242 (C.D. Cal.) (defendant's motion to reconsider preliminary injunction (ECF No. 43) and plaintiffs' *ex parte* motion to remand to state court (ECF No. 45)), address which federal or state agency has jurisdiction; regardless of the outcome, the County is barred by the PSA from imposing its own standards. The County is preempted either way.

Intervenors also seek dismissal "*[t]o the extent* that Petitioners' allegations in the Seventh COA assert that federal preemption issues arose under the PSA *at the*

*time of the Board's December 16 decision . . . .*" Intervenors' Mot. at 11 (emphasis added. This is a strawman. As stated on the face of the FAC, the Seventh Cause of Action seeks *prospective* relief based on *current* preemption, namely, "a declaratory judgment that Chapter 25B, as applied by the County to the Facilities, is preempted by federal and state law . . . ." FAC ¶ 189; *see also Landgraf v. USI Film Prods.*, 511 U.S. 244, 273 (1994) ("a court should apply the law in effect at the time it renders its decision, even though that law was enacted after the events that gave rise to the suit," especially "[w]hen the intervening statute authorizes or affects the propriety of prospective relief[.]" (quoting *Bradley v. Sch. Bd. of Richmond*, 416 U.S. 696, 711 (1974))). Intervenors cite no authority, and there is none, for the assertion that the Supremacy Clause can be defeated by the timing of a preempted action. In fact, this argument contradicts the PSA itself. *See* 49 U.S.C. § 60104(c) ("A State authority may not adopt *or continue in force* safety standards for interstate pipeline facilities . . . ." (emphasis added)). Petitioners have plausibly pleaded that the County acted in a way that is preempted by the PSA.

## 2. Defense Production Act Preemption

Petitioners have plausibly pleaded preemption as a result of the DPA Order as well. The FAC pleads that the DPA Order requires Sable to operate the Pipeline, and Petitioners allege that the County's actions were taken "with the purpose of obstructing the operation of the Facilities," and that County's stance "frustrate[s] Sable's compliance with the DPA Order." FAC ¶ 183. "[W]hen Congress enacts a valid statute pursuant to its Article I powers, state law is naturally preempted to the extent of any conflict with a federal statute. End of story." *Haaland v. Brackeen*, 599 U.S. 255, 287 (2023) (internal quotation marks and citation omitted). "Impossibility preemption" preempts a state law "where it is impossible for a private party to comply with both state and federal law[.]" *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); *accord Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963).

Sable faces two directly contradictory demands: the DPA Order, commanding Sable to flow oil and specifically identifying Sable as the "lessee, owner, and operator of the [Facilities]," FAC ¶¶ 116–17, 183, and the County's denial, which prevents Sable from lawfully holding the local permits that authorize operation of the Facilities. FAC ¶¶ 20, 34.  This irreconcilable conflict is the hallmark of impossibility preemption.  *See Crosby*, 530 U.S. at 379–80.  The Complaint plausibly alleges an ongoing conflict between the Board's denial and a current, binding federal order, *see* FAC ¶¶ 116–17, 183, which is all that is required to survive a motion to dismiss.  *See Crosby*, 530 U.S. at 380 ("Conflict is imminent when two separate remedies are brought to bear on the same activity." (internal quotation marks omitted)).

Defendants fail to identify any defects in these allegations.  Instead, they argue that the DPA Order does not actually require Sable to operate the Facilities.  *See* Intervenors' Mot. at 20.  But this is a factual dispute; in written filings to other judges of this Court, the federal government, *see* United States' Motion to Terminate or Modify the Consent Decree, *Plains* (Apr. 3, 2026), ECF No. 49, the state of California, *see* Petitioners' Ex Parte Motion to Enforce the Consent Decree, *Plains*, (Mar. 16, 2026), ECF No. 43, and Sable, *see* Complaint, *Sable v. Quintero*, No. 2:26-cv-02739- SVW-SSC (C.D. Cal Mar. 13, 2026),  ECF No. 1, have all understood the DPA Order to require Sable to immediately operate the Facilities.  Similarly, Defendants make multiple arguments about what the *DPA* may or may not lawfully require, citing cases regarding the scope of DPA indemnity and similar matters.  *See* Cnty. Mot. at 21; Intervenors' Mot. at 18–20.  These cases have been sharply distinguished in other cases with more analogous facts.[12]  More fundamentally,

