LATHAM & WATKINS LLP
  Jessica Stebbins Bina (Bar No. 248485)
  *jessica.stebbinsbina@lw.com*
10250 Constellation Blvd. Suite 1100
Los Angeles, CA  90067
Telephone:  +1 424.653.5500
Facsimile:  +1 424.653.5501

*Attorneys for Petitioners and Plaintiffs Sable Offshore Corp., Pacific Pipeline Company, and Pacific Offshore Pipeline Company*

O'MELVENY & MYERS LLP
  Dawn Sestito (Bar No. 214011)
  *dsestito@omm.com*
  Lauren Kaplan (Bar No. 294703)
  *lkaplan@omm.com*
400 South Hope Street, 19th Floor
Los Angeles, CA  90071
Telephone:  +1 213.430.6000
Facsimile:  +1 213.430.6407

*Attorneys for Petitioners and Plaintiffs Exxon Mobil Corporation, Mobil Pacific Pipeline Company, and ExxonMobil Pipeline Company*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SABLE OFFSHORE CORP., et al.,<br><br>　　Petitioners/Plaintiffs,<br><br>　　v.<br><br>COUNTY OF SANTA BARBARA, et al.,<br><br>　　Respondents/Defendants.<br><br>　　and<br><br>ENVIRONMENTAL DEFENSE CENTER, et al.,<br><br>　　　Intervenors. | CASE NO. 2:25-cv-04165-DMG-CTS<br><br>**SECOND AMENDED AND SUPPLEMENTAL VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES**<br><br>DEMAND FOR JURY TRIAL |

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR
WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY
RELIEF AND DAMAGES

Petitioners and Plaintiffs Sable Offshore Corp. ("Sable Offshore"), Pacific Pipeline Company ("PPC"), and Pacific Offshore Pipeline Company ("POPCO") (collectively, "Sable") and Petitioners and Plaintiffs Exxon Mobil Corporation ("ExxonMobil"), Mobil Pacific Pipeline Company ("MPPC"), and ExxonMobil Pipeline Company ("EMPCo") (collectively, "ExxonMobil affiliates") (together with Sable, "Petitioners") submit this petition for a writ of mandate and complaint for declaratory relief and damages against Respondents and Defendants the County of Santa Barbara and Santa Barbara County Board of Supervisors ("County"), and allege as follows:

## **INTRODUCTION**

1.      This case is about a county that changed the rules after the game had already been won. Petitioners seek a straightforward and long-overdue permit transfer for three offshore oil and gas facilities in Santa Barbara County: the Santa Ynez Unit, which receives, processes, and transmits oil from the offshore rigs (the "SYU"); the POPCO gas facilities, onshore gas midstream processing facilities located in the Las Flores Canyon ("POPCO"); and the onshore pipeline segments that transmit oil from the SYU through Santa Barbara County (the "Pipeline") (collectively, the "Facilities").

2.      For decades, the County has treated these transfers as administrative housekeeping: confirm that fees are paid, insurance is in place, and the facility complies with its existing permit, then update the paperwork. And that diligent ministerial process is exactly what County staff and the Planning Commission engaged in here over the course of months, ultimately recommending approval of a transfer of all Final Development Permits (the "Transfers"). But when environmental intervenors asked the Board of Supervisors to block the transfer anyway, the Board obliged—not by identifying any real deficiency in Sable's application, but by reading Santa Barbara County Code ("County Code") Chapter 25B (hereinafter, "Chapter 25B") in an unprecedented and expansive way, echoing

2

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR
WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY
RELIEF AND DAMAGES

a similar unlawful attempt by the County 40 years ago to prevent the Pipeline from being built in the first place.

3. Federal law and the County's own history forecloses its current position. California law recognizes that a Final Development Permit ("FDP") is a vested right that runs with the land when a property is sold. The FDPs for all three Facilities were issued decades before the passage of Chapter 25B—in the 1970s for the SYU and POPCO facilities, and in the 1980s for the Pipeline.  The rights to all three sets of FDPs thus vested more than 30 years ago, and transfer as a matter of law to new owners whenever the land is sold.

4. In the 1980s, when the County tried to leverage its permitting power to regulate pipeline construction and operation, the owner of the Pipeline and holder of the FDPs for it, Celeron, sued the County, and the parties settled. The resulting settlement agreement (the "Celeron Agreement," attached hereto as **Exhibit 10**) confirmed that the County has no authority over the design, construction, or operation of the Pipeline, nor will it require any permit to operate the Pipeline, nor may it withhold ministerial permits.

5. In 2001, the County adopted Chapter 25B of its County Code to formalize ownership, operator, and guarantor changes for existing oil and gas facilities. Until last year, Chapter 25B, an ordinance that,to the best of Petitioners' knowledge, has no analogous counterpart in any other county in America, had never once been used to block a transfer—nor could it be so used with respect to FDPs issued prior to its passage.  Indeed, as recently as 2023, when ExxonMobil transferred the very Pipeline at issue here, the Board rejected calls to scrutinize the operator's history and affirmed that the transfer was a purely administrative act.

6. That consistent understanding evaporated when, amidst intensely polarized environmental lobbying, Sable's application came before the Board. County staff confirmed that Sable's application satisfied every requirement of Chapter 25B and the County Planning Commission approved the transfers by a 3-

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR
WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY
RELIEF AND DAMAGES

to-1 vote. Yet anti-oil advocates appealed and urged the Board to read Chapter 25B as it had never previously done—as authorizing a wholesale judgment about whether Sable was, in the County's own estimation, a sufficiently "safe" operator—a inquiry that federal law forecloses. County staff urged the Board to reject that expansive reading, but the Board ignored their request.  Notwithstanding three separate staff recommendations for approval, and the approval of the Planning Commission, the Board directed County staff to prepare findings for denial of the Transfers resting solely on a single, amorphous finding—"Operator Capability"—while ignoring the other categories of required findings entirely. The Board's denial rests on assertions preempted by federal law: the federal Pipeline and Hazardous Materials Safety Administration ("PHMSA"), the only agency with authority to judge whether an interstate pipeline operator has the capability to safely operate under the federal Pipeline Safety Act (the "PSA"), has already found that Sable is qualified. Moreover, the Board's decision denied ExxonMobil and MPPC their vested right to sell their property free and clear of all encumbrances, including any FDP obligations—with the Board expressing its desire to force ExxonMobil to be a permanent guarantor of Sable's business operations.  None of this was lawful.

7.      The consequences of the County's overreach are not academic. The County's denial leaves Sable caught between complying with PHMSA's requirements that Sable inspect, test, and repair the Pipeline within prescribed timeframes, which requires acting as the operator of the Facilities—and the County's denial of the Transfers, resulting in potential civil and criminal penalties, including a possible injunction, under Chapter 25B.

8.      Petitioners bring eight causes of action to unwind this unlawful result. Chapter 25B is, and can only constitutionally be, a ministerial permit-transfer ordinance, and it has been interpreted and applied that way for a quarter century— until now. The County cannot rewrite its own law in the middle of one applicant's proceeding to reach a result its own staff repeatedly said the record could not support,

4

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR
WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY
RELIEF AND DAMAGES

and it cannot do so in a way that conflicts with the federal government's own determination that Sable is a safe, qualified operator required to keep oil flowing. Petitioners respectfully request that the Court issue a writ of mandate directing the County to approve the transfers, declare Chapter 25B unenforceable as applied here, and award damages and fees as set forth below.

## JURISDICTION AND VENUE

9.     This action arises under the laws of the United States and the State of California.  This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over the California state law claims pursuant to 28 U.S.C. § 1367.

10.     This Court has jurisdiction to grant mandamus relief pursuant to §§ 1085 and 1094.5 of the California Code of Civil Procedure.

11.     This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 and California Code of Civil Procedure § 1060.

12.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b).[1]

## THE PARTIES

13.     Petitioner/Plaintiff Sable Offshore is a Delaware corporation, registered to do business in California, with its principal place of business in Texas.

14.     Petitioner/Plaintiff PPC is a Delaware corporation, registered to do business in California.

15.     Petitioner/Plaintiff POPCO is a California corporation.

16.     Petitioner/Plaintiff ExxonMobil is a Texas corporation with its principal place of business in Texas.

17.     Petitioner/Plaintiff EMPCo is a Delaware Limited Liability Company with its principal place of business in Texas.

---

[1] The filing of this complaint and Petitioners' participation in this lawsuit shall not be construed as a waiver of personal jurisdiction defenses in any other matter. Petitioners do not consent to personal jurisdiction in California in connection with any other matter.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

18. Petitioner/Plaintiff MPPC is a Delaware corporation with its principal place of business in Texas.

19. Respondent/Defendant County of Santa Barbara is a political subdivision of the State of California. The Facilities are located within the jurisdictional limits of the County of Santa Barbara.

20. Respondent/Defendant Board of Supervisors of the County of Santa Barbara is Santa Barbara County's legally constituted legislative body and is composed of five elected Board members.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES
### AND STANDING

21. Petitioners have exhausted all administrative remedies available, and have no plain, speedy, or adequate remedy in the ordinary course of law, to compel the County's issuance of permits listing Sable as the owner, operator, and guarantor of the Facilities.

22. Petitioners have a direct and substantial beneficial interest in the County's full and complete compliance with all applicable laws. Absent obtaining judicial relief, the ExxonMobil affiliates will still be listed on the FDPs and Sable will not be able to lawfully hold the permits for its Facilities in Santa Barbara, forcing Petitioners to incur substantial unnecessary and unlawful financial and legal burdens.

23. Petitioners complied with the California Government Claims Act with respect to the claims for damages to which it applies. Sable's claims accrued on February 25, 2025, in connection with the Board's tie-vote and failure to deny the Appeals and approve the Transfers. On August 20, 2025, within a year of accrual, Sable presented written claims for money damages to the County of Santa Barbara Board of Supervisors. The County did not provide written notice of action on the claim within forty-five days and did not serve any written notice of rejection thereafter. The claim was thus rejected by operation of law.

6

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR
WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY
RELIEF AND DAMAGES

24. On or after December 16, 2025, additional claims accrued in connection with the Board of Supervisor's actions to grant the Appeals and deny the Transfers. On January 20 and 21, 2026, Petitioners presented written claims for money damages to the County of Santa Barbara Board of Supervisors. The County rejected Petitioners' claims by separate letters dated March 3, 2026.

25. The amended Sixth and Eighth Causes of Action for damages *infra* are filed as of March 16, which is within the timeframes set forth in California Government Code Section 945.6(a).

## GENERAL ALLEGATIONS

### FDPs Issued and Vested in 1980s and 1990s

26. The FDPs for the Facilities were all issued—and became fully vested— more than 30 years ago.

27. In the 1970s, ExxonMobil, acting pursuant to federal leases, built three offshore platforms (Hondo, Harmony, and Heritage), which pump oil from the seabed of the Santa Ynez Unit—one of the largest offshore oil fields in the United States.

28. In 1974, the County issued Conditional Use Permit 74-CP-11 (RV1), which authorized Pacific Offshore Pipeline Company, an affiliate of ExxonMobil, to construct the POPCO gas facilities, onshore gas midstream processing facilities located in the Las Flores Canyon. In 1993, the County issued a Final Development Permit, 93-FDP-015, authorizing further POPCO plant works.

