LATHAM & WATKINS LLP
Jessica Stebbins Bina (Bar No. 248485)
*jessica.stebbinsbina@lw.com*
10250 Constellation Blvd. Suite 1100
Los Angeles, CA 90067
Telephone: +1 424.653.5500
Facsimile: +1 424.653.5501

*Attorneys for Petitioners Sable Offshore Corp., Pacific Pipeline Company, and Pacific Offshore Pipeline Company*

O'MELVENY & MYERS LLP
Dawn Sestito (Bar No. 214011)
*dsestito@omm.com*
Lauren Kaplan (Bar No. 294703)
*lkaplan@omm.com*
400 South Hope Street, 19th Floor
Los Angeles, California 90071
Telephone: +1 213.430.6000
Facsimile: +1 213.430.6407

*Attorneys for Petitioners and Plaintiffs Exxon Mobil Corporation, Mobil Pacific Pipeline Company, and ExxonMobil Pipeline Company*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

SABLE OFFSHORE CORP. et al.,

Petitioners/Plaintiffs,

v.

COUNTY OF SANTA BARBARA et al.,

Respondents/Defendants,

and

ENVIRONMENTAL DEFENSE CENTER, et al.

Intervenors.

CASE NO. 2:25-cv-04165-DMG-CTS

**PETITIONERS' OPPOSITION TO RESPONDENT COUNTY OF SANTA BARBARA'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**

Complaint Filed: May 8, 2025

Date: October 23, 2026
Time: 9:30 a.m.
Ctrm.: 8C
Judge: Hon. Dolly M. Gee

# TABLE OF CONTENTS

Page


I. INTRODUCTION .......... 1

II. PLEADED FACTS .......... 2

III. STANDARD OF REVIEW .......... 3

IV. ARGUMENT .......... 4

A. The ExxonMobil Affiliates Adequately Allege a Takings Claim .......... 4

1. Economic Impact .......... 4

2. Interference With Investment-Backed Expectations .......... 7

3. Character of the Government Action .......... 9

B. The Pipeline Safety Act Preempts Chapter 25B-10(a)(9) .......... 9

C. The County Fails to Justify Dismissal of Petitioners' Contract Claim .......... 15

1. The Contract Claim Survives if the Preemption Claim Survives .......... 16

2. Part of the Contract Claim Survives Even Without Preemption .......... 16

3. None of the County's Arguments Warrant Dismissal .......... 17

V. CONCLUSION .......... 21

# TABLE OF AUTHORITIES

Page(s)

## CASES

*108 Holdings, Ltd. v. City of Rohnert Park*,
136 Cal. App. 4th 186 (2006) ........ 20

*1210 Cacique Street, LLC v. City of Santa Barbara*,
2026 WL 2098709 (9th Cir. 2026) ........ 6

*ASARCO, LLC v. Union Pacific R. Co.*,
765 F.3d 999 (9th Cir. 2014) ........ 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 3

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 3

*Bridge Aina Le'a, LLC v. Land Use Comm'n*,
950 F.3d 610 (9th Cir. 2020) ........ 5, 7, 9

*Colony Cove Props., LLC v. City of Carson*,
888 F.3d 445 (9th Cir. 2018) ........ 6, 7

*Commonwealth Of Puerto Rico v. Franklin California Tax-free Tr.*,
579 U.S. 115 (2016) ........ 13

*Couser v. Shelby County*,
139 F.4th 664 (8th Cir. 2025), *cert. denied sub nom. Shelby Cnty. v. Couser*, 25-419, 2026 WL 79941 (U.S. Jan. 12, 2026) ........ 14

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ........ 10, 12

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey*,
95 F.3d 1422 (9th Cir. 1996) ........ 4

*DoorDash, Inc. v. City & County of San Francisco*,
2022 WL 867254 (N.D. Cal. Mar. 23, 2022) ........ *passim*

*Enbridge Energy, Ltd. P'ship v. Whitmer*,
813 F. Supp. 3d 777 (W.D. Mich. 2025) ........ 9, 15

*Evans Creek, LLC v. City of Reno*,
No. 21-16620, 2022 WL 14955145 (9th Cir. Oct. 26, 2022) .............................. 7

*FFV Coyote LLC v. City of San Jose*,
637 F. Supp. 3d 761 (N.D. Cal. 2022) ............................................. 4, 5, 6, 7

*Guggenheim v. City of Goleta*,
638 F.3d 1111 (9th Cir. 2020) .......................................................... 8

*Haaland v. Brackeen*,
599 U.S. 255 (2023) ........................................................................ 10

*Hawai'i Legal Short-Term Rental All. v. City & Cnty. of Honolulu*,
2022 WL 7471692 (D. Haw. 2022) ................................................. 5, 7

*Hotel & Motel Ass'n of Oakland v. City of Oakland*,
344 F.3d 959 (9th Cir. 2003) ............................................................ 4

*Kinley Corp. v. Iowa Utilities Bd., Utilities Div., Dep't of Com.*,
999 F.2d 354 (8th Cir. 1993) ............................................................ 14

*Morrison Homes Corp. v. City of Pleasanton*,
58 Cal. App. 3d 724 (Ct. App. 1976) ................................................. 20

*Myers v. Philip Morris Companies, Inc.*,
28 Cal. 4th 828 (2002) ...................................................................... 9

*Olympic Pipe Line Co. v. City of Seattle*,
437 F.3d 872 (9th Cir. 2006) ............................................................ 13

*Pauma Band of Luiseno Mission Indians of Pauma & Yuima Rsrv. v. California*,
813 F.3d 1155 (9th Cir. 2015) .......................................................... 18

*Penn Central Transp. Co. v. City of New York*,
438 U.S. 104 (1978) .......................................................................... 4

*State Farm Mut. Auto. Ins. Co. v. Fernandez*,
767 F.2d 1299 (1985) ........................................................................ 18

*Stephens v. City of Vista*,
994 F.2d 650 (9th Cir. 1993), *as amended on denial of reh'g* (Aug. 4, 1993) ........................................................................................... 20

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
535 U.S. 302 (2002) .......... 4

*United States v. Ritchie*,
342 F.3d 903 (9th Cir. 2003) .......... 11

*Wiley v. Kern High Sch. Dist.*,
107 Cal. App. 5th 765 (2024), *review denied* (Mar. 19, 2025) .......... 9

