LATHAM & WATKINS LLP
Jessica Stebbins Bina (Bar No. 248485)
*jessica.stebbinsbina@lw.com*
10250 Constellation Blvd. Suite 1100
Los Angeles, CA 90067
Telephone: +1 424.653.5500
Facsimile: +1 424.653.5501

Attorneys for Petitioners Sable Offshore Corp., Pacific Pipeline Company, and Pacific Offshore Pipeline Company

O'MELVENY & MYERS LLP
Dawn Sestito (Bar No. 214011)
*dsestito@omm.com*
Lauren Kaplan (Bar No. 294703)
*lkaplan@omm.com*
400 South Hope Street, 19th Floor
Los Angeles, California 90071
Telephone: +1 213.430.6000
Facsimile: +1 213.430.6407

*Attorneys for Petitioners and Plaintiffs Exxon Mobil Corporation, Mobil Pacific Pipeline Company, and ExxonMobil Pipeline Company*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SABLE OFFSHORE CORP. et al.,<br><br>Petitioners/Plaintiffs,<br><br>v.<br><br>COUNTY OF SANTA BARBARA et al.,<br><br>Respondents/Defendants,<br><br>and<br><br>ENVIRONMENTAL DEFENSE CENTER, et al.,<br><br>Intervenors. | CASE NO. 2:25-cv-04165-DMG-CTS<br><br>**PETITIONERS' OPPOSITION TO INTERVENORS' MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**<br><br>Complaint Filed: May 8, 2025<br><br>Date: October 23, 2026<br>Time: 9:30 a.m.<br>Ctrm.: 8C<br>Judge: Hon. Dolly M. Gee |

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ........................................................................ 1

II. STANDARD OF REVIEW ............................................................ 2

III. PLEADED FACTS ...................................................................... 3

IV. PETITIONERS HAVE PLAUSIBLY PLEADED PREEMPTION ............. 4

A. Petitioners Have Stated a Claim for Express Preemption. .................. 6

B. Petitioners Have Stated a Claim for Field Preemption. ..................... 13

C. Petitioners Have Stated a Claim for Conflict Preemption. ................ 17

V. CONCLUSION ........................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Am. Apparel & Footwear Ass'n, Inc. v. Baden*,
107 F.4th 934 (9th Cir. 2024) .......... 18, 19

*ANR Pipeline Co. v. Iowa State Com. Comm'n*,
828 F.2d 465 (8th Cir. 1987) .......... 9

*Arizona v. United States*,
567 U.S. 387 (2012) .......... 13, 17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 2, 20

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 2

*Bryant v. Woodall*,
1 F.4th 280 (4th Cir. 2021), *as amended* (June 23, 2021) .......... 10, 20

*Couser v. Shelby Cnty., Iowa*,
139 F.4th 664 (8th Cir. 2025), *cert. denied sub nom. Shelby Cnty. v. Couser*, 25-419, 2026 WL 79941 (U.S. Jan. 12, 2026) .......... *passim*

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) .......... 13, 16, 18

*Enbridge Energy, Ltd. P'ship v. Whitmer*,
813 F. Supp. 3d 777 (W.D. Mich. 2025) .......... *passim*

*English v. General Elec. Co.*,
496 U.S. 72 (1990) .......... 7

*FFV Coyote LLC v. City of San Jose*,
637 F. Supp. 3d 761 (N.D. Cal. 2022) .......... 2

*Haaland v. Brackeen*,
599 U.S. 255 (2023) .......... 18

*Kinley Corp. v. Iowa Utilities Bd., Utilities Div., Dep't of Com.*,
999 F.2d 354 (8th Cir. 1993) .......... 8, 10

*Matsumoto v. Labrador*,
122 F.4th 787 (9th Cir. 2024) .......... 10, 20

*Nat'l Org. of Veterans' Advocs. v. Sec'y of Veterans Affs.*,
981 F.3d 1360 (Fed. Cir. 2020) .......... 10, 20

*Olympic Pipe Line Co. v. City of Seattle*,
437 F.3d 872 (9th Cir. 2006) .......... *passim*

*People ex rel. Sneddon v. Torch Energy Servs., Inc.*,
102 Cal. App. 4th 181 (2002) .......... 14

*Portland Pipe Line Corp. v. City of S. Portland*,
288 F. Supp. 3d 321 (D. Me. 2017) .......... 9

*Shroyer v. New Cingular Wireless Servs., Inc.*,
498 F.3d 976 (9th Cir. 2007) .......... 18, 19

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .......... 10, 20

*Texas Midstream Gas Servs., LLC v. City of Grand Prairie*,
608 F.3d 200 (5th Cir. 2010) .......... 9

*United States v. Salerno*,
481 U.S. 739 (1987) .......... 6

*Washington Gas Light Co. v. Prince George's Cnty. Council*,
711 F.3d 412 (4th Cir. 2013) .......... 9, 19

*Williams Pipe Line Co. v. City of Mounds View, Minn.*,
651 F. Supp. 551 (D. Minn. 1987) .......... 12

*Young v. NeoCortext, Inc.*,
690 F. Supp. 3d 1091 (C.D. Cal. 2023) .......... 3

## STATUTES

49 U.S.C.
§ 60101 *et seq.* .... 4
§ 60102(a)(2) .... 8, 13, 14
§ 60102(a)(2)(C) .... 16
§ 60102(a)(3) .... 16
§ 60102(b) .... 8
§ 60104(c) .... 1, 7, 8
§ 60117(p)(1) .... 15
§ 60118(a)(1) .... 14
§ 60118(b) .... 15
§ 60118(c) .... 17
§ 60118(e)(1) .... 14
§ 60120 .... 15
§ 60120(c) .... 9
§ 60122(a) .... 15
§ 60123(a) .... 15