---

[12] Most recently, in responding to COVID-19 the Secretary of Agriculture invoked the DPA to require meat-processing plants to remain operational and the courts uniformly held that conflicting state requirements were preempted wherever state law conflicted with the Secretary of Agriculture's DPA Order, because it was issued

Defendants' arguments that the DPA *Order* is unauthorized by the *DPA* fails to address the fact that Sable must comply now with the DPA Order as written: The *DPA Order*, not the DPA, is the alleged source of preemption, *see* FAC ¶ 183, and has the force and effect of federal law. *See Silver Dollar Grazing Ass'n v. U.S. Fish & Wildlife Serv.*, No. 07-35612, 2009 WL 166924, at *2 (9th Cir. Jan. 13, 2009). The DPA Order requires Sable to "immediately prioritize and allocate" and "immediately commence performance under contracts or orders" for "pipeline transportation services" from the offshore Santa Ynez Unit through the Pipeline system, including the Facilities at issue in this case, and "maintain such compliance until such time as the conditions necessitating the issuance of this order abate or until Sable is directed otherwise." FAC ¶¶ 115–117. Sable pleads that the County's actions were taken "with the purpose of obstructing the operation of the Facilities," and to "frustrate Sable's compliance with the DPA Order." FAC ¶ 183. Defendants cannot dispute these pleaded facts. To the extent they dispute whether the DPA Order is valid under the DPA, that question is properly before the court in *California v. Wright*, No. 26-cv-3396-SVW-SSC (C.D. Cal. Mar. 31, 2026). Defendants cannot

---

"pursuant to [the President's] delegated DPA authority" and the "application of those state-law standards would undermine the President's statutory authority" under the DPA. *Johnson v. Tyson Foods, Inc.*, 580 F. Supp. 3d 382, 388–89 (N.D. Tex. 2022); *see also Reed v. Tyson Foods, Inc.*, No. 21-cv-01155, 2021 WL 5107725, at *6 (W.D. Tenn. Nov. 3, 2021).

As explained by Sable in its opposition to California's motion for a preliminary injunction in *California v. Wright*, No. 26-cv-3396-SVW-SSC (C.D. Cal. May 11, 2026), ECF No. 24-4, executive agencies may validly preempt state laws when acting within the scope of their statutory authority. *See id.* at 9 (citing *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 273 n.5 (1974)). "It is simply implausible that Congress would have gone to such lengths to empower the President if it had been willing to compromise his effectiveness by deference to every provision of state statute or local ordinance that might, if enforced, blunt the consequences of discretionary Presidential action." *Crosby*, 530 U.S. at 376.

collaterally attack the DPA Order—issued by non-party the United States—in a motion to dismiss Petitioners' claims in this case.

Defendants then assert either that Petitioners failed to allege impossibility preemption and/or that it is possible for Sable to comply with both the DPA Order and Chapter 25B. *See* Cnty. Mot. at 21–22; Intervenors' Mot. at 20. However, these arguments ignore that the DPA Order requires Sable to "'immediately commence performance' of hydrocarbon transportation services" using the Facilities. FAC ¶ 183 (quoting Exhibit 11). The County also attacks a nonexistent argument that the DPA does not "confer immunity for *any* actions a recipient might take." Cnty. Mot. at 21. Petitioners do not contend that the DPA Order preempts *all* state laws touching upon Sable's operations, only that it preempts this particular County regulation as the County applied it to prevent the Transfers. FAC ¶ 183 (*"[T]he County's denial of the Transfers* is preempted by the DPA Order." (emphasis added)). The County's cited cases are inapposite as none involved an allegation that it was impossible for a party to comply, on an ongoing basis, with both state and federal law. Rather, they concerned the question of *indemnification* by the United States for past violation of environmental laws in the production of Agent Orange. *See Hercules, Inc. v. United States*, 24 F.3d 188, 204 (Fed. Cir. 1994), and *United States v. Vertac Chemical Corp.*, 46 F.3d 803, 812–13 (8th Cir. 1995). Not only did these cases analyze a different section of the DPA, § 707, the U.S. Supreme Court specifically declined to adopt this interpretation with respect to immunity. *See Hercules, Inc. v. United States*, 516 U.S. 417, 430 & n.14 (1996).