29. In 1987, the County issued Final Development Permit 87-DP-32cz (modified on July 25, 2001, with 87-DP-032cz (RV05) Synergy Project) (modified on Feb. 19, 2003, with 87-DP-032cz (RV06) Offshore Power Cable Repair & Enhancement Project)), to ExxonMobil. These permits authorized ExxonMobil to develop and build the SYU, including the onshore and offshore processing facilities, as well as associated pipelines and components, for the Santa Ynez Unit at Las Flores Canyon.

7

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR
WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY
RELIEF AND DAMAGES

30.    In 1988, the County issued Final Development Permits 88-DPF-033 (RV01)z, 88-CP-60 (RV01), 88-DPF-25cz, 85-DP-66cz, and 83-DP-25cz, to Celeron Company of California.  These permits authorized Celeron to build the Pipeline.

31.    Each FDP authorizes the ongoing operation and maintenance of that oil or gas facility consistent with the terms and requirements of that FDP.  Once issued and relied upon, the FDP is a vested entitlement that runs with the facilities it authorizes, without an  expiration date or any condition that could result in a *de facto* expiration of the FDPs.  Each FDP fully vested shortly after its issuance, and thus each FDP is still valid and now runs with the land.

32.    The FDPs do not include any requirement that subsequent owners, operators, or guarantors of the Facilities obtain additional approval from the County to take advantage of the vested rights to own and operate the Facilities provided by the FDPs.

**In the 1980s, the County Attempts to Regulate the Pipeline Facility in Violation of Federal Pipeline Safety Law, Resulting in the Celeron Agreement**

33.    During the construction of the Pipeline in the 1980s, the County adopted a third-party review and inspection process that it leveraged to hold up Celeron's construction permits and regulate the facilities in ways that were preempted by federal law, as well as to extract money from Celeron.  Celeron sued the County, alleging that its actions were inconsistent with the federal Hazardous Liquids Pipeline Safety Act (the Pipeline Safety Act's predecessor statute).

34.    The parties settled on February 8, 1988, memorialized in an agreement known as the "Celeron Agreement." (Exhibit 10.)

35.    The Celeron Agreement, noting that "the parties have disagreed as to the scope of the County's jurisdiction over interstate pipelines," and that there "are some areas that need greater clarification," stated that "[t]he Parties through this Agreement intend to resolve the review and inspection role of the County" with

8

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR
WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY
RELIEF AND DAMAGES

respect to the Pipeline. (Exhibit 10 at Recitations, p. 3.) The County acknowledged and agreed in the Celeron Agreement "that the jurisdiction of the County over an interstate pipeline is limited and partially preempted by the provisions of the federal Hazardous Liquids Pipeline Safety Act and 49 CFR Part 195," that is, the PSA's predecessor statute and its associated federal regulations, as "was specifically addressed to the Court" at several hearings. (Exhibit 10 § 2.1.)

36.    The County further conceded that it "shall have no authority over the design, construction, and operation of Celeron's interstate pipeline except as might be set forth under this Agreement . . . or as the County may be required to assert under a mandatory and enforceable state or federal law or regulation. This means clearly that the County will not require any permit to construct or operate Celeron's pipeline except as specifically set forth in this Agreement[.]" (Exhibit 10 § 2.2.) Furthermore, the County agreed that "[a]ll . . . Final Development Plan conditions required to satisfy County's concerns must be compatible and not inconsistent with his Agreement[.]" (Exhibit 10 § 2.3.)

37.    The County further agreed that if it "is taking or contemplating the taking of any action which involve Part 195 areas [(that is, covered by the PSA and its associated federal regulations)] and is not authorized under 2.5.1 above, including suspending or withholding ministerial permits, and which will stop or delay Celeron's . . . operation, the County shall immediately cease such action or contemplated action upon receipt of a written notice from Celeron stating its objection. In such case, County's action or proposed action may resume or commence only upon the County obtaining judicial sanction by order of a State or Federal Court." (Exhibit 10 § 2.5.3.)

38.    The Celeron Agreement does not define "ministerial permits." The Black's Law Dictionary contemporary with the signing of the Celeron Agreement defines "ministerial" as "[t]hat which involves obedience to instructions, but demands no special discretion, judgment, or skill." *Ministerial*, Black's Law

9

Dictionary (5th ed. 1979). Contemporaneous caselaw analyzing what constituted a "ministerial" permit under the California Environmental Quality Act contains a similar definition of ministerial. *See, e.g.*, *Adams Point Pres. Soc'y v. City of Oakland*, 192 Cal. App. 3d 203, 206 (Ct. App. 1987) ("'Ministerial' describes a governmental decision" in which "[t]he public official merely applies the law to the facts as presented," and "[a] building permit is ministerial if the ordinance requiring the permit limits the public official to determining whether," for example, "the zoning allows the structure to be built in the requested location, the structure would meet the strength requirements in the Uniform Building Code, and the applicant has paid his fee." (quoting Cal. Code Regs. tit. 14, § 15369)).

39. Additionally, in the Celeron Agreement the County agreed that, "[f]or an aid in determining what is preempted by [federal law] and what is a valid area for the County to enter based upon the terms of this Agreement it shall be presumed that the County is preempted: . . . [i]f the activity to be performed is *impliedly but not expressly specified* by Part 195 and it deals with design, construction *or operation of an interstate pipeline*." (Exhibit 10 § 3.1.2 (emphasis added).) This expands the area the County may not "enter based upon the terms of this Agreement" to include areas not expressly regulated under the PSA, but within its broad ambit of pipeline design, construction, or operation—including operator capability.

40. Finally, the Celeron Agreement confirmed that "[i]n the event of any action or proceeding required to be filed to interpret and/or enforce any provisions of this Agreement, the prevailing Party shall be entitled to receive from the other Party all damages and as costs all of its attorney fees and other costs reasonably incurred." (Exhibit 10 § 13.1.)

41. The Celeron Agreement confirms the County's understanding of its limited role under federal pipeline regulation—the Hazardous Liquid Pipeline Safety Act of 1979 (recodified as the PSA, which brought federal regulation of natural gas and liquid pipelines into one statute). The substantive provisions of the HLPSA and

10

the PSA governing hazardous liquid pipelines are materially identical, and the Celeron Agreement continues to apply to the benefit of Celeron's successors in interest, including the ExxonMobil affiliates and PPC.

42. The stated purpose of the PSA, 49 U.S.C. § 60101 *et seq.*, is "to provide adequate protection against risks to life and property posed by pipeline transportation." *Id.* § 60102(a)(1). That explicitly includes both "safely transporting hazardous liquids" and "protecting the environment." *Id.* § 60102(b)(1)(B).

43. Under the PSA, the United States Secretary of Transportation (the "Secretary of Transportation") is broadly empowered to "prescribe minimum safety standards for pipeline transportation and for pipeline facilities." *Id.* § 60102(a)(2). Those minimum safety standards apply to all pipeline facilities, interstate or intrastate, and a state may only "adopt additional or more stringent safety standards for *intrastate* pipeline[s] . . . if those standards are compatible with the minimum standards proscribed" by the Secretary of Transportation. *Id.* § 60104(c) (emphasis added). Those additional safety standards may only be adopted by "[a] State authority that has submitted a current certification" under the PSA and been approved as a state regulator. *Id.* In California, the only such entity is the California Office of the State Fire Marshal ("OSFM"). Thus, only PHMSA or OSFM may regulate the safety of any pipeline, interstate or intrastate, within California. Individual counties are wholly preempted from regulating pipeline safety under the PSA.

44. Here, on December 17, 2025, PHMSA asserted jurisdiction over the Facilities, including the oil pipeline within the SYU connecting the offshore platforms to the Las Flores Canyon oil processing facility, the POPCO Facilities (which are a mid-stream processing facility considered by PHMSA as part of a pipeline facility under the federal Pipeline Safety Act), and the Pipeline.

45. The minimum safety standards prescribed by the Secretary of Transportation "apply to the design, installation, inspection, emergency plans and

procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities," 49 U.S.C. § 60102(a)(2)(B), and "shall include a requirement that all individuals who operate and maintain pipeline facilities *shall be qualified to operate and maintain the pipeline facilities*," *id.* (a)(2)(C) (emphasis added). Both the pipeline operator and its employees must be qualified to operate in accordance with the law: "[t]he operator of a pipeline facility shall ensure that employees who operate and maintain the facility *are qualified to operate and maintain the pipeline facilities*," which means they must have the "ability to recognize and react appropriately to abnormal operating conditions that may indicate a dangerous situation or a condition exceeding design limits." *Id.* § 60102(a)(3). Accordingly, the Secretary of Transportation is empowered to "conduct . . . demonstration[] and training activities." *Id.* § 60117(a).

46.    The Secretary of Transportation further "shall prescribe minimum standards requiring an operator of a pipeline facility subject to this chapter to maintain, to the extent practicable, information related to operating the facility," including "an emergency response plan describing the operator's procedures for responding to and containing releases[.]" *Id.* § 60102(d)(5). All pipeline operators shall "conduct a risk analysis, and adopt and implement an integrity management program, for pipeline facilities." *Id.* § 60118(a)(4).

47.    The Secretary of Transportation has broad enforcement authority under the PSA to, among other things, "conduct investigations, make reports, issue subpenas [sic], conduct hearings, require the production of records, take depositions," *id.* § 60117(a), "impos[e] emergency restrictions, prohibitions, and safety measures on owners and operators of gas or hazardous liquid pipeline facilities," *id.* § 60117(p)(1), issue orders directing an operator to take certain actions to bring themselves into compliance with the PSA or the regulations issued thereunder, *id.* § 60118(b), make judgments about whether certain safety standards should be waived in individual cases, *id.* § 60118(c)(1)(A) & (2), and assess civil

12

penalties of up to $200,000 per day, *id.* § 60122(a), and criminal penalties of up to five years' imprisonment, *id.* § 60123(a).  The Secretary of Transportation further has the authority to request the United States Attorney General to bring civil actions to seek injunctive relief, punitive damages, and civil penalties.  *See id.* § 60120.

48.    After the Celeron Agreement was signed in early 1988, and in reliance on it, Celeron finished building the Pipeline and commenced operation.  The Pipeline operated in the County under the jurisdiction of the federal Pipeline and Hazardous Materials Safety Administration ("PHMSA") until 2016, when its the flow of oil was paused after a spill under a prior owner.

**Fifteen Years Later, Santa Barbara County Enacts County Code Chapter 25B**

49.    In 2001—roughly fifteen years after the first FDPs were issued and eight years after the last of the Facilities was built—the County adopted Chapter 25B.

50.    Chapter 25B applies to certain oil and gas facilities in the County, including "any facility involved in exploration, production, processing, storage or transportation of oil or gas extracted from offshore reserves." (County Code § 25B-2(1).) The County has taken the position that the Facilities fall within this definition.