*Williams Pipe Line Co. v. City of Mounds View*,
651 F. Supp. 551 (D. Minn. 1987) .......... 10

*Young v. NeoCortext, Inc.*,
690 F. Supp. 3d 1091 (C.D. Cal. 2023) .......... 4, 18

**STATUTES**

49 U.S.C.
§ 60102(a)(2)(c) .......... 12, 19
§ 60102(a)(3) .......... 12
§ 60104(c) .......... 13
§ 60104(e) .......... 14
§ 60117(p)(1) .......... 12
§ 60118(b) .......... 12
§ 60118(c)(1)(A) .......... 10
§ 60120 .......... 12
§ 60120(c) .......... 14
§ 60122(a) .......... 12
§ 60123(a) .......... 12

Santa Barbara County Code
Chapter 25B .......... *passim*
§ 25B-10(a)(9) .......... *passim*
§ 25B-13 .......... 10, 11

**RULES**

Fed. R. Civ. P.
8(a)(2) .......... 3
12(b)(6) .......... 18

## REGULATIONS

49 C.F.R.
§ 195 .......... 21
§ 195.2 .......... 12
§§ 195.50-195.56 .......... 12
§ 195.204 .......... 12
§ 195.206 .......... 12
§ 195.402 .......... 12
§ 195.403 .......... 12
§ 195.408 .......... 12
§ 195.412 .......... 12
§ 195.430 .......... 12
§§ 195.434-195.436 .......... 12
§ 195.446 .......... 12

## OTHER AUTHORITIES

Santa Barbara County Code
Chapter 25B .......... *passim*
§ 25B-10(a)(9) .......... *passim*
§ 25B-13 .......... 10, 11

# I. INTRODUCTION

The Court is familiar with this case and its history. Since this litigation began, two things have happened that make dismissal inappropriate. First, this Court held that the ExxonMobil Affiliates[1] possess vested property rights in the FDPs. Second, PHMSA reviewed the operations of Sable, approved Sable as a safe operator, and issued Sable a Special Permit. Nevertheless, the County again moves to dismiss Petitioners' takings, preemption, and contract claims. This motion should be denied.

On takings, the County no longer disputes that the ExxonMobil Affiliates hold vested property interests in the FDPs. Its refusal to transfer those permits rendered the Facilities effectively unsalable, shackling the ExxonMobil Affiliates as involuntary indemnitors, and frustrating a $600 million transaction. These allegations satisfy the *Penn Central* factors.

On preemption, the County's position has become untenable. The County denied the FDP transfers based on its assessment that Sable cannot safely operate the Pipeline—a determination reserved exclusively to PHMSA and contrary to PHMSA's subsequent safety determinations and requirements for Sable. The County's claim that its local safety judgment must be satisfied before PHMSA's federal mandate can take effect inverts the Supremacy Clause. The County's conduct is preempted under express preemption, obstacle preemption, and field preemption.

On the contract claim, the County ignores the central purpose of the 1988 Celeron Agreement: to provide a procedural framework and damages remedy for this very kind of jurisdictional overreach. Because the preemption claim survives, the contract claim necessarily follows. Petitioners also independently allege that the County violated the dispute-resolution procedure, which survives regardless of preemption.

---

[1]Capitalized terms have the definitions given them in Petitioners' Second Amended and Supplemental Verified Petition for Writ of Mandate and Complaint for Declaratory Relief and Damages, ECF 86.

For these reasons, the motion should be denied.

## II. PLEADED FACTS

Petitioners challenge the County's refusal to transfer three vested FDPs for the Facilities—the SYU, the POPCO Facilities, and the Pipeline—after Sable purchased the Facilities from the ExxonMobil Affiliates. *See* Second Am. and Suppl. Pet. for Writ of Mandate and Compl. ("SAC") ¶¶ 1–2, 26–32.

The FDPs, issued between 1987 and 1993, constitute vested entitlements that run with the Facilities, do not expire, and do not require subsequent approval for new owners. SAC ¶¶ 28–32. The Facilities' prior owners invested many millions of dollars in reliance on these FDPs and have a right to alienate those interests without potentially forced indemnity.[2] SAC ¶¶ 149-152.

In the 1980s, the County and the prior permit holder, Celeron, disagreed over "the scope of the County's jurisdiction over interstate pipelines." *Id.* ¶ 35; Celeron Agreement at Recitations, p. 3. Celeron sued, and the parties settled by entering into the "Celeron Agreement." *Id.* ¶¶ 33-34. The Celeron Agreement's centerpiece is a procedural framework to resolve future jurisdictional disputes and a damages remedy for claims under the Celeron Agreement. *Id.* ¶¶ 37, 166, 177, 185. These protections expressly run to Celeron's successors, including Petitioners. *Id.* ¶ 175 n.7.

Thirteen years later, in 2001, the County adopted Chapter 25B to regulate the transfer of FDPs. *Id.* ¶¶ 49–51. The ninth finding, "Operator Capability" (County Code § 25B-10(a)(9)), is different from the preceding discrete, verifiable criteria, requiring the County to determine whether the proposed operator is able to operate a pipeline safely. *Id.* ¶¶ 54–56, 68. Under Chapter 25B, the County may seek an injunction on a streamlined showing, civil penalties of up to $25,000 per day, and criminal penalties including jail time. *Id.* ¶ 56. The County has not disclaimed using

[2] Sable refers to its pending Motion for Reconsideration concerning whether it has stated a takings claim.

its enforcement authority with respect to the Facilities. *Id.*

The County has historically treated Chapter 25B as perfunctory and never denied a transfer until now. *Id.* ¶¶ 57, 150. This consistent practice defined the regulatory environment in which Petitioners made their investment decisions. *Id.* ¶¶ 57-59, 62, 150. In February 2024, when Sable acquired the Facilities and submitted its transfer applications, County staff concluded they were fully compliant with Chapter 25B's requirement and recommended approval. *Id.* ¶¶ 63-66. On October 30, 2024, the Planning Commission made all required findings for Chapter 25B and approved the transfers. *Id.* ¶¶ 67-69.