## RULES

Fed. R. Civ. P.
8(a)(2) .... 2
12(b)(6) .... 2

## REGULATIONS

49 C.F.R.
§ 190.341 .......... 17
§ 195.0 *et seq.* .......... 14, 15
§ 195.2 .......... 14
§ 195.10 .......... 15
§§ 195.50–195.56 .......... 14
§ 195.65 .......... 14
§§ 195.104–195.106 .......... 14
§ 195.126 .......... 14
§ 195.204 .......... 14
§ 195.206 .......... 14
§ 195.210 .......... 14
§ 195.402 .......... 15
§ 195.403 .......... 15
§ 195.404 .......... 15
§ 195.408 .......... 15
§ 195.412 .......... 15
§ 195.430 .......... 15
§§ 195.434–195.436 .......... 15
§ 195.446 .......... 15

## CONSTITUTIONAL PROVISIONS

U.S. Const. Article VI, cl. 2 .......... 6

## OTHER AUTHORITIES

Santa Barbara County Code
Chapter 25B .......... *passim*
Chapter 25B-1 .......... 10
§ 25B-10(a)(9) .......... *passim*
§ 25B-13 .......... *passim*

# I. INTRODUCTION

Intervenors' motion to dismiss should be denied. The County[1] denied the transfer of the Facilities to Sable based solely on its determination that Sable lacks "the skills, training, and resources necessary to operate the permitted facility" and has "a record of non-compliant or unsafe operations." County Code § 25B-10(a)(9); SAC ¶¶ 98, 169. That determination was preempted. Petitioners properly plead that Santa Barbara County Code Chapter 25B, at least as applied in this case, improperly overrides federal authority over pipeline safety that Congress expressly and exclusively reserved to the federal government in the Pipeline Safety Act, or PSA.

First, the County's actions are expressly preempted. The PSA bars state and local authorities from adopting or enforcing safety standards for pipeline facilities unless specifically authorized by PHMSA. *See* 49 U.S.C. § 60104(c). No party alleges the County holds PSA certification. *See* Order re Defendants' Motion to Dismiss and Intervenors' Motion to Dismiss, ECF 83 ("Order") at 14. Yet Chapter 25B empowers the County to determine whether an operator can safely run a pipeline, and § 25B-13 arms it with authority to seek injunctive shutdown of the Facilities as well as civil and criminal penalties. In making its 25B determination, the County made a *de novo* determination that the Facilities could not be safely operated by Sable, infringing on the comprehensive pipeline-operator safety scheme the PSA vests exclusively in PHMSA or its state delegee. PHMSA already reviewed Sable's qualifications and approved Sable for operation of these Facilities pursuant to a federal Consent Decree, finding it to be a safe operator in compliance with federal law. SAC ¶ 99. Intervenors cannot overcome these facts.

Field preemption also bars the County's actions. Congress occupied the field of pipeline safety through the PSA and its implementing regulations, which

---

[1] Capitalized terms have the definitions given them in Petitioners' Second Amended and Supplemental Verified Petition for Writ of Mandate and Complaint for Declaratory Relief and Damages, ECF 86.

comprehensively regulate operators' qualifications, training, operational protocols, maintenance, and enforcement. The federal government holds "plenary power to determine how to keep pipelines safe at every stage from design through construction, testing, operation, maintenance, and even replacement." *Enbridge Energy, Ltd. P'ship v. Whitmer*, 813 F. Supp. 3d 777, 794 (W.D. Mich. 2025). As applied to facilities within the PSA's jurisdiction, such as the Facilities here, PSA field preemption bars the County from independently assessing operator safety.

Finally, conflict preemption also applies under the pleaded facts. PHMSA has ordered Sable to act as owner and operator of these Facilities, performing inspections, tests, and repairs mandated by federal Special Permits. SAC ¶¶ 99, 171–172. Yet the County retains authority under § 25B-13 to enjoin Sable from performing those PHMSA-ordered activities and to impose civil and criminal penalties for Sable's so doing. Compliance with both Chapter 25B and the PSA is impossible, and Chapter 25B is conflict preempted.

Intervenors' renewed motion to dismiss relies on a cramped and disjointed reading of both the PSA and Chapter 25B—a reading that even contradicts the County's interpretation of its own ordinance—and cannot overcome the plain text, the weight of multi-circuit authority, or the well-pleaded facts. The motion should be denied.

## II. STANDARD OF REVIEW

A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint survives a motion to dismiss so long as it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Dismissal for failure to state a claim under Rule 12(b)(6) is appropriate only "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *FFV Coyote LLC v. City of San Jose*,

637 F. Supp. 3d 761, 767 (N.D. Cal. 2022). The Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *See, e.g.*, *Young v. NeoCortext, Inc.*, 690 F. Supp. 3d 1091, 1098 (C.D. Cal. 2023).

## III. PLEADED FACTS

Petitioners refer to their concurrently filed opposition to the County's motion to dismiss for general facts. As relevant to Chapter 25B's preemption by the federal PSA, on November 4, 2025—following this Court's order that the County Board of Supervisors must approve or deny the Transfers—the Board directed the County staff to "return with findings to . . . deny the change of Owner, Operator, and Guarantor" for all three Facilities. SAC ¶¶ 79, 86. The Board adopted those December Findings with respect to all three Facilities. *See id.* ¶ 89. The December Findings "are expressly limited to a single finding: the 'Operator Capability' finding." *Id.* ¶ 92. The "Operator Capability" finding requires the Board to determine whether the proposed operator:

> has the skills, training, and resources necessary to operate the permitted facility in compliance with the permit and all applicable county codes and has demonstrated the ability to comply with compliance plans listed [above]. The director shall require relevant records of compliance, and corrective actions taken subsequent to any major incidents for facilities, if any, that are similar in nature to those that are the subject of the permit, as may be necessary to make findings. These records shall be used to provide sufficient assurance that the proposed operator does not reflect a record of non-compliant or unsafe operations systemic in nature for similar facilities to those being considered for operatorship.