Finally, like for PSA preemption, Defendants again suggest the sequence of the DPA Order and the County's actions somehow preclude a finding of preemption. *See* Intervenors' Mot. at 17; Cnty. Mot. at 20. Again, Defendants cite no precedent for this proposition and ignore the allegations of *current* preemption and request for *prospective* relief. *See* FAC ¶¶ 183, 189; *Landgraf*, 511 U.S. at 273.

### 3.    Office of Spill Prevention and Response Preemption

The final area where Petitioners allege preemption is with respect to financial regulation.  The Amended Complaint plausibly alleges that financial considerations formed part of the actual basis for the supervisors' votes, yet under state law, OSPR "has the exclusive authority to require that owners and operators have the financial wherewithal to cover costs associated with a worst-case-scenario incident."  FAC ¶ 186; *see also* Cal. Gov't Code § 8670.37.51; Cal. Const. art.  XI, § 7 ("A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations *not in conflict with general laws*." (emphasis added)).  The Board invaded the jurisdiction of OSPR by attempting to regulate in that preempted space.  FAC ¶¶ 186–88.  The fact that OSPR's regulations "lack any general preemption provision," Cnty. Mot. at 22-23, is irrelevant.  The California Supreme Court has made clear that "[a] conflict exists if the local legislation duplicates, contradicts, or enters an area fully occupied by general law, *either expressly or by legislative implication*."  *O'Connell v. City of Stockton*, 41 Cal. 4th 1061, 1067 (2007) (emphasis added) (internal quotation marks and citations omitted).  "Whenever the Legislature has seen fit to adopt a general scheme for the regulation of a particular subject, the entire control over whatever phases of the subject are covered by state legislation ceases as far as local legislation is concerned." *Id.* at 1068.

Here, California has established general statewide regulations to ensure the financial responsibility of owners and operators for oil spills, *see* Cal. Gov't Code § 8670.37.51, and so "as far as local legislation is concerned" their "control . . . ceases," *O'Connell*, 41 Cal. 4th at 1067,  as to ensuring such financial responsibility under Chapter 25B.  In response, Defendants argue that Chapter 25B is merely "intended to assure an entity is capable of complying with all permit conditions and County ordinances, the latter is focusing on liability for oil spill response." Intervenors' Mot. at 23.  But once again, Defendants are impermissibly asking this

Court to disregard the Amended Complaint's allegations in favor of Defendants' preferred characterization of the Board's conduct. *See* Cnty. Mot. at 22; Intervenors' Mot. at 22–23. It cannot do so. The Amended Complaint contains specific allegations about the preempted attempts of the Board to override OSPR's conclusion that Sable *meets* the financial requirements for safe Pipeline operation and the Board's attempts to impose different obligations. During the November hearing, Supervisor Hartmann asked whether "the permit require[s] that the owner/operator have financial responsibility to clean up a spill." FAC ¶ 187. Supervisor Hartmann likewise raised "numerous questions about the adequacy of Sable's insurance policy" and opined that she was "very concerned about bankruptcies." FAC ¶ 92. Supervisor Lavagnino cited Sable's stock price as a reason to deny the transfers. FAC ¶ 121. During the February hearing, Chair Capps opined that the Board's decision was "about fiscal oversight" and stated that Sable's financing was "fishy." FAC ¶ 187. She also declared: "it's too risky to have an applicant that was formed when a major company decided that having this Pipeline was potentially too risky." and further faulted Sable for "not going 'above and beyond the checklist' in Chapter 25B because Sable did not provide copies of insurance policies," which are not required under Chapter 25B. FAC ¶¶ 82, 187. And in the December hearing—where the Board rendered its final decision—Chair Capps "again asked whether Sable had submitted its insurance policies" and stated that in her opinion Sable has "unresolved financial concerns." FAC ¶¶ 99, 187. As explained above, courts consider the intent to regulate in a preempted space a basis to establish preemption; these allegations are thus sufficient to state a claim for preemption. *See, e.g.*, *Olympic Pipe Line*, 437 F.3d at 878.