51.    The stated purpose of Chapter 25B is to "ensur[e] that safe operation, adequate financial responsibility, and compliance with all applicable county laws and permits are maintained[.]" (County Code § 25B-1.)  Chapter 25B created a formal process for transferring FDPs for existing facilities to new owners, operators, and guarantors, and permit transfers are prohibited except in accordance with Chapter 25B. (County Code § 25B-4(d).) Petitioners are informed and believe that the County is the only jurisdiction in the country to have adopted such a process.

52.    In evaluating requests for Change of Owner, Operator, or Guarantor, the County is limited to reviewing application materials as of the date that the applications are deemed complete. If the County wishes to consider additional information not submitted as part of the initial applications, it must specifically

13

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

identify and request such information in an "incompleteness" letter mailed to the applicant within "thirty calendar days of receipt of the application." (County Code § 25B-8(d); *see also id.*, § 25B-10(a)(5) [compliance with County permits, safety audits, any notice of violation, and County ordinance is assessed as of "the date that the application is deemed complete."].)

53.    There is no language in the text of Chapter 25B making it retroactive or expressly applying it to already-issued permits in existence at the time the ordinance was enacted.

54.    When approving combined applications that include a Change of Owner, Operator, and Guarantor of a permitted facility under Chapter 25B, the Planning Commission must find that the proposed owner, operator, and/or guarantor is in compliance with certain criteria. The five required findings for a change of owner are in § 25B-9(a), the one required finding for a Change of Guarantor is in § 25B-9(e), and the nine required findings for Change of Operator are in § 25B-10(a). The requirements are almost entirely technical in nature and readily identifiable: e.g., whether relevant fees have been paid, *see* §§ 25B-10(a)(1); 25B-9(a)(1), whether the owner, operator, and guarantor have insurance, *see* §§ 25B-10(a)(2); 25B-9(a)(2) & (e)(1), or whether the proposed operator "has adequately performed one or more county approved emergency response plan drills," § 25B-10(a)(8).

55.    County Code § 25B-10(a)(9) "Operator Capability" requires a finding that the proposed operator:

> has the skills, training, and resources necessary to operate the permitted facility in compliance with the permit and all applicable county codes and has demonstrated the ability to comply with compliance plans listed [above]. The director shall require relevant records of compliance, and corrective actions taken subsequent to any major incidents for facilities, if any, that are similar in nature to those that are the subject of the permit, as

14

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR
WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY
RELIEF AND DAMAGES

may be necessary to make findings.  These records shall be used to provide sufficient assurance that the proposed operator does not reflect a record of non-compliant or unsafe operations systemic in nature for similar facilities to those being considered for operatorship.

(County Code § 25B-10(a)(9).)

56.    Chapter 25B's potential penalties are broad: "any owner, operator, guarantor, or permittee who fails to comply . . . is subject to a civil penalty" of up to $25,000 per day, and "[a]ny person, whether as principal, agent, employee, or otherwise," is subject to criminal penalties of up to $25,000 and six months in jail per day.  (County Code § 25B-13 (emphasis added)).  Additionally, the district attorney is explicitly empowered to seek an injunction against any action that "any person has engaged in, is engaged in, or about to engage in" that would violate Chapter 25B, without having to show irreparable harm or the inadequacy of legal remedies.  (County Code § 25B-13.).  The County has not disclaimed using its enforcement authority with respect to the Facilities.

**Despite the Nominal Breadth of Chapter 25B, the County Reaffirms its Limited Role in the 2023 ExxonMobil Transfer**

57.    Despite the potential breadth of Chapter 25B's "Operator Capability" provision and its encroachment on federal law, the County's past practice has been to interpret the County Code as limited, ministerial, and in harmony with federal law and the Celeron Agreement to avoid confirming the ordinance's invalidity.  Indeed, until this case, the County has never refused to transfer an FDP under Chapter 25B.

58.    As explained above, ExxonMobil and its affiliates were the original holders of the FDPs for the SYU and POPCO; neither of those Facilities was previously subject to the Chapter 25B transfer process.

59.    In 2023, the County processed transfers of the Pipeline FDPs from their former owner, operator, and guarantor, Plains Pipeline, L.P., to ExxonMobil and its affiliates.

15

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

60. In 2023, as in the transfer at issue here, the Planning Commission approved the permit transfer. (*See* 2023 Planning Commission Action Letter, dated Jun. 16, 2023, Attachment A - Findings of Approval, attached hereto as **Exhibit 3**.) And, again as in the transfer at issue here, various interested parties appealed that approval to the Board of Supervisors, arguing that the prior owner was "not in compliance with existing permit conditions," citing the alleged failure "to install and operate a functional cathodic protection system," and alleged maintenance failures related to the 2015 oil spill.

61. Yet, in accordance with the limitations to its jurisdiction agreed to in the Celeron Agreement and embodied in federal law, the Board rejected this argument and found that the prior owner was "in compliance with all requirements of the FDP Permit." (Board Agenda Letter for a Change of Owner, Operator, and Guarantor for the Las Flores Pipeline System, dated Sept. 19, 2023, Attachment A – Findings of Approval attached hereto as **Exhibit 5** [2023 Findings of Approval], p. 161.) (*See also* Board Agenda Letter for a Change of Owner, Operator, and Guarantor for the Las Flores Pipeline System, dated Sept. 19, 2023, attached hereto as **Exhibit 4** [2023 Board Letter], p. 151.) Accordingly, on September 19, 2023, the Board denied the appeal and affirmed the Planning Commission's determination approving the requested Change of Owner, Guarantor, and Operator for the Pipeline. (Board Minute Order, dated Sept. 19, 2023, attached hereto as **Exhibit 6**.)

62. Board Members noted in approving the transfer that "[t]his change of ownership is an administrative action" that is "not about the integrity of the pipeline, [but] is really about the integrity of making sure that our County permit actually matches the company that owns the pipeline, and that's important." Other Board Members noted that "we live in a society of laws and we have a responsibility to uphold those laws," regardless of what any individual might "emotionally . . . want." (Hearing Transcript excerpt of the Santa Barbara County Board of Supervisors Hearing, September 19, 2023 Meeting, attached as **Exhibit 7**, pp. 52-53.). This

16

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR
WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY
RELIEF AND DAMAGES

language, along with the approval, reinforced the belief that—notwithstanding the potentially broad scope of the operator provision in Chapter 25B as written—the County recognized its limited jurisdiction under federal law and the Celeron Agreement and was committed to applying Chapter 25B as an administrative statute rather than attempt to assert regulatory power over a pipeline's operation. The 2023 transfer process further supports the conclusion that because the transfer was "an administrative action," the FDPs were "ministerial permits" within the meaning of the Celeron Agreement.

**In 2024, the Planning Commission Approves Sable's Chapter 25B Applications, but Intervenors Appeal and Advance an Unprecedently Sweeping View of Chapter 25B**

63.    On February 14, 2024, Sable acquired from MPPC and ExxonMobil full ownership of MPPC's and ExxonMobil's subsidiary companies PPC and POPCO, owners of the Pipeline and POPCO Facilities, respectively. Sable also acquired the SYU directly from ExxonMobil.

64.    In compliance with Chapter 25B, Sable thereafter submitted applications to the County to authorize the Change of Owner, Operator, and Guarantor for the Facilities. Because ownership of the Pipeline and POPCO Facility did not change, the County processed applications only for Change of Operator and Guarantor for those facilities.

65.    On July 30, 2024, County staff determined the applications to be complete.

66.    After a monthslong, diligent review of the submitted materials, County staff concluded that the applications were fully compliant with Chapter 25B, and recommended that the Planning Commission approve the Transfers. (Staff Report for a Change of Owner, Operator, and Guarantor for the Santa Ynez Unit, POPCO Gas Plant, and Las Flores Pipeline System, dated Oct. 22, 2024, attached hereto as **Exhibit 1**, pp. 65-66.) As part of this process, County staff prepared a detailed

17

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR
WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY
RELIEF AND DAMAGES

analysis of consistency with the Chapter 25B requirements and presented draft findings, ultimately adopted by the Planning Commission, going through each and every requirement of Chapter 25B and demonstrating that each requirement was fully satisfied. These findings included—consistent with the 2023 transfer determinations—that the prior owners were in compliance with the FDPs, as well as confirming that the permit transfer process is administrative and does not constitute a project under CEQA.

67. The Planning Commission took up the matter at a lengthy and thorough hearing—lasting approximately six hours—on October 30, 2024. At the close of that hearing, the Planning Commission made the required findings and approved the Transfers by a vote of 3-to-1. (Planning Commission Approval of Change of Owner, Operator, and Guarantor for the Santa Ynez Unit, POPCO Gas Plant, and Las Flores Pipeline System Final Development Plan Permits, dated November 4, 2024, attached hereto as **Exhibit 8**, pp. 1-2.)

68. Specifically, consistent with County staff's detailed review and recommendations, the Planning Commission made required findings related to:

- <u>Fees and Exactions</u> (County Code §§ 25B-9(a)(1), 25B-10(a)(1)) – determining that "the requirements of this finding are satisfied" and that there are "no outstanding payments" due for the Facilities. (*Id.*, pp. 178, 180, 184, 187.)

- <u>Financial Guarantees</u> (County Code §§ 25B-9(a)(2), 25B-9(e)(1), 25B-10(a)(2)) – determining that all previously required bonds and endowments under the FDPs have been satisfied, and that the only other County-imposed financial obligations would be triggered solely at the time of permanent closure of the respective Facilities. (*Id.*, pp. 178-79, 180-81, 183-84.)

- <u>Acceptance of Permit</u> (County Code §§ 25B-9(a)(3), 25B-10(a)(3)) – determining that the requirements of this finding were satisfied. (*Id.*,

18

pp. 179, 181, 184, 187.)

- Safety Audit (County Code §§ 25B-9(a)(4), 25B-10(a)(4)) – determining that this finding had been satisfied and that copies of the necessary audit information had been provided to Sable as the new owner/operator. (*Id.*, pp. 179, 181, 184-85, 187-88.) Related to the SYU and POPCO, the Planning Commission determined that the County's Systems Safety & Reliability Review Committee had deferred annual audits until the Pipeline restarted operations. (*Id.*, p. 179.) Related to the Pipeline, the Planning Commission noted that the 1988 Settlement Agreement between the County and Celeron/All American "determined that the County does not have the jurisdiction to regulate any aspect of the design, construction, or operation of the pipeline." (*Id.*, p. 188.) While no County-conducted safety audits are required for the Pipeline, safety audit information from PHMSA and OSFM from 2018 to 2023 were provided to the County and Sable. (*Ibid.*)

- Compliance with Existing Permit Requirements (County Code §§ 25B-9(a)(5), 25B-10(a)(5)) – determining that this requirement had been satisfied, as the owner/operator "is in compliance with all requirements of the FDP" and "[n]o notices of violation had been issued" by the County. (*Id.*, pp. 180, 181, 185, 188.)

- Compliance Plans (County Code § 25B-10(a)(6)) – determining that this requirement had been satisfied and that "all relevant compliance plans have been updated with the current emergency contact information" for Sable as required by the County Code. (*Id.*, pp. 181-82, 185, 188.)

- Transitional Plans (County Code § 25B-10(a)(7)) – determining that Sable had submitted comprehensive transition plans on October 22,

19

2024, and that this requirement was satisfied. (*Id.*, pp. 182, 185, 189.)