In November 2024, intervenors appealed to the Board. *Id.* ¶¶ 2, 70–74. At subsequent hearings, the Board voted to continue the hearing and prepare a denial based on safety and financial considerations. *Id.* ¶¶ 80–86. County Staff complied, and the Board voted to deny the Transfers based on its assessment of safety considerations. *Id.* ¶¶ 87–99.

On December 17, 2025, PHMSA asserted jurisdiction over the Pipeline, including portions of SYU. *Id.* ¶ 44. PHMSA subsequently approved Sable for operation after finding it would be a safe operator acting in compliance with the law. *Id.* ¶ 99. On June 25, 2026, PHMSA issued Sable a Special Permit directing it to perform inspections, testing, assessments, and repairs on the Pipeline within prescribed timeframes. *Id.* ¶¶ 99, 171–172.

## III. STANDARD OF REVIEW

A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint survives a motion to dismiss so long as it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Dismissal is appropriate only "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory."

*FFV Coyote LLC v. City of San Jose*, 637 F. Supp. 3d 761, 767 (N.D. Cal. 2022). The Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *See, e.g.*, *Young v. NeoCortext, Inc.*, 690 F. Supp. 3d 1091, 1098 (C.D. Cal. 2023).

**IV. ARGUMENT**

**A. The ExxonMobil Affiliates Adequately Allege a Takings Claim**

This Court already held that the ExxonMobil Affiliates have vested property rights in the FDPs. Dkt. 83 (Order) at 9. The ExxonMobil Affiliates have stated a claim for the taking of those property rights.

A regulatory taking "occurs when the value or usefulness of private property is diminished by a regulatory action that does not involve a physical occupation of the property." *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 965 (9th Cir. 2003). Courts evaluate regulatory takings under three factors: (1) "the economic impact," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). This evaluation "necessarily entails complex factual assessments." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 323 (2002). Under these factors, the ExxonMobil Affiliates have adequately alleged a taking. SAC ¶¶ 147–61.

1. <u>Economic Impact</u>

The ExxonMobil Affiliates have adequately alleged the economic impact factor, which requires a "severe" economic impact from regulation. *FFV Coyote*, 637 F. Supp. 3d at 770; *see also Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1432–34 (9th Cir. 1996). Once a severe economic impact is pleaded, its adequacy is typically a question of fact. "Courts determine whether a regulatory action is functionally equivalent to the classic taking using essentially ad hoc, *factual inquiries*, designed to allow careful examination and weighing of all the

relevant circumstances." *Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950 F.3d 610, 625 (9th Cir. 2020) (quotations omitted and emphasis added). For example, in *DoorDash, Inc. v. City & County of San Francisco,* the need to renegotiate or terminate contracts, scale back marketing, and raise prices to comply with a commission-rate ordinance were sufficiently "severe" to allege economic impact, even if "factual questions" "remain[ed]" as to the extent of harm. 2022 WL 867254, at *17-18 (N.D. Cal. Mar. 23, 2022).

Here, the ExxonMobil Affiliates allege that they invested "cumulatively millions of dollars in the Facilities," that the FDPs "form a material part of the Facilities' value," and that the County's construction of Chapter 25B seeks to "unlawfully undo and/or encumber" the $600 million transaction, "extinguish[ing]" vested rights and "depriving the ExxonMobil affiliates of all economically beneficial use of a property with a value of at least $600 million." SAC ¶¶ 149, 151. The County has also deprived the ExxonMobil Affiliates of their property rights by attempting to retain their indemnity with a potential exposure of "hundreds of millions of dollars." SAC ¶ 152. These allegations suffice to allege "severe economic impact." *See FFV Coyote*, 637 F. Supp. 3d at 770 (allegations that defendant scuttled $44.1 million sale and limited all economically viable use of subject property sufficient at pleading stage); *see also Hawai'i Legal Short-Term Rental All. v. City & Cnty. of Honolulu*, 2022 WL 7471692, at *10 (D. Haw. 2022) (granting preliminary injunction based on ordinance that outlawed short-term rentals where plaintiffs alleged economic harm from lost rental income and being forced to sell investment properties).

None of the County's arguments undercut the sufficiency of these allegations. First, the County fixates on the Facilities' sale price. *See* Cnty. Mot. at 12. But that figure reflects the *unencumbered* value, not the present impaired value.[3] *See* SAC

[3] The County argues that the ExxonMobil Affiliates do not allege that Sable sought rescission. But they do allege the sale lost material value. Both the ExxonMobil

¶ 151. Besides, the economic impact inquiry is not limited to the value of the property in question. *See DoorDash*, 2022 WL 867254, at *18. Even if the Facilities' value were unchanged, the County ignores the alleged risk of the ExxonMobil Affiliates being forced to remain indemnitors. Whatever factual questions that may raise, the alleged magnitude of this harm—potentially hundreds of millions of dollars—is severe. *See* SAC ¶ 152; *see also FFV Coyote*, 637 F. Supp. 3d at 770.

Relatedly, the County suggests that this factor reduces to whether a sufficient percentage of value is wiped out, *see* Cnty. Mot. at 13-14, but that framing oversimplifies the law. The single cited case explains that "no litmus test determines whether a taking occurred" because *Penn Central* is a cumulative, fact-intensive inquiry. *See Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 451 (9th Cir. 2018). The Ninth Circuit has since confirmed that "no case from our court or the Supreme Court establishes a legal floor for economic impact." *1210 Cacique Street, LLC v. City of Santa Barbara*, 2026 WL 2098709, at *1 (9th Cir. 2026). A plaintiff need only plausibly allege severe economic impact.