*Id.* ¶ 55 (quoting § 25B-10(a)(9)). "The December Findings fail to identify a single instance of non-compliance with the County Code, the FDPs, or the relevant Compliance Plans[.]" *Id.* ¶ 102. Instead, "the County asserts that it could and did determine that Sable lacks 'the skills, training, and resources necessary to operate'" the Facilities. *Id.* ¶ 97 (quoting § 25B-10(a)(9)). The County "has not disclaimed using its enforcement authority" in Chapter 25B-13, including injunctive relief

without any showing of irreparable harm plus civil and criminal penalties of up to $25,000 and six months in jail per day for noncompliance. *Id.* ¶ 56.

While the County determined that Sable may not safely operate the Facilities, PHMSA, the federal agency charged with implementing the PSA, determined the opposite. On December 17, 2025, PHMSA asserted jurisdiction over the Facilities. *See id.* ¶ 44. PHMSA approved Sable for operation after finding it would be a safe operator acting in compliance with the law. *See id.* ¶ 99. On June 25, 2026, PHMSA issued Sable a Special Permit directing it to inspect, test, assess, and repair the pipeline Facility within prescribed timeframes. *See id.* ¶¶ 99, 171–172.

## IV. PETITIONERS HAVE PLAUSIBLY PLEADED PREEMPTION

Petitioners seek declaratory and injunctive relief on the grounds that the County's actions are preempted by the PSA. The well-pleaded facts support this claim. The PSA reserves to the federal government "almost unbridled authority and discretion" and "plenary power to determine how to keep pipelines safe at every stage from design through construction, testing, operation, maintenance, and even replacement." *Enbridge Energy*, 813 F. Supp. 3d at 794; *see* 49 U.S.C. § 60101 *et seq.* PHMSA has already exercised that authority by approving the Facilities' restart. SAC ¶ 99; Petitioners' Request for Judicial Notice ("RJN"), ECF 97, Ex. 1 at 4.

The County denied the Transfers based solely on its determination that Sable has "non-compliant or unsafe operations" and lacks "the skills, training, and resources necessary to operate the Facilities." County Code § 25B-10(a)(9); SAC ¶¶ 55, 89, 91–93, 97–98, 111. Moreover, the County continues to assert that it has authority under Chapter 25B to seek an injunction ordering shutdown of the Facilities. *See* SAC ¶¶ 56, 100. And it asserts it has the power to do so merely for violation of the Chapter, that is, operating without the County's blessing, without any showing of irreparable harm. *See* SAC ¶ 56; County Code § 25B-13. Taken as true, as they must be on a motion to dismiss, these allegations state a claim for

preemption based on all three preemption theories: express preemption by the PSA's express preemption clause, field preemption, and conflict preemption.

In their motion to dismiss, Intervenors mischaracterize this Court's Order, the PSA, and Chapter 25B. Intervenors claim that Chapter 25B can only be preempted by the PSA if PHMSA, in a single regulatory finding, made the exact same determinations as the County, *see* Mot. at 11, 19–20. In so doing so they misrepresent this Court's Order, which merely acknowledged that *a* potential method of preemption could be opposing findings in mirror-image analyses, *see* Order at 16. In any event, the PSA does in fact comprehensively regulate the very same pipeline operator safety qualifications as § 25B-10(a)(9) does. Attempting to avoid this conclusion, Intervenors try to narrow the PSA to a single provision governing "the qualifications of *individual* pipeline personnel," Mot. at 14, and recast Chapter 25B as narrower than its text. *See* SAC ¶ 168.

Taking Intervenors at their invitation to "begin with the text," Mot. at 19, the text of the PSA and its implementing regulations comprehensively address pipeline operator safety at the individual and company level, leaving no room for local regulation. Yet Chapter 25B, as applied to the Facilities, attempts to regulate the same safety standards and occupy the same field: it purports to empower the County to shut down any pipeline whose operator it deems to have "non-compliant or unsafe operations" or to lack the "skills, training, and resources necessary to operate the [pipeline]." County Code §§ 25B-10(a)(9), 25B-13. While "Chapter 25B *largely* dictates who can hold the FDPs and who bears liability and responsibility for certain standards," as the Court found, Order at 16 (emphasis altered), that was not the basis for the denial of the Transfers: rather, denial was based solely on Section 25B-10(a)(9)'s "Operator Capability" finding. *See* SAC ¶¶ 42–47; 55–56, 89, 91-93, 97–100, 111; 162–173. That is a preempted determination.

Although Intervenors claim throughout their brief that Chapter 25B does not necessarily interfere with the PSA's regulation of pipeline safety standards, *see, e.g.*,

Mot. at 12, they are contradicted by the County's *own motion*, which asserts that "[t]o comply with both [Chapter 25B and the PSA], an applicant need only to wait to apply for the Special Permit [from PHMSA] until *after its FDP application is approved under Chapter 25B*." Or, in other words, the County argues that a pipeline operator cannot seek, and PHMSA cannot grant, an operating permit until *after the County has independently determined that the pipeline can be safely operated*. County Mot. at 18 (emphasis added). Intervenors may advance hypothetical arguments about Chapter 25B's scope, but in the real world the County has claimed the right to condition the operation of federal law on its consent. It may not do so. *See* U.S. Const. art. VI, cl. 2.

Finally, Intervenors attack the idea that County Code § 25B-10(a)(9) could be facially preempted. *See* Mot. at 17–18. But Petitioners' argument is simple: denial of the Transfers is (1) preempted as applied for the reasons explained above and, (2) to the extent that the County's asserted interpretation is mandated by the text, by the facial preemption of § 25B-10(a)(9), *see* SAC ¶¶ 98, 169, because "no set of circumstances exists under which" it "would be valid" for the County to regulate pipeline safety. *United States v. Salerno,* 481 U.S. 739, 745 (1987); *see also, e.g.*, *Couser v. Shelby Cnty., Iowa*, 139 F.4th 664, 670–73 (8th Cir. 2025), *cert. denied sub nom. Shelby Cnty. v. Couser*, 25-419, 2026 WL 79941 (U.S. Jan. 12, 2026).