Defendants argue that "the written findings adopted by the majority of the Board focus on operator capability, not financial guarantees or other criteria," thus arguing that the Board did not *actually* render any decisions based on preempted financial capabilities. Cnty. Mot. at 22; *see also* Intervenors' Mot. at 23. But

Defendants are trying to have it both ways, arguing both that the County *may* lawfully consider financial responsibility for spills and that the Court should presume it did not.  Again, these are factual disputes not appropriate for resolution on a motion to dismiss.  Moreover, neither Defendant cites any authority for the assertion that only written findings—and not oral statements or materials submitted in support of those findings—can be considered in evaluating the Board's decision— indeed, there is not *a single cited case* supporting this argument in either Defendant's motion.  Petitioners' allegations are sufficient to state a claim.

### C.    PETITIONERS STATE A CLAIM FOR BREACH OF CONTRACT

Finally, the County Motion should be denied as to Petitioners' Eighth Cause of Action because Petitioners properly alleged the three elements of their contract claim: (1) a contract, the Celeron Agreement, *see* FAC ¶ 43; (2) breach, the adoption of the December 2025 Findings and/or the failure to transfer the permits, *see* FAC ¶ 191; and (3) damages, excessive costs.  FAC  ¶ 194.  *See Hickcox-Huffman v. US Airways, Inc.*, 855 F.3d 1057, 1062 (9th Cir. 2017).  The County does not, and cannot, identify any pleading deficiency for any element of this claim.

Instead, the County again mischaracterizes Petitioners' claims to create its own preferred version of the facts, arguing that the Celeron agreement does not "preclude[] the County from regulating local permit transfers or following the discretionary process set forth in Chapter 25B." Cnty. Mot. at 23.  This is inapposite: the alleged breach is not the *enactment* of Chapter 25B, but the County's attempt to use Chapter 25B to exercise "'authority over the design, construction, and operation' of the Pipeline," or to take "any action which involve[s] Part 195 areas and is not authorized under 2.5.1 [in the Celeron Agreement], including suspending or withholding ministerial permits."  FAC ¶ 192 (quoting Celeron Agreement, ¶¶ 2.2 & 2.5.3).  In other words, Petitioners allege that the County agreed in the Celeron Agreement not to take any action with respect to the Pipeline not specifically

authorized thereunder, including (but not limited to) suspending or withholding ministerial permits.  FAC ¶ 192.

The County has no response to this specific claim of breach, other than to argue that Chapter 25B was a lawful exercise of its police power.  But that the County could lawfully enact Chapter 25B does not mean that the Celeron Agreement did not limit Chapter 25B's application to the Pipeline.  *Compare* FAC ¶¶ 191–95 & Prayer for Relief ¶ 7 ("For a declaration finding that County Code § 25B-10(a)(9), *as applied*, violates the Celeron Agreement." (emphasis added)) *with* Cnty. Mot. at 23 ("there are no allegations that Celeron or any other successors *challenged Chapter 25B*"[13] (emphasis added)); Cnty. Mot. at 23 ("Plaintiffs *do not challenge the County's jurisdiction to issue local permits . . .* through Chapter 25B." (emphasis added)).

Moreover, the County does not identify which terms of the Celeron Agreement they assert Petitioners misinterpret, nor does the County offer any interpretation of their obligations under the Celeron Agreement.  *See* Cnty. Mot. at 24.  This may be because asserting contractual ambiguity raises a factual dispute that precludes dismissal.  *See State Farm Mut. Auto. Ins. Co. v. Fernandez*, 767 F.2d 1299, 1301 (1985) ("If [contractual] ambiguity exists, a question of fact is presented."); *ASARCO, LLC v. Union Pacific R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014) (holding that if "an asserted defense raises disputed issues of fact, dismissal under Rule 12(b)(6) is improper").  And, indeed, the County does offer a contractual assertion at odds with Petitioners'—asserting "[t]he Celeron Agreement *does not . . .* bar the County from [taking the challenged actions]."  Cnty. Mot. at 24 (emphasis added).  This conclusory assertion is contrary to the interpretation Petitioners allege: that "[t]he Board's adoption of the December 2025 Findings and County's failure to

---

[13] Even if or to the extent relevant, this is not an omitted allegation; it is a new assertion of fact the County asks the Court to rely upon in granting a motion to dismiss, contrary to the Rule 12(b)(6) legal standard.

transfer the permits is a breach of the February 8, 1988 Celeron Agreement." FAC ¶ 191. The County may not dispute Petitioners' well-pleaded facts on a motion to dismiss.