- Emergency Response Plan Drills (County Code § 25B-10(a)(8)) – determining that this requirement was satisfied, and that Sable had conducted emergency response drills for the Facilities. (*Id.*, pp. 182, 186, 189.)

- Operator Capability (County Code § 25B-10(a)(9)) – determining that this requirement had been satisfied, citing the extensive subject matter expertise of Sable's management team, experience of the on-site operations team, and that the team has had "zero major incidents involving crude oil and gas facilities within the U.S." while managing facilities between 2009 and 2021. (*Id.*, pp. 182-83, 186, 189-90.)

69. Because the Planning Commission determined that all of the requirements of Chapter 25B had been met, the County Code compelled the Transfers.

70. On November 5, 2024, the Center for Biological Diversity and Wishtoyo Foundation ("CBD Appellants") filed an appeal of the Planning Commission's October 30, 2024 decision to the Board (the "CBD Appeal").

71. On November 7, 2024, the Environmental Defense Center, Get Oil Out!, and Santa Barbara County Action Network ("EDC Appellants") (together with the CBD Appellants, "Appellants") filed a separate appeal (the "EDC Appeal," and together with the CBD Appeal, the "Appeals").

72. The Appeals urged the Board to adopt an expansive interpretation of Chapter 25B contrary to its interpretation the year prior during the 2023 transfers. The Appeals urged the Board to undertake a comprehensive audit of Sable's finances, require hundreds of millions of dollars in new bonds, require new environmental review for the fully-permitted Facilities despite such review not being authorized by the FDPs, and—crucially—judge whether Sable was, in the Board's estimation, a sufficiently safe operator of the Facilities, including the Pipeline.

20

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR
WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY
RELIEF AND DAMAGES

73. On February 20, 2025, County staff issued a Board letter ("February 2025 Staff Report," attached hereto as **Exhibit 2**) and presentation, recommending the Board deny these Appeals in their entirety. In the supporting February 2025 Staff Report, County staff confirmed that the scope of Chapter 25B was narrow and did not authorize the County to undertake the expansive demands urged by Appellants. This reading was consistent with the Parties' long understanding of the County's role memorialized in the Celeron Agreement, federal law, and the recent 2023 transfer.

74. Prior to the Board's hearing related to the Transfers, both Petitioners and Appellants filed letters in support of their respective positions. Sable also submitted evidence from the administrative record before the Planning Commission demonstrating its full compliance with Chapter 25B. Appellants, on the other hand, submitted hundreds of pages of materials focused on issues entirely outside the scope of Chapter 25B and undisputedly preempted by the PSA, such as their claim that a restart of oil operations at the Facilities creates environmental and safety risks.

### In February 2025, the Board Fails to Approve or Deny the Transfers, and Petitioners Sue for a Writ of Mandate, Which This Court Issues

75. On February 25, 2025, the Board held a public hearing on both Appeals. Appellants urged the Board to exceed its power by granting the Appeals and denying the Planning Commission's approval of the Transfers. The Board's role is solely to review and "affirm, deny, or modify" the Planning Commission's decision. Unlike the Planning Commission, the Board is not authorized to take independent action on Chapter 25B permit transfers; it acts only as a reviewing body.[2]

76. At the hearing on the Appeals, Supervisor Joan Hartmann recused herself from the proceedings, due to a longstanding conflict of interest because of

---

[2] Petitioners acknowledge that this Court, in its Order re Cross Motions for Summary Judgment, concluded that the Board's review is "not one strictly of an appellate nature." Dkt. 52. The ongoing inclusion of this allegation and similar allegations by Petitioners is intended to avoid waiver.

21

the close proximity of the Pipeline property to her real property. Supervisor Hartmann's recusal left only four of the five supervisors present to consider and act on the Appeals. After an approximately seven-hour hearing and deliberation, the remaining four supervisors split the vote on a motion to deny the Appeals, two votes to two votes.

77.    As the Board cannot act without three votes,[3] the split vote resulted in Appellants failing to carry their burden to overturn the Planning Commission's approval and accordingly no action being taken by the Board on the Appeals.

78.    On April 11, 2025, Sable sent the Director of Planning and Development a letter requesting that the County transfer the FDPs and noting that it might need to seek writ relief if the County failed to act. (Letter to L. Plowman re: Change of Owner, Operator, and Guarantor for the Santa Ynez Unit, POPCO Gas Plant, and Las Flores Pipeline System Final Development Plan Permits, dated Apr. 11, 2025, attached hereto as **Exhibit 9**.)

79.    At its April 16, 2025 meeting, the Board went into closed session to discuss Sable's letter, but at the conclusion of the closed session, the Board noted that no reportable action was taken. Accordingly, on May 8, 2025, Petitioners subsequently filed this case against the County and Board alleging, among other claims, that the County failed to comply with Chapter 25B by failing to act on the Appeals. On September 12, 2025, following a hearing on cross-motions for summary judgment, the Court issued a peremptory writ of mandate ordering the Board to hold a new hearing to affirm, reverse, or modify the Planning Commission's decision in compliance with Chapter 25B. (Order re Cross-Motions for Summary Judgment, Dkt. 52, pp. 24, 25 n. 17.)

---

[3] *See* Procedural Rules Governing Planning, Zoning and Subdivision Hearings Before the Board of Supervisors and Planning Commission (Santa Barbara County Res. No. 91-333), Sec. IV.1 ("Any action taken by the Board of Supervisors must be by a majority of the Board of Supervisors. An abstention shall not be counted as an affirmative vote on the motion.").

## In November 2025, the Board Adopts Intervenors' Unprecedentedly Broad Interpretation of Chapter 25B

80.    The Board of Supervisors held a new hearing on the Appeals on November 4, 2025.

81.    Prior to the November 4, 2025 hearing, on October 30, 2025, Sable submitted letters to Chair Capps, Supervisor Hartmann, the Board, and County counsel requesting that Chair Capps and Supervisor Hartmann recuse themselves from the hearing based on due process concerns: in a June 6, 2025, interview, Chair Capps discussed her opposition to anything that she viewed as potentially facilitating Pipeline restart, and stated that in 2023 "I voted against [installation of state-mandated upgraded valves on the pipeline] *because it was a way to restart the pipeline*." (*See* Chair Capps Recusal Letter (October 30, 2025).  Likewise, and as she previously acknowledged,[4] Supervisor Hartmann has a conflict of interest arising from the proximity of the Pipeline's property to her real property.  (*See* Supervisor Hartmann Recusal Letter (October 30, 2025); Supervisor Hartmann Recusal Letter (December 3, 2025).)

82.    Despite this, Supervisor Hartmann declined to recuse herself from the November 4, 2025 hearing on the Appeals.  During the November 4, 2025 hearing, she was an active participant and advocated for a wide-ranging interpretation of Chapter 25B based on her interpretation of "the plain reading of the ordinance" as opposed to Chapter 25B's interaction with federal law and the Celeron Agreement, concluding that "I guess it's a difference of interpretation."  Supervisor Hartmann stated that she thought "a culture of responsibility and safety . . . is very much a County responsibility" and that "*we as a County have a duty as local government to protect . . . safety, . . . [a]nd that's what 25B does*."  During the hearing,

---

[4] Emails between Supervisor Hartmann and her staff and various constituents in advance of the *February* 2025 Board hearing, explain that the Pipeline runs through or grazes Supervisor Hartmann's property and that she must recuse herself as a result of the conflict of interest.

Supervisor Hartmann told County staff to "stop there" after they noted that violations pursued by California state agencies "are not necessarily related to Sable's ability to ensure the facilities are *safe for operation*."  After the close of the public hearing, Supervisor Hartmann advanced a sweeping view of the County's authority, stating, "*I don't think that [the County's alleged] responsibility is preempted by other legislation.*"  Supervisor Hartmann also urged the Board to deny the transfers because "it helps to keep Exxon on the hook, both for spill and for abandonment if necessary."

83.    Chair Capps also declined to recuse herself and likewise advocated for an overly broad interpretation of Chapter 25B.

84.    Supervisor Lavagnino likewise stated that he would "be supporting the appeal" because "if they [Sable] have the skills, training, and resources *to operate safely, they certainly have not yet demonstrated that to me*."

85.    The Supervisors made numerous other statements, both at the hearing and outside the hearing, suggesting their decision to deny the Transfers was predetermined and/or pretextual, based on their overall opposition to oil or to Sable, rather than good-faith compliance with Chapter 25B.

86.    With Chair Capps and Supervisor Hartmann's participation, the supervisors voted 4-to-1 to continue the hearing to December 16, 2025, with direction to County staff to "return with findings to approve the Appeal and deny the Change of Owner, Operator, and Guarantor."

**In December 2025, the Board Denies All Transfers Based Only on a Conclusion That Sable Would Not Be a "Safe Operator"**

87.    In an effort to align with the Board's desired outcome, and ahead of the continued December 16, 2025 Board meeting, County staff prepared another set of findings, which, for the first time, recommended denial of the Transfers ("December Findings").

88.    At the start of the continued hearing, Supervisor Hartmann once again

24

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR
WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY
RELIEF AND DAMAGES

recused herself after Sable submitted another letter requesting that she do so, and after she received updated guidance from the FPPC indicated that the Pipeline was nine feet from her property line. Neither Supervisor Hartmann, County counsel, nor any other Board member addressed her participation in the November portion of the hearing, including the fact that she was the first to suggest that County staff prepare findings of denial, that she provided the second vote on the motion to direct staff to prepare findings of denial, and that she participated in the final vote to direct staff to prepare findings of denial and continue the hearing.

89. At the conclusion of the December 16 hearing, as memorialized in its December 23, 2025 Board Action Letter ("December 2025 Board Action Letter"), the County states that the Board voted "3 to 1" to: "1. Approve the appeals, . . .; 2. Make the required findings for denial of the Change of Owner, Operator, and Guarantor for the respective [Facilities'] FDP permits; 3. Determine that the denial of the requests is exempt from CEQA . . . ; and 4. Deny the Change of Owner, Operator, and Guarantor for the respective [Facilities] FDP Permits." The letter also states, "The attached findings reflect the Board of Supervisors actions of December 16, 2025." Thus, the Board adopted the December Findings in full.

90. The December Findings, however, are fatally flawed for multiple reasons.

91. **Failure to Make Required Findings.** First, the December Findings failed to present evidence of or make any of the required findings sufficient to sustain denial of the permit transfers for Change of Guarantor or Change of Owner. The December Findings include no discussion of the one finding required for a Change of Guarantor under Section 25B-9(e), the five individual findings applicable to the separate request for Change of Owner under Section 25B-9(a), or eight of the nine individual findings for the applications for a Change of Operator under Section 25B-10(a).

92. Instead, the December Findings are expressly limited to a single

25

finding: the "Operator Capability" finding, which asks whether the proposed operator "has the skills, training, and resources necessary to operate the permitted facility in compliance with the permit and all applicable county codes and" that there is "sufficient assurance that the proposed operator does not reflect a record of non-compliant or unsafe operations systemic in nature for similar facilities to those being considered for operatorship." (County Code § 25B-10(a)(9)).