Next, the County asserts the allegations of financial and legal exposure are speculative and conclusory, *see* Cnty. Mot. at 13, but they are not. *See* SAC ¶¶ 56, 82, 152. Moreover, it is disingenuous for the County to argue that enforcement exposure is speculative—while at the same time refusing to disclaim future enforcement efforts. SAC ¶ 56; *see DoorDash*, 2022 WL 867254, at *17–18 (allegations that ordinance would cause economic harm were sufficient where the

---

Affiliates and Sable suffered losses from the County's actions, and are not required to engage in actions that would *worsen* their respective financial positions in order to maintain a claim against the County, the cause of their respective losses.

defendant did not disclaim application of ordinance to plaintiff).[4]

Finally, the County argues ExxonMobil's loss flows from the "business decision to sell the Facilities to Sable before the County approved the FDP applications." Cnty. Mot. at 14. Not so. It has been two and a half years since Sable applied for the Transfers. *See* SAC ¶¶ 63-66. Even if it were common to wait for permit transfers before completing a sale (it is not), it is unreasonable to expect an otherwise finalized transaction to wait that long. Additionally, if the County's pre-sale interpretation prevails, it would limit (or eliminate) the potential pool of purchasers based on the Board's political whims. The inability to reasonably predict the County's actions materially reduces the Facilities' value. Moreover, courts in this Circuit recognize that regulations that force property owners to make harmful business decisions constitute economic harm. *Hawai'i Legal Short Term Rental All.*, 2022 WL 7471692, at *10.[5]

2. Interference With Investment-Backed Expectations

A plaintiff establishes the second factor by alleging investment expectations and explaining why, "but-for the regulatory change," they reasonably expected the investment to succeed. *FFV Coyote*, 637 F. Supp. 3d at 770; *see also DoorDash*, 2022 WL 867254, at *19. Expectations are measured against "the regulatory environment at the time of the acquisition of the property." *Bridge Aina Le'a,* 950 F.3d at 634. ExxonMobil acquired two of the three Facilities prior to Chapter 25B's passage, and acquired the third under the then-prevailing interpretation of Chapter 25B as ministerial—under which the County *never* blocked *any* FDP transfer. *See*

---

[4] The County's citation to *Evans Creek, LLC v. City of Reno* is inapposite, because in that case the plaintiff failed to provide "*any* information about the value of the property." No. 21-16620, 2022 WL 14955145, at *1 (9th Cir. Oct. 26, 2022).

[5] *Colony Cove Properties, LLC v. City of Carson* is inapposite. There, after a jury trial, the Court concluded the plaintiff had not proven diminution in value because operating losses "resulted directly from Colony's decision to incur a large debt." 888 F.3d 445, 452 (9th Cir. 2018).

SAC ¶¶ 57-62, 70-89. Thus, the ExxonMobil Affiliates allege a decades-long investment stymied by the County's arbitrary reversal of predictable past practice. That is sufficient.

The County argues that because ExxonMobil did not acquire the Pipeline until after Chapter 25B was enacted, Petitioners have not alleged interference. *See* Cnty. Mot. at 14-15. The County ignores that the SYU and POPCO were acquired before Chapter 25B was enacted, and even as to the Pipeline, the County had *never* denied an FDP transfer until this transaction. *See* SAC ¶¶ 26-32, 57-62. The Court has already acknowledged that FDPs are vested rights that run with the land in California, *see* Order at 9, and these allegations are sufficient to support an inference that the ExxonMobil Affiliates had a reasonable, invested-backed expectation that the FDPs would be transferred and the Facilities could be sold unencumbered.[6]

The County also asserts the ExxonMobil Affiliates lacked reasonable expectations because they knew they were entering a highly regulated industry. Mot. at 15. But that argument cuts *against* the County because Chapter 25B is not a typical local regulation: "the County is *the only jurisdiction in the country to have adopted such a process*." SAC ¶ 51 (emphasis added). These allegations are sufficient to establish the unforeseeability of this application of Chapter 25B. *See DoorDash*, 2022 WL 867254, at *7, *19.

Finally, the County argues the ExxonMobil Affiliates failed to allege they expected more than the unencumbered sale price. Cnty. Mot. at 16. This assertion is false; they allege the contract's value is impaired. *See supra* Section IV.A.1; FAC ¶¶ 151-52. The County's alternative theory—that the ExxonMobil Affiliates should have anticipated perpetual liability for their buyer's use of property they sold, even if wipes out the entire sale price—when such liability has never been imposed by

---

[6] This case is nothing like *Guggenheim v. City of Goleta*, which held that an ordinance enacted years before any of the transactions at issue could not constitute interference. 638 F.3d 1111, 1120 (9th Cir. 2020).

any county nationwide, including this County—is unreasonable.[7]

3. Character of the Government Action

The County argues the character of government action weighs against the ExxonMobil Affiliates based on this Court's first ruling. Cnty. Mot. at 11. Petitioners do not concede this factor, *see* ECF No. 73 at 22-24, but even if this factor weighed in the County's favor, that would not warrant dismissal. *Bridge Aina Le'a*, 950 F.3d at 636 ("The first and second *Penn Central* factors are the primary factors."); *DoorDash*, 2022 WL 867254, at *19. Because the first two *Penn Central* factors weigh strongly in the ExxonMobil Affiliates' favor, they have pleaded a viable takings claim.

**B. The Pipeline Safety Act Preempts Chapter 25B-10(a)(9)**

Under the PSA, PHMSA has exclusive authority to determine pipeline safety and has exercised that authority by approving restart. *See Enbridge Energy, Ltd. P'ship v. Whitmer*, 813 F. Supp. 3d 777, 794 (W.D. Mich. 2025) (PSA provides federal government exclusive "plenary power to determine how to keep pipelines safe at every stage from design through construction, testing, operation, maintenance, and even replacement."); *see also generally* Opp. to Intervenors' Partial Mot. to Dismiss. The County denied the Transfers based entirely on its

[7] The County also argues that the language in Chapter 25B requiring the existing owner/operator/guarantor to "submit a certification to the director" within 30 days of enactment provided notice that the Chapter would be applied retroactively. Cnty. Mot. at 16. But the County identifies no language explicitly providing notice that Chapter 25B would be applied to regulate the transfer of existing FDPs and their vested rights, as necessary to overcome the strong presumption against retroactivity. *See* SAC ¶ 53; *see also, e.g.*, *Myers v. Philip Morris Companies, Inc.*, 28 Cal. 4th 828, 843 (2002) (discussing "the time-honored presumption against retroactive application of a statute"); *Wiley v. Kern High Sch. Dist.*, 107 Cal. App. 5th 765, 781 (2024), *review denied* (Mar. 19, 2025) (same). Moreover, the ExxonMobil Affiliates have pleaded that the County's prior narrow application of Chapter 25B gave no reason to anticipate this novel new use of Chapter 25B to impair their vested rights. SAC ¶¶ 57–89.

judgment that Sable has "non-compliant or unsafe operations" and lacks "the skills, training, and resources necessary to operate the [pipeline]," County Code § 25B-10(a)(9), and reserves to itself authority to halt Sable's operations, *see id.* § 25B-13; SAC ¶¶ 56, 168. Petitioners' well-pleaded allegations thus state a claim for: (1) express preemption under the PSA's preemption clause, (2) field preemption, and (3) conflict preemption.