**A. Petitioners Have Stated a Claim for Express Preemption.**

"The Supremacy Clause of Article VI of the United States Constitution grants Congress the power to preempt state or local law." *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 877 (9th Cir. 2006). "Congress is empowered to pre-empt state law by so stating in express terms." *Couser*, 139 F.4th at 669 . "Pre-emption fundamentally is a question of congressional intent . . . and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *Id.* (quoting *English v. General Elec. Co.*, 496 U.S. 72, 78–79 (1990)). The parties and the Court agree that the County has no authority to impose pipeline safety

regulations on the Facilities, whether interstate or intrastate, as only PHMSA (or, in certain enumerated circumstances, a state law designee, such as OSFM) may regulate pipeline safety. *See* 49 U.S.C. § 60104(c); SAC ¶¶ 43-44; Order at 14 (holding that "[t]he PSA's express preemption clause applies to both intrastate and interstate pipelines," and "[n]o party alleges the County applied for PSA certification"). Intervenors dispute, however, that Chapter 25B constitutes a preempted safety regulation, arguing its regulation of pipeline safety is merely an incidental part of the County's local regulatory authority, akin to zoning. Intervenors thus argue that the County did not "attempt[] to regulate pipeline safety standards." Mot. at 12–17. Intervenors both misstate the PSA's express preemption provision and mischaracterize the County's authority under Chapter 25B. "[C]ongressional intent" as revealed in the "explicit statutory language," *Couser*, 139 F.4th at 669, along with the well-pleaded facts, demonstrate that Petitioners plausibly plead express preemption.

In the PSA, "Congress reserved for the federal government almost unbridled authority and discretion to regulate the safety of interstate pipelines" and "plenary power to determine how to keep pipelines safe at every stage from design through construction, testing, operation, maintenance, and even replacement." *Enbridge Energy, Ltd. P'ship*, 813 F. Supp. 3d at 794. The Ninth Circuit has confirmed that "[f]ederal preemption of the regulation of interstate pipeline safety . . . is manifest in the language of the PSA provision entitled 'Preemption.'" *Olympic Pipe Line*, 437 F.3d at 878. The PSA expressly preempts all state and local safety regulation of pipelines, both interstate and intrastate. As this Court has noted, the issue of whether the Pipeline is interstate or intrastate "is the subject of litigation in the Ninth Circuit," and this Court "need not resolve this question to determine whether the County's action was preempted," because it is undisputed that the County does not have regulatory authority regardless of the pipeline's interstate status. Order at 14

14 (citing *California v. PHMSA*, Nos. 25-8059, 26-508 (9th Cir. 2026)); *see* 49 U.S.C. § 60104(c).[2]

Intervenors state that "[t]he PSA contains an express preemption clause that is explicitly limited to 'safety standards[,]'" and that here Congress chose "a more limited preemptive scope." Mot. at 13. Intervenors are wrong about the scope: courts have held that "[t]he scope of the Pipeline Safety Act's preemption provision is extensive," and "demonstrate[s] Congressional intent to interpret 'safety standard'—and thus the preemption provision—broadly." *Enbridge Energy*, 813 F. Supp. 3d at 794 (citing 49 U.S.C. §§ 60102(a)(2) & (b)); *see* 49 U.S.C. § 60104(c). Taken altogether, the PSA's "Congressional grant of exclusive federal regulatory authority precludes state decision-making in this area altogether and leaves no regulatory room for the state to either establish its own safety standards or supplement the federal safety standards." *Couser*, 139 F.4th at 669 (internal citation omitted); *see Kinley Corp. v. Iowa Utilities Bd., Utilities Div., Dep't of Com.*, 999 F.2d 354, 359 (8th Cir. 1993) ("Congressional grant of exclusive federal regulatory authority precludes state decision-making in this area altogether and leaves no regulatory room for the state to either establish its own safety standards or supplement the federal safety standards." (citing *ANR Pipeline Co. v. Iowa State Com. Comm'n*, 828 F.2d 465, 472 (8th Cir. 1987)).

The PSA does not, of course, preempt *all* state and local regulations that have a "passing mention of safety." As this Court noted, the PSA incorporates "a savings clause for tort claims." Order at 16; *see* 49 U.S.C. § 60120(c). Accordingly, as Intervenors note, courts have occasionally upheld zoning, setback, and other regulations of the physical location of pipeline facilities. *See* Mot. at 13 & n.3.

[2] Those cases have since been consolidated with another case brought by California in response to PHMSA's issuance of the non-emergency Special Permit. *See* ECF 145, *California v. PHMSA*, No. 26-4629 (9th Cir. 2026). The Ninth Circuit has yet to decide the merits of the case and has currently asked the parties whether to weigh in on the need for supplemental briefing. *Id.*

Intervenors argue that these carveouts show the PSA's preemption provision is narrow. The opposite is true: the carveouts "reinforce the broad preemptive force against any other state regulatory power." *Enbridge Energy*, 813 F. Supp. 3d at 796. Explicit carveouts are necessary only because the PSA's preemption clause is broad enough that, without them, it *would* preempt state tort claims. Accordingly, courts have upheld local regulations *only* where the evidence showed that the municipality was not regulating the pipeline's safety or passing judgment on the operator's ability to safely operate. *See Washington Gas Light Co. v. Prince George's Cnty. Council*, 711 F.3d 412, 421-22 (4th Cir. 2013) (upholding zoning ordinance where safety considerations were "incidental"); *Texas Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 211 (5th Cir. 2010) (upholding setback requirement where safety concerns were "incidental[]"); *Portland Pipe Line Corp. v. City of S. Portland*, 288 F. Supp. 3d 321, 419, 433–34 (D. Me. 2017) (same).