The County also argues that "Plaintiffs' interpretation of the Agreement as requiring the County to approve a discretionary permit is inconsistent with the rules of contract interpretation and would render the Agreement invalid." Cnty. Mot. at 24. In support, the County cites four cases concerning the government's ability to limit its police powers by contract. *See id.* But these cases involved entirely different factual situations than the one present here: in the Celeron Agreement, the County *affirmatively acknowledged it lacked jurisdiction over the Pipeline.* Lacking jurisdiction, the County had no lawful police power to surrender. *See*, *e.g.*, FAC ¶ 192 ("In the Celeron Agreement . . . the County *acknowledged* that it has 'no authority over the design, construction, and operation of the Pipeline . . . .*" (emphasis altered)). Even were it otherwise, the County's cited cases involve substantially greater factual development and do not support dismissal on the pleadings.[14]

## V.    CONCLUSION

For these reasons, both motions to dismiss should be rejected in their entirety. To the extent the court dismisses any of the claims, they should be dismissed with leave to amend. *See United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*, No. CV 08-2068PSG(FFMX), 2009 WL 650730, at *1 (C.D. Cal. Mar. 12, 2009) ("The Ninth Circuit has explained that this standard should be applied with extreme liberality" (internal quotation marks omitted).).

---

[14] *See Discovery Builders, Inc. v. City of Oakland*, 92 Cal. App. 5th 799, 804 (2023) (reversing writ of mandate); *Alameda Cnty. Land Use Ass'n. v. City of Hayward*, 38 Cal. App. 4th 1716, 1725 (1995) (vacating a trial court's granted demurrer); *Delucchi v. Cnty. of Santa Cruz*, 179 Cal. App. 3d 814, 823 (1986) (affirming judgment after trial); *Avco Cmty. Devs., Inc. v. South Coast Reg'l. Com.*, 17 Cal. 3d 785 (1976) (same).

Dated:  May 27, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

By: /s/*Jessica Stebbins Bina*
Jessica Stebbins Bina
*Jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Tel.:  (424) 653-5500
Fax:  (424) 653-5501

Attorneys for Plaintiffs and Petitioners Sable Offshore Corp., Pacific Pipeline Company, and Pacific Offshore Pipeline Company

O'MELVENY & MYERS LLP

By: /s/*Lauren Kaplan*
Lauren Kaplan (Bar No. 294703)
*lkaplan@omm.com*
Dawn Sestito (Bar No. 214011)
*dsestito@omm.com*
400 South Hope Street, 19th Floor
Los Angeles, California 90071
Telephone:  +1 213.430.6000
Facsimile:  +1 213.430.6407

Attorneys for Petitioners and Plaintiffs Exxon Mobil Corporation, Mobil Pacific Pipeline Company, and ExxonMobil Pipeline Company

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

39

CASE NO. 2:25-cv-04165-DMG-AGR
OPP. TO MOTIONS TO DISMISS

## **ATTESTATION STATEMENT**

I, Jessica Stebbins Bina, am the ECF User whose identification and password are being used to file this Consolidated Opposition to Respondents' and Intervenors' Motions to Dismiss.  Pursuant to Local Rule 5-4.3.4(a)(2)(i), I attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.


/s/*Jessica Stebbins Bina*
Jessica Stebbins Bina

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Petitioners Sable Offshore Corp., Pacific Pipeline Company, and Pacific Offshore Pipeline Company, certifies that this brief contains 13,041 words, which complies with the Order on Joint Stipulation to File Consolidated Brief, ECF No. 72.


Dated: May 27, 2026                     /s/*Jessica Stebbins Bina*
                                        Jessica Stebbins Bina


LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
CENTURY CITY

CASE NO. 2:25-cv-04165-DMG-AGR
OPP. TO MOTIONS TO DISMISS

41