93. The December Findings thus present no evidence to support the denial of the application for a Change of Owner for the SYU or the denial of the applications for the Change of Guarantor for all three Facilities. Indeed, they cite no record evidence at all supporting their conclusions with respect to the POPCO Facilities, yet they still held that the Operator Capability finding cannot be met for the POPCO Facilities.

94. Although the December Findings assert that "all applications are denied" on the basis that the Operator Capability finding allegedly cannot be made, the Change of Guarantor and Change of Owner applications do not require an "Operator Capability" finding. Thus, the December Findings contravene this Court's direction that the Board's action be "in compliance with the requirements of Chapter 25B—an affirmance, reversal, or modification tethered to the factual findings under Chapter 25B-8, 9, and 10." (Order re Cross-Motions for Summary Judgment, Dkt. 52, pp. 23-24.)

95. **Preemption Under the PSA.** The Operator Capability is additionally fatally flawed in two ways: it rests entirely on a finding the County is not authorized to make under federal law, and it is based on evidence that the County is not authorized to consider by the terms of Chapter 25B itself.

96. As to federal law, the Operator Capability finding is wholly preempted by the Pipeline Safety Act. (*See supra* ¶¶ 42-27).

97. Under § 25B-10(a)(9) "Operator Capability," the County asserts that it could and did determine that Sable lacks "the skills, training, and resources

26

necessary to operate the permitted facility," because it allegedly has "a record of non-compliant or unsafe operations." (County Code § 25B-10(a)(9).) However, PHMSA has exclusive authority to determine that a pipeline operator is "qualified to operate and maintain the pipeline facilities," 49 U.S.C. § 60102(a)(2)(C), determined based on the operator's compliance with regulations governing "the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of [the relevant] pipeline facilities," *id.*(a)(2)(B).

98.    The December Findings assert that Sable "reflects a record of *non-compliant or unsafe operations* systemic in nature for the Facilities." (Emphasis added.) That finding—that Sable allegedly cannot operate the Facilities in a "safe" manner "compliant" with the law—is the sole basis for the denial of all three Transfers. But, as explained above, the County is not authorized to make a finding about whether Sable is a "safe" operator based on that finding, nor is it authorized to consider whether Sable has the "skills, training, and resources" to operate the Facilities in a safe manner. (County Code § 25B-10(a)(9)). The County is preempted.

99.    Moreover, PHMSA—the sole federal authority empowered to make such determinations—had already approved Sable for operation of the Facilities after finding that it would be a safe operator and is acting in compliance with the law. (*See* December 22, 2025 "Approval of Sable Offshore Corp.'s Restart Plan for the Las Flores Pipeline System Line CA-324 and Line CA-325," attached hereto as **Exhibit 11**). PHMSA also issued two Special Permits—an emergency Special Permit (PHMSA docket number PHMSA-2025-1502) and a regular Special Permit (PHMSA docket number PHMSA-2026-0464)—authorizing Sable to operate the Pipeline consistent with the conditions imposed therein.

100.    Applying Chapter 25B to permit the County to assess operator capability is also preempted by PHMSA's enforcement authority. Chapter 25B,

27

§ 25B-13 purports to give the County authority to seek a judicial order shutting down operation of the Facilities as well as civil fees and criminal penalties against the operator.  But the PSA only gives those authorities exclusively to PHMSA or its delegate. *See* 49 U.S.C. § 60117(p)(1) (authority to order emergency shutdowns), *id.* § 60118(b) (authority to order compliance with the PSA and its regulations), and *id.* §§ 60120; 60122(a); 60123(a) (authority to assess civil and criminal penalties.)  Nor does the County have delegated authority from PHMSA to implement these authorities pursuant to 49 U.S.C. 49 U.S.C. § 60105.

101.    **What the County May Consider Under Chapter 25B**.  The Board's operator finding is also inconsistent with the language of Chapter 25B itself.  By its terms, the operator finding is limited to considering operation of the facility "in compliance with the permit and all applicable county codes and [whether the operator] has demonstrated the ability to comply with compliance plans listed in section 25B-10.1.f."  The chapter specifies that in evaluating this, the director shall "require relevant records of compliance, and corrective actions taken subsequent to any major incidents[5] for facilities, if any, that are similar in nature to those that are the subject of the permit, as may be necessary to make findings. These records shall be used to provide sufficient assurance that the proposed operator does not reflect a record of non-compliant or unsafe operations systemic in nature for similar facilities to those being considered for operatorship."

---

[5] "Major Incident" is a defined term: "any accident that results in one or more of the following:

(1) An oil spill of fifty barrels or more, not including associated water, that escapes any device designed for spill containment and enters the environment;

(2) one or more fatalities or serious injuries that require significant medical intervention to members of the public who were situated outside the facility's premises when the incident occurred;

(3) evacuation of people outside the boundaries of the facility from which the release occurred; and

a fire offsite or that spread offsite." (County Code § 25B-3.)

28

102.  The December Findings fail to identify a single instance of non-compliance with the County Code, the FDPs, or the relevant Compliance Plans, nor do they identify any Major Incidents at similar facilities.  Instead, the December Findings rely on various allegations made by state and regional agencies in connection with separate proceedings and regulatory regimes that are outside the County's jurisdiction.  The December Findings also rely on allegations that relate to events that transpired *after* the County deemed the Transfer applications complete on July 30, 2024, which are outside the scope of the Board's review.  Additionally, they cite to irrelevant, conclusory, and unfounded claims as purported evidence.  For example, the December Findings:

- Cite conclusory allegations that certain activities required prior clearance from the County's Systems Safety and Reliability Review Committee, per SYU FDP Permit Condition XI-2.a.  However, no such requirement exists in Condition XI-2.a.

- Assert that Sable "started moving oil from the platforms to the onshore SYU prior to formally notifying the County," without identifying any requirement for such notification, and despite the fact that Sable communicated its intentions to the County's petroleum engineering consultant on multiple occasions.

- Make the unfounded claim that Sable should have submitted Zoning Clearance applications prior to Sable's initiation of the anomaly repair work on the Pipeline, despite the fact that the County expressly confirmed to Sable in a February 12, 2025 letter that no such Zoning Clearance was required

103.  The December Findings thus fail to comport with Chapter 25B or justify denial of the transfers even absent federal preemption.

104.  Further, to the extent the County alleges that Chapter 25B permits the Board to consider anything and everything that it might consider relevant to operator capability, the ordinance is unconstitutionally vague, as it does not provide a

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR
WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY
RELIEF AND DAMAGES

potential operator with the required information needed to assess whether or not it is in compliance with the ordinance, or what it needs to do to come into compliance with the ordinance.

## FIRST CAUSE OF ACTION

### Writ of Mandate – Abuse of Discretion

### (Cal. Code Civ. Proc. § 1094.5)

105.   Petitioners allege and incorporate by reference each and every of the above allegations.

106.   Because Chapter 25B is necessarily narrow, the Board abused its discretion by refusing to deny the Appeals and uphold the Planning Commission's determination based on the record before it.   The Board adopted the December Findings even though they are not supported by the record, and the December Findings, even if they were supported by the record, do not support the Board's decision to deny the Transfers as they are based on materials outside the County's jurisdiction and outside the scope of Chapter 25B.   In voting to adopt the December Findings and uphold the Appeals, the Board acted arbitrarily and in a capricious manner, without evidentiary support, and contrary to law.

107.   Sable complied with all County Code requirements and obtained the required approvals from the Planning Commission.   County staff provided the Board with a detailed analysis of each of the points raised by the Appellants and confirmed that the Transfers fully comply with Chapter 25B.   As County staff confirmed in its February 2025 Staff Report to the Board, the requirements of Chapter 25B are so narrow in scope that the Board lacked legitimate discretion to grant the Appeals and deny the Transfers.   Still, the Board voted to uphold the Appeals and reverse the Planning Commission's determination, adopting the December Findings that are not supported by the record and do not support a decision to deny Sable's applications for Change of Owner, Change of Operator, and Change of Guarantor.

108.   In addition, members of the Board publicly indicated their intent to

30

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR
WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY
RELIEF AND DAMAGES

ignore the requirements of Chapter 25B and to instead deny the Transfers for policy-based reasons having nothing to do with the Chapter's requirements. At the February 25, 2025 hearing, Supervisor Lee indicated that he was opposed to the restart of operations even with full compliance with the FDPs. And Chair Capps stated that she found Sable's purchase of the Facilities "fishy" and faulted Sable for failing to provide documents that were neither required by Chapter 25B nor requested by the County. At the November hearing, Supervisor Hartmann claimed that there was an "SEC complaint" against Sable, which was not true. She also stated that she was "very concerned about bankruptcies," citing "articles" that show that "[bankruptcies] are very common in the energy sector." At the November hearing, Chair Capps explained that she "really was concerned about the fact that the company existed due to a loan from the company that had sold it." Chair Capps repeated this concern at the December hearing, in addition to asserting that she had "unresolved financial concerns." At the November Hearing, Supervisor Lavagnino cited various press articles that he read, "fallout" from press coverage, Sable's stock price, and unadjudicated allegations made in a complaint filed by the County District Attorney. All of these purported concerns are beyond the scope of the Board's review under Chapter 25B.

109. The Board adopted no findings related to the requests for Change of Guarantor. (County Code § 25B-9(e)(1); ¶¶ 91-92, *supra*.) Accordingly, the December Findings fail to articulate any basis to contravene County staff's prior determination or to reverse the Planning Commission's findings that Sable meets the requirements for a Change of Guarantor for all three Facilities. Likewise, the December Findings fail to identify any evidence relevant to the required finding for Change of Guarantor requests, as none was made here. Thus, the Board's decision to deny the Change of Guarantor for the three Facilities is not supported by the December Findings, and the December Findings themselves are not supported by the record.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

110.    Similarly, the Board adopted no findings related to the request for Change of Owner, meaning the December Findings fail to articulate any basis to contravene County staff's prior determination or to reverse the Planning Commission's findings that Sable meets the requirements for a Change of Owner for the SYU.  (County Code § 25B-9(a)(1)-(5); ¶¶ 91-92, *supra*.)  Likewise, the December Findings fail to identify any evidence with respect to the required findings for the Change of Owner requests, as none were made here.  Therefore, the decision to deny the application for the Change of Owner for the SYU is not supported by the December Findings, and the December Findings themselves are not supported by the record.

111.    The Board also adopted no findings for eight of the nine requirements for a Change of Operator.  (County Code § 25B-10(a)(1)-(9).)  The Board's December Findings addressed only a single requirement, the Operator Capability finding, which is limited to applications for a Change of Operator.  (County Code § 25B-10(a)(9); ¶¶ 15, 91-93, *supra.*)  The December Findings contend that Sable does not meet the Operator Capability finding by relying on irrelevant, extra-jurisdictional, and extra-statutory rationales.  (*See* ¶¶ 92-94, *supra*.)  All of the purported evidence cited by the December Findings is unmoored from the applicable Chapter 25B requirements and from the substance of Sable's applications, which County staff deemed complete on July 30, 2024.  Further, the Operator Capability finding is wholly preempted with respect to all three Facilities, meaning this finding cannot apply to the Facilities at all (*see* ¶¶ 42-45, 58, *supra*).  Further, the December Findings raise no arguments at all with respect to the POPCO Facilities (*see supra* ¶ 93).  Thus, the Operator Capability finding is not supported by the record, and the decision to deny the applications for a Change of Operator for the three Facilities is not supported by the December Findings.