The County first attempts to rebut conflict preemption, which arises because Sable cannot comply with the Special Permit under the PSA without exposure to Chapter 25B enforcement. *See* SAC ¶¶ 99, 171-172; Petitioners' Request for Judicial Notice ("RJN"), ECF 97, Ex. 1; *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) ("When Congress intends federal law to 'occupy the field,' state law in that area is preempted."); *Haaland v. Brackeen*, 599 U.S. 255, 287 (2023) ("[W]hen Congress enacts a valid statute pursuant to its Article I powers, state law is naturally preempted to the extent of any conflict with a federal statute. End of story." (internal citation and quotation marks omitted)). PHMSA may issue Special Permits waiving compliance with certain regulations if it "determines that the waiver is not inconsistent with pipeline safety." 49 U.S.C. § 60118(c)(1)(A). PHMSA issued such a permit here. *See* SAC ¶¶ 99, 171-172; RJN Ex. 1.

The County argues that there is no conflict preemption because "[t]o comply with both [Chapter 25B and the PSA], an applicant need only to wait to apply for the Special Permit [from PHMSA] until *after its FDP application is approved under Chapter 25B*." County Mot. at 18 (emphasis added). The County thus claims its local pipeline safety determination under Chapter 25B is a *prerequisite* to PHMSA's federal consideration of pipeline safety. But that assertion—that the County is "entitled to demand compliance with [its] own safety standards" ahead of federal regulators—would thwart "the clear Congressional goal of a national standard for hazardous liquid pipeline safety," an outcome "so repugnant to the statute that the survival of such rights would in effect deprive [the PSA] of its efficacy." *Williams*

*Pipe Line Co. v. City of Mounds View*, 651 F. Supp. 551, 569-70 (D. Minn. 1987).

The County next argues there is no conflict preemption because PHSMA special permits (allegedly) require consideration of different factors as Chapter 25B. *See* Cnty. Mot. at 18-19. This contradicts the alleged facts that PHMSA and the County made different findings about whether Sable is a safe operator. *See* SAC ¶ 99. It also misrepresents preemption law and this Court's Order—both of which state that consideration of similar factors is *a* potential method of preemption.[8] *See* Order at 16. Here, conflict preemption arises not because the Special Permit analyzes the same factors as § 25B-10(a)(9) but because the Special Permit requires —in contravention of the County's findings—that Sable act as owner and operator of the Facilities in testing, inspecting, and repairing them, such as requiring Sable repair pipes with pipeline-wall loss of 40% or more. *See* SAC ¶¶ 99, 171-172. Yet Sable cannot complete those PHMSA-ordered tasks when the County claims authority to stop Sable's work based on its independent operator safety determination.[9] *See id.* ¶¶ 56, 172. These facts state a claim for conflict preemption.

The County next argues that its asserted right to shut down any pipeline upon deciding the operator lacks the "skills, training, and resources necessary" to safely operate, SAC ¶¶ 55-56, 162-173, is not preempted by the PSA's express preemption provision because "Chapter 25B concerns the operator," whereas the PSA concerns "the individuals the operator employs," Mot. at 21. This is inaccurate. The County

---

[8] Not attaching the Special Permit to the SAC, *see* Cnty. Mot. at 18, is not a basis for dismissal. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim."). Regardless, Petitioners now attach the Special Permit as Exhibit 1 to their RJN.

[9] This is especially true given that the County's enforcement mechanism does not require a showing of irreparable harm or inadequacy of a legal remedy and imposes civil and criminal sanctions for noncompliance. *See* County Code § 25B-13.

analyzes only one PSA provision—49 U.S.C. § 60102(a)(2)(c), requiring safety training of employees—and claims that the PSA does not preempt Chapter 25B because that provision is only concerned with individuals. *See* Mot. at 20. But preemption analysis requires examining "the entire scheme of the statute." *See Crosby*, 530 U.S. at 373. The very next provision of the PSA, § 60102(a)(3), makes "the operator of a pipeline facility" responsible for "ensur[ing] that employees who operate and maintain the facility are qualified" to safely operate the operator's pipelines. The County's claimed distinction is also illogical: its judgment that a pipeline operator lacks "the skills, training, and resources necessary to operate the permitted facility," § 25B-10(a)(9), is fundamentally a judgment about an operator's *employees*: a corporate entity cannot have "skills" or "training."

The rest of the PSA and its implementing regulations make it overwhelmingly clear that the PSA regulates "operators" (any firm that owns or operates pipeline facilities, *see* 49 C.F.R. § 195.2) to ensure they have—as Chapter 25B puts it—the "skills, training, and resources necessary" to operate safely. *See, e.g.*, *id.* §§ 195.204, 195.206, 195.412 (inspections, including one at least every 3 weeks); *id.* §§ 195.402, 195.446 (preparation, training, and continuous updating of written procedures for normal and emergency operations); *id.* § 195.403 (employee safety training); *id.* §§ 195.408, 195.430, 195.434-195.436 (communications, firefighting, and signage); *id.* §§ 195.50-195.56 (annual, accident-based, and safety-related reporting). If an operator fails to comply—or, per Chapter 25B, engages in "non-compliant or unsafe operations"—it faces emergency shutdowns, injunctions, remedial orders, and civil and criminal penalties. *See, e.g.*, 49 U.S.C. §§ 60117(p)(1), 60118(b), 60120, 60122(a), 60123(a); *see also* SAC ¶¶ 47, 100; *See also generally* Opp. to Intervenors' Partial Mot. to Dismiss at 17-20.

To protect this intricate regulatory scheme, the PSA explains that states "may not adopt or continue in force safety standards for interstate pipeline[s]" and may "adopt additional or more stringent safety standards for intrastate pipeline[s]" . . .