The Eighth Circuit's recent decision in *Couser v. Shelby County* is instructive. There, the court examined *Washington Gas Light* and *Texas Midstream* and noted that courts "look[ed] beyond the rationale offered" by local governments "to evidence of the law's purpose." 139 F.4th at 670. Where the text of a statute evidences concern about regulating pipeline safety, such as "requiring larger setbacks from buildings with vulnerable populations" or language about "human safety in the event of a rupture" then "[t]he evidence supports that, at their core, the [law] regulate[s] safety." *Id.* at 671. That "undermines Congress's express intent to preempt the states from regulating in the area of safety" and means the local regulation is strictly preempted. *Id.* (internal citation omitted); *see also id.* at 670 (noting that even "nominally non-safety provisions are preempted by federal law if they nevertheless regulate safety"); *see also Kinley*, 999 F.2d at 359 (permit denial citing safety concerns was preempted even where non-pipeline safety justifications were also asserted).

Chapter 25B is no mere zoning ordinance or setback. Chapter 25B plainly states that "[t]he purposes of this chapter are to protect public health and safety . . . by ensuring . . . safe operation . . . of certain oil and gas facilities." Chapter 25B-1. This is not a passing reference; it is the stated purpose of the ordinance. Moreover, by its terms, Chapter 25B-10(a)(9) empowers the County to determine whether "[t]he proposed operator has the skills, training, and resources necessary to operate the permitted facility" and requires "sufficient assurance that the proposed operator does not reflect a record of non-compliant or unsafe operations systemic in nature for similar facilities to those being considered for operatorship." Chapter 25B-10(a)(9); *see* SAC ¶¶ 51, 55. Chapter § 25B-13 further empowers the County to "seek civil and criminal penalties, as well as injunction ordering the shutdown, of a pipeline the county deems unsafe." SAC ¶ 168. Despite repeated opportunities to do so, the County has not disclaimed this enforcement authority. *See id.* ¶ 56.[3]

As applied to the PSA-governed Facilities, Chapter 25B is a preempted safety regulation. The County "denied all three [permit] Transfers based *solely* on its determination that Sable lacks 'the skills, training, and resources necessary to operate the permitted facility,' because it allegedly has 'a record of non-compliant

---

[3] The fact that the County has not yet sought to shut down operation of the pipeline Facility or impose civil and criminal penalties is irrelevant to whether Chapter 25B is preempted by the PSA. A party need not wait until the State acts against it before litigating the Constitutionality of a particular statute. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 165 (2014) ("[A]dministrative action[] . . . may give rise to harm sufficient to justify pre-enforcement review."); *Bryant v. Woodall*, 1 F.4th 280, 289 (4th Cir. 2021), *as amended* (June 23, 2021) ("Unofficial and non-binding statements . . . do not and cannot override the plain text of the [statutes] when it comes to establishing a credible threat of enforcement" (internal quotation marks omitted).); *Matsumoto v. Labrador*, 122 F.4th 787, 797 (9th Cir. 2024) (similar); *Nat'l Org. of Veterans' Advocs. v. Sec'y of Veterans Affs.*, 981 F.3d 1360, 1380 (Fed. Cir. 2020) (stating that courts should look to a decision's "practical effect" in assessing the finality of the decision-making process, not conduct a formulaic check on whether or not an enforcement action has occurred.)

or unsafe operations.'" *Id.* ¶ 169 (quoting County Code § 25B-10(a)(9)) (emphasis added); *see also id.* ¶ 98. Comments by Board members confirm they understood their statutory role to be determining *de novo* whether Sable could safely operate the Facilities. *See, e.g.*, SAC ¶ 84 (Supervisor Lavagnino stated he would "be supporting the appeal" because Sable had not "demonstrated" it has "the skills, training, and resources to operate safely"); *id.* ¶ 82 (Supervisor Hartmann stated "we as a County have a duty as local government to protect . . . safety, . . . [a]nd that's what 25B does."); *see also id.* ¶¶ 81, 83, 85. And the County now argues that Sable should have gotten *its* permission first, prior to PHMSA's, to operate the existing federally regulated Pipeline. *See* County Mot. at 18.

Intervenors argue that stray comments by Board members stating a belief that Chapter 25B was "not about the integrity of the pipeline," SAC ¶ 62, in approving the 2023 transfer of some of the FDPs to the ExxonMobil affiliates "contradict[s] [Petitioners'] theory for express preemption," Mot. at 16. But this Court has already rejected the argument—now advanced by Intervenors—that preemption can be determined from "isolated comments." *See, e.g.*, Order at 15–16.

The text of Chapter 25B, and Petitioners' pleaded facts about how the Board interpreted it, reveal that Chapter 25B goes far beyond the setback regulations at issue in *Couser* and is worlds away from the zoning regulations and setbacks at issue in *Washington Gas Light* and *Texas Midstream*. This is direct regulation of the safe operation of a pipeline: "at [its] core, the [law] regulate[s] safety," and it is preempted by the PSA's express preemption clause. *Couser*, 139 F.4th at 671. "Hazardous liquid pipelines run through 21 states, and presumably through small and large plots of land belonging to vast numbers of persons." *Williams Pipe Line Co. v. City of Mounds View, Minn.*, 651 F. Supp. 551, 569 (D. Minn. 1987). If each jurisdiction were "entitled to demand compliance with their own safety standards, the clear Congressional goal of a national standard for hazardous liquid pipeline safety would be thwarted," an outcome "so repugnant to the statute that the survival

of such rights would in effect deprive [the PSA] of its efficacy." *Id.* at 569–70. No other county in the United States asserts the sweeping right to regulate pipeline operator safety as Santa Barbara County does here. *See* SAC ¶ 5. Petitioners' well-pleaded facts assert that that Sable is in full compliance with PSA and PHMSA regulations to operate the Facilities. *See id.* ¶ 99. Yet if the County determines, as it purportedly has, that Sable lacks the "skills, training, and resources necessary to operate the permitted facilit[ies]," the County may impose civil and criminal penalties and obtain an injunction ordering shutdown, regardless of PHMSA's approval. *See* County Code § 25B-13; SAC ¶¶ 55–56, 96–99.