112.    The Board adopted the December Findings and denied the Transfers, but as the record demonstrates, Sable's applications satisfied all Chapter 25B

32

requirements, and Petitioners have proceeded as required by law. The December Findings fail to articulate any basis upon which to reverse the Planning Commission's findings with respect to the requirements for a Change of Guarantor for all three Facilities, the five requirements for a Change of Owner for the SYU, and eight of the nine requirements for a Change of Operator for the three Facilities. Likewise, the December Findings present no evidence with respect to those requirements. The Board's singular finding to support the denial of the Change of Operator is not supported by the record. Thus, the Board abused its discretion in adopting the December Findings, upholding the Appeals, and denying the Planning Commission's approval of the Transfers.

113. The County's refusal to transfer the FDPs unlawfully denies the ExxonMobil affiliates the right to relieve themselves of the burden of County permits for Facilities they no longer own or operate, deprives Sable of rights legally acquired under the FDPs, and subjects Petitioners to substantial financial harm.

114. For the foregoing reasons, the County has failed to proceed in accordance with the law, and Petitioners are entitled to issuance of a writ of mandate vacating the December 16, 2025 action and directing the County to issue the updated FDPs or directing alternative relief as appropriate and proper.

## SECOND CAUSE OF ACTION

### Writ of Mandate – Failure to Provide a Fair Hearing

### (Cal. Code Civ. Proc. § 1094.5)

115. Petitioners allege and incorporate by reference each and every of the above allegations.

116. The Board failed to provide Petitioners with a fair hearing because Chair Capps did not recuse herself from the November 4, 2025 and December 16, 2025 hearings, yet her documented bias against Sable, ExxonMobil, and the Facilities means that she cannot act as an impartial, noninvolved reviewer. Moreover, Supervisor Hartmann's involvement and participation in the November

33

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

4, 2025 hearing, which was continued to December 16, 2025, compromised the integrity of the proceedings due to her bias against Sable, ExxonMobil, and the fossil fuel industry, and her material, longstanding conflict of interest.

117. Chair Capps has a substantial record of bias against Sable, ExxonMobil, and the use of the Facilities, and she has made numerous public comments indicating her willingness to disregard the merits of applications involving the Pipeline as a means to achieve her broader improper goal of blocking its future use.

118. Despite this bias, Chair Capps participated in and influenced the hearings on November 4, 2025 and December 16, 2025 by focusing the Board's discussion on issues outside the scope of Chapter 25B. For instance, during the hearings on November 4 and December 16, she asked numerous questions about Sable's insurance policies, documentation that is not required under Chapter 25B, and expressed an irrelevant concern that "the company existed due to a loan from [ExxonMobil]." (*See* ¶¶ 81-86, *supra*.)

119. She also expressed her bias against Sable and ExxonMobil, asserting that ExxonMobil "mischaracter[ized]" the Operator Capability finding requirements and asking the Appellants—not Sable—to "characterize [Sable's] skills."

120. In advance of the November 4, 2025 hearing, Sable sent a letter to Chair Capps, the Board, and County counsel requesting that she recuse herself from the proceedings involving the Transfers due to her bias. She has refused. Chair Capps' participation means that Petitioners were denied a fair hearing.

121. Supervisor Hartmann has made numerous public statements demonstrating her bias against Sable, ExxonMobil, and the fossil fuel industry. Moreover, she has a longstanding disqualifying, material financial conflict of interest under the Political Reform Act because of the close proximity of her real property to the Pipeline. (*See supra* ¶¶ 76, 81-82.) Yet despite her documented bias and this material conflict of interest, she failed to recuse herself from the hearing on

34

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR
WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY
RELIEF AND DAMAGES

November 4, 2025 and instead participated in and influenced the proceedings. (*See supra* ¶¶ 91-95.) At the November 4, 2025 hearing, she asked numerous questions related to the potential of a spill, reflecting her unique interest as a property owner along the Pipeline, and repeatedly sought confirmation that insurance would cover all damages from a potential spill. (*See supra* ¶¶ 81-82.)

122. Supervisor Hartmann also influenced the proceedings by advocating for her expansive interpretation of Chapter 25B and interrupting County staff during key explanations. (*See* ¶ 82, *supra*.)

123. During the Board's deliberations, Supervisor Hartmann also influenced the discussion by making an unfounded allegation that "there is an SEC complaint" against Sable when no such complaint exists.

124. At the November 4, 2025 hearing, Supervisor Hartmann actively opposed the Transfers and seconded the motion to continue the hearing to December 16, 2025 with direction to County staff to return with findings to support denial, and participated in the vote to direct staff to prepare findings to support denial and continue the hearing. (*See supra* ¶ 82.)

125. In advance of the December 16, 2025 hearing, Sable sent a letter to Supervisor Hartman, the Board, and County counsel to again request that she recuse herself due to the longtime disqualifying, material conflict of interest as a result of the close proximity of her real property to the Pipeline. (*See* ¶ 81, *supra*.)

126. At the December 16 hearing, Supervisor Hartmann recused herself. Yet without acknowledging Supervisor Hartmann's influence and participation in the November 4, 2025 hearing, the remaining supervisors continued with the hearing and, after public comments and deliberation, voted 3-to-1 to deny the Transfers.

127. While she recused herself in December, the hearing on December 16, 2025 was continued from the November 4, 2025 hearing, where she participated extensively. Instead of acknowledging that Supervisor Hartmann's participation improperly influenced the proceedings during the November 4, 2025 hearing,

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

initiating an action to cure the error, and/or re-voting on the item from the November hearing agenda, the remaining supervisors moved forward with the continued hearing.  Petitioners were denied a fair hearing.

128.  For the foregoing reasons, the County has failed to proceed in accordance with the law, and Petitioners are entitled to issuance of a writ of mandate vacating the Board's actions on November 4, 2025 and December 16, 2025 and mandating that the Board hold a new, fair hearing in compliance with the narrow requirements of Chapter 25B.

## THIRD CAUSE OF ACTION

**Writ of Mandate – Failure to Comply with County Code Chapter 25B By**

**Failing to Deny the Appeals and Effectuate the Transfers**

**(Cal. Code Civ. Proc. § 1085)**

129.  Approval under Chapter 25B is compulsory if the requirements have been met: "upon making the findings listed in" the ordinance, the decision-making body "*shall* approve the change" of Operator, Owner, or Guarantor.  Given that each of the required findings for change of Owner, Operator and Guarantor involve ministerial criteria, which have been met, or are fully preempted as applied to the Facilities and outside the County's jurisdiction, the approval of the Transfers and disposition of any appeals is mandatory.

130.  If an appeal to the Planning Commission's determination is filed, Chapter 25B requires the Board to "affirm, reverse, or modify the planning commission's decision." (County Code § 25B-12(b)(2).)

131.  County staff repeatedly furnished the Board with detailed information demonstrating that the Transfers comply with all relevant ministerial requirements under Chapter 25B, and the Board was required by law to deny the Appeals and affirm the Planning Commission's determination.

132.  The Board's review is cabined by the same set of required findings applicable to Planning Commission review of the requests for Change of Owner,

36

L A T H A M & W A T K I N S LLP
ATTORNEYS AT LAW
LOS ANGELES

Operator, and Guarantor, which are ministerial criteria that, once satisfied, give rise to the County's mandatory duty to approve the requests and deny any appeals.

133. According to the Board's December Findings, the *only* finding which it allegedly could not make is the Operator Capability finding (the December Findings expressly limit discussion "to the required findings which cannot be made for the requests").

134. Any purported discretion claimed by the County under Chapter 25B's Operator Capability requirement is preempted by federal law with respect to the Facilities. (*See supra* ¶¶ 42-45, 110-117.)

135. The Board refused to undertake its ministerial duty to deny the Appeals and uphold the Planning Commission's approval of the Transfers. The Board's refusal to undertake its ministerial duty to deny the Appeals and uphold the Planning Commission's approval of the Transfers unlawfully denies the ExxonMobil affiliates the right to relieve themselves of the burden of County permits for Facilities they no longer own or operate, deprives Sable of rights legally acquired under the FDPs, and subjects Petitioners to substantial financial harm.

136. Petitioners are entitled to issuance of a writ of mandate vacating the Board's December 16, 2025 action and directing the County to issue the updated FDPs.

## FOURTH CAUSE OF ACTION

**Writ of Mandate – Failure to Comply with County Code Chapter 25B**

**By Failing to Make Findings to Reverse the Planning Commission's Grant of**

**the Change of Owner and Change of Guarantor Requests**

**(Cal. Code Civ. Proc. § 1085)**

(Pleaded in the Alternative to the First and Second Causes of Action)

137. Petitioners allege and incorporate by reference each and every of the above allegations.

138. The County violated County Code Chapter 25B by failing to make

37

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

findings to support its decision to reverse the Planning Commission's grant of Sable's requests for Change of Owner and Change of Guarantor.

139.   Under the County Code, requests for a Change of Owner are required to be evaluated on the basis of five required findings set forth in Section 25B-9(a)(1)-(5).   These Change of Owner findings are "Fees and Exactions," "Financial Guarantees," "Acceptance of Permit," "Facility Safety Audit," and "Compliance with Existing Requirements."   (County Code § 25B-9(a)(1)-(5).)   Elsewhere, Chapter 25B refers to these findings as "the findings required by this chapter." (County Code § 25B-6(f)(4).)

140.   Under the County Code, requests for Change of Guarantor must be evaluated only with respect to one enumerated criterion: the Financial Guarantees finding.  (County Code § 25B-9(e).)  Neither a request for a Change of Owner nor a request for a Change of Guarantor permit or require the County to make a finding related to "Operator Capability."

141.   On October 30, 2024, the Planning Commission made each of the five required findings to approve Sable's request for a Change of Owner for the SYU, and the Planning Commission made the single required finding to approve Sable's request for a Change of Guarantor for each of the Facilities.  Prior to a Board hearing on an appeal of a Planning Commission decision, the Planning Commission is required to "transmit to the board of supervisors copies of the application, including all attachments and related materials, and a statement of findings setting forth the reasons for the planning commission's decision."  (County Code § 25B-12(b)(3).)

142.   In considering an appeal, the Board is required to "affirm, reverse, or modify the planning commission's decision at a public hearing."  (County Code § 25B-12(b)(4).)

143.   The Board had a mandatory duty to support its decision with respect to the requests for Change of Guarantor and Change of Owner with written findings.

144.   On December 16, 2025, the Board approved the Appeals and reversed

38

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

the Planning Commission's grant of Sable's request for a Change of Owner for the SYU and its grant of Sable's request for the Change of Guarantor for each of the Facilities.

145.   According to the December 2025 Board Action Letter, the Board purported to "[m]ake the required findings for denial of the Change of Owner, Operator, and Guarantor for the respective [Facilities] FDP Permits." However, the December Findings do not refer to any of the five required findings for Change of Owner under Section 25B-9(a), nor do the December Findings refer to the required finding for Change of Guarantor set forth under Section 25B-9(e).