*only if* those standards are compatible" with the PSA. 49 U.S.C. § 60104(c) (emphasis added). As the County notes, "the plain wording of the clause[] . . . necessarily contains the best evidence of Congress' pre-emptive intent." *Commonwealth Of Puerto Rico v. Franklin California Tax-free Tr.*, 579 U.S. 115, 125 (2016); *see* Mot. at 20. And as the Ninth Circuit has held, "[federal preemption of the regulation of interstate pipeline safety in any . . . manner is manifest in the language of the PSA provision entitled 'Preemption.'" *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 878 (9th Cir. 2006). Here, PHMSA has exercised its authority under the PSA's safety standards to issue the Special Permit authorizing Sable's operations. The County has no lawful role applying different standards, let alone determining that Sable may not safely operate. Unless the local authority gives way in the event of such overlap, a county could give itself unilateral veto power over operation of an interstate pipeline. The County's action is preempted.

Assessing similar allegations, another judge of this Court held last month that Sable's claim that "the Pipeline Safety Act preempts California's denial of an easement for [a portion of the pipeline Facility] and decision to bring [an] associated trespass action . . . ***must survive a motion to dismiss***." RJN, Ex. 2 at 40 (emphasis added). Sable "plausibly allege[d] facts that might imply that [California] denied the easement for the purposes of imposing regulation" on the Facility in violation of the PSA, *id.*, because California had conditioned granting the easement on "extensive additional environmental analysis and review" duplicative of analyses completed in the 1980s prior to the Pipeline's construction. *Id.*, Ex. 3 at 3. So too here: the County is attempting to condition operation of the Facilities on different standards than those applied by PHMSA. Petitioners have adequately pleaded express preemption.

Finally, the County errs in arguing that Chapter 25B is not preempted by the PSA under a theory of field preemption. *See* Opp. to Intervenors' Mot. at 8-9 (the PSA's broad preemption provision supports field preemption of pipeline safety

standards); *Kinley Corp. v. Iowa Utilities Bd., Utilities Div., Dep't of Com.*, 999 F.2d 354, 359 (8th Cir. 1993) (PSA does not allow "gap-filling state regulation"). Under the PSA, even "nominally non-safety provisions are preempted by federal law if they nevertheless regulate safety," *Couser v. Shelby County*, 139 F.4th 664, 670-71 (8th Cir. 2025), *cert. denied sub nom. Shelby Cnty. v. Couser*, 25-419, 2026 WL 79941 (U.S. Jan. 12, 2026) (emphasis added).

The County argues that there is no preemption because (1) its asserted right to determine operator safety and order shutdowns is an exercise of County "land-use and development-permitting authority," and (2) Chapter 25B "largely concerns liability for compliance with local permit conditions and abandonment." Mot. at 21-22. These arguments misrepresent Chapter 25B's scope. First, the County cites to 49 U.S.C. § 60104(e), stating that the PSA "does not authorize the Secretary of Transportation to prescribe the location or routing of a pipeline facility," to argue that land-use regulation is not preempted. *See* Mot. at 21-22. This is irrelevant. Section 25B-10(a)(9) is not concerned with pipeline location or routing: it concerns whether a proposed operator has "a record of non-compliant or unsafe operations systemic in nature" such that they lack "the skills, training, and resources necessary" to operate a pipeline. *See* SAC ¶¶ 162-173.[10] The *sole* basis for denying the Transfers was that Sable allegedly lacked "the skills, training, and resources" necessary to operate the Facilities. *See* SAC ¶¶ 6, 99, 169, 180.

Finally, the County notes that the PSA has a carveout for tort claims. *See* 49 U.S.C. § 60120(c); Mot. at 22. But section 25B-10(a)(9) does not concern tort liability, it is a regulation concerning *operator safety*, *see* SAC ¶¶ 162-173, and the PSA reserves to the federal government "almost unbridled authority and discretion . . . to determine how to keep pipelines safe at every stage," and "[t]hese narrow carveouts reinforce the broad preemptive force against any other state regulatory

---

[10] The County's own brief reveals that permit conditions and abandonment are covered by Sections 25B-**4(h)** and 25B-**4(i)**, *not* Section 25B-**10(a)(9)**.

power." *Enbridge Energy*, 813 F. Supp. 3d at 794, 796. The County's determination that the Facilities could not be safely operated is preempted by the PSA's multilayered regulation of operator safety.

### C. The County Fails to Justify Dismissal of Petitioners' Contract Claim

Petitioners have also pleaded a claim for breach of contract. The County's argument ignores that the Celeron Agreement was a compromise of a prior *jurisdictional* dispute over exactly the sorts of claims that have arisen again here. *See* Celeron Agreement at Recitals, p. 2 ("Whereas, the parties have disagreed as to the scope of the County's jurisdiction over interstate pipelines."). In 1988, the County imposed substantial costs on Celeron through delays during litigation over jurisdictional overreach. Celeron bargained to mitigate that risk. *See* Celeron Agreement § 2.5 ("if Celeron is forced to stop work during pipeline construction and/or operation by reason of some action of the County, the cost to Celeron could be extremely high"). The County's characterization omits the two key protections Celeron bargained for: (1) a procedural mechanism to resolve future jurisdictional disputes, and (2) a damages remedy for such disputes. These terms were intended to protect Celeron (and its successors and assigns)[11] from undue costs should the County again exceed its jurisdiction—as Petitioners allege it has done here.

It is undisputed that federal law preempts *at least some* County actions regarding the Pipeline. *See* Celeron Agreement § 2.1. It also is undisputed that some actions fall within the County's jurisdiction. The Celeron Agreement thus distinguishes actions *beyond* the County's undisputed jurisdiction (to which the Agreement's framework applies) from actions *within* the County's undisputed jurisdiction (to which it does not). *See id.* §§ 2.5.3, 3.1. Section 2.5 provides the procedural framework for jurisdictional disputes. Section 13.1 provides the damages

[11] *See* Celeron Agreement Section 13.3, 13.4.

remedy, awarding the prevailing party "all damages and as costs all of its attorney fees and other costs reasonably incurred," including for breach of this framework. Celeron Agreement § 13.1.

1. <u>The Contract Claim Survives if the Preemption Claim Survives</u>

The Celeron Agreement provides Petitioners a damages remedy if the County exceeds its jurisdiction over the Pipeline (*i.e.*, attempts a preempted action). *See* SAC ¶¶ 40, 176, 177, 185. Therefore, if the Court concludes Petitioners have stated a preemption claim, a claim alleging the contractual damages remedy for preemption must also be viable. *See* SAC ¶ 185. The County does not dispute that the contractual remedy applies if its conduct is in fact preempted. *See generally* Cnty. Mot.