Assessing similar allegations of government overreach, another judge of this Court held last month that Sable's claim that "the Pipeline Safety Act preempts California's denial of an easement for [a portion of the pipeline Facility] and decision to bring [an] associated trespass action . . . ***must survive a motion to dismiss***." RJN, Ex. 2 (*Sable v. Quintero* Order ("Quintero Order")), at 100. Sable "plausibly allege[d] facts that might imply that [California] denied the easement for the purpose of imposing regulation" on the Pipeline in violation of the PSA, *id.*, because California had conditioned granting the easement on "extensive additional environmental analysis and review" duplicative of analyses completed in the 1980s prior to the Pipeline's construction. *See id.*, Ex. 3 (*Sable v. Quintero* Complaint) at ¶ 6. Here, Chapter 25B's preemption by the PSA's express preemption provision is even starker; PHMSA says Sable can operate the pipeline safely; the County says it cannot. Intervenors can overcome neither the plain text of the PSA and Chapter 25B nor the County's own assertion that it regulates in the field of pipeline safety.

Petitioners' allegations plausibly describe a usurpation of Congress's reservation to PHMSA or its state delegee of the "unbridled" and "plenary" power "to determine how to keep pipelines safe at every stage." *Enbridge Energy*, 813 F. Supp. 3d at 794; *see Olympic Pipe Line*, 437 F.3d at 878. Under these facts, Petitioners have sufficiently alleged express preemption.

### B. Petitioners Have Stated a Claim for Field Preemption.

Petitioners have also plausibly pleaded field preemption. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) ("When Congress intends federal law to 'occupy the field,' state law in that area is preempted."). "The intent to displace state law altogether can be inferred from a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (internal quotation marks and ellipses omitted). "[T]he basic premise of field preemption[ is] that States may not enter, in any respect, an area the Federal Government has reserved for itself[.]" *Id.* at 402. Even where a law allegedly "complement[s] the federal law, or enforc[es] additional or auxiliary regulations," the fact that "the State would have the power to bring criminal charges" or other enforcement actions "in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies . . . underscore[s] the reason for field preemption." *Id.* at 402–03.

Intervenors devote half a page to this point, asserting only that Congress "did not intend to comprehensively legislate the entire field of oil and gas regulation." Mot. at 21. This is true. Congress *did*, however, occupy the field of *pipeline safety*. The PSA's "statutory scheme demonstrated Congressional intent to interpret 'safety standard' . . . broadly." *Enbridge Energy*, 813 F. Supp. 3d at 794 (quoting 49 U.S.C. § 60102(a)(2)). Congress empowered the Secretary of Transportation to prescribe safety standards for "the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities." *Id.* This grant shows "the federal government has plenary power to determine how to keep pipelines safe at every stage" and that "Congress reserved for the federal government almost unbridled authority and discretion to regulate the safety of interstate pipelines." *Id.*; *see also Olympic Pipe*

*Line*, 437 F.3d at 878 ("Federal preemption of the regulation of interstate pipeline safety in *any* other manner is manifest in the language of the PSA provision entitled 'Preemption.'"); *People ex rel. Sneddon v. Torch Energy Servs., Inc.*, 102 Cal. App. 4th 181, 187 (2002) ("The language of the PSA clearly expresses the intent of Congress to fully occupy the field of . . . interstate pipeline safety so that any state law that touches upon the area, even consistent state law, is preempted.").

The PSA's implementing regulations demonstrate that no aspect of pipeline safety is left for local regulation—whether classified as "standards" or "approvals" or "review" or "operator capability." The PSA requires "[a] person owning or operating a pipeline facility [to] . . . comply with applicable safety standards prescribed under this chapter." *Id.* § 60118(a)(1); *see also* § 60102(a)(2). Those standards, codified at 49 C.F.R. § 195.0 *et seq.* ("Part 195"), do not just regulate the physical pipes (pressure, *see id.* §§ 195.104–195.106; flange connections, *see id.* § 195.126; and location, *see id.* § 195.210). They also regulate "operators" (any individual or firm who owns or operates pipeline facilities, *see id.* § 195.2) to ensure each operator is qualified to run pipelines safely.

Thus, for example, Part 195 requires operators to participate in extensive annual, accident-based, and safety-related reporting. *See id.* §§ 195.50–195.56. Operators must assist in PHMSA investigations, *see id.* § 195.65; *see also* 49 U.S.C. § 60118(e)(1); maintain safety data sheets, *see* 49 C.F.R. § 195.65; and conduct inspections on newly installed pipelines, *see id.* §§ 195.204, 195.206. "[E]ach operator" must "prepare and follow for each pipeline system a manual of written procedures for conducting normal operations and maintenance activities and handling abnormal operations and emergencies," with requirements for ongoing review. *Id.* § 195.402. Each operator must "establish and conduct a continuing training program to instruct emergency response personnel" and "require and verify that its supervisors maintain a thorough knowledge" of the same, *id.* § 195.403, and "maintain current maps and records of its pipeline systems" plus "3 years [of] daily

operating records," *id.* § 195.404. Operators must inspect pipelines "at intervals not exceeding 3 weeks," *id.* § 195.412; "have a communication system" covering the whole pipeline, § 195.408; "maintain adequate firefighting equipment at each pump station and breakout tank area," *id.* § 195.430; and secure pump station areas and post public contact signs, *see id.* §§ 195.434–195.436. Operators "must have and follow written control room management procedures" to ensure adequate oversight. *Id.* § 195.446. And operators bear ultimate responsibility for "any requirement" in the PSA and its regulations. *Id.* § 195.10.