146.   Petitioners are entitled to issuance of a writ of mandate vacating the Board's December 16, 2025 action and directing the Board to make the required findings for the Change of Owner and Change of Guarantor requests.

## FIFTH CAUSE OF ACTION

**Writ of Mandate – Violation of the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 19 of the California Constitution**

**(42 U.S.C. § 1983; U.S. Const. amends. V, XIV; Cal. Const. art. I, § 19)**

**(as to ExxonMobil Plaintiffs)**

147.   Petitioners allege and incorporate by reference each and every of the above allegations.

148.   The United States Constitution prohibits the government from taking private property "without just compensation." (U.S. Const. amends. V, XIV.)  The California State Constitution likewise provides that private property "may be taken . . . only when just compensation" is provided to the owner. (Cal. Const. art. I, § 19.)  Under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 19 of the California Constitution, Petitioners have a federal and state right to be free from the taking of their private property and from laws that take or seize property for a public purpose, but on an unreasonable ground and

39

without any mechanism for compensation.

149. As a matter of long-established California law, the FDPs are vested rights that run with the land. The ExxonMobil affiliates' protected property interests include (1) their vested rights under the FDPs, which were issued and became fully vested well before the passage of Chapter 25B, (2) the right to alienate those property interests, and (3) the right to be relieved of County permit obligations for Facilities they no longer own, operate, or control. The ExxonMobil affiliates thus have the vested right to sell their assets and exit the FDPs without encumbrance or improper County interference. The ExxonMobil affiliates invested cumulatively millions of dollars in the Facilities, including in the development and long-term operation of the SYU and POPCO, and in the acquisition of the Pipeline.

150. The ExxonMobil affiliates invested in the Facilities consistent with the reasonable understanding and expectation that they could sell the Facilities with the FDPs. The FDPs impose no requirement that subsequent owners, operators, or guarantors of the Facilities obtain additional County approval to exercise the vested rights the FDPs confer. Chapter 25B was not adopted until 2001—approximately fifteen years after the first FDPs were issued and eight years after the last of the Facilities was built. Until this case, the County had never refused to transfer an FDP under Chapter 25B.

151. The FDPs form a material part of the Facilities' value and consideration for any transaction involving the Facilities. If as the County claims, Chapter 25B prohibits the ExxonMobil affiliates from selling the Facilities with the vested FDPs, then Chapter 25B constitutes a regulatory taking of the ExxonMobil affiliates' vested rights under the FDPs. The County's construction of Chapter 25B seeks to unlawfully undo and/or encumber a transaction that occurred more than two years ago and in so doing extinguishes in its entirety the transferability of the ExxonMobil affiliates' vested rights under the FDPs. Because no person would acquire the Facilities without the FDPs, the County's position renders the Facilities valueless

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR
WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY
RELIEF AND DAMAGES

and unsalable, depriving the ExxonMobil affiliates of all economically beneficial use of a property interest with value of at least $600 million.

152.   The County also deprives the ExxonMobil affiliates of their property rights by seeking to force the ExxonMobil affiliates to act as owners, operators, and guarantors for the Facilities indefinitely, despite the fact that the ExxonMobil affiliates sold the Facilities and no longer control them, effectively making them a forced indemnitor of any subsequent owner, operator, or guarantor. [6]   Forcing the ExxonMobil affiliates to indemnify the County for the actions of third parties who they do not control likewise constitutes an unlawful regulatory taking and an unreasonable interference with the ExxonMobil affiliates' property rights.  The costs of these forced indemnities are currently incalculable but may total hundreds of millions of dollars in any worst-case-scenario, given the County's position that ExxonMobil must remain "on the hook" unless and until the County relieves it, no matter who owns and operates the Facilities or what happens to them.

153.   The County's actions take the ExxonMobil affiliates' property for the benefit of the public and without prior compensation.

154.   In refusing to issue the corrected FDPs, the County violated the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 19 of the California Constitution.

155.   For the foregoing reasons, the County has failed to proceed in accordance with the law, and the ExxonMobil affiliates are entitled to injunctive

---

[6] The County denies that "Exxon will forever have permits in its name for these facilities" suggesting that Sable could "come[] back to reapply," with no indicia a contrary result would be reached by the Board, or "sell[] the facilities to another," which would serve only to unjustifiably tie the ExxonMobil affiliates to some other unidentified entity until the County's years' long approval process is completed. *See* July 10, 2026 Hearing Tr. at 42:13-18.  And any suggestion that this process under Chapter 25B could have been completed *before* a transaction is closed is economically unreasonable given the amount of time it takes, and the inevitable regulatory quagmire it inspires.  *See id.* at 42:19-43:6 (suggesting "[a]potential owner and operator could pursue this process early, and Exxon could ensure that it finds a buyer who is going to be found to be a capable operator under the County's code").

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
LOS ANGELES

relief pursuant to Section 1983 in the form of issuance of a writ of mandate directing the County to issue the updated FDPs.

### SIXTH CAUSE OF ACTION

**Declaratory Relief and Damages – Violation of the Takings Clause of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 19 of the California Constitution**

**(42 U.S.C. § 1983; U.S. Const. amends. V, XIV; Cal. Const. art. I, § 19; Cal. Code Civ. Proc. § 1060)**

**(as to ExxonMobil Plaintiffs)**

156.   Petitioners allege and incorporate by reference each and every of the above allegations.

157.   As explained above, the ExxonMobil affiliates have a vested right to transfer their assets, including the FDPs.  The County's failure to proceed as required by law in issuing updated FDPs further subjects the ExxonMobil affiliates to legal and financial exposure as described above, including the loss of valuable property rights by being unable to sell the FDPs with the Facilities, and by being forced to be an indefinite guarantor to the County for the actions of third parties.

158.   As applied, the Board's failure to uphold the Transfers violates the ExxonMobil affiliates' constitutional property rights under the FDPs.

159.    There is a justiciable controversy in this case as to whether Chapter 25B violates the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 19 of the California Constitution.

160.   Petitioners seek a declaratory judgment that Chapter 25B, as applied by the County here, unconstitutionally takes property, seizes property, or deprives Petitioners of their property rights in violation of the United States and California Constitutions.

161.   As a direct and proximate cause of the County's actions, the ExxonMobil affiliates have suffered and continue to suffer substantial damages in

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR
WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY
RELIEF AND DAMAGES

an amount to be proven at trial.  Accordingly, the ExxonMobil affiliates also seek damages and attorneys' fees for the violations of the United States Constitution.

### SEVENTH CAUSE OF ACTION

**Declaratory and Injunctive Relief – Violation of the Supremacy Clause of the United States Constitution and Pipeline Safety Act**

**28 U.S.C. §§ 2201, 2202; U.S. Const., Art. VI; Cal. Code Civ. Proc. § 1060; 49 U.S.C. § 60104(c))**

162.   Petitioners allege and incorporate by reference each and every of the above allegations.

163.   Regulation of all aspects of pipeline safety, including those pertaining to restart and operation for interstate pipelines are under the exclusive federal jurisdiction of PHMSA.  As such, regulation of these aspects of pipeline safety is reserved to PHMSA, not the County.

164.   The Supremacy Clause of the Constitution states that "the Laws of the United States . . .  shall be supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State Contrary notwithstanding."  (U.S. Constitution, Art. VI, cl. 2.)  The Supremacy Clause preempts state or local governments from interfering in a field fully occupied by federal agencies and law.

165.   Under the PSA, state and local authorities "may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation."  49 U.S.C. § 60104(c).  Moreover, only State authorities that have "submitted a current certification under section 60105(a) may adopt additional or more stringent safety standards for intrastate pipeline facilities," and such standards still must be compatible with the federal pipeline safety standards. *Id*.  Only PHMSA has authority to regulate pipeline safety for interstate pipelines and intrastate pipelines not otherwise covered under a state certification under 49 U.S.C. §60105(a).

43

166.    In addition, through the Celeron Agreement, the County disclaimed its jurisdiction over areas already covered by federal law, namely Part 195 which "prescribes safety standards and reporting requirements for pipeline facilities used in the transportation of hazardous liquids and carbon dioxide." (49 CFR 195.0.)  The County agreed that "[a]s to areas covered by Part 195, the County is generally without jurisdiction."  (Celeron Agreement, p. 2; *see supra* ¶ 35.)  Moreover, as detailed in the Celeron Agreement, the County is not allowed to take "any action which involve[s] Part 195 areas and is not authorized under 2.5.1 [in the Celeron Agreement], including suspending or withholding ministerial permits, and which will stop or delay [Sable's] construction and/or operation."  (Celeron Agreement, § 2.5.3; ¶ 37, *supra*.)  Thus, the County acknowledged that it has "no authority over the design, construction and operation" of the Pipeline except as set forth in the agreement and attached Final Development Plan/Conditional Use Plan.  (Celeron Agreement, § 2.2; ¶¶ 4, 36, *supra*.)

167.    The Pipeline, SYU, and the POPCO Facilities are all subject to regulation by PHMSA as pipeline facilities within the meaning of the PSA.  The County is preempted from regulating pipeline and pipeline facility operations, including authorizing the restart of the Pipeline for commercial hydrocarbon transport or denying Sable's request to transfer the FDPs on the basis of safety concerns.

168.    Nonetheless, under the County's interpretation, Chapter 25B-10(a)(9) requires the County to evaluate whether a proposed operator can safely operate pipelines and empowers the County to seek civil and criminal penalties, as well as injunction ordering the shutdown, of a pipeline the county deems unsafe.  Chapter 25B is thus federally preempted under the PSA.  (*See* 49 U.S.C. § 60104(c).)

169.    The Board denied all three Transfers based solely on its determination that Sable lacks "the skills, training, and resources necessary to operate the permitted facility," because it allegedly has "a record of non-compliant or unsafe operations."

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

(County Code § 25B-10(a)(9).)

170.    However, PHMSA, which has exclusive authority to determine that a pipeline operator is "qualified to operate and maintain the pipeline facilities," 49 U.S.C. § 60102(a)(2)(C), approved and continues to approve Sable for operation of these same Facilities.  (*See* Exhibit 11.)

171.    Moreover, Chapter 25B is impliedly preempted by the PSA as it directly conflicts with the PSA and PHMSA's safety standards issued pursuant to it. On June 25, 2026, PHMSA issued Sable a Special Permit (under 49 U.S.C. § 60118(c) and 49 C.F.R. § 190.341) that, among other things, directs Sable to perform certain inspections, testing, and assessments and to perform necessary repairs identified from those activities on its Pipeline within prescribed timeframes.

172.    These inspection, testing, and assessment requirements require Sable to act as the operator of the Pipeline.  Chapter 25B's enforcement mechanisms—which the County has consistently refused to eschew—present a direct conflict:  Sable cannot comply with the Special Permit under the PSA without potential adverse action from the County under Chapter 25B, and otherwise serves as an obstacle to the implementation of the PSA and the Special Permit.

173.    Petitioners seek a declaratory judgment that Chapter 25B, as applied by the County to the Facilities, is preempted by federal law, and an injunction prohibiting the County from further enforcement of Chapter 25B against Petitioners in a manner inconsistent with the provisions cited above.