2. <u>Part of the Contract Claim Survives Even Without Preemption</u>

If Petitioners' preemption claim is dismissed, the contract claim inquiry must continue as to Section 2.5.3. A violation of that procedural framework is itself an actionable breach of the Celeron Agreement—even if the County's disputed jurisdiction is ultimately affirmed. Under Section 2.5.3, the County must immediately cease taking or contemplating actions with disputed jurisdiction upon receipt of Sable's written objection, and then refrain from such action until securing court approval in advance. *See* SAC ¶ 37; Celeron Agreement § 2.5.3. Petitioners allege the County failed to follow this procedure. Specifically, they allege: (1) the County took or contemplated actions which triggered the procedural protections of Section 2.5.3 (*see* SAC ¶¶ 180-182); (2) Sable and the ExxonMobil Affiliates provided the County with their written objection to such actions (*see id.* ¶ 183);[12] and (3) the County did not immediately cease those actions or seek a court order affirming its jurisdiction. *See id.* Whether or not Petitioners' jurisdictional argument prevails, those allegations on their own state a claim for breach.

[12] Both Petitioners served the County with Claim Notices objecting to the County's conduct. RJN Exs. 4, 5, and 7.

3. <u>None of the County's Arguments Warrant Dismissal</u>

First, contrary to the County's suggestion (*see* Cnty. Mot. at 23), Petitioners' contract claim is not based on an independent violation of Section 2.5.2 (which limits the County's stop work authority), but rather cites that provision to illustrate the scope of the County's agreed stop work authority under the Agreement—an agreed scope that is contrary to the County's assertion that it has the right to issue such an order based on a claimed violation of Chapter 25B—an assertion it has refused to disclaim despite repeated opportunities to do so.

Second, as to Section 2.5.3 (the dispute resolution framework), the County asserts procedural impropriety related to the Court's prior order because the amended complaint retains a contract claim that the County views as dependent on preemption. *See id*. at 23. Not only do Petitioners allege a different preemption theory than what was dismissed, the alleged procedural violation of Section 2.5.3 also stands on its own, independent of the preemption claim—*i.e.*, Petitioners allege the County failed to follow the contractual process applicable to claims of preemption. Therefore, the contract claim cannot be dismissed on this basis.

Third, the County asserts Petitioners have not "alleged the County has *taken* any action . . . 'which will stop or delay [Sable]'s construction or operation.'" Cnty. Mot. at 23 (emphasis added). But the procedural protections apply if "the County is taking *or contemplating the taking* of any action" with disputed jurisdiction "which *will* stop or delay . . . operation." Celeron Agreement § 2.5.3 (emphasis added). Neither the action nor the stoppage need have yet occurred. *See also id.* § 3.1.1 ("If the activity *to be performed* is covered by Part 195." (emphasis added)). Relatedly, the County asserts, "Plaintiffs do not allege the Board . . . has ordered them *through the FDP process* to cease operations . . . ." Cnty Mot. at 23-24 (emphasis in original). That qualification is revealing. The County claims it may make a regulatory determination against Sable that is enforceable via a stop work order (with civil and criminal liability accruing in the interim) yet evade Section 2.5.3 until it *initiates*

*enforcement*—even if the underlying determination is plainly beyond its jurisdiction. The Celeron Agreement contains no such loophole, and that reading contradicts the parties' intent to trigger Section 2.5.3 at the mere "contemplat[ion]" of a qualifying action. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Rsrv. v. California*, 813 F.3d 1155, 1165 (9th Cir. 2015) ("[T]he fundamental goal of contract interpretation is to give effect to the mutual intent of the parties . . . .").

Even the County seems to admit that *enforcement* under Chapter 25B would trigger Section 2.5.3. And the County's denial of the Transfers supports a reasonable inference that—as Petitioners allege and the County has yet to contradict, *see* SAC ¶ 183—the County is contemplating enforcement if Sable continues as operator. *See Young*, 690 F. Supp. 3d at 1098 (reasonable inferences must be drawn in plaintiff's favor); *see also* SAC ¶ 56 ("The County has not disclaimed using its enforcement authority with respect to the Facilities."). That is a pleaded breach.

Further, the County's suggestion that seeking an injunction under Chapter 25B (*i.e.*, initiating enforcement) would itself satisfy the Section 2.5.3 process because it requires a court order (*see* Cnty. Mot. at 24) proves the County is advancing a competing interpretation of the Celeron Agreement, which is another reason dismissal is improper.[13] Petitioners' interpretation is that Section 2.5.3 requires the County to seek declaratory judgment confirming its jurisdiction *before* it could file for an injunction under Section 25B; on its face Section 2.5.3 operates as a preclearance mechanism, not an affirmative defense, and the Chapter 25B injunction procedure would subvert important contractual protections. Regardless of future conduct, Petitioners allege the County has *already* violated the Celeron Agreement based on its conduct to date. *See* SAC ¶¶ 183-185.

---

[13] *See State Farm Mut. Auto. Ins. Co. v. Fernandez*, 767 F.2d 1299, 1301 (1985) ("If [contractual] ambiguity exists, a question of fact is presented."); *ASARCO, LLC v. Union Pacific R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014) (if "an asserted defense raises disputed issues of fact, dismissal under Rule 12(b)(6) is improper").

Fourth, the County's arguments about ministerial permits fail for three reasons. First, Section 2.5.3 applies to actions of disputed jurisdiction "*including*," but not limited to, "suspending or withholding ministerial permits." Celeron Agreement § 2.5.3 (emphasis added). So even if Chapter 25B were discretionary, that would not warrant dismissal of the contract claim. Second, the County's suggestion that "the parties did not consider" "[t]he amendment of [FDPs] to change the owner, operator, or guarantor . . . because Chapter 25B had not yet been enacted" (Cnty. Mot. at 24) contradicts the allegations. The need and ability to amend FDPs to reflect a change in ownership predated Chapter 25B, and the Celeron Agreement's inclusion of Celeron's successors shows the parties contemplated the Facilities' future sales and expected the successors to succeed to the agreement. *See, e.g.,* Celeron Agreement §§ 13.3, 13.4. Third, the Celeron Agreement described the *qualities* of actions triggering Section 2.5.3 rather than a complete list. So even if FDP transfers were subsequently created, that would not establish the parties' intent to exclude them.