The PSA and Part 195 thus ensure operators have, as Chapter 25B puts it, the "skills, training, and resources necessary" to operate safely. If an operator fails to comply (or, in Chapter 25B's language, engages in "non-compliant or unsafe operations"), it faces the PSA's sweeping enforcement authority: emergency shutdowns, injunctions, remedial orders, and civil and criminal penalties. *See, e.g.*, 49 U.S.C. §§ 60117(p)(1), 60118(b), 60120, 60122(a), 60123(a); *see also* SAC ¶¶ 47, 100.

Chapter 25B, as applied to the pleaded facts here, intrudes upon this fully occupied field by purporting to grant to the County the exclusive authority granted to PHMSA (or OSFM) by the PSA and its implementing regulations. The County claims a broad right to determine what constitutes "unsafe operations" (regardless of whether such operations comply with the PSA), and to shut down any pipeline run by an operator the County deems to lack the "skills, training, and resources necessary" to operate safely (even if that operator is in full compliance with the PSA and its implementing regulations and authorized by PHMSA/OSFM to operate). *See* SAC ¶¶ 162–173.

Intervenors argue that Chapter 25B's "Operator Capability" provision "is concerned with the company as a whole," while the PSA regulates only individuals, analyzing a single provision: 49 U.S.C. § 60102(a)(2)(C). *See* Mot. at 14, 16. But this claimed distinction is false: the very next provision of the PSA, § 60102(a)(3),

states that "[t]he operator of a pipeline facility shall ensure that employees who operate and maintain the facility are qualified to operate and maintain the pipeline facilities," making the *operator* responsible for the safe operation of its pipeline *through* its employees. Intervenors' claimed distinction is also illogical: the County's judgment that a pipeline operator lacks "the skills, training, and resources necessary to operate the permitted facility," § 25B-10(a)(9), is fundamentally a judgment about the *employees* of an operator. By its very nature, a corporate entity cannot have "skills" or "training."

Although Intervenors provide a granular statutory analysis allegedly distinguishing between 49 U.S.C. § 60102(a)(2)(C) and Chapter 25B-10(a)(9), in so doing they miss the forest for the trees—and ignore settled field preemption law. *See Crosby*, 530 U.S. at 373 ("For when the question is whether a Federal act overrides a state law, *the entire scheme of the statute must of course be considered* and *that which needs must be implied is of no less force* than that which is expressed." (emphasis added)). The County's claimed power under Chapter 25B conflicts with the PSA's comprehensive pipeline-safety scheme, which extensively governs operator qualifications. *See* SAC ¶¶ 42, 45, 99–100, 163; *Olympic Pipe Line*, 437 F.3d at 877–80.

The County invades this comprehensive scheme with its vague standard that it will determine whether a proposed operator "has the skills, training, and resources necessary to operate the permitted facility" and whether that operator has "a record of non-compliant or unsafe operations systemic in nature for similar facilities." County Code § 25B-10(a)(9). The County contends in its motion that "[t]o comply with both [Chapter 25B and the PSA]," an applicant would need "to wait to apply for the Special Permit [from PHMSA, pursuant to 49 U.S.C. § 60118(c) and 49 C.F.R. § 190.341] *until after its FDP application is approved under Chapter 25B*." Cnty. Mot. at 18 (emphasis added). The County further claims that Sable "prematurely applied for a Special Permit" by first seeking PHMSA approval,

thereby "manufacturing" a conflict with Chapter 25B. *Id.* In other words, the County claims the right to determine *in the first instance* whether a pipeline can be safely operated by a particular operator and that PHMSA cannot "prematurely" issue a Special Permit until *after* the County has approved. This is the exact sort of piecemeal, local regulation that field preemption forbids. *See Williams Pipe Line*, 651 F. Supp. at 569 (finding that if each jurisdiction were "entitled to demand compliance with their own safety standards, the clear Congressional goal of a national standard for hazardous liquid pipeline safety would be thwarted."); Order at 14 ("Federal legislation seeks to provide 'a national hazardous liquid pipeline safety program with nationally uniform minimal standards and with enforcement administered through a Federal–State partnership.'" (quoting *Olympic Pipe Line*, 437 F.3d at 877–78)). As in *Arizona v. United States*, so too here: "the [County] would have the power to bring criminal charges" and other enforcement actions, leaving the "federal officials in charge of the comprehensive scheme" unable to effectively control their regulated industry, which "would frustrate federal policies." 567 U.S. at 402. Petitioners have stated a claim for field preemption.

### C. Petitioners Have Stated a Claim for Conflict Preemption.

Petitioners have also plausibly pleaded conflict preemption. Courts "will find preemption where it is impossible for a private party to comply with both state and federal law, and where under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 372 (internal citation and quotation marks omitted); *see Haaland v. Brackeen*, 599 U.S. 255, 287 (2023) ("[W]hen Congress enacts a valid statute pursuant to its Article I powers, state law is naturally preempted to the extent of any conflict with a federal statute. End of story." (internal citation and quotation marks omitted)).

This Court's "analysis of implied conflict preemption is 'substantially identical' to [its] express preemption analysis." *Am. Apparel & Footwear Ass'n,*

*Inc. v. Baden*, 107 F.4th 934, 943 (9th Cir. 2024). And here, "[t]he scope of the Pipeline Safety Act's preemption provision is extensive," and "demonstrate[s] Congressional intent to interpret 'safety standard'—and thus the preemption provision—broadly." *Enbridge Energy*, 813 F. Supp. 3d at 794); *see also Couser*, 139 F.4th at 669 (concluding that the PSA's "Congressional grant of exclusive federal regulatory authority precludes state decision-making in this area altogether."). The numerous cases Intervenors advance for the legal standard are in accord. Although "*tension* between federal and state law is not enough to establish conflict preemption . . . state law is preempted to the extent it *actually interferes with the methods* by which the federal regulatory scheme was designed to reach its goal." *Am. Apparel*, 107 F.4th at 943 (emphasis added) (internal quotation marks omitted); *see also Shroyer v. New Cingular Wireless Servs., Inc.*, 498 F.3d 976, 988 (9th Cir. 2007) ("[W]e will find conflict preemption . . . where *conflicts* will necessarily arise." (emphasis added)). Or put another way, "state law is naturally preempted to the extent of any *conflict* with a federal statute. End of story." *Haaland v*, 599 U.S. at 287 (emphasis added) (internal quotation marks omitted).