## EIGHTH CAUSE OF ACTION

### Breach of Settlement Agreement

174.    Petitioners allege and incorporate by reference each and every of the above allegations.

175.    The Board's adoption of the December Findings and County's failure to transfer the permits is a breach of the February 8, 1988 Celeron Agreement between the County and the previous Pipeline owner, which the parties entered into

45

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR
WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY
RELIEF AND DAMAGES

to confirm the scope of the County's jurisdiction over the Pipeline.[7] (*See* ¶¶ 34-39, *supra*.)

176. In the Celeron Agreement, the County acknowledged that it has "no authority over the design, construction and *operation*" of the Pipeline except as set forth in the agreement and attached Final Development Plan/Conditional Use Plan. (Celeron Agreement, § 2.2 [emphasis added]; ¶ 36, *supra*.) The Celeron Agreement states that this "means clearly that the County will not require any permit to . . . operate Celeron's pipeline except as specifically set forth in this Agreement[.]" (Exhibit 10 § 2.2.) Furthermore, the County agreed that "[a]ll . . . Final Development Plan conditions . . . must be compatible and not inconsistent with this Agreement[.]" (Exhibit 10 § 2.3.)

177. The County further agreed that, if the "County is taking or contemplating the taking of any action which involve Part 195 areas and is not authorized [by section 2.5.1 of the agreement], including suspending or withholding ministerial permits, and which will stop or delay Celeron's construction and/or operation, the County shall immediately cease such action or contemplated action upon written notice from Celeron stating its objection." The "County's action or proposed action may resume or commence only upon the County obtaining judicial sanction by order of a State or Federal Court." (Exhibit 10 § 2.5.3.)

178. "Ministerial Permits," although not defined in the Celeron Agreement, has a well-defined meaning in contemporary caselaw, statutes, and secondary sources as one in which "[t]he public official merely applies the law to the facts as presented," for example, whether "the zoning allows the structure to be built in the requested location, the structure would meet the strength requirements in the Uniform Building Code, and the applicant has paid his fee." (*Adams Point Pres.*

---

[7] Petitioners are asserting this claim as current and former Pipeline owner and successors to the Agreement. *See, e.g.*, Celeron Agreement, p. 19("The terms and conditions of this Agreement will be binding upon the County and upon Celeron, its successors and assignees.").

46

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

*Soc'y*, 192 Cal. App. 3d at 206.)

179. Moreover, as memorialized in the Celeron Agreement, "the jurisdiction of the County over an interstate pipeline is limited and partially preempted by the provisions of the federal Hazardous Liquids Pipeline Safety Act and 49 CFR Part 195," that is, the PSA's predecessor statute and its associated federal regulations. This is true even as to activities that are "*impliedly* but not expressly specified by" the Pipeline Safety Act to the extent that those activities "deal[] with . . . *operation* of an interstate pipeline." (Exhibit 10 § 3.1.2 (emphasis added.))

180. However, the Board adopted the December Findings on December 16, 2025, based solely on the federally preempted "Operator Capability" prong of Chapter 25B, through which it made a formal determination that Sable does not meet the Operator Capability requirements to safely operate the Pipeline. This is a direct usurpation of PHMSA's PSA-derived responsibility to ensure that pipeline operators are "qualified to operate and maintain the pipeline facilities." (*See* 49 U.S.C. § 60102(a)(2)(C).) And, because the County is not the PHMSA-approved California state regulator of interstate pipelines, the County is impermissibly regulating pipeline safety regardless of whether PHMSA or OSFM is the regulatory body. The County's action constitutes prohibited action under sections 2.5.2, 2.5.3, and 3.1.1, and 3.1.2 of the Celeron Agreement.

181. The County's action also independently and separately constitutes the requiring of a "permit to . . . operate Celeron's pipeline" that was not "specifically set forth in this Agreement," (Exhibit 10 § 2.2.), and the "suspending or withholding" of a "ministerial permit." (Exhibit 10 § 2.5.3.) The County's action constitutes prohibited action under sections 2.5.2, 2.5.3, and 3.1.1, and 3.1.2 of the Celeron Agreement.

182. The County also independently breached the Celeron Agreement by interfering with Sable's compliance, among other things, with the PHMSA Special Permit that orders Sable to perform certain inspections and conduct necessary repairs

47

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR
WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY
RELIEF AND DAMAGES

identified within prescribed timeframes.  (*See* 49 U.S.C. § 60118(c); 49 C.F.R. § 190.341.)   The County's interference with these activities also constitutes prohibited action under sections 2.5.2, 2.5.3, 3.1.1, and 3.1.2 of the Celeron Agreement.

183.  Petitioners gave written notice of these breaches as required by the Celeron Agreement, but the County did not "immediately cease" its action, as required.

184.  Based on the foregoing, the Board and County acted outside their jurisdiction and violated the Celeron Agreement.  The Board and County's violation of the Celeron Agreement has caused Sable to incur excessive costs to operate the Pipeline.

185.  Pursuant to Section 13.1 of the Celeron Agreement, Petitioners are entitled to recover their damages and, as costs, all their attorneys' fees and other costs as a result of the County's refusal to approve Transfers.

## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Petitioners/Plaintiffs pray for relief as follows:

1.  For the First and Third, and Fifth Causes of Action for Writ of Mandate:

a.  For a peremptory writ of mandamus vacating the Board's December 16, 2025 action and directing the County to issue updated FDPs;

b.  For attorneys' fees and other litigation expenses permitted by law in an amount to be proven; and

c.  For such other and further relief as the Court may deem just and proper.

2.  For the Second Cause of Action for Writ of Mandate:

a.  For a peremptory writ of mandamus vacating the Board's November 4, 2025 and December 16, 2025 actions and directing the Board to hold a new, fair hearing in compliance with narrow requirements of Chapter 25B;

b.  For attorneys' fees and other litigation expenses permitted by law

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR
WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY
RELIEF AND DAMAGES

in an amount to be proven; and

c. For such other and further relief as the Court may deem just and proper.

3. For the Fourth Cause of Action for Writ of Mandate:

a. For a peremptory writ of mandamus vacating the Board's December 16, 2025 action and directing the County to make the required findings for the Change of Guarantor and Change of Owner requests;

b. For attorneys' fees and other litigation expenses permitted by law in an amount to be proven; and

c. For such other and further relief as the Court may deem just and proper.

4. For the Fifth Cause of Action for Writ of Mandate:

a. For a declaration that the County's enforcement of Chapter 25B, as applied to Petitioners, violates the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 19 of the California Constitution;

b. For a writ of mandate prohibiting the County from further enforcement of Chapter 25B against Petitioners in a manner inconsistent with the provisions cited above; and

c. For such other and further relief as the Court may deem just and proper.

5. For the Sixth Cause of Action for Declaratory Relief and Damages:

a. For a declaration finding that, as applied, the County's Chapter 25B ordinance violates the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, Section 19 of the California Constitution;

b. For damages in an amount to be proven;

c. For attorneys' fees and other litigation expenses permitted by law in an amount to be proven; and

d. For such other and further relief as the Court may deem just and

49

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

proper.

6.   For the Seventh Cause of Action for Declaratory and Injunctive Relief:

a.   For a declaration finding that, as applied, the County's Chapter 25B ordinance violates the Supremacy Clause of the U.S. Constitution;

b. For an injunction prohibiting the County from further enforcement of Chapter 25B against Petitioners in a manner inconsistent with the provisions cited above; and

c.   For such other and further relief as the Court may deem just and proper.

7.   For the Eighth Cause of Action for breach of contract:

a.   For a declaration finding that County Code § 25B-10(a)(9) violates the Celeron Agreement;

b.   For damages in an amount to be proven;

c.   For attorneys' fees and other litigation expenses permitted by law in an amount to be proven; and

d.   For such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Petitioners/Plaintiffs demand a jury trial for all issues so triable.

Dated:  August 4, 2026

Respectfully submitted,

LATHAM & WATKINS LLP
Jessica Stebbins Bina

By /s/ *Jessica Stebbins Bina*
Jessica Stebbins Bina
Attorneys for Plaintiffs and
Petitioners Sable Offshore Corp.,
Pacific Pipeline Company, and Pacific
Offshore Pipeline Company

50

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR
WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY
RELIEF AND DAMAGES

O'MELVENY & MYERS LLP
Lauren Kaplan


By /s/*Lauren Kaplan*
Lauren Kaplan
Attorneys for Plaintiffs and
Petitioners Exxon Mobil Corporation,
Mobil Pacific Pipeline Company, and
ExxonMobil Pipeline Company

51

SECOND AMENDED AND SUPP. VERIFIED PETITION FOR
WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY
RELIEF AND DAMAGES

**VERIFICATION**

I, Robert W. Lundell, am Assistant Secretary of Sable Offshore Corp. ("Sable Offshore"), Secretary of Pacific Pipeline Company ("PPC"), and Secretary of Pacific Offshore Pipeline Company ("POPCO"), and I am authorized to execute this verification on behalf of Sable Offshore, PPC, and POPCO.  I have read the forgoing **SECOND AMENDED AND SUPPLEMENTAL VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** and know the contents thereof. The matters stated therein are true and correct to my own personal knowledge, except those matters that are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the forgoing is true and correct, and that I have executed this Verification on this 4th day of August, 2026, in Houston, Texas.

_Rob Lldell_

Robert W. Lundell

# VERIFICATION

I, Nathan Franka, was SYU Asset Manager of Exxon Mobil Corporation ("ExxonMobil"), and I am authorized to execute this verification on behalf of ExxonMobil. I have read the foregoing **SECOND AMENDED AND SUPPLEMENTAL VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** and know the contents thereof. The matters stated therein are true and correct to my own personal knowledge, except those matters that are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that I have executed this Verification on this 4th day of August, 2026, in Spring, Texas.

_____
Nathan Franka

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

SECOND AMENDED VERIFIED PETITION FOR WRIT OF
MANDATE AND COMPLAINT FOR DECLARATORY RELIEF
AND DAMAGES

53

## VERIFICATION

I, David Welsh, am the President at Mobil Pacific Pipeline Company ("MPPC"), and I am authorized to execute this verification on behalf of MPPC.  I have read the foregoing **SECOND AMENDED AND SUPPLEMENTAL VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** and know the contents thereof.  The matters stated therein are true and correct to my own personal knowledge, except those matters that are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that I have executed this Verification on this 4th day of August, 2026, in Spring, Texas.

David Welsh

## VERIFICATION

I, Saul Flota, am the Vice President and US Operations Manager at ExxonMobil Pipeline Company ("EMPCo"), and I am authorized to execute this verification on behalf of EMPCo.  I have read the foregoing **SECOND AMENDED AND SUPPLEMENTAL VERIFIED PETITION FOR WRIT OF MANDATE AND COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** and know the contents thereof.  The matters stated therein are true and correct to my own personal knowledge, except those matters that are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that I have executed this Verification on this 4th day of August, 2026, in Spring, Texas.

Saul Flota

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

SECOND AMENDED VERIFIED PETITION FOR WRIT OF
MANDATE AND COMPLAINT FOR DECLARATORY RELIEF
AND DAMAGES

55