Fifth, the County expresses confusion about Petitioners' allegations concerning Sections 3.1.1 and 3.1.2, which "simply provide an 'aid' in determining what is preempted." Cnty Mot. at 25. These "aids" help determine when Section 2.5.3 is triggered rather than constituting standalone bases for breach. *See* Celeron Agreement §§ 3.1.1 (presumption of preemption "[i]f the activity to be performed is covered by Part 195."), 3.1.2 (presumption "[i]f the activity to be performed is impliedly but not expressly specified by Part 195 and it deals with design, construction or operation of an interstate pipeline."). Petitioners allege the County triggered Section 2.5.3 via such preempted conduct. *See* SAC ¶¶ 180-182. The County argues, "even if 49 U.S.C. § 60102(a)(2)(c) and Part 195, subpart G preempted Chapter 25B, that would not support a breach of contract claim because those provisions did not exist" in 1988. Cnty. Mot. at 25. Yet even taken as true, this argument is insufficient to carry the County's burden to prove *none* of its

conduct would have been preempted (either explicitly or impliedly) under the similarly preemptive 1988 version of Part 195—which the County does not analyze. *See* Celeron Agreement §§ 3.1.1, 3.1.2.

Finally, the County vaguely asserts that "Plaintiffs' construction would render the Agreement invalid" for purportedly surrendering police powers. *See* Cnty. Mot. at 26. But the County cites neither the contract nor the pleadings—because Petitioners do not allege the County surrendered any jurisdiction, and it did not. As this Court previously observed, "a municipality may not 'contract away' its legislative and governmental functions." Dkt. 83 at 24. However, that "rule applies to void *only* a contract which amounts to a city's *surrender*, or *abnegation*, of its control of a properly municipal function." *Stephens v. City of Vista*, 994 F.2d 650, 655 (9th Cir. 1993), *as amended on denial of reh'g* (Aug. 4, 1993) (emphasis altered) (internal quotation marks and citation omitted). Contracts that fall short of a "surrender" are upheld. *See 108 Holdings, Ltd. v. City of Rohnert Park*, 136 Cal. App. 4th 186, 195 (2006) ("The inquiry thus turns on whether 'this crucial control element has been lost.'"); *Morrison Homes Corp. v. City of Pleasanton*, 58 Cal. App. 3d 724, 734 (Ct. App. 1976) ("No provision of the various agreements supports the inference . . . that any of them involved a 'surrender' by the City of its control of the annexation process or of its sewer operation. The general rule is accordingly inapplicable.").

Here, on its face, the Celeron Agreement sought to "clarify"—not modify or expand—what types of actions may be preempted, and to specify a framework for resolving disputes. *See*, *e.g.*, SAC ¶¶ 35, 41; Celeron Agreement § 2.5 ("It is for this reason that the Parties seek to *clarify* the areas where the County can issue a stop work order without resort to a judicial action and areas where the County would be required to seek judicial relief." (emphasis added)). The Agreement did so to help identify which County actions are subject to Section 2.5.3, not to impose a redundant contractual prohibition duplicating federal preemption. *See*, *e.g.*, Celeron Agreement

§ 3. The contract's descriptions of the County's jurisdiction are merely factual statements about existing law. *See, e.g.,* SAC ¶ 35; Celeron Agreement § 2.1 ("The County and Celeron agree that the jurisdiction of the County over an interstate pipeline is limited and partially preempted by the provisions of the Hazardous Liquid Pipeline Safety Act and 49 CFR Part 195."). Moreover, the Celeron Agreement explicitly *preserved* the County's legislative authority (*see id.* § 13.5 ("Nothing in this Agreement shall be construed to restrict County's authority derived from future changes to state or federal law")), and made clear that the County's jurisdiction is limited by the extent of federal preemption, not any contractual agreement beyond that preemption. *See id.* ("If the [US] DOT gives up some or all of its jurisdiction over the design, construction and/or operation of Celeron's pipeline and DOT delegates such authority to the County then, notwithstanding the foregoing, the County shall have the right to exercise such authority without restriction under this Agreement.").

This procedural framework cannot be read as a substantive surrender of County jurisdiction. Even for actions subject to Section 2.5.3, the County retained—and still retains—the ability to exercise the maximum extent of its lawful jurisdiction. Under the Celeron Agreement, the only potential jurisdiction the County is prohibited from exercising is jurisdiction that a court determines in advance is preempted. *See id.* § 2.5.3. The County's cited cases and the general rule they describe (*see* Cnty. Mot. at 26-27) therefore do not apply: a contract cannot reasonably be read as surrendering police powers a local government never had.

## V. CONCLUSION

For these reasons, the County's motion to dismiss should be denied.

Dated: September 15, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

By: /s/*Jessica Stebbins Bina*

Jessica Stebbins Bina
*Jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Tel.: (424) 653-5500
Fax: (424) 653-5501

Attorneys for Plaintiffs and Petitioners Sable Offshore Corp., Pacific Pipeline Company, and Pacific Offshore Pipeline Company

O'MELVENY & MYERS LLP

By: /s/*Lauren Kaplan*

Lauren Kaplan (Bar No. 294703)
*lkaplan@omm.com*
Dawn Sestito (Bar No. 214011)
*dsestito@omm.com*
400 South Hope Street, 19th Floor
Los Angeles, California 90071
Telephone: +1 213.430.6000
Facsimile: +1 213.430.6407

Attorneys for Petitioners and Plaintiffs Exxon Mobil Corporation, Mobil Pacific Pipeline Company, and ExxonMobil Pipeline Company

## ATTESTATION STATEMENT

I, Jessica Stebbins Bina, am the ECF User whose identification and password are being used to file this Opposition to Respondent County of Santa Barbara's Motion to Dismiss. Pursuant to Local Rule 5-4.3.4(a)(2)(i), I attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

/s/*Jessica Stebbins Bina*
Jessica Stebbins Bina

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Petitioners Sable Offshore Corp., Pacific Pipeline Company, and Pacific Offshore Pipeline Company, certifies that this brief contains 6,974 words, which complies with L.R. 11-6.1.

Dated: September 15, 2026

/s/ *Jessica Stebbins Bina*
Jessica Stebbins Bina