Intervenors argue that "the allegations do not plausibly show that compliance with both the PSA and Chapter 25B is impossible," because Petitioners do not point to a "finding" in the Special Permit that conflicts with the denial of the Transfers or that the County's denial "withdrew" or "amended" the FDPs. Mot. at 20. These arguments twist the simply pleaded facts. Here, conflict preemption "will necessarily arise," *Shroyer*, 498 F.3d at 988, because it is impossible for Petitioners to comply with both PHMSA's Special Permit and the County's denial of the Transfers, *see* SAC ¶¶ 99, 171–172. The Special Permit authorizes ***Sable*** and not any other entity to operate the Facilities "after finding that it would be a safe operator and is acting in compliance with the law," and so requires Sable to act as the owner and operator of the Facilities by making it responsible for ongoing inspection, testing, and repair pursuant to the Special Permit's requirements. *See id.* ¶¶ 99, 171–

172; *id.* Ex. 11; *see also* RJN, Ex. 1 at 5. Yet the County has denied the Transfers, and thus, according to the County, Sable *cannot* act as the owner or operator of the Facilities. The County asserts the right to seek an injunction (without showing irreparable harm or inadequacy of a legal remedy) preventing Sable from performing PHMSA-ordered tests or making necessary repairs, and to seek civil and criminal penalties against Sable for doing what Special Permit requires. *See* Chapter 25B-13; SAC ¶¶ 56, 172; County Mot. at 18. This "actually interferes with the methods by which" the PSA regulates pipelines and pipeline-operator safety by frustrating PHMSA's ability to compel compliance with the PSA's comprehensive regulatory scheme. *Am. Apparel*, 107 F.4th at 943.

Intervenors advance only one case that (allegedly) comes out the other way: *Washington Gas Light*, 711 F.3d 412. But, as explained *supra* pp. 9, that case concerned zoning regulations, and an analysis of the statutory text revealed that safety considerations were "incidental." *See id.* at 421–22. In *Washington Gas Light*, plaintiff was "seeking zoning approval to add LNG storage tanks" to a facility near a subway station when the County adopted zoning plans that "were aimed at maximizing 'transit-oriented development' in the area around the [subway station]" and so "prohibited all industrial usage in that area." *Id.* at 414–15. Those facts are irrelevant to the facts here, where Chapter 25B's plainly-stated purpose is "to protect public health and safety . . . by ensuring . . . safe operation . . . of certain oil and gas facilities," pursuant to which § 25B-10(a)(9) empowers the County to determine whether "[t]he proposed operator has the skills, training, and resources necessary to operate the permitted facility" and to require "sufficient assurance that the proposed operator does not reflect a record of non-compliant or unsafe operations systemic in nature for similar facilities to those being considered for operatorship." Chapter 25B-10(a)(9); *see* SAC ¶¶ 51, 55.

In response, Intervenors argue that, because the County has not yet taken an enforcement action, denial of the Transfers did not "affect[] Sable's operations" and

Petitioners' theory is "nothing more than a 'sheer possibility.'" Mot. at 20–21 (quoting *Iqbal*, 556 U.S. at 678). Not so. As discussed *supra* p. 10 n.3, Petitioners may bring this case because the County continuously asserts the *right* to shut down the Facilities and civilly and criminally charge Sable for making federally ordered repairs. *See, e.g.*, *Susan B. Anthony List*, 573 U.S. at 165; *Bryant*, 1 F.4th at 289; *Matsumoto*, 122 F.4th at 797–98; *Nat'l Org. of Veterans' Advocs*, 981 F.3d at 1379–80.

*Even if* Intervenors had shown that the PSA's express preemption clause did not foreclose the County's regulation of pipeline safety, and *even if* Intervenors had shown that the PSA's field preemption did not foreclose the County's regulation of pipeline-operator safety, their motion would still fail for this reason alone.

## V. CONCLUSION

For the reasons articulated above, Intervenors' motion to dismiss should be denied.

Dated: September 15, 2026

Respectfully submitted,

LATHAM & WATKINS LLP

By: /s/*Jessica Stebbins Bina*

Jessica Stebbins Bina
*Jessica.stebbinsbina@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Tel.: (424) 653-5500
Fax: (424) 653-5501

Attorneys for Plaintiffs and Petitioners Sable Offshore Corp., Pacific Pipeline Company, and Pacific Offshore Pipeline Company

O'MELVENY & MYERS LLP

By: /s/*Lauren Kaplan*

Lauren Kaplan (Bar No. 294703)
*lkaplan@omm.com*
Dawn Sestito (Bar No. 214011)
*dsestito@omm.com*
400 South Hope Street, 19th Floor
Los Angeles, California 90071
Telephone: +1 213.430.6000
Facsimile: +1 213.430.6407

Attorneys for Petitioners and Plaintiffs Exxon Mobil Corporation, Mobil Pacific Pipeline Company, and ExxonMobil Pipeline Company

**ATTESTATION STATEMENT**

I, Jessica Stebbins Bina, am the ECF User whose identification and password are being used to file this Opposition to Intervenors' Motion to Dismiss. Pursuant to Local Rule 5-4.3.4(a)(2)(i), I attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

/s/*Jessica Stebbins Bina*
Jessica Stebbins Bina

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Petitioners Sable Offshore Corp., Pacific Pipeline Company, and Pacific Offshore Pipeline Company, certifies that this brief contains 6,747 words, which complies with L.R. 11-6.1.

Dated: September 15, 2026 /s/*Jessica Stebbins Bina*
Jessica Stebbins